**ORAL ARGUMENT NOT YET SCHEDULED**

---

**Appeal No. 23-7016**

---

UNITED STATES COURT OF APPEALS

FOR THE DISTRICT OF COLUMBIA CIRCUIT

➤➤◄◄

ZHONGSHAN FUCHENG INVESTMENT CO. LTD.,

Petitioner-Appellee,

v.

FEDERAL REPUBLIC OF NIGERIA,

Respondent-Appellant.

---

*On Appeal from the United States District Court*
*for the District of Columbia in Case No.* 1:22-cv-00170-BAH
*Honorable Beryl A. Howell*

---

**APPELLEE'S MOTION FOR SUMMARY AFFIRMANCE**

Emma Lindsay, Esq.
Jovana Crncevic, Esq.
WITHERS BERGMAN LLP
430 Park Avenue, 10th Floor
New York, New York 10022
Ph: (212) 848-9800
Fax: (212) 848-9888
Emma.Lindsay@withersworldwide.com
Jovana.Crncevic@withersworldwide.com
*Counsel for Petitioner-Appellee*
*Zhongshan Fucheng Industrial*
*Investment Co. Ltd.*

.

# **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................1

BACKGROUND ....................................................................................3

ARGUMENT ........................................................................................4

   A.   The District Court Has Jurisdiction Under the FAA Because the Award Is Commercial as Required by the New York Convention .......................................7

   B.   Nigeria Is Not Immune Under the FSIA ....................................15

CONCLUSION ....................................................................................17

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*BCB Holdings Ltd. v. Gov't of Belize*,
   232 F. Supp. 3d 28 (D.D.C. 2017)....................................................................6

*Belize Social Dev. Ltd. v. Gov't of Belize*,
   794 F.3d 99 (D.C. Cir. 2015)...............................................................7, 12, 13

*Cascade Broad. Grp. Ltd. v. F.C.C.*,
   822 F.2d 1172 (D.C. Cir. 1987)..........................................................................2

*Chevron Corp. v. Ecuador*,
   795 F.3d 200 (D.C. Cir. 2015)............................................................................8

*Chevron Corp. v. Republic of Ecuador*,
   949 F. Supp. 2d 57 (D.D.C. 2013)....................................................................16

*Creighton Ltd. v. Gov't of State of Qatar*,
   181 F.3d 118 (D.C. Cir. 1999)..........................................................................17

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
   244 F. Supp. 3d 100 (D.D.C. 2017)....................................................................9

*Diag Human v. Czech Republic Ministry of Health*,
   824 F.3d 131 (D.C. Cir. 2016)............................................................7, 12, 14

*Gebre LLC v. Kyrgyz Republic*,
   No. CV 20-1795 (ABJ), 2022 WL 2132481 (D.D.C. June 14,
   2022) .............................................................................................................8, 10

*Gold Reserve Inc. v. Bolivarian Republic of Venezuela*,
   146 F. Supp. 3d 112 (D.D.C. 2015)....................................................................9

*Island Territory of Curacao v. Solitron Devices, Inc.*,
   356 F. Supp. 1 (S.D.N.Y.), aff'd, 489 F.2d 1313 (2d Cir. 1973) .....................11

*LLC SPC Stileks v. Republic of Moldova*,
   985 F.3d 871 (D.C. Cir. 2021)......................................................................8, 16

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
    27 F.4th 771 (D.C. Cir. 2022)...................................................................12

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
    962 F.3d 576 (D.C. Cir. 2020)................................................................12

*Saudi Arabia v. Nelson*,
    507 U.S. 349, 113 S. Ct. 1471, 123 L. Ed. 2d 47 (1993) ....................15

*Tatneft v. Ukraine*,
    21 F.4th 829 (D.C. Cir. 2021)......................................................8, 11, 12

*Tatneft v. Ukraine*,
    301 F. Supp. 3d 175 (D.D.C. 2018), aff'd, 771 F. App'x 9 (D.C.
    Cir. 2019 .............................................................................................5, 12

*Taxpayers Watchdog, Inc. v. Stanley*,
    819 F.2d 294 (D.C. Cir. 1987).................................................................2

*Walker v. Washington*,
    627 F.2d 541 (D.C. Cir. 1980).................................................................2

**Statutes**

28 U.S.C. § 1605(a)(2)..................................................................................13

28 U.S.C. § 1605 (a)(6)(B) ...........................................................................15

Federal Arbitration Act Chapter 2, 9 U.S.C. §§ 201 *et seq.* .........................1

Federal Arbitration Act Chapter 2, 9 U.S.C. §§ 202 ....................................5

Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*......................1

**Other Authorities**

Restatement (Third) of Foreign Relations Law §§ 301, 487....................10

Restatement (Third) of Foreign Relations Law § 487 cmt f....................11

Restatement (Third) of U.S. Law of Int'l Com. & Inv. State Arb. §
    1.1, cmt. e. (2019) ............................................................................7, 10

# INTRODUCTION

Appellee Zhongshan Fucheng Industrial Investment Co. Ltd. ("**Zhongshan**" or "**Appellee**"), respectfully moves for summary affirmance of the January 26, 2023 Order and Memorandum Opinion by Chief Judge Beryl A. Howell of the United States District Court for the District of Columbia (the "**District Court**") denying the Motion to Dismiss Zhongshan's Petition to Confirm Foreign Arbitral Award ("**Motion to Dismiss**") filed by Appellant Federal Republic of Nigeria ("**Nigeria**" or "**Appellant**"), and finding personal jurisdiction over Nigeria and subject matter jurisdiction over the case.

Nigeria presents one issue for appeal in this case regarding the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* (the "**FSIA**"): "Whether the district court erred in denying the Federal Republic's Motion to Dismiss for Lack of Jurisdiction under the [FSIA]." (*See* Appellant's Statement of Issues (March 16, 2023) (Doc. #1990435).) Specifically, and without any supporting legal authority, Nigeria argued in its Motion to Dismiss that jurisdiction over it is improper pursuant to Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201 *et seq.* (the "**FAA**"), because Zhongshan's Award, obtained through an arbitration against Nigeria under the bilateral investment treaty between Nigeria and the People's Republic of China

(the "**China-Nigeria BIT**") (*see* R. 2-2),[1] is unenforceable under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "**New York Convention**") since it does not arise out of a legal relationship that is considered commercial.

It is indisputable that the Award, which arises out of Nigeria's unlawful expropriation of Zhongshan's multi-million-dollar investment in a free trade zone in Nigeria's Ogun State, has a connection with commerce under this Circuit's broad and well-settled interpretation of the word "commercial" and thus falls under the New York Convention as in other cases involving enforcement of arbitration awards arising out of investment treaties in this Circuit.  Summary affirmance is appropriate because the "merits of this appeal are so clear as to make summary affirmance proper[,]" *Walker v. Washington*, 627 F.2d 541, 545 (D.C. Cir. 1980) (*per curiam*), and "no benefit will be gained from further briefing and argument of the issues presented." *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297-98 (D.C. Cir. 1987) (*per curiam*).  The current record before the Court comprises a "basis adequate to allow the fullest consideration necessary to a just determination," of this well-settled, discrete issue.  *Cascade Broad. Grp. Ltd. v. F.C.C.*, 822 F.2d 1172, 1174 (D.C. Cir. 1987) (citing *Sills v. Bureau of Prisons*, 761 F.2d 792, 794 (D.C. Cir.

---

[1] "R" refers to the District Court docket numbers. Copies of the Memorandum Opinion and Order are also attached.

1985)).  There is a "sound basis" for summary affirmance, which should be entered here.  (*See* D.C. Cir. Handbook of Practice and Internal Proc. at 36.)

## BACKGROUND

The present dispute stems from Nigeria's failure to pay a valid arbitral award for more than two years.  From 2010 to 2016, Zhongshan made substantial investments in Nigeria through the development, operation and management of the Ogun-Guangdong Free Trade Zone (the "**Zone**").  (*See* R. 1 (Petition, ⁋ 15).)  These investments were memorialized by a series of agreements including the 2010 Framework Agreement and the 2013 Joint Venture Agreement ("**JVA**").  (*See id.*, ⁋⁋ 16–17.)

On August 30, 2018, Zhongshan commenced arbitration proceedings against Nigeria under the China-Nigeria BIT and sought damages for its losses beginning in 2016 caused by Nigeria "terminating [Zhongshan's] management of the Free Trade Zone, expropriating its shareholding rights in the Zone management company and forcibly removing and chasing its employees out of the country."  (R. 24-4 (Statement of Claim, ⁋ 2); *see also* R. 1 (Petition, ⁋⁋ 18–23).)

On March 26, 2021, the arbitral tribunal rendered a Final Award finding that Zhongshan was a protected investor and held a qualifying investment pursuant to the China-Nigeria BIT.  (*See* R. 2-1 (Award, ⁋ 77).)  The arbitral tribunal agreed with Zhongshan that Nigeria had violated Zhongshan's rights protected by the China-

3.

Nigeria BIT, including violation of the fair and equitable treatment obligation and expropriation.  (R. 2-1 (Award, ⁋⁋ 121–132); R. 24-1 (Motion to Dismiss, at 6).) Through a detailed award, the tribunal ordered Nigeria to pay Zhongshan more than USD $65 million in compensation for the loss of its rights in the Zone under the 2010 Framework Agreement and the 2013 JVA as well as for moral damages.  (*See* R. 2-1 (Award, ⁋⁋ 133–197).)

After withdrawing an application to set aside this arbitration award in the United Kingdom, Nigeria still has not paid the Award.  On January 25, 2022, Zhongshan commenced this summary enforcement proceeding and filed a petition to enforce the Award pursuant to the FAA, which provides for the confirmation of arbitral awards falling under the New York Convention.  (*See* R. 1 (Petition, ¶ 1).) In response, Nigeria filed a motion to dismiss for lack of subject matter jurisdiction and personal jurisdiction under the FSIA.  (*See* R. 24-1.)

On January 26, 2023, the District Court denied Appellant's Motion to Dismiss Zhongshan's Petition for Enforcement finding both personal and subject matter jurisdiction over Nigeria.  (*See* R. 28 (Order); R. 29 (Memorandum Opinion).)  This appeal followed.

## **ARGUMENT**

For the District Court to have subject matter jurisdiction over Zhongshan's petition to enforce its Award against Nigeria, there must be (1) "a basis upon which

4.

a court in the United States may enforce a foreign arbitral award," and (2) the foreign state "must not enjoy sovereign immunity from such an enforcement[.]" *Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 185 (D.D.C. 2018), *aff'd*, 771 F. App'x 9 (D.C. Cir. 2019), and *aff'd*, 21 F.4th 829 (D.C. Cir. 2021). The District Court did not err in finding that Zhongshan's Petition satisfied both requirements "under the binding precedent of the D.C. Circuit, requiring denial of Nigeria's motion to dismiss." (R. 29 (Memorandum Opinion, at 1).)

Nigeria sought to dismiss Zhongshan's petition on the grounds of sovereign immunity under the FSIA on the basis of a sole argument—that the Award is not enforceable under the New York Convention because the Convention applies only to awards that arise out of a commercial relationship and, in Nigeria's submission, Zhongshan's Award does not because it arises out of the China-Nigeria BIT. (R. 24-1 (Motion to Dismiss, at 2).)

As reflected in the District Court's decision below, Nigeria is incorrect as a matter of law and "[its] novel argument contradicts U.S. courts' regular confirmation of arbitral awards rendered under similar treaties." (R. 29 (Memorandum Opinion, at 13).) The uncontroverted facts and applicable law confirm that Zhongshan's Award "aris[es] out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title," and thus "falls under the Convention." FAA § 202. Nigeria

did not proffer a single case from any U.S. court that rejected enforcement under the New York Convention of an investment treaty award like Zhongshan's on the basis that the award arises from a non-commercial relationship.

The District Court correctly decided based on this Court's precedent that (1) the Award for Nigeria's breaches of the China-Nigeria BIT causing damages to Zhongshan's investment arises out of a commercial relationship with Nigeria, and is enforceable under the New York Convention, and (2) Nigeria is not entitled to sovereign immunity under the well-established arbitration exception of the FSIA. Conversely, finding in favor of Nigeria based on the non-commerciality argument in its Motion to Dismiss would upend established D.C. Circuit jurisprudence enforcing investment treaty awards under the New York Convention and contradict the foundational principles upon which enforcement under the New York Convention has been conducted in U.S. courts pursuant to the FAA.

Because the District Court's denial of the Motion to Dismiss is so clearly correct based on the established precedent of confirming arbitral awards rendered pursuant to investment treaties, Zhongshan respectfully requests summary affirmance of the District Court Order and Memorandum Opinion.

A.    **The District Court Has Jurisdiction Under the FAA Because the Award Is Commercial as Required by the New York Convention**

The District Court did not err in deciding that Zhongshan's Award was commercial under the New York Convention and denying Nigeria's Motion to Dismiss on this basis.

The term "commercial" is "construed broadly" (*see BCB Holdings Ltd. v. Gov't of Belize*, 232 F. Supp. 3d 28, 41 (D.D.C. 2017)), and refers to "matters or relationships, whether contractual or not, that arise out of or in connection with commerce." *Belize Social Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 104 (D.C. Cir. 2015) (citing Restatement (Third) of U.S. Law of Int'l Comm. Arbitration § 1–1 (2012)); *see also Diag Human v. Czech Republic Ministry of Health*, 824 F.3d 131, 136 (D.C. Cir. 2016) ("In the field of international arbitration, 'commercial' refers to '"matters or relationships, whether contractual or not, that arise out of or in connection with commerce."' Accordingly, a matter may be commercial even if not contractual, 'so long as it has a connection with commerce'.") (internal citations omitted).  The phrase "involving commerce" has been interpreted in this Circuit to be the "functional equivalent of the more familiar term 'affecting commerce'–words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause Power[.]" *Belize Soc. Dev. Ltd.*, 794 F.3d at 104 (citing *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003).

7.

The Restatement (Third) of the U.S. Law of International Commercial and Investor–State Arbitration—cited by Nigeria in its Motion to Dismiss—confirms that "a dispute or award may be commercial even though one of the parties to it is a sovereign State and even though the dispute arises out of public regulatory acts. ***Accordingly, investor–State arbitrations, and investor–State awards, are commercial as defined here.***"  Restatement (Third) of U.S. Law of Int'l Com. & Inv. State Arb. § 1.1, cmt. e. (2019) (emphasis added).

Consequently, "[t]he D.C. Circuit has confirmed many arbitral awards in which sovereign nations have been found to breach treaty—rather than contract—obligations."  (R. 29 (Memorandum Opinion, at 13).)  *See e.g., Tatneft v. Ukraine*, 21 F.4th 829, 833 (D.C. Cir. 2021) (recognizing under New York Convention investor-State arbitral award rendered in Paris pursuant to "Russia–Ukraine Bilateral Investment Treaty," which "incorporate[d] the United Nations Commission on International Trade Law's (UNCITRAL) arbitration rules[,]" and finding that FSIA arbitration exception applies); *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 874 (D.C. Cir. 2021) (recognizing under New York Convention French investor-State arbitral award rendered pursuant to Energy Charter Treaty signed by both Ukraine and Moldova and finding that FSIA arbitration exception applies); *Chevron Corp. v. Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015) (recognizing under New York Convention investor-State arbitral award rendered pursuant to US–

8.

Ecuador BIT, which does not explicitly mention that awards arising thereunder are to be considered to arise out of commercial relationships, and finding that FSIA arbitration exception applies); *Gebre LLC v. Kyrgyz Republic*, No. CV 20-1795 (ABJ), 2022 WL 2132481, at *4 (D.D.C. June 14, 2022) (finding investor-State arbitral award rendered under 2003 Kyrgyz Investment Law, which does not explicitly mention the New York Convention, was governed by the Convention because "[t]he dispute [], which arose out of a series of license agreements between the parties to transfer shares of company stock and mine rare earth elements in Kyrgyzstan, arise[s] out of or in connection with commerce within the broad meaning of commercial…") (internal quotations omitted); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 105–08 (D.D.C. 2017) (recognizing under New York Convention investor-State arbitral award rendered in Washington D.C. pursuant to Canada-Venezuela bilateral investment treaty); *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 118–20 (D.D.C. 2015) (recognizing under New York Convention investor-State arbitral award rendered in Washington D.C. pursuant to Canada-Venezuela bilateral investment treaty).

Following this broad interpretive framework and consistent legal authority, the District Court correctly found that "Nigeria's attempts to cast the Final Award as arising from a non-commercial relationship lack support in D.C. Circuit

precedent." (R. 29 (Memorandum Opinion, at 10).)  None of Nigeria's arguments were availing given the weight and clarity of the case law.

*First*, the District Court did not err in finding that the Award arising out of the China-Nigeria BIT does not render the parties' legal relationship *per se* non-commercial.

Nigeria incorrectly argued that Zhongshan and Nigeria do not share a legal relationship that is considered commercial because "the Nigeria-China Treaty is comprehensively focused on regulating state conduct in the protection of investments" and is not "a commercial agreement between [Zhongshan] and Nigeria." (R. 24-1 (Motion to Dismiss, at 9).)  To the contrary, the regulation of such State conduct "arise[s] out of or in connection with commerce[,]" *Gebre LLC v. Kyrgyz Republic*, No. CV 20-1795 (ABJ), 2022 WL 2132481, at *4 (D.D.C. June 14, 2022), because the purpose behind regulating Nigeria's conduct is so the China-Nigeria BIT remains "conducive to stimulating [the] business initiative[s] of [] investors," like Zhongshan. (*See* R. 2.2 (China-Nigeria BIT, Preamble); *see also* Restatement (Third) of the U.S. Law of Int'l Comm. and Inv. State Arb. § 1.1, cmt. e., PFD (2019) ("[A] dispute or award may be commercial even though one of the parties to it is a sovereign State and *even though the dispute arises out of public regulatory acts*.") (emphasis added).

10.

Nigeria tried to support its baseless argument that "'international agreements,' like the Nigeria-China Treaty, that involve 'two or more states' and are 'governed by international law' are 'not subject to the New York Convention' because they are not commercial" (R. 24-1 (Motion to Dismiss, at 9)) by "quoting, barely Restatement (Third) of Foreign Relations Law §§ 301, 487 cmt. f)[.]" (R. 29 (Memorandum Opinion, at 11).)  The District Court found that "Nigeria, however, has cherry-picked the quoted text out of context."  (R. 29 (Memorandum Opinion, at 11).)  Instead, as the District Court pointed out (R. 29 (Memorandum Opinion, at 12)), that same Restatement expressly states that "[d]isputes arising out of investment agreements are *not* excluded by" the commercial reservation and that the reservation "excludes arbitration agreements and awards *arising out of matrimonial or custody disputes, disputes concerning succession to property, and labor disputes*, and for the United States also other disputes excluded from the United States Arbitration Act under 9 U.S.C. § 1."  Restatement (Third) of Foreign Relations Law § 487 cmt. f (emphasis added); *see also Island Territory of Curacao v. Solitron Devices, Inc*., 356 F. Supp. 1, 13 (S.D.N.Y.), *aff'd*, 489 F.2d 1313 (2d Cir. 1973) ("We may logically speculate that [the purpose of the commercial limitation] was to exclude matrimonial and other domestic relations awards, political awards, and the like.").

Nigeria did not cite any cases to support its argument that the Award should not be enforced under the New York Convention because there was not a commercial

11.

relationship.  Rather, Nigeria relied on *Tatneft*, where the Court recognized an investment arbitration award pursuant to the New York Convention under circumstances very similar to this case.  *See Tatneft v. Ukraine*, 301 F. Supp. 3d 175 181, 186–90 (D.D.C. 2018), *aff'd*, 771 F. App'x 9 (D.C. Cir. 2019), and *aff'd*, 21 F.4th 829 (D.C. Cir. 2021).[2]  Nigeria's other cases were inapposite because they addressed non-investment treaty awards and did not hold that investment treaty awards are non-commercial and unenforceable as Nigeria suggested.  *See Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 27 F.4th 771, 775–76 (D.C. Cir. 2022); *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 579, 586 (D.C. Cir. 2020); *Diag Human*, 824 F.3d at 134–37; *Belize Soc. Dev. Ltd.*, 794 F.3d at 103–05.

Consequently, "Nigeria ma[de] no convincing argument to explain away the crush of cases that undercut its theory." (R. 29 (Memorandum Opinion, at 15).)  The District Court correctly "decline[d] to swim upstream against the common practice of confirming arbitral awards rendered pursuant to violations of treaties based on

---

[2] Like the China-Nigeria BIT, the Russia-Ukraine BIT does not mention that the New York Convention applies to enforcements of awards arising under it.  Thus, *Tatneft* also plainly contradicts Nigeria's assertions that awards arising out of the China-Nigeria BIT "fall[] outside the ambit of the New York Convention" because the Convention only applies to Awards arising under treaties that "explicitly reference the New York Convention" or when parties "have agreed that the New York Convention applies[.]"  (R. 24-1 (Motion to Dismiss, at 10); *see also* R. 29 (Memorandum Opinion, at 14, n. 7 ("[A]s petitioner notes, not all arbitral awards that have been confirmed in the D.C. Circuit arise from treaties that expressly reference the New York Convention.")).)

[Nigeria]'s cherry-picked and partial quotation from a Restatement." (R. 29 (Memorandum Opinion, at 13–14).)

*Second*, the District Court did not err in finding that the arbitration record between the parties does not prove that the dispute was non-commercial. (*See* R. 29 (Memorandum Opinion, at 15-16).)

As detailed in Zhongshan's Statement of Claim in the arbitration and in the Award, Zhongshan invested millions of dollars in Nigeria from 2010-2016 to develop, operate and manage the Zone—plainly a commercial undertaking—only to have Nigeria destroy its significant investment beginning in 2016. (R. 24-4 (Statement of Claim, ⁋ 2); R. 1 (Petition, ⁋⁋ 15–23).) In arbitration, the Tribunal confirmed that Zhongshan had a qualifying investment under Article 1 of the China-Nigeria BIT and ordered Nigeria to pay damages to Zhongshan because Nigeria breached its BIT obligations to Zhongshan and damaged Zhongshan's investment.

The District Court pointed out that "the flaw" in Nigeria's argument "stem[med] from predication on a false dichotomy between sovereign and commercial conduct in the context of the New York Convention." (R. 29 (Memorandum Opinion, at 15).) The District Court noted that this Court "rejected this narrow view of the commercial reservation" in *Belize Social Dev. Ltd. v. Gov't of Belize,* 794 F.3d 99, 104–05 (D.C. Cir. 2015), where the Court declined to define the commercial reservation similarly to FSIA's "commercial activity" exception, 28

U.S.C. § 1605(a)(2), under which a foreign state is only held to "engage[]" in commercial activities when it acts in the manner of a private player within the market[,]" because "[u]nlike with the FSIA, Congress was not codifying the restrictive theory of foreign sovereign immunity when it ratified and implemented the New York Convention." (R. 29 (Memorandum Opinion, at 16).)

*Third*, the District Court did not err in finding that the absence of a contractual relationship between Zhongshan and Nigeria "falls short of showing that the instant parties' legal relationship is therefore not commercial." (R. 29 (Memorandum Opinion, at 17).)

"[A] matter may be commercial even if not contractual, 'so long as it has a connection with commerce.'" *Diag Human*, 824 F.3d at 136. It would defy this Court's precedent to see the China-Nigeria BIT, Zhongshan's investment in the development, management and operation of the Zone in Nigeria, Nigeria's destruction of the economic value of Zhongshan's investment, the arbitration of Zhonghan's claims against Nigeria under the China-Nigeria BIT, and the Award ordering Nigeria to pay Zhongshan more than $65 million in damages as anything other than commercial. Moreover, the China-Nigeria BIT "create[d] a legal framework" (R. 29 (Memorandum, at 19)) whereby, Zhongshan became entitled to the standards of treatment guaranteed by Nigeria under the China-Nigeria BIT by virtue of having invested in Nigeria and being an investor with a qualifying

14.

investment pursuant to Article 1 of the BIT.[3]  (*See* R. 29 Memorandum Opinion at 19).)

## B.    Nigeria Is Not Immune Under the FSIA

Because the Award falls under the New York Convention, the District Court has subject matter jurisdiction over Appellant under the established FSIA arbitration exception to sovereign immunity.  *See* 28 U.S.C. § 1605 (a)(6)(B) (codifying the arbitration exception).  Under the FSIA, a foreign state is presumptively immune from the jurisdiction of the United States courts, unless a specified exception applies.  *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S. Ct. 1471, 1476, 123 L. Ed. 2d 47 (1993).[4]  The arbitration exception allows U.S. courts to confirm arbitral awards rendered outside of the United States that are (1) "made pursuant to [] an agreement to arbitrate," and (2) are "governed by a treaty or other international agreement in force [in] the United States calling for the recognition and enforcement

---

[3] Article 1 defines investment to mean "every kind of asset invested by investors of one Contracting Party[,] in accordance with the laws and regulations of the other Contracting Party in the territory of the latter" and provides a non-exhaustive list of the types of assets that an investor can invest in the host State so as to render the investment relationship subject to the protection of the China-Nigeria BIT. (R. 2-2 (China-Nigeria BIT, Art. 1).)  In the case of Zhongshan's investment, these assets were clearly commercial and included "(a) movable and immovable property as well as […] property rights," "(b) shares", "(c) claims to money or to any other performance having an economic value associated with an investment[,]" and "(e) [a] business concession[] […] under contract permitted by law[.]" (*Id.*)

[4] The District Court noted that "Congress amended the FSIA in 1988 to include the arbitration exception, ensuring that foreign agreements to arbitrate and arbitral awards governed by certain treaties would be enforceable in U.S. courts, even against sovereigns." (R. 29 (Memorandum Opinion, at 20, n. 8).)

of arbitral awards." *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 62 (D.D.C. 2013) (quoting 28 U.S.C. § 1605(a)(6)).

Under the FSIA's arbitration exception, "the existence of an arbitration agreement, an arbitration award and a treaty governing the award are all jurisdictional facts that must be established." *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021) (citing *Chevron Corp.*, 795 F.3d at 204).

Appellant concedes that personal and subject matter jurisdiction exists "if [Zhongshan] establishes an exception to the FSIA applies to lift Nigeria's sovereign immunity protections" and that "once shown, the sovereign bears the ultimate burden of persuasion to show the exception does not apply." (R. 24-1 (Motion to Dismiss, at 6–7).) Appellant cannot carry its burden of persuasion here where all three requirements of the arbitration exception are met.

*First*, as to the existence of an arbitration agreement, Appellant does not dispute that both parties consented to arbitration—Nigeria via Article 9 of the China-Nigeria BIT and Zhongshan via filing a Request for Arbitration. (R. 29 (Memorandum Opinion, at 21); R. 1 (Petition ¶¶ 24–25).) *Second*, as to an arbitration award, there is no dispute that the Award exists. (R. 2-1 (Award).) *Third*, as confirmed by the District Court, the Award is governed by the New York Convention which is "exactly the sort of treaty Congress intended to include in the

16.

arbitration exception." *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 123–24 (D.C. Cir. 1999) (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1018 (2d Cir. 1993)).  Therefore, the District Court did not err in holding that it has subject matter jurisdiction over Appellant to enforce Appellee's Award.

## <u>CONCLUSION</u>

Because the District Court's denial of the Motion to Dismiss was so clearly correct based on the established precedent of confirming arbitral awards rendered pursuant to investment treaties, Zhongshan respectfully requests that the Court summarily affirm the District Court's Order and Memorandum Opinion below.

Dated:     March 31, 2023

Respectfully submitted,

By:   */s/ Emma Lindsay*
_____
Emma Lindsay
Jovana Crncevic
WITHERS BERGMAN LLP
430 Park Avenue
New York, New York 10022
Telephone: (212) 848-9800
Fax: (212) 848-9888
Emma.Lindsay@withersworldwide.com
Jovana.Crncevic@withersworldwide.com

*Counsel for Petitioner-Appellee Zhongshan*
*Fucheng Industrial Investment Co. Ltd.*

17.

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. R. 27(d)(1)(E)(2) because the brief contains 3,974 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

The brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P 32(a)(6) because the brief uses the proportionally spaced typeface Microsoft Word 14-point Times New Roman.

/s/ Emma Lindsay
Emma Lindsay
Jovana Crncevic
*Counsel for Petitioner-Appellee*
*Zhongshan Fucheng Industrial*
*Investment Co. Ltd.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 31st day of March, 2023, I electronically filed Appellee Zhongshan Fucheng Industrial Investment Co. Ltd.'s Motion for Summary Affirmance with the Clerk of the United States Court of Appeals for the D.C. Circuit by using the Court's CM/ECF system, which will serve all counsel of record.

/s/ Emma Lindsay
Emma Lindsay
Jovana Crncevic
*Counsel for Petitioner-Appellee*
*Zhongshan Fucheng Industrial*
*Investment Co. Ltd.*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ZHONGSHAN FUCHENG INDUSTRIAL INVESTMENT CO., LTD.,<br><br>Petitioner,<br><br>v.<br><br>FEDERAL REPULIC OF NIGERIA,<br><br>Respondent. | Civil Action No. 22-170 (BAH)<br><br>Chief Judge Beryl A. Howell |

## <u>ORDER</u>

Upon consideration of the respondent's Motion to Dismiss, ECF No. 24, the related legal memoranda in support and in opposition, the attachments thereto, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby—

**ORDERED** that the respondent's Motion to Dismiss is **DENIED**; it is further

**ORDERED** that the parties shall submit jointly, by February 18, 2023, a schedule to govern further proceeds in this matter.

**SO ORDERED.**

Date: January 26, 2023

*This is a final and appealable Order.*

_____
BERYL A. HOWELL
Chief Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ZHONGSHAN FUCHENG INDUSTRIAL
INVESTMENT CO., LTD.,

                    Petitioner,

                    v.

FEDERAL REPULIC OF NIGERIA,

                    Respondent.

Civil Action No. 22-170 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

Petitioner Zhongshan Fucheng Industrial Investment Co., Ltd. ("Zhongshan") instituted this suit against Respondent, the Federal Republic of Nigeria ("Nigeria"), to enforce an arbitration award that—nearly two years after issuance—Nigeria has failed to pay. Nigeria now moves to dismiss the petition for lack of subject matter jurisdiction and personal jurisdiction, pursuant to Federal Rules of Civil Procedure 12(b)(1)–(2), on the grounds of sovereign immunity not exempted under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* *See* Resp't's Mot. Dismiss for Lack of Jurisdiction Under the FSIA ("Resp't's Mot."), ECF No. 24. Petitioner counters that the requirements of the FSIA's arbitration exception are met, and jurisdiction may therefore be exercised. *See* Pet'r's Mem. Opp'n Resp't's Mot. Dismiss ("Pet'r's Opp'n"), ECF No. 26. For the reasons explained below, petitioner has the better of the arguments under the binding precedent of the D.C. Circuit, requiring denial of Nigeria's motion to dismiss.

## I.      BACKGROUND

A.      **Nigeria's Seizure of Zhongshan's Assets**

The present dispute emerges from a Chinese business investment in Nigeria—once successful enough to have garnered coverage by the Economist Intelligence Unit as an example of "China's economic model in Africa"—that ended in the expropriation of the company's assets, the flight of its executives from Nigeria after one executive was arrested at gunpoint and physically beaten by the police, and, ultimately, a $55-million-plus arbitration award against Nigeria.[1]   The locus of the saga is a free-trade zone, called the Ogun Guangdong Free Trade Zone, in Nigeria's southwestern region in Ogun State, not far from Lagos.

As set forth in the arbitral tribunal's findings of facts in its Final Award, ECF No. 2-1, starting in 2007, Ogun State contracted with various Chinese companies, including petitioner, to develop the subject free-trade zone.  Specifically, Ogun State entered an agreement with Guangdong Xinguang International China-Africa Investment Ltd. ("CAI") and CCNC Group, Ltd., pursuant to which the three entities would jointly own the Ogun Guangdong Free Trade Zone Company ("OGFTZ") for a period of 99 years, and CAI would lead the development of the Zone, encompassing nearly 8 square miles of land.  *See* Decl. of Hussein Haeri Supp. Pet. Recognize & Enforce Foreign Arbitral Award ("Haeri Decl. Supp. Pet."), Ex. A, Final Arbitration Award dated March 26, 2021 ("Final Award") ¶¶ 4–5, ECF No. 2-1.  After three years of limited progress, on June 29, 2010, OGFTZ entered an agreement with petitioner's parent company, Zhuhai Zhongfu Industrial Group Co. Ltd. ("Zhuhai"), giving Zhuhai control of developing and operating a fraction of the Zone's area into Fucheng Industrial Park.  *Id.* ¶¶ 6–8.

---

[1]      The Economist Intelligence Unit's profile of the Ogun Guangdong Free Trade Zone was referenced by the arbitral tribunal in its final award decision.  *See* Decl. of Hussein Haeri Supp. Pet. Recognize & Enforce Foreign Arbitral Award ("Haeri Decl. Supp. Pet."), Ex. A, Final Arbitration Award dated March 26, 2021 ("Final Award") ¶ 127, ECF No. 2-1; Economist Intelligence Unit, Zones of Influence (last accessed January 21, 2023), https://growthcrossings.economist.com/video/zones-of-influence/.

That year, Zhuhai effectively transferred its rights to petitioner, which operated in Nigeria

through its wholly-owned Nigerian subsidiary Zhongfu International Investment (NIG) FZE

("Zhongfu").  *Id.* ¶¶ 3, 9.[2]

From 2010 until the breakdown of the relationship in 2016, Zhongfu invested substantial

assets into developing Fucheng Industrial Park.  For example, to attract industrial lessees to the

Park, Zhongfu built roads, upgraded communications, sewage, and power systems, and opened

community services including a hospital, hotel, supermarket, and bank.  *Id.* ¶¶ 21–22.  By early

2014, the Park had attracted approximately sixteen businesses.  *Id.* ¶ 23.  During this period,

CAI's management of the overall Zone had apparently broken down, resulting in Ogun State's

termination of the company's participation in the OGFTZ in 2012 and appointment of Zhongfu

to take its place as part owner of the OGFTZ in 2013.  *Id.* ¶¶ 13–20.

Zhongfu's woes began in April 2016, when the Secretary of Ogun State indicated in a

letter to OGFTZ—apparently on the advice of the Chinese Consulate in Lagos—that CAI had

been acquired by Guangdong New South Group ("NSG"), and that this transfer may have

somehow entitled NSG, rather than Zhongfu, to ownership of the Zone.  *Id.* ¶¶ 33–34.  Ogun

State had received a *note verbale*, a diplomatic note, from the Economic and Commercial

Section of the Chinese consulate in Lagos, dated March 11, 2016, which stated that the

acquisition of CAI "will legally lead to the replacement of the management rights of the OGFTZ

which is now in the hands of [Zhongfu] to Guangdong New South Group."  *Id.* ¶ 33.[3]  In May

---

[2]  The tribunal noted in its Final Award that, although Zhongfu had apparently assumed Zhuhai's interests in the Zone by 2010—as reflected in an October 10, 2010-dated deed entitling Zhuhai to delegate its rights and obligations to third parties—the assignment of interests between Zhuhai and Zhongfu was formalized in a January 15, 2013 document.  Final Award ¶ 16, ECF No. 2-1.

[3]  This detail of the Chinese government's involvement in—if not outright instigation of—Ogun State's ejection of Zhongfu from the Zone did not detain the arbitral tribunal for long, and Nigeria apparently did not call, or even "suggest[]," that any agents of the Chinese government could be identified to provide evidence of the underlying reasons for replacement of petitioner with NSG as manager of the Zone.  Final Award ¶¶ 93–94.  The tribunal's admitted lack of clarity on this element of the underlying facts is unsettling in light of the whisper in the

2016, according to petitioner, Ogun State purported to terminate its 2013 agreement that appointed Zhongfu as part owner of the Zone, and reneged on the 2010 agreement that had given Zhongfu and Zhongshan management rights of the Fucheng Industrial Park.  Pet'r's Pet. to Recognize & Enforce Foreign Arbitral Award ("Pet.") ¶¶ 18–19, ECF No. 1.  In July 2016, Ogun State's Secretary texted Zhongshan's managing director Jianxin Han, urging him to "leave peacefully when there is opportunity to do so," and the following month, warrants were issued for the arrest of Han and Wenxiao Zhao, who had served as the Chief Financial Officer of the OGFTZ.  Final Award ¶¶ 37, 39.  Zhao was arrested at gunpoint, physically beaten, and detained for ten days by police before he and Han could flee the country—unceremoniously closing the book on Zhongshan's management of the OGFTZ and Fucheng Industrial Park.  *Id.* ¶¶ 39–40.

### B.      Subsequent Arbitration Proceedings

Petitioner commenced an arbitration proceeding against Nigeria on August 30, 2018 pursuant to a bilateral treaty between Nigeria and China.  Pet. ¶ 22–23.[4]  The bilateral investment treaty, called the Agreement Between the Government of the People's Republic of China and the

---

Final Award's pages that Zhongfu's administration of the Zone might have fallen short of expectations.  *See, e.g., id.* ¶ 29 (noting a May 18, 2015-dated letter from the Secretary of Ogun State complaining about Zhongfu's performance); *id.* ¶¶ 115–120 (noting that the parent companies of CAI and Zhongfu signed an "entrustment of equity management agreement" in March 2012, in which CAI's share of the Zone would be "entrusted" to Zhongfu—a detail that the arbitral tribunal apparently found perplexing and about which it "had an initial degree of concern about the accuracy" of Zhongfu's witness's testimony, but that it ultimately found irrelevant).  The factual findings by the arbitral tribunal, however, are not reviewable by this Court, nor are they presently challenged by Nigeria.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 110 (D.D.C. 2017) (describing courts' deferential standard in reviewing foreign arbitral awards as "allowing vacatur of an award not if 'the panel committed an error—or even a serious error' but 'only when [an] arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice'" (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671–72 (2010))).

[4]      Petitioner, via Zhongfu, initially sought relief through the Nigerian courts, initiating one lawsuit in the Federal High Court in Abuja, Nigeria, against Nigeria's Export Processing Zones Authority ("NEPZA"), the Attorney-General of Ogun State, and another company that was a partner of the OGFTZ, *see* Final Award ¶ 42, and another lawsuit in Ogun State High Court against OGFTZ, Ogun State, and the Attorney-General of Ogun State, *id.* The lawsuits sought reinstatement of Zhongfu's management and possession of the Zone based on the 2010 and 2013 contracts, *id.* ¶ 43, but both proceedings "were discontinued" in March and April 2018, *id.* ¶ 44.  Zhongfu also began arbitration proceedings in the Singapore International Arbitration Center against, *inter alia*, Ogun State, but that proceeding was enjoined by the Ogun State High Court.  *Id.* ¶ 45.

Government of the Federal Republic of Nigeria for the Reciprocal Promotion and Protection of

Investments ("China-Nigeria BIT"), represents an agreement between the countries to promote

bilateral investment by guaranteeing that the other country's investors would be treated equally

and protected from the nationalization of their investments.  *See generally* Haeri Decl. Supp.

Pet., Ex. B, China-Nigeria BIT, ECF No. 2-2.  Article 9 of the China-Nigeria BIT provides that,

when any dispute arises between one of the countries and an investor from the other country—

*e.g.*, a dispute between Nigeria and a Chinese investor—that cannot be resolved by the parties,

either party may request that an ad hoc arbitral tribunal settle the dispute with a binding decision.

*See id.* at Art. 9.

Petitioner brought five claims against Nigeria for breaches of the China-Nigeria BIT in

the arbitral action.  First, petitioner claimed that Nigeria violated its obligation of fair and

equitable treatment of Chinese investors under Art. 3(1).  Pet. ¶ 23.  Second, petitioner claimed

that Nigeria unreasonably discriminated against it, violating Art. 2(3), and third, that Nigeria

failed to provide the "continuous protection" afforded by Art. 2(2).  *Id.*  Fourth, petitioner

claimed that Nigeria violated its contract with petitioner, violating Art. 10(2).  *Id.*  Finally,

petitioner claimed that Nigeria wrongfully expropriated Zhongshan's investments without

compensation, in violation of Art. 4.  *Id.*

The London, United Kingdom-located arbitral tribunal rendered its Final Award on

March 26, 2021, finding that Nigeria had violated Zhongshan's rights under the China-Nigeria

BIT.  Specifically, the tribunal determined that Nigeria took actions that were "plainly designed

to deprive, and indeed succeeded in depriving, Zhongfu of its rights" under the 2010 and 2013

agreements.  Final Award ¶¶ 125–26.  In addition, the tribunal found that Ogun State, Nigeria's

Export Processing Zones Authority ("NEPZA"), and the police—all state actors—took

discriminatory and coercive steps against Zhongfu that resulted in Nigeria taking possession of Zhongfu's investment in the country. *Id*. ¶¶ 125–32. Nigeria was ordered to pay Zhongshan approximately $55.6 million in compensation for the expropriation, $75,000 in "moral damages," $9.4 million in interest calculated between the July 22, 2016-dated expropriation and rendering of the award, approximately $3 million in legal fees and costs related to the arbitration, approximately $430,000 in other costs, and post-Award interest on the preceding sums—a total figure approaching $70 million, and growing. Pet. ¶ 33.[5]

Nigeria has already tried and failed to shirk this arbitration award in the United Kingdom. Approximately one month after the Award's rendering, Nigeria filed an arbitration claim form in the English High Court, collaterally challenging the Award under the English Arbitration Act on the basis that the tribunal lacked jurisdiction. Although Nigeria later discontinued this challenge, petitioner was still not paid the sums awarded by the tribunal. *Id*. ¶¶ 35–41. On December 8, 2021, petitioner commenced enforcement proceedings in the United Kingdom, and the English court issued an order that recognized the Award. *Id.* ¶ 42.

## C. Instant Litigation

On January 25, 2022, Zhongshan initiated the instant lawsuit, pursuant to the Federal Arbitration Act (the "FAA"), which provides for confirmation of arbitral awards falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517 (the "New York Convention"), *see* 9 U.S.C. § 201–207. *See* Pet. ¶ 1. The FAA provides that the New York Convention is enforceable in the courts of the United States, to which courts a party may apply for an order confirming an arbitral award issued under the

---

[5] The Award enumerated certain of the damages—namely, the compensation, moral damages, and pre-Award interest on both—in U.S. dollars, and the legal fees and costs related to the arbitration in British pounds. As a result, the Court's calculation of the total figure, which converted all sums into U.S. dollars, is a mere estimate.

Convention. *Id.* §§ 201, 207.  In response, Nigeria filed the pending motion to dismiss for lack

of subject-matter and personal jurisdiction under the FSIA, contending that no exception to the

FSIA applies because the award does not fall under the New York Convention, Resp't's Mot.,

ECF No. 24, which motion petitioner opposes, Pet'r's Opp'n, ECF No. 26.  With briefing now

complete, *see* Resp't's Reply, ECF No. 27, Nigeria's motion to dismiss is now ripe for review.

## II.   LEGAL STANDARD

"Federal courts are courts of limited jurisdiction," *Gunn v. Minton*, 568 U.S. 251, 256

(2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)), and

"have only the power that is authorized by Article III of the Constitution and the statutes enacted

by Congress pursuant thereto," *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 980

(D.C. Cir. 2017) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)).  To

survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), plaintiff thus "bears

the burden of invoking the court's subject matter jurisdiction." *Arpaio v. Obama*, 797 F.3d 11,

19 (D.C. Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  "Where a

plaintiff has asserted jurisdiction under the FSIA and the defendant foreign state has asserted 'the

jurisdictional defense of immunity,' the defendant state 'bears the burden of proving that the

plaintiff's allegations do not bring its case within a statutory exception to immunity.'" *Belize*

*Social Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 102 (D.C. Cir. 2015) (quoting *Phoenix*

*Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).  Further, in deciding a

motion to dismiss on the basis of the FSIA, courts' subject-matter and personal jurisdictional

inquiries often collapse into the same question: "If none of the exceptions to sovereign immunity

set forth in the Act applies, the District Court lacks both statutory subject matter jurisdiction and

personal jurisdiction." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983).

*See also Schubarth v. Federal Republic of Germany*, 891 F.3d 392, 397 n.1 (D.C. Cir. 2018)

("Under the FSIA, personal jurisdiction exists where (1) subject matter jurisdiction has been

satisfied, and (2) proper service has been effected." (citing 28 U.S.C. § 1330(b))).  Nigeria does

not contend that service was improper, so the jurisdictional challenges merge.

When a jurisdictional skirmish "present[s] a dispute over the factual basis of the court's

subject matter jurisdiction . . . the court must go beyond the pleadings and resolve" any dispute

necessary to the disposition of the motion to dismiss.  *Feldman v. F.D.I.C.*, 879 F.3d 347, 351

(D.C. Cir. 2018) (quoting *Phoenix Consulting*, 216 F.3d at 40).  In such situations, the "court

may properly consider allegations in the complaint and evidentiary material in the record,"

affording plaintiff "the benefit of all reasonable inferences."  *Id.; see also Am. Freedom Law Ctr.

v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) ("In considering a motion to dismiss for lack of

subject matter jurisdiction . . . we 'may consider materials outside the pleadings in deciding

whether to grant a motion to dismiss for lack of jurisdiction.'" (quoting *Jerome Stevens Pharm.,

Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005))).  Absent "evidentiary offering[s],"

*Feldman*, 879 F.3d at 351, however, courts must seek jurisdictional assurance by accepting as

true all material "factual allegations in the complaint and contru[ing] the complaint liberally,"

and again "granting plaintiff the benefit of all inferences that can be derived from the facts

alleged."  *Am. Nat'l Ins. Co. v. F.D.I.C.,* 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal

quotation marks omitted).

## III.   DISCUSSION

For this Court to have subject matter jurisdiction over a petition to enforce a foreign

arbitral award against a foreign sovereign, two inter-related requirements must be satisfied: (1)

"there must be a basis upon which a court in the United States may enforce a foreign arbitral

award," and (2) the foreign state "must not enjoy sovereign immunity from such an

enforcement." *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999).

Both requirements are addressed in turn.

### A.  Jurisdiction under the Federal Arbitration Act

The New York Convention is an international treaty ratified by the United States that

provides for signatory states' recognition of arbitral awards "made in the territory of a State other

than the State where the recognition and enforcement of such awards are sought." *Process &*

*Indus. Dev. Ltd. v. Fed. Republic of Nigeria ("P&ID")*, 27 F.4th 771, 774 (D.C. Cir. 2022)

(quoting New York Convention, art. I(1)).  The FAA codified the New York Convention into

law, providing that "[a]n action . . . falling under the Convention shall be deemed to arise under

the laws and treaties of the United States," and granted district courts original jurisdiction over

such actions.  9 U.S.C. § 203.

For an arbitral award to "fall[] under the Convention," two requirements—both optional

elements of the New York Convention that the United States adopted at ratification—must be

satisfied.  *See* Restatement (Third) of the Foreign Relations Law of the United States § 487 cmts.

b, f (Am. L. Inst. 1987).  First, the arbitral award must be "rendered within the jurisdiction of a

signatory country," pursuant to the reciprocity reservation of the Convention.  *Creighton*, 181

F.3d at 123.  The United Kingdom, where the at-issue arbitration award was rendered, is a

member of the New York Convention.  *See* New York Arbitration Convention, Contracting

States, http://www.newyorkconvention.org/countries (last visited Jan. 22, 2023).  Second,

pursuant to the Convention's commercial reservation, which the United States adopted as a part

of a minority of the Convention's signatories, the award must "aris[e] out of a legal relationship,

whether contractual or not, which is considered as commercial."  9 U.S.C. § 202; *Belize Social Dev. Ltd.*, 794 F.3d at 103.  This commercial reservation is the basis for Nigeria's instant motion.

Nigeria argues that petitioner is "precluded from relying on the New York Convention to recognize and enforce the Award in this Court," because the China-Nigeria BIT giving rise to petitioner's arbitral award "does not establish a 'legal relationship . . . which is considered as commercial.'"  Resp't's Mot. at 8, 13 (quoting *Diag Human, S.E. v. Czech Republic Ministry of Health*, 824 F.3d 131, 136 (D.C. Cir. 2016)).  The FAA does not define the term "commercial," but the D.C. Circuit has interpreted the term expansively.  "In the context of international arbitration, 'commercial' refers to 'matters or relationships, whether contractual or not, that arise out of or in connection with commerce.'"  *Belize Social Dev. Ltd.*, 794 F.3d at 103–104 (quoting Restatement (Third) of U.S. Law of Int'l Comm. Arbitration § 1–1 (2012)); *see also id*. at 104 (noting the relationship between the "term's broad compass" and "the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power" (quoting *Citizens Bank v. Alafabco, Inc*., 539 U.S. 52, 56 (2003))).

Nigeria's attempts to cast the Final Award as arising from a non-commercial relationship lack support in D.C. Circuit precedent.  According to Nigeria, the China-Nigeria BIT is "quintessentially sovereign" and cannot form the basis for a commercial relationship between a private investor and either country.  *See* Resp't's Mot. at 13–15; Resp't's Reply at 13–15.  Next, Nigeria contends that Zhongshan conceded the non-commercial character of its relationship with Nigeria by litigating initially against Ogun State, as reflected in the arbitral record.  *See* Resp't's Mot. at 15–18; Resp't's Reply at 10–12; *see also supra* n.4.  Finally, Nigeria challenges the Final Award as being "unlike other arbitration awards routinely enforced in this Circuit" because this

Award did not arise from a business relationship between Nigeria and Zhongshan, but solely from the China-Nigeria BIT.  Resp't's Reply at 5.

Each argument is considered in turn and none is persuasive.

### 1.    *The Award's Basis in the China-Nigeria BIT Does Not Render the Parties' Legal Relationship* **Per Se** *Non-Commercial*

Nigeria asserts the bold argument that, as a matter of law, the China-Nigeria BIT cannot form the basis of an arbitral award that falls within the coverage of the New York Convention's commercial reservation.  Resp't's Mot. at 13–15.  Nigeria urges a distinction between "certain direct contractual arrangements between sovereigns and investors, which are subject to the New York Convention, and international treaties, which are not."  Resp't's Reply at 17.  The parties do not dispute that the China-Nigeria BIT is a treaty and, under Nigeria's reasoning, falls in the latter category.  *See* Resp't's Mot. at 14 (observing that "the Nigeria-China Treaty is comprehensively focused on regulating state conduct in the protection of investments" and is not "a commercial agreement between Petitioner and Nigeria").  Nigeria claims to derive this hardline distinction from the Restatement (Third) of Foreign Relations Law.  Resp't's Reply at 17–18; Resp't's Mot. at 14 ("'international agreements,' like the Nigeria-China Treaty, that involve 'two or more states' and are 'governed by international law' are 'not subject to the New York Convention' because they are not commercial" (quoting, barely, Restatement (Third) of Foreign Relations Law §§ 301, 487 cmt. f)).

Nigeria, however, has cherry-picked the quoted text out of context.  The relevant portion of § 487 comment f from the Restatement reads in full as follows:

Ordinarily, arbitration of a controversy of a public international law character, such as a boundary dispute or a dispute about interpretation of or performance under an international agreement (see § 301), is not subject to the New York Convention, and an

award resulting from such an arbitration is not subject to enforcement through civil

courts. *See* § 904 and Comment e thereto.

Restatement (Third) of Foreign Relations Law § 487 cmt. f.  Nigeria reasons that, as an

"international agreement" under Restatement (Third) of Foreign Relations Law § 301, the China-

Nigeria BIT is "'not subject to the New York Convention' because [it is] not commercial."

Resp.'s Mot. at 14 (quoting Restatement (Third) of Foreign Relations Law § 487).  Yet, this

comment does not broadly exclude *all* international agreements from the Convention's scope, as

Nigeria apparently reads the text.  Rather, the comment only excludes controversies "of a public

international law character," citing § 904 of the Restatement ("interstate arbitration"), which

concerns *only arbitrations between states*.  Of course, this arbitration took place between Nigeria

and Zhongshan, a private actor—not two states.

Moreover, the remainder of the comment makes clear the extremely narrow scope of the

commercial reservation's exclusion, which as noted does not cover *all* arbitrations arising under

international agreements.  Indeed, earlier in the same comment, the Restatement expressly

advises that "[d]isputes arising out of investment agreements are not excluded by" the

commercial reservation.  Restatement (Third) of Foreign Relations Law § 487 cmt. f.  The

Restatement goes on to explain that this reservation merely "excludes arbitration agreements and

awards *arising out of matrimonial or custody disputes, disputes concerning succession to*

*property, and labor disputes*, and for the United States also other disputes excluded from the

United States Arbitration Act under 9 U.S.C. § 1."  *Id.* (emphasis added).  *See also Island*

*Territory of Curacao v. Solitron Devices, Inc.,* 356 F. Supp. 1, 13 (S.D.N.Y. 1973) ("Research

has developed nothing to show what the purpose of the 'commercial' limitation was.  We may

logically speculate that it was to exclude matrimonial and other domestic relations awards, political awards, and the like.").[6]

Nigeria's novel argument contradicts U.S. courts' regular confirmation of arbitral awards rendered under similar treaties.  According to the logic of Nigeria's argument, any arbitral award rendered pursuant to a sovereign state's violation of a treaty created under public international law would be "*per se* noncommercial," Resp't's Mot. at 17, and fall outside of the New York Convention.  *See also* Resp't's Mot. at 15 (arguing that BITs, "as international agreement[s] governed by and applying public international law, fall[] outside the ambit of the New York Convention as a matter of U.S. foreign relations law").  The D.C. Circuit has confirmed many arbitral awards in which sovereign nations have been found to breach treaty—rather than contract—obligations.  *See, e.g., Tatneft v. Ukraine,* 21 F.4th 829 (D.C. Cir. 2021) (confirming arbitral award rendered pursuant to Ukraine-Russia BIT); *Chevron Corp. v. Ecuador*, 795 F.3d 200, 203–204 (D.C. Cir. 2015) (confirming arbitral award rendered pursuant to BIT between United States and Ecuador); *LLC Komstroy v. Republic of Moldova*, 2019 WL 3997385, *1–2 (D.D.C. Aug. 23, 2019) (confirming arbitral award pursuant to multilateral Energy Charter Treaty); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 105–108 (D.D.C. 2017) (confirming arbitral award resulting from Venezuelan expropriation of investments pursuant to BIT between Canada and Venezuela); *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 118–120 (D.D.C. 2015) (confirming arbitral award rendered pursuant to BIT between Canada and Venezuela).  This Court declines to swim

---

[6]     Nor does Nigeria's citation to the Restatement on International Commercial Arbitration support its argument, since this Restatement likewise embraces a broad definition of arbitral agreements, disputes, and awards that are "commercial" in nature.  *See* Restatement (Third) of the U.S. Law of Int'l Comm. and Inv'r-State Arbitration § 1.1, cmt. e (Am. Law Inst., Proposed Final Draft 2019) ("[A] dispute or award may be commercial even though one of the parties to it is a sovereign State and even though the dispute arises out of public regulatory acts.").

upstream against the common practice of confirming arbitral awards rendered pursuant to violations of treaties based on respondent's cherry-picked and partial quotation from a Restatement.

Nigeria attempts to explain away courts' application of the New York Convention in other cases involving treaties similar to the China-Nigeria BIT by arguing that many of those treaties explicitly reference the New York Convention, and that the parties in other cases agreed that the Convention applied to their dispute.  *See* Resp't's Mot. at 15.  Neither of these scattershot attempts to distinguish those cases is persuasive.  First, Nigeria does not explain why a treaty's mere reference to the New York Convention rescues an arbitral award from the treaty's "public international law character" that Nigeria claims would exclude such a treaty-based arbitral award from confirmation.  Referencing the New York Convention, after all, does not transform a treaty into a contract between a state and private actor.  This argument is particularly perplexing given that, in one of the cases upon which Nigeria relies as support for this point, the treaty at issue merely refers to the New York Convention to discuss the Convention's requirement that parties agree in writing to arbitration, rather than the Convention's commercial reservation.  *See* Resp't's Mot. at 15 (citing *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 70 (D.D.C. 2013)); *Chevron Corp. v. Republic of Ecuador*, Case No. 12-cv-1247 (JEB), Decl. of Edward G. Kehoe, Ex. 1, U.S.-Ecuador BIT at art. VI(4)(b), ECF No. 4-1.[7]  Second, respondent cites to *Crystallex Int'l Corp.*, 244 F. Supp. 3d at 109, seeming to argue that the New York Convention applied in this case because the respondent did not object to the court's jurisdiction.  Resp't's Mot. at 15.  This argument ignores that, in *Crystallex*, as here, the

---

[7]      Further, as petitioner notes, not all arbitral awards that have been confirmed in the D.C. Circuit arise from treaties that expressly reference the New York Convention.  *See* Pet'r's Opp'n at 17 (noting that the Russia-Ukraine BIT at issue in *Tatneft*, 21 F.4th 829, "does not mention that the New York Convention applies to enforcements of awards arising under it").

applicability of the New York Convention folded into the question of the court's subject-matter
jurisdiction and, thus, whether Venezuela consented to jurisdiction is irrelevant since "[i]t is
axiomatic that subject matter jurisdiction may not be waived" and "a federal court must raise the
issue because it is 'forbidden—as a court of limited jurisdiction—from acting beyond [its]
authority.'" *Diag Human S.E. v. Czech Republic, Ministry of Health*, 64 F. Supp. 3d 22, 27
(D.D.C. 2014) (quoting *NetworkIP, LLC v. F.C.C.,* 548 F.3d 116, 120 (D.C. Cir. 2008)), *rev'd on
other grounds*, 824 F.3d 131 (D.C. Cir. 2016).  Nigeria makes no convincing argument to
explain away the crush of cases that undercut its theory.

### 2.   *The Arbitration Record Does Not Prove That the Dispute was Non-Commercial*

Nigeria next turns to the record of the underlying arbitration to argue that the dispute was
non-commercial, asserting a new distinction between what it calls "Treaty Claims" and
"Commercial Claims."  In support of this argument, Nigeria recounts that petitioner had initially
brought claims in the Nigerian courts and the Singapore International Arbitration Center
(SIAC)—the latter pursuant to a clause in the 2013 agreement—alleging breach of contract
claims under its series of agreements with Ogun State.  *See* Resp't's Reply at 10; *see also* Final
Award ¶¶ 43–45.  Nigeria describes petitioner's discontinuance of both proceedings as a
"tactical[]" decision to "proceed exclusively with the Treaty Claims" and "abandon the
Commercial Claims."  Resp't's Reply at 10.  As a result, as Nigeria's argument goes, the Final
Award was based on Nigeria's *sovereign,* rather than *commercial*, conduct—or, by way of
analogy to the limits of the Commerce Clause, the country's use of its police power, rather than
commerce power.  *See* Resp't's Mot. at 15–18; Resp't's Reply at 11–12.

The flaw in this argument stems from predication on a false dichotomy between
sovereign and commercial conduct in the context of the New York Convention.  A similar

argument was considered and rejected by the D.C. Circuit in *Belize Social Dev. Ltd. v. Government of Belize,* 794 F.3d 99, 104–105 (D.C. Cir. 2015).  There, Belize argued that, in granting a private telecommunications company tax and duty exemptions pursuant to an agreement, "it exercised 'powers peculiar to sovereigns' as opposed to 'powers that can also be exercised by private citizens,' and thus its actions were not commercial." *Id.* at 105 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)).  This argument attempted to define the commercial reservation by reference to the FSIA's "commercial activity" exception, 28 U.S.C. § 1605(a)(2), under which a foreign state is only held to "engage[] in commercial activities when it acts in the manner of a private player within the market." *Belize Social Dev. Ltd.,* 794 F.3d at 104.  The D.C. Circuit rejected this narrow view of the commercial reservation, holding that "[u]nlike with the FSIA, Congress was not codifying the restrictive theory of foreign sovereign immunity when it ratified and implemented the New York Convention." *Id.* at 105. Instead, because the Convention's "purpose was to 'encourage the recognition and enforcement of commercial arbitration agreements in international contracts' . . . 'commercial' in the context of international arbitration refers to matters which have a connection to commerce." *Id.* (quoting *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 933 (D.C. Cir. 2007)).  Accordingly, as Zhongshan correctly posits, "there can be no debate that the multimillion-dollar investment that Petitioner made in Nigeria to develop, manage and operate a free trade zone near Lagos was connected with commerce." Pet'r's Opp'n at 5–6.  *See Belize Social Dev. Ltd.,* 794 F.3d at 104 (holding that "taxes Belize levies against a company . . . have a connection with commerce . . . as do the duties Belize charges").

### 3.   *No Underlying Contract Between Nigeria and Zhongshan is Required*

Finally, Nigeria urges that the "Award at issue is unlike other arbitration awards routinely enforced in this Circuit" because "it arose neither from a commercial agreement between

Petitioner and Nigeria, nor from a contractual or other business relationship between them." Resp't's Reply at 5.  To be sure, nearly every case enforcing an arbitration award against a foreign sovereign in this Circuit has involved an underlying contract or business agreement between the petitioner and foreign sovereign.  *See, e.g., P&ID,* 27 F.4th at 772 (describing underlying twenty-year natural gas supply and processing agreement between Irish engineering company and Nigeria); *Diag Human*, 824 F.3d at 135 (describing underlying "Framework Agreement" between arbitration parties Czech Republic and foreign blood plasma company by which company supported modernization of Czech Republic's blood plasma supply and services in exchange for share of the total volume of plasma produced); *Belize Social Dev. Ltd.*, 794 F.3d at 100–01 (involving underlying agreement between Belize and petitioner's predecessor-in-interest, a telecommunications company, pursuant to which company would purchase property from Belize); *Gebre LLC v. Kyrgyz Republic*, 2022 WL 2132481, *2 (D.D.C. June 14, 2022) (foreign company signed series of license agreements with Kyrgyz authorities to mine rare earth elements).  In contrast, Nigeria is correct—and petitioner does not dispute, *see* Pet'r's Opp'n at 15 n.8—that the underlying agreements leading to Zhongshan's investments in the Zone and Industrial Park "[were] formed with OGFTZ and Ogun State, <u>not</u> Nigeria."  Resp't's Reply at 7 (emphasis in original).

This distinction drawn by Nigeria between the parties involved in the facts underlying the arbitral award at issue (*i.e.*, involving a business arrangement between a private party and part of a sovereign country) versus previous awards confirmed in this Circuit (*i.e.*, involving business arrangements between a private party and a sovereign country), falls short of showing that the instant parties' legal relationship is therefore not commercial.  As the FAA provides, a legal relationship need not arise from contract to be commercial, *see* 9 U.S.C. § 202, with the crucial

factor being that "the subject matter [of the arbitration] is commercial." *Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 184 (D.D.C. 2016) (quoting *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 241 F.3d 135, 146 (2d Cir. 2001)).  Here, the subject matter of the underlying arbitration related to commerce: Zhongshan's status as a foreign investor in Nigeria, pouring millions of dollars into developing the free trade zone, "has an obvious connection to commerce." *Diag Human*, 824 F.3d at 136 (describing "the provision of healthcare technology and medical services" as having "an obvious connection to commerce" based on health care's role in the "global economy").

Notably, Nigeria focuses principally on urging adoption of its characterization of the parties' relationship as non-commercial.  *See, e.g.,* Resp't's Mot. at 15 ("The record of the arbitration confirms the *non-commercial nature of the parties' legal relationship* that is the foundation for the Award.") (emphasis added); Resp't's Reply at 14–15 (arguing that petitioner's agreements with Ogun State cannot "dictate whether the extrinsic legal relationship between Nigeria and Petitioner is commercial for purposes of the New York Convention" and urging that "[t]he conditions in question here . . . rendered the legal relationship between Nigeria and Petitioner fundamentally noncommercial").  Only passingly, in reply, does Nigeria allude to the absence of a direct contractual or business relationship between Zhongshan and Nigeria as precluding the existence a "legal relationship" between the parties—a condition precedent to the requirement that the arbitral award "aris[e] out of a legal relationship, whether contractual or not, which is considered as commercial." 9 U.S.C. § 202; *see* Resp't's Reply at 14 (noting that "no independent legal relationship existed between Nigeria and Petitioner regarding [the latter's] investments" in service of its argument that Nigeria's conduct was "sovereign" rather than commercial).

Regardless, the parties plainly shared a "defined legal relationship, whether contractual or not," *Diag Human*, 824 F.3d at 135, based on the China-Nigeria BIT.  In *Diag Human*, the D.C. Circuit held that, even if failing to qualify as a contract, a "Framework Agreement" between a blood plasma company and the Czech Republic created a legal relationship, because the Agreement "explicitly contemplated which parties it would obligate, the extent of the obligations, the remuneration exchanged for meeting the obligations, and the legal framework to govern the arrangement." *Diag Human*, 824 F.3d at 135.  The China-Nigeria BIT, too, creates a legal framework "entitling [Chinese investors] to the standards of treatment guaranteed by" Nigeria.  Pet'r's Opp'n at 7.  Further, the treaty constitutes "an already-binding arbitration contract" between Nigeria and China, with investors from both countries, including petitioner, acting as the equivalent of third-party beneficiaries, *BG Group, PLC v. Republic of Argentina*, 572 U.S. 25, 41 (2014), or at the very least, the treaty operates as Nigeria's "standing offer to all potential [Chinese] investors to arbitrate investment disputes," *Chevron*, 795 F.3d at 206. Nigeria cannot and does not explicitly dispute that the BIT thus creates a legal relationship— even if not a contractual one—between the parties.

## B.   Nigeria Is Not Immune Under the FSIA.

Having established that this matter falls under the New York Convention, and thereby the FAA, the next question is whether Nigeria is immune from suit under the FSIA.  The FSIA is "a comprehensive statute containing a 'set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities.'" *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004) (quoting *Verlinden*, 461 U.S. at 488). The FSIA "provides, with specified exceptions, that a 'foreign state shall be immune from the jurisdiction of the courts of the United States . . . ." *Bolivarian Republic of Venezuela v.*

*Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 173 (2017) (quoting 28 U.S.C. § 1604).

Accordingly, "subject matter jurisdiction in any [FSIA] action depends on the existence of one of

the specified exceptions to foreign sovereign immunity."  *Verlinden,* 461 U.S. at 493.

At issue here is the arbitration exception, 28 U.S.C. § 1605(a)(6), which permits U.S.

courts to confirm an arbitration award rendered outside of the United States in certain instances.[8]

The exception provides, in pertinent part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or
>
> of the States in any case . . . in which the action is brought . . . to confirm an award made
>
> pursuant to . . . an agreement to arbitrate, if . . . the agreement or award is or may be
>
> governed by a treaty or other international agreement in force . . . calling for the
>
> recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a)(6).  For the Court's jurisdiction to attach pursuant to the arbitration

exception, "the existence of an arbitration agreement, an arbitration award and a treaty governing

the award are all jurisdictional facts that must be established."  *LLC SPC Stileks v. Republic of*

*Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021) (citing *Chevron*, 795 F.3d at 204).  As to these

three requirements, petitioner bears "a burden of production" to support a claim that the

---

[8]       Congress amended the FSIA in 1988 to include the arbitration exception, ensuring that foreign agreements
to arbitrate and arbitral awards governed by certain treaties would be enforceable in U.S. courts, even against
sovereigns.  *See Process & Indus. Dev. Ltd. v. Fed. Republic of Nigeria*, 506 F. Supp. 3d 1, 10 (D.D.C. 2020), *aff'd
on other grounds,* 27 F.4th 771 (D.C. Cir. 2022).  This exception facilitated the participation of U.S. courts in
upholding the international arbitration system that has flourished since the post-World War II era, designed to
facilitate cross-border investments and business dealings.  The conventional wisdom undergirding the international
arbitration system is that promising foreign investors an efficient and fair alternative dispute-resolution mechanism
outside of potentially biased local courts would encourage foreign direct investment, insulated from the uncertainties
created by the host country's domestic politics and law.  *See generally* Jeswald W. Salacuse & Nicholas P. Sullivan,
*Do BITS Really Work? An Evaluation of Bilateral Investment Treaties and Their Grand Bargain*, 46 Harv. Int'l L. J.
67, 68–79 (2005) (arguing that arbitration provisions in BITs are a "mechanism that gives important, practical
significance to BITs, a mechanism that truly enables these bilateral treaties to afford protection to foreign
investment," and that BITs have promoted foreign direct investment in developing countries and the United States);
Leonard V. Quigley, *Accession by the United States to the United Nations Convention on the Recognition and
Enforcement of Foreign Arbitral Awards*, 70 Yale L. J. 1049 (June 1961) (detailing the reasons for the United
States' ratification of the New York Convention).

arbitration exception applies; "the burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence." *Chevron*, 795 F.3d at 204.

Petitioner has met its burden of production as to all three requirements under the arbitration exception. First, as to the existence of the arbitration agreement, petitioner has alleged, without dissent from Nigeria, that both parties consented to the arbitration—Nigeria via Art. 9 of the China-Nigeria BIT, which provided that either party may submit a dispute to an *ad hoc* tribunal, and Zhongshan via filing a Request for Arbitration. Pet. ¶¶ 24–25. *See Stati*, 199 F. Supp. 3d at 188 ("All that is required is that the petitioner make a 'prima facie showing that there was an arbitration agreement by producing the [treaty] and the notice of arbitration.'" (quoting *Chevron*, 795 F.3d at 205)). Petitioner has also met its burden as to the second and third requirements by producing the Final Award and referring to the New York Convention. *See* Final Award, ECF No. 2-1; *see also Creighton*, 181 F.3d at 123–24 (describing the "New York Convention [as] 'exactly the sort of treaty Congress intended to include in the arbitration exception'" (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1018 (2d Cir. 1993))). Nigeria, meanwhile, has failed to discharge its burden of persuasion to establish that this arbitral award falls outside the scope of the New York Convention, for the reasons stated *supra,* in Part III.A. Resultantly, the Court finds that the arbitration exception to the FSIA applies, stripping Nigeria of sovereign immunity and establishing the Court's subject-matter and personal jurisdiction over the case.

IV.    **CONCLUSION**

For the foregoing reasons, the Federal Republic of Nigeria's Motion to Dismiss is

**DENIED**.  An order consistent with the Memorandum Opinion will be entered

contemporaneously.

Date: January 26, 2023

_____
BERYL A. HOWELL
Chief Judge