ORAL ARGUMENT NOT YET SCHEDULED

No. 23-7016

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

ZHONGSHAN FUCHENG INDUSTRIAL INVESTMENT CO., LTD.,
*Petitioner-Appellee,*

v.

FEDERAL REPUBLIC OF NIGERIA,
*Respondent-Appellant.*

---

PROOF OPENING BRIEF FOR RESPONDENT-APPELLANT
FEDERAL REPUBLIC OF NIGERIA

---

*On Appeal from an Order and Memorandum & Opinion of the
U.S. District Court for the District of Columbia
Civil Action No. 22-170 (BAH)*

---

Keith R. Bradley
ScheLeese Goudy
SQUIRE PATTON BOGGS (US) LLP
717 17th Street, Ste 1825
Denver, CO 80202
Tel.: (303) 830-1776
Fax: (303) 894-9239
Email: keith.bradley@squirepb.com
Email: scheleese.goudy@squirepb.com

Raúl B. Mañón
SQUIRE PATTON BOGGS (US) LLP
200 South Biscayne Blvd., Ste 3400
Miami, FL 33131
Tel.: (305) 577-7000
Fax: (305) 577-7001
Email: raul.manon@squirepb.com

*Attorneys for the Federal Republic of Nigeria*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1)

Appellant, the Federal Republic of Nigeria, certifies as follows:

### A.  Parties and Amici

The Appellant (Respondent below) is the Federal Republic of Nigeria. The Appellee (petitioner below) is Zhongshan Fucheng Industrial Investment Co., Ltd.  There were no amici before the District Court, and none are currently anticipated in this Court.

### B.  Ruling under Review

The Ruling under review is the January 26, 2023, Order and Memorandum and Opinion by Chief Judge Beryl A. Howell of the United States District Court for the District of Columbia denying Nigeria's Motion to Dismiss for Lack of Jurisdiction under the Foreign Sovereign Immunities Act. ECF Nos. 28, 29.

### C.  Related Cases

Appellant knows of no related cases within the meaning of Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

**Page**

GLOSSARY ....................................................................................... xi

JURISDICTION ................................................................................ 3

STATUTES AND AUTHORITIES ................................................... 4

ISSUE PRESENTED ........................................................................ 4

STATEMENT OF THE CASE ......................................................... 5

    A.    The sovereign nation of Nigeria entered a treaty with China regarding treatment of each other's citizens. ...................... 5

    B.    Ogun State arranged for Zhongshan affiliates to develop a free-trade zone, but then ejected them from the zone................... 7

    C.    Zhongshan sought arbitration against Nigeria under the Treaty................................................................................... 10

    D.    Zhongshan sought to enforce the Award in the district court, and the district court asserted jurisdiction over Nigeria. .................................................................................. 12

SUMMARY OF ARGUMENT ........................................................ 13

STANDARD OF REVIEW ............................................................. 18

ARGUMENT .................................................................................. 18

    I.    The Award Does Not "Aris[e] Out of Differences Between Persons." ................................................................................. 20

        A.    A sovereign is a "person" for Convention purposes only when it engages in private activity. ............................ 21

        B.    Nigeria acted solely as a sovereign with respect to Zhongshan. ................................................................. 30

    II.    Zhongshan's Claims Against Nigeria Do Not Arise Out Of A Commercial Legal Relationship.................................... 41

A.    Nigeria had no legal relationship directly with Zhongshan. ................................................................ 42

B.    The Nigeria-China Treaty is not a commercial legal relationship. ............................................................ 44

C.    The Restatements do not convey a view that international treaties are commercial legal relationships. ........................................................... 53

D.    None of the precedents invoked by Zhongshan or the district court shows a treaty on economic issues is a "legal relationship which is considered commercial." ...... 57

CONCLUSION ................................................................ 69

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AG Abia v. AG Federation*
(2006), 16 NWLR 1005 (Nigeria) ...................................................... 6, 39

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n,*
528 F.3d 934 (D.C. Cir. 2008) ........................................................ 19

*Air France v. Saks,*
470 U.S. 392 (1985) ...................................................................... 28

*Ala. Educ. Ass'n v. State Superintendent of Educ.,*
746 F.3d 1135 (11th Cir. 2014) ...................................................... 46

*Alfred Dunhill of London, Inc. v. Repub. of Cuba,*
425 U.S. 682 (1976) .................................................................. 27, 30

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.,*
138 S. Ct. 1865 (2018) .................................................................. 6

*Argentine Repub. v. Amerada Hess Shipping Corp.,*
488 U.S. 428 (1989) ...................................................................... 18

*Banco Nacional de Cuba v. Sabbatino,*
376 U.S. 398 (1964) .................................................................. 27, 32

*Belize Soc. Dev. Ltd. v. Gov't of Belize,*
688 F.3d 724 (D.C. Cir. 2012) ........................................................ 52

*Belize Social Dev. Ltd. v. Gov't of Belize,*
794 F.3d 99 (D.C. Cir. 2015) ......................... 16, 17, 27, 28, 29, 50, 51, 52, 53, 59

*Chevron Corp. v. Ecuador,*
    795 F.3d 200 (D.C. Cir. 2015)...................................................................62

*Collins v. NTSB,*
    351 F.3d 1246 (D.C. Cir. 2003)...............................................................22

*Creighton Ltd. v. Qatar,*
    181 F.3d 118 (D.C. Cir. 1999).................................................................60

*Crystallex Int'l Corp. v. Bolivarian Repub. of Venezuela,*
    244 F. Supp. 3d 100 (D.D.C. 2017)...................................................63, 64

*Diag Human S.E. v. Czech Repub.-Ministry of Health,*
    824 F.3d 131 (D.C. Cir. 2016).................................................19, 52, 59, 60, 69

*Dole v. United Steelworkers of Am.,*
    494 U.S. 26 (1990)..................................................................................53

*El-Hadad v. United Arab Emirates,*
    216 F.3d 29 (D.C. Cir. 2000) ...................................................................4

*Fed. Repub. of Germany v. Philipp,*
    141 S. Ct. 703 (2021) .............................................................................32

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,*
    462 U.S. 611 (1983) ...............................................................32, 37, 40, 41

*Foremost-McKesson, Inc. v. Islamic Repub. of Iran,*
    905 F.2d 438 (D.C. Cir. 1990)...........................................................40, 41

*Gebre LLC v. Kyrgyz Repub.,*
    No. 20-1795, 2022 WL 2132481 (D.D.C. June 14, 2022) .....................62, 63

*Gold Reserve Inc. v. Bolivarian Repub. of Venezuela,*
    146 F. Supp. 3d 112 (D.D.C. 2015).........................................................64

*He Depu v. Yahoo! Inc.*,
    950 F.3d 897 (D.C. Cir. 2020) ................................................................. 8

*Island Territory of Curacao v. Solitron Devices, Inc.*,
    356 F. Supp. 1 (S.D.N.Y. 1973) ............................................................. 58

*Kareem v. Haspel*,
    986 F.3d 859 (D.C. Cir. 2021) ................................................................. 5

*Khochinsky v. Repub. of Poland*,
    1 F.4th 1 (D.C. Cir. 2021) ..................................................................... 18

*La Republique Francaise v. Saratoga Vichy Spring Co.*,
    191 U.S. 427 (1903) ............................................................................... 27

*LLC Komstroy v. Repub. of Moldova*,
    No. 14-1921, 2019 WL 3997385 (D.D.C. Aug. 23, 2019) ................... 61

*LLC SPC Stileks v. Repub. of Moldova*,
    985 F.3d 871 (D.C. Cir. 2021) ................................................. 48, 61, 62

*McDonnell v. United States*,
    579 U.S. 550 (2016) ............................................................................... 53

*Medellín v. Texas*,
    552 U.S. 491 (2008) ........................................................................ 48, 69

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    294 F.3d 82 (D.C. Cir. 2002) ............................................................ 18, 21

*Process & Indus. Devs. Ltd. v. Fed. Repub. of Nigeria*,
    27 F.4th 771 (D.C. Cir. 2022) ............................................................... 61

*Process & Indus. Devs. Ltd. v. Fed. Repub. of Nigeria*,
    962 F.3d 576 (D.C. Cir. 2020) .............................................................. 60

*Pub. Emps. Ret. Sys. of Ohio v. Betts*,
  492 U.S. 158 (1989) ........................................................................ 55

*Pueschel v. Chao*,
  955 F.3d 163 (D.C. Cir. 2020) .......................................................... 8

*Repub. of Argentina v. BG Grp. PLC*,
  665 F.3d 1363 (D.C. Cir. 2012) ....................................................... 67

*Repub. of Argentina v. BG Grp. PLC*,
  715 F. Supp. 2d 108 (D.D.C. 2010) ................................................. 65

*Repub. of Argentina v. BG Grp. PLC*,
  No. 08-485, ECF No. 1-4 (D.D.C. Mar. 21, 2008) ................. 65, 67, 68

*Return Mail, Inc. v. U.S. Postal Serv.*,
  139 S. Ct. 1853 (2019) ................................................................... 25

*Rong v. Liaoning Province Gov't*,
  452 F.3d 883 (D.C. Cir. 2006) ........................................................ 32

*Samantar v. Yousef*,
  560 U.S. 305 (2010) ................................................................. 46, 47

*San Diego Gas & Elec. Co. v. FERC*,
  913 F.3d 127 (D.C. Cir. 2019) ......................................................... 52

*Saudi Arabia v. Nelson*,
  507 U.S. 349 (1993) .............................................................. 18, 33, 34

*Schindler Elevator Corp. v. Wash. Metro. Area Transit Auth.*,
  16 F.4th 294 (D.C. Cir. 2021) .......................................................... 62

*Stati v. Repub. of Kazakhstan*,
  199 F. Supp. 3d 179 (D.D.C. 2016) .................................................. 63

*Tatneft v. Ukraine,*
301 F. Supp. 3d 175 (D.D.C. 2018) ........................................................ 60

*Tatneft v. Ukraine,*
771 F. App'x 9 (D.C. Cir. 2019) .............................................................. 60

*Transamerica Leasing, Inc. v. La Republica de Venezuela,*
200 F.3d 843 (D.C. Cir. 2000) ................................................... 38, 40, 41

*United States v. Cooper Corp.,*
312 U.S. 600 (1941) ................................................................................ 21

*United States v. Godoy,*
706 F.3d 493 (D.C. Cir. 2013) ................................................................ 55

*Van Ee v. EPA,*
202 F.3d 296 (D.C. Cir. 2000) ............................................................... 47

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens,*
529 U.S. 765 (2000) ............................................................................... 22

*Wilson v. Good Humor Corp.,*
757 F.2d 1293 (D.C. Cir. 1985) ............................................................. 54

*Wilson v. Omaha Indian Tribe,*
442 U.S. 653 (1979) ............................................................................... 22

*Wisc. Central Ltd. v. United States,*
138 S. Ct. 2067 (2018) ..................................................................... 57, 58

*Zicherman v. Korean Air Lines Co.,*
516 U.S. 217 (1996) ............................................................................... 23

## Statutes and Treaties

9 U.S.C. § 202 ........................................................ 16, 45, 49, 50, 51, 53

9 U.S.C. § 203 ........................................................................... 3, 12

9 U.S.C. § 207 ............................................................................. 12

28 U.S.C. § 1292(a)(1) ..................................................................4

28 U.S.C. § 1603(a) ..................................................................... 46

28 U.S.C. § 1603(b)(2) ................................................................39

28 U.S.C. § 1605(6)(A) ...............................................................66

28 U.S.C. §§ 1605(a)(1) ...............................................................66

28 U.S.C. § 1605(a)(3) .................................................................32

28 U.S.C. § 1605(a)(6)(B)........................................................ 3, 19

## Other Authorities

Am. Law Inst., *Frequently Asked Questions,*
    https://www.ali.org/about-ali/faq/ ...................................54

Central Intelligence Agency, The World Factbook—Nigeria,
    https://www.cia.gov/the-world-factbook/countries/nigeria/ ..................... 5

Constitution of Nigeria (1999), § 2(2) ................................5, 39

International Council for Commercial Arbitration, *Guide to the*
    *Interpretation of the 1958 New York Convention: A Handbook for*
    *Judges* (P. Sanders ed., 2011)...................................................... 30

New York Convention on the Recognition and Enforcement of
    Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330
    U.N.T.S. 3 ................................................................................ 1

Rest. 3d Foreign Relations Law § 301 cmt. d ....................... 48

Rest. 3d Foreign Relations Law, § 487 cmt. f.................50, 55

Rest. of the U.S. Law on Int'l Commercial & Investor-State
   Arbitration, § 1.1 cmt. e ........................................................................ 57

Sornarajah, M, *The Settlement of Foreign Investment Disputes* (2000) ................. 30

U.N Conference on International Commercial Arbitration, *16th
   meeting*, E/CONF. 26/SR.16 (June 1958) .............................................. 49

U.N. Doc. A/56/10 (2001): Report of the Int'l Law Comm'n on the
   work of its fifty-third session (2001) ................................................... 41

U.N. Economic & Social Council, *Report of the Committee on the
   Enforcement of International Arbitral Awards*, E/2704,
   E/AC.42/4/Rev.1 (Mar. 1955) .............................................................. 23

U.N. Gen. Assembly Resolution 56/83 (2001) ........................................... 12

# GLOSSARY

| ABBREVIATION | DEFINITION |
|---|---|
| Award | The March 26, 2021, arbitration award that Zhongshan petitioned to enforce (ECF No. 2-1, JA_) |
| Convention | The New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 |
| FSIA | Foreign Sovereign Immunities Act, Pub. L. No. 94-583, 90 Stat. 2892 (codified as 28 U.S.C. §§ 1602 *et seq.*) |
| Nigeria | Federal Republic of Nigeria |
| Opinion | January 26, 2023, Memorandum and Opinion by the district court (ECF No. 29, JA_) |
| Petition | Petition to Recognize and Enforce Arbitral Award (ECF No. 1, JA_). |
| Treaty or Nigeria-China Treaty | The Agreement Between the Government of the People's Republic of China and the Government of the Federal Republic of Nigeria for the Reciprocal Promotion and Protection of Investments (2001) (ECF No. 2-2, JA__) |
| Zhongfu | Zhongfu International Investment, an affiliate of Zhongshan |

| ABBREVIATION | DEFINITION |
|---|---|
| Zhongshan | Zhongshan Fucheng Industrial Investment Co., Ltd., the Petitioner-Appellee |
| Zhuhai | Zhuhai Zhongfu Industrial Group Co. Ltd., the corporate parent of Zhongshan |

The district court took the unprecedented step of asserting jurisdiction over a foreign sovereign—the Federal Republic of Nigeria ("Nigeria")—based on no commercial activity by Nigeria, no waiver of immunity by Nigeria, and no transactions by Nigeria.  The court held that a treaty between sovereign nations that concerns bilateral investment is a commercial legal relationship, regardless of what those sovereign nations intended or expressed in the treaty.  The result, by operation of the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (the "Convention"), is that for any treaty among sovereigns, a dispute resolution clause can subject the parties to enforcement in U.S. courts, so long as the treaty has some perceived connection to commerce.  That outcome is the opposite of what the drafters and signers of the Convention intended.

Nigeria has a treaty with China about each country's treatment of investors from the other.  In some treaties that have come before U.S. courts, the nations have stated that disputes and arbitrations under the treaties are to be considered commercial transactions for purposes of the Convention.

1

The Nigeria-China Treaty does not say that. And it expresses no other intention by Nigeria and China that the treaty should operate in the realm of private law.

The petitioner (appellee here) ("Zhongshan") is a Chinese company that (together with some affiliates) had contractual arrangements with the State of Ogun, an autonomous, separate government body within the Nigerian Federation, to develop a free-trade zone in Ogun. Ogun State apparently abrogated the contracts and harassed the companies out. Bypassing the commercial arbitration clause in the agreements with Ogun State, Zhongshan then sought compensation from Nigeria, on the basis of the Nigeria-China Treaty. A panel of arbitrators treated Nigeria as responsible, under public international law, for the actions of its independent constituent state, and awarded Zhongshan compensation. Zhongshan petitioned to enforce the award in the district court below, even though Nigeria has sovereign immunity from U.S. courts.

The district court asserted jurisdiction over Nigeria's objection, solely on the ground that the court believed the Nigeria-China Treaty is a

commercial legal relationship justifying enforcement under the Convention. A treaty between nations is not an ordinary commercial transaction, but the court ignored the intentions of Nigeria and China, and ignored the reality that Nigeria's role with respect to Zhongshan was solely that of a sovereign. To be sure, there have been many cases in which governments have engaged in commercial transactions, and courts have enforced those commercial arbitration awards. This is not such a case. This Court should reverse the decision below, and remand with instructions to dismiss the petition for lack of jurisdiction.

## JURISDICTION

Zhongshan invoked jurisdiction under the Convention and its implementing statute, 9 U.S.C. § 203. ECF No. 1, ¶ 8 ("Petition"), JA_. Nigeria is a foreign sovereign, and Zhongshan asserted its sovereignty is abrogated under the Foreign Sovereign Immunities Act ("FSIA"), Pub. L. No. 94-583, 90 Stat. 2892, due to the "arbitration treaty exception," 28 U.S.C. § 1605(a)(6)(B). Petition, ¶ 11, JA__. On January 26, 2023, the district court denied Nigeria's motion to dismiss for lack of jurisdiction on grounds of sovereign immunity.

3

ECF No. 28, JA_; ECF No. 29 ("Opinion"), JA__.  "[D]enial of a foreign state's motion to dismiss on the ground of sovereign immunity is subject to interlocutory appeal under the collateral order doctrine." *El-Hadad v. United Arab Emirates*, 216 F.3d 29, 31 (D.C. Cir. 2000).  Accordingly, this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).  Nigeria timely appealed on February 10, 2023.  Dkt. No. 1985715.

## STATUTES AND AUTHORITIES

Pertinent authorities are set forth in the Addendum.

## ISSUE PRESENTED

Whether, for compensation requested under a treaty between sovereign nations, on the basis of solely sovereign conduct attributed to Nigeria under public international law, in the absence of any other relationship between Nigeria and Zhongshan, the district court erred in concluding the resulting arbitration was subject to the Convention?

## STATEMENT OF THE CASE

### A.    The sovereign nation of Nigeria entered a treaty with China regarding treatment of each other's citizens.

The country of Nigeria is a federal republic, comparable to the United States, with a federal government (appellant here) and multiple states that are parties to the federation.[1]   Under Nigeria's constitution, each state is an autonomous entity, with a separate existence and independence from the federal government.   Constitution of Nigeria (1999), § 2(2).   According to Nigeria's Supreme Court, "[E]ach government exists not as an appendage of another government but as an autonomous entity in the sense of being able to exercise its own will in the conduct of its affairs, free from direction by another government."   *AG Abia v. AG Federation*, (2006) 16 NWLR part 1005,

---

[1]   *See* Central Intelligence Agency, The World Factbook—Nigeria, https://www.cia.gov/the-world-factbook/countries/nigeria/ (Nov. 6, 2023) (Nigeria is a "federal presidential republic" with "36 states".) This court can "take judicial notice" of such a "fact that … can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." *Kareem v. Haspel*, 986 F.3d 859, 867 (D.C. Cir. 2021).

265 (Nigeria).[2]

Exercising its sovereignty, Nigeria concluded an Agreement with the Government of the People's Republic of China, for the Reciprocal Promotion and Protection of Investments. ECF No. 2-2, JA__ ("Treaty"). In the Treaty, the two nations recognized their mutual desire to intensify cooperation with each other. *Id.* at 1, JA_. The Treaty committed each government to the other with respect to "fair and equitable treatment" of each other's nationals and companies. *Id.* art. 3 § 1, JA_. The Treaty included dispute-resolution mechanisms, including allowing a company from one of the countries to seek an arbitration with the other country. *Id.* art. 9, JA_.

---

[2]    Available at http://www.nigeria-law.org/LawReporting/2006/Attorney%20General%20of%20Abia%20State%20&%202%20Ors%20V%20Attorney%20General%20of%20the%20Federation%2033%20Ors.htm. English is Nigeria's official language and the original language of the cited case. *See* Central Intelligence Agency, The World Factbook—Nigeria, *supra* n.1. The decisions of the Nigerian Supreme Court are an appropriate source for this Court regarding Nigerian law. *See Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1869 (2018) ("[I]n determining foreign law, 'the court may consider any relevant material or source.'") (quoting Fed. R. Civ. P. 44.1).

Unlike some treaties that place their arbitrations under the Convention by stating that disputes and claims under the treaties "shall be considered to arise out of a commercial relationship or transaction for the purposes of Article 1 of that Convention," *e.g.* Agreement between the Government of Canada and the Government of Venezuela for the Promotion and Protection of Investments, Can.-Venez., Jan. 28, 1988, E101531–1998 Can. T.S. No. 20, art. XII § 6(b) and 2012 U.S. Model Bilateral Investment Treaty, art. 34(10) (available here: https://ustr.gov/sites/default/ files/BIT%20text%20for%20ACIEP%20Meeting.pdf), the Nigeria-China Treaty does not purport to do that or establish commercial transactions.

## B. Ogun State arranged for Zhongshan affiliates to develop a free-trade zone, but then ejected them from the zone.

Ogun State, one of the autonomous states within the Nigerian federation, established a free-trade zone called the Ogun Guangdong Free Trade Zone. Petition, ¶¶ 6, 15, JA_; ECF No. 2-1, ¶ 3, JA_ ("Award") (noting the

zone was "owned by the Ogun State Government").[3]

Starting in 2007, Ogun contracted with various Chinese companies, to develop the free-trade zone.  First, Ogun State entered an agreement to jointly own a company called the Ogun Guangdong Free Trade Zone Company.  Award, ¶¶ 4-5, JA__.  The Free Trade Zone Company then entered an agreement for Zhongshan's parent, Zhuhai Zhongfu Industrial Group Co. Ltd. ("Zhuhai"), to develop a portion of the zone into an industrial park.  Award, ¶¶ 6-8, JA__.  Zhuhai later assigned that agreement to Zhongshan.  Award, ¶¶ 3, 9, JA__.

In 2013, apparently, Ogun replaced the original joint venture partners in the Free Trade Zone Company with an affiliate of Zhongshan, Zhongfu International Investment (NIG) FZE ("Zhongfu"), and another company.  Award, ¶¶ 18-19, JA_.

---

[3] This recitation is based on the Petition's allegations, which for Nigeria's motion to dismiss the Court should assume are true.  *See Pueschel v. Chao*, 955 F.3d 163, 165-66 (D.C. Cir. 2020).  The Court can also consider the Award and the Treaty, which Zhongshan attached to its Petition, ECF Nos. 2-1 & 2-2, JA__.  *See He Depu v. Yahoo! Inc.*, 950 F.3d 897, 901 (D.C. Cir. 2020) ("[A] court may ... consider documents attached to or incorporated in the complaint.").

Nigeria did not enter into or participate in any of the agreements or undertakings with Zhongshan or its affiliates related to the free trade zone. Award, ¶ 72, JA__.

Evidently concerns arose about the ownership of the Free Trade Zone Company.  Award, ¶¶ 33-36, JA_.  In 2016, Ogun officials accused certain Zhongfu executives of fraud. *Id.*  Ogun then purported to terminate Zhongfu's appointments to operate the free-trade zone, and apparently Ogun officials made certain threats to Zhongfu executives. *Id.* ¶¶ 38-39, JA_.

Over several months in 2016, the Nigerian Export Processing Zone Authority asked the Nigerian Immigration Service to confiscate immigration papers from Zhongfu's foreign staff; the police issued a warrant for the arrest of two of Zhongfu's executives; and the police arrested, detained, and beat one of the executives. *Id.* ¶ 39, JA__.

Zhongfu sued Ogun State, its attorney general, and several other defendants in both Nigeria federal court and Ogun state court. *Id.* ¶ 42, JA_. These cases were based on Zhongfu's asserted contractual rights. *Id.*  For some

reason, in 2018 the cases "were discontinued." *Id*. ¶ 44, JA_.  Because Nigeria was not a party to the contracts, it was not a party to these cases either.

Zhongshan's Petition says "Nigeria took over Zhongshan's rights." Petition, ¶ 18 JA__.  But the arbitrators found differently, accepting "that Zhongshan's case is primarily based on actions of Ogun State" attributed to Nigeria vicariously under public international law.  Award, ¶ 72, JA__.

## C.  Zhongshan sought arbitration against Nigeria under the Treaty.

Zhongshan then sought compensation from Nigeria itself and demanded arbitration under the Treaty.  Petition, ¶ 2, JA__.  Zhongshan asserted only claims based on the Treaty, with no claims for breach of contract or the like, and no claims under Nigerian law.  Award, ¶ 86, JA_.  Nigeria raised several defenses, including that the accused actions were taken by Ogun State, a different government, and that the issues were pending in the federal and state cases.  Award, ¶¶ 70, 82-85, JA_.  The arbitrators concluded that the litigations were different because those claims arose from the various contracts, whereas "Zhongshan's case in this arbitration is based squarely on the Treaty." *Id.*, ¶ 86, JA_.

With respect to the separation between Ogun State and the Federal Republic of Nigeria, the arbitrators acknowledged that Zhongshan's case "is primarily based on actions of Ogun State, although the actions of other entities, namely the police and [the Nigeria Export Processing Zone Authority], are also strongly relied on." *Id.*, ¶ 72, JA_.  But the arbitrators concluded that "all organs of the State [meaning the national government], including those which have an independent existence in domestic law, are to be treated as part of the State." *Id.*  The arbitrators asserted this principle is customary public international law, citing a document titled "Draft Articles on Responsibility of States for Internationally Wrongful Acts," which the International Law Commission had proposed to the United Nations in 2001 but which was never adopted. *Id.*[4]

---

[4] This document was only a draft, including some features describing existing international law and also some suggestions for "progressive development" of new international law.  U.N. Doc. *A/56/10:* Report of the Int'l Law Comm'n on the work of its fifty-third session (2001), p.24 ¶ 66.  The International Law Commission recommended that the United Nations "take note of the draft articles" and eventually develop a multinational treaty embodying its concepts.  *Id.*, p.25 ¶ 67.5.  Doing neither, U.N. General Assembly postponed,

The arbitrators then determined that Nigeria should pay Zhongshan roughly $65 million.  Award, ¶¶ 72-76; 198, JA__.

**D.    Zhongshan sought to enforce the Award in the district court, and the district court asserted jurisdiction over Nigeria.**

Zhongshan petitioned the district court to enforce the Award under the federal statute implementing the Convention, 9 U.S.C. § 207.  Petition, ¶ 53, JA_.  The Petition invoked the court's jurisdiction under section 203, 9 U.S.C. § 203, on grounds that the Award is under the Convention, and Zhongshan said Nigeria lacks sovereign immunity from the Petition because the Award is "governed by the New York Convention." *Id.*, ¶¶ 8, 11, JA__.  The Convention calls for signatory nations (of which the United States is one) to enforce arbitration awards within its scope (subject to certain preconditions and potential defenses, including, in the United States, the requirement that the award arise out of a legal relationship commercial in nature).

---

indefinitely, its consideration of the draft.  U.N. Gen. Assembly Resolution 56/83, dated December 12, 2001.

Nigeria moved to dismiss the Petition for lack of subject matter jurisdiction, given Nigeria's sovereign immunity.  ECF No. 24-1.  Nigeria asserted none of the exceptions to immunity in the FSIA applies for the Petition.  In particular, it said the clause (a)(6)(B) arbitration treaty exception does not hold because the Convention does not apply to an arbitration under the Nigeria-China Treaty and Nigeria had no commercial legal relationship with Zhongshan.  *Id.* at 8-16.

The district court concluded that "the arbitration exception to the FSIA applies, stripping Nigeria of sovereign immunity and establishing the Court's subject-matter and personal jurisdiction over the case."  Opinion 21, JA_.  Accordingly it denied Nigeria's motion to dismiss.

Nigeria asks the Court to reverse the district court's denial, because the clause (a)(6)(B) exception does not properly apply and Nigeria is immune from the Petition.

## SUMMARY OF ARGUMENT

The district court assumed that a bilateral treaty relating to investments is, on its own, sufficient to lead to Convention-based enforcement, simply

because there have been many cases enforcing awards rooted in superficially similar treaties. But the situation here differs in critical ways from the mine-run of government-commercial disputes. Zhongshan is extending those ordinary commercial cases into a realm that the parties to the Convention never intended.

Nigeria had no relationship with Zhongshan, commercial or otherwise. Zhongshan's relationships in the country were with Ogun State (and companies owned by Ogun); and its disputes were ultimately with Ogun. Nigeria's roles were that its police, acting purely as police, took actions that contributed to Zhongshan's departure from Ogun; and Nigeria is the federal government of a federation of which Ogun State is a member. Nigeria had agreed on a treaty with China in which each country promised certain treatment for each other's investors. The Nigeria-China Treaty gives no hint that either country regarded the Treaty promises as commercial transactions or relationships. Unlike many investment-related treaties, the Treaty does not commit the parties to treating investor disputes as commercial transactions under the Convention.

These circumstances matter under the Convention.  First, the Convention does not apply to an arbitration against a sovereign government acting as a sovereign.  The Convention applies only to disputes between "persons."  It was well-understood during the drafting and negotiation of the Convention that this word would encompass a sovereign only to the extent the sovereign was operating in the realm of private law—the "*jure gestionis*" operations of a government that, as a sovereign, acts "*jure imperii.*"  That limited use of the word "person" with respect to a sovereign is consistent with how statutes are interpreted under U.S. law as well.  Nigeria was, with respect to Zhongshan in this case, solely functioning *jure imperii.*  Alleged expropriation by the police, the Supreme Court has held, is *jure imperii.*  So is the negotiation of a treaty.  And so is the sufferance of vicarious liability for a constituent state, according to the very same draft document on which the arbitrators relied to impose that vicarious liability.

Even assuming Ogun State had private-law interactions with Zhongshan, under this Court's precedents the actions of Ogun cannot be

attributed to the Federal Republic for stripping the Federal Republic's sovereign immunity.

Second, beyond the fact that the Convention does not apply to a dispute with a sovereign in its *jure imperii* capacity, in the United States the Convention applies only to disputes arising from a "legal relationship ... which is considered commercial," 9 U.S.C. § 202—the "commercial legal relationship" reservation under which the United States adopted the Convention. Nigeria's only pertinent legal relationship was the Nigeria-China Treaty—not a relationship that would be considered commercial in any ordinary sense use of the term.

To conclude the Treaty is a commercial relationship, the district court overextended *Belize Social Development Ltd. v. Government of Belize*, 794 F.3d 99 (D.C. Cir. 2015). In *Belize*, the legal relationship was a direct sale of real estate from the government to an ordinary company, for payment. Belize was a "person" in that transaction anyway, so no party raised the point made above that the Convention does not apply in the first place to disputes against a sovereign acting *jure imperii*. Belize suggested that its property sale could fall

outside the "commercial" reservation because the sales contract also included certain tax privileges for the buyer, and this Court held that "commercial" means simply having a connection to commerce. Here, there was no transaction between Nigeria and Zhongshan in the first place. The relationship at issue is purely a treaty between sovereign nations. To conclude that a treaty is a "legal relationship … which is considered as commercial" would imply that every treaty between sovereigns that relates to economic issues could give rise to Convention-based enforcement—the opposite of what the Convention's drafters intended.

Sometimes nations intend their agreements to be commercial in character for Convention purposes. When they do, they say so, in the treaty texts; there are multiple such examples. Given the Convention was not intended to cover disputes against sovereigns *qua* sovereigns, it must be possible for a nation to undertake a treaty on economic topics without being stripped of its sovereign immunity. The Nigeria-China Treaty is such an instance, and this is such a case.

## STANDARD OF REVIEW

The Court reviews *de novo* the decision on the motion to dismiss, *see Khochinsky v. Repub. of Poland*, 1 F.4th 1, 8 (D.C. Cir. 2021), and reviews *de novo* whether the FSIA denies a state its sovereign immunity. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 91 (D.C. Cir. 2002).

## ARGUMENT

As a foreign government, Nigeria is "presumptively immune from the jurisdiction of United States courts." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in the courts of [the United States]." *Argentine Repub. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). Consequently, the district court could only have jurisdiction if an exception under the FSIA applies to Zhongshan's Petition. Zhongshan had the burden to allege and eventually prove the asserted exception. *See Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008) (noting plaintiff must "present adequate supporting evidence" for jurisdiction); *Diag Human S.E. v. Czech Repub.-Ministry of Health*,

824 F.3d 131, 136 (D.C. Cir. 2016) (describing plaintiff's "burden" of showing its arbitration award is governed by the Convention).

Zhongshan invoked the (a)(6)(B) exception. Petition, ¶ 10, JA_. Thus, Zhongshan must allege its Petition is "to confirm an award" made under "an agreement made by [Nigeria] with or for the benefit of [Zhongshan] to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship," and that the award "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6)(B). The only arbitration agreement to which Zhongshan can point is the Nigeria-China Treaty. And the only "treaty or other international agreement" that supposedly governs the Award is the Convention.

But in truth, the Convention does not apply to the Award that Zhongshan won against Nigeria. The Award was made pursuant to a Treaty under which Nigeria and China, in their sovereign capacities, made diplomatic promises to allow judicial remedies and also dispute resolution by

arbitration for appropriate Chinese and Nigerian nationals.  The dispute leading to the Award involved only sovereign conduct as far as Nigeria is concerned; and Nigeria had no legal relationship with Zhongshan other than Nigeria's diplomatic promises to China.

The district court concluded that the Treaty is itself a commercial relationship—a first, so far as Nigeria is aware, for a diplomatic agreement that the parties chose not to treat as commercial.  That conclusion is contrary to the Convention and has no basis in precedent.  Meanwhile, Zhongshan has contended—so far as Nigeria can glean—that because the arbitrators relied on a doctrine of public international law to hold Nigeria vicariously liable for the conduct of Ogun State, Ogun's legal relationship is imputed to Nigeria for Convention purposes.  That, too, is contrary to the Convention and has no basis in precedent.

## I.    The Award Does Not "Aris[e] Out of Differences Between Persons."

Zhongshan's invocation of the Convention fails at the threshold, because the Award is not within the scope stated at the outset of the Convention.  Article I, section 1 says, "This Convention shall apply to the

recognition and enforcement of arbitral awards ... arising out of differences between persons, whether physical or legal."  Convention, art. I, § 1.  The Award against Nigeria does not qualify, because Nigeria is not a "person" for these purposes.

### A.    A sovereign is a "person" for Convention purposes only when it engages in private activity.

"[I]n common usage, the term 'person' does not include the sovereign," and therefore "statutes employing the phrase are ordinarily construed to exclude it."  *United States v. Cooper Corp.*, 312 U.S. 600, 604 (1941) (concluding the United States is not a "person" under the Sherman Act).  This presumption is not absolute, and of course there are multiple instances in which statutes have been interpreted to include various types of sovereigns as persons.  *See Price*, 294 F.3d at 96 (listing examples and counterexamples).  But in each such case, there must be some basis from the specific statute for overcoming the "longstanding interpretive presumption that 'person' does not include the sovereign."  *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000).  "Particularly is this true where the statute imposes a burden or

limitation, as distinguished from conferring a benefit or advantage." *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667 (1979). The presumption is "particularly applicable" where treatment as a person would subject a sovereign to liability, and "it may be disregarded only upon some affirmative showing of statutory intent to the contrary." *Vt. Agency of Nat. Res.*, 529 U.S. at 781. The presumption applies for interpreting the Convention, because, as this Court has repeatedly held, "treaty interpretation should be 'guided by principles similar to those governing statutory interpretation.'" *Collins v. NTSB*, 351 F.3d 1246, 1251 (D.C. Cir. 2003) (citation omitted).

There is, indeed, good reason to think the Convention applies to government bodies only to the extent they are engaged in the private sphere.[5] The countries developing the Convention said exactly that.[6]

---

[5] This Court and others have on multiple occasions treated awards against sovereigns as being subject to the Convention. Those occasions, discussed below, involved private activity by the respective governments. *Infra* at 52-58.

[6] The records of the drafting are pertinent sources of information on the Convention's meaning. "[W]e have traditionally considered as aids to [a treaty's] interpretation the negotiating and drafting history (*travaux préparatoires*)." *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996).

- A committee of the United Nations Economic and Social Council prepared the draft Convention. The committee's report explained that the new treaty should "go[] further than the Geneva Convention [a predecessor treaty on arbitration]" while "at the same time ... respect[ing] the sovereign rights of States." U.N. Economic & Social Council, *Report of the Committee on the Enforcement of International Arbitral Awards*, E/2704, E/AC.42/4/Rev.1 (Mar. 1955) ("Report of the Comm."), ¶ 14.

- The committee made several decisions towards that end. For example, while the title of an early proposal referred to "International Arbitral Awards," the committee changed it to say "Foreign Arbitral Awards" because the Convention "does not deal with arbitration between States." *Id.* ¶ 17. If sovereign governments were "persons" for all purposes under the Convention, an arbitration between States would be a dispute between "persons," so this statement of purpose by the

---

*Zicherman*, for example, relied on the reports of a drafting committee to interpret the Warsaw Convention. *Id.*

committee would have been contrary to the committee's own drafting work.[7]  Thus, the committee's statement that the Convention does not cover arbitrations between States demonstrates that States are not generically included as "persons" whose disputes are within the scope of Article I section 1.

- The committee specifically explained what the "differences between persons" clause means, with respect to governmental bodies.  Belgium proposed that the clause "should expressly provide that public enterprises and public utilities should be deemed to be legal persons for purposes of this article if their activities were governed by private law." *Id.* ¶ 24.  "The Committee was of the opinion that such a provision would be superfluous and that a reference in the present report would suffice." *Id.*  That "reference" thus makes clear that governmental bodies can be legal persons but only to the extent they are operating in the private sphere—"their activities ... governed by private law."

---

[7] The drafting committee developed the clause "arising out of differences between persons whether physical or legal." *See* Report of the Comm., Annex.

In sum, the *travaux préparatoires* of the Convention provide affirmative evidence that "persons" encompasses sovereigns only in this limited sense. As noted above, a litigant seeking to treat a sovereign as a "person" "must point to some indication" in the statutory context showing that was the intent. *Return Mail, Inc. v. U.S. Postal Serv.*, 139 S. Ct. 1853, 1863 (2019). After the Convention's drafters stated their intention so plainly, there is no room to interpret "person," in the Convention, beyond that stated intention.

That limited interpretation is also in line with how courts have often approached the matter in those cases that treat sovereigns as "persons." For example, in *Pfizer, Inc. v. Government of India*, the Supreme Court assessed whether foreign governments are "persons" that can present Sherman Act claims. 434 U.S. 308 (1978). "[A] foreign nation," the Court concluded, "is entitled to pursue the remedy of treble damages *when it has been injured in its business or property by antitrust violations*." *Id.* at 318 (emphasis added). "When a foreign nation enters our commercial markets as a purchaser of goods or services, it can be victimized by anticompetitive practices," and can be permitted a claim. *Id.* Thus, *Pfizer* held that a foreign government as a

purchaser can present an antitrust claim; it did not hold that a foreign government can act as a sovereign to enforce the Sherman Act. In *California State Board of Optometry v. FTC*, this Court explained the converse situation: "Although a State may be a 'person' for purposes of the antitrust laws, it is equally clear, … that when a State acts in a sovereign rather than a proprietary capacity, it is exempt from the antitrust laws even though those actions may restrain trade." 910 F.2d 976, 980 (D.C. Cir. 1990). A century ago, the Supreme Court held that the Republic of France is subject to a *laches* defense when it sues "for the prosecution of a private and proprietary, instead of a public or governmental right," whereas a government is ordinarily not subject to *laches* for its sovereign actions. *La Republique Francaise v. Saratoga Vichy Spring Co.*, 191 U.S. 427, 438 (1903). In two cases a decade apart, the Supreme Court decided that the Republic of Cuba cannot be sued in U.S. courts for expropriation of assets, and yet it could be sued for failure to refund certain contractual payments. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964); *Alfred Dunhill of London, Inc. v. Repub. of Cuba*, 425 U.S. 682 (1976). "Distinguishing between the public and governmental acts of sovereign states on the one hand and their

private and commercial acts on the other is not a novel approach." *Alfred Dunhill*, 425 U.S. at 695.

*Belize Social Development* is not to the contrary. In that case, Belize contended that a reservation to the Convention as adopted by the United States, under which this country enforces only awards arising out of commercial legal relationships, excluded an agreement for claimant "to purchase properties from Belize" in return for preferential tax treatment and "other significant benefits." 794 F.3d at 100. The Court rejected that argument because the word "commercial," in that reservation, means simply "in connection with commerce." The agreement at issue met that requirement because it "involve[d] the sale of real property," the "provision of telecommunication services," and the payment of corporate taxes incurred for commercial transactions—all acts having a connection to commerce. *Id.* at 104. Focusing on the preferential tax treatment, as no one disputed that the sale of real property and provision of telecommunication services are commercial acts, the Court rejected the notion that a transaction is "non-commercial" simply because one aspect is sovereign in character. *Id.* at 105.

27

In contrast to *Belize*, here no act of Nigeria was commercial in nature. And none of the above conclusions is contrary to Nigeria's observations here, because the question is not what Congress intended when the United States adopted the "commercial" reservation. The Convention itself is a treaty agreed upon by multiple nations, and its interpretation is governed by "the shared expectations of the contracting parties," *Air France v. Saks*, 470 U.S. 392, 399 (1985). As set forth above, the Convention as a whole—even before contemplating the "commercial legal relationship" reservation—applies to "private arbitral agreements," as even *Belize* recognized, 794 F.3d at 103. A governmental body can enter a "private" agreement, as discussed above, as Belize did ("the company contracted to purchase properties from Belize which the country desired to sell," *id.* at 100). Perhaps for that reason, the Government of Belize did not ask the Court to assess the Convention's scope under article I section 1, and the Court's opinion did not touch that question. That the U.S. "commercial legal relationship" reservation does not follow the international-law distinction between sovereign and private acts does not mean the Convention itself ignores the difference.

When the Convention was negotiated, countries around the world were newly adopting the more refined concept of sovereign immunity in which "the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*)." Letter from Jack B. Tate, Acting Legal Adviser, U.S. Dept. of State, to Acting U.S. Attorney General Phillip B. Perlman (May 19, 1952), reprinted as Appendix 2 to *Alfred Dunhill*, 425 U.S. at 711. The Convention, in that context, was "designed to deal with purely commercial matters," and "was not designed for enforcement of arbitral awards against state parties." Sornarajah, M, *The Settlement of Foreign Investment Disputes,* 309 (2000). It is sensible, then, that the only extent that the parties to the Convention could have contemplated enforcing it against a sovereign government was to the extent the government acted in the private sphere. Leading commentators are in accord on this point. For example, the International Council for Commercial Arbitration's *Guide to the Interpretation of the 1958 New York Convention*, explains that "persons," in Article I section 1, includes "public law entities entering into commercial contracts with private parties"—and at the

same time, the Guide says, courts recognize, in this respect, "the distinction between *acta de jure gestionis* and *acta de jure imperii*."[8]  *Guide to the Interpretation of the 1958 New York Convention: A Handbook for Judges*,  85 (P. Sanders ed., 2011).

### B.    Nigeria acted solely as a sovereign with respect to Zhongshan.

Zhongshan has not alleged any commercial activity on the part of Nigeria.  Nigeria did not purchase anything from Zhongshan or make any investment in Zhongshan, or sell anything to Zhongshan or provide it anything, or to or from any of Zhongshan's affiliates.  Nigeria had no contractual arrangement with Zhongshan or its affiliates at all.  The Petition alleges various contracts and other arrangements that Zhongshan or its affiliates had for working on the Ogun Free Trade Zone.  Petition, ¶¶ 5-6, JA__. None was with Nigeria or with any agency or company controlled by Nigeria. The Award describes Zhongshan's arrangements in more detail.  Award, ¶¶ 4-32, JA__.  It, too, mentions no agreement or arrangement with Nigeria or

---

[8] As quoted above from the State Department's 1952 letter, the phrase "*jure gestionis*" refers to private activity and "*imperii*" to sovereign activity.  452 U.S. at 711.

with entities it controls.  Nigeria simply was not involved in Zhongshan's engagement in the Ogun Free Trade Zone or in Zhongshan's work there.

To the contrary, Zhongshan's dispute with Nigeria arises solely from sovereign activities by the Federal Republic.  There are, so far as the Petition or Award reveals, three potential sources for the dispute.

***First***, Nigeria allegedly expropriated Zhongshan's investments. Petition, ¶ 23, JA__.  This accused expropriation involved activities by police and by the Nigerian Export Processing Zones Authority to deprive Zhongshan of its rights—rights it asserted, note again, under agreements not with Nigeria.  Award, ¶¶ 125-126, JA__ (summarizing the expropriation). Nigeria does not agree with Zhongshan's characterization of the events, but regardless, expropriation is a quintessentially sovereign act.  In *Sabbatino*, the Supreme Court held that, by operation of the "act of state" rule, U.S. courts "will not examine the validity of a taking of property within its own territory by a foreign sovereign government."  376 U.S. at 428.  Congress subsequently legislated that sovereigns will not be immune from such cases in U.S. courts. 28 U.S.C. § 1605(a)(3).  But, as the Supreme Court subsequently explained, that

stripping of immunity is "unique" in the world, because it "permits the exercise of jurisdiction over some public acts of expropriation." *Fed. Repub. of Germany v. Philipp*, 141 S. Ct. 703, 713 (2021). It remains the case that expropriation is "a sovereign's public [act] not its private act[]." *Id.; see also, e.g.*, *Rong v. Liaoning Province Gov't*, 452 F.3d 883, 889-90 (D.C. Cir. 2006) (affirming dismissal of a case alleging expropriation by a Chinese province, because "[a] private party in the market could not have done what the Province did here").

**Second**, the events of which Zhongshan complained were, the Award concluded, breaches of certain obligations under Nigeria's Treaty with China. Award, ¶¶ 128-132, JA__; Petition ¶ 23, JA_. A treaty is obviously a sovereign, not a commercial, act. What distinguishes *jure gestionis* actions from *jure imperii* is that a government "exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Nelson*, 507 U.S.at 360. "Put differently, a foreign state engages in commercial activity ... only where it acts in the manner of a private player within the market." *Id.* A "private player" obviously does not and cannot engage in making a treaty with another sovereign nation. Indeed, the Supreme Court

observed that "[s]uch acts as legislation ... cannot be performed by an individual acting in his own name." *Id.* at 362. "They can be performed only by the state acting as such." A treaty is quite akin to legislation, and is equally an act that can only be performed by a government, as a government.

*Nelson* also confirms further that the activities Zhongshan complains about as constituting the expropriation were sovereign, not commercial, in character. Apparently the Nigerian Export Processing Zone Administration wrote to the Nigerian Immigration Service asking it to confiscate immigration papers from foreign staff. Award, ¶ 39, JA_. And police harassed, arrested, and beat one of Zhongshan's managers. *Id. See also id.* ¶ 125, JA_ (summarizing the expropriation as arising from "the actions taken by Ogun State, NEPZA and the police"). *Nelson* held directly that such conduct is *jure imperii.* In *Nelson*, Saudi Arabian police arrested the plaintiff, imprisoned him, and mistreated him in prison. Regardless of whether those activities were improper or unlawful, the Supreme Court held, they were sovereign not commercial, because "[e]xercise of the powers of police and penal officers is

33

not the sort of action by which private parties can engage in commerce." 507 U.S. at 362.

Even if in some circumstances a treaty between sovereign nations could have a commercial character, the Treaty in this case does not. For example, the Energy Charter Treaty expressly says that any "[c]laims submitted to arbitration" under that treaty "shall be considered to arise out of a commercial relationship or transaction for the purposes of article I" of the Convention. Energy Charter Treaty, (Annex I of the Final Act of the European Energy Charter Conference) (1995) 34 ILM 373, art. 26(5)(b). The Nigeria-China Treaty makes no such representation. To the contrary, in its provisions on dispute resolution, the first sentence says that disputes between the parties to the Treaty "shall be settled through diplomatic channels." Treaty, art. 8 § 1, JA__. That is the mechanism available to sovereigns, not to private commercial parties. When the parties must resort to arbitration and cannot agree on a panel, the President of the International Court of Justice—a tribunal accessible only to sovereign nations—is designated to appoint the panel's chair. *Id.* art. 8 § 4, JA_. For disputes with private parties, China and Nigeria

each "commit[ted] themselves to enforcement" of arbitration decisions." *Id.* art. 9, § 6, JA_. Were the Treaty and its disputes commercial in character, this clause would be superfluous; both China and Nigeria have acceded to the Convention,[9] and would already be committed to enforcing the awards. Instead, each country made a sovereign commitment to undertake the enforcement of an award promised between them as sovereigns.

In short, every sentence of the Treaty breathes sovereignty. Nigeria and China made promises to each other about how to treat each other's nationals. Nothing in the Treaty suggests that either side was engaged in private activity, in the sense relevant for the Convention's Article I.

***Third***, Zhongshan alleges that Ogun State itself had contracts with Zhongshan and its affiliates, in particular a joint venture between Ogun, a Zhongshan subsidiary, and a third party. Petition, ¶ 17, JA_; *see also* Award, ¶¶ 4-12, JA__ (describing additional agreements involving Ogun State).

---

[9] *Contracting States,* Convention, https://www.newyorkconvention.org/countries (last visited: November 13, 2023).

Regardless of whether those agreements gave rise to the Award,[10] and regardless of whether those agreements were private activity by Ogun State, none of them constituted activity by Nigeria.  The Supreme Court has explained how to assess whether a sovereign government is responsible, under U.S. law, for the actions of an instrumentality.  "[G]overnment instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 626-27 (1983) ("*Bancec*"). This Court applies that analysis for determining whether a sovereign is "amenable to suit based upon the acts of such an instrumentality"—exactly the question here. *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000).

---

[10] In truth they did not.  Zhongshan's arbitration claims were solely based on the Treaty, and its affiliates were meanwhile litigating contract breach claims through the Nigerian courts.  Award, ¶ 86, JA_.  The arbitration panel allowed the case to go forward precisely because it was different from the litigation, in that the arbitration case was "based squarely on the Treaty." *Id.*

In *Transamerica*, a Venezuelan government-owned company engaged in shipping became insolvent and failed to make lease payments. *Id.* at 846. That was obviously private activity. But this Court rejected the notion that Venezuela itself could be subject to suit on the basis of the activities of its instrumentality. "[T]he rule," the Court explained, is that "a foreign sovereign is not amenable to suit based upon the acts of such an instrumentality." *Id.* at 848. That presumption can only be overcome if the body is "'so extensively controlled by its owner that a relationship of principal and agent is created,'" or where the circumstances are such that "recognition of the instrumentality as an entity apart from the state 'would work fraud or injustice.'" *Id.* (quoting *Bancec*, 462 U.S. at 629). On similar grounds, in *Hester International Corp. v. Federal Republic of Nigeria* the Fifth Circuit preserved Nigeria's sovereign immunity against a suit based on the private activities of the National Grains Production Company and of Cross River State—a sister state to Ogun,

37

another among the states in the federation.  879 F.2d 170, 171, 175-76 (5th Cir. 1989).[11]

Ogun State is an instrumentality under the definitions in the FSIA, 28 U.S.C. § 1603(b)(2) (defining that term to include "a separate legal person" which is "an organ of a foreign state or "political subdivision").  But under the Nigerian constitution, Ogun State is an "autonom[ous] ... government," with a "separate existence" and "independence from the Federal Government." *AG Abia*, (2006) 16 NWLR at 265 (Nigeria).  Nigeria's doctrine of federalism is set forth in section 2(2) of the constitution; and as the Nigerian Supreme Court has explained, "each government exists not as an appendage of another government but as an autonomous entity in the sense of being able to exercise its own will in the conduct of its affairs, free from direction by another government." *AG Abia*, 16 NWLR at 265 (Nigeria).  "[A] foreign government's determination that its instrumentality is to be accorded separate legal status"

---

[11] The claimant contended the National Grains Production Company was an agent of Nigeria.  It did not even offer the radical notion that Nigeria could lose its sovereign immunity based on the activities of a State in the federation. 879 F.2d 170.

is exactly what the *Bancec* presumption respects.  462 U.S. at 628.  So the Nigerian law clearly establishing the separate sovereignty of Ogun State precludes the attribution of Ogun's activities to Nigeria to rank the Federal Republic under *jure gestionis*.

Zhongshan certainly cannot show Ogun State is an agent of Nigeria, given the independence and "free[dom] from direction" enshrined in the Nigerian constitution.  More broadly, Zhongshan has not alleged either of the exceptions permitted by *Bancec* and *Transamerica*, or any facts to support either one.  *See* Petition, ¶¶ 2, 9, 16-20, JA__ (asserting jurisdiction but offering no allegations about the relationship between Ogun State and Nigeria).  This was Zhongshan's burden to allege.  *Foremost-McKesson, Inc. v. Islamic Repub. of Iran*, 905 F.2d 438, 447 (D.C. Cir. 1990) ("[T]he *plaintiff* bears the burden of asserting facts sufficient to withstand a motion to dismiss regarding the agency relationship.").

Nor did the Award describe any such facts, give any basis for applying either exception, or conclude that either exception holds for Ogun.  *See* Award, ¶¶ 72-76, JA__.  To the contrary, the arbitrators concluded that "all organs of

39

the State [the sovereign nation], *including those which have an independent existence in domestic law*, are to be treated as part of the State." Award, ¶ 72, JA__. Whatever the validity of that principle under evolving international law, it is the opposite of *Bancec* and *Transamerica*, under which Ogun's "independent existence" must be respected for assessing whether Nigeria acted in a commercial capacity.[12] That is the key question for determining whether the Award falls within the scope of Convention article 1 section 1, and that is the question this Court must address, without regard to the arbitrators' different theory on vicarious liability. *Cf. Foremost-McKesson,* 905 F.2d at 438 (holding that because "[t]he legal standards employed by the Claims Tribunal to

---

[12] The imposition of vicarious liability on this theory is also fundamentally inconsistent with the Award's being subject to the Convention. A necessary prerequisite to vicarious liability under the Draft Articles on the Responsibility of States for Internationally Wrongful Acts is that the entity directly acting was exercising governmental authority. "If it is to be regarded as an act of the State for purposes of international responsibility, the conduct of an entity must accordingly concern governmental activity and not other private or commercial activity in which the entity may engage." Draft Articles on Responsibility of States for Internationally Wrongful Acts, With Commentaries, art. 5 cmt. 5, U.N. Doc. A/56/10 (2001), https://legal.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf.

determine liability … are not coterminous with the standards applicable to determine a claim of attribution under FSIA," the Tribunal's decision did not govern the FSIA determination).

Because Nigeria's sole role with respect to Zhongshan, throughout the matter, has been that of a sovereign acting as a sovereign, Zhongshan's claims against it, and the resulting Award, are not within the Convention's scope set forth in Article 1 section 1.

## II.    Zhongshan's Claims Against Nigeria Do Not Arise Out Of A Commercial Legal Relationship.

Moreover, even if the Award were generally within the scope of Article I (it is not), the Award is particularly excluded from enforcement under the Convention in the United States.  This country acceded to the Convention with the "commercial reservation," allowed by Article I section 3.  The United States proclaimed it "will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as

commercial under the national law of the United States."[13]  Zhongshan's claims do not arise out of such a commercial legal relationship.

### A.    Nigeria had no legal relationship directly with Zhongshan.

Zhongshan has never identified any legal relationship that it had with Nigeria, and indeed there was none.  Nigeria was not a party to the various contracts that Ogun State had with Zhongshan or its affiliates, and Nigeria was not involved in Zhongshan's work on the free trade zone. *See supra* at 8-9. Zhongshan has not contended Nigeria was involved.  Indeed, when Zhongshan's affiliates commenced proceedings in Nigerian federal and state courts, the allegations were that Ogun and the Free Trade Zone Company— not Nigeria—had contracts that they had breached.  Award, ¶ 42, JA_. Zhongshan's Petition alleges that "Ogun State"—not Nigeria—wrongfully purported to terminate" the joint venture agreement. Petition, ¶ 19, JA_. The alleged expropriation did not result in Nigeria's obtaining any property or rights from Zhongshan or its affiliates.  Whoever obtained the allegedly

---

[13] *See Contracting States,* Convention, https://www.newyorkconvention.org/ countries (last visited: November 13, 2023).

seized investment interests, and whatever was Nigeria's contribution to pushing Zhongshan out, Nigeria did not receive what Zhongshan lost. Award, ¶ 33, JA__. The district court acknowledged that Zhongshan's agreements were with Ogun and the Free Trade Zone Company, and it noted without disagreement Nigeria's point that "no independent legal relationship existed between Nigeria and Petitioner." Opinion 17, 18-19, JA_.

In its reply in support of its motion for summary affirmance (a motion this Court denied), Zhongshan conceded that the various contracts connected to the free trade zone did not constitute a legal relationship between Zhongshan and Nigeria. "[T]he contractual relationships that Zhongshan and its affiliates had with other parties ... are irrelevant at this jurisdictional stage. Zhongshan's commercial legal relationship with Nigeria is rooted in the China-Nigeria [Treaty]." Dkt. No. 1997148, at 7.

B.    **The Nigeria-China Treaty is not a commercial legal relationship.**

A treaty between sovereign nations is not a "legal relationship ... which is considered as commercial," the criterion by which the "commercial" reservation is determined in the United States.  9 U.S.C. § 202.

The meaning of that criterion must be determined by the examples that Congress provided.  The statute illustrates:  Such "legal relationships" "includ[e] a transaction, contract, or agreement described in section 2."  *Id.* The section 2 agreements, in turn, are "any maritime transaction or a contract evidencing a transaction involving commerce."  *Id.* § 2.  A treaty is none of these things.  It is not a "transaction," but rather an international agreement establishing law for the nations undertaking it.  It is not a "contract" in the ordinary understanding of that word.  Nor is it an agreement "evidencing a transaction."

To be sure, section 202 covers not just those three types, but a broader category of "legal relationship[s]" that "includ[es]" them.  But "without claiming" that those terms "are exhaustive of the meaning of that term, one

44

must still admit their probative force in explaining that meaning." *Ala. Educ. Ass'n v. State Superintendent of Educ.*, 746 F.3d 1135, 1157 (11th Cir. 2014).  For example, the Supreme Court, in interpreting the FSIA's definition of "foreign state," noted that it "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state." *Samantar v. Yousef*, 560 U.S. 305, 314 (2010) (quoting 28 U.S.C. § 1603(a)).  The Court concluded, on that basis, that "foreign state" does not include individual officials of a foreign government.  "[E]ven if the list in § 1603(a) is merely illustrative, it still suggests that 'foreign state' does not encompass officials, because the types of defendants listed are all entities." *Id.* at 317.  *Alabama Education Ass'n* interpreted a statute that defined "political activities" to include "endorsing candidates and contributing to campaigns."  The Eleventh Circuit concluded that the statute covered only election-related activity, because that was the common thread introduced by the illustrative examples.  746 F.3d at 1157.  This Court has applied the same principle.  For example, in *Ass'n of American Railroads v. United States*, the Court interpreted the concept of "securities" in the Interstate Commerce Act.  603 F.2d 953, 958 (D.C. Cir. 1979).  That term was

45

defined to mean "any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier." *Id.* (quoting 49 U.S.C. § 20a(2) (1976)). "[G]eneral words ... should be construed as applicable to cases or matters of like kind with those described by the particular words," *id.* at 382 (citation omitted), the Court recalled, and therefore not *every* evidence of financing was covered—only those "of like kind to stocks or bonds." *Id.*

The Court has explained that this interpretive approach is necessary "to avoid rendering the [specific] terms superfluous." *Van Ee v. EPA*, 202 F.3d 296, 302 (D.C. Cir. 2000); *see also Ass'n of Am. of Railroads*, 603 F.2d at 382 (observing that too broad a reading of "securities" "rendered nugatory the statute's express reference to specific securities"). That concern is central here. If "legal relationship that is considered commercial" is broad enough to include a treaty simply because the treaty addresses economic issues, then that phrase, on its own, surely would include any transaction, contract, or agreement evidencing a transaction in commerce. So it was unnecessary and superfluous for Congress to list those particular examples. In reality, and properly understood, the list is not superfluous, because it is "illustrative," *see Samantar*,

560 U.S. at 317—it illustrates what the general concept means. Thus, to give significance to the items on the list of "legal relationship[s] considered as commercial," the Court must assess what they have in common, and apply that commonality to the general phrase.

That commonality is fairly evident. All the examples describe commercial transactions, however those transactions are memorialized. A treaty is fundamentally different. The nations undertaking a treaty are not providing or receiving goods, services, payments, or any other promise of the sort exchanged in a transaction. They are establishing the operative international law for the covered areas. Treaties are sometimes analogized to contracts, *e.g. LLC SPC Stileks v. Repub. of Moldova*, 985 F.3d 871, 879 (D.C. Cir. 2021), but they are fundamentally different. Treaties "do[] not include a contract by a state, even with another state, that is essentially commercial in character," Rest. 3d Foreign Relations Law § 301 cmt. d, and "the international law of international agreements has its own character," *id.* Part III Introductory Note. The effect of a treaty in domestic law is that of a "legislative enactment." *Medellín v. Texas*, 552 U.S. 491, 506 (2008).

That the "legal relationship[s]" that are "considered to be commercial" do not encompass treaties is consistent with the widespread understanding of the purposes of the Convention—which 9 U.S.C. § 202 implements. During deliberations on the draft Convention by the U.N. Conference on International Commercial Arbitration, Italy expressed worry whether the Convention could be used "in a dispute between States submitted to the Permanent Court of Arbitration at the Hague." The President of the Conference explained there was "no such intention." U.N. Conference on International Commercial Arbitration, *16th meeting*, E/CONF. 26/SR.16 (June 1958), p.5. As noted above, the title of the Convention was changed from "International Arbitral Awards," as a draft had it, to "Foreign Arbitral Awards," precisely because the drafters all understood that the Convention was not intended to govern inter-national arbitration. Report of the Comm., ¶ 17. The Restatement on Foreign Relations explains that while a government can have a commercial relationship, such as a "contract between a government and a private person," "[o]rdinarily, arbitration of a controversy of a public international law character, such as ... performance under an

international agreement ... is not subject to the New York Convention." Rest. 3d Foreign Relations Law, § 487 cmt. f.[14]

The district court, rejecting the assertion that a treaty is not a commercial legal relationship, relied on *Belize Social Development*, in which this Court held that the word "commercial" in section 202 refers to the broad scope of commerce, rather than delimiting the *jure gestionis* versus *jure imperii* distinction discussed above. Opinion 16, JA_; *Belize Social Dev't*, 794 F.3d at 104-05. But that holding from *Belize* is beside the point and does not address the questions that are central here. The government of Belize made an agreement with a private company for "the sale of real property in exchange for certain accommodations." 794 F.3d at 104. It could not have been disputed that the agreement was similar to the types listed in section 202; it was, as this Court said, "a transaction." *Id.* Belize sold properties that it owned, and

---

[14] An "international agreement," as used in that comment, means "an agreement between two or more states ... that is intended to be legally binding and is governed by international law." *Id.* § 301(1). The Treaty is obviously an "international agreement." It is an agreement between two sovereign nations, Nigeria and China, and it is explicitly governed by public international law. Treaty, art. 8 § 1, art. 9 § 7, JA_.

received payment; in the deal, it also guaranteed the purchaser a 15% return on investment, "with any shortfall to be paid by Belize." *Id.* at 100. Belize argued that the transaction was a sovereign act because, alongside the guaranteed payments, it promised certain regulatory benefits such as preferential tax treatment.[15] This Court held that for purposes of the "commercial" reservation and section 202, the word "commercial" means simply "hav[ing] a connection to commerce." *Id.* at 105. But in the same breath, the Court noted that the Convention's purpose was to "encourage the recognition and enforcement of commercial arbitration agreements in international *contracts*." *Id.* Belize had made such a contract. Nothing in the case suggests that a treaty falls within scope as well, simply because it addresses matters related to commerce.

If the district court were correct in its extension of *Belize*, the implications would be momentous. The vast majority of treaties are

---

[15] In truth, Belize's contract would have fallen on the *iure gestionis* side of the line anyway, because the core of the agreement was to sell real estate and exchange payments, which is exactly the sort of thing private parties do.

connected to commerce in one way or another.  The district court's approach would mean, therefore, that in all those treaties among sovereign nations that involve economic topics, the dispute resolution processes would lead to Convention enforcement.[16]  That is the opposite of what the drafters expressly said they intended.

The district court focused on how this Court interpreted the word "commercial."  But the *Belize* opinion did not even purport to interpret the full language that is at issue here, the complete phrase "legal relationship ... which is considered as commercial."[17]  As this Court has noted in passing, what matters is whether "th[e] *relationship* was commercial in nature." *Diag Human*, 824 F.3d at 136 (emphasis added).  "[I]n expounding a statute, we are not

---

[16] Under this Court's precedents, it does not matter whether the nations that are party to a dispute have accepted the Convention.  All that matters is that the award is rendered in a Convention country.  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 688 F.3d 724, 731 (D.C. Cir. 2012) (for an arbitration in a Convention country, upon enforcement in U.S. courts, "the fact that Belize is not a party to the [Convention] is irrelevant").

[17] "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *San Diego Gas & Elec. Co. v. FERC,* 913 F.3d 127, 142 (D.C. Cir. 2019).

guided by a single sentence or member of a sentence, but look to the provisions of the whole law." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35 (1990). Knowing (from *Belize*) that a document that is squarely a transactional agreement, within the heartland of the items listed in section 202, counts as "commercial" so long as it is connected to commerce, does not determine that a treaty is a legal relationship considered as commercial. As set forth above, a treaty is a very different kind of legal relationship from a transactional agreement.

Furthermore, the statute actually does not cover all relationships that *are* commercial. It only covers legal relationships that "are considered as commercial." Those additional words—"are considered"—must be given significance. *McDonnell v. United States*, 579 U.S. 550, 569 (2016) (there is a presumption that "statutory language is not superfluous."). So there must be some relationships that might be generally related to commerce but are, nonetheless, not "considered to be commercial." A treaty on economic issues would readily fit the bill.

### C.  The Restatements do not convey a view that international treaties are commercial legal relationships.

The Restatements of the American Law Institute are not, of course, the law, *see Wilson v. Good Humor Corp.*, 757 F.2d 1293, 1312 (D.C. Cir. 1985) (Bork. J, concurring) (noting courts "must resist" giving too much weight to Restatements); *see also* Frequently asked questions, Am. Law Inst. (Restatements are "not controlling law"), but the district court and Zhongshan gave them great significance.

Above, Nigeria quoted the Restatement on Foreign Relations. Nigeria presented that passage to the district court, but the district court rejected it because the Restatement's comment also cites section 904 of the Restatement (which discusses purely state-to-state arbitrations).  Opinion 11-12, JA_ (presenting a longer quotation from section 487 comment f).  Therefore, the court concluded, the phrase "arbitration of a controversy of a public international law character, such as . . . performance under an international agreement" must refer only to nation-to-nation arbitrations. Opinion 12, JA_. In the district court's view, not all disputes about performance under

international agreements are disputes "of a public international law character." Opinion 18, JA_. That is not what the Restatement says. It says arbitrations of a "public international law character" are not commercial, and then it gives three examples of disputes in that category. One of the examples is disputes about "performance under an international agreement." Rest. 3d Foreign Relations Law, § 487 cmt. f. The phrase "such as" ordinarily indicates that what follows is a list of example of items "fall[ing] within" the broader category. *Cf. Pub. Emps. Ret. Sys. of Ohio v. Betts*, 492 U.S. 158, 159 (1989).[18] It would be strange to use "such as" to introduce a list of items that are *not* generally within the broader category. The district court adopted that awkward interpretation solely because the comment included a "*See* section 904" citation. That is a poor justification for ignoring the actual words of the comment, and doing so to reach the startling result that a dispute purely

---

[18] This Court once recalled an example from Justice Thomas's writing: "'[R]ights enumerated in the Constitution, such as the freedom of speech' ... refer[s] to the whole set of enumerated constitutional rights, and not just the one." *United States v. Godoy*, 706 F.3d 493, 495 (D.C. Cir. 2013).

arising from a sovereign treaty—no ordinary commercial agreement in sight—is "considered to be commercial."

The district court further noted that comment (f) says the "commercial" reservation excludes "matrimonial or custody disputes, disputes concerning succession to property, … labor disputes," and other disputes excluded by FAA section 1.  Opinion 12, JA_.  That list in the comment cannot be exclusive, because immediately following it is another broad category that is excluded, namely the disputes of a public international law character.  And the district court pointed out that comment (f) also says "[d]isputes arising out of investment agreements are not excluded" by the "commercial" reservation.  Opinion 12, JA_.  But that observation begs the question of what the commentator meant by the term "investment agreement," and whether that term was meant to encompass treaties in general.  After all, the very next sentence says that disputes under "international agreements" are not commercial in character.  Assuming the commentator meant "investment agreements" to refer in part to agreements made by sovereigns (the comment

55

does not elaborate), at most it would appear to cover their agreements with investors. Not nation-to-nation treaties.

Zhongshan has also pointed out that the Restatement on International Commercial and Investor-State Arbitration defines the word "commercial" to encompass "investor-State arbitrations." Rest. of the U.S. Law on Int'l Commercial & Investor-State Arbitration, § 1.1 cmt. e. A Restatement adopted in 2023 cannot be significantly informative about the intentions of Congress in ratifying the Convention in 1970. "[W]ords generally should be interpreted as taking their ordinary, contemporary, common meaning ... at the time Congress enacted the [s]tatute," *Wisc. Central Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018), not the meanings created by commentators on developments in international law in recent decades. Besides, the Reporter's Note to this passage disclaims the very usage that Zhongshan attempts. "The broad meaning given the term 'commercial,'" the Reporter said, "corresponds to the relatively wide ambit of the present Restatement." *Id.* Reporter's Note (e). "But the term is not intended to provide a unified definition governing every context in which the commercial character of a transaction or relationship

leads to application of the principles restated," and "[s]pecific contexts may require the application of specialized definitions dictated by the particular treaty or statutory requirements in question." *Id.* The Reporter suggested that "relations between States and foreign investors" are often considered commercial." *Id.* The example it cited, *Island Territory of Curacao v. Solitron Devices, Inc.*, 356 F. Supp. 1, 13 (S.D.N.Y. 1973), involved an agreement directly between a sovereign and an investor—not a treaty between two sovereigns about how to treat each other's nationals.

### D.    None of the precedents invoked by Zhongshan or the district court shows a treaty on economic issues is a "legal relationship which is considered commercial."

The district court thought that because there are multiple cases enforcing arbitration awards against foreign sovereigns, that must be the right course here too. But no case cited by Zhongshan or the district court, nor any case that Nigeria has found, holds that a treaty between two sovereign nations, extending sovereign protection to investors of each other's citizens, can constitute the "legal relationship, commercial in nature" needed for an award to be enforceable under the Convention in the United States. The court

below said it would not "swim upstream against the common practice," Opinion 13-14, JA_. In truth, in all those previous cases, the respondent foreign sovereign had undertaken commercial transactions with the claimant. Nigeria did not transact with Zhongshan in any sense. The district court's description of a "common practice" is like a person who grew up in a land of zebras and concludes that all equines are striped.

- *Belize Social Development*, 794 F.3d 99: As discussed above, the country's prime minister signed an "Accommodation Agreement," under which Belize sold some real estate to a purchaser, and also promised to make payments if the purchaser's return on investment fell below a guaranteed minimum. *Id.* at 100. The Court rejected Belize's argument that this agreement was not "commercial," and there was an actual commercial transaction. *Id.* at 103-04. Selling real estate is also not a sovereign activity, though no party raised that issue, understandably.

- *Diag Human*, 824 F.3d at 133: The Czech government "entered into an agreement" to procure various services from Diag Human. The Court explicitly determined the company had shown a "legal relationship" with

the Czech Republic because the agreement described "the extent of the obligations" for the company to perform and "the remuneration exchanged for meeting the obligations." *Id.* at 133, 136.  In other words, it was an ordinary transaction with a government purchasing services, even though the agreement memorializing it was informal.

• *Tatneft v. Ukraine*, 771 F. App'x 9 (D.C. Cir. 2019) (unpublished per curiam judgment):  Ukraine formed a joint venture to operate an oil refinery, and then ousted the other investors. *Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 180-82 (D.D.C. 2018).  So it obviously had a legal relationship from which the dispute arose, a proposition that no party disputed.  This Court never decided whether the (a)(6)(B) exception would apply, because the Court concluded that Ukraine had waived sovereign immunity—the (a)(1) exception, which Zhongshan has not contended would apply in this case.[19]

---

[19] *Tatneft* mistakenly believed that a previous case, *Creighton Ltd. v. Qatar*, 181 F.3d 118 (D.C. Cir. 1999), had decided a country's accession to the Convention constitutes a waiver of its immunity from U.S. court.  771 F. App'x at 10.  *Creighton* had not actually decided that, and this Court subsequently clarified that the question remains open.  *Process & Indus. Devs. Ltd. v. Fed. Repub. of Nigeria*, 962 F.3d 576, 584 (D.C. Cir. 2020).  The U.S. government has warned

Zhongshan and the district court invoked a subsequent appeal in the same case, which addressed the merits and did not touch the FSIA jurisdictional point (which this Court had already resolved). 21 F.4th 829 (D.C. Cir. 2021). At any rate, Ukraine's formation of a joint venture to operate an oil refinery was surely *jure gestionis* activity, and the joint venture agreement was surely an ordinary legal relationship of a commercial nature.

- *LLC SPC Stileks v. Repub. of Moldova*, 985 F.3d 871 (D.C. Cir. 2021): The claimant sold electricity to a utility owned by Moldova's government. *Id.* at 875. To avoid paying, the government transferred most of the utility's assets to other, new, state-owned entities. *Id.* at 877; *see also LLC Komstroy v. Repub. of Moldova*, No. 14-1921, 2019 WL 3997385 (D.D.C. Aug. 23, 2019) (additional details in the district-court decision). Similarly in that case, the government's activities were ordinary *jure gestionis* actions, and there was an obvious commercial legal relationship. In addition, the arbitration was

---

application of "waiver" in such circumstances could adversely affect U.S. foreign relations, *Process & Indus. Devs. Ltd. v. Fed. Repub. of Nigeria*, 27 F.4th 771, 776 n.4 (D.C. Cir. 2022) (declining to apply the "waiver" exception).

conducted under the Energy Charter Treaty.  985 F.3d at 877.  As noted

above, *supra* at 31, that treaty says expressly that arbitrations under its

auspices are to be considered commercial.  The Nigeria-China Treaty does

not say that.

- *Chevron Corp. v. Ecuador*, 795 F.3d 200 (D.C. Cir. 2015):  "Chevron

and Ecuador signed an agreement allowing Chevron to develop

Ecuadorian oil fields in exchange for providing below-market oil to the

Ecuadorian government for domestic use." *Id.* at 202.  That was obviously

a commercial legal relationship, and Ecuador seems not to have disputed

the point.[20]  Buying oil would also seem to be a private-law transaction,

and Chevron's disputes with Ecuador were breach-of-contract claims.  *Id.*

at 203.

- *Gebre LLC v. Kyrgyz Repub.*, No. 20-1795, 2022 WL 2132481 (D.D.C.

June 14, 2022):  "The dispute in this case ... arose out of a series of license

---

[20] When a case does not discuss a particular jurisdictional issue, it is not even
"persuasive, much less binding, authority" on that issue.  *Schindler Elevator
Corp. v. Wash. Metro. Area Transit Auth.*, 16 F.4th 294, 299 (D.C. Cir. 2021)

agreements between the parties to transfer shares of company stock and mine rare earth elements." *Id.* at *4.

- *Stati v. Repub. of Kazakhstan*, 199 F. Supp. 3d 179 (D.D.C. 2016):  The Kazakhstan government harassed the claimants into "selling their investments to the state-owned KazMunaiGas at a substantial discount." *Id.* at 182.  There, too, was a commercial relationship.  The district court relied, for satisfying the element of a commercial legal relationship, on the Energy Charter Treaty, but not in the abstract.  As noted above, that treaty expressly says that claims arbitrated under it "shall be considered to arise out of a commercial relationship or transaction for the purposes" of Convention Article I.  That express statement by the signatories, which include Kazakhstan, was the basis for the district court's assertion of FSIA jurisdiction.  199 F. Supp. 3d at 186-87.  That premise does not hold here.

- *Crystallex Int'l Corp. v. Bolivarian Repub. of Venezuela*, 244 F. Supp. 3d 100 (D.D.C. 2017):  The claimant entered a "Mine Operating Contract" with a state-owned enterprise, to develop certain gold deposits.  *Id.* at 105.  The government then took fees from the claimant to issue a mining permit but

instead denied the permit and mined the gold deposits itself. *Id.* Here too, the sovereign had a commercial legal relationship with the claimant. The FSIA immunity question was not contested, because "Venezuela d[id] not object to th[e] Court's jurisdiction." *Id.* at 109 n.12.

• *Gold Reserve Inc. v. Bolivarian Repub. of Venezuela*, 146 F. Supp. 3d 112 (D.D.C. 2015): Here too, the mining claims were originally owned by a state-controlled company, which then "granted—and then revoked" the mining concessions giving rise to the claims. Venezuela did not object to the court's jurisdiction in this case either, so there was no decision about the issues raised in the instant appeal. Besides, in both *Crystallex* and *Gold Reserve*, the treaty under which Venezuela had promised to arbitrate was a particular Canada-Venezuela treaty, under which Venezuela had agreed that "claims submitted to arbitration shall be considered to arise out of a commercial relationship or transaction for the purposes of Article 1 of that Convention." Agreement between the Government of Canada and the Government of Venezuela for the Promotion and Protection of

Investments, Can.-Venez., Jan. 28, 1988, E101531–1998 Can. T.S. No. 20, art. XII § 6(b).

• Finally, Zhongshan has asserted that it is in an "identical … position" (Doc. 1997148, at 5) to the claimant in *Republic of Argentina v. BG Grp. PLC*, 715 F. Supp. 2d 108 (D.D.C. 2010): Argentina privatized its government-owned gas company, in part by selling part of it to a group of investors. *Id.* at 113-14. The terms of the sale included certain guarantees about the prices the privatized company could charge for gas sales in Argentina's capital city. Petition to Vacate or Modify Arbitration Award, Exhibit A, *Repub. of Argentina v. BG Grp. PLC*, No. 08-485, ECF No. 1-4, at 17-19 (D.D.C. Mar. 21, 2008). Argentina later changed the rules about those prices, and the investors complained that Argentina had violated the terms of the deal. *Id.* at 60-61.[21] If the courts had decided in *BG Group* that the arbitration fell within the "commercial legal relationship" reservation,

---

[21] Argentina argued that the arbitrators could not decide the investors' claims because they were really breach-of-contract claims. The arbitrators agreed the claims were contractual in nature but concluded that character did not exclude them from arbitration. *Id.* at 54, 61.

that conclusion would have little import for Zhongshan's case against Nigeria. Argentina was, quite arguably, engaged in private activity (selling a company) and a commercial legal relationship (that same sale).

But in fact, that question never came up. The arbitration took place in Washington, D.C., and Argentina then petitioned the district court to vacate the award. BG Group cross-petitioned for enforcement, and the court would have had at least two bases for penetrating Argentina's immunity—Argentina's waiver by initiating the case, and the separate arbitration exception for arbitrations taking place in the United States. 28 U.S.C. §§ 1605(a)(1), (a)(6)(A). But perhaps because that was obvious, no party raised the issue and no court addressed it. The applicability of the Convention arose in the district court in a strange way. BG Group asked the court to order a bond pending enforcement, pursuant to Article VI of the Convention. In response, Argentina disputed that the Convention applied, even though Argentina's petition had alleged that the Convention does apply. *See* 115 F. Supp. 2d at 116-17 (describing the procedural history). Argentina never disputed whether the dispute arose from private

activities, and never disputed whether the dispute arose from a commercial legal relationship—perhaps because, after all, the genesis of the dispute was the promises Argentina made in the transaction selling its gas company. 2d Supp. Mem. of Points with Regard to Posting of Bond, *Repub. of Argentina v BG Grp. PLC*, No. 08-485, ECF No. 30 (D.D.C. Oct. 10, 2008). Instead, Argentina contended the Convention does not apply to an arbitration held within the United States. The district court rejected that argument, 115 F. Supp. 2d at 117-19; and no party raised the issue again, as the case proceeded through this Court and then the Supreme Court on other issues. *Repub. of Argentina v. BG Grp. PLC*, 665 F.3d 1363 (D.C. Cir. 2012), *rev'd, BG Grp. PLC v. Repub. of Argentina*, 572 U.S. 25 (2014).

The *BG Group* case has nothing to teach the Court about whether the Convention covers *jure imperii* actions or whether the Treaty is a "legal relationship … which is considered as commercial." In *BG*, the Supreme Court decided that a certain procedural question was delegated to the arbitrators, and in doing so it applied to Argentina's treaty with the United Kingdom (the treaty that committed Argentina to arbitrate) the same presumptions about

delegation that the Court has developed for ordinary arbitration contracts. 572 U.S. at 36-38. But describing a treaty as "a contract … between nations," *id.* at 37, is one thing. This is only an analogy. "[T]he international law of international agreements has its own character, and analogies from the contract law of any particular country are to be used with caution." Rest. 3d Foreign Relations Part III Introductory Note. *BG Group*'s analogizing does not imply, and the opinion certainly does not say, that a treaty is *itself* a commercial transaction.

There was an underlying dispute between BG Group and Argentina, and Argentina itself had claimed that dispute was contractual. *Supra* at n. 21. Here, there is no other legal relationship between Zhongshan and Nigeria, and the district court concluded that the Nigeria-China Treaty is the commercial legal relationship. That conclusion is contrary to the long-accepted notion that a treaty is not a transaction, but rather "a compact between independent nations," "depend[ing] for the enforcement of its provisions on the interest and the honor of the governments which are parties

to it." *Medellín*, 552 U.S. at 505 (quoting *Head Money Cases*, 112 U.S. 580, 598 (1884)).

This discussion covers all the cases on which Zhongshan or the district court relied. As the district court admitted, "nearly every case enforcing an arbitration award against a foreign sovereign in this Circuit has involved an underlying contract or business agreement between the petitioner and foreign sovereign." Opinion 17, JA_. Unsurprisingly so; given the Convention's text, claimants ordinarily proceed in U.S. courts only when those legal relationships exist. The district court acknowledged the underlying agreements and conduct in this case were with and by Ogun, not Nigeria. Opinion 17, JA_. Yet it then concluded that the missing legal relationship does not matter, so long as the "subject matter ... is commercial." That premise is contrary to the Convention; is contrary to *Diag Human*, which allowed the exercise of jurisdiction only because "Diag Human had a legal relationship with the Czech Republic," 824 F.3d at 136; and has no support from cases in which courts enforced arbitration awards from disputes that actually did arise from such legal relationships.

## CONCLUSION

Nigeria's role with respect to Zhongshan was solely as a sovereign, not as a government acting in the private sphere.  That Ogun State had contracts and joint ventures with Zhongshan does not count as private activity by the Federal Republic itself, because Ogun is an independent government, whose actions cannot be attributed to Nigeria under private law or under U.S. law. An arbitration award arising from Nigeria's purely sovereign activities is not within the scope of Article I section 1 of the Convention; under the plainly stated understanding of the countries that developed it, a sovereign is not a "person," for Convention purposes, with respect to its *jure imperii* actions.

Moreover, regardless of the Court's interpretation of Article I section 1, in the United States an award is subject to the Convention only if the dispute arose from a "legal relationship ... which is considered as commercial."  A treaty between sovereign nations does not qualify, and Zhongshan cannot point to any other legal relationship it had with Nigeria.

For the foregoing reasons, Nigeria has sovereign immunity against Zhongshan's Petition. The Court should reverse the decision below, and instruct the district court to dismiss the Petition for lack of jurisdiction.

Dated: November 15, 2023                    Respectfully Submitted,

*/s/ Keith Bradley*
Keith Bradley
ScheLeese Goudy
SQUIRE PATTON BOGGS (US) LLP
717 17th Street, Suite 1825
Denver, CO 80202
Telephone: (303) 830-1776
Facsimile: (303) 894-9239
E-mail: keith.bradley@squirepb.com
E-mail: scheleese.goudy@squirepb.com

Raúl B. Mañón
200 South Biscayne Blvd, Suite 3400
Miami, FL 33131
Telephone: (305) 577-7000
Facsimile: (305) 577-7001
Email: raul.manon@squirepb.com

*Attorneys for the Federal Republic of Nigeria*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.     This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure P. 32(f) and Circuit Rule 32(e)(1), this document contains no more than 12,903 words, as determined by the word-count function of Microsoft Word 2016.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure P. 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Vollkorn Font.

*/s/ Keith Bradley*
Keith Bradley

## CERTIFICATE OF SERVICE

I certify that the foregoing document, together with appendices, was served on all parties to the proceeding in the district court by filing through CM/ECF. All parties below are represented by counsel that has registered with the Court's CM/ECF system.

/s/ *Keith Bradley*
Keith Bradley

ADDENDUM

# TABLE OF CONTENTS

9 U.S.C.A. § 202 ........................................................................................... 1a

28 U.S.C.A. § 1605(a)(6) ............................................................................. 2a

Convention on the Recognition and Enforcement of Foreign
Arbitral Awards, United Nations Conference on
International Commercial Arbitration ................................................... 3a

 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limitation Recognized by  Foresight Energy, LLC v. Certain London Market Insurance Companies,   E.D.Mo.,   Apr. 25, 2018

United States Code Annotated
  Title 9. Arbitration (Refs & Annos)
    Chapter 2. Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Refs & Annos)

9 U.S.C.A. § 202

§ 202. Agreement or award falling under the Convention

Currentness

An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

**CREDIT(S)**

(Added Pub.L. 91-368, § 1, July 31, 1970, 84 Stat. 692.)

Notes of Decisions (176)

9 U.S.C.A. § 202, 9 USCA § 202
Current through P.L. 118-19. Some statute sections may be more current, see credits for details.

End of Document                                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

28 U.S.C.A. § 1605

§ 1605. General exceptions to the jurisdictional immunity of a foreign state

Effective: December 16, 2016

**(a)** A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case-

**(6)** in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

# UNITED NATIONS CONFERENCE
## ON INTERNATIONAL COMMERCIAL ARBITRATION

# CONVENTION

## ON THE RECOGNITION AND ENFORCEMENT
## OF FOREIGN ARBITRAL AWARDS



*UNITED NATIONS*
*1958*

## CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS

### Article I

1. This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought.

2. The term "arbitral awards" shall include not only awards made by arbitrators appointed for each case but also those made by permanent arbitral bodies to which the parties have submitted.

3. When signing, ratifying or acceding to this Convention, or notifying extension under article X hereof, any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State. It may also declare that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration.

### Article II

1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

2. The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

### Article III

Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles. There shall not be imposed substantially more onerous conditions or higher fees or charges on the recognition or enforcement of arbitral awards to which this Convention applies than are imposed on the recognition or enforcement of domestic arbitral awards.

### Article IV

1. To obtain the recognition and enforcement mentioned in the preceding article, the party applying for recognition and enforce-

49

4a

ment shall, at the time of the application, supply:

(*a*) The duly authenticated original award or a duly certified copy thereof;

(*b*) The original agreement referred to in article II or a duly certified copy thereof.

2. If the said award or agreement is not made in an official language of the country in which the award is relied upon, the party applying for recognition and enforcement of the award shall produce a translation of these documents into such language. The translation shall be certified by an official or sworn translator or by a diplomatic or consular agent.

### Article V

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

(*a*) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(*b*) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(*c*) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains

decisions on matters submitted to arbitration may be recognized and enforced; or

(*d*) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(*e*) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(*a*) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(*b*) The recognition or enforcement of the award would be contrary to the public policy of that country.

### Article VI

If an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V (1) (*e*), the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security.

### Article VII

1. The provisions of the present Convention shall not affect the validity of multilateral or bilateral agreements concerning the recognition and enforcement of arbitral awards entered into by the Contracting States nor deprive

50

any interested party of any right he may have to avail himself of an arbitral award in the manner and to the extent allowed by the law or the treaties of the country where such award is sought to be relied upon.

2. The Geneva Protocol on Arbitration Clauses of 1923 and the Geneva Convention on the Execution of Foreign Arbitral Awards of 1927 shall cease to have effect between Contracting States on their becoming bound and to the extent that they become bound, by this Convention.

### Article VIII

1. This Convention shall be open until 31 December 1958 for signature on behalf of any Member of the United Nations and also on behalf of any other State which is or hereafter becomes a member of any specialized agency of the United Nations, or which is or hereafter becomes a party to the Statute of the International Court of Justice, or any other State to which an invitation has been addressed by the General Assembly of the United Nations.

2. This Convention shall be ratified and the instrument of ratification shall be deposited with the Secretary-General of the United Nations.

### Article IX

1. This Convention shall be open for accession to all States referred to in article VIII.

2. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

### Article X

1. Any State may, at the time of signature, ratification or accession, declare that this Convention shall extend to all or any of the territories for the international relations of which

it is responsible. Such a declaration shall take effect when the Convention enters into force for the State concerned.

2. At any time thereafter any such extension shall be made by notification addressed to the Secretary-General of the United Nations and shall take effect as from the ninetieth day after the day of receipt by the Secretary-General of the United Nations of this notification, or as from the date of entry into force of the Convention for the State concerned, whichever is the later.

3. With respect to those territories to which this Convention is not extended at the time of signature, ratification or accession, each State concerned shall consider the possibility of taking the necessary steps in order to extend the application of this Convention to such territories, subject, where necessary for constitutional reasons, to the consent of the Governments of such territories.

### Article XI

In the case of a federal or non-unitary State, the following provisions shall apply:

(a) With respect to those articles of this Convention that come within the legislative jurisdiction of the federal authority, the obligations of the federal Government shall to this extent be the same as those of Contracting States which are not federal States;

(b) With respect to those articles of this Convention that come within the legislative jurisdiction of constituent states or provinces which are not, under the constitutional system of the federation, bound to take legislative action, the federal Government shall bring such articles with a favourable recommendation to the notice of the appropriate authorities of constituent states or provinces at the earliest possible moment;

(c) A federal State Party to this Convention shall, at the request of any other Contracting

51

6a

State transmitted through the Secretary-General of the United Nations, supply a statement of the law and practice of the federation and its constituent units in regard to any particular provision of this Convention, showing the extent to which effect has been given to that provision by legislative or other action.

### Article XII

1. This Convention shall come into force on the ninetieth day following the date of deposit of the third instrument of ratification or accession.

2. For each State ratifying or acceding to this Convention after the deposit of the third instrument of ratification or accession, this Convention shall enter into force on the ninetieth day after deposit by such State of its instrument of ratification or accession.

### Article XIII

1. Any Contracting State may denounce this Convention by a written notification to the Secretary-General of the United Nations. Denunciation shall take effect one year after the date of receipt of the notification by the Secretary-General.

2. Any State which has made a declaration or notification under article X may, at any time thereafter, by notification to the Secretary-General of the United Nations, declare that this Convention shall cease to extend to the territory concerned one year after the date of the receipt of the notification by the Secretary-General.

3. This Convention shall continue to be applicable to arbitral awards in respect of which recognition or enforcement proceedings have been instituted before the denunciation takes effect.

### Article XIV

A Contracting State shall not be entitled to avail itself of the present Convention against other Contracting States except to the extent that it is itself bound to apply the Convention.

### Article XV

The Secretary-General of the United Nations shall notify the States contemplated in article VIII of the following:

($a$) Signatures and ratifications in accordance with article VIII;

($b$) Accessions in accordance with article IX;

($c$) Declarations and notifications under articles I, X and XI;

($d$) The date upon which this Convention enters into force in accordance with article XII;

($e$) Denunciations and notifications in accordance with article XIII.

### Article XVI

1. This Convention, of which the Chinese, English, French, Russian and Spanish texts shall be equally authentic, shall be deposited in the archives of the United Nations.

2. The Secretary-General of the United Nations shall transmit a certified copy of this Convention to the States contemplated in article VIII.

52

I hereby certify that the foregoing text is a true copy of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York on 10 June 1958, the original of which is deposited with the Secretary-General of the United Nations, as the said Convention was opened for signature, and that it includes the necessary rectifications of typographical errors, as approved by the Parties.

Je certifie que le texte qui précède est une copie conforme de la Convention pour la reconnaissance et l'exécution des sentences arbitrales étrangères, conclue à New York le 10 juin 1958 et dont l'original se trouve déposé auprès du Secrétaire général de l'Organisation des Nations Unies telle que ladite Convention a été ouverte à la signature, et que les rectifications matérielles nécessaires, telles qu'approuvées par les Parties, y ont été incorporées.

For the Secretary-General,
The Legal Counsel:

Pour le Secrétaire général,
Le Conseiller juridique :

Carl-August Fleischhauer

United Nations, New York
6 July 1988

Organisation des Nations Unies
New York, le 6 juillet 1988

8a