IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

ZHONGSHAN FUCHENG INDUSTRIAL INVESTMENT CO., LTD.,
*Petitioner-Appellee,*

v.

FEDERAL REPUBLIC OF NIGERIA,
*Respondent-Appellant.*

JOINT DEFERRED APPENDIX

*On Appeal from an Order and Memorandum & Opinion of the
U.S. District Court for the District of Columbia
Civil Action No. 22-170 (BAH)*

Keith R. Bradley
ScheLeese Goudy
SQUIRE PATTON BOGGS (US) LLP
717 17th Street, Ste 1825
Denver, CO 80202
Tel.: (303) 830-1776
Fax: (303) 894-9239
Email: keith.bradley@squirepb.com
E-mail: scheleese.goudy@squirepb.com

Raúl B. Mañón
SQUIRE PATTON BOGGS (US) LLP
200 South Biscayne Blvd., Ste 3400
Miami, FL 33131
Tel.: (305) 577-7000
Fax: (305) 577-7001
Email: raul.manon@squirepb.com

# TABLE OF CONTENTS

Page

I.    Petition to Recognize and Enforce Foreign Arbitral Award, by Zhongshan Fucheng Indistrial Investment Co. Ltd., January 25, 2022, ECF No. 1. ........................................................... JA-1

II.    Final Award between Zhongshan Fuchengh Industrial Investment Co. Ltd. and The Federal Republic of Nigeria, *In the Matter of an Arbitration Pursuant to the Agreement Between the Government of the People's Republic of China and the Government of the Federal Republic of Nigeria for the Reciprocal Promotion and Protection of Investments*, March 26, 2021, ECF No. 2-1 (Exhibit "A"). .................................................... JA -20

III.    Agreement Between the Government of the People's Republic of China and the Government of the Federal Republic of Nigeria for the Reciprocal Promotion and Protection of Investments, August 27, 2001, ECF No. 2-2 ("Exhibit "B") ................................................................. JA –88

IV.    Respondent Federal Republic of Nigeria's Motion to Dismiss for Lack of Jursidiction Under the FSIA, June 13, 2022, ECF No. 24 .......................................................... JA –98

V.    Reply Brief in Support of Federal Republic of Nigeria's Motion to Dismiss for Lack of Jursidiction Under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605, July 12, 2022, ECF No. 27 ........................................................ JA –294

VI.    Order of the District Court for the Disctrict of Columbia, January 26, 2023, ECF No. 28 .................................................... JA -313

VII.    Memorandum Opinion of the District Court for the District of Columbia, January 26, 2023, ECF No. 29. ........... JA -314

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ZHONGSHAN FUCHENG INDUSTRIAL INVESTMENT CO. LTD., Room 05, Floor 15 Tower 5 Shangfeng Financial Business Center No. 88 Zhongshan 4th Road East District Zhongshan City China, <div style="text-align:center">Petitioner,</div> v. THE FEDERAL REPUBLIC OF NIGERIA, c/o Hon. Geoffrey Onyeama Minister of Foreign Affairs The Ministry of Foreign Affairs of the Federal Republic of Nigeria Tafawa Balewa House Off Ahmadu Bello Way Central Business District Federal Secretariat Abuja Nigeria, <div style="text-align:center">Respondent.</div> | Civil Action No. _____ **PETITION TO RECOGNIZE AND ENFORCE FOREIGN ARBITRAL AWARD** |

Zhongshan Fucheng Industrial Investment Co. Ltd. ("**Petitioner**" or "**Zhongshan**"), by its undersigned attorneys, for its Petition to Recognize and Enforce a Foreign Arbitral Award, alleges as follows:

**INTRODUCTION**

1.      This is an action for recognition and enforcement of a foreign arbitral award dated March 26, 2021 that was rendered in London, United Kingdom (the "**Award**") and for judgment to be rendered thereon, pursuant to the Federal Arbitration Act (the "**FAA**"), 9 U.S.C. § 201 *et seq*., implementing the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21

U.S.T. 2517, T.I.A.A. 6997, 330 U.N.T.S. 3 (the "**New York Convention**").  A duly certified copy of the Award is attached as **Exhibit A** to the Declaration of Hussein Haeri dated January 20, 2022 (the "**Haeri Declaration**") filed in support of this Petition.

2.      The Award was rendered in Petitioner's favor in an arbitration that Petitioner commenced against the Federal Republic of Nigeria ("**Respondent**" or "**Nigeria**") on August 30, 2018, pursuant to the Agreement between the Government of the People's Republic of China ("**PRC**") and the Government of the Federal Republic of Nigeria for the Reciprocal Promotion and Protection of Investments (the "**BIT**").  A true and correct copy of the BIT as on file with the United Nations Conference on Trade and Development is attached as **Exhibit B** to the Haeri Declaration.  The *ad hoc* arbitration took place under the rules of the United Nations Commission on International Trade Law and was seated in London, United Kingdom (the "**Arbitration**").

3.      The Award was rendered on March 26, 2021.

4.      To date, Respondent has not paid any sums due under the Award.

5.      Accordingly, pursuant to 9 U.S.C. § 207, Petitioner respectfully requests that this Court:

    a.  enter an order recognizing and enforcing the Award and enter judgment in Petitioner's favor ordering Respondent to pay:

        i.   compensation damages in the sum of USD 55.6 million;

        ii.  moral damages in the sum of USD 75,000;

        iii. pre-award interest in the sum of USD 9.4 million;

        iv.  £2,509,789.57 (or US dollar equivalent) in respect of Zhongshan's legal and related costs of the arbitration;

JA-2

    v.  £354,655.17 (or US dollar equivalent) in respect of the other costs of the arbitration;

  vi.  interest on the sums specified on all the amounts specified in sub-paragraphs (i) to (iii) above from the day after the Award until payment at the one month USD LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly, until and including the date of payment (and should, for any reason, USD LIBOR cease to be operative while any amount remains outstanding, the interest due shall from that date onward be calculated on the basis of whatever rate is generally considered equivalent to USD LIBOR plus 2%, compounded monthly, until and including the date of payment );

 vii.  interest on the sums specified on all the amounts specified in sub-paragraphs (iv) and (v) above from the day after the Award until payment at the one month GBP LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly, until and including the date of payment (and should, for any reason, GBP LIBOR cease to be operative while any amount remains outstanding, the interest due shall from that date onward be calculated on the basis of whatever rate is generally considered

JA-3

equivalent to GBP LIBOR plus 2%, compounded monthly, until and

including the date of payment);[1] and

    b.   grant Petitioner such other and further relief as this Court deems just and proper.

## THE PARTIES

6.     Petitioner Zhongshan Fucheng Industrial Investment Co. Ltd. is a Chinese-registered company and has its principal place of business at Room 05, Floor 15, Tower 5, Shangfeng Financial Business Center, No. 88 Zhongshan 4th Road, East District, Zhongshan City, PRC. Petitioner was initially established as the subsidiary of Zhuhai Zhongfu Industrial Group Co. Ltd ("**Zhuhai**"). Zhuhai is a large and successful Chinese bottling company that, *inter alia*, operates in Free Trade Zones in the PRC and in other countries.

7.     Respondent the Federal Republic of Nigeria is a foreign state within the meaning of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1603.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 9 U.S.C. §§ 203 and 207 since this action seeks recognition and enforcement of an award rendered in an arbitration falling under the New York Convention.

9.     The Award is governed by the New York Convention because it arises out of a commercial legal relationship memorialized by a written agreement—including an agreement to arbitrate any disputes in London, United Kingdom (a contracting state to the New York Convention)—and at least one of the parties is not a citizen of the United States. *See* 9 U.S.C. § 202.

---

[1] For all of the aforementioned payments in US dollar equivalent, Petitioner respectfully requests that such payment be based on the exchange rate most favorable to Petitioner from the time that the Award was issued to the date of this Court's order or the date of payment.

10.     This Court also has subject matter jurisdiction to recognize and enforce the Award against Respondent, a foreign state, pursuant to 28 U.S.C. § 1330(a) which states:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

11.     Pursuant to 28 U.S.C. § 1605(a)(6), Respondent is not entitled to immunity in this proceeding since Petitioner is seeking to recognize and enforce a foreign arbitral award governed by the New York Convention.

12.     This Court has personal jurisdiction over Respondent pursuant to 28 U.S.C. § 1330(b), where Petitioner is making service in accordance with 28 U.S.C. § 1608.

13.     Venue is proper in this Court pursuant to 9 U.S.C. § 204 and 28 U.S.C. § 1391(f)(4), which provides that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

## FACTUAL BACKGROUND

### I.     Summary of the Underlying Dispute

14.     The facts leading up to the dispute between the parties are reflected in paragraphs 4-45 of the Award and are summarized below.  (*See* Haeri Declaration, Ex. A.)

15.     From approximately 2010-2016, Petitioner made substantial investments in Nigeria.  Through its local subsidiary, Zhongfu International Investment (NIG) FZE ("**Zhongfu**"), it developed and managed Fucheng Industrial Park ("**Fucheng Park**") in the Ogun-Guangdong Free Trade Zone in Nigeria (the "**Zone**"), a free trade zone established in Ogun State in Nigeria as a joint venture to promote trade between the PRC and Nigeria.

5

16.     Zhuhai originally acquired the right to develop and operate Fucheng Park within the Zone through the Agreement on Establishment of Fucheng Industrial Park in the Zone dated June 29, 2010 ("**the 2010 Framework Agreement**") entered into between Zhuhai and the Ogun Guangdong Free Trade Zone Company ("**OGFTZ**").  A deed dated October 10, 2010 (the "**2010 Deed**") among Zhuhai, OGFTZ, and Zhongshan had "the practical effect of transferring Zhuhai's rights and obligations under the 2010 Framework Agreement to Zhongshan[.]" (Award, ¶ 9.)

17.     On September 28, 2013, Ogun State, Zhongfu and Zenith Global Merchant Limited entered into the Joint Venture Agreement For the Development, Management and Operation of the Zone ("**2013 JVA**").

18.     Beginning in May 2016, and in breach of its obligations under the BIT, Nigeria took over Zhongshan's rights and assets and forcibly evicted its local subsidiary, Zhongfu, from the Zone, and consequently deprived Petitioner and Zhongfu of their rights under the 2010 Framework Agreement and/or the 2013 JVA.

19.     On May 27, 2016, Ogun State wrongfully purported to terminate the 2013 JVA.

20.     Subsequent to this wrongful termination, Respondent then mounted a campaign to threaten, harass, and evict Zhongfu from the Zone (including Fucheng Park) utilizing the police, Ogun State officials, and other governmental agencies.

**II.     The Arbitration Agreement in the BIT and the Arbitration**

21.     A description of the BIT and arbitration proceedings is reflected in paragraphs 46-69 of the Award and is summarized below.  (*See* Haeri Declaration, Ex. A.)

22.     On September 21, 2017, Petitioner gave Respondent notice of a dispute in accordance with Article 9 of the BIT.  The notice also contained a request to meet at Respondent's

earliest convenience to discuss the terms of an amicable settlement under the BIT. As evidenced

in the Award, Petitioner did not receive any response to the notice. (*See* Award, ¶ 81.)

23.     On August 30, 2018, Petitioner commenced the Arbitration, seeking damages for

losses resulting from Respondent's violations of the BIT. Petitioner claims for Respondent's

breaches of the BIT included:

> a.  Respondent violated its obligation of fair and equitable treatment under Article
>     3(1) of the BIT;
>
> b.  Respondent took unreasonable and discriminatory measures in violation of
>     Article 2(3) of the BIT:
>
> c.  Respondent failed to afford continuous / full protection and security in violation
>     of Article 2(2) of the BIT;
>
> d.  Respondent failed to observe the commitments entered into in violation of
>     Article 10(2) of the BIT; and
>
> e.  Respondent wrongfully expropriated Zhongshan's investments without
>     compensation in violation of Article 4 of the BIT.

24.     Petitioner and Respondent consented to arbitration. Respondent consented to the

submission of a claim to arbitration pursuant to Article 9 of the BIT which provides, in relevant

part:

> (1) Any dispute between an investor of the other contracting Party and the
> other Contracting Party in connection with an investment in the territory of
> the other Contracting Party shall, as far as possible, be settled amicably
> through negotiations between the parties to the dispute.
>
> (2) If the dispute cannot be settled through negotiations within six months,
> the [sic.] either party to the dispute shall be entitled to submit the dispute to
> the competent court of the Contracting Party accepting the investment.
>
> (3) If a dispute cannot be settled within six months after resort to
> negotiations as specified in Paragraph 1 of this Article it may be submitted

at the request of either Party to an ad hoc arbitral tribunal. The provisions of this Paragraph shall not apply if the investor concerned has resorted to the procedure specified in Paragraph 2 of this Article.

25.    In turn, on August 30, 2018, Zhongshan consented to arbitration by filing its Request for Arbitration.  It showed that the requirements for jurisdiction and admissibility in Article 9 of the BIT had been satisfied:

    a.   A dispute existed between Zhongshan (a national of one Contracting Party, the PRC) and Nigeria (the other Contracting Party);

    b.   The dispute arose in connection with Zhongshan's investments in Nigeria; and

    c.   Zhongshan provided Nigeria with a notice of dispute on September 21, 2017 in accordance with Article 9 of the BIT.  The notice also contained a request to meet at Nigeria's earliest convenience to discuss the terms of an amicable settlement under the BIT.  As evidenced in the Award, Zhongshan did not receive any response to the notice.  Thus, the parties were unable to settle their dispute amicably within six months.

26.    Respondent appeared and participated in the Arbitration.  In the context of the Arbitration, Respondent challenged the Tribunal's jurisdiction on the basis of a number of arguments. Specifically, Respondent asserted that:

    a.   Zhongshan's claims were not concerned with the conduct of Nigeria (but of one of the constituent states of Nigeria) and therefore that no claim lay against Nigeria in international law;

    b.   Zhongshan did not hold an "investment" within the meaning of article 1(1) of the BIT;

    c.   The six-month "cooling-off" period required by article 9(3) of the BIT was not properly observed, meaning Zhongshan could not commence the Arbitration;

JA-8

    d. Two sets of proceedings brought by Zhongfu in Nigeria in 2016 (the "**Nigerian Proceedings**") triggered a "fork-in-the-road" provision at article 9(3) of the BIT and acted as a bar to the Tribunal's jurisdiction;

    e. Zhongshan's claim could not be adjudicated without the involvement of the PRC government in the Arbitration; and

    f. Zhongshan could not base any part of its claim on the conduct of Nigerian courts since it had failed to pursue an appeal.

27. A hearing took place from November 9-13, 2020. (*See* Award, ¶ 69.)

## III. The Final Award

28. On 26 March 2021, the Tribunal rendered its Award.

29. The Tribunal considered Respondent's arguments with respect to jurisdiction at some length and rejected them all. Taking each of the above arguments in turn, the Tribunal held, *inter alia*, that:

    a. Zhongshan had a valid claim against Nigeria since the actions of Nigerian State organs are attributable to Nigeria for the purposes of State responsibility. On the same basis, the Tribunal dismissed Nigeria's subsidiary objection that Zhongshan's case was based on contractual breaches rather than BIT breaches.

    b. Zhongshan had made a qualifying investment within the meaning of Article 1(1) of the BIT.

    c. Zhongshan had complied with the six-month waiting period since "it would be contrary to justice if Nigeria could rely on its own failure to take up the invitation to negotiate in order to say that Zhongshan had failed to allow for a sufficient negotiating period." (Award, ¶ 81.)

  d. The fact that Zhongfu had pursued court proceedings in Nigeria did not preclude Zhongshan from pursuing the Arbitration in accordance with Articles 9(2) and 9(3) of the BIT.

  e. There was no need to request evidence from the PRC since Nigeria's actions fell within the scope of the BIT and Zhongshan was therefore entitled to proceed with the Arbitration.  Nigeria had also failed to approach any representatives from the PRC to provide evidence in the Arbitration.

  f. The evidence as to what Zhongfu should have done to appeal domestic court proceedings was not relevant to the Tribunal's determination, meaning no definitive conclusion was drawn as to the possibility of an appeal in the domestic proceedings.

30. On the above basis, the Tribunal concluded, in its Award, that it had jurisdiction to hear the dispute.

31. With respect to Petitioner's claims in the Arbitration, the Tribunal found, *inter alia*, that Respondent breached:

  a. Article 2(2) of the BIT (which contains a "continuous protection" standard) because it supported threats against Zhongshan, Zhongfu and their employees, and helped carry those threats into effect;

  b. Article 2(3) of the BIT (which contains a prohibition on unreasonable or discriminatory measures) because State bodies took actions for which there were no apparently justifiable grounds in domestic law with the aim of evicting Zhongfu from the Zone, and

engaged in illegal conduct or threats of illegal conduct towards Zhongfu and its employees;

c. Article 3(1) of the BIT (which contains a requirement that Nigeria accord "fair and equitable treatment" to investors) because there was a lack of due process in its conduct, including in the threats made by State officials to individuals, the "peremptory requirements to vacate", and the unnecessary use of police; and

d. Article 4 of the BIT (which contains a prohibition against unlawful expropriation) because Nigeria expropriated Zhongshan's investment without a public interest for that expropriation, without following domestic legal procedure, in a discriminatory manner and without paying fair (or any) compensation.

32.    Petitioner refers to paragraphs 121-132 of the Award for full details of the Tribunal's analysis regarding Respondent's breaches of the BIT.

33.    On the basis of these breaches of the BIT, the Tribunal ordered Nigeria to pay Zhongshan:

a. compensation for the expropriation in the sum of USD 55.6 million;

b. moral damages in the sum of USD 75,000;

c. interest on the aforesaid two sums from 22nd July 2016 at the one-month USD LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly, until and including the date of the award, in the sum of USD 9.4 million;

d.  in respect of the Claimant's legal and related costs of the arbitration, the sum of £2,509,789.57;

e.  £354,655.17 in respect of the other costs of the arbitration;

f.  post-Award interest on the sums specified on all the amounts specified in sub-paragraphs 33(a)-(c) above from the day after the Award until payment—the Award stipulated that this post-Award interest should be calculated "at the one month USD LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly, until and including the date of payment (and should, for any reason, USD LIBOR cease to be operative while any amount remains outstanding, the interest due shall from that date onward be calculated on the basis of whatever rate is generally considered equivalent to USD LIBOR plus 2%, compounded monthly, until and including the date of payment)".

g.  post-Award interest on the sums specified on all the amounts specified in sub-paragraphs 33(d)-(e) above from the day after the Award until payment—the Award stipulated that this post-Award interest should be calculated "at the one month GBP LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly, until and including the date of payment (and should, for any reason, GBP LIBOR cease to be operative while any amount remains outstanding, the interest due shall from that date onward be calculated on the basis of whatever rate is generally considered equivalent to GBP LIBOR plus 2%, compounded monthly, until and including the date of payment)."

34.     To date, Respondent has not complied with the Award and has not paid any part of the sums so awarded.

## IV.     RESPONDENT'S ENGLISH CHALLENGE AND ITS DISCONTINUANCE

35.     On April 23, 2021, Respondent filed an arbitration claim form in the English High Court seeking to challenge the Award under the English Arbitration Act, on the purported basis that the Tribunal lacked jurisdiction to render the Award (the "**English Challenge**").  (*See* Haeri Decl., ¶ 5.)  A true and correct copy of the English Challenge is attached as **Exhibit C** to the Haeri Declaration.

36.     In summary, Respondent contended that:

a.   The arbitration agreement in the BIT was invalid.  Nigeria gave no explanation as to the legal or factual basis for this assertion (which was made for the first time in the context of the English Challenge).

b.   Zhongshan failed to make a qualifying "investment" within the meaning given to that word by the BIT (the same argument which Nigeria had raised and the Tribunal had rejected in the Arbitration).

c.   The Nigerian Proceedings deprived the Tribunal of jurisdiction over the Arbitration under Article 9(3) of the BIT (again, an argument which Nigeria had raised and the Tribunal had rejected in the Arbitration).

(*See* Haeri Decl., ¶ 6.)

37.     On June 9, 2021, Zhongshan filed its response to the English Challenge.  (*See* Haeri Decl., ¶ 7.)  In summary, Zhongshan opposed the English Challenge on the basis that:

a.   Nigeria did not and could not identify any basis on which to suggest that the BIT or its arbitration agreement is invalid;

       b.   There is significant evidence showing that Zhongshan made an investment in Nigeria;

       c.   The Nigerian Proceedings are separate and distinct from Zhongshan's claim under the BIT.

       d.   Moreover, Nigeria had a full opportunity to argue the above points before the Tribunal, both in writing and orally.  The Tribunal considered arguments made by Nigeria before it at length and rejected them.

(*See id.*)

38.     On June 18, 2021, Zhongshan filed an application for security for costs and an application for security for the Award.  Nigeria did not respond to those applications.  (*See* Haeri Decl., ¶ 8.)

39.     On October 11, 2021, four days before the hearing of Zhongshan's application for security for costs, Nigeria filed a notice to discontinue the English Challenge.  (*See* Haeri Decl., ¶ 9.)  A true and correct copy of Nigeria's notice of discontinuance of the English Challenge is attached as **Exhibit D** to the Haeri Declaration.

40.     On November 3, 2021, the parties reached an agreement for Nigeria to pay Zhongshan's costs of, and arising from, the English Challenge in the sum of GBP 175,000.  (*See* Haeri Decl., ¶ 10.)  An order of the English High Court was issued to this effect on November 4, 2021 requiring Nigeria to pay the agreed sum by 4pm on December 1, 2021.  (*See id.*)  In breach of this order, Nigeria paid only GBP 100,000 by the deadline.  On December 2, 2021, Nigeria paid a further GBP 35,000.  (*See id.*)  On December 3, 2021, Nigeria paid a further GBP 25,000.  On December 7, 2021, Nigeria paid the remaining GBP 15,000 due.  (*See id.*)

41.     On November 8, 2021, following the discontinuance of the English Challenge, Petitioner invited Respondent to pay the sums awarded in the Award. No response was forthcoming.  (*See* Haeri Decl., ¶ 11.)  A true and correct copy of this November 8, 2021 correspondence is attached as **Exhibit E** to the Haeri Declaration.  On November 26, 2021, Petitioner sent a second invitation for Respondent, which also received no answer.  (*See* Haeri Decl., ¶ 11.)  A true and correct copy of this November 26, 2021 correspondence is attached as **Exhibit F** to the Haeri Declaration.

42.     On December 8, 2021, Petitioner commenced enforcement proceedings against Respondent in the UK court.  (*See* Haeri Decl., ¶ 12.)  On December 21, 2021, the English court issued an order recognizing the Award.  This order will be served on Nigeria by Petitioner's English counsel.  (*See id.*)

43.     As of the date of this Petition, Respondent still has not paid any part of the Award. (*See* Haeri Decl., ¶ 13.)

## CLAIM FOR RELIEF

### (Recognition and Enforcement of the Award under 9 U.S.C. § 207)

44.     Petitioner repeats and re-alleges paragraphs 1 through 43 as if fully set forth herein.

45.     The Award is a binding arbitration award and was rendered in Petitioner's favor.

46.     The Award is governed by the New York Convention because it arises out of a commercial legal relationship between Zhongshan and Nigeria and was rendered following an arbitration in London, United Kingdom (a contracting state to the New York Convention)—and at least one of the parties is not a citizen of the United States.  *See* 9 U.S.C. § 202.

47.     As of the date of this Petition, Respondent has not complied with the Award.

48.    The Federal Arbitration Act provides that the "court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207.

49.    The Award has not been set aside or suspended by a court in the United Kingdom, the competent authority of the country in which and under the law of which the Award was made.

50.    None of the grounds available for refusal or deferral of recognition or enforcement of an award specified in the New York Convention are applicable to the Award.

51.    Pursuant to 9 U.S.C. § 207, Petitioner has brought this action within three years after the Award was made on March 26, 2021.

52.    Under the terms of the Award, Respondent was ordered to pay:

    a.   compensation for the expropriation in the sum of USD 55.6 million;

    b.   moral damages in the sum of USD 75,000;

    c.   interest on the aforesaid two sums from 22nd July 2016 at the one-month USD LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly, until and including the date of the award, in the sum of USD 9.4 million;

    d.   in respect of the Claimant's legal and related costs of the arbitration, the sum of £2,509,789.57;

    e.   £354,655.17 in respect of the other costs of the arbitration;

    f.   post-Award interest on the sums specified on all the amounts specified in sub-paragraphs 52(a)-(c) above from the day after the Award until payment—the Award stipulated that this post-Award interest should be calculated "at the one month USD LIBOR rate plus 2 per cent for each year, or proportion thereof,

such interest to be compounded monthly, until and including the date of payment (and should, for any reason, USD LIBOR cease to be operative while any amount remains outstanding, the interest due shall from that date onward be calculated on the basis of whatever rate is generally considered equivalent to USD LIBOR plus 2%, compounded monthly, until and including the date of payment)."

g.  post-Award interest on the sums specified on all the amounts specified in sub-paragraphs 52(d)-(e) above from the day after the Award until payment—the Award stipulated that this post-Award interest should be calculated "at the one month GBP LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly, until and including the date of payment (and should, for any reason, GBP LIBOR cease to be operative while any amount remains outstanding, the interest due shall from that date onward be calculated on the basis of whatever rate is generally considered equivalent to GBP LIBOR plus 2%, compounded monthly, until and including the date of payment)."

53.    By reason of the foregoing, pursuant to 9 U.S.C. § 207, Petitioner respectfully requests that the Court recognize and enforce the Award and enter judgment in favor of Petitioner and against Respondent in the amount of the Award and as reflected in the accompanying proposed order.

**WHEREFORE**, Petitioner Zhongshan Fucheng Industrial Investment Co. Ltd. respectfully requests that the Court:

JA-17

a) recognize and enforce the Award against Respondent the Federal Republic of Nigeria pursuant to 9 U.S.C. § 207;

b) enter a judgment in Petitioner Zhongshan Fucheng Industrial Investment Co. Ltd.'s favor and against Respondent the Federal Republic of Nigeria ordering the payment of the following:

    i. compensation damages in the sum of USD 55.6 million;

    ii. moral damages in the sum of USD 75,000;

    iii. pre-award interest in the sum of USD 9.4 million;

    iv. £2,509,789.57 (or US dollar equivalent) in respect of Zhongshan's legal and related costs of the arbitration;

    v. £354,655.17 (or US dollar equivalent) in respect of the other costs of the arbitration;

    vi. interest on the sums specified on all the amounts specified in sub-paragraphs (i) to (iii) above from the day after the Award until payment at the one month USD LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly, until and including the date of payment (and should, for any reason, USD LIBOR cease to be operative while any amount remains outstanding, the interest due shall from that date onward be calculated on the basis of whatever rate is generally considered equivalent to USD LIBOR plus 2%, compounded monthly, until and including the date of payment);

    vii. interest on the sums specified on all the amounts specified in sub-paragraphs (iv) and (v) above from the day after the Award until payment at the one

18

month GBP LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly, until and including the date of payment (and should, for any reason, GBP LIBOR cease to be operative while any amount remains outstanding, the interest due shall from that date onward be calculated on the basis of whatever rate is generally considered equivalent to GBP LIBOR plus 2%, compounded monthly, until and including the date of payment); and

c)  grant Petitioner Zhongshan Fucheng Industrial Investment Co. Ltd. such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: January 25, 2022

By:  /s/ Steven Moore
_____
Steven Moore, D.C. Bar No. CT0012
WITHERS BERGMAN LLP
1700 East Putnam Avenue
Suite 400
Greenwich, Connecticut 06870
Telephone: (203) 302-4100
Fax: (203) 302-6609
Steven.Moore@withersworldwide.com

Emma Lindsay (*pro hac vice* pending)
Jovana Crncevic (*pro hac vice* pending)
WITHERS BERGMAN LLP
430 Park Avenue
New York, New York 10022
Telephone: (212) 848-9800
Fax: (212) 848-9888
Emma.Lindsay@withersworldwide.com
Jovana.Crncevic@withersworldwide.com

*Counsel for Petitioner Zhongshan Fucheng*
*Industrial Investment Co. Ltd.*

# EXHIBIT A

# CHEESWRIGHTS

### SCRIVENER NOTARIES | LLP

TO ALL TO WHOM THESE PRESENTS SHALL COME, I **EMMA NOON** of the City of London **NOTARY PUBLIC** by royal authority duly admitted and sworn DO HEREBY CERTIFY that the photographic copy hereunto annexed is a true copy of an original document purporting to be a final award issued on 26th March 2021, I having carefully collated and compared the said copy with the said original and found the same to agree therewith.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office at London aforesaid this fifteenth day of November in the year two thousand and twenty one.

Regulated through the Faculty Office of the Archbishop of Canterbury
Bankside House, 107 Leadenhall Street, London, EC3A 4AF   tel 020 7623 9477
email notary@cheeswrights.com   **www.cheeswrights.com**   Canary Wharf office tel 020 7712 1565
**Cheeswrights LLP** is a limited liability partnership registered in England and Wales under number OC426084

International Union of Notaries

SCRIVENER NOTARIES

JA-21

IN THE MATTER OF AN ARBITRATION PURSUANT TO THE
AGREEMENT BETWEEN THE GOVERNMENT OF THE PEOPLE'S
REPUBLIC OF CHINA AND THE GOVERNMENT OF THE FEDERAL
REPUBLIC OF NIGERIA FOR THE RECIPROCAL PROMOTION AND
PROTECTION OF INVESTMENTS

BETWEEN:

ZHONGSHAN FUCHENG INDUSTRIAL INVESTMENT CO. LTD.

Claimant

- AND –

THE FEDERAL REPUBLIC OF NIGERIA

Respondent

## FINAL AWARD

Arbitral Tribunal:

Mr Rotimi Oguneso SAN, co-arbitrator

Mr Matthew Gearing QC, co-arbitrator

Lord Neuberger of Abbotsbury, presiding arbitrator

Place of arbitration: London, United Kingdom

Date of Award: 26 March 2021

Date of Hearing: 9th to 13th November 2020

## FINAL AWARD

### A. **Introduction**

1.  The Claimant, Zhongshan Fucheng Industrial Investment Co. Ltd ("Zhongshan"), contends that, in the summer of 2016, entities for whose actions the Respondent, the Federal Republic of Nigeria ("Nigeria"), is liable in international law, deprived it of a substantial investment contrary to the provisions of articles 2, 3 and/or 4 of a Bilateral Investment Treaty ("the Treaty") between (i) the People's Republic of China ("the PRC") and (ii) Nigeria, and that Zhongshan is entitled to compensation from Nigeria to be assessed by an arbitration tribunal pursuant to article 9 of the Treaty.

2.  In the next section of this Award, Section B, we explain the basic relevant facts as advanced in this arbitration by Zhongshan on the basis of documents and oral evidence. Then, in Section C, we set out the relevant provisions of the Treaty. In Section D, we describe the relevant procedural history of this arbitration. Following that, in Section E, we address various jurisdictional and preliminary points raised by Nigeria. In Section F, we discuss misrepresentation and concealment arguments raised by Nigeria. Next, in Section G, we address the issue of Nigeria's liability. In Section H, we consider the appropriate level of compensation to be awarded. Section I deals with questions of interest and Section J with costs. Finally, in Section K, we make our award.

3.  Before setting out the history as described by Zhongshan, it is convenient to record that Zhongshan's claim relates to rights in the Ogun Guangdong Free Trade Zone ("the Zone"), a substantial area of land in Ogun State in Nigeria, which is owned by the Ogun State Government ("Ogun State") and which is not far from Lagos, Agapa Port and Lagos Airport. The history involves three companies in the Chinese-owned Zhuhai Zhongfu Industrial Group Co Ltd group of companies, Zhuhai Zhongfu Industrial Group Co Ltd ("Zhuhai"), Zhongfu International Investment (NIG) FZE (Zhongfu") and Zhongshan. The unchallenged evidence of Dr Jianxin Han, the manging director of, and majority shareholder in, Zhongshan, was that Zhuhai started in the early 1980s as a business manufacturing and repairing fishing nets, then developed a bottle manufacturing business, and finally expanded into operating in Special Economic Zones ("SEZ"s) also known as Free Trade Zones ("FTZ"s), initially in China, and then in other countries. He said that the Group had an excellent record in developing and managing FTZs. He also explained

that the private equity firm, CVC Capital, had purchased a 29% stake in Zhonghsan in 2007 for USD225 million.   Zhuhai and Zhongshan are and were Chinese registered companies, and Zhuhai is Zhongshan's parent company. Zhongfu was and is a Nigerian company and a wholly owned subsidiary of Zhongshan,.

**B.**    **The basic facts as alleged by Zhongshan**

*The involvement of Zhongfu and Zhongshan in the Zone*

4.    The Zone was the subject of a Joint Venture Agreement entered into on 28th June 2007 ("the 2007 JVA") between the Ogun State and Guangdong Xinguang International China-Africa Investment Ltd (also known as China-Africa Investment Ltd, and hereinafter "CAI"), and CCNC Group Ltd ("CCNC").  We know that CAI was a Chinese entity but, other than that, the Tribunal was told very little about it.   Under the 2007 JVA, the development of the OGFTZ was to be carried out through Ogun Guangdong Free Trade Zone Company ("OGFTZ"), which was to be jointly owned by Ogun State, CCNC and (as to 60%) CAI, for a period of 99 years. The arrangement envisaged by the 2007 JVA involved CAI effectively carrying out the development, marketing and management of the Zone, albeit through OGFTZ. In practice, it appears likely that the management was carried out by CAI, and that OGFTZ was not constituted as envisaged by the 2007 JVA.

5.    On 28 September 2007, Ogun State granted to OGFTZ a 99-year Certificate of Occupancy ("the 2007 Certificate") over  2,000 hectares of land in the Zone. On 2 April 2008, the Nigeria Export Processing Zones Authority ("NEPZA"), which has a statutory duty to supervise and coordinate the organisations operating within Nigerian FTZs, signed an agreement granting OGFTZ exclusive concessions to construct, manage, and operate the Zone. On 3 June 2008, OGFTZ was registered as a free trade zone company.

6.    Dr Han's evidence was that, by 2010, only limited development had been carried out and CAI was running short of funds, and that, as a result, Zhuhai was introduced to Ogun State as a potential alternative or additional developer and manager. Following discussions, Ogun State and Zhuhai agreed that Zhuhai would effectively take over the development and management of Fucheng Industrial Park ("Fucheng Park"), an area of 224 hectares within the 2,000 hectares the subject of the 2007 Certificate, and enjoy some sort of priority rights over the rest of the Zone

7.  On 29th June 2010, Zhuhai and OGFTZ entered into a *"Framework Agreement on Establishment of Fucheng Industrial Park in the Zone"* ("the 2010 Framework Agreement"). This Agreement (of which there was a Chinese version and an English version) gave Zhuhai the right to develop and operate Fucheng Park, within the Zone, which was described as *"an area of 100 km² constructed and managed [OGFTZ] which is located in the southeast of Ogun State, Nigeria"*. CAI was not a party to the 2010 Framework Agreement.

8.  The 2010 Framework Agreement included the following provisions:

    a.  Paragraph (A) of the preamble, which recorded that OGFTZ was formed by Ogun State and CAI *"to establish and operate"* the Zone and to *"acquire the land use rights"* over it *"for a period of 99 years"* from an unspecified date in 2008;

    b.  Paragraph (B) of the preamble, which recorded that Zhuhai *"wishes to build up [the] Park"*, and to develop on it *"factories and an industrial park"*;

    c.  Clause 2.2, which stated: *"[t]he actual operation and management organ of [the] Park shall be [Zhuhai's] wholly-owned subsidiary or a company under [its] control"*;

    d.  Clause 2.6, which stipulated that *"the 97-year land use rights regarding [the] Park shall be in the possession of"* Zhuhai, which was *"entitled to exercise its full right for such industrial land's occupancy, use, proceeds and disposal"*;

    e.  Clause 3, which provided for a *"97-year concession fee"* payable by Zhuhai to OFGTZ as well as an *"initial Concession Fee of Land Use Right"*;

    f.  Clauses 4.1 and 4.2, which set out Zhuhai's rights and obligations with regard to the development of Fucheng Park (and in particular the installation of infrastructure) and gave Zhuhai the right:

        i.   To charge a "Comprehensive Administrative Fee" (clause 4.1.1);

        ii.  To have *"certain administrative right over enterprises in [the] Park"* (clause 4.1.6);

  iii.  After it had completed its infrastructure obligations in relation to Fucheng Park, to have "*priority to invest in and develop other areas in [the Zone] under the same conditions*" (clause 4.1.7); and

g.  Clause 5, which contained OGFTZ's obligations which were effectively to be supportive of the development of Fucheng Park, and which included an obligation not to develop any other part of the Zone until 80% of Fucheng Park was developed (clause 5.2.7).

h.  Clause 6, by which OGFTZ apparently agreed to transfer to Zhuhai the benefit of all existing contracts in respect of businesses already trading in Fucheng Park.

9.  Some fifteen weeks after the 2010 Framework Agreement was entered into, another document dated 10th October 2010 ("the 2010 Deed") was entered into by Zhuhai, OGFTZ and Zhongshan. This document, which is in Chinese, whose English translation is a little hard to understand, appears to have the effect of entitling Zhuhai to carry out its obligations under 2010 Framework Agreement through third parties. According to the testimony of Dr Han, the 2010 Deed was treated by Zhongshan and Zhuhai as having the practical effect of transferring Zhuhai's rights and obligations under the 2010 Framework Agreement to Zhongshan (which, as we have mentioned, is a subsidiary of Zhuhai).

10.  On 24th January 2011 Zhongfu (which, as we have mentioned, is a subsidiary of Zhongshan) was registered by NEPZA as a Free Trade Zone Enterprise in the Zone.

11.  A document ("the 2011 receipt"), which is dated 25th July 2011 and was signed on behalf of Zhongshan and OGFTZ, contains an acknowledgment by OGFTZ that Zhongshan had paid "*the first instalment of the land use rights fees*" under the 2010 Framework Agreement in the sum of RMB 5,455,129.50.

12.  On 28th November 2011, Mr Taiwo Adeoluwa, who had recently become the Secretary to the Ogun State Government ("Ogun State") (and remained so until 2019) wrote a letter ("the November 20111 letter) to CAI, referring to earlier correspondence and complaining of "*wanton violation of the terms of the [2007 JVA]*", "*the unsatisfactory share arrangements*" (presumably with regard to OGFTZ), and "*rampant smuggling*". The letter then went on to refer to the fact that "*following …. extensive due diligence enquiries in both Nigeria and China*", CAI or its parent company, Guangdong Xinguang

*International Group Co Ltd, "is now officially bankrupt"* and that *"a top executive is alleged to be involved in criminal activity"*. The letter invited CAI's response to these allegations. If there was such a response, the Tribunal was not provided with it.

13. On 15th March 2012, Mr Adeoluwa wrote two letters on behalf of the Ogun State ("the March 2012 letters"). The first was to CAI. It referred to earlier correspondence, including the November 2011 letter, which had contained a number of complaints which Ogun State had made against CAI, based on its *"incompetence and flagrant violation of the terms of the [2007 JVA]"*. The letter then went on to state that Ogun State was *"constrained to terminate forthwith your participation in the [Zone] in accordance with the terms of that Joint Venture Agreement"*, on various grounds including *"that the company has been adjudged bankrupt"*, as well as illegality, fraudulent practices, failing to provide a business plan, a Master Plan, or a Phased Design Plan, and failure to contribute to the share capital of OGFTZ.

14. The second letter of the March 2012 letters was to the Managing Director of Zhongfu. It stated that Ogun State had decided to appoint Zhongfu *"the interim Manager/Administrator"* of the Zone (and not just Fucheng Park) for *"an initial period"* of three months, *"subject to a renewal thereof upon satisfactory performance"*. The role was briefly described in the letter as *"attracting sufficient business to the Zone to boost economic activities"* and *"rejuvenating generally the Free Trade Zone"*. It appears that the three months was extended either expressly or implicitly, until the arrangements were placed on a more permanent basis on 28th September 2013 as explained below.

15. The arrangements set out in the March 2012 letters had the approval of NEPZA. On 10th April 2012, it wrote to the General Manager of CAI *"confirm[ing] the termination of your appointment as Manager and operator of the [Zone] by [Ogun State]"*, and requiring CAI to *"handover all assets and documentation which belongs to the Ogun Guangdong Free Trade Zone to the newly appointed Management company [Zhongfu]"*. The following day, NEPZA wrote to Mr Wang Junxiang of Zhongfu *"confirm[ing] the appointment of your organisation as the Managers and operators of [the Zone]"*.

16. Meanwhile, on 15th January 2013, by a document ("the 2013 document"), which is in Chinese (and of which we were supplied with an English translation), Zhuhai assigned its interest in the 2010 Framework Agreement to Zhongfu. As we have mentioned, it appears

that Zhongshan, the parent company of Zhongfu had already taken over Zhuhai's rights and responsibilities under the 2010 Framework Agreement, at least in practical, if not in legal, terms, some thirty months earlier.

17.   There is also a document ("the 2013 acknowledgement") written in Chinese, dated 13th April 2013, which is signed on behalf of Zhongshan and Ogun State, and which (according to the English translation) is an acknowledgment by OGFTZ that Zhongshan had not only paid the sum referred to in the 2011 receipt, but also RMB 4,544,870.50 "*to make up the deficiency of land use transfer fee that should be paid by Zhuhai*".

18.   On 28th September 2013, Ogun State, Zhongfu and Zenith Global Merchant Limited ("Zenith") entered into a "*Joint Venture Agreement For the Development, Management and Operation*" of the Zone ("the 2013 JVA"). The preamble to the 2013 JVA recorded, inter alia, that:

   a.   The "*participation*" of [CAI] in the Zone "*has been terminated by [Ogun State] vide a letter dated 15th March 2012*"; and

   b.   Zhongfu "*has been appointed as the new manager of the [Zone] has invested in the infrastructure of the [Zone] and has proved its expertise to partner in the development, operation, management and administration of a free trade zone*".

19.   Clause 3 of the 2013 JVA provided that OGFTZ would be the joint venture company, and that it would owned as to 60% by Zhongfu, and 20% each by Ogun State and Zenith. Clause 4 was concerned with the control and running of OGFTZ. Clauses 6 and 12 of the 2013 JVA contained a number of obligations on the parties. They included:

   a.   In clause 2.3, an obligation on Zhongfu to contribute to the share capital of OGFTZ, and an obligation on Ogun State to provide "*10,000 hectares of land (in phases) to the [Zone]*",  and it was recorded in a Schedule that the "*parties try their best to locate maximum 7,000 hectares as a major land [sic] of the Zone*" and the remaining 3,000 hectares could be "*located in a different place if the cost to be spent in locating the 10,000 hectares in a place is too high for [Ogun State]*"

   b.   In clause 6.1,

     i.    an obligation on Ogun State to grant OGFTZ a 99-year term in respect of 10,000 hectares;

     ii.   an obligation on Ogun State together with Zhongfu and Zenith to work to get all necessary licences to enable any contemplated development and occupation to take place;

     iii.  an obligation on Ogun State to make the 10,000 hectares available to OGFTZ to enable it to "*conduct development and construction activities*" during the 99 years;

c.    In clause 6.2, a requirement that Zhongfu prepare a Master Plan, a Phased design Plan and a business plan, and also to begin construction within two months of getting the necessary licences;

d.    In clause 12.1, a requirement that Zhongfu carry out development in accordance with the Master Plan;

e.    In clause 12.3, an obligation on Zhongfu to instal infrastructure;

f.    Elsewhere in clause 12, a number of obligations on Zhongshu with regard to development, managing and marketing;

g.    In clause 15.1, the obligation on Ogun State to provide 10,000 hectares of land was effectively repeated, along with other obligations on Ogun State designed to assist the operations of Zhongfu, and in particular to "*strictly observe the provisions of [the Treaty] ... and provide adequate protection to the investment of [Zhongfu and Zenith] in OGFTZ and the Zone*".

20.    Clause 18 of the 2013 JVA included provisions for early termination by one party if the other party was in breach, became insolvent, or ceased to carry on business. So far as early termination for breach was concerned, it could only be implemented if (i) the breach was material, (ii) a notice specifying the breach had been served; and (iii) the breach was not remedied within 60 days of receipt of the notice. And clause 27 provided that, in the event of any dispute arising under the 2017 JVA, it should first be the subject of an attempt to settle, and if that failed, either party could refer the dispute to arbitration under

the UNCITRAL Rules in Singapore under the aegis of the Singapore International Arbitration Centre ("SIAC").

*The development of the Zone*

21.   From 2010, Zhuhai and Zhongfu carried out significant work on at Fucheng Park, and this work consisted of developing infrastructure, marketing and letting sites in Fucheng Park ("sites") for development to potential occupiers, and managing Fucheng Park as it was developed and occupied. Evidence to this effect was given to us by:

    a.   Dr Han, who visited the Zone in early 2010 and then went there to work more or less full time as Chief Executive Officer and Joint Chief Operating Officer of OGFTZ from October 2012 until June 2016,

    b.   Mr Zheng Xue, who worked more or less full time at Zone, and principally at Fucheng Park as Joint Chief Operating Officer of OGFTZ from October 2012 until June 2016, and

    c.   Mr Wenxiao Zhao, who was Chief Financial Officer of OGFTZ from April 2012 until June 2016, and spent almost all his time there in that period.

22.   The work carried out by Zhongfu, according to this evidence, included the erection of a perimeter fence round Fucheng Park, the installation or upgrading of roads, the upgrading of the sewerage system, and the upgrading of the power network in Fucheng Park. In addition, Zhongfu negotiated improved communication systems, and the opening of a bank, a supermarket, a hospital, and a hotel in order to assist to draw potential occupiers to Fucheng Park.

23.   Dr Han, Mr Xue  and Mr Zhao also said that, from 2010, efforts had been made to let out sites in Fucheng Park to occupiers for fixed terms, initially 90 years, but then normally between 10 and 50 years, most commonly 20 years. In 2011, there were, according to Mr Zhang, five occupiers of sites in Fucheng Park (and this is consistent with the documentary evidence, which suggests that agreements were entered into with seven potential occupiers that year). He also said that this increased to around 16 occupiers by early 2014, when much of the work just summarised had been completed. At that point, Zhongfu started to focus more sharply  on finding occupiers of sites in Fucheng Park, and

of Zenith who had been appointed to act for Ogun State as chief co-ordinator of the Zone, was distributed to occupiers of the Zone.

26. A letter dated 28th April 2014 in similar terms was sent by M.A. Banire and Associates ("Banires"), solicitors acting at that time for OGFTZ, to the Managing Director of Zhongfu, which stated that Ogun State has "*long terminated the interest of [CAI in the Zone]*" and referred to the letter to CAI of 15th March 2012. Banires' letter went on to explain that Zhongfu had been appointed to replace CAI under the "*able leadership of Dr Jason Han the Managing Director and Prof John Xue, the Chief Operating Officer*", and asked Zhongfu to disregard any communication from or on behalf of CAI "*as they have no authority or approval of ... Ogun State ... to act or do anything in respect of the ... Zone*".

27. Thereafter, at least until 2016, there appears to have been no further intervention in the Zone from CAI or NSG.

28. Meanwhile, Dr Han and Mr Xue were seeking out potential investors and partners for the development of the remainder of the Zone, travelling to China and the United States for this purpose. They were assisted by the fact that Zone was receiving a degree of international recognition. For instance, in April 2016, the Economist Intelligence Unit published a video entitled "*Growth Crossings: Ogun Guangdong Free Trade Zone in Nigeria*".

29. On 18th May 2015, Mr Adeoluwa wrote to the Managing Director of Zhongfu making a number of complaints about Zhongfu's operations, and stating that, while terminating the JVA was Ogun State's "*initial reaction*", it invited Zhongfu to attend a meeting to "*clear the air*" two days later. It does not seem that this meeting took place. It also appears that, although Zhongfu did not reply to the letter, Ogun State did not pursue the complaints any further.

30. On 20th January 2016, following discussions between Dr Han and a former MBA classmate, a Mr Li, who had 30 years' experience in the pharmaceutical industry, Ogun State and OGFTZ entered into a memorandum of understanding ("the 2016 MoU"), which was written in Chinese and English) with an entity called Xi'an Industrial Delegation, and which related to the development of a pharmaceutical park ("the

JA-31

Pharmaceutical Park") in the OFGTZ. It was expressed in very general terms, but it referred to "*setting up a Xi'an Hi-Tech Industrial Park with USD1 billion investment on 10 square kilometers of land over 10 years*". It referred to the "*hope*" that Ogun State would provide the requisite "*information ..., planning materials, personnel support, geographical data, ... plans etc*". It also contained a statement that another company in the Xi'an group ("Xi'an") was "*willing to cooperate with [Ogun State] to improve the infrastructure*", including building bridges, roads and a port, for which it needed the "*support*" of Ogun State..

31.  This was followed on 20th April 2016 by a "*Framework Agreement*" ("the 2016 Framework Agreement") between OGFTZ and an entity called Xi'an Ogun Construction and Development Limited Company (which the second recital records as having been formed by the Xi'an Industrial Delegation to implement the 2016 MoU).  It was signed when President Buhari of Nigeria was on an official visit to China in April 2016, and it set out in rather more detail how the Pharmaceutical Park would be managed and operated. Thus, it envisaged that OGFTZ would provide the infrastructure outside the park necessary to support the Pharmaceutical Park, and that Xi'an would carry out the development of the park. The 2016 Framework Agreement also provided for a slightly different arrangement from the Fucheng Park underleases so far as level of rents and allocation of administrative fees were concerned.

32.  Dr Han and Mr Xue also had discussions with Professor Issa Baluch and Mr Jon Vandenheuvel, both of whom gave evidence to us. Professor Baluch is an experienced businessman with over 35 years involvement in FTZ world. He was one of the principal individuals responsible for the setting up and running of the Jebel Ali Free Zone in Dubai, which he said had been very successful and which he had then used as a model for other FTZ developments.  Together with Mr Vanderheuvel, who is his partner in First Hectares Capital ("FHC") and had a background in academia and government, he started advising Zhongfu in autumn 2015. On 30th March 2016, FHC entered into a formal agreement with OGFTZ under which it was to be paid USD 7,500 per month. Together with Dr Han and Mr Xue, FHC started to develop a proposal for raising USD 250m "*to expand infrastructure across the Zone and the southwest region of Nigeria in order to attract new businesses to the Zone*", to quote from Mr Vandenheuvel's evidence. This got as far as

the production of a couple of brochures, but they were never   finalised, let alone distributed or circulated.

### *The events of April to August 2016*

33.   The reason that the brochure was not circulated was that Ogun State was challenging Zhongfu's right to any interest in the Zone through OGFTZ. This challenge appears to have been precipitated by a *note verbale* ("Note 1601") dated 11th March 2016 from the Economic and Commercial Section of the Consulate of the PRC in Lagos ("the Consulate") to Ogun State. Note 1601 stated that the Consulate had been "*officially notified*" by a PRC authority "*about the replacement of shareholdings owner of [CAI] to Guangdong New South Group*", which, the Note said, "*will legally lead to the replacement of the management rights of the OGFTZ which is now in the hands of [Zhongfu] to Guangdong New South Group*". A certificate dated 9th July 2013 from the Guangzhou Notary Public Office confirmed the fact that 51% of CAI had been acquired by NSG.

34.   On 12th April 2016, Mr Adeoluwa wrote a letter ("the April 2016 letter") to the Managing Director of OGFTZ. The letter stated in the first (unnumbered) paragraph, that the PRC government "*through [the Consulate]*" had directed that Ogun State "*be notified of the transfer Shareholding interests of [CAI] in  the OFGTZ to the New South Group*" and that "*[a]s a result of this development, the Consulate is requesting the Management Rights over the Zone be given to the new share owners*". Paragraph numbered 2 said that Ogun State had been provided with "*what appears to be valid Share transfer documents*", and stated that "*Ogun State was carrying out an investigation*". Paragraph numbered 3 requested that *"you furnish this office with proof that your company, [Zhongfu], is legitimately entitled to the shares and management rights over the Zone*", and suggested that, "*[w]ithout prejudging the outcome of the investigation*", "*the implication*" could be that the "*agreement between [Ogun State] and Zhongfu was premised upon misrepresentation and concealment of facts, and, therefore cannot be allowed to stand.*" Zhongfu was invited to "*clarify the position and respond to the demand of*" the PRC government.

35.   OGFTZ responded to the April 2016 letter on 26th May, saying that Dr Han and Mr Xue were out of the country, and seeking a meeting. The following day, Mr Adeoluwa wrote

a letter to the Managing Director of Zhongfu, referring to the April 2016 letter and saying that "*[t]he allegation against you bothered [sic] on fraud and material misrepresentation*" in that "*you were alleged to have fraudulently converted State assets ... and you misled Ogun State*" and that "*in the absence of new facts, we are obliged to accept the facts as presented by the Chinese government [in Note 1601] and act accordingly*". The letter then went on to suggest that OGFTZ's letter of 26th May "*deliberately did not address any of the issues, particularly the criminal allegations*", and ended by requiring Zhongfu "*to hand over all OGFTZ assets in its possession to [Zenith] and to vacate the Zone within 30 days hereof*".

36.  On 14th June 2016, Banires, who were by then acting for Zhongfu, responded in a letter apologising for the failure to deal with the issues raised in the April 2016 letter, and saying that the accusations in that letter and the "*termination*" in the May 2016 letter were "*based on some erroneous facts as misrepresented to you by the Chinese Consular*". Banires' letter then stated that the "*issue on which your letter of termination is based is not just coming up for the first time*", that it had arisen "*first in 2014*" and that Zhongfu's "*response*" at that time "*eventually laid to rest that issue*", and that "*it is now surprising that this issue is coming up again*". The letter than explained that CAI's rights had been terminated by Ogun State by the first of the March 2012 letters, and Zhongfu had then been subsequently appointed and had entered into the 2013 JVA, and then stated that "*the Chinese Consular misrepresented the facts to you*" but that, if the Consulate wished to persist, CAI "*should institute an action against [Zhongfu]*". The letter ended by "*urg[ing] your restraint*" and "*plead[ing] for a convenient date for a meeting wherein this issue can be appropriately discussed*".

37.  On 14th July 2016, Ogun State informed NEPZA that it should "*withdraw recognition and stop all dealings with [Zhongfu] with regard to any matter relating or connected to the [Zone]*", and "*implored ... all agencies to step in and fully investigate the activities of [Zhongfu]*". Two days later, Mr Adeoluwa sent a text to Dr Han, which ended by saying that his advice to Dr Han "*as a friend*" was that he should "*leave peacefully when there is opportunity to do so, and avoid forceful removal, complications and possible prosecution*". On 19th July, Dr Han said that he visited Mr Odega of the NEPZA who told him that Ogun State would use security personnel to get Zhongfu out of Nigeria. Dr Han also said that Mr Onas informed him in a telephone call around the same time that if he

did not hand over the Zone to Ogun State, his passport would be seized and he would be put in jail. Dr Han described himself as "*very scared*" by all this.

38.   There was also indirect evidence from Dr Han that, on 21st July, Mr Onas visited Fucheng Park and informed the tenants that Zhongfu's appointment had been terminated, and that a handover to the new manager had been scheduled for the following day. On 22nd July (again based on Dr Han's indirect evidence), Mr Onas again attended at Fucheng Park, this time with a member of the Nigerian police ("the police"), and introduced NSG as the new manager, and according to Mr Zhao caused some of Zhongfu's employees to be frightened.

39.   There was other evidence about activities and statements made on behalf of Ogun State which are said by Zhongshan to amount to threats to individuals working for Zhongfu, with the apparent aim of getting Zhongfu to vacate the Zone, and its personnel to leave Nigeria. However, it is only appropriate to refer to one or two further aspects. First, on 27th July, NEPZA wrote to the Nigerian Immigration Service asking it to collect the original form of immigration papers (in particular, work permits known as CERPACs) from all foreign staff, who would not have been able to work in Nigeria without such papers. The letter stated that the staff should only be allowed to leave with copies of the immigration papers.  Secondly, on 4th August 2016, warrants citing "*criminal breach of trust*" were issued, apparently at the request of the police, for the arrest of Dr Han and Mr Zhao. Thirdly, on 17th August, Mr Zhao was arrested at gunpoint, and was then deprived initially of food and water, intimidated, physically beaten, and detained for a total of ten days, by the police.  During his detention he was shown a copy of his warrant.  Mr Zhao's evidence is that when in custody the police repeatedly asked him about the whereabouts of Dr Han. Mr Zhao was eventually freed on bail.  He was initially required to deposit his passport with the police but after three visits to the relevant police station he was able to get the passport back and therefore he was able to leave Nigeria.

40.   Dr Han was never arrested and was also able to leave Nigeria.  Mr Zhao left Nigeria on 2 October 2016. Dr Han left on 11 October 2016.  Neither has returned since.

41.   We will refer to the oral and written communications from, and the actions of, Ogun State, NEPZA and the police as set out in paragraphs 33 to 39 above as "the 2016 Activities".

*Proceedings in Nigerian courts*

42. On 18th August 2016, Zhongfu started proceedings ("the Federal court proceedings") by way of a writ issued out of the Federal High Court in Abuja against NEPZA, the Attorney-General of Ogun State ("the A-G") and Zenith seeking declaratory and injunctive relief, effectively seeking to be reinstated as manager of the Zone. Some three weeks later on 9th September 2016 it started proceedings ("the State court proceedings") by way of a Statement of Claim issued out of Ogun State High Court against OGFTZ, Ogun State and the A-G of Ogun State, seeking possession of the Zone, an injunction, damages (in excess of USD 1 billion) and interest. On the same day, Mr Zhao issued proceedings ("Mr Zhao's proceedings") out of the Federal High Court in Abuja against the police, the Inspector General of Police, the Commissioner of Police for the Federal Capital Territory, Abuja and Wang Junxiong for damages in connection with his mistreatment.

43. The Federal court proceedings essentially relied on the proposition that there had been breaches of (i) Zhongfu's contractual rights as a manager of the Zone appointed by the first of the March 2012 letters, as approved in NEPZA's letter of 10th April 2012 confirming the termination of CAI's rights, and (ii) Zhongfu's rights under a *"tenancy"* of Fucheng Park under the 2010 Framework Agreement. In the State court proceedings, the claim was based on Zhongfu's right to possession of Fucheng Park under the 2010 Framework Agreement. The only reference to the 2013 JVA in either proceedings was in paragraph 5 of the Statement of Claim in the State court proceedings, where it was stated that *"[t]his action is filed by [Zhongfu] to recover possession of land based on documents existing prior to 2013 and without prejudice to any claims arising pursuant to agreements made by the parties to the [2013 JVA] which claims may be pursued in other proceedings"*.

44. It appears that nothing happened in the Federal court proceedings or the State court proceedings (together "the Court proceedings") or in Mr Zhao's proceedings for a substantial period, and that deadlines imposed by court rules were not complied with by the defendants, apparently with impunity. In March and April 2018, these three proceedings were discontinued.

45. Meanwhile, Zhongfu began SIAC arbitration proceedings against Ogun State and Zenith pursuant to clause 27 of the 2013 JVC, but on 5th January 2017, Zenith applied in the

Ogun State High Court for an anti-suit injunction restraining the arbitration. The application was heard by Justice Akinyemi, who gave judgment on 29th March 2017 granting the injunction sought on a permanent basis, essentially on the grounds that Nigeria (not Singapore) had a substantially closer connection to the arbitration and was therefore the seat of arbitration, and that the issue of the Federal court proceedings operated a waiver of the right to arbitrate or otherwise rendered the arbitration abusive or oppressive. On 23 June 2017, Zhongfu appealed this decision, but that appeal was were discontinued in 2018, together with the discontinuance of the Court proceedings.

C.   **The Treaty**

46.   The Treaty describes itself as an "Agreement Between the Governments of the PRC and Nigeria "*for the Reciprocal Promotion and Protection of Investments*". Save where the contrary is stated, all references hereafter to articles are to articles of the Treaty.

47.   Article 1(1) defines "*investment*" as "*every kind of asset invested by investors of one Contracting Party in accordance with the laws and regulations of the other Contracting Party in the territory of the latter*", and it goes on to identify certain more specific items "*in particularly [sic], but not exclusively*", including "*(a) ... any property rights ...* ", *(b) shares .... and any other kind of participation in companies ...., (c) claims to money or to any other performance with economic value ..., (e) business concessions ...*".

48.   Article 2(2) provides that "*Investments of the investors of either Contracting Party shall enjoy the continuous protection in the territory of the other Contracting Party*", and article 2(3) prohibits a Contracting Party "[*s*]*ubject to its laws and regulations*" from "*tak[ing] any unreasonable or discriminatory measures against the management, use, enjoyment and disposal of the investments  by the investors of the other Contracting Party*".

49.   Article 3(1) requires each Contracting Party to accord "*fair and equitable treatment*" to the "[*i*]*nvestments of investors of [the other] Contracting Party*" in its territory.

50.   Article 4(1) prohibits a Contracting Party "*expropriate[ing] against the investments if investors of the other Contracting Party in its territory*", unless it is "*for the public interests*", "*under domestic legal procedure*", "*without discrimination*" and "*against fair compensation*". Article 4(2) describes "*fair compensation*" as "*the value of the*

*expropriated investments immediately before the expropriation is proclaimed*". Article 4(2) also stipulates that such compensation is to be paid "*without unreasonable delay*", and that it must "*include interest at a normal commercial rate*".

51.  Article 9 is concerned with the "*Settlement of disputes between investors and one Contracting Party*". Article 9(1) provides for amicable settlement "*as far as possible*". Article 9(2) states that, if amicable settlement is unachievable "*through negotiations within six months, the [sic] either Party shall be entitled to submit the dispute to a competent court to [sic] the Contracting Party accepting the investment*". Article 9(3), first sentence, provides that if "*a dispute cannot be settled within six months after resort to negotiations ... it may be submitted at the request of either Party to an ad hoc tribunal*". The second sentence of article 9(3) states that "[*t*]*he provisions of this Paragraph shall not apply if the investor concerned has resorted to the procedure specified in paragraph 2 of this article*". Article 9(4) provides for the constitution of the ad hoc tribunal, with each party nominating an arbitrator, and the two party-appointed arbitrators appointing a "*Chairman*". Article 9(5) stipulates that the tribunal "*shall determine its own procedure*", although it goes on to provide that it may take guidance from ICSID's Arbitration Rules. Article 9(6) states that the tribunal's decisions are to be "*by a majority of votes*" and are to be "*final and binding on both parties to the dispute*". Article 9(7) provides that the tribunal shall "*adjudicate in accordance with the law of the Contracting Party to the dispute accepting the investment... as well as the generally recognized principles of international law...*".  Article 9(8) deals with costs.

### D.   **This arbitration**

52.  On 21st September 2017 Zhongshan sent to Nigeria a notice of dispute and request for negotiations ("the 2017 notice"), in which it expressed its willingness to discuss the dispute which had arisen as a result of the actions taken and statements made between April and August 2016 as described above. No response was received.

53.  On 30th August 2018, Zhongshan served a Request for Arbitration (a "Request") pursuant to article 9, setting out the history of Zhongfu's involvement in the Zone, and contending that the actions taken between April and August 2016 were in breach of Nigeria's obligations under the Treaty, nominating Mr Matthew Gearing QC as arbitrator, and claiming compensation, interest and costs.

54.  On 7th November 2018, Zhongshan applied to the International Centre for Settlement of Investment Disputes ("ICSID") for the appointment of an arbitrator for Nigeria pursuant to article 9(4). On 8th November, 2018, Nigeria nominated Mr Rotimi Oguneso SAN as its arbitrator, whereupon Zhongshan withdrew its application to ICSID.

55.  By a Notice of Appointment dated 5th January 2018, Mr Gearing QC and Mr Oguneso SAN formally appointed Lord Neuberger of Abbotsbury as the Chairman, whereupon the Tribunal was formerly constituted.

56.  The Tribunal had its first meeting on 15th January, 2019 via telephone conference. On 23rd February 2019, the Tribunal appointed the Permanent Court of Arbitration to provide support in managing the deposit and in connection with the hearing.

57.  Following a series of discussions between the Tribunal and the parties conducted by email, Consolidated Terms of Appointment were agreed and circulated on 24th April 2019, and Procedural Order No 1 ("PO 1") was made on 19th February 2019. PO 1 included a timetable ("the timetable") which, inter alia, provided for Nigeria to make a request for bifurcation by 2 September 2019 and for a hearing starting on 15th June 2020.

58.  On 1st May 2019, as prescribed in the timetable, Zhongshan served its Statement of Claim together with the witness statements of the witnesses on whose testimony it intended to rely, including evidence from an expert witness, Mr Matthews, an accountant, on the issue of quantum of compensation.

59.  Nigeria requested an extension of time for the date in the timetable (2nd September 2019) for the service of its Statement of Defence and associated witness statements and its Request for Bifurcation, and, following discussions, a revised timetable was directed by the Tribunal on 30th September 2019.

60.  In accordance with the revised timetable, Nigeria served (i) its Statement of Defence and associated witness statements, but no evidence from an expert witness, and (ii) Requests (a) for Bifurcation, (b) that the Tribunal determine the law applicable to the dispute, on 14th October 2019.

61.  Zhongshan responded to the Request for Bifurcation and the Request for a determination of the applicable law on 28th October 2019. On 7th November 2019, we decided that (i)

the proceedings should not be bifurcated, and (as amended by a subsequent email on the same day) (ii) it was premature to determine the applicable law. Pursuant to further representations from the parties, the Tribunal reconsidered its decision (ii) and on 14th November 2019 ruled that the governing law was "*the law of Nigeria as supplemented by international law as provided by article 9.7 of the Treaty*".

62.   Meanwhile, on 5th November 2019,  Zhongshan made a Request for Production of Documents, to which Nigeria replied on 19th November 2019, which reply was answered by Zhongshan on 25th November 2019, and Nigeria made a brief further rejoinder on 27th November 2019. The Tribunal gave its ruling on the Request for Production on 29th November 2019. Nigeria thereafter failed to give production of any of the documents which the Tribunal ordered that it produce.

63.   On 31st January 2020, in accordance with the revised timetable, Zhongshan served its Statement of Reply together with supporting witness statements. On 3rd February 2019, Nigeria sent corrected versions of a witness statement, and on 2nd March 2020, it served its Statement of Rejoinder, well in time.

64.   On 15th May 2020, there was a pre-hearing conference, at which Nigeria applied for (i) an adjournment of the hearing due to start on 15th June 2020 and (ii) permission to amend its Statement of Defence, both of which were opposed by Zhongshan. On 18th May 2020,

a.   The Tribunal ruled that, albeit only "*on balance*", application (i) should be granted the start of the hearing  would be moved to 9th November 2020,  making it clear that "only very exceptional circumstances could possibly justify a further adjournment";

b.   The Tribunal also granted Nigeria permission to amend as sought;

c.   The Tribunal gave certain other directions.

65.   On 12th June 2020, Zhongshan served an amended version of its Statement of Reply to respond to the amendment to the Statement of Defence.

66.   On 31st August and 2nd September 2020, Nigeria applied to serve a Further Statement of Rejoinder and to amend its Statement of Defence respectively, to which Zhongshan responded on 11 September 2020, and Nigeria answered on 17th September 2020. The

Tribunal ruled on 21st September 2020 that the Defence could be amended but that the Further Rejoinder could not be served.

67. On 2nd October 2020, following submissions from the parties, the Tribunal directed that the hearing due to start on 9th November 2020 should proceed electronically owing to the problems which would be likely to be encountered by the parties' respective representatives, counsel and witnesses in connection with travelling and meeting owing to the continuing Covid-19 emergency.

68. A case management conference took place electronically on 26th October 2020, at which Nigeria applied (i) for the hearing due to start on 9th November to be adjourned, and (ii) to adduce an expert report on the issue of quantum. In a ruling provided on 26th October 2020, the Tribunal rejected both applications on the grounds set out in the ruling, and in particular, that an adjournment of the hearing, which would occur if either application was granted, could not be justified, not least in the light of the fact that Nigeria had already been granted an adjournment over Zhongshan's objection, and had been warned that the Tribunal would require exceptional circumstances before it would consider granting a further adjournment.

69. The hearing took place electronically from and including 9th to 13th November 2020. Zhongshan was represented by Mr Christopher Harris QC, and Mr Hussein Haeri and Ms Emma Lindsay as advocates, Withers LLP, Asato & Co, and G Elias & Co acting, and they called Mr Xue, Dr Han, Mr Zhao, Professor Baluch and Mr Vandenheuvel as witnesses of fact, and Mr Noel Matthews as an expert witness. Nigeria was represented by Mr Chikwendu Madumere as advocate, supported by Chemezie Ojiabo, Dr Peter Oniemola, Z S Adeyanju, Mrs Maimuna Shiru, Philomena C Uwandu, and Ifeoluwa M Olaweye, and they called Mr Adeoluwa, Mr Akanni Akinosi, and Mr Olumide Aderemi as witnesses of fact.

## E.   **Nigeria's jurisdictional and preliminary points**

*Introductory*

70. Nigeria took a number of points of principle, some of which are jurisdictional in nature, as to why Zhongshan's claim should fail, and it is convenient to consider them before turning to the issues of liability and quantum. The points of principle are as follows:

a.   That Zhongshan's complaints are not about the conduct of the Federal State of Nigeria, and therefore there is no claim against Nigeria;

b.   That Zhongshan has no claim because it did not hold an "*investment*" within the meaning of article 1(1);

c.   The Tribunal has no jurisdiction because the six-month period referred to in the first sentence of article 9(3) had not expired when this arbitration was launched;

d.   The Tribunal has no jurisdiction as the Court proceedings operated as a bar in the light of the second sentence of article 9(3) (the "fork in the road" point);

e.   Zhongshan's claim should not be adjudicated in the absence of the PRC government being involved in the arbitration;

f.   In so far as Zhongshan is basing its claim on the Court proceedings and/or the anti-suit injunction, it cannot do so, because of its failure to pursue an appeal;

71.   The Tribunal will deal with these contentions in turn.

*No valid claim against Nigeria*

72.   We reject the argument that Zhongshan has no valid claim against Nigeria, which is advanced on the ground that none of the actions complained of were carried out by the Federal State (save in connection with the Court proceedings and the anti-suit injunction). We accept that Zhongshan's case is primarily based on actions of Ogun State, although the actions of other entities, namely the police and NEPZA, are also strongly relied on. However, for the purposes of a claim such as this, all organs of the State, including those which have an independent existence in domestic law, are to be treated as part of the State. This is customary international law, and is clear in the light of the Articles on *Responsibility of States for Internationally Wrongful Acts* ("ARSIWA") adopted by the International Law Commission in August 2001. Article 1 of ARSIWA provides that "*[t]here is an internationally wrongful act of a State when conduct consisting of an act or omission (a) is attributable to the State under international law; and (b) constitutes a breach of an international law obligation.*" And article 4.1 of ARSIWA provides that "*[t]he conduct of any State organ shall be considered an act of that state under international law, whether the organ exercises legislative, executive, judicial or any other*

*functions*", and article 9.2 of ARSIWA stipulates that an organ "*includes any person or entity which has that status in accordance with the internal law of the State*". Article 5 of ARSIWA extends the rule to apply to "*a person or entity which is not an organ of the State under article 4, but which is empowered by the law of that State to exercise elements of the governmental authority*".

73. The principles which are enshrined in these provisions have been recognised and applied in a number of arbitral decisions relating to alleged breaches of bilateral investment treaties – see e.g. *Deutsche Bank AG v Democratic Socialist Republic of Sri Lanka* ICSID Case No ARB/09/2, Award, 31 October 2012, §§357ff; *Flemingo DutyFree Shop Private Limited v Republic of Poland* UNCITRAL Award, 12 August 2016, §§416ff; *Nissan Motor Co Ltd v Republic of India*, PCA Case no. 2017-37, relating in substantial part to actions taken by the State Government of Tamil Nadu and engaging the responsibility of the Republic of India.  Quite apart from legal principle, it would render Investment Treaties almost meaningless if they did not apply to actions of local, as opposed to national, government.

74. Nigeria relied on decisions where a breach of contract by a local authority could not be attributed to the state concerned (e.g. *Compania de Aguas del Aconquija SA and Vivendi Universal SA v Argentine Republic* ICSID Case No ARB 97/3 Award, 21 November 2000, §§77-82, and *Azinia, Davitian, & Baca v The United Mexico States* ICSID Case ARB (AF)/97/2 Award, I November 1999, §84). However, they were cases where the claim was based on a breach of contract by the local authority, and it was held that a "mere" breach of contract by a local authority could not of itself be attributed to the state. Indeed, it was implicit in the reasoning in those cases that, if the action complained of would otherwise amount to a breach of the treaty in issue, then it would be attributed to the state. And that is clear from decisions such as *Interocean Oil Development Company and Interocean Oil Exploration Company v Federal Republic of Nigeria* ICSID Case No ARB/13/20, Decision on Preliminary Objections, 29 October 2014, §§ 111 and 112, and *Garanti Koza LLP v Turkmenistan* ICSID Case No ARB/11/2019 Award, 16 December 2016, §244. In *Interocean*, the tribunal stated that "*the existence of contractual claims under the JVA does not preclude the claimants from filing a separate set of claims pursuant to international law*" because "*[t]he substantive claims in this arbitration are not for breach of the JVA per se*".  That is precisely the case here.

75. We therefore conclude that, if and in so far as the 2016 Activities would otherwise amount to a breach of the Treaty, they can and should be attributed to Nigeria.

76. We add that, although we do not rely on this point as it was not argued, we draw comfort from the fact that it appears to have been the intention of the parties to the 2013 JVA, in the light of clause 15.1 thereof, that Ogun State would "*strictly observe*" the terms of the Treaty, thus reflecting an apparent understanding that the actions of Ogun State would be subject to the terms of the Treaty.

*No investment*

77. The contention that Zhongshan did not hold an investment seems to us to be untenable. The more difficult issue is whether the investment should be treated as its ownership of Zhongfu or Zhongfu's indirect 60% ownership of the interests created by the 2010 Framework Agreement and the 2013 JVA ("Zhongfu's rights"). Orthodox legal analysis might suggest that it should be the former approach: Zhongshan was the Chinese party who invested in Nigeria through its ownership of a Nigerian company, Zhongfu. On the other hand, commercial reality can be said to favour the latter approach, in that in economic terms Zhongshan indirectly owned Zhongfu's interests, and the only purpose which Zhongfu had was to hold what were in practice Zhongshan's Nigerian assets. It is not necessary to decide the point, because, whichever approach is right, the far-reaching definition of "investment" in article 1(1) is wide enough to cover either the shareholding in Zhongfu or Zhongfu's interests – see for instance the discussion in *Mytilineos Holdings SA v The State Union of Serbia & Montenegro and Republic of Serbia* UNCITRAL Partial Award on Jurisdiction, 8 September 2006, §§101 to 109.

78. It is right to add that, even for the purpose of assessing compensation, it would not in our opinion matter which was the right approach. What would be treated as lost is Zhongfu's rights, and it is they that were valued by Mr Matthews, as we discuss below. In the absence of any suggestion to the contrary in argument, evidence or cross-examination, it seems to us that the natural inference is that the depreciation in the value of Zhongfu as a result of the loss of its interests would have been equivalent to the value of the rights which were lost.

79.   As we understood it, Nigeria also argued that Zhongshan could not in any event contend that it held an investment because it had not invested its own money or other assets in the alleged investment. Even assuming that the legal basis for that contention is made out, we would reject it on the facts. We have no reason to think that the 2010 Framework Agreement, the 2011 Receipt, the 2013 Document, the 2013 Acknowledgment and the 2013 JVA are anything other than genuine documents, which had the effect which they purport to have. In other words, they demonstrate that Zhongshan paid money, and Zhongfu undertook obligations, which were referable, indeed solely referable, to the acquisition and enjoyment of the rights which Zhongshan says that Zhongfu had. On top of that, there is no reason to doubt the evidence of Dr Han, Mr Xue and Mr Zhao, supported as it is by documents, that Zhongshan, through Zhongfu, spent considerable sums on works to the infrastructure of the Zone, and in particular Fucheng Park, as well as on marketing and managing Fucheng Park and the Zone. This is supported by the fact that that the audited accounts of Zhongfu and OGFTZ for the calendar year 2015 ("the 2015 Accounts") record expenditure (in rounded figures), respectively, of NGN 54m on "road construction" and NGN 297m on infrastructure expenditure (and, to put that in context, in 2015 the exchange rate was around 200 NGN per USD).

*The six-month wait*

80.   We also reject Nigeria's contention that this arbitration is ill-founded because Zhongshan failed to allow the six month period referred to in the first sentence of article 9(3) to expire before serving the Request. We are in some doubt whether a failure on the part of Zhongshan to wait six months would necessarily invalidate the Request or this arbitration, particularly if it had become clear that there was no possibility of settling its claim. However, it is unnecessary to decide that point, because Nigeria's contention fails, in our view, on the facts.

81.   As already mentioned, on 21st September 2017 Zhongshan sent Nigeria the 2017 notice in which it expressed its willingness to discuss the dispute which had arisen as a result of the 2016 Activities. The 2017 notice specifically described itself as "*a request for negotiations concerning a dispute between [Zhongshan] and [Nigeria] in connection with [Zhongshan's] investments in Nigeria in and through [Zhongfu].*" Nigeria did not even acknowledge this notice. It seems to us both clear as a matter of principle and in

accordance with common sense and fairness that in these circumstances, the six month period referred to in the first sentence of article 9(3) should be treated as running from the date of the 2017 notice. As a matter of simple analysis, Zhongshan started the negotiating process and then nothing happened, and consequently, after six months, Zhongshan was free to initiate arbitration proceedings. So far as common sense is concerned, it would be contrary to justice if Nigeria could rely on its own failure to take up the invitation to negotiate in order to say that Zhongshan had failed to allow for a sufficient negotiating period. We draw support from the reasoning of the tribunal in *Khan Resources Inc, Khan Resources BV and CAUC Holdings Company Ltd v The Government of Mongolia* PCA Case No 2011-09, Decision on Jurisdiction, 25 July 2012, §406, where it was held that the stipulated period for negotiations was triggered by a letter from the claimant expressing "*willingness to discuss the issues*". Indeed, this case is a stronger one for Zhongshan than that of the successful claimant in *Bayinder Insaat Turizm Ticaret Ve Sanayi AS v Islamic Republic of Pakistan* ICSID Case No ARB/03/29, Decision on Jurisdiction, 14 November 2005, §102.

*The fork in the road*

82.   Nigeria contended that the second sentence of article 9(3) precludes Zhongshan bringing this arbitration, on the ground that Zhongfu opted for Court proceedings. Nigeria relies on both the Court proceedings, but in particular on the State court proceedings where Zhongfu claimed substantial damages, which apparently included loss of income which it would have enjoyed if it had not been effectively deprived of its rights under the 2010 Framework Agreement and the 2013 JVA. In effect, therefore, Nigeria contends that the Court proceedings or either of them consisted of the submission of "*the dispute to a competent court*" in Nigeria.

83.   There are a large number of tribunal decisions where such a fork in the road point has been considered in connection with a provision equivalent to the second sentence of article 9(3), and it is not easy to reconcile the approach adopted in all the decisions on the issue. We mean no disrespect to the various tribunals to whose decisions we were referred, but it does not seen to us that it would be helpful to analyse all the decisions, given that we have resolved that the correct approach on this issue is that adopted by a very distinguished and experienced tribunal in the *Khan v Mongolia* decision, already

cited in the last paragraph but one of this Award. At §389, the tribunal identified the two familiar tests, "*the triple identity test*" (which requires the domestic court proceedings to involve the same parties, the same cause and the same object as the treaty arbitration) and "*the fundamental basis test*" (which involves asking whether the basis of the domestic court proceedings was fundamentally the same as the basis for the treaty arbitration). At §390, the tribunal saw "*no reason to go beyond the triple identity test*" for whose application there was "*ample authority*". In the following paragraph, the tribunal addressed the argument that it would be "*unrealistic to expect all three prongs [of the triple identity test] to be satisfied*", and said that "*the test for the application of fork in the road provisions should not be too easy to satisfy, as this could have a chilling effect on the submission of disputes by investors in domestic fora, eve when the issues at stake are clearly within the domain of local law*". Having made that point, in §392, the tribunal accepted that the triple identity test may nonetheless be "*too strict ... where one only of [its] requirements ... is not satisfied*", but explained that "*this is not the case here*", as "*not one of*" the three requirements was satisfied.

84.    We agree with the approach of the tribunal in those passages in *Khan v Mongolia*, and consider that it should be applied here. On that basis, the fork in the road argument raised by Nigeria should be rejected.

85.    First, neither of the parties to this arbitration, Zhongshan and Nigeria, was party to either of the Court proceedings. In this connection, we note in particular that article 9(3) refers to the "*investor concerned*", which is a reference back to the definition in article 1(2), so that, in the present context, it refers to the Chinese investor, Zhongshan, not the Nigerian subsidiary, Zhongfu.  On that basis alone, the "*investor concerned*" has not commenced any proceedings at all in the Nigerian courts and hence article 9(3) has not been triggered. (We accept that there is a powerful case for saying that this factor alone should be enough to defeat Nigeria's case on the fork in the road point, but, as we have explained, we consider it more appropriate to look at the issue more widely.)

86.    Secondly, in the Court proceedings, the case of the plaintiff, Zhongfu, was based (in the State court proceedings) on alleged breaches of its contractual and possessory rights under the 2010 Framework Agreement and the 2013 JVC, and (in the Federal court proceedings)

on alleged breaches of Nigerian domestic public law; whereas Zhongshan's case in this arbitration is based squarely on the Treaty.

87. Thirdly, as to the relief sought, subject to one point, it is different also. In both of the Court proceedings, Zhongfu sought declaratory and injunctive relief, whereas in this arbitration, Zhongshan seeks compensation. The one area of overlap is that in the State court proceedings, Zhongfu also claimed damages in USD 1,000,797,000. However, we do not consider that this factor justifies not following the approach of the tribunal in *Khan v Mongolia*. First, it is the only overlap; secondly, the claim for damages was very much of a subsidiary claim in the State court proceedings, the principal object of which appeared to be to seek an enforceable determination that Zhongfu was entitled to occupy the Zone and to continue to operate there peacefully and without harassment; thirdly, the State court proceedings got nowhere following their issue, and, particularly, as this does not appear to have been the fault of Zhongfu, it seems inappropriate for Nigeria to invoke those proceedings to justify reliance on the second sentence of article 9(3).

88. Whilst the Tribunal has decided to apply the triple identity test, we consider that the same result would obtain if we had applied the fundamental basis test. Three decisions were principally relied on to support an application of the fundamental basis test. In two of the three decisions there are two obvious differences from the present case, in that the Claimant in the subsequent Treaty arbitration had itself commenced local litigation which it had lost – up to and including the Supreme Court in *Pantechniki v. Albania*, ICSID case no. ARB/07/21, §§21-27, and in a local arbitration and in local court proceedings up to the Cairo Court of Appeals in *H&H Enterprises v Arab Republic of Egypt*, ICSID Case no. ARB/09/15, §§373-375. In the present case the Claimant commenced no local proceedings and neither set of proceedings commenced by Zhongfu made any progress at all, as explained above. In the third decision, *Supervision y Control v Costa Rica*, ICSID case no. ARB/12/4/2017, the local proceedings were commenced by a subsidiary of the Claimant and it was found that those proceedings must be considered as filed by Claimant (see §329). That is not a conclusion this Tribunal feels able to make in respect of Zhongshan and Zhongfu in this case. However, the *Supervision y Control* decision may also be distinguished by the facts that the Claimant failed to withdraw the local proceeding once it had initiated the arbitration (§330) and the Claimant pursued the local proceedings all the way to the Costa Rica Supreme Court, to a judgment some two years

after the treaty arbitration proceedings had commenced (§307). As the tribunal put it, *"What, in the end, matters for the application of fork in the road clauses is that the two relevant proceedings under examination have the same normative source and pursue the same aim."* (§330)  As we have explained, the Court proceedings did not pursue the same aim as are pursued in this Arbitration.

89.   Accordingly, we find for Zhongshan on the fork in the road argument. Before leaving this topic, there are two further points we should mention in connection with this argument.

90.   First, we note that (i) the JVA expressly referred to the Treaty in clause 15.1, and (ii) Zhongfu did not rely on its rights under the Treaty or even under the 2013 JVA in the Nigerian Court proceedings, and specifically reserved its rights under the 2013 JVA in the State court proceedings. While we have not taken those points into account when arriving at our conclusion on the fork in the road issue because they were not raised, our present view is that they supports Zhongshan's case on that issue. In particular, while we do not suggest that an investor can automatically avoid being defeated by a fork in the road argument automatically by stating in domestic proceedings that it was reserving its other rights, it does seem to us to be a relevant factor for a tribunal to take into account when considering the issue, and that it could in some cases be decisive.

91.   Secondly, we note that the Court proceedings were issued well before the expiry of the six months referred to in article 9(2), and it may therefore be arguable that, quite apart from what we have said in the preceding two paragraphs, neither the Federal court proceedings nor the State court proceedings were capable of falling within the ambit of the second sentence of article 9(3). We doubt that that argument would have succeeded if it had been raised by Zhongshan, and it is unnecessary to address it but we mention it for completeness.

*The involvement of the PRC*

92.   Nigeria contends that *"[t]he Tribunal cannot meaningfully engage in a consideration of Nigeria's conduct when another State – whose conduct would necessarily also be in issue - is not present before the Tribunal to explain its position and action"*, and in particular the conveying of Note 1601 to Nigeria.

93.   It is true that the facts and reasoning behind the existence and contents of Note 1601 are by no means entirely clear and that only a representative of the PRC government or an agency of that government is likely to be able to explain them. However, that does not mean that, in the absence of such evidence, Zhongshan should be precluded from proceeding with this arbitration, or that the Tribunal should be precluded from publishing an award. Zhongshan does not need to rely on such evidence, as its case is based on the existence of Zhongfu's rights in Nigerian law as a result of entering into the 2010 Framework Agreement and the 2013 JVA, and its contention that Zhongfu was deprived of those rights by the statements and actions of various organs of the Nigerian state between April and August 2016, and that deprivation was a breach of Nigeria's obligations under the Treaty. Note 1601 is irrelevant to that claim, save in so far as its existence or contents provide Nigeria with a defence to Zhongshan's claim – or would provide Ogun State, NEPZA and the police with a domestic law defence to Zhongfu's claim.

94.   If Nigeria wished to contend that not merely that the 1601 Note itself, but that the PRC's explanation for the Note, is relevant to Nigeria's case in this arbitration, then it would have been open to Nigeria to call, or at least to seek to call, relevant employees or agents of the PRC government to give evidence to us. No such witness was called by Nigeria and no proof or statement from such a witness was put before us. Indeed, it has not been suggested to us by Nigeria that it has sought to identify, let alone to take a proof of evidence or statement from such a witness or to call such a witness.

95.   Accordingly, we can see no ground for accepting Nigeria's argument that the arbitration should not conclude without evidence from the PRC government.

_No reliance on the Court proceedings or the anti-suit injunction_

96.   At least on the face of it and in the light of the very limited information we have been provided with, there do appear to have been significant and unjustified delays, and considerable latitude given to the defendants, in the Court proceedings. However, we were not provided with any details as to the steps which Zhongfu took or could have taken to ensure that the proceedings were dealt with more speedily. While we see the force of the point that the anti-suit injunction was processed very quickly in comparison with the very slow progress of the Court proceedings, we consider that the evidence is

insufficiently strong or clear or strong to enable us to conclude that the way in which they were dealt with could represent a breach of the Treaty.

97.   As for the anti-suit injunction, although we consider that the reasoning and conclusion of Justice Akinyemi were, with all due respect to him, misconceived, we are disinclined to hold that the grant of the anti-suit injunction amounted to a breach of the Treaty. There was nothing to prevent Zhongfu from appealing the decision, and indeed it did so, although it subsequently abandoned the appeal (when the proceedings were discontinued). Given that there is no reason to think that the grant of the anti-suit injunction by Justice Akinyemi was anything other than simply a wrong decision (at least in our view), Zhongfu's failure to prosecute its appeal, for no apparent reason, and certainly for no compelling reason, should, we think, disentitle it from relying on the decision as an infringement of the Treaty.

98.   We have expressed our views in the preceding two paragraphs in somewhat tentative terms, because, as Zhongshan confirmed in argument, if we accept that its claim, based on the 2016 Activities, which are attributable to Nigeria, is well founded, it would not need to rely on the Court proceedings or the anti-suit injunction. For the reasons given in the following section, we do accept that that claim is well founded, and therefore it is unnecessary to reach a definitive conclusion on the issues discussed in those two paragraphs.

*A further point raised by Nigeria*

99.   Before we move on from the jurisdictional and preliminary points, we should mention a further point which was raised by Nigeria in its skeleton argument for the hearing and which it mentioned at the hearing with some force (albeit briefly), namely that Zhongfu's investment was not made in accordance with Nigerian domestic law. This was not a point which had been pleaded by Nigeria. Indeed, in our ruling on 21st September 2020, we had refused permission for it to be raised in Nigeria's proposed Rejoinder. Accordingly, it is not a point which Nigeria can rely on, and therefore it is not a point which Zhongshan could have be expected to meet, and indeed, it was not a point on which we were addressed by Zhongshan.

100. While we therefore do not propose to rule on the point, it is, we think, right to say that we are very doubtful whether there would have been anything in the point even if Nigeria could have relied on it. Nigeria's primary argument on this point was that the 2010 Framework Agreement transferred or created an interest in land, and was therefore invalid because it required the consent of the Governor of Ogun State. However, (i) it was the duty of OGFTZ as transferor or grantor, not Zhuhai as transferee or grantee, to obtain the Governor's consent, (ii) Ogun State was a substantial shareholder in OGFTZ, (iii) in reliance on the 2010 Framework Agreement, Zhuhai and its successor-in-title Zhongfu, to the knowledge of Ogun State made substantial investments, and (iv) Ogun State both directly and as a substantial shareholder in OGFTZ benefitted from these investments. Accordingly, even assuming (which seems to us to be open to serious doubt) that the 2010 Framework Agreement did involve the creation or transfer of an interest in land, we would have thought that Nigeria could not have successfully impugned the Agreement on the basis that the consent of Ogun State's governor was not obtained.

101. Nigeria also wished to argue that the 2010 Framework Agreement violated domestic law because Zhuhai was not registered as a Nigerian company at the time it was entered into, but once again we are very sceptical whether this argument could have succeeded, bearing in mind the points just made, and the fact that the benefit of the 2010 Framework Agreement became vested in a Nigerian registered company within a few months of its execution.

### F. Nigeria's case on misrepresentation and concealment

*Introductory*

102. Nigeria contended that Ogun State was wrongfully induced by Zhongfu to enter into the 2013 JVA and that accordingly no claim could be brought against it based on the loss of Zhongfu's rights thereunder. Essentially, Nigeria's contention was that Ogun State had been induced by what counsel for Nigeria referred to as a "*fraudulent misrepresentation and concealment of material facts*" made by Zhongfu to persuade Ogun State to write the March 2012 letters and, eighteen months later, to enter into the 2013 JVA with Zhongfu. Nigeria's case was that this misrepresentation and concealment entitled it to invalidate, or, in more technical terms, to rescind, the 2013 JVA, on discovering the misrepresentation and concealment.

*The alleged misrepresentation*

103. The misrepresentation was said in Nigeria's Statement of Defence (and effectively repeated in its opening submissions) to be that *"[i]n order to achieve its target of securing appointment as substantive manager of the Zone, Zhongfu represented to [Ogun State] that CAI and its parent company have [sic] been liquidated and wound up without successor companies"*. It was claimed that this misrepresentation led Ogun State to decide to write the November 2011 letter and the March 2012 letters ("the 2011/2012 letters"), and then to enter into the 2013 JVA.

104. This contention is strongly denied by Zhongshan, and on the basis of the documentary and oral evidence before us in this arbitration, we are satisfied that Nigeria has failed to make out the contention.

105. First, in his witness statement, Mr Adeoluwa said that, when sending the 2011/2012 letters he had relied on *"mouthwatering representations"* by Zhongfu about its ability to manage the Zone, *"as well as representations concerning and relating to CAI's incapability to manage the Zone and the criminal investigation in China involving its parent company"*. Mr Adeoluwa expanded in his witness statement on the alleged criminal activity of senior members of CAI and parent company, Guangdong Xinguang International Group Co Ltd ("GXIG"), but he did not refer to being told that CAI or GXIG were in liquidation. Mr Akinosi said much the same, albeit rather more concisely. Further, Mr Adeoluwa described himself as having written the 2011/2012 letters because he was *"[s]wayed by the representations of Zhongfu, especially as regards its expertise and experience"*. There is thus no suggestion in the witness statements of anything having been said about CAI being in liquidation or ceasing to exist prior to the 2011/2012 letters having been sent.

106. It is true that the November 2011 letter refers to CAI and GXIG as being *"officially bankrupt"* and Mr Adeoluwa described that letter describes itself as having been written *"[b]ased on the information given ... by Zhongfu"*, but that does not assist Nigeria. It is clear that, even on Mr Adeoluwa's evidence, he did not rely on Zhongfu as the sole source of information for what he wrote in the letter - and it would be astonishing if it were otherwise. Thus, in May 2011, as Mr Adeoluwa accepted in cross-examination (albeit very reluctantly, even though it was in his witness statement), Ogun State representatives

had visited the Zone and remarked on the "*low activity*" and "*were not satisfied*" with CAI's management of the Zone. Mr Adeoluwa also confirmed in cross-examination that (as he had said in the November 2011 letter) he had made enquiries about CAI and GXIG in China, although he was evasive about the extent of the enquiries and as to the identity of his informant.

107. In these circumstances, in relation to the 2011/2012 letters, it seems to us that the misrepresentation case has simply not been made out on Nigeria's own evidence. That evidence instead supports a different statement which has not been pleaded (and anyway has not been shown to be untrue, let alone dishonestly so).

108. Quite apart from this, there are other problems in the way of our concluding that Zhongfu made any misrepresentations about CAI or GXIG. First, Mr Adeoluwa and Mr Akinosi never identified the individuals who had made any alleged representations. Secondly, the November 2011 letter seems to suggest someone in China as the source of the information about CAI's status, and that was, as we have mentioned, confirmed in Mr Adeoluwa's cross-examination (though he was evasive about this and said that he could not remember who the individual was). Thirdly, the first of the March 2012 letters, addressed to CAI, justified the termination of the 2007 JVA on a number of different grounds, almost all of which concerned CAI's alleged poor performance, in managing the Zone, and, although CAI's bankruptcy is mentioned, it reads as something of an afterthought.

109. Fourthly, there is the fact that Nigeria says that what persuaded Ogun State that Zhongfu had misled it in 2012 was the 1601 Note. While that Note does indicate that the Chinese authorities believed that CAI was still in existence, it also suggests that the Chinese authorities also believed that CAI still had management rights over the Zone, which as Ogun State knew, was wrong, and had been wrong for some four years. Fifthly, Mr Adeoluwa does not seem to have suggested in either of his letters of 12th April 2016 and 27th May 2016 that Ogun State had been misled in 2012 by Zhongfu into thinking that CAI had been wound up. In the former letter, he said that Ogun State was "*persuaded by the argument of the Consulate that the problem Ogun State had with [CAI] was as regards management rights and practices, not shareholdi*ng", which is, with respect, somewhat opaque, but it is not an allegation that CAI were falsely said to have been wound up. And in the letter of 27th May 2016, Mr Adeoluwa said that what Zhongfu was "*alleged*" to

have done was "*to have fraudulently converted State assets ... and ... misled Ogun State thereby*", which again is not an allegation that Zhongfu falsely represented that CAI had been wound up. Sixthly, even as late as 18 August 2016, Mr Adeoluwa was emailing Radix Legal and Consulting, who were now acting for Zhongshan and Zhongfu, that "*Ogun State ... has no issues with ... Zhongfu*" and that "*[t]he complaint against them, as you know, came from the Government of the [PRC]*", who, he suggested, said in Note 1601, that NSG "*rather than your clients were the ones who bought the shares of [CAI]*". He added that the PRC government had suggested that "*to continue to allow Zhongfu to manage the Zone is a fraud on the [PRC]*".

110. Finally on this aspect, it had come to the attention of Ogun State and indeed of Mr Adeoluwa, that CAI appeared to be in existence and in business in Spring 2014, as is evidenced by the letters written to and by Mr Adeoluwa on, respectively, 25th and 28th April that year. If he had considered that he had been seriously misled into agreeing to Zhongfu being manager of the Zone by Zhongfu telling him that CAI had been wound up, then we consider that Mr Adeoluwa would have raised with Zhongfu the fact that CAI appeared to be very much in existence in April 2014, rather than, as he did, unreservedly supporting Zhongfu as manager of the Zone.

111. In so far as the pleaded misrepresentation relates to the execution of the 2013 JVA, Nigeria's position seems even weaker, as by that time CAI had been stood down as manager of the Zone for more eighteen months. Again there is nothing in Mr Adeoluwa's witness statement to support the contention that the alleged misrepresentation was made, let alone that Ogun State acted on it when entering into the 2013 JVA. The only additional statement attributed to Zhongshan is that its "interim status was negatively affecting its effectiveness". Accordingly, all the points made in paragraphs 105 to 110 above in relation to the 2011/2012 correspondence apply at least equally to the 2013 JVA.

112. Quite apart from this, we are unpersuaded that any statements as to the status of CAI or GXGI played any significant part in Ogun State's decision to write the 2011/2012 letters or to enter into the 2013 JVA.

113. In the light of the way in which the 2011/2012 letters are expressed and in the light of Mr Adeoluwa's testimony, it seems reasonably clear that what really motivated Ogun State into replacing CAI with Zhongfu as de facto manager of the Zone was CAI's

disappointing performance and the expectation that Zhongfu would do much better. Accordingly, even if we had found that the alleged misrepresentation was made, it nonetheless is apparent that what "swayed" Mr Adeoluwa into writing the 2011/2012 letters was, according to him, Zhongfu's record and promises, as well as CAI's poor performance.

114.  Again, that point applies with even more force to the 2013 JVA. By the time it was executed Ogun State had seen Zhongfu in action at Fucheng Park for well over a year, and common sense strongly suggests that Ogun State's assessment of Zhongfu's ability would have been by far the most important factor in deciding to enter into the 2013 JVA. In addition, having terminated the arrangement with CAI by the first of the March 2012 letters, it seems very unlikely that Ogun State would have been influenced more than a year later by Zhongfu saying that CAI had been wound up, especially as the letter had cited CAI's bankruptcy.

### *The alleged concealment*

115.  The concealment of material facts relied on by Nigeria arises from the fact (not so far mentioned in this Award) that Zhuhai and GXIG entered into an "*Entrustment of Equity Management Agreement*" ("the Equity Agreement"), on 29th March 2012. This document is written in Chinese, and we have been provided with a translation into English. Clause 1 stated that GXIG owned 51% of CAI, which owned 60% of OGFTZ. Clause 2 stated that GXIG "*agrees to entrust*" this shareholding to Zhuhai, which is "*willing to accept the entrustment*". Clause 3 provided for a valuation of the CAI shares, and clause 4 stipulated that (i) the period of entrustment started when the CAI shares are "*transferred to [Zhuhai] or the third party*" (and it is unclear who that is), and (ii) the arrangement could not be terminated unless Zhuhai is in breach. Clause 5 appears to have envisaged that, at least while the Equity Agreement subsisted, Zhuhai would have control and de facto effective ownership rights over CAI's 60% shareholding in OGFTZ, but that it could not "*dispose [of] any major asset of OGFTZ*" without GXIG's consent. Clause 12(3) provided for the consent of Ogun State to the arrangement before it could proceed.

116.  On 10th June 2012, GXIG and Zhuhai entered into a Supplemental Agreement to the Equity Agreement (in Chinese, and again we refer to the English translation) to "*entrust*" the 51% shareholding in CAI "*speedy and to promote the Ogun State Government to*

*withdraw the relevant decision*". Although clause 2 of this Supplemental Agreement refers to a valuation of RMB 33,785,500, clause 3 stipulates that owing to "*the unpredictable situation and uncertainties of the entrusted target*", this "*assessed result shall not be equaled to the final transaction value of the 51% shares*", which should be "*separately assessed or reconfirmed*". Clause 4 states that Zhuhai should "*manage the entrusted target and operate the Company diligently*".

117.   The Equity Agreement was only executed on 29th March 2012, which was two weeks after Ogun State had written the March 2012 letters dismissing CAI and appointing Zhuhai as interim de facto manager of the Zone, so it is hard to see how that Agreement could have been said to have been concealed from Ogun State at that stage. Having said that, we accept that it is likely that the Equity Agreement was being negotiated at the time of those letters.

118.   Quite apart from this, at least according to the testimony of Dr Han, there is an innocent explanation for the Equity Agreement. He said that he had been told in October 2012 by Jeffrey Huang, the son of the founder of the group of which Zhongshan, Zhongfu and Zhuhai were members, that, earlier in the year Zhuhai had negotiated to purchase GXIG's shareholding in CAI, because Zhuhai feared that CAI's involvement in the Zone might be terminated, and Zhuhai wished to preserve the investment it had made since it had entered into the 2010 Framework Agreement.  Dr Han was also told by Mr Huang that, although an agreement in principle had been reached with GXIG, the parties could not agree on a price, and in any event the consent of Ogun State had not been obtained (or even, it appears, sought), and so the transaction envisaged by the Equity Agreement (as varied by the Supplemental Agreement) had not proceeded.

119.   The Tribunal had an initial degree of concern about the accuracy of this testimony. First, it was not immediately apparent why the Equity Agreement would have been entered into after CAI had been dismissed as de facto Zone manager on 15th March 2012. However, it may well have been thought that CAI could be reinstated (particularly as Zhongfu had only been appointed as manager on an interim basis for three months). Indeed, this was probably what was contemplated by the reference to "*promot[ing] the Ogun State Government to withdraw the relevant decision*" in the Supplemental Agreement. Secondly, at least if read on their own, clauses 4 and 5 of the Supplemental Agreement

appear to have been treating the Equity Agreement as if it had been completed. However, read in context and bearing in mind that the document has been rather idiosyncratically translated, the clauses appear perfectly capable of applying only when (and if) the Equity Agreement is completed. Further, the fact, mentioned above, that it appears that NSG acquired 51% of CAI in 2013 is plainly consistent with Dr Han's evidence that the Equity Agreement was not implemented. In any event, he was not challenged on the accuracy of his testimony as to the Equity Agreement, and no document or witness called what he said into question. Accordingly, although Dr Han's evidence on the issue was in part based on what he was told by Mr Huang, we accept it.

120. Over and above this, we have some difficulty in seeing on what basis it can be said that the fact that Zhongfu did not inform Ogun State about the Equity Agreement, even if it became effective, amounted to some sort of wrongdoing on the part of Zhongfu. We accept that Ogun State might well have been surprised to discover that CAI and Zhongfu had entered into such an arrangement. However, in the absence of special circumstances, the fact that A is negotiating, or even has negotiated, a contract with B, who is in a contractual relationship with C, is not something which A is legally obliged to reveal to C when negotiating a contract with C, even if the negotiations are related to C's contract with B. In a particular case, there could of course be special facts which would mean that there was an obligation on A to reveal to C that A was having negotiations with B. It has not been suggested that there are such special facts in this case, and, having considered the facts, we do not consider that there are.

## G.   **Nigeria's liability to Zhongshan**

*The relevant facts*

121. Having rejected Nigeria's jurisdictional and preliminary points and its argument based on misrepresentation and concealment, we must now address the central question on liability, namely whether Zhongshan has established that Nigeria wrongly deprived Zhongfu of its rights under the 2010 Framework Agreement and/or the 2013 JVA, what we have called "Zhongfu's rights".

122. So far as the facts are concerned, the Tribunal can see no good reason for not accepting as accurate both the documentary evidence, and the oral testimony, adduced by

Zhongshan and summarised in Section B of this Award. The genuineness or effectiveness of some of the documents was challenged by Nigeria, but it does not seem to us that there was any basis for those challenges. In particular, Nigeria contended that OGFTZ had not actually executed the 2010 Framework Agreement, and in any event that Ogun State was unaware of it. However, the seal of OGFTZ is visible on the copy of the 2010 Framework Agreement, and it appears to have been signed on behalf of OGFTZ. Further, there is no reason to doubt the genuineness and accuracy of the 2011 Deed, the 2011 Receipt and the 2013 Document, all of which are consistent with the 2010 Framework Agreement being in existence, as is the work carried out by Zhuhai and Zhongfu before the March 2012 letters were written by Mr Adeoluwa. Quite apart from this, while we are of the view that it is unlikely that Ogun State was unaware of the 2010 Framework Agreement, it would not in any event be invalidated because of such unawareness.

123. Further, Nigeria called no evidence which materially challenged the witness and documentary evidence relied on by Zhongshan. Thus, although Nigeria suggested that the carrying out of infrastructure work to Fucheng Park and the organisation of letting to occupiers of sites in Fucheng Park after the execution of the 2010 Framework Agreement, was effected by CAI, at any rate up to 15th March 2012, Nigeria called no witness to support that contention, or to contradict Zhongshan's documentary evidence and witness testimony which supported the contention that it was Zhuhai and Zhongfu, not CAI, who were responsible for these matters from the time of the 2010 Framework Agreement. The very existence of that Agreement, and the terms of the March 2012 letters also support Zhongshan's case on this.

124. The 2016 Activities, in so far as they involved Ogun State and NEPZA between April and August 2016 and set out above, were clearly aimed at getting Zhongfu and its staff to vacate the Zone and abandon Zhongfu's rights. Whether the actions of the police in that period had that purpose may be thought to be less clear, not least because, unlike Ogun State and NEPZA, the police had no involvement with Zhongfu's management of the Zone and had no legitimate interest in Zhongfu in that capacity. Nonetheless, we are of the view that the police actions were taken to discourage Zhongfu from defending its rights and to discourage its staff from remaining in the Zone. First, no other reason was advanced for the existence, or indeed the timing, of the warrants for the arrest of Dr Han and Mr Zhao, or for the arrest and mistreatment of Mr Zhao. Secondly, the police were

involved when Mr Onas went to the Zone on 22nd July 2016, which suggests that they were parties to the attack on Zhongfu's rights. Thirdly, NEPZA and Ogun State stated that they would get the immigration service and the police to use their powers to put pressure on Zhongfu staff, as Ogun State's letter of 14th July 2016, NEPZA's letter of 27th July 2016, and Dr Han's evidence as to what he was told on or around 14th July 2016 by Mr Onas and Mr Odega, demonstrate.

*Conclusion on Nigeria's liability*

125.  In the light of these conclusions on the facts, it seems clear to us that Zhongshan's claim must succeed. More specifically, we have concluded that the written and oral communications and the actions taken by Ogun State, NEPZA and the police between April and August 2016, namely the 2016 Activities, infringed Nigeria's obligations under articles 2(2), 2(3), 3(1), and 4.

126.  The 2016 Activities were plainly designed to deprive, and indeed succeeded in depriving, Zhongfu of its rights under the 2010 Framework Agreement and the 2013 JVA in circumstances where there were no domestic law grounds for doing so, and in a way which involved a combination of actual and threatened illegitimate use of the state's power to achieve that end. The Nigerian courts' failure to grant any prompt interlocutory or declaratory order, and granting of the anti-suit injunction, while not enough on their own to constitute breaches of the Treaty, serve to compound the wrongness of these actions and statements.

127.  It is not even as if there is any convincing evidence to suggest that Nigeria considered that Zhongfu was doing a bad job in managing the Zone (although, as we have noted, complaints were made in the letter of 18th May 2015 letter, but they do not appear to have been pursued and no attempt was made by Nigeria to substantiate them in this arbitration). On the contrary: the Zone under Zhongfu's management in 2013 and 2014 resulted in a substantial number of occupiers by 2016, and produced tax revenues for Nigeria of over NGN 160m. We also were referred to an Article published in February 2015 the Assistant Comptroller of the Nigerian Customs Service said that Zhongfu "*should be given a pat on the back for a job well done*". Further, in April 2016, as already mentioned, the Economist Intelligence Unit produced a video praising the Zone.

128. Article 2(2) was infringed by Nigeria because Zhongfu's interests in the Zone were entitled to "the continuous protection" of Nigeria. This article is normally invoked where the investment has been harmed by someone other than the state, and the state has failed, by action or by law, to prevent or reverse the harm. However, in this case, far from stepping in to prevent or even discourage threats being made to Zhongfu and its staff, the police, whose function it is to prevent and deal with breaches of the law, actually supported those threats and helped carry them into effect.

129. Article 2(3) prevents Nigeria from taking "*any unreasonable or discriminatory measures against the management, ... use, enjoyment ... of the investments by [Chinese] investors*". The combination of facts that (i) there were no apparently justifiable grounds in domestic law to shut out Zhongfu from the Zone and from its legal rights, and (ii) illegitimate actions, and threats of illegitimate actions, on the part of state bodies, which cannot have been in accordance with domestic public law, were taken or made to achieve that end, means that the actions and threats amounted to "*unreasonable measures*". The additional fact that there is no suggestion of other owners or operators were treated in such a way, and indeed that NSG was brought in as manager, suggests that the measures were also discriminatory.

130. The written and oral communications directed and actions taken by Ogun State, NEPZA and the police against Zhongfu and its staff between April and August 2016 also breached Nigeria's obligation under article 3((1) to accord "*fair and equitable treatment*" to Zhongfu's rights under the 2010 Framework Agreement. In this connection, there was a wholesale "*lack of due process leading to an outcome which offends judicial propriety*" as it was put in *Waste Management Inc v United Mexican States (Number 2)* ICSID Case No ARB(AF)/00/03, Final Award, 30 April 2004, §98. The threats to individuals, the peremptory requirements to vacate, and the use of police, in particular in the treatment of Mr Zhao, amounted to "*forms of coercion that may be considered inconsistent with the fair and equitable treatment to be given to international investment*", to quote from *Desert Line Projects LLC v Republic of Yemen*, ICSID Case No ARB/05/17, Award, 6 February 2008, §§151-9. Another way of making the point is that the 2016 Activities were arbitrary in the sense of having been, as it was put in *Ronald S Lauder v The Czech Republic* UNCITRAL, Final Award, 3 September 2001, §221, "*founded on prejudice or preference rather than on reason or fact*" – or indeed rather than on any domestic legal basis (and

see also *Biwater Gauff (Tanzania) Lt v United Republic of Tanzania* ICSID Case No ARB/05/22, Award, 24 July 2008, §709).

131. As to article 4, the actions and statements between April and August 2016 were aimed at, and succeeded in, "*expropriat[ing]*", or involved "*tak[ing] similar measures ... against*", Zhongfu's Rights. It was rightly observed in *Metalclad Corporation v The United Mexican States* ICSID Case No ARB(AF)/97/1, Award, 30 August 2000, §103, that "*[e]xpropriation ... includes not only, open, deliberate and acknowledged taking of property, such as outright seizure ..., but also covert or incidental interference with the use of property which has the effect of depriving the owner ... of the use or reasonably-to-be-expected economic benefit of property*". In other words, an action or statement which has the intended effect of enabling the state to take possession of the investment in question can fall within article 4. There can be no doubt that the 2016 Activities had such an intention and effect in relation to Zhongfu's Rights. Nigeria produced no evidence that this expropriation was "*for the public interests*", and there is no reason to infer that it was. It is clear that the expropriation was not effected "*under domestic legal procedure*". As we have observed, the expropriation appears to have been discriminatory. And there can be no doubt that there has been no "*fair compensation*": indeed, there has been no compensation. It follows that none of the four requirements of article 4 in relation to an expropriation have been satisfied.

132. Accordingly, we conclude that Zhongshan has made out its case that Nigeria breached its obligations under the Treaty when it effectively deprived Zhongfu of its rights under the 2010 Framework Agreement and the 2013 JVC, and that Zhongshan is entitled to require compensation to be paid by Nigeria under article 5. We now therefore turn to the question of the quantum of that compensation.

## H.   The level of compensation

*Introductory*

133. Zhongshan contended that it was entitled to a sum which was the aggregate of (i) compensation for the loss of its rights under the 2010 Framework Agreement and the 2013 JVA and (ii) what is often called moral compensation or moral damages. We will

refer to these two categories of relief as, respectively, (i) "Compensation," and (ii) "Moral Damages".

134.   So far as Compensation is concerned, Zhongshan's case is that it is entitled to be awarded a sum equal to the value of its rights under the 2010 Framework Agreement and the 2013 JVA ("the two Agreements") as at the date those rights were effectively lost, namely 22nd July 2016. In particular, Zhongshan contends that there should be no adjustment for a possible fall in the value of those rights since that date. We consider that that submission is correct. We have concluded that there was more than a single act of expropriation, but we agree with Zhongshan's suggestion that 22nd July 2016 is the right date to select, and it was not challenged by Nigeria. Zhongshan's submission that there be no adjustment for a fall in value (if any) since that date appears to reflect the terms of article 4(1)(d) and 4(2), in which the Treaty requires an expropriation of an investment to be for *"fair compensation"*, which is defined as *"the value of the expropriated investments immediately before the expropriation is proclaimed"*. Where, as here, the expropriation infringes the Treaty, it would seem wrong if Zhongshan's compensation was less than it should have been if the expropriation had been lawful. Although the Treaty does not expressly state what the basis of the assessment of Compensation should be, we consider that, in respect of all breaches of an Investor-State treaty, the standard is one of "full reparation" for a claimant's losses. This reflects Article 34 of ARSIWA. Article 36(2) further makes it clear that compensation may extend to loss of profits. There are a number of ICSID tribunal decisions which support   this approach – see e.g. *Ioannis Kardassopoulos v Georgia* ICSID Case No ARB/05/18, Award, 3 March 2010, §517, and *Compania del Desarrollo de Santa Elena S.A. v Republic of Costa Rica* ICSID Case No ARB/96/1, Award, 17 February 2000, §78.

135.   As to Interest, again article 4 appears to assist Zhongshan's case that it should be paid interest on any Compensation. Further, article 38(2) of ARSIWA provides that *"[i]nterest runs from the date when the principal sum should have been paid until the obligation to pay is fulfilled"*.

136.   So far as Moral Damages are concerned, such a head of compensation can be traced back at least to *Lusitania (US v Germany)* (1923) VII RIAA 32 at §40, where the tribunal held that damages could be awarded for *"injury inflicted resulting in mental suffering, injury*

*to his feelings, humiliations, shame, degradation ... and such compensation should be commensurate to his injury*". Such damages have been frequently recognised and awarded where appropriate in investor-state arbitration awards – see e.g. *Desert Line Projects LL C v The Republic of Yemen* ICSID Case No ARB/05/17, Award, 6 February 2008, §§290-291. That decision is also in point because the mistreatment for which moral damages were awarded was of an employee of the claimant.

137.  When it comes to the assessment of the Compensation, the Tribunal is in the uncomfortable position of having a fully reasoned and detailed expert report from a qualified expert witness, Mr Noel Matthews, in support of Zhongshan's primary contention that it should receive Compensation of USD 1,078 million (plus interest) (or USD 1,446 million using an approach based on a comparable transaction), without any expert evidence on behalf of Nigeria in response. This is very unfortunate, and the circumstances in which it comes about are set out in our ruling of 26th October 2020: as explained above, Nigeria failed to instruct an expert when it had the opportunity to do so in accordance with the procedural timetable, and, when it finally applied to do so late, it sought an adjournment of the hearing, which we considered that we could not grant as Nigeria had already been granted one adjournment over Zhongshan's strong and understandable objection, and with a warning that a further adjournment would only be granted in wholly exceptional circumstances.

138.  Because of the absence of any expert witness for Nigeria, the Tribunal considered it appropriate to ask Mr Matthews significantly more questions about his evidence than we would have done had Nigeria called an expert witness. Before doing so, we told the parties that we would take that course, and added that we appreciated that this should not be done in a way which would, or would be perceived to, affect our impartiality, and that if either party felt that any questions were inappropriate, they should feel free to object. In the event, there were no objections to our questions, all of which Mr Matthews answered. After the hearing, as explained below, we also asked Mr Matthews to produce some revised calculations. We gave the parties the opportunity to comment on those revised calculations. The Respondent commented briefly and the Claimant did not wish to add anything to its earlier submissions.

*Assessment of Compensation*

139. Mr Matthews is an experienced chartered accountant, a Fellow of the Institute of Chartered Accountants, a Senior Managing Director of FTI Consulting LLP, and a member of the FTI Consulting Inc. Group. He has considerable experience in the quantification of damage, the valuation of shares and businesses, and has given evidence and advice in a large number of investor-state and similar arbitrations involving the loss or depreciation of an asset or a right.

140. His primary assessment of the value of Zhongfu's rights in the figure of USD 1,078 million was principally based on a discounted cash flow, or DCF, exercise, which involved assessing the likely income and outgoings which would have been enjoyed and incurred each year over the term of the Agreements and capitalising the net annual income as at 22ⁿᵈ July 2016. This exercise thus involved assessing each year (i) the likely revenues which would be generated by the Zone and paid to Zhongfu, and (ii) the likely costs which would be incurred in developing and managing the Zone and paid by Zhongfu, and then taking the capitalised value of the difference between those two sets of figures.

141. This DCF assessment exercise involved making a number of assumptions:

    a.    That the assessment should be based on a period ("the Term") ending in December 2106, the contractual expiry date of the 2013 JVA;

    b.    As to the development period

        i.    That Fucheng Park would have been fully developed within 12 months on the basis that Dr Han said that it "*would have been at full or close to full capacity within six to twelve months*",

        ii.    That the Pharmaceutical Park would have been fully developed and occupied within ten years from the end of 2017, in light of what was said in the 2016 Framework Agreement and the 2016 MoU; and

        iii.    That the remainder of the Zone ("the Rest of the Zone") would have been fully developed within about 20 years from the end of 2017, based on the

evidence of Dr Han, who described the Zone as "*a long term project expected to be developed over a period of 20 years*".

c.   That full development would involve 60% of the area of the Zone being let off as sites to occupiers on underleases, with "*the remaining 40% of the land being used for road, public utilities and green spaces*", again quoting from Dr Han's evidence, although the figure for the Pharmaceutical Park was 80% according to the 2016 Framework Agreement and the 2016 MOU;

d.   That each occupier would have been granted a 20 year underlease of a site, and that those underleases would have been renewed throughout the Term;

e.   That the land transfer fee income should be assessed on the basis of the median rent under underleases granted in 2015, USD 12 per square metre (USD 11.23 for the Pharmaceutical Park), adjusted each year for anticipated inflation;

f.   That Zhongfu's administrative fee income would be 1.35% (or 1.1% in the case of the Pharmaceutical Park) of the revenue generated by occupiers, which was assessed on the basis of a weighted average of the forecast income in the underleases, adjusted each year for anticipated inflation;

g.   That, while Mr Matthews said that he had "*relatively limited information with which to project the costs of developing land*", Dr Han's evidence that costs "*generally equated to around one-third of the land transfer fees*", should be adopted, although this seemed conservative in the light of other evidence;

h.   That the evidence of Professor Baluch, that USD 250m would be raised "*to expand infrastructure across the Zone and the southwest region of Nigeria*", should be assumed to be right, supported as it was by the evidence of Mr Xue that this sum would be used to "*upgrade infrastructure ... within and leading to the Zone, power generating capacity in the South West Region of Nigeria, ... power cables within and around the Zone, sewerage and water treatment facilities to support the Zone and a business centre at Lagos Airport*", and also by the evidence of Dr Han and Mr Vandenheuvel;

i.     In addition, that certain other running costs should be allowed for, which Mr Matthews assumed would increase from its 2015 level at a pro rata rate with respect to the increase in developed land;

j.     That a discount rate should be applied of 14.3% per annum, as the appropriate figure to take as the cost of equity, being the aggregation of (a) the product of a beta (which measures the volatility of the asset in question against the market) of 0.98 and the aggregate of the risk-free rate of 2.3% and an equity risk premium of 5%, and (ii) a country risk premium for Nigeria of 7.2%.

142.   The valuation which these assumptions produced resulted in a figure for compensation in the sum of USD 1,078 million, and this figure was arrived at on the basis of calculations summarised by Mr Matthews in the following table:

| Estimate of the value of Zhongshan's rights under the Fucheng Industrial Park Agreement (USD million) | | | | |
|---|---|---|---|---|
| | Fucheng Park | Pharmaceutical Park | Rest Of Zone | Total |
| Land transfer income | 1.0 | N/A | 44.9 | 45.9 |
| Administrative fee income | 49.8 | N/A | 625.2 | 675.0 |
| Other running costs | N/A | N/A | N/A | (11.4) |
| Infrastructure investment | N/A | N/A | N/A | N/A |
| Total | 50.8 | N/A | 670.1 | 709.5 |

| Estimate of the value of Zhongshan's rights under the JV Agreement (USD million) | | | | |
|---|---|---|---|---|
| | Fucheng Park | Pharmaceutical Park | Rest Of Zone | Total |
| Land transfer income | 1.8 | 14.0 | 67.8 | 83.5 |
| Administrative fee income | 29.9 | 71.1 | 375.1 | 476.1 |
| Other running costs | N/A | N/A | N/A | (67.5) |
| Infrastructure investment | N/A | N/A | N/A | (123.7) |
| Total | 31.6 | 85.1 | 442.9 | 368.4 |

| Summary of Zhongshan's loss based on my DCF analysis (USD million) | Value |
|---|---|
| Value of rights under the Framework Agreement | 709.5 |
| Value of rights under the 2013 JVA | 368.4 |
| Total Value of Zhongfu's Rights | 1,078 |

143. The use of a DCF calculation as a means of assessing compensation for the loss of an asset has been relied on by claimants in many cases where an income-producing asset has been lost or harmed, including in a large number of investor-state cases. In many decisions on investor-state disputes, tribunals have assessed compensation on a DCF basis. However, even in some cases where it has been adopted, the tribunal has emphasised that DCF should be used with caution. Thus, in *Enron Corporation Ponderosa Assets LP v Argentine Republic* ICSID Case No ARB/01/3 22 May 2007, §385, while explaining that DCF had been "*constantly used by tribunals in establishing the fair market value of assets to determine compensation of [sic] breaches of international law*", the tribunal also emphasised that "*it is to be used with caution as it can give rise to speculation*".

144. In many cases where use of the DCF approach was rejected by tribunals, it was because the investment had not really got under way and therefore had little or nothing to show by way of a track record. Decisions show that there is resistance to using DCF where the investment had not been implemented or was at a fairly early stage. Thus, in *Tecnicas Medioambientales Tecmed S. A. v United Mexican States* ICSID Case No ARB (AF)/00/2, 29 May 2003, §186 the tribunal refused to adopt a DCF approach because of "*the brief history of operation of the Landfill ... - little more than two years – and difficulty in obtaining objective data allowing the [DCF] method on the basis of estimates for a protracted future, not less than fifteen years*" coupled with the fact that the "*future cash flow depends upon investments to be made – building of seven additional cells – in the long term*". Similarly, the tribunal in *Wena Hotel v Arab Republic of Egypt* ICSID Case No. ARB/98/4, 8 December 2000, §124, considered that a DCF approach "*would be too speculative*" where the business had operated for only seventeen months, under a contract which was contractually due to last around between 22 and 25 years. And in the earlier decision in *SPP (Middle East) v Egypt* ICC Award, Case No 3493, 11 March 1983, 22 ILM 752 (1983), one of the reasons for rejecting a DCF approach was, as explained in *Wena Hotel*, §123, that "*by the date of the cancellation, the great majority of the work had still to be done*".

145. DCF valuations in the context of investment treaty cases were the subject of an article, *DCF: Gold Standard or Fool's Gold*" in *The Asia-Pacific Arbitration Review 2020*, written by two members of FTI, Mantek Mayal and Alex Davie. The authors consider

some of the investment treaty cases, where DCF has been adopted or rejected, and say that "*[p]erhaps the main drawback of DCF analysis is its sensitivity to uncertain inputs*" and that the "*uncertainty of appropriate inputs is compounded in the case of early stage businesses where there is no track record of steady historical cash flow generation*". The authors suggest that such uncertainty should not lead to a DCF valuation being rejected, but that it justified using "*other valuation methods*" in addition.

146.   In this case, we would summarise the information most relevant to the DCF valuation carried out by Mr Matthews as follows:

    a.    Between mid-2009 and mid-2016, some 37 occupiers were granted underleases of sites totalling about 830,000 square metres or 83 hectares, i.e. somewhat over 0.8 square kilometres, in Fucheng Park;

    b.    Copies of 32 of those underleases, which show the financial terms agreed with, and the anticipated income of, the respective occupiers;

    c.    The audited annual accounts for the calendar year 2015 prepared in NGN (the exchange rate in 2015 was around 200 NGN per USD, and on 22nd July 2016 it was 295 NGN per USD), including:

        i.    Zhongfu's accounts, which show negligible expenditure, and profits of NGN 621m (compared with NGN 227m for 2014);

        ii.    OGFTZ's accounts, which show operating revenue of NGN 607m and a loss after administrative expenses etc of NGN 520m (compared with operating revenue NGN 252m and a loss of 673m for 2014);

        iii.    The Notes to Zhongfu's accounts, recording that NGN 54m was spent in 2015 on "road construction"; and   the Notes to OGFTZ's accounts recording infrastructure expenditure in 2015 of NGN 297m;

    d.    Witness evidence that USD 250m would be sought for installing infrastructure inside and outside the Zone;

    e.    Dr Han's statements that Zhongfu had worked on the basis that it would take up to a year to fill Fucheng Park, and 20 years to fill the Zone with occupiers, and that

60% of the gross area of the Zone could be underlet with the remainder used for infrastructure, amenity etc;

f.   Witness and documentary evidence that agreements had been entered into by OGFTZ with Xi'an in relation to the development of the Pharmaceutical Park.

147.   In the case of Fucheng Park, while one may have doubts about some of the details of the assessment, both the adoption of a DCF valuation, and the general thrust of Mr Matthews's approach to that valuation appear to us to be justified. We conclude that there is a sufficient track record upon which a DCF calculation may be based, albeit caution is needed as regards the appropriate assumptions to be adopted. As at July 2016, around 830,000 square meters of land in that Park had been let by way of sites to occupiers under underleases which were long-term arrangements, and this had been achieved over some seven years. 830,000 square metres represents around 35% of the total area of Fucheng Park, and around 60% of the lettable land, on the basis of Dr Han's evidence that about 40% would be given over to infrastructure, amenity land and the like. It also appears that a substantial proportion of those sites which were subject to underleases had been developed by the occupiers. And a not insignificant amount had been incurred on infrastructure at Fucheng Park, as is revealed by the 2015 Accounts. It is true that there were accounts for only two years (although our information about the 2014 Accounts rests solely on the information in the 2015 Accounts), and they do not show a particularly profitable venture - particularly if one looks at OGFTZ's losses.

148.   It was not contended by Nigeria that the accounts did not present a true and fair view of the finances relating to the investment for these two years, 2014 and 2015, and we have no basis to doubt their accuracy  Despite the limited period covered by the accounts, it is not unreasonable to assume that there was a good prospect, based on the experience of the previous seven years, that Fucheng Park would be fully occupied within a few years or so. There were some 500,000 square metres of lettable area still unoccupied (given that 60% of 2.24 square kilometres is 1.34m square metres, of which 830,000 were occupied).

149.   According to Mr Matthews's evidence, the average rate at which space at Fucheng Park had been let between mid-2009 and mid-2016 was 120,000 square metres per year, and between mid-2012 and mid-2016, it was 150,000 square metres per year. During the last eighteen months of that four-year period, the rate was approximately 325,000 square

metres per annum. However, it would not be safe to assume that that rate could have been maintained: for example, it may have reflected a time of high demand in a cyclical market or it may have been a spurt due to temporarily pent-up demand. In that connection, we note that in the last six months of those eighteen months the rate appeared to be falling off.

150.  In those circumstances, we consider that, even taking the most pessimistic end of Dr Han's assessment that it would have taken "*six to twelve months*" to let off the remaining sites in Fucheng Park looks very optimistic, as it would involve letting some 500,000 square metres in a year. On the basis of the past experience summarised in the preceding paragraph, it seems to us that 30 months would be a more realistic assessment. After all, the only evidence as to the likely rate of letting is past performance and a statement by Dr Han, which was simply adopted by Mr Matthews. The basis of Dr Han's assessment was not explained and, in the absence of any convincing supporting evidence, we do not consider that it can be treated as anything more than an aspiration. Accordingly, the only reliable evidence as to the likely rate of letting after 2016 is the past performance summarised in the immediately preceding paragraph, and we have concluded that it suggests that it would be appropriate to assume a letting rate of 200,000 square metres per year. That is more than the average rate achieved in the four years of Zhongfu's stewardship, and, although it is less than the average rate achieved in the last eighteen month period, that rate seems to have been levelling off towards the end of that period.

151.  We also consider that taking into account the income and outgoings over 30 years would amount to unrealistic speculation, particularly given the early stage of this investment and the considerable uncertainties as to infrastructure expenditure. As Mr Matthews fairly accepted, the effect of carrying out a DCF valuation on the basis of limiting the net income to 20 years rather than his approximately 90 years on the present value of Zhongfu's asset is relatively small. as each successive year's contribution is less than its predecessor. In all the circumstances of this case, it seems to us that 20 years is the right cut-off.

152.  Accordingly, we accept Mr Morrison's valuation of Zhongfu's loss insofar as it relates to Fucheng Park, subject to (i) assuming a 30-month period to let off the remaining lettable area, and (ii) limiting the period over which the DCF assessment is carried out to 20 years.

153. The application of a DCF approach to valuing the Pharmaceutical Park and the Rest of the Zone on anything like the assumptions as to the rate of letting which Mr Matthews made, appears to us to be very problematic indeed. No underleases had been granted of any site in those parts of the Zone; no, or very little, infrastructure was in place in those parts of the Zone, and there was not even any finance in place to carry out infrastructure works; further, there were no feasibility or other business plans; no marketing proposals or investigation. Taking the Zone as a whole (i.e. including Fucheng Park) the total amount of land which had been let under underleases by July 2016 was less than 0.9% of the total area of the Zone (according to both the 2010 Framework Agreement and the 2013 JVA). That figure should be almost doubled, because, as just mentioned, we are proceeding on the basis that 60% of the land would be subject to underleases, with the rest being given over to infrastructure, amenity land and the like. But that makes little difference to the point: 1.5% is a very small proportion of the total lettable land in the Zone. A DCF valuation of the Pharmaceutical Park and the Rest of the Zone in those circumstances on anything like the basis assumed by Mr Matthews appears to us to be unjustifiable - especially when one bears in mind what was said in cases such as *Tecmed* and *Wena Hotel*.

154. In such cases, tribunals have sometimes emphasised the desirability of a detailed business plan if a claimant is proposing a DCF valuation, and that must, self-evidently, be particularly true where, as in this case, the investment is at a relatively early stage of development. In his oral evidence, Mr Matthews acknowledged that a business plan "*would obviously be relevant*" and that it would be "*obviously it would be helpful*" to have such a document. Given that such a document does not exist (or at least none was drawn to our attention), it would have been helpful to have an in-depth independent expert assessment of the prospects of letting off units in the Zone and of the nature, extent, costs, and importance of necessary and desirable infrastructure works inside and outside the Zone, the time they would be likely to take and any difficulties they were likely to encounter. As it is, although Mr Matthews was able to draw some support from the underleases granted of sites in Fucheng Park up to mid-2016, when it came to assessing future lettings and future expenses, he was largely reliant on the statements of employees and agents of Zhongfu, which were not the subject of any sort of detailed analysis or justification.

155. The speculative nature of the DCF exercise when applied to the Pharmaceutical Park and the Rest of the Zone is further demonstrated by the fact that OGFTZ and Zhongfu only have audited accounts for the two calendar years 2014 and 2015. Although they show that Zhongfu made a profit in those two years, it was not a large one when viewed in the context of Mr Matthews's projections, and, according to those accounts, OGFTZ, which was bearing most of the costs of management and the infrastructure costs, made a loss in each year.

156. As with the 20-year estimate for letting the totality of the Zone, the assumptions on which Mr Matthews based his DCF assessment for the Zone involved substantially relying on relatively general statements by directors, employees or agents of Zhongfu, rather than on independent assessments of the required infrastructure, and the expenditure which it would involve and the time it would take to instal. The figure of USD 250m, to which Professor Baluch and Mr Vanderveuvel spoke, was not broken down, and did not appear to be based on any assessment of the specific nature and extent of the works involved, how long they would take, and how much they would cost. If there was such an assessment, we were not told about it. Nor was Mr Matthews, as he was unable to say what such works would involve, although he accepted that "*it matters to have a good infrastructure both outside and inside the Zone*", and he explained that "*underlying [his] valuation is the assumption that the infrastructure is in place inside the Zone and outside the Zone*". The figure of USD 250m derives some credibility from the fact that it is supported by the experienced Professor Baluch and Mr Vanderveuvel, but the fact that we do not know – and the fact that Mr Matthews did not know - what the works would consist of, how, indeed whether, they had been costed, and how long they would take, is a matter of obvious concern. This is particularly true in relation to the work which it was accepted would have to be carried out outside the Zone, because there could obviously be greater impediments in the way of carrying out such work, given the relative lack of control which OGFTZ and Zhongfu would have over what went on outside the Zone. Nor do we know how serious it would be for the profitability of the Zone, if some of the works outside the Zone could not be carried out, or what the risks of that happening were.

157. The documentation to support the raising of the USD 250m was scant. It is far from clear how a fund-raising initiative would have been received by potential investors or how easy it would have been to raise the money. While we accept that the evidence of  Professor

JA-73

Baluch and Mr Vanderveuvel assists Zhongfu's case on this question, there are obvious grounds for caution as to how easy it would have been to raise the money, given that the market had not been tested and there were apparently no lenders lined up to advance the funds. As Mr Matthews said *"they were still exploring how they were going to raise [the money]"*, and there was no formulated or detailed plan to raise the money. When considering the appetite of the market for such an investment, it is, we think, also right to bear in mind Mr Matthews's evidence that *"[i]t appears that many Nigerian FTZ's have not been particularly successful to date"*.

158. In the immediately preceding paragraphs, the Tribunal has been considering both the Pharmaceutical Park and the Rest of the Zone together. Unlike the Rest of the Zone, the development of the Pharmaceutical Park was at least the subject of a written arrangement, namely the 2016 MoU and the 2016 Framework Agreement. However, these documents do not take matters a great deal further, although we acknowledge that they do show that the projected development of the Pharmaceutical Park was not merely a matter of unsubstantiated hope, and was, at least potentially, ahead of that of the Rest of the Zone. The Pharmaceutical Park is a substantial area, 10 square kilometres, i.e. 10m square metres or 1,000 hectares, which is over four times the size of Fucheng Park. As far as the evidence goes, no development assessment of the Pharmaceutical Park had been undertaken, and, save that the documents contain a reference to USD 1 billion, there was no evidence as to the nature, cost or timing of any infrastructure work. We know nothing about the experience, record, capabilities or financial status of Xi'an, and it appears that the company which entered into the MoU was a Special Purpose Vehicle formed for that purpose. Nor is there any evidence as to the likely level of demand in the pharmaceutical industry for space in the Zone: apparently, there are no pharmaceutical business occupiers of Fucheng Park. Furthermore, it does not appear that there is any commitment from Xi'an to do anything specific under the terms of the 2016 MoU or the 2016 Framework Agreement.

159. Mr Matthews made the point that in a way it was artificial to divide up the Zone into three sectors and value each separately. We see the force of that, but it was the basis on which he decided to carry out his valuation. However, the point does provide some support for the notion that, if one looks at the Zone as a whole, it can be said that the letting history of Fucheng Park means that there was a track record, albeit a very preliminary and limited

track record, for the Pharmaceutical Park and the Rest of the Zone, namely the lettings and infrastructure in Fucheng Park.

160. Mr Matthews based his DCF valuation of  Zhongfu's rights in relation to the Pharmaceutical Park and the  Rest of the Zone on the assumption that it would take 20 years to let the totality of the sites in the Zone: that involves assuming that lettings will be achieved at the rate of just under 3,000,000 square metres per annum (on the basis that the Zone is 100,000,000 square metres, that 60% of the Zone would be lettable, and only a very small proportion, namely most of Fucheng Park, had been let). A letting rate of 3,000,000 square metres per annum is around 20 times the average rate at which sites were let in Fucheng Park between mid-2009 and mid-2016, and around 10 times the rate during the last eighteen months. Yet, the only basis which Zhongshan appears to advance for justifying this remarkably substantial increase in letting rate is Dr Han's description of the Zone as "*a long term project expected to be developed over a period of 20 years*". But that is an unsubstantiated and unexplained estimate from someone with an indirect interest, who was expressing what Zhongshan, the claimant had expected, and who was not proffered as an expert witness. So far as Mr Matthews was concerned, having explained in his Report that his 20-year assumption was based on Dr Han's view, he said in his oral testimony that he would not otherwise be "*able to benchmark*" his assessment "*to a data point is [sic] the period of time that it would take for the Zone to be developed*".

161. In the Tribunal's view, in order to justify such a very substantial differences between (i) the assumed future rates of letting of sites in the Rest of the Zone and the Pharmaceutical Park and (ii) the actually achieved rate of letting of sites in Fucheng Park over the preceding seven years, one would expect to have cogent expert evidence based on experience and examples and containing explanations as to why such a remarkable change could be expected. The unsubstantiated and briefly expressed expectations of a director of the company relying on what he said were "*expected*" future rates falls very far short of such an evidential requirement. Further, the uncertainties we have discussed in paragraphs 152 to 160 above reinforce the point that it would be inappropriate to assume that the letting rate would be significantly higher, let alone very substantially higher, than the letting rate achieved even in the last eighteen months in Fucheng Park.

162. In the light of these conclusions, the correct approach to the assessment of the Compensation other than in respect of Fucheng Park is not easy, particularly bearing in mind the warnings about the risks of speculating and the desirability of having a track record when carrying out a DCF valuation. So far as the Pharmaceutical Park is concerned, we consider that it should be assumed that land would be let off to occupiers at the rate of 200,000 square metres per annum (i.e. at the same rate as for Fucheng Park) on the basis that letting the Pharmaceutical Park will commence when Fucheng park is fully let (i.e. after 30 months). Although it does not actually affect our valuation, we consider that 60% of the Pharmaceutical Park would be lettable: the documents contained a suggestion that the right figures might be more but there was no independent support for this, so, again, we adopt the assumption made for Fucheng Park. This would mean that. 6,000,000 square metres would be available for letting in the Pharmaceutical Park.

163. Of course, if the Pharmaceutical Park turns out, or would have turned out, to be a great success, a letting rate of 200,000 square metres per annum would very probably seem to be an unduly cautious rate, but it is equally true that if the Pharmaceutical Park did not turn out, or would not have turned out, well, 200,000 square metres a year would very probably be an over-optimistic rate.

164. At 200,000 square metres per annum, and working on the same assumption as to 60% of lettable area, it would take 30 years until the Pharmaceutical Park was fully let. For the purposes of the valuation, we are prepared to take into account 17½ years of letting activity at this rate (i.e. 20 years less the 2½ years to let the remainder of Fucheng Park), and this would mean that a total of 3,500,000 square metres would have been let by the end of the 20-year period that we are prepared to consider for valuation purposes.

165. Subject to those adjustments, we would not make any amendment to Mr Matthews's DCF calculations for the Pharmaceutical Park.

166. The concerns we have expressed as to the lack of evidence as to the prospects of the Pharmaceutical Park apply with even more force to the Rest of the Zone. The uncertainty is even greater because OGFTZ and Zhongfu did not have the benefit of a development partner such a Xi'an, or the concomitant benefit of an arrangement such as the 2016 Framework Agreement or the 2016 MoU, in relation to the Rest of the Zone. In these

circumstances, we think that it would simply be too speculative to take into account any potential development of the Rest of the Zone.

167. In any event, the assumption of a letting rate of 200,000 square metres per year for the unlet part of Fucheng Park and the Pharmaceutical Park means that the Pharmaceutical Park would not be fully let by the end of the 20 years. If the Rest of the Zone was marketed at the same time as the Pharmaceutical Park, it would involve significant expenditure on infrastructure in both areas at the same time, and would at least potentially render the letting of the Pharmaceutical Park more problematic (in that the two areas might well compete for the attention of potential tenants), and so would justify a reduction in the 200,000 square metre letting rate that we have assumed for the Pharmaceutical Park. That also strongly suggests that it is right to assume that the Rest of the Zone will not be marketed until the Pharmaceutical Park is fully (or nearly fully) let. And the assumption of sequential letting of space in the three areas of Fucheng Park, the Pharmaceutical Park and the Rest of the Zone seems consistent with Mr Matthews's point that they are all part of a single Zone. In those circumstances, particularly in the light of the absence of any evidence as discussed in paragraphs 152 to 160 above, we take the view that we should assume the development of the Rest of the Zone is likely to be postponed beyond 20 years, in which case its prospects as at 2017 or today are very speculative indeed. The prospects are simply speculative for us to be prepared to attribute any value to the Rest of the Zone.

168. We acknowledge that the assumption that the Zone as a whole will be let off at the rate of 200,000 square metres a year effectively implies that we are proceeding on the basis that it would take a very long time indeed to let off the whole of the Zone. But that is the consequence of the Zone extending over such a very substantial area. The size of the Zone seems unlikely to have a substantial effect on the demand for space within it, and, at least in the absence of some convincing expert evidence to support such a proposition, it would seem unjustifiable to conclude that, because the Zone is very large, the letting rate should be significantly increased beyond what it otherwise would be.

169. We also acknowledge that some of the findings and assumptions we have made in connection with the valuation exercise are somewhat speculative in nature. That is partly because a significant degree of uncertainty and unpredictability is almost always inherent

in the exercise of valuing a future income and outgoing stream. But, in this particular case, it is also because the evidential support for the two most important assumptions on which Mr Matthews's valuation was based, the likely rate of letting and the cost, nature and timetable of any infrastructure expenditure, is very thin indeed. This is not a criticism of Mr Matthews, who was plainly honest and competent; indeed it was Mr Matthews who provided the facts on which we have been able to arrive at an assessment of these factors, and without which we may well have had no alternative but to reject any allowance in relation to future lettings.

170. In the event, we have concluded that we can properly base our assessment on a DCF valuation, on the basis that (i) we have the track record of Fucheng Park, which can be relied to support an evidence-based assumption as to annual letting rates (and lettable area), (ii) we should proceed on the basis of a sequential letting policy for the Zone as whole, (iii) we can rely on Mr Matthews's assessment of the likely infrastructure costs based as it is on the Fucheng Park expenditure, and (iv) we should adopt a reasonably conservative but realistic valuation period of 20 years.

171. In these circumstances, we consider that we should assess the Compensation on the following basis:

    a.    Valuing Zhongfu's rights over Fucheng Park on the DCF basis proposed by Mr Matthews, save that (i) it should be assumed that it would be fully developed after 30 months rather than 1 year, and (ii) the cut-off should be after 20 years;

    b.    Valuing the Pharmaceutical Park on the DCF basis proposed by Mr Matthews, save that (i) it should be assumed that it would be let off at the rate of 200,000 square metres per annum from the end of 2019, as opposed to being fully let within 10 years from some time in 2017, and (ii) the cut-off should be after 20 years, and therefore 3,500,000 square metres would be let after 17.5 years;

    c.    Disregarding the letting prospects of the Rest of the Zone.

172. Pursuant to a request from the Tribunal at the Hearing, Mr Matthews provided us, a few days after the end of the Hearing, with his spreadsheet containing the figures which he used for his DCF valuations summarised in tabular form above, on the basis that we could change the inputs to arrive at what we considered to be the correct valuation. In the event,

only three inputs were variable, namely DCF period, area, and development time.  Having provisionally come to the conclusion that we should value along the lines summarised in paragraph 171 above, we realised that the spreadsheet might be insufficiently flexible to enable us to arrive at our valuation. We therefore wrote to the parties on 22nd January 2021 asking for a more flexible version of the document which he had sent us. After we received that more flexible version on 29th January 2021, we gave the parties the opportunity of commenting on it, which resulted in an email on 10th February 2021 from Mr Madumere on behalf of Nigeria with some concisely expressed comments, which we have taken into account.

173.  Our valuation of the Compensation, based on Mr Matthews's primary, DCF, approach amended as described in paragraph 171 above is USD 55.6 million, made up in the following way:

| Estimate of the value of Zhongshan's rights under the Fucheng Industrial Park Agreement (USD million) | | | | |
|---|---|---|---|---|
| | Fucheng Park | Pharmaceutical Park | Rest Of Zone | Total |
| Land transfer income | 0.8 | N/A | 0.0 | 0.8 |
| Administrative fee income | 42.7 | N/A | 0.0 | 42.7 |
| Other running costs | N/A | N/A | N/A | (4.2) |
| Infrastructure investment | N/A | N/A | N/A | N/A |
| Total | 43.5 | N/A | 0.0 | 39.3 |

| Estimate of the value of Zhongshan's rights under the JV Agreement (USD million) | | | | |
|---|---|---|---|---|
| | Fucheng Park | Pharmaceutical Park | Rest Of Zone | Total |
| Land transfer income | 1.5 | 3.6 | 0.0 | 5.1 |
| Administrative fee income | 25.6 | 10.4 | 0.0 | 36.0 |
| Other running costs | N/A | N/A | N/A | (24.8) |
| Infrastructure investment | N/A | N/A | N/A | 0.0 |
| Total | 27.1 | 14.0 | 0.0 | 16.3 |

| Summary of Zhongshan's loss based on the above DCF analyses (USD million) | Value |
|---|---|
| Value of rights under the Framework Agreement | 39.3 |
| Value of rights under the 2013 JVA | 16.3 |
| Total Value of Zhongfu's Rights | 55.6 |

174. We have not so far referred to Mr Matthews's secondary approach to assessing Compensation. This produced a higher figure than his primary assessment of USD1,446 million. As a check on his DCF valuation, Mr Matthews relied on a single comparable transaction, which related to Nkok SEZ ("Nkok") which is a site of 1,126 hectares (i.e. just over 11 square kilometres) near the capital of Gabon, Libreville. His evidence revealed that Nkok had been the subject of two potentially relevant transactions, in 2014 and 2016. For various reasons, some of which were in his Report, but another of which was vouchsafed (voluntarily) in his oral evidence, Mr Matthews considered the 2014 transaction, which involved the sale of a 20% shareholding in Nkok, more reliable, and we agree. It suggested, he said, a value of 26.6 USD per square metre.

175. The Tribunal finds it very difficult to accept that the 2014 transaction relating to Nkok is of much if any help when assessing the value of Zhongshan's rights in respect of the Zone. Nkok is in a different country, and in the absence of a detailed assessment of the variations between Nigeria and Gabon in terms of economic prospects, political risk, and taxation policy, it appears to us that use of one as a comparable to value the other would be very dangerous even before one considers the differences in physical location. Mr Matthews was well aware of this and did his best to cater for these potential variations, but we are not persuaded that it would be safe to place any significant weight on this comparable. Having said that, we should acknowledge that Mr Matthews acted entirely reasonably in seeking a comparable given what we have said about the DCF approach, and that he appears to have done his best to find one: it is not his fault that Nkok was the best he could come up with.

176. Accordingly, we would award Zhongshan USD 55.6 million by way of Compensation.

*Moral damages*

177. The Tribunal is in no doubt that there were aspects of the 2016 Activities on the part of organs of the Nigerian state which justify an award of moral damages. By far the most significant of those activities for present purposes was treatment of Mr Zhao by the police in the second half of August 2016. It represented an indefensible and serious infringement of his human rights, and a humiliating and frightening experience, lasting the best part of two weeks. The threats to Dr Han by Mr Adeoluwa and Mr Onas in July 2016, and the

fact that Zhongfu's employees were intimidated on 22nd July 2016 reinforce the claim for moral damages.

178. So far as the quantum is concerned, the Tribunal considers that USD 75,000 would be an appropriate sum. It represents around USD 5,000 for each day of Mr Zhao's mistreatment plus a further sum to reflect the other inappropriate behaviour of representatives of Nigeria towards employees and a director of Zhongfu.

**I.    Interest**

179. As already explained, Zhongshan is entitled to interest at least in the absence of a good reason, and we have not been provided with a  reason for not awarding interest. As the Compensation has been assessed as at 22nd July 2016, we consider that interest should run from that date.  We agree with the Claimant that the rate of interest should be the same both before and after the date of this award. There are two questions which have to be determined, however. The first is the rate of interest and the second is whether the interest should be awarded on a simple or compound basis (and if compounded, the frequency of the compounding).

180. So far as the rate is concerned, Zhongshan has asked for 2% over LIBOR for the time being on the basis that that would represent the likely cost of borrowing. It is a rate which does not seem unreasonable, which has not been challenged by Nigeria, and which has been awarded in other investor-state arbitrations. Thus, in the *Enron* case referred to above, at §452 the Tribunal considered it right to award interest "*at the 6 month average LIBOR rate plus 2 per cent for each year, or proportion thereof*" and on the basis that "*[i]nterest shall be compounded semi-annually*". Compound interest has been said to be more normal than simple interest in investor-state arbitration awards – see e.g. the *Wena Hotel* case cited above, at §129, and the *Desarrollo v Costa Rica* decision also cited above, at §§101-104. However, there are still cases where simple interest has been awarded.

181. Many tribunal decisions supporting each side in the compound interest versus simple interest debate were noted by the tribunal in a useful section of the decision in *Tenaris S.A. and Talta-Trading E Marketing Sociedade Unipessoal LDA v. Bolivarian Republic of Venezuela* ICSID Case No. ARB/11/26, 29 January 2016, §§588 to 594. In that case,

the tribunal acknowledged that either basis was appropriate, but, quoting from Dozer and Scheuer, *Principles of International Law* (2ⁿᵈ ed, 2008), they recognised that "*the practice of recent tribunals shows a trend towards compounding interest as more in accord with commercial reality*". In the end, the tribunal decided that the facts of the case justified an order for compound interest. We also note that the majority of the tribunal in *Foresight Luxembourg Solar 1 Sarl v. Kingdom of Spain*, SCC Case No. 2105/150, 14 November 2018, §544 expressed the view that compound interest is the generally accepted standard in international investment arbitration. Even if that is not right, the high-handed and inappropriate way in which Zhongfu was deprived of its rights, and the failure of Nigeria to engage with Zhongshan after the deprivation, persuade us that this is a case for compound interest.

182. Zhongshan cited decisions endorsing the notion that an award of interest should be compounded monthly, including *Foresight Luxembourg Solar*, §545. The Tribunal is satisfied that monthly compounding of interest is a reasonable approach to adopt in this case.

183. Accordingly we award Zhongshan interest on the Compensation and on the moral damages to run from 22ⁿᵈ July 2018 until payment, at the one month USD LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly.

184. This produces a figure of USD 9.4 million on the basis that this award is made on 26 March 2021.

185. We add that in respect of the figures we have decided to award by way of Compensation and Interest we have not deviated from the figures rounded to USD millions and one decimal point as produced by Mr Matthews' spreadsheet. We were not given more precise figures and, even if we had been, to produce an award in those terms might convey a degree of precision with respect to the calculations that would be misleading.

## J.   Costs

186. It is clear that Zhongshan is the effective winner in these arbitral proceedings, in that (i) it has proved that its version of events is accurate, (ii) it has successfully resisted Nigeria's jurisdictional and preliminary objections, (iii) it has established that it has a valid claim

against Nigeria under the Treaty, and (iv) it has obtained an award for substantial damages.

187.   In these circumstances, we consider that Zhongshan is entitled to recover at least a substantial proportion of its costs from Nigeria. This arbitration is being conducted according to English law and section 61(1) of the Arbitration Act 1996 states that "*[t]he tribunal may make an award allocating the costs of the arbitration as between the parties, subject to any agreement of the parties*". The parties are agreed that the UNCITRAL Rules on costs apply, and Article 42(1)of those Rules provides that the "*costs of the arbitration shall in principle be borne by the unsuccessful party or parties*", although the Tribunal can, "*if it determines that apportionment is reasonable, taking into account the circumstances of the case*". Again, this is consistent with section 61(2) of the 1996 Act.

188.   Although a party may have won an arbitration dispute, there may be reasons to deprive it of some, or even all, of its costs. In this case, we consider that there is nothing in the conduct of Zhongshan or its representatives which would justify reducing the costs which it can recover on such grounds, and indeed Nigeria has not made any suggestion that there is any reason for reducing the costs claimed. It is true that we have awarded Zhongshan substantially less than it has claimed, but the size of the claim has not affected the conduct of this arbitration and Nigeria has not protected its position on costs by making a sealed offer.

189.   However, that does not mean that we should simply award Zhongshan the entire amount which it seeks by way of costs. The costs payable by a successful party to its legal representatives and expert witnesses in connection with proceedings may well be reasonable as between as between payer and payee, but that does not mean that it would be reasonable to award those costs in full as against the other party to the proceedings.

190.   Zhongshan claims a total of £3,012,067.61 for legal costs and disbursements aside from the other costs of the arbitration and the specific additional amount referred to below. That sum includes £292,035 in respect of the fees of FTI (Mr Matthews).   For an investment treaty arbitration claim seeking a substantial sum (and recovering a substantial, albeit significantly lower, sum), it is not excessive for a claimant to incur costs of this order, especially where an international law firm and Counsel are instructed. The Tribunal notes that Nigeria's claim for costs is significantly less, being N450,000,000

(approximately £850,000 at present exchange rates).  Although a significant difference is to be expected as Nigeria did not instruct international counsel or solicitors, the disparity is striking.

191.  Bearing in mind that a comparative exercise between the costs of the parties is one way of assessing reasonableness, the Tribunal in its discretion applies a reduction of a little over 20% to Zhongshan's claimed figure, and we award Zhongshan £2,400,000 by way of costs (plus the additional amount addressed in the next paragraph of this Award).

192.  Zhongshan separately claims £109,789.57 in respect of its costs of dealing with the Amended and Re-Amended Statement of Reply.  By its Order dated 18 May 2020, the Tribunal directed Nigeria to pay, irrespective of the outcome of the dispute, "*the costs of and occasioned by the amendment (including the costs of amending the Statement or Reply to deal with the new paragraphs)*".  Zhongshan's claim under this head appears reasonable and is accordingly awarded in full.

193.  To the extent it was claimed, the Tribunal does not award pre-award interest on legal and other costs, because it would be unusual to do so and we have not been given the information (as to when amounts were paid) to enable it to do so.

194.  The total of the other costs of the arbitration are £549,655.17, comprised as follows:

    a.    Tribunal fees:  £457,095.86, broken down as follows:

        i.    Fees of Mr Rotimi Oguneso SAN, co-arbitrator:  £130,113.36

        ii.    Fees of Mr Matthew Gearing QC, co-arbitrator:  £118,738.75

        iii.    Fees of Lord Neuberger of Abbotsbury, presiding arbitrator:  £208,243.75

    b.    Tribunal disbursements:  £147.76

    c.    PCA Fees:  £15,996.01

    d.    Hearing hosting fees (Opus 2) paid by Zhongshan:  £61,324.76

    e.    Interpretation fees paid by Zhongshan:  £7,067.76.

f.      All other expenses (bank costs, currency translation, telecommunication, cancelled court reporting arrangements, interpretation arranged by the PCA, etc.): £8,023.02.

195.    The Tribunal decides that Nigeria should bear all of these costs, as the unsuccessful party in the arbitration.

196.    Thus far, Zhongshan has advanced £295,000 and Nigeria £195,000, Zhongshan having made a substitute payment of £50,000 on Nigeria's behalf. The costs of the arbitration not paid directly by the Parties, in the amount of £481,262.65, shall be deducted from the deposit held by the PCA. The amount of £8,737.35 remaining in the deposit shall be returned to the Claimant, in view of the Claimant having made a substitute payment to the deposit.

197.    Bearing in mind the Parties' unequal contributions to the deposit, Nigeria shall pay £286,262.65 in respect of the costs of arbitration paid in the first instance from Zhongshan's share of the deposit and £68,392.52 in respect of the hearing and interpretation fees paid directly by Zhongshan.

## K.    Conclusion and Award

198.    **Accordingly, the Tribunal concludes, orders and awards as follows:**

a.      Zhongshan has locus to pursue a claim for compensation under the Treaty in respect of its rights under the 2010 Framework Agreement and the 2013 JVA;

b.      Nigeria is in breach of its obligations under articles 2(3), 3(1) and 4(1) of the Treaty;

c.      Nigeria is ordered to pay to Zhongshan;

i.      Compensation for the expropriation  in the sum of USD 55.6 million

ii.     Moral damages in the sum of USD 75,000;

iii.    interest on the aforesaid two sums from 22nd July 2016 at the one month USD LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly, until and including the date of the award, in the sum of USD 9.4 million.

iv.   in respect of the Claimant's legal and related costs of the arbitration, the sum of £2,509,789.57

v.   £354,655.17 in respect of the other costs of the arbitration.

vi.   interest on the sums specified on all the amounts specified in sub-paragraphs (i) to (iii) above from the day after this award until payment  at at the one month USD LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly, until and including the date of payment (and should, for any reason, USD LIBOR cease to be operative while any amount remains outstanding, the interest due shall from that date onward be calculated on the basis of whatever rate is generally considered equivalent to USD LIBOR plus 2%, compounded monthly, until and including the date of payment ).

vii.   interest on the sums specified on all the amounts specified in sub-paragraphs (iv) and (v) above from the day after this award until payment  at at the one month GBP LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly, until and including the date of payment (and should, for any reason, GBP LIBOR cease to be operative while any amount remains outstanding, the interest due shall from that date onward be calculated on the basis of whatever rate is generally considered equivalent to GBP LIBOR plus 2%, compounded monthly, until and including the date of payment ).

------------------------------------------------

**Mr Rotimi Oguneso SAN, co-arbitrator**

------------------------------------------------

**Mr Matthew Gearing QC, co-arbitrator**

------------------------------------------------

**Lord Neuberger of Abbotsbury, presiding arbitrator**

Place of arbitration: London, United Kingdom

Date of Award: **26 March 2022**

# EXHIBIT B

**Agreement Between the Government of the People's Republic of China and the Government of the Federal Republic of Nigeria for the Reciprocal Promotion and Protection of Investments**

Department of Treaty & Law

The Government of the People's Republic of China and the Government of the **Federal Republic of Nigeria** (hereinafter referred to as "the Contracting Parties"),

Recognizing that the reciprocal encouragement, promotion, and protection of such investments will be conducive to stimulating business initiative of the investors and will increase prosperity in both States,

Recognizing investor's duty to respect the host country's sovereignty and laws;

Desiring to intensify the cooperation of both States on the basis of equality and mutual benefits;

Determined to create favourable conditions for greater investment by investors of one Contracting Party in the territory of the other Contracting Party;

Have agreed as follows:

### Article 1 DEFINITIONS

For the purpose of this Agreement,

1. The term "investment" means every kind of asset invested by investors of one Contracting Party in accordance with the laws and regulations of the other Contracting Party in the territory of the latter, and in particularly, though not exclusively, includes:

(a) movable and immovable property as well as any property rights, such as mortgages, liens and pledges;

(b) shares, debentures, stock and any other kind of participation in companies;

(c) claims to money or to any other performance having an economic value associated with an investment;

(d) intellectual property rights, in particular copyrights, patents, trade-marks, trade-names, technical process, know-how and good-will; and

JA-89

(e) business concessions conferred by law or under contract permitted by law, including concessions to search for, cultivate, extract or exploit natural resources.

2. The term "investor" include nationals and companies of both Contracting Parties :

(a) "nationals" means, with regards to either Contracting Party, natural persons having the nationality of that Contracting Party;

(b) "companies" means, with regards to either Contracting Party, corporations, firms and associations incorporated or constituted under the law in force in the territory of the Contracting Party.

3. The term "return" means the amounts yielded from investments such as profits, dividends, interests, capital gains, royalties and fees;

4. The term "territory" means the land area, the inland area, the territorial sea of the Contracting Party, as well as continental shelf and the exclusive economic zone over which the State concerned exercises, in accordance with international law, sovereign and jurisdictional rights.

### Article 2  PROMOTION AND PROTECTION OF INVESTMENTS

1. Each Contracting Party shall promote economic cooperation and encourage investors of the other Contracting Party to make investments in its territory and admit such investments in accordance with its laws and regulations.

2. Investments of the investors of either Contracting Party shall enjoy the continuous protection in the territory of the other Contracting Party.

3.Subject to its laws and regulations, neither Contracting Party shall take any unreasonable or discriminatory measures against the management, maintenance, use, enjoyment and disposal of the investments by the investors of the other Contracting Party.

4. Each Contracting Party shall endeavor to provide assistance in obtaining visas and working permit to nationals of the other Contracting Party engaging in activities associated with investments made in the territory or that Contracting Party.

### Article 3  TREATMENT OF INVESTMENTS

1. Investments of investors of each Contracting party shall all the time be accorded fair and equitable treatment in the territory of the other Contracting Party.

2. Without prejudice to its laws and regulations, each Contracting Party shall accord to investments and activities associated with such investments by the investors of the other Contracting Party treatment not less favorable than that accorded to the investments and associated activities by its own investors.

3. Neither Contracting Party shall subject investments and activities associated with such investments by the investors of the other Contracting Party to treatment less favorable than that accorded to the investments and associated activities by the investors of any third State.

4. The provisions of Paragraph 1 to 3 of the Article shall not be construed so as to oblige one Contracting party to extend to the investors of the other Contracting Party the benefit of any treatment, preference or privilege by virtue of:

(a)  any customs union, free trade zone, economic union and any international agreement resulting in such customs union, free trade zone, economic union; and

(b)  any international agreement or arrangement relating wholly or mainly to taxations;

### Article 4  EXPROPRIATION

1. Neither Contracting Party shall expropriate, nationalize or take similar measures (hereinafter referred to as "expropriation") against the investments of investors of the other Contracting Party in its territory, unless the following conditions are met:

(a) for the public interests;

(b) under domestic legal procedure;

(c)  without discrimination;

(d)  against fair compensation.

2. The compensation mentioned in Paragraph 1 (d) of this Article shall be equivalent to the value of the expropriated investments immediately before the expropriation is proclaimed, be convertible and freely transferable. The compensation shall be paid without unreasonable delay and include interest at a normal commercial rate.

### Article 5  COMPENSATION FOR DAMAGES ANS LOSSES

Investors of one Contracting Party whose investments in the territory of the other Contracting Party suffer losses owing to war, a state of national emergency, insurrection,

JA-91

riot or other similar events in the territory of the latter Contracting Party, shall be accorded by the latter Contracting Party, as regards restitution, indemnification, compensation and other settlements no less favorable that accorded to the investors of its own or any third State.

### Article 6   PEPATRIATION OF INVESTMENTS AND RETURNS

1. Each Contracting Party shall, subject to its laws and regulations, guarantee to the investors of the other Contracting Party the transfer of their investments and returns held in its territory, including:

(a)profits, dividends, interests and other legitimate income;

(b) proceeds obtained from the total or partial or liquidation of investments;

(c) payments pursuant to a loan agreement in connection with investments;

(d) royalties;

(e) payments of technical assistance or technical service fees, management fee;

(f) payments in connection with contracting projects;(g) earnings of nationals of the other Contracting Party.

2. The transfer mentioned above shall be made in freely convertible currency.

### Article 7  SUBROGATION

If one Contracting Party or its Agency makes a payment to an investor under guarantee it has granted to an investment of such investor in the territory of the other Contracting Party, such other Contracting Party shall recognize the assignment of any the right or claim of such investor to the former Contracting Party or its Agency and recognize the subrogation of the former Contracting Party or its Agency to such right or claim. The subrogated right or claim shall not be greater than the original right or claim of the said investor.

### Article 8  SETTLEMENT OF DISPUTES BETWEEN CONTRACTING PARTIES

1. Any dispute between the Contracting Parties concerning the interpretation or application of provisions of this Agreement shall be settled through diplomatic channels.

JA-92

 2. Where the Contracting Parties cannot reach an agreement with twelve months, the dispute shall, upon request of either Contracting Party, be submitted toan arbitral tribunal of three members. Each Contracting Party shall appoint one arbitrator, and those two arbitrators shall nominate a third arbitrator who shall be a national of a third State with diplomatic relations with the Contracting Parties. The third arbitrator shall be appointed by the two Contracting Parties as the Chairman of the arbitral tribunal.

3. Where one of the Contracting Parties has not appointed its arbitrator and followed the invitation of the other Contracting Party to make that appointment within two months, the arbitrator shall be appointed upon the request of the latter Contracting Party by the President of the International Court of Justice.

4. Where the Chairman of the arbitral tribunal has not been constituted within two months after the appointment of the two arbitrators and in the absence of any other agreement, the Chairman shall be appointed upon the request of either Contracting Party by the President of the International Court of Justice.

5. Where in the case specified under paragraph (3) and (4) of this Article, the President of International Court of Justice. Is a national of either Contracting Party or is otherwise prevented from carrying out the said function, the appointment shall be made by the Vice-President is a national of either Contracting Party or is otherwise prevented from discharging the said function, the appointment shall be made by the most senior Judge of the Court who is not a national of either Contracting Party.

6. The arbitral tribunal shall determine its procedure.

7. Each Contracting Party shall bear the costs of its appointed arbitrator and of its representation in arbitral proceedings. The relevant costs of the Chairman and the tribunal shall be borne in equal parts by the Contracting Parties.

8. The decisions of the tribunal are final and biding on the Contracting Parties.

**Article 9 SETTLEMENT OF DISPUTES BETWEWEEN INVESTORS AND ONE CONTRACTING PARTY**

5

JA-93

1. Any dispute between an investor of the other contracting Party and the other Contracting Party in connection with an investment in the territory of the other Contracting Party shall, as far as possible, be settled amicably through negotiations between the parties to the dispute.

2. If the dispute cannot the settled through negotiations within six months, the either Party to the dispute shall be entitled to submit the dispute to the competent court to the Contracting Party accepting the investment.

3. If a dispute cannot be settled within six months after resort to negotiations as specified in Paragraph 1 of this Article it may be submitted at the request of either Party to an ad hoc arbitral tribunal. The provisions of this Paragraph shall not apply if the investor concerned has resorted to the procedure specified in Paragraph 2 of this Article.

4. Such an ad hoc arbitral tribunal shall be constituted for each individual case in the following way: each Party to the dispute shall appoint one arbitrator, and these two shall select a national of a third State which has diplomatic relations with the two Contracting Parties as the Chairman. The first two arbitrators shall be appointed within two months of the written notice for arbitration by either party to the dispute to the other, and the Chairman shall be selected within four months. If within the period specified above, the tribunal has not been constituted, either Party to the dispute may invite the Secretary General of the International Center for Settlement of Investment Disputes to make the necessary appointments.

5. The tribunal shall determine its own procedure. However, the tribunal may, in the course of determination of procedure, take as guidance the Arbitration Rules of International Center for Settlement of Investment Disputes.

6. The tribunal shall reach its decision by a majority of votes. Such decision shall be final and binding upon both parties to the dispute. Both Contracting Parties shall commit themselves to the enforcement of the award.

7. The tribunal shall adjudicate in accordance with the law of the Contracting Party to the dispute accepting the investment including its rules on the conflict of laws, the

JA-94

provisions of this Agreement as well as the generally recognized principles of international law accepting by both Contracting Parties.

8. Each Party to the dispute shall bear the costs of its appointed member of the arbitral and of its representation in the proceedings. The cost of the appointed Chairman and the remaining costs shall be borne in equal parts by the parties to the dispute.

### Article 10 OTHER OBLIGATIONS

1.  If the legislation of either Contracting Party or international obligations existing at the present or established hereafter between the Contracting Parties result in a position entitling investments by investors of the other Contracting Party to a treatment more favorable than is provided for by this Agreement, such position shall not be affected by this Agreement.

2.  Each Contracting Party shall observe any commitments it may have entered into with the investors of the other Contracting Party as regards to their investments.


### Article 11  APPLICATION

This Agreement shall apply to investments, which are made prior to or after its entry into force by investors of either Contracting Party in accordance with the laws and regulations of the other Contracting Party in the territory of the latter.

### Article 12 CONSULTATIONS

1. The representatives of the Contracting Parties shall hold meetings from time to time for the purpose of:

(a) reviewing the implementation of this Agreement;

(b) exchanging legal information and investment opportunities;

(c) resolving disputes arising out of investments;

(d) forwarding proposals on promotion of investment;

(e) studying other issues in connection with investments.

2.   Where either Contracting Party requests consultation on any matters of Paragraph 1 of this Article, the other Contracting Party shall give prompt response and the consultation be held alternatively in Beijing,China and Abuja, Nigeria.

### Article 13 AMENDMENT OR REVISION

Any amendment to or revision of this Agreement shall be in writing and shall come into force when confirmed by both Contracting Parties in an Exchange of Notes through diplomatic channel.

### Article 14  ENTRY INTO FORCE, DURATION AND TERMINATION

1.  This Agreement shall enter into force on which both Contracting Parties have notified each other in writing that their respective internal legal procedures thereof have been completed with and  remain in force for a period of ten years.

2. This Agreement shall continue in force if either Contracting Party fails to give a written notice to the other Contracting Party to terminate this Agreement one year before the expiration of the period specified in Paragraph 1 of this Article.

3. After the expiration of initial ten years period, either Contracting Party may at any time thereafter terminate this Agreement by giving at least one year's written notice to the other Contracting Party.

4. With respect to investments made prior to the date of termination of this Agreement, the provisions of Article 1 to 13 shall continue to be effective for a further period of ten years from such date of termination.

IN WITNESS WHEREOF, the duly authorized representatives of their respective Governments, have signed this Agreement.

Done in duplicate in Beijing on 27th August2001 in two originals in  Chinese and English languages, both texts being equally authentic.

SUN GUANGXIANG                          CHIEF KOLA JAMODU, MFR

Honourable Vice Minister of             Honourable Minister of Industry
Foreign Trade and Economic

JA-96

Cooperation

For and on behalf of the Government
of the People's Republic of China

For and on behalf of the Government
of the Federal Republic of Nigeria

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

ZHONGSHAN FUCHENG INDUSTRIAL
INVESTMENT CO., LTD.,

       Petitioner,

       v.

FEDERAL REPUBLIC OF NIGERIA,

       Respondent.

Civil Action No. 22-170 (BAH)

Oral Argument Requested

---

## RESPONDENT FEDERAL REPUBLIC OF NIGERIA'S
## MOTION TO DISMISS FOR LACK OF JURISDICTION UNDER THE FSIA

Pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, and Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2), Respondent, the Federal Republic of Nigeria ("Nigeria"), respectfully moves this Court to dismiss the Petition to Recognize and Enforce Foreign Arbitral Award, Dkt. No. 1.

Pursuant to Local Civil Rule 7(f), Nigeria respectfully requests that the Court schedule an oral hearing on its motion.

In compliance with Local Civil Rule 7(a), Nigeria has filed concurrently an accompanying memorandum of points and authorities, and the exhibits attached thereto, in support of its motion.

JA-98

Date: June 13, 2022

Respectfully submitted,

SQUIRE PATTON BOGGS (US) LLP

*/s/ Raúl  B. Mañón*

Raúl  B. Mañón (*Pro Hac Vice*)
Maria Gomez (*Pro Hac Vice*)
200 South Biscayne Boulevard, Suite 3400
Miami, FL 33131
T: (305) 577-7000
F: (305) 577-7001
Email: raúl.manon@squirepb.com
       maria.gomez@squirepb.com

-and-

Alexandra E. Chopin (D.C. Bar No. 490736)
2550 M Street, N.W.
Washington, DC 20037
T: (202) 457-5623
F: (202) 457-6315
Email: alexandra.chopin@squirepb.com

*Counsel for Respondent Federal Republic of Nigeria*

JA-99

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of June, 2022, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system, which will send electronic copy to counsel of record.

*/s/ Raúl  B. Mañón*
By: Raúl  B. Mañón

JA-100

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ZHONGSHAN FUCHENG INDUSTRIAL
INVESTMENT CO., LTD.,

        Petitioner,

        v.                                        Civil Action No. 22-170 (BAH)

FEDERAL REPUBLIC OF NIGERIA,

        Respondent.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
RESPONDENT'S MOTION TO DISMISS FOR LACK OF JURISDICTION
<u>UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT, 28 U.S.C. § 1605</u>**

**TABLE OF CONTENTS**

GLOSSARY ............................................................................................................................. iv

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     STATEMENT OF FACTS .......................................................................................... 3

        A.      Petitioner Files Breach Of Contract Claims Against Ogun State In
                Nigerian Court. ................................................................................................ 3

        B.      Petitioner Initiates Separate Arbitration Proceedings Against Nigeria
                Claiming Breach Of International Law Under The Nigeria-China Treaty,
                But Does Not Raise Any Commercial Contract Claims. ................................. 4

        C.      The Tribunal Applies International Law And Rules That Nigeria, Through
                Ogun State, Breached Its Obligations Under The Nigeria-China Treaty. ............. 5

III.    ARGUMENT ............................................................................................................... 6

        A.      Nigeria Is Immune From Suit Because Petitioner Cannot Establish An
                Exception To Sovereign Immunity Under the FSIA. ...................................... 6

        B.      The New York Convention Does Not Apply To The Award, which Arises
                From The Nigeria-China Treaty. .................................................................... 8

        C.      The Arbitration Tribunal Agreed With Petitioner That The Underlying
                Dispute Was Non-Commercial. .................................................................... 10

        D.      Petitioner Has Not Sufficiently Alleged That Nigeria Waived Its
                Sovereign Immunity ..................................................................................... 14

        E.      Nigeria Is Entitled To A Threshold, Conclusive Determination Of Its
                Sovereign Immunity Without Waiving Any Substantive Defenses Against
                Enforcement. ................................................................................................. 16

IV.     CONCLUSION ......................................................................................................... 17

JA-102

## TABLE OF AUTHORITIES

**Cases**

*Africard Co. v. Republic of Niger*, 210 F. Supp. 3d 119 (D.D.C. 2016)....................................... 14

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) ................................ 6

*\*Belize Soc. Dev., Ltd. v. Gov't of Belize*, 794 F.3d 99 (D.C. Cir. 2015)...................................... 8

*Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312 (2017)...
    16

*Campagnie Sahélienne d'Enterprise v. Republic of Guinea*, No. 20-1536, 2021 U.S. Dist. LEXIS
    10442 (D.D.C. June 14, 2021) ............................................................................................. 14

*Chevron Corp. v. Republic of Ecuador,* 949 F. Supp. 2d 57 (D.D.C. 2013) ................................ 10

*Citizens Bank v. Alafabo, Inc.*, 539 U.S. 52 (2003) ..................................................................... 13

*Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118 (D.C. Cir. 1999).................................................. 14

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.,* 244 F. Supp. 3d 100 (D.D.C. 2007)..... 10

*Customs & Tax Consultancy LLC v. Dem. Rep. Congo*, No. 18-1408, 2019 U.S. Dist. LEXIS
    162136 (D.D.C. Sept. 16, 2019) .......................................................................................... 14

*\*Diag Human v. Czech Ministry of Health*, 824 F.3d 131 (D.C. Cir. 2016) ...................... 7, 13, 15

*Foremost-McKesson v. Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990)...................... 16

*Luxexpress 2016 Corp. v. Gov't of Ukraine*, No. 18-cv-812, 2020 U.S. Dist. LEXIS 47629
    (D.D.C. Mar. 19, 2020).......................................................................................................... 14

*Mowrer v. U.S. Dep't of Transp.*, 14 F.4th 723 (D.C. Cir. 2021)................................................. 16

*Princz v. Fed. Republic of Ger.*, 998 F.2d 1 (D.C. Cir. 1993) ..................................................... 17

*\*Process & Indus. Devs. Ltd. v. Fed. Republic of Nig.*, 27 F.4th 771 (D.C. Cir. 2022) *(Process II)*
    ................................................................................................................................................ 7

*\*Process & Indus. Devs. Ltd. v. Fed. Republic of Nig.*, 962 F.3d 576 (D.C. Cir. 2020) *(Process I)*
    .............................................................................................................................................. 16

*S.K. Innovation Inc. v. Finpol*, 854 F. Supp. 2d 99 (D.D.C. 2012) ............................................ 15

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)............................................................................... 6

*Authorities upon which Nigeria chiefly relies are marked with asterisks.

*Stati v. Republic of Kaz.*, 199 F. Supp. 3d 179 (D.D.C. 2016) ..................................................... 10

*\*Tatneft v. Ukraine*, 771 F. App'x 9 (D.C. Cir. 2019)................................................................ 14

*United States v. Morrison*, 529 U.S. 598, (2000) ........................................................................ 13

**Statutes**

Fed. R. Civ. P. 12(b) ..................................................................................................................... 3

\* Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*.................................................................... 2, 7, 15

\* Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*........................................... 2, 7, 14

\* New York Convention, 21 U.S.T. 2517 (1970)................................................................... passim

**Other Authorities**

Anthea Roberts, Divergence Between Investment and Commercial Arbitration, 106 Proceedings
    of the Annual Meeting (Am. Soc'y of Int'l L.)Confronting Complexity 297-300 (2012) ......... 8

Brief of The United States as Amicus Curiae at 6, *Process and Indus. Devs. Ltd.*, No. 21-7003
    (D.C. Cir. Jan. 20, 2022)........................................................................................................ 16

*Compania de Aguas del Aconquija SA and Vivendi Universal SA v. Argentine Republic*, ICSID
    Case No ARB 97/3 Award (Nov. 21, 2000) ........................................................................... 13

Contracting States: New York Arbitration Convention,
    https://www.newyorkconvention.org/countries (last visited June 11, 2022)............................ 16

Kenneth Vandevelde, Bilateral Investment Treaties: History, Policy & Interpretation (2010)...... 9

*The Robert E. Huder Article on Global Trade: Enabling Private Ordering: Function, Scope and
    Effect of Umbrella Clauses in International Investment Treaties*, 18 Minn. J. Int'l L. 1, 31-32
    (2009)...................................................................................................................................... 13

**Treatises**

\* Restatement (Third) of the Foreign Relations L. of the U.S. (2012) ......................................... 13

\* Restatement (Third) of U.S. L. of Int'l Com. & Inv. State Arb. (2012).................................. 8, 9

## GLOSSARY

| ABBREVIATION | DEFINITION |
|---|---|
| Award | The March 26, 2021, arbitration award issued in favor of Zhongshan and against Nigeria under the Treaty. |
| CAI | Guangdong Xinguang International China-Africa Investment Ltd. |
| NEPZA | Nigeria Export Processing Zone Authority |
| Nigeria | Federal Republic of Nigeria |
| Nigeria-China Treaty | The Agreement Between the Government of the People's Republic of China and the Government of the Federal Republic of Nigeria for the Reciprocal Promotion and Protection of Investments |
| New York Convention | The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 |
| OGFTZ | Ogun-Guangdong Free Trade Zone Company |
| Ogun State | A state in southwestern Nigeria |
| OSG | The Ogun State Government |
| Zhongfu | Zhongfu International Investment, a subsidiary of Zhongshan |
| Zhongshan | Zhongshan Fucheng Industrial Investment Co., Ltd. |
| The Zone | Ogun Guangdong Free Trade Zone |

## I.   PRELIMINARY STATEMENT

The Petition seeks to enforce a March 26, 2021, arbitration award that arises out of the sovereign exercise of police powers and alleged expropriation by a political subdivision of the Federal Republic of Nigeria, and not out of a breach of contract or other commercial claim.  The Award derives from a bilateral investment treaty, the Agreement Between the Government of the People's Republic of China and the Government of the Federal Republic of Nigeria for the Reciprocal Promotion and Protection of Investments ("Nigeria-China Treaty"), which provides for arbitration of breaches of that Treaty by China or Nigeria.  *See* Final Arbitration Award (Dkt. No. 2-1) (the "Award").

China and Nigeria undertook under the Nigeria-China Treaty to "encourage, promote, and protect" investments made by their respective nationals in the territory of the other party.  Nigeria-China Treaty (Dkt. No. 2-2).  The Treaty is not a commercial agreement, nor does it govern the terms of investments subject to its protection.  Instead, the Treaty binds Nigeria and China to certain standards of conduct with respect to protected investments.  *See, e.g., id.* Art. 2 (neither country shall take "unreasonable or discriminatory measures" with respect to protected investments); Art. 3 (countries shall "accord fair and equitable treatment" to protected investments); Art. 4 (neither country "shall expropriate, nationalize or take similar measures" unless four specific conditions are met <u>and</u> the expropriating party pays fair, freely transferable compensation "without unreasonable delay and include interest at a normal commercial rate").

Public international law provides the contours of the sovereign protections afforded under the Nigeria-China Treaty and the sovereign conduct that may give rise to their breach.  Consistent with that, the Award is explicit that the arbitrated disputes were governed by public international law, as they fell outside of the commercial sphere.  Award ¶¶ 72-73.  This distinction is dispositive of the Court's jurisdiction in light of the sovereign immunity protections granted to Nigeria by the

Foreign Sovereign Immunities Act, 28 U.S.C. § 1605, because Petitioner Zhongshan Fucheng Industrial Investment Co., Ltd. ("Zhongshan" or "Petitioner") relies for enforcement exclusively on the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), Art. I(1), 21 U.S.T. 2517 (1970), which Nigeria and the United States have elected to apply only to commercial relationships.[1]

Further, Petitioner's claims that are the subject of the Award are based on sovereign conduct attributed to Nigeria under public international law and determined to be an internationally wrongful act that violates the Nigeria-China Treaty. *See* Award (Dkt. No. 2-1) ¶¶ 72–73. These claims are distinct from those arising from a commercial relationship. The Restatement (Third) of Foreign Relations Law of the United States articulates the same principle: "[I]nternational law is not implicated" in the "breach[] [of] a commercial contract with a foreign national for commercial reasons" such "as a private contractor might" have. *Id.* § 712. Petitioner's pursuit of its claims has been consistent with both the Award and the Restatement (Third) in this regard, and is a concession that the claims underlying the Award do not arise from a commercial relationship. In fact, Petitioner's claims at issue in the Award are distinct in nature and origin from Petitioner's separate commercial claims it brought before Nigeria courts against its contractual counter-parties (which did not include Nigeria). More to the point, to justify the arbitration tribunal's jurisdiction over Nigeria, Petitioner insisted that it was seeking relief under international law from Nigeria's sovereign conduct and that it claims did not arise from a purely commercial relationship. Ex. B to Mañón Decl. (Statement of Claim), ¶¶ 181, 218–95. Petitioner is estopped from arguing otherwise in this action in an attempt to push the Award within reach of the New York Convention.

---

[1] *See* Federal Arbitration Act, 9 U.S.C. §§ 201 *et seq.* (codifying New York Convention, and providing that the Convention applies to an arbitral award when it "aris[es] out of a legal relationship, whether contractual or not, which is considered as commercial" ).

Petitioner consequently is precluded from relying on the New York Convention to recognize and enforce the Award in this Court.  Because Petitioner relied exclusively on the Convention to circumvent Nigeria's sovereign immunity, Petitioner has failed to establish an exception to the FSIA and thus this Court's jurisdiction over the Petitioner. The Petition accordingly should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2).

## II.     STATEMENT OF FACTS

This dispute involves Petitioner's alleged loss of its development, management, and operational rights over the Ogun Guangdong Free Trade Zone ("the Zone"), an area of land which is owned by Ogun State in Nigeria.  *See* Award (Dkt. No. 2-1), ¶ 1.  Petitioner entered into a series of agreements to develop the Zone, which culminated in a 2013 joint venture agreement between Petitioner's wholly owned subsidiary, Zhongfu International Investment (NIG) FZE ("Zhongfu"), and Ogun State.  *Id.* ¶¶ 3, 18–19.  Ogun State is a separate juridical entity from Nigeria.  *See* Constitution of the Federal Republic of Nigeria 1999, ch. 1, parts 1 & 2 (providing for federal and state governments with distinct structures and powers).  Nigeria was not a party to any of those agreements. *See* Award (Dkt. No. 2–1), ¶ 72.

In 2016, the relationship between Ogun State and Petitioner dissolved after Ogun State terminated Zhongfu's appointment as the manager of the Zone.  *See* Award (Dkt. No. 2-1), ¶¶ 33–41.  Nigeria was not involved in that relationship or in the conduct undertaken by Ogun State.  *Id.* ¶¶ 33–41.

A.  Petitioner Files Breach Of Contract Claims Against Ogun State In Nigerian Court.

On August 18, 2016, and September 9, 2016, Zhongfu brought breach of contract claims in Nigerian federal court against Nigeria Export Processing Zone Authority ("NEPZA"), the Attorney General of Ogun State, and Zenith Global Merchant Limited, arguing breaches of

Zhongfu's contractual rights under the various agreements as manager of the Zone.  *Id.* ¶¶ 42–43.  Petitioner purportedly defaulted in those proceedings, which were terminated by the courts for Petitioner's failure to meet deadlines and other obligations.  *Id.* ¶ 44.

Nigeria was not a party to those proceedings. *Id.* ¶ 85.

B.   Petitioner Initiates Separate Arbitration Proceedings Against Nigeria Claiming Breach Of International Law Under The Nigeria-China Treaty, But Does Not Raise Any Commercial Contract Claims.

On August 30, 2018, Zhongshan served Nigeria with a Request for Arbitration pursuant to the Nigeria-China Treaty, and submitted its Statement of Claim on May 1, 2019.  *Id.* ¶¶ 53, 58.  The Nigeria-China Treaty permits protected investors to bring claims for violation of the Treaty "to an ad hoc arbitral tribunal."  *Id.* Art. 9(3).  The Treaty does not mention or reference the New York Convention.  *See generally id.*

Petitioner pleaded only claims for breach of international law under the Nigeria-China Treaty, and did not include any breach of contract or similar commercial claims.  *See* Ex. B to Mañón Decl. (Statement of Claim), ¶¶ 218–75.  Petitioner argued that, under principles of attribution pursuant to public international law, Ogun State's conduct was attributable to Nigeria.  Ex. A to Mañón Decl. (Statement of Reply), ¶ 184.  It argued that the conduct, as attributed to Nigeria, breached the Nigeria-China Treaty, making Nigeria liable under public international law.  *See* Award (Dkt. No. 2-1) ¶ 58.  Specifically, Petitioner asserted that, during a three-month period in 2016, Ogun State officials initiated an investigation into Petitioner's management rights in the Zone and sent police to the Zone to intimidate Petitioner's employees.  *See* Pet. (Dkt. No. 1) ¶¶ 33–41 ("Mr[.] Onas again attended at Fucheng Park, this time with a member of the Nigerian police . . . , and introduced NSG as the new manager, and according to Mr[.] Zhao caused some of Zhongfu's employees to be frightened.").  Petitioner claimed that Ogun State officials detained Petitioner's employee.  *See id.* ¶ 39 ("Mr[.] Zhao was [allegedly] arrested at gunpoint . . . . Mr[.]

Zhao was eventually freed on bail")); *see also* Ex. B to Mañón Decl. (Statement of Claim), ¶ 129 (describing alleged "abuse of police power").

Petitioner also contended that its forced abandonment of the Zone amounted to an expropriation by Ogun State, attributable to Nigeria under public international law. *See* Award (Dkt. No. 2-1), ¶ 131; *see also* Ex. B to Mañón Decl. (Statement of Claim), ¶¶ 12, 109, 129. In Petitioner's words, "Nigeria—through actions of the Ogun State Government, the Nigeria Export Processing Zones Authority and the Nigeria police—took over the entirety of the Claimant's rights and assets in the Zone and forcibly evicted Zhongfu Nigeria from the Zone, thereby destroying the entire value of the Claimant's investment in Nigeria." Ex. B to Mañón Decl. (Statement of Claim), ¶ 12.

C. The Tribunal Applies International Law And Rules That Nigeria, Through Ogun State, Breached Its Obligations Under The Nigeria-China Treaty.

On March 26, 2021, the arbitration tribunal issued the Award. Agreeing with Petitioner, it found that "Zhongshan's case [was] primarily based on the actions of Ogun State" and by "the police and NEPZA", all of which was sovereign conduct attributable to Nigeria under public international law.[2] Award (Dkt. No. 2-1), ¶¶ 72–73. The Award distinguished Zhongfu's separate breach of contract claims—that were the subject of the discontinued proceedings in Nigeria—from the arbitration under the Nigeria-China Treaty, emphasizing that the parties were distinct in either proceeding and that the arbitration was predicated on the Treaty, not on the contracts between Zhongfu, Ogun State, and other entities. *Id.* ¶¶ 82–91.

The tribunal concluded that Nigeria failed to afford Petitioner's investment the protections contained in the Nigeria-China Treaty thereby violating public international law. First, the tribunal

---

[2] The tribunal rejected the application of Nigeria law on the issue, proceeding exclusively under principles of public international law. *See* Award (Dkt. No. 2-1), ¶¶ 72-73.

concluded that Nigeria did not afford "continuous protection" to Petitioner's investment because "the police, whose function it is to prevent and deal with breaches of the law, actually supported . . . threats [against] Petitioner and helped carry them into effect." *Id.* ¶ 128.  Second, the tribunal found that Petitioner was subjected to "unreasonable or discriminatory measures" because "there were no apparently justifiable grounds in domestic law to shut Zhongfu from the Zone and from its legal rights" and "illegitimate actions, and threats of illegitimate actions . . . were taken or made to achieve that end." *Id.* ¶ 129.  Third, the tribunal found that certain "written and oral communications directed and actions taken by Ogun State, NEPZA and the police against Zhongfu and its staff … breached Nigeria's obligation under article 3(1) to accord 'fair and equitable treatment' to Zhongfu's rights." *Id.* ¶ 130.  Finally, the tribunal concluded that the "actions and statements" of Ogun State, NEPZA and the police "were aimed at, and succeeded in, 'expropriat[ing]'" Zhongfu's rights in violation of Article 4 of the Nigeria-China Treaty. *Id.* ¶ 131.  The tribunal awarded Petitioner more than USD $65 million for these alleged breaches. *Id.* ¶ 198.

## III.    ARGUMENT

A. <u>Nigeria Is Immune From Suit Because Petitioner Cannot Establish An Exception To Sovereign Immunity Under the FSIA.</u>

The FSIA provides the exclusive basis for establishing jurisdiction over a foreign sovereign in the United States. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989).  The FSIA encompasses both personal and subject matter jurisdiction, which will lie only if Petitioner establishes an exception to the FSIA applies to lift Nigeria's sovereign immunity protections.  *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  Petitioner must carry the burden to produce "evidence that an exception applies . . . and once shown, the sovereign bears

the ultimate burden of persuasion to show the exception does not apply." *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 696 (D.C. Cir. 2022) (cleaned up).

Petitioner relies on the so-called "arbitration exception" to the FSIA, 28 U.S.C. § 1605(a)(6), and asserts it has established the exception because the Award allegedly is governed by the New York Convention.  Pet. ¶ 11.  Under the arbitration exception, a foreign state will be deemed to have waived its sovereign immunity protections under the FSIA if an award "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards."  28 U.S.C. § 1605(a)(6).  The New York Convention is an international treaty ratified by the United States that allows for "the recognition and enforcement of arbitral awards made in a territory of a State other than the State where the recognition and enforcement of such awards are sought."  New York Convention Art. I.  The New York Convention requires U.S. courts to "recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the articles of the Convention."  *Process & Indus. Devs. Ltd. v. Fed. Republic of Nig.*, 27 F.4th 771, 774-75 (D.C. Cir. 2022) (cleaned up) (*Process II*); *see also* 9 U.S.C. § 203 (codifying original jurisdiction in U.S. courts over cases arising under the New York Convention).

The United States ratified the New York Convention subject to the "commercial reservation," 9 U.S.C. § 202, which makes the Convention applicable "only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the law of the State making such declaration."  New York Convention, Art. I (3); *accord Diag Human v. Czech Ministry of Health*, 824 F.3d 131, 136 (D.C. Cir. 2016).  The FSIA's arbitration exception to foreign sovereign immunity will not apply, warranting dismissal for lack of

jurisdiction, unless Petitioner can establish that the Award is commercial under the terms of the New York Convention.

As established below, it is not.  Dismissal is warranted.

B. The New York Convention Does Not Apply To The Award, which Arises From The Nigeria-China Treaty.

The Nigeria-China Treaty does not establish a "legal relationship . . . which is considered as commercial," *Diag Human*, 824 F.3d at 136, as is required for the New York Convention to apply to the Award, because it is an international treaty between two sovereign states that extends sovereign protection to investors of the other nation's citizens.  In this Circuit, "commercial" is a "term of art . . . Congress intended that word to have the meaning generally attached to that term in the international arbitration context." *Belize Soc. Dev., Ltd. v. Gov't of Belize*, 794 F.3d 99, 105 (D.C. Cir. 2015).  Accordingly, "commercial" is defined to mean "matters or relationships, whether commercial or not, that arise out of or in connection with commerce." *Id.* (quoting Restatement (Third) of U.S. L. of Int'l Com. & Inv. State Arb. § 1-1 (2012), and citing Restatement (Third) of Foreign Relations L. of the U.S. § 487).

The Nigeria-China Treaty establishes a non-commercial legal relationship governing the exercise of sovereign state conduct pursuant to public international law.  It eminently "involves public international law" and is a "treat[y]" between two "states acting in their public capacity as sovereigns (which enter into treaties) and regulators (which govern populations)."[3]  The Restatement (Third) of Foreign Relations Law explicitly distinguishes between "international agreement[s]" of this nature and other forms of commercial arrangements to which a sovereign state might be a party.  *See id.* §§ 301, 487 cmt. f.  In contrast, where "an agreement to arbitrate is

---

[3] Anthea Roberts, Divergence Between Investment and Commercial Arbitration, 106 Proc. of the Ann. Meeting (Am. Soc'y of Int'l L.) Confronting Complexity 297-300 (2012).

in the contract between a government and a private person," that legal relationship may be "commercial" in nature.  *Id*. § 487 cmt. f.  But "international agreements," like the Nigeria-China Treaty, that involve "two or more states" and are "governed by international law" are "not subject to the New York Convention" because they are not commercial.[4]  *Id*. §§ 301, 487.

Further, as a treaty granting <u>all</u> qualifying investments certain base-line protections against sovereign state conduct,[5] the Nigeria-China Treaty does not set forth the terms of those investments, nor is it a commercial agreement between Petitioner and Nigeria.  As noted, the Nigeria-China Treaty is comprehensively focused on regulating state conduct in the protection of investments.  *See, e.g.,* Art. 2 (prohibiting "unreasonable or discriminatory measures" by Nigeria or China); Art. 3 (requiring Nigeria and China to accord "fair and equitable treatment" to protected investments); Art. 4 (prohibiting Nigeria and China from "expropriat[ing], nationaliz[ing] or tak[ing] similar measures" unless four specific conditions are met <u>and</u> the expropriating sovereign pays fair, freely transferable compensation "without unreasonable delay").

While the New York Convention has been applied in other cases involving similar treaties,[6] those cases arose under either of two circumstances, neither of which applies to this dispute under

---

[4] The Restatement (Third) of International Commercial Arbitration similarly includes "investor-State arbitrations" within its definition of commercial, but clarifies this definition is intended to bring such arbitration within the "ambit of the … Restatement," which is limited to international commercial arbitration: "The broad meaning given to the term 'commercial' corresponds to the relatively wide ambit of the present Restatement.  But the term is not intended to provide a unified definition governing every context in which the commercial character of a transaction or relationship leads to application of the principles restated."  Restatement (Third) of Int'l Commercial Arbitration (2019), § 1-1 cmt. E, Reporters Note e.

[5] *See* Kenneth J. Vandevelde, Bilateral Investment Treaties: History, Policy & Interpretation 1, 3 (2010) ("The remedy provided by BITs is that they ensure that the treatment of foreign investment is subject to the rule of law" and therefore function "like foundational or constitutional documents that create a long term legal framework within which the host country must apply its international investment law and policy").

[6] It is undisputed that the United Nations Convention on Contracts for the International Sale of Goods and the Convention on the Settlement of Investment Disputes between States and Nationals

- 9 -

the Nigeria-China Treaty.  First, certain courts have concluded that treaties that explicitly reference the New York Convention constitute "agree[ments] that the relationship between [sovereign] and the petitioners is commercial under the New York Convention." *Stati v. Republic of Kaz*., 199 F. Supp. 3d 179, 186 (D.D.C. 2016); *see also Chevron Corp. v. Republic of Ecuador,* 949 F. Supp. 2d 57, 70 (D.D.C. 2013) (observing the "[Bilateral Investment Treaty] … provides such awards shall be enforceable under the New York Convention").  Second, in certain instances the parties have agreed that the New York Convention applies to the particular dispute arising under the treaty. *See, e.g., Crystallex Int'l Corp. v. Bolivarian Republic of Venez.,* 244 F. Supp. 3d 100, 109 & n.12 (D.D.C. 2007) (observing "Venezuela does not object to this Court's jurisdiction" but also concluding New York Convention applied on basis of Canadian-Venezuelan Treaty, which expressly references the New York Convention).  The Nigeria-China Treaty makes no reference to the New York Convention or to enforcement in the United States.  Nigeria-China Treaty (Dkt. No. 2-2).  Accordingly, the Nigeria-China Treaty, as an international agreement governed by and applying public international law, falls outside the ambit of the New York Convention as a matter of U.S. foreign relations law.

   C.   The Arbitration Tribunal Agreed With Petitioner That The Underlying Dispute Was Non-Commercial.

   The record of the arbitration confirms the non-commercial nature of the parties' legal relationship that is the foundation for the Award.  For example, Petitioner argued to the arbitration tribunal that its relationship with Nigeria giving raise to its claims was not commercial, but rather was governed by public international law.  *See. e.g.,* Ex. B to Mañón Decl. (Statement of Claim), ¶ 21 (alleging "Respondent's violations of the Treaty and international law"), *see also id*. ¶¶ 176,

_____

of Other States, two other avenues to enforcement of arbitral awards obtained pursuant to treaties, do not apply here.

181, 217.  Petitioner urged the arbitration tribunal to conclude that Ogun State's actions were sovereign conduct, attributable to Nigeria under public international law.  *See, e.g.*, Exs. A to Mañón Decl. (Statement of Reply), ¶¶ 184, 191-93 (alleging "occupation of the claimant's property by a Government agency" and "egregious due process violations" by the Nigerian police), B (Statement of Claim), ¶¶ 12–14 (describing seizure of property by the Nigerian Police and "draconian action of the Nigerian authorities" including threats and arrests and explaining "[t]he shocking treatment . . . breached Nigeria's international obligations under the Treaty").

As a matter of customary international law, the activities of organs of a state are attributable to that state.  *See* Award ¶ 72 ("for the purposes of a claim such as this, all organs of the State … are to be treated as part of the state … [t]his is customary international law").  International law distinguishes between sovereign regulatory and police acts, for which a state may be liable as a matter of public international law, and "breach[] [of] a commercial contract with a foreign national for commercial reasons as a private contractor might" in which "international law is not implicated."  Restatement (Third) of the Foreign Relations L. of the U.S. § 712 (contrasting these circumstances from those where "in repudiating or breaching the contract, the state is acting essentially from governmental motives (akin to those that operate in cases of expropriation")).

The tribunal agreed with Petitioner, and held Nigeria liable for certain of Ogun State's conduct precisely <u>because</u> that conduct constituted a sovereign exercise of power under public international law.[7]  *See* Award (Dkt. No. 2-1), ¶¶ 72–73 (holding that the actions of Ogun State were attributable to the Nigeria because they "constitute[d] a breach of an international law obligation" under the Treaty).  The tribunal explicitly distinguished between "a 'mere' breach of

---

[7] Nigeria reserves the right to challenge the arbitration tribunal's jurisdictional rulings under Article V of the New York Convention, should the need arise.  *See* Part III(E).

- 11 -

contract by a local authority [that] could not of itself be attributed to the state … [and an] action complained of [that] would otherwise amount to a breach of the treaty in issue, then it would be attributed to the state." *Id*. ¶ 74.  That sovereign offending conduct, as found by the tribunal, amounted to: (*i*) an "abuse of police powers," *see id*. ¶¶ 33–41 (describing facts as presented by Petitioner); Ex. B to Mañón Decl. (Statement of Claim), ¶ 129 (describing alleged "abuse of police power"); (*ii*) "unreasonable and discriminatory measures" and unfair and inequitable treatment in violation of public international law, *see* Ex. B to Mañón Decl. (Statement of Claim), ¶¶ 129–30; and (*iii*) expropriation in the form of a regulatory taking, *see id*. ¶¶ 258-60.

Further agreeing with Petitioner, the Award contrasts the facts and circumstances of Petitioner's claims, which featured an exercise of sovereign power, with other disputes that were purely contractual in nature and thus ungoverned by an international treaty.  *See id*. ¶ 74 (citing *Compania de Aguas del Aconquija SA and Vivendi Universal SA v. Argentine Republic*, ICSID Case No ARB 97/3 Award, 21 November 2000, §§ 77-82) ("[A]ll of the above-mentioned actions of the Province of Tucumán on which the Claimants rely for their position attributing liability to the Argentine Republic are closely linked to the performance or non-performance of the parties under the Concession Contract.").

While Nigeria challenges the factual accuracy of these findings and the tribunal's jurisdictional holdings, the tribunal's conclusions make clear that the Award as rendered was *per se* noncommercial, because as a matter of public international law, Nigeria could only be liable for conduct sovereign in nature.  *See* Restatement (Third) of the Foreign Relations L. of the U.S. § 427 (2012); *see also The Robert E. Huder Article on Global Trade: Enabling Private Ordering: Function, Scope and Effect of Umbrella Clauses in International Investment Treaties*, 18 Minn. J. Int'l L. 1, 31-32 (2009) (referencing "'well established' jurisprudence that a simple, commercial

breach of an investor-State contract per se does not involve the breach of an investment treaty provision").

The Award distinguishes commercial claims from those governed by the Nigeria-China Treaty in much the same way the Commerce Clause of the U.S. Constitution is inapplicable to Congress's exercise of police powers, which are fundamentally non-commercial in character.  *See* U.S. Const., art. 1, § 8, clause 3 (Commerce Clause); *United States v. Morrison*, 529 U.S. 598, 618-19 (2000) (distinguishing between "police power" and the Commerce Clause); *see also id.* at 584 (Thomas, J., concurring) ("[W]e always have rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power").   This Circuit in *Belize Soc. Dev.*, 794 F.3d at 99, 105, held that the Federal Arbitration Act ("FAA"), which codifies the New York Convention, reaches contracts "evidencing a transaction involving commerce"—"the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress's Commerce Clause Power." 794 F.3d at 104 (quoting *Citizens Bank v. Alafabo, Inc.*, 539 U.S. 52, 56 (2003)).

Finally, the arbitration tribunal's determination that Ogun State violated public international law in accord with the terms of the Nigeria-China Treaty is distinguishable from other Circuit decisions in which contractual or quasi-contractual arrangements between sovereign states and private parties constituted "commercial" legal relationships for purposes of the New York Convention.  *See, e.g., Diag Human*, 824 F.3d at 136 (considering claims pursuant to a "Framework Agreement" between Diag Human and the Czech Republic, under which "Diag Human agreed to supply commercial goods to the Czech Republic" in exchange for funding); *Belize Soc. Dev.*, 794 F.3d at 100 (finding commercial relationship where Belize entered into an "Accommodation Agreement" with Belize Telemedia Limited in order to "purchase properties

- 13 -

from Belize"); *Campagnie Sahélienne d'Enterprise v. Republic of Guinea*, No. 20-1536, 2021 U.S.

Dist. LEXIS 10442, at *4 (D.D.C. June 14, 2021) ("Contracting to provide infrastructure upgrades

is plainly commercial"); *Customs & Tax Consultancy LLC v. Dem. Rep. Congo*, No. 18-1408,

2019 U.S. Dist. LEXIS 162136, at *10 (D.D.C. Sept. 16, 2019) (holding that "service contract

between a company and the government to consult in overhauling the collection of customs duties,

is plainly commercial"); *Africard Co. v. Republic of Ni*ger, 210 F. Supp. 3d 119, 124 (D.D.C.

2016) ("[S]service contract between a company and a government to provide biometrics and

electronic passports . . . clearly arises out of or in connection with commerce") (internal quotation

marks and citation omitted).

   D.   Petitioner Does Not Allege the Waiver Exception to the FSIA.

       As noted, Petitioner's entire sovereign immunity argument hinges on the applicability of

the New York Convention.  *See* Pet. ¶ 11.  The only other FSIA exception potentially applicable

is the waiver exception, through which a "foreign state [can] waive[] its immunity either explicitly

or by implication."  28 U.S.C. § 1605(a)(1).  Petitioner correctly does not argue the waiver

exception, because it is inapplicable.  This Circuit has emphasized "the 'virtually unanimous'

precedents construing the implied waiver provision narrowly" and has concluded that "implicit in

§ 1605(a)(1) is the requirement that the foreign state have <u>intended</u> to waive its sovereign

immunity."  *Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999) (emphasis

added); *accord Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019) (same).  There is no

evidence that Nigeria intended to waive its sovereign immunity in the U.S. courts.  For example,

the Nigeria-China Treaty's arbitration clause does not refer to U.S. courts, "nor does it purport to

waive [Nigeria's] sovereign immunity."  *Luxexpress 2016 Corp. v. Gov't of Ukraine*, No. 18-cv-

812, 2020 U.S. Dist. LEXIS 47629, at *24 (D.D.C. Mar. 19, 2020) (declining to find waiver

exception met by BIT because BIT did not contain any reference to the New York Convention or

- 14 -

to a waiver of sovereign immunity) (quoting *S.K. Innovation Inc. v. Finpol*, 854 F. Supp. 2d 99, 115 (D.D.C. 2012) (same)).[8]  Nigeria demonstrates in Sections III(B)–(C) that the underlying dispute in this action was not commercial, because the arbitration tribunal concluded that the dispute fell within the ambit of the Treaty.  As a result, the waiver exception is inapplicable to Nigeria.  *See Diag Human*, 824 F.3d at 140 (Sentelle, J., dissenting) (writing that there is no "basis[] to find an implied waiver" because "the New York Convention is inapplicable to this case").

Recent Circuit decisions have questioned the prudence of applying the waiver exception in an enforcement action under the New York Convention, and have declined "to wade into the murky waters of the waiver exception" given the "significant policy concerns" that accompany it.  *Process & Indus. Devs. Ltd v. Fed. Republic of Nig.*, 27 F.4th 771, 775 n.3 (D.C. Cir. 2022) (*Process II*); *see also* Brief of The United States as Amicus Curiae at 6, *Process & Indus. Devs. Ltd.*, No. 21-7003 (D.C. Cir. Jan. 20, 2022) (arguing that applicability of waiver exception in New York Convention case is "a question that raises difficult questions of statutory construction and could also implicate adverse reciprocity concerns were foreign courts to take a broad view of waiver in cases brought against the United States").

---

[8] Circuit law is well established with regard to these principles, but some outlier decisions exist. In an unpublished decision from this Circuit, *Tatneft*, 771 F. App'x at 10, for example, the Court of Appeals held that "a sovereign, by signing the New York Convention, waives its immunity from arbitration-enforcement actions."  That case is easily distinguished, however, because Ukraine did not make a commercial reservation to the New York Convention and thus could not be said to have limited the Convention's applicability for purposes of enforcement in the United States.  *See id.; see also* "Contracting States: Ukraine, New York Arbitration Convention", https://www.newyorkconvention.org/countries (last visited June 11, 2022). By contrast, like the United States, Nigeria explicitly limited the application of the Convention to relationships that are "commercial" under its laws.  Contracting States-Nigeria, New York Arbitration Convention, https://www.newyorkconvention.org/countries (last visited June 11, 2022).

E. Nigeria Is Entitled To A Threshold, Conclusive Determination Of Its Sovereign Immunity Without Waiving Any Substantive Defenses Against Enforcement.

Nigeria is entitled to a conclusive, threshold determination of its sovereign immunity before it must present its defenses on the merits.  A foreign sovereign is not required to defend the merits before resolving issues of sovereign immunity.  *See Mowrer v. U.S. Dep't of Transp.*, 14 F.4th 723, 735 (D.C. Cir. 2021); *Process & Indus. Devs. Ltd. v. Fed. Republic of Nig.*, 962 F.3d 576, 584 (D.C. Cir. 2020) (*Process I*) (holding "the district court erred in requiring Nigeria to defend the merits before resolving its colorable immunity assertion").  Requiring a foreign sovereign to present its merits defenses along with its immunity defenses defeats the purposes underlying sovereign immunity.  *Id.* at 585-86 (holding that "one of the 'basic objectives' of the FSIA is to 'respect the independence and dignity' of foreign sovereigns, not simply to ameliorate their litigation burdens." (citation omitted)).

Should the Court rule against Nigeria regarding sovereign immunity, Nigeria is entitled to an immediate appeal from that threshold immunity determination without waiving any substantive defenses.  *See id.* at 581–83 ("the collateral-order doctrine applies to the denial of a motion to dismiss on the ground of foreign sovereign immunity") (collecting cases); *Foremost-McKesson v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990) ("we adhere to the law of this circuit . . . in granting interlocutory appeal of the District Court's denial of the foreign state's motion to dismiss on grounds of sovereign immunity.  Such an appeal comes within the ambit of the collateral order doctrine") (cleaned up) (collecting cases).  *See also Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1323 (2017) (recognizing that foreign states "enjoy a right to take an immediate appeal" from denials of immunity under the FSIA before the merits are decided) (collecting cases); *Princz v. Fed. Republic of Ger.*, 998 F.2d 1, 1 (D.C. Cir.

1993) ("A district court's denial of a foreign state's motion to dismiss on grounds of sovereign immunity is immediately appealable") (R.B. Ginsburg & Wald, JJ.) (per curiam).

## IV.    CONCLUSION

For the foregoing reasons, the Petition to Recognize and Enforce Arbitral Award against Nigeria must be dismissed for lack of jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. 1602, *et seq.*


Date: June 13, 2022                          Respectfully submitted,

                                             SQUIRE PATTON BOGGS (US) LLP

                                             */s/ Raúl  B. Mañón*
                                             Raúl  B. Mañón (*Pro Hac Vice*)
                                             Maria Gomez (*Pro Hac Vice*)
                                             200 South Biscayne Boulevard, Suite 3400
                                             Miami, FL 33131
                                             T: (305) 577-7000
                                             F: (305) 577-7001
                                             Email: raúl.manon@squirepb.com
                                                       maria.gomez@squirepb.com

                                             -and-

                                             Alexandra E. Chopin (D.C. Bar No. 490736)
                                             2550 M Street, N.W.
                                             Washington, DC 20037
                                             T: (202) 457-5623
                                             F: (202) 457-6315
                                             Email: alexandra.chopin@squirepb.com

                                             *Counsel for Respondent Federal Republic of Nigeria*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

ZHONGSHAN FUCHENG INDUSTRIAL
INVESTMENT CO., LTD.,

        Petitioner,

        Civil Action No. 22-170 (BAH)

        v.

FEDERAL REPUBLIC OF NIGERIA,

        Respondent.

---

## DECLARATION OF RAÚL B. MAÑÓN

**RAÚL B. MAÑÓN,** declares pursuant to 28 U.S.C. § 1746(2) as follows:

1.      I am a partner with the law firm of Squire Patton Boggs (US) LLP, and am counsel for Respondent the Federal Republic of Nigeria ("Nigeria" or "respondent") and admitted *pro hac vice* to this Bar in this action.  *See* Dkt. 22.  I submit this declaration in support of Respondent's Motion to Dismiss the Petition to Recognize and Enforce Foreign Arbitration Award.

2.      Attached as Exhibit A is a true and correct copy of an excerpt of the Statement of Reply and Witness Statements submitted by Petitioner Zhongshan Fucheng Industrial Investment Co., Ltd. ("Zhongshan") in the arbitration underlying the Award at issue.

3.      Attached as Exhibit B is a true and correct copy of the Statement of Claim submitted by Zhongshan in the same arbitration.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 13, 2022 in Miami, Florida.

                   */s/ Raúl  B. Mañón*
                   Raúl B. Mañón

# EXHIBIT A

**IN THE MATTER OF AN ARBITRATION PURSUANT TO THE AGREEMENT BETWEEN THE GOVERNMENT OF THE PEOPLE'S REPUBLIC OF CHINA AND THE GOVERNMENT OF THE FEDERAL REPUBLIC OF NIGERIA FOR THE RECIPROCAL PROMOTION AND PROTECTION OF INVESTMENTS**

**- BETWEEN -**

---

**ZHONGSHAN FUCHENG INDUSTRIAL INVESTMENT CO. LTD.**

(THE "CLAIMANT")

**- AND -**

**THE FEDERAL REPUBLIC OF NIGERIA**

(THE "RESPONDENT")

---

**STATEMENT OF REPLY AND WITNESS STATEMENTS**

---

## VI.   THE TRIBUNAL HAS JURISDICTION OVER THIS DISPUTE

146. The Respondent does not dispute the jurisdictional prerequisites set out in the Claimant's Statement of Claim, namely that the Respondent is bound by the Treaty, that the Claimant is a protected investor under the Treaty and that the Claimant's investment qualifies for protection under the Treaty.[317] The sole jurisdictional objection raised by the Respondent is that the fork-in-the-road provision in Article 9(3) of the Treaty operates to preclude the Claimant from bringing this dispute before this Tribunal because of litigation by different parties before the Nigerian courts.[318]

147. The Claimant submits that the Tribunal has jurisdiction to hear this dispute for the reasons provided in its Statement of Claim and because the Respondent's sole jurisdictional objection has no merit.[319]   As will be established in this Section, the fork-in-the-road provision in Article 9(3) is not applicable, including because the Claimant has never submitted any dispute – let alone this dispute – to the Nigerian courts.

### A   The Respondent's jurisdictional objection disregards the language of the Treaty and misinterprets the fork-in-the-road provision in Article 9(3)

148. The Respondent's jurisdictional objection refers to Articles 9(2) and 9(3) of the Treaty, which read as follows:

> "2. If the dispute cannot the settled through negotiations within six months, the either Party to the dispute shall be entitled to submit the dispute to the competent court to the Contracting Party accepting the investment.
>
> 3. If a dispute cannot be settled within six months after resort to negotiations as specified in Paragraph 1 of this Article it may be submitted at the request of either Party to an ad hoc arbitral tribunal. **The provisions of this Paragraph shall not apply if the investor concerned has resorted to the procedure specified in Paragraph 2 of this Article.**"[320]

149. The Respondent contends that these provisions present a fork in the road, namely two mutually exclusive options to an investor seeking redress: recourse to national courts or recourse to arbitration.[321]

---

[317] Statement of Claim, ¶¶ 155-175.

[318] Respondent's Jurisdictional Objection, ¶¶ 3.13-3.14. The Respondent has also attempted to pre-empt an MFN argument that the Claimant has not made and does not intend to make and, accordingly, we do not address it in this Statement of Reply. Respondent's Jurisdictional Objection, ¶¶ 4.1-4.12.

[319] Statement of Claim, ¶¶ 155-175.

[320] China-Nigeria BIT, Arts. 9(2)-9(3), **CLA-001** (emphasis added).

[321] Respondent's Jurisdictional Objection, ¶¶ 3.9, 3.10, 3.12, 3.13, 3.14 and 3.15.

150.   The Claimant's position is that it has clearly not submitted any dispute to the Nigerian courts, let alone an investment treaty dispute regarding the Respondent's breaches of the Treaty, which are at issue in the present proceedings.  The Respondent contrives to disagree, arguing that:

> "*Claimant through* **ZHONGFU** *initiated a raft of litigations against* **Ogun-Guangdong Free Trade Zone Company, Nigeria Export Processing Zones Authority (NEPZA), Ogun State Government of Nigeria, the Attorney-General of Ogun State** *and* **Zenith Global Merchant Limited** *for alleged unlawful acts resulting in the evisceration of its investment in OGFTZ.*"[322]

151.   For the purposes of its jurisdictional objection, the Respondent claims to rely on the Fucheng Park Proceedings, the NEPZA Proceedings and the Anti-Arbitration Proceedings,[323] although ultimately it does not address the Anti-Arbitration Proceedings in its submissions.[324]

152.   In order to assess the requirements for the application of a fork-in-the-road provision, the starting point for the Tribunal is the treaty language.  The Respondent ostensibly agrees with the Claimant that the treaty interpretation principles in the VCLT are applicable to the present case.[325]  However, the Respondent completely fails to apply such principles in its interpretation of the second sentence of Article 9(3) of the Treaty.[326]

153.   The terms of the Treaty are clear: "[t]he *provisions of this Paragraph shall not apply if the* **investor concerned** *has resorted to the procedure specified in Paragraph 2 of this Article.*"[327]  The term "investor" is defined in Article 1(2) of the Treaty:

> "*The term 'investor' include* [sic.] *nationals and companies of both Contracting Parties:* [...]
>
> (b) *'companies' means, with regards to either Contracting Party, corporations, firms and associations incorporated or constituted under the law in force in the territory of the Contracting Party.*"[328]

154.   Thus, the language of the Treaty is clear that the fork-in-the-road provision can only operate in circumstances where the person initiating local proceedings is a foreign

---

[322] Respondent's Jurisdictional Objection, ¶ 2.9.

[323] Respondent's Jurisdictional Objection, ¶ 2.9.

[324] Respondent's Jurisdictional Objection, ¶¶ 3.26-3.41.

[325] Respondent's Jurisdictional Objection, ¶¶ 3.6 and 3.7.

[326] Respondent's Jurisdictional Objection, ¶ 3.31.

[327] China-Nigeria BIT, Art. 9(3) of the BIT, **CLA-001** (emphasis added).

[328] China-Nigeria BIT, Art. 1(2), **CLA-001**.

company registered in China.[329]  As the Respondent has tacitly admitted by its decision not to object to jurisdiction *ratione personae*, the Claimant fulfils the criteria of the Treaty since it is a company incorporated and constituted under the laws of China.  By contrast, Zhongfu Nigeria does not meet the criteria required to qualify as a Chinese investor under the Treaty since it is a company constituted under Nigerian law.  The Claimant, the investor for the purposes of Articles 1(2)(b) and 9(3) of the Treaty, has never submitted any dispute to the Nigerian courts.  As in *Champion v Egypt*, the Respondent has not shown "*any convincing reason why the Treaty should not be interpreted in good faith in accordance with the ordinary meaning expressed therein which excludes from [Treaty] arbitration only those disputes where the [Treaty] claimant is also the claimant in the national proceedings.*"[330]  Here, there is no identity of the claimants, as required by the Treaty for the fork-in-the-road to apply.

155.   The Respondent's jurisdictional objection is thus premised upon a false assumption: that the Claimant and Zhongfu Nigeria are the same legal person.  The question of whether a claimant can be equated to its local subsidiary for the purposes of activating a fork-in-the-road clause was considered in *CMS v The Argentine Republic*.  The tribunal emphasised that:

> "*[the claimant's subsidiary] is a separate legal entity and is not the investor;*
> *only the investor can make the choice of taking a claim to the local courts*
> *or to arbitration, and CMS chose the ICSID arbitration option.*"[331]

156.   Similarly, in *Genin v Estonia*, the tribunal considered that national litigation "*certainly affected the interests of the Claimants, but this in itself did not make them parties to these proceedings.*"[332]  The Treaty also requires an identity of respondents for the fork-in-the-

---

[329] See *Chevron Corporation and Texaco Petroleum Corporation v The Republic of Ecuador*, PCA Case No. 2009-23, Third Interim Award on Jurisdiction and Admissibility, 27 February 2012, ¶¶ 1.10, 4.78, **CLA-166.**

[330] *Champion Trading Company, Ameritrade International, Inc. v Arab Republic of Egypt*, ICSID Case No. ARB/02/9, Decision on Jurisdiction, 21 October 2003, ¶¶ 3.4.3, **CLA-167;** "*According to Article VII 3.(a) of the Treaty recourse to ICSID arbitration is only possible if '(iii) the national or company concerned has not brought the dispute before the courts of justice or administrative tribunals or agencies of competent jurisdiction of the Party that is a Party to the dispute.' The terms 'national' or 'company' are defined for the purpose of this Treaty in Article I (e) and (a). The nationals and company concerned in the present dispute are the three individuals Claimants and the two corporate Claimants, however not NCC. The Respondents have not shown any convincing reason why the Treaty should not be interpreted in good faith in accordance with the ordinary meaning expressed therein which excludes from ICSID arbitration only those disputes where the ICSID claimant is also the claimant in the national proceedings.*"

[331] *CMS Gas Transmission Company v The Argentine Republic*, ICSID Case No. ARB/01/8, Decision on Objections to Jurisdiction, 17 July 2003, ¶ 78, **CLA-168.** See also ¶ 80: "*no submission has been made by CMS to local courts and since, even if TGN had done so – which is not the case –, this would not result in triggering the "fork in the road" provision against CMS. Both the parties and the causes of action under separate instruments are different*"; *Total S.A. v Argentina*, ICSID Case No. ARB/04/01, Decision on Liability, 27 December 2010, ¶ 443, **CLA-029;** *Khan Resources Inc., Khan Resources B.V., and Cauc Holding Company Ltd. v The Government of Mongolia*, PCA Case No. 2011-09, Decision on Jurisdiction, 25 July 2012, ¶ 393 **CLA-169;** *Nissan Motor Co., Ltd., v India*, PCA Case No. 2017-37, Decision on Jurisdiction, 29 April 2019, ¶¶ 201, 205, 212, 214, **CLA-170;** *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Objections to Jurisdiction, 30 April 2004, ¶ 76, **CLA-171;** *Alex Genin, Eastern Credit Limited Inc. and A.S. Baltoil v Estonia*, ICSID Case No. ARB/99/2, Award, 25 June 2001, ¶ 333, **CLA-154.**

[332] *Alex Genin, Eastern Credit Limited Inc. and A.S. Baltoil v Estonia*, ICSID Case No. ARB/99/2, Award, 25 June 2001, ¶ 331, **CLA-154.**

road provision to operate. The *"dispute"* referred to in Article 9(3) must be interpreted consistently with other references to that term in the Treaty.[333] Article 9(1) makes clear that a *"dispute"* is *"between an investor of the other contracting Party and the other Contracting Party."*[334] As for the term *"the other Contracting Party"*, there can be no doubt that it is the Federal Republic of Nigeria. The Respondent proposes a selective reading of the fork-in-the-road clause by seeking to define the term *"dispute"* in a vacuum and thus failing to consider the context provided by Article 9(1) of the Treaty. However, it is clear that the Federal Republic of Nigeria is not the respondent in the national proceedings.

157. Following from the meaning of the word *"dispute"* in the Treaty, an additional requirement flows from the language of the Treaty. It requires that the dispute have a *"connection with an investment"* as per Article 9(1).[335] Thus, in terms of the object of the dispute, the Treaty requires that the dispute be an investment dispute.[336]

158. The tribunal in *Genin v Estonia* made clear that there is a difference between litigation concerning matters of local law, as in the proceedings before the Nigerian courts, and investment treaty disputes concerning breaches of treaty obligations and international law, as in the case before this Tribunal:

> *"It is quite obvious that this matter* [concerning the revocation of a license] *had to be litigated in Estonia; there was no other jurisdiction competent to deal with the restoration of the status quo. The 'investment dispute' submitted to ICSID arbitration, on the other hand, relates to the losses allegedly suffered by the Claimants alone, arising from what they claim were breaches of the BIT. Although certain aspects of the facts that gave rise to this dispute were also at issue in the Estonian litigation, the 'investment dispute' itself was not, and the Claimants should not therefore be barred from using the ICSID arbitration mechanism."*[337]

159. Likewise, in the case of *AES v Kazakhstan*, the tribunal explained:

> *"While it is true that the claims before the* [national] *courts and in the present proceedings are based on the same facts and in particular the same alleged basic wrongdoings by Respondent (i.e., the implementation of new laws),*

---

[333] VCLT, Art. 31(1), **CLA-018**.

[334] China-Nigeria BIT, Art. 9(1), **CLA-001**.

[335] China-Nigeria BIT, Art. 1(1), **CLA-001**.

[336] See, for example, *Nissan Motor Co., Ltd. v Republic of India*, PCA Case No. 2017-37, Decision on Jurisdiction, 29 April 2019, ¶ 211, **CLA-170**.

[337] *Alex Genin, Eastern Credit Limited Inc. and A.S. Baltoil v Estonia*, ICSID Case No. ARB/99/2, Award, 25 June 2001, ¶ 332, **CLA-154**. See also *Nissan Motor Co., Ltd., v India*, PCA Case No. 2017-37, Decision on Jurisdiction, 29 April 2019, ¶¶ 214: *"That the Writ Proceedings nonetheless may involve certain overlapping facts with the CEPA claim does not change the analysis of Article 96(6)'s clear text.",* **CLA-170**.

*they present important differences which do not justify considering these claims as having 'fundamentally the same [normative] basis [...]*

*While the implementation by the Kazakh authorities of the new Kazakh competition law plays an important role in the present proceedings, it does so only from a factual perspective in the sense that it is one of the factual causes for Claimants' treaty claims in the present ICSID proceedings."[338]*

160. Furthermore, in addition to the identity of the parties and the object of the dispute, Article 9(3) requires that the dispute relate to claims of breaches of the Treaty under international law to trigger the fork-in-the-road provision (i.e. the same cause of action). This requirement derives from Article 9(7) read in conjunction with Article 9(3). Article 9(7) requires that the dispute be adjudicated in accordance with *"the provisions of this Agreement as well as the generally recognized principles of international law accepting [sic.] by both Contracting Parties."* The dispute before this Tribunal comprises claims under international law for breaches of the Treaty. By contrast, the national proceedings involved claims under national law. Thus, there is also no identity of the cause of action, as the Treaty requires.[339]

## B   The triple identity test accords with the language of Article 9(3)

161. The Claimant submits that, in order for the fork-in-the-road provision in Article 9(3) of the Treaty to operate, the national court proceedings and this investment arbitration must have: (1) the same parties; (2) the same object; and (3) the same cause of action.[340] These three conditions are cumulative and mirror the proper interpretation of the fork-in-the-road provision in Article 9(3) of the Treaty, as set out above. If any one of these elements is not the same in both cases, the fork-in-the-road will not be triggered. In this case, however, not one of these three elements is the same in the present investment treaty arbitration dispute between the Claimant and the Respondent and the local litigation, thereby highlighting the weakness of the Respondent's jurisdictional objection.

162. The Respondent contends that this test, known as the triple identity test, is outdated.[341] It argues that *"Investor-State arbitral jurisprudence on the fork-in-the-road principle has evolved beyond the triple identity test"[342]* but nonetheless admits that *"arbitral tribunals*

---

[338] *AES Corporation and Tau Power B.V. v Kazakhstan,* ICSID Case No. ARB/10/16, Award, 1 November 2013, ¶¶ 227, 229, CLA-155.

[339] See *Toto Costruzioni Generali S.p.A. v The Republic of Lebanon,* ICSID Case No. ARB/07/12, Decision on Jurisdiction, 11 September 2009, ¶¶ 211-212, RLA-09; *CMS Gas Transmission Company v The Argentine Republic,* ICSID Case No. ARB/01/8, Decision on Objections to Jurisdiction, 17 July 2003, ¶ 80, CLA-168; *Desert Line Projects LLC v The Republic of Yemen,* ICSID Case No. ARB/05/17, Award, 6 February 2008, ¶¶ 135-138, CLA-066; *Alex Genin, Eastern Credit Limited, Inc. and A.S. Baltoil v The Republic of Estonia,* ICSID Case No. ARB/99/2, Award, 25 June 2001, ¶ 331, CLA-154.

[340] See also Statement of Claim, ¶¶ 155-159.

[341] Respondent's Jurisdictional Objection, ¶ 3.16.

[342] Respondent's Jurisdictional Objection, ¶ 3.17.

currently lay emphasis on the substantive language of the applicable BIT and not on an extraneous triple identity test unless in BITs where the language of the fork-in-the-road provision clearly require the triple identity standard."[343] Thus, in the Respondent's own submission, the triple identity test should be applied where the language of the provision requires it. The Claimant agrees. As demonstrated above, the language of the fork-in-the-road provision in Article 9(3) requires the application of the triple identity test.

163. As for the Respondent's contention that the triple identity test is outdated, such an assertion cannot be credited. The Respondent's argument of supposed outdatedness is further undermined by its own reliance on the award in *H&H v Egypt* (issued in 2014) which bases a substantial part of its reasoning on the award in *Pantechniki v Albania* (issued in 2009). By contrast, more recent decisions in investment treaty arbitration have upheld the validity of the triple identity test when assessing the applicability of appropriately-worded fork-in-the-road provisions.[344]

164. Numerous other arbitral tribunals have endorsed the appropriateness and validity of the triple identity test.[345] For example, in *Lauder v Czech Republic*, the tribunal explained:

"*The purpose of* [the fork-in-the-road provision] *of the Treaty is to avoid a situation where the same investment dispute ('the dispute') is brought by the same the claimant ('the national or the company') against the same respondent (a Party to the Treaty) for resolution before different arbitral tribunals and/or different state courts of the Party to the Treaty that is also a party to the dispute.*

*The resolution of the investment dispute under the Treaty between* [the claimant] *and the* [respondent] *was not brought before any other arbitral tribunal or* [national] *court before – or after – the present proceedings was*

---

[343] Respondent's Jurisdictional Objection, ¶ 3.17.

[344] See, for example, *Charanne B.V. and Construction Investments S.A.R.L. v The Kingdom of Spain*, SCC Case No. V062/2012, Award, 21 January 2016, ¶¶ 399-410, **CLA-172**. See also *Jin Hae Seo v Korea*, HKIAC Case No. 18117, Concurring Opinion of Dr. Benny Lo, 24 September 2019, ¶ 15, **CLA-173**.

[345] *Toto Costruzioni Generali S.p.A. v The Republic of Lebanon*, ICSID Case No. ARB/07/12, Decision on Jurisdiction, 11 September 2009, ¶¶ 211-212, **RLA-09**; *Ronald S. Lauder v The Czech Republic*, Final Award, 3 September 2001, ¶¶ 159-166, **CLA-085**; *Azurix Corp. v The Argentine Republic*, ICSID Case No. ARB/01/12, Decision on Jurisdiction, 8 December 2003, ¶¶ 89-92, **CLA-012**; *Occidental Exploration and Production Company v The Republic of Ecuador*, LCIA Case No. UN3487, Final Award, 1 July 2004, ¶¶ 43-52, 57, **CLA-070**; *Jan de Nul N.V. and Dredging International N.V. v Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Decision on Jurisdiction, 16 June 2006, ¶¶ 114-122, **CLA-174**; *Pan American Energy LLC and BP Argentina Exploration Company v The Argentine Republic*, ICSID Case No. ARB/03/13, Decision on Preliminary Objections, 27 July 2006, ¶¶ 154-157, **CLA-152**; *Mobil Exploration and Development Argentina Inc. Suc. Argentina and Mobil Argentina S.A. v The Argentine Republic*, ICSID Case No. ARB/04/16, Decision on Jurisdiction and Liability, 10 April 2013, ¶¶ 139, **CLA-175**; *Yury Bogdanov v The Republic of Moldova*, SCC Case No. 091/2012, Final Award, 16 April 2013, ¶¶ 169-176, **CLA-091**; *Champion Trading Company, Ameritrade International, Inc. v Arab Republic of Egypt*, ICSID Case No. ARB/02/9, Decision on Jurisdiction, 21 October 2003, ¶¶ 3.4.3.1-3.4.3.5, **CLA-167**; *Victor Pey Casado and President Allende Foundation v Republic of Chile*, ICSID Case No. ARB/98/2, Award, 8 May 2008, ¶¶ 483-486, **CLA-176**; *Khan Resources Inc., Khan Resources B.V., and Cauc Holding Company Ltd. v The Government of Mongolia*, PCA Case No. 2011-09, Decision on Jurisdiction, 25 July 2012, ¶¶ 386-400, **CLA-169**.

58

*initiated. All other arbitration or court proceedings referred to by the [r]espondent involve different parties, and deal with different disputes.*"[346]

165.   When applying the triple identity test to the facts of the present case, it is obvious that the cases submitted before Nigerian courts do not have: (1) the same parties; (2) the same object; nor (3) the same cause of action as the present proceedings. In particular, the Respondent relies on two cases which, it argues, have the same fundamental basis as the present proceedings: (1) the Fucheng Park Proceedings; and (2) the NEPZA Proceedings.[347]

### (i)   The Fucheng Park Proceedings

166.   As explained in Section IV.E above, the Fucheng Park Proceedings involved Zhongfu Nigeria as plaintiff and the OGFTZ Company, Ogun State and the Attorney General of Ogun State as defendants.   These proceedings involved neither the Claimant nor the Respondent.

167.   The object of the dispute was to prevent the unlawful ejection of Zhongfu Nigeria from the Zone.   Zhongfu Nigeria sought to recover the land granted to Zhongfu Nigeria for the development of the Fucheng Industrial Park within the Zone consistent with its contractual rights under the agreement.[348]   By contrast, the present investment dispute relates to the Respondent's breaches of its obligations under the Treaty and the Claimant's claim for compensation under international law.

168.   The contractually-based cause of action in the Fucheng Park Proceedings is thus different from the cause of action in the present arbitration, which concerns breaches of the Treaty.

### (ii)   The NEPZA Proceedings

169.   Zhongfu Nigeria filed the NEPZA Proceedings against NEPZA, the Attorney General of Ogun State and Zenith. Once again, these proceedings involved neither the Claimant nor the Respondent.   The object of the dispute was the wrongful actions of NEPZA under Nigerian law, especially its unlawful decision not to recognise Zhongfu Nigeria as the lawful manager of the Zone.

170.   The claims of Zhongfu Nigeria were based on the recognition of Zhongfu Nigeria as manager of the Zone and the collusion which led to the wrongful termination of the JVA

---

[346] *Ronald S. Lauder v The Czech Republic*, Final Award, 3 September 2001, ¶¶ 161-162, **CLA-085.**

[347] Respondent's Jurisdictional Objection, ¶¶ 3.27 to 3.33, 3.35 to 3.39.

[348] Zhongfu Nigeria also asked the court to (1) declare that Zhongfu Nigeria was entitled to possession of the land and that Ogun State had no power to eject Zhongfu Nigeria from the area; (2) order Ogun State to restore the land to Zhongfu Nigeria; (3) issue an injunction preventing the defendants from harassing Zhongfu Nigeria's employees; and (4) order the defendants to compensate Zhongfu Nigeria in the amount of USD 1,000,797,000 plus interest.

59

2013. Once again, the cause of action in the NEPZA Proceedings is thus different from the cause of action in the present arbitration, which concerns breaches of the Treaty.

(iii)    *The present proceedings*

171.    In the present arbitration between the Claimant and the Respondent, the Claimant's claims concern breaches of the Treaty under international law.  This is an investment treaty dispute.[349]

172.    Thus, the triple identity test is not met by either of the cases in the national courts since neither the Fucheng Park Proceedings nor the NEPZA Proceedings have the same parties, the same object nor the same cause of action as the present arbitration – let alone all three which would be required in order for the fork-in-the-road provision to be activated. Accordingly, the fork-in-the-road provision in Article 9(3) of the Treaty is not activated by the present dispute.

## C    Even if the fundamental basis test were to be applied, the Tribunal has jurisdiction over this investment treaty dispute

173.    The Respondent relies on two cases to support its proposition that this Tribunal should apply the fundamental basis test: *H&H v Egypt* and *Pantechniki v Albania*.[350]  Both cases are clearly distinguished from the present case on the basis that in each the claimant was the entity that had initiated litigation in the national courts of the respondent.  The Respondent's authorities thus do nothing to assist it in this case; rather, they highlight that the Tribunal has jurisdiction on any analysis.

174.    Factually, the *H&H v Egypt* case is also very different from the present one.  In *H&H v Egypt*, the tribunal held that certain claims in the investor-State arbitration had the same fundamental basis as claims previously brought in other *fora* after finding that the claimant in the investment treaty arbitration had submitted claims before Egyptian courts and a Cairo arbitral tribunal in circumstances where both the courts and the Cairo arbitral tribunal had previously rendered decisions rejecting the claimant's claims.[351]

175.    Since most of the claims before the investor-State tribunal had already been resolved by the Cairo arbitration, in accordance with the applicable Egyptian law,[352] the tribunal held

---

[349] Statement of Claim, ¶ 164.

[350] Respondent's Jurisdictional Objection, ¶¶ 3.19-3.20.

[351] The exact details of the case are not known since only excerpts of the award have been published. *H&H Enterprises Investments, Inc. v Arab Republic of Egypt*, ICSID Case No. ARB 09/15, Excerpts of Award, 6 May 2014, ¶ 360, **RLA-12**.

[352] *H&H Enterprises Investments, Inc. v Arab Republic of Egypt*, ICSID Case No. ARB 09/15, Excerpts of Award, 6 May 2014, ¶¶ 372-373, **RLA-12**.

that hearing those claims would amount to a re-litigation of issues that the Cairo arbitration had already adjudicated.[353]

176.   This factual circumstance is not found in the present case since the Nigerian courts never adjudicated any of Zhongfu Nigeria's claims.

177.   The Respondent also relies on *Pantechniki v Albania*, where the claimant in the arbitration had previously initiated proceedings before the Albanian courts concerning the payment of sums from Albania. The national court had ruled against the claimant in the first instance and the claimant subsequently submitted this issue to investor-State arbitration.[354]

178.   Sitting as sole arbitrator in the investor-State arbitration, Mr. Paulsson considered whether the fork-in-the-road provision was applicable to the payment claim and held that "[w]*hat I believe to be necessary is to determine whether claimed entitlements have the same normative source.*"[355]  In order to assess whether the claims had the same normative source, Mr. Paulsson determined that the relevant question was whether the payment claim brought under the treaty had an "*autonomous existence outside the contract.*"[356]  Applying this reasoning, he found that the treaty claim was strictly based on Albania's breaches of its contractual commitments and that the claim did not have an autonomous existence outside the contract.[357]  Thus, the fork-in-the road provision applied to this particular claim.

179.   However, in the present case, it is abundantly clear that the Claimant's Treaty claim has an autonomous existence outside either the JVA 2013 or the Fucheng Industrial Park Agreement, relating to issues that include the Respondent's lack of due process accorded to the Claimant, the Respondent's harassment of the Claimant and more generally the Respondent's arbitrary, non-transparent, inconsistent and unreasonable actions, the effect of which was to eviscerate the totality of the Claimant's investment in Nigeria and force the employees of Zhongfu Nigeria to flee the country in fear of their safety.

180.   The Respondent seems to argue that the current proceedings share factual similarities with the proceedings before the Nigerian courts.[358]  However, even under the fundamental

---

[353] *H&H Enterprises Investments, Inc. v Arab Republic of Egypt*, ICSID Case No. ARB 09/15, Excerpts of Award, 6 May 2014, ¶ 384, **RLA-12**.

[354] *Pantechniki v Albania*, ICSID Case No. ARB/07/21, Award, 30 July 2009, ¶¶ 3, 52, **RLA-13**.

[355] *Pantechniki v Albania*, ICSID Case No. ARB/07/21, Award, 30 July 2009, ¶ 62, **RLA-13**.

[356] *Pantechniki v Albania*, ICSID Case No. ARB/07/21, Award, 30 July 2009, ¶ 64, **RLA-13**. See also *H&H Enterprises Investments, Inc. v Arab Republic of Egypt*, ICSID Case No. ARB 09/15, Excerpts of Award, 6 May 2014, ¶ 377, **RLA-12**.

[357] *Pantechniki v Albania*, ICSID Case No. ARB/07/21, Award, 30 July 2009, ¶¶ 64, 67, **RLA-13**. See also *H&H Enterprises Investments, Inc. v Arab Republic of Egypt*, ICSID Case No. ARB 09/15, Excerpts of Award, 6 May 2014, ¶ 377, **RLA-12**.

[358] Respondent's Jurisdictional Objection, ¶¶ 3.30, 3.31, 3.37 and 3.40.

61

basis test advocated by the Respondent, this is not the determinative factor nor is any purported similarity of respective prayers for relief.[359]  As noted by Mr. Paulsson in *Pantechniki v Albania*:

> *"The same facts can give rise to different legal claims. The similarity of prayers for relief does not necessarily bespeak an identity of causes of action."*[360]

181.   In conclusion, by application of either the triple identity test (which is the correct test under the Treaty) or even the fundamental basis test, the Respondent's jurisdictional objection based on the applicability of the fork-in-the-road provision contained in Article 9(3) of the Treaty must fail. Accordingly, this Tribunal has jurisdiction to hear the dispute between the Parties.

## VII.   THE RESPONDENT'S CONDUCT BREACHED THE TREATY AND INTERNATIONAL LAW

182.   As a result of the conduct described in the Statement of Claim and Section IV above, the Respondent has breached its international obligations contained in the Treaty and under international law, owed to the Claimant.  In response to the Claimant's arguments, the Respondent summarily denies the facts of this case.

183.   The Respondent has, in the words of the tribunal in *Desert Line v Yemen*, simply "*contented itself with expressing doubts as to the accuracy of the [c]laimant's version of events*" rather than properly addressing the Claimant's factual and legal arguments.[361] Indeed, the Respondent has provided virtually no response to the Claimant's legal submissions, save for simply denying, in one paragraph, that it breached the Treaty.[362] Notwithstanding the paucity of legal arguments in the Respondent's Statement of Defence, the Claimant will, as best it can, address the Respondent's legal arguments or implied arguments, such as they are or appear.

184.   Regarding attribution, the Claimant explained in its Statement of Claim that the conduct of Ogun State, NEPZA, the Nigerian police and the Nigerian courts is attributable to the Respondent under customary international law rules codified in Articles 4 and 5 of

---

[359] Respondent's Jurisdictional Objection, ¶ 3.34.

[360] *Pantechniki v Albania*, ICSID Case No. ARB/07/21, Award, 30 July 2009, ¶ 62, **RLA-13**.

[361] *Desert Line Projects LLC v The Republic of Yemen*, ICSID Case No. ARB/05/17, Award, 6 February 2008, ¶ 159, **CLA-066**.

[362] Statement of Defence, ¶ 134.

ARSIWA.[363] The Respondent rightly has not disputed this and it can be taken as common ground.

185.    As the factual circumstances set out in Section IV above demonstrate, nothing in the Respondent's Statement of Defence has altered the position that the Respondent has breached Articles 2(2), 2(3), 3(1) and 4(1) of the Treaty.  Each of the Respondent's breaches is addressed in turn.

### A    The Respondent did not treat the Claimant's investment fairly and equitably

186.    Article 3(1) of the Treaty provides that:

"[i]nvestments of investors of each Contracting party shall all the time be accorded fair and equitable treatment in the territory of the other Contracting Party."[364]

187.    The Respondent has not contested the constituent components of the FET standard and has limited itself to perfunctory denials of the facts of the Claimant's FET analysis, to which the Claimant responds below.[365]

### 1.    The Respondent did not respect the Claimant's due process rights

188.    As set out in Section IV above, the Respondent has engaged in multiple actions which have denied the Claimant's right to due process, thereby violating the FET standard in the Treaty.[366]  These include, but are not limited to, the following, which considered, either individually or collectively, entail a breach of the FET standard.

(i)    *The Respondent threatened and evicted Zhongfu Nigeria in disregard of its rights*

189.    The Respondent violated Zhongfu Nigeria's rights under the Fucheng Industrial Park Agreement and the JVA 2013 by threatening Zhongfu Nigeria's employees and evicting Zhongfu Nigeria from the Zone.[367]  The Respondent's only response to this violation is to deny that it threatened or evicted Zhongfu Nigeria or its employees.[368]  However, as shown

---

[363] Statement of Claim, ¶¶ 208-216.

[364] China-Nigeria BIT, Art. 3(1), CLA-001; Statement of Claim, ¶¶ 218-224.

[365] See Statement of Defence, ¶ 134. The relevant factors for the FET standard include: (a) whether the host State has denied the investor due process; (b) whether the host State failed to act in a transparent manner towards the investor; (c) whether the host State has permitted harassment or coercion of the investor; (d) whether the host State has acted in a manner that is arbitrary, unfair, unjust or idiosyncratic; and (e) whether the host State failed to respect the investor's legitimate expectations.

[366] Statement of Claim, ¶¶ 225-232.

[367] Statement of Claim, ¶ 228.

[368] Statement of Defence, ¶¶ 42, 95, 98, 106, 107 and 112.

above, this is plainly false. No explanation is offered for why leading and experienced international businessmen would simply have fled, abandoning their personal possessions and their substantial professional investments, absent the threats that were made.

190.    As the evidence demonstrates, Mr. Adeoluwa, despite his denial, sent Dr. Han a direct threat to "*leave peacefully when there is opportunity to do so, and avoid forceful removal, complications and possible prosecution.*"[369] Further threats to Dr. Han were relayed to him to by Mr. Odega, the NEPZA representative in the Zone, and Mr. Onas, the Zone coordinator, who told Dr. Han that "*Zhongfu Nigeria would be forcefully removed from the Zone* [and] *that the Secretary to the Ogun State Government would send the immigration authorities and the Department of State Services to seize* [his] *passport and put* [him] *in jail if* [he] *did not leave.*"[370]

191.    As for the eviction of the Claimant from the Zone, the Nigerian police and NEPZA engaged in a series of intimidating tactics to evict Zhongfu Nigeria from the Zone in addition to Mr. Adeoluwa's threats to Dr. Han.    These include, amongst others: (a) the police accompanying the Zone coordinator to the Zone as he ordered Zhongfu Nigeria's employees to give access to Zhongfu Nigeria's offices;[371] (b) NEPZA seeking to collect immigration papers (known as CERPACs) from Zhongfu Nigeria's staff;[372] and (c) the Nigerian police arresting, detaining and physically beating Mr. Zhao.[373]

192.    Given the blatant misconduct by the Ogun State Government and NEPZA, the Respondent is unable to provide any legal justification for the actions of its State organs. This conduct plainly breaches the requirements of due process under the FET standard in the Treaty. For example, the tribunal in *OI European Group v Venezuela* held that the occupation of the claimant's property by a Government agency, without following appropriate legal procedures, amounted to a violation of due process and the FET standard.[374]

---

[369] Text message from Taiwo Adeoluwa to Jianxin (Jason) Han, 16 July 2016, **C-196**; Witness Statement of Taiwo Adeoluwa, 14 October 2019, ¶¶ 70 and 72; First Witness Statement of Jason Han, 30 April 2019, ¶¶ 95-131; Second Witness Statement of Jason Han, 23 January 2020, ¶ 54; Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**; Email from Email from Jason Han to Elizabeth Uwaifo, 25 September 2016, **C-012**.

[370] Second Witness Statement of Jason Han, 23 January 2020, ¶ 55. See also First Witness Statement of Jason Han, 30 April 2019, ¶¶ 115-116. See also Second Witness Statement of Jon Vandenheuvel, 27 January 2020, ¶¶ 11-12; Second Witness Statement of Issa Baluch, 20 January 2020, ¶ 15.

[371] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**.

[372] Letter from NEPZA to the Nigeria Immigration Service, 27 July 2016, **C-167**; Second Witness Statement of Jason Han, 23 January 2020, ¶ 66.

[373] First Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 17-38; Second Witness Statement of Wenxiao (Areak) Zhao, 21 January 2020, ¶ 5.

[374] *OI European Group B.V. v Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Award 10 March 2015, ¶¶ 510-511 and 557, **CLA-177**.

64

JA-137

193.  In relation to Mr. Zhao's arrest and detention, the Nigerian police committed egregious due process violations.   In response to overwhelming witness and contemporaneous documentary evidence, the Respondent merely states that it does not admit the allegations and that "*Nigeria has elaborate procedural laws and rules guiding arrest and performance of their functions by the Police which are strictly adhered to...*"[375] However, despite being ordered to produce relevant documents by the Tribunal,[376] the Respondent has provided no evidence as to the procedural laws and rules guiding arrest and Police performance, as well as no evidence that these procedural laws and rules, if they exist, were complied with in the case of Mr. Zhao.  Consequently, the Claimant requests the Tribunal to make the adverse inference that these procedural laws and rules were not complied with in relation to Mr. Zhao.

194.  Despite the Respondent not providing the procedural laws and rules guiding police behaviour, the Nigerian police have a public Code of Conduct.[377]  This Code of Conduct prohibits police officers from engaging in actions which involve the "*unnecessary infliction of pain or suffering*" and from "*engag*[ing] *in cruel, degrading or inhuman treatment of any person.*"[378]  The treatment inflicted on Mr. Zhao, including failing to explain the reason for his arrest, beating him, denying him adequate food and water, keeping him in appalling conditions with other prisoners and making him watch horrific videos, clearly violates the Nigerian police's own Code of Conduct and fails to accord with any semblance of due process.

   (ii)  *The Respondent has failed to accord due process to the Claimant in relation to the Claimant's rights under the Fucheng Industrial Park Agreement and the JVA 2013*

195.  The Respondent denies that Zhongfu Nigeria's rights under the Fucheng Industrial Park Agreement have been abrogated and asserts that Zhongfu Nigeria is still recognised as a tenant in the Zone.[379]  However, as demonstrated above, the Respondent's position now is completely at odds with its previous conduct which ignored the Claimant's rights under the Fucheng Industrial Park Agreement.  As an example, the Respondent directed Zhongfu Nigeria in categorical terms to "*vacate the Zone within 30 days.*"[380]  This was followed by

---

[375] Statement of Defence, ¶ 107.

[376] Tribunal's Decision on Claimant's Application for Production of Documents, 29 November 2019.

[377] Nigeria Police Code of Conduct, **CLA-178**.

[378] Nigeria Police Code of Conduct, p. 2, **CLA-178**.

[379] Statement of Defence, ¶ 95; Witness Statement of Taiwo Adeoluwa, 14 October 2019, ¶ 69.

[380] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 27 May 2016, **C-158**.

the use of the Nigerian police to assist in the forceful handing over of the Zone to NSG and eviction of Zhongfu Nigeria from the Zone.[381] This conduct took place despite numerous letters being sent by Professor Elias, counsel for Zhongfu Nigeria, requesting the Ogun State Government to respect the Claimant's legitimate rights in the Zone under the Fucheng Industrial Park Agreement.[382] For example, on 21 September 2016, Professor Elias wrote to NEPZA as follows:

> "We need to reiterate once again that Zhongfu is a valid subsisting registered enterprise and a lawful tenant in the Zone. Even if [Zhongfu Nigeria's] management rights and participation in the Zone Company are in dispute, Zhongfu's tenancy and registration as an enterprise in the Zone are not. As such, Zhongfu cannot be evicted from the Zone.
>
> We implore you to call your staff, NEPZA Administrator at the Zone, the OGSG and its allies to order and refrain from taking any further steps that would hinder Zhongfu's presence and operation in the Zone."[383]

196. Despite repeated pleas, the Respondent continued to interfere with the Claimant's investment. This included harassing the employees of Zhongfu Nigeria and inhibiting Zhongfu Nigeria's ability to operate in the Zone.[384] The Respondent's actions, which ran roughshod over the Claimant's rights, are a manifest violation of due process – as is the inconsistency of the Respondent's position in the Statement of Defence that Zhongfu Nigeria is still recognised as a tenant in the Zone.

197. A further argument that the Respondent appears to make in relation to the Fucheng Industrial Park Agreement – although it is unclear whether this is its primary position – is to question the validity of that agreement by saying that it was entered into without the consent of the Ogun State Government, who is the Chairman of the OGFTZ Company.[385] Aside from the fact that the Statement of Defence was the first time that any concerns as to the validity of the Fucheng Industrial Park were raised, the premise of the Respondent's argument is incorrect. The knowledge or approval of the Chairman of the OGFTZ

---

[381] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**; Letter from Ogun-Guangdong Free Trade Zone Co-Ordinator, Zenith Global Merchant Ltd. to Zhongfu International Investment (NIG) FZE, 21 July 2016, **C-164**; Letter from NEPZA to O/C, Zone Security, Ogun-Guangdong FTZ, 22 July 2016, **C-166**.

[382] See Letter from G. Elias & Co. to NEPZA, 21 September 2016, **C-181**; Letter from G. Elias & Co. to Managing Director of NEPZA, 21 September 2016, **C-181**. See also Letter from G. Elias & Co. to NEPZA, 8 May 2017, **C-202**; Letter from Zhongfu International Investment (NIG) FZE to NEPZA, 22 August 2017, **C-198**; Letter from G. Elias & Co to NEPZA, 12 June 2017, **C-222**; Letter from G. Elias & Co. to the Governor of the Ogun State, 12 September 2017, **C-203**.

[383] Letter from G. Elias & Co. to Managing Director of NEPZA, 21 September 2016, **C-180**.

[384] See, for example, Report from Steve Allen, 30 March 2017, **C-183**.

[385] Statement of Defence ¶ 42.

66

Company is not relevant to whether the Fucheng Industrial Park Agreement is valid. Indeed, under the Memorandum and Articles of Association of the OGFTZ Company, the "Chairman shall not participate or intervene the operation and management of the Company."[386] The Fucheng Industrial Park Agreement was validly entered, being signed and sealed by the OGFTZ Company's legal representative, Mr. Zhong.[387]

198.   In relation to the JVA 2013, the Respondent purported to terminate that agreement on the basis of a mischaracterisation of Note 1601 without providing Zhongfu Nigeria with an opportunity to discuss its position and have its legitimate rights considered in accordance with due process.[388] It is evident from the purported termination taking place the day after a request to meet was made by Zhongfu Nigeria that the Ogun State Government had no interest in hearing Zhongfu Nigeria explain its position, or to accord it due process.[389]

199.   Due process requires that the Claimant be allowed to present its position before any actions which may affect its investment are taken.[390] As the tribunal in *Deutsche Telekom v India* stated, when finding a breach of the due process under the FET standard:

> "the Indian authorities made no attempt to engage with [the investor] to examine whether and how these services could accommodate the public needs that had allegedly arisen. At no time after [the State official] had come to the conclusion that the Agreement needed to be annulled did [the investor] get the opportunity to explain, fix, amend, or try to meet the concerns asserted."[391]

200.   The tribunal in *Deutsche Telekom v India* went on to hold that:

> "reaching such a conclusion and issuing the Order as detailed above with its far-reaching consequences, without a proper examination and without giving the banks involved an opportunity to respond, constitutes a breach of

---

[386] Memorandum and Articles of Association of the OGFTZ Company, 30 May 2008, Art. 34, **C-204**.

[387] Fucheng Industrial Park Agreement, p. 11, **C-002**.

[388] Statement of Claim, ¶ 229.

[389] Witness Statement of Taiwo Adeoluwa, 14 October 2019, ¶ 32; Letter from Zhongfu International Investment (NIG) FZE to Secretary to the State Government of Ogun State, 26 May 2016, **C-157**; Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 27 May 2016, **C-158**; Second Witness Statement of John Xue, 22 January 2020, ¶ 24.

[390] ADC Affiliate Limited and ADC & ADMC Management Limited v The Republic of Hungary, ICSID Case No. ARB/03/16, Award, 2 October 2006, ¶ 435, **CLA-076**; Quiborax S.A., Non-Metallic Minerals S.A. v Plurinational State of Bolivia, ICSID Case No. ARB/06/2, Award, 16 September 2015, ¶ 221, **CLA-179**.

[391] Deutsche Telekom AG v The Republic of India, PCA Case No. 2014-10, Interim Award, 13 December 2017, ¶ 375, **CLA-180**. See also ¶¶ 376 and 378, **CLA-180**.

the fair and equitable treatment obligation of Article 2(2) of the BIT in form of a due process violation."[392]

201.    As Mr. Xue explains, Zhongfu Nigeria wrote to Ogun State Government to "*discuss the allegations and resolve any concerns of the Ogun State Government, and, if necessary, remedy any breaches of the JVA 2013 before it was terminated.*"[393] However, far from providing the Claimant with an opportunity to present its position in accordance with the requirements of due process under the Treaty, the Respondent proceeded to engage the police and NEPZA to take over the Claimant's investment in the Zone in breach of its due process obligations.

   (iii)    *The Respondent's refusal to abide by the instructions of the Solicitor-General of Nigeria was a due process violation*

202.    As shown above, the Respondent ignored unequivocal and direct instructions from the Solicitor-General of Nigeria to preserve the *status quo ante* in the Zone pending court processes which had been commenced to preserve the Claimant's rights.[394] In response, the Respondent asserts that it preserved the *status quo ante* by allowing NSG to continue to manage the Zone.[395] The Respondent's flawed argument misinterprets the term *status quo ante* and ignores the plain language of the Solicitor-General's instructions.

203.    In his letter dated 17 October 2016, the Solicitor-General of Nigeria instructed Ogun State Government and NEPZA to maintain the *status quo ante*.  In the very next line, the Solicitor-General clarifies the meaning of the term in this particular context, stating that:

   "*Zhongfu* [should] *be allowed to exercise its mandate pending the determination of these matters, or any court order made pursuant thereto. It is trite that once a court of law is seized of a matter no party has a right to take the laws into his own hands by resorting to self help.*"[396]

204.    The instructions of the Solicitor-General could not be clearer: until the issue was solved before Nigerian courts, Ogun State and NEPZA could not "*forcibly eject Messrs Zhongful* [sic.] *and its personnel from the Zone which is being managed under a subsisting Joint*

---

[392] *Deutsche Bank AG v Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/2, Award, 31 October 2012, ¶ 478, **CLA-048**.

[393] Second Witness Statement of John Xue, 22 January 2020, ¶ 24.

[394] Letter from Solicitor-General of the Federation and Permanent Secretary to Secretary to the State Government, Ogun State Secretariat, 17 October 2016, **C-013**; Letter from Solicitor-General of the Federation and Permanent Secretary to NEPZA, 17 October 2016, **C-185**.

[395] Statement of Defence, ¶ 118; Witness Statement of Taiwo Adeoluwa, 14 October 2019, ¶¶ 86-87.

[396] Letter from Solicitor-General of the Federation and Permanent Secretary to Secretary to the State Government, Ogun State Secretariat, 17 October 2016, **C-013**.

*Venture Agreement between the Ogun State Government and Messrs Zhongfu.*" Despite the instructions of the Solicitor-General, and in clear breach of due process, the Respondent continued to deny Zhongfu Nigeria the ability to exercise its rights in the Zone and repeatedly harassed and denied entrance to the Zone to Zhongfu Nigeria's employees.[397]

### (iv)   The conduct of Nigerian courts amounts to a violation of due process

205.   The actions of the Nigerian judiciary to thwart the Claimant's exercise of its legitimate right to have its contractual claims under the JVA 2013 resolved by a fair and impartial arbitral tribunal through the issue of a permanent injunction in the Anti-Arbitration Proceedings is a further violation of due process under the Treaty.[398]   In response to the Claimant's position, the Respondent argues that:

> "*the issue before the High Court in Ogun State* [...] *was the propriety of commencing Arbitration by Zhongfu after initiating legal proceedings in court in respect of the same subject matter and not the applicability or breach of the* [New York Convention]. *Neither Zhongfu* [Nigeria] *nor its lawyers advanced argument on the New York Convention at the said proceedings.*"[399]

206.   As explained in Section IV.E, the NEPZA Proceedings did not have the same subject matter as the Singapore Arbitration Proceedings and did not involve the same parties. The NEPZA Proceedings concerned Zhongfu Nigeria's claim challenging NEPZA's decision not to recognise Zhongfu Nigeria as the lawful manager of the Zone.   By contrast, the Singapore Arbitration Proceedings were based on contractual breaches of the JVA 2013. As such, there was no basis for the Ogun High Court to conclude that initiating the NEPZA Proceedings impinged Zhongfu Nigeria's arbitration rights under the JVA 2013.

207.   Similarly, there was no basis for the Ogun High Court to completely ignore the basic principles of the New York Convention, to which the Respondent is a Contracting Party, when injuncting Zhongfu Nigeria from continuing with the Singapore Arbitration Proceedings. In reaching its decision, the Ogun High Court manifestly failed to give effect

---

[397] Report from Steve Allen, 30 March 2017, **C-183**.

[398] *Mr Franck Charles Arif v Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013, ¶ 445, **CLA-089**.

[399] Statement of Defence, ¶ 131; Witness Statement of Taiwo Adeoluwa, 14 October 2019, ¶ 94.

69

to the due process rights of Zhongfu Nigeria by failing to apply the relevant law, which included the New York Convention.[400]

## 2.   The Respondent did not act transparently

208.   As shown in Section IV above, the Respondent failed to act *"transparently in its relations with foreign investors"* in multiple respects in violation of its FET obligations under the Treaty.[401]

### (i)   *The Respondent lacked transparency in its refusal to preserve Zhongfu Nigeria's rights under the Fucheng Industrial Park Agreement*

209.   The Respondent failed to engage with Zhongfu Nigeria's repeated requests to have its rights under the Fucheng Industrial Park Agreement preserved.[402] Indeed, the Respondent admits that NEPZA received at least some of Professor Elias' letters in which he pleaded that the *status quo* be maintained and that Zhongfu Nigeria's rights be respected.[403] However, instead of responding to and acting on those legitimate requests, NEPZA continued to intimidate Zhongfu Nigeria's personnel and to take over its assets without communicating the basis for these actions.[404]

210.   Despite the evidence to the contrary, the Respondent continues to obfuscate in its Statement of Defence when it states that *"NEPZA attempted to step in and resolve the dispute in line with its mandate but did not get cooperation from Zhongfu [Nigeria]."*[405] As Dr. Han states, NEPZA did not take such steps and *"Zhongfu Nigeria would have welcomed its assistance and, indeed, requested such assistance on a number of occasions."*[406]

---

[400] See New York Convention, Art. II(1), **CLA-007**; Arbitration and Conciliation Act 1988, Art. 2, **CLA-181**.

[401] *Tecnicas Medioambientales Tecmed SA v United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, ¶ 154, **CLA-063**. See also *Emilio Agustin Maffezini v Kingdom of Spain*, ICSID Case No. ARB/97/7, Award (Merits), 13 November 2000, ¶¶ 83, **CLA-065**; *CME Czech Republic B.V. v Czech Republic*, UNCITRAL, Partial Award, 13 September 2001, ¶ 611, **CLA-098**; *Bernhard von Pezold and others v Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Award, 28 July 2015, ¶ 546, **CLA-080**.

[402] Statement of Claim, ¶ 233; Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**; Letter from NEPZA to the Nigeria Immigration Service, 27 July 2016, **C-167**; Letter from G. Elias & Co. to Managing Director of NEPZA, 21 September 2016, **C-180**. See also Letter from G. Elias & Co. to NEPZA, 21 September 2016, **C-181**; Report from Steve Allen, 30 March 2017, **C-183**.

[403] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**; Letter from NEPZA to the Nigeria Immigration Service, 27 July 2016, **C-167**; Letter from G. Elias & Co. to Managing Director of NEPZA, 21 September 2016, **C-180**. See also Letter from G. Elias & Co. to NEPZA, 21 September 2016, **C-181**; Report from Steve Allen, 30 March 2017, **C-183**.

[404] Report from Steve Allen, 30 March 2017, **C-183**.

[405] Statement of Defence, ¶ 104; Witness Statement of Taiwo Adeoluwa, 14 October 2019, ¶ 75.

[406] Second Witness Statement of Jason Han, 23 January 2020, ¶ 58; Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**; Letter from G. Elias & Co to NEPZA, 12 June 2017, **C-222**; Letter from Zhongfu International Investment (NIG) FZE to NEPZA, 22 August 2017, **C-198**.

70

211. The Respondent's continued failure to act transparently is exemplified by its complete failure to provide any documents requested and / or ordered to be produced in this arbitration. For example, the Respondent failed to produce any documents *"relating to the decision of NEPZA to send the letter of 27 July 2016"* – which compelled Zhongfu Nigeria employees to surrender their original CERPAC immigration papers – as ordered by the Tribunal.[407] Accordingly, the Claimant respectfully invites the Tribunal to draw an adverse inference that the Respondent sought the surrender of CERPAC immigration papers from Zhongfu Nigeria employees to harass and ultimately pressure them to leave Nigeria.

(ii) *The Respondent did not act transparently with regards to Mr. Zhao's arrest and detention*

212. The Nigerian police failed to act in a transparent manner when arresting and detaining Mr. Zhao.[408] As part of the manifold violations of rights that Mr. Zhao suffered, he did not receive an explanation for the reason of his arrest in a language he could understand. As Mr. Zhao explains, the police officers *"asked [him] to sign a piece of paper. They did not say or explain what this paper was or what it said."*[409] In addition, Mr. Zhao was not told why the police were looking for Dr. Han nor why they were transferring Mr. Zhao to Abuja.[410] Further, the Nigerian police also failed to act in a transparent manner when allegedly conducting an investigation concerning his mistreatment as Mr. Zhao was not contacted to provide evidence in the investigation, nor was he informed of the results of the investigation.[411]

213. It is telling that the Respondent fails to engage with the circumstances of Mr. Zhao's treatment and simply denies that any wrongdoing took place.  Further, despite being ordered to by the Tribunal, the Respondent has continued to conceal the circumstances surrounding Mr. Zhao's arrest and detention by failing to produce any documents in relation to his treatment.[412]  The Tribunal is accordingly invited to draw the adverse inference that Mr. Zhao was mistreated and abused at the hands of the Nigerian police.

---

[407] Tribunal's Decision on Claimant's Application for Production of Documents, 29 November 2019. Letter from NEPZA to the Nigeria Immigration Service, 27 July 2016, **C-167**.

[408] Statement of Claim, ¶ 238; Second Witness Statement of Wenxiao (Areak) Zhao, 21 January 2020, ¶ 8.

[409] First Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶ 23.

[410] Second Witness Statement of Wenxiao (Areak) Zhao, 21 January 2020, ¶ 5.

[411] Second Witness Statement of Wenxiao (Areak) Zhao, 21 January 2020, ¶ 8.

[412] Statement of Defence, ¶¶ 104, 106 and 107.

(iii)   *The Respondent did not act transparently when it purported to terminate the JVA 2013*

214.   As demonstrated in Section IV above, the Respondent's purported termination of the JVA 2013 was abrupt and the reasons for the termination opaque and inconsistent. On the one hand, the Respondent has asserted that the reason for the termination was a direct result of a request from the Chinese Consulate communicated in Note 1601, and on the other hand, the Respondent has provided a series of *post-facto* justifications for why the JVA 2013 was either not entered into, not enforced, not binding or was allegedly breached by Zhongfu Nigeria.[413]   Accordingly, it is still not clear why the JVA 2013 was purportedly terminated.

215.   Further, the reasoning of the Respondent for its failure to comply with the 60-day cure period in clause 18.1 of the JVA 2013 is unintelligible.  The Respondent asserts, without any explanation, that the alleged breach by Zhongfu Nigeria of the JVA 2013 was "*not capable of being remedied in view of the information in* [Note 1601] *and NSG's Share Purchase Agreement.*"[414]

## 3.   The Respondent harassed the employees of Zhongfu Nigeria

216.   As shown above, Nigerian authorities engaged in a series of actions to coerce and harass Zhongfu Nigeria and its employees, forcing Zhongfu Nigeria to leave the Zone and the country.[415] These actions included the threats received by Zhongfu Nigeria's Management Team from the Ogun State Government and NEPZA officials, the forcible takeover of the Zone on 22 July 2016 and intimidation and harassment of the remaining Zhongfu Nigeria employees with the assistance of the police and / or NEPZA, which left people in the Zone feeling "*terrorized and fearful*", and the arrest and detention of Mr. Zhao.[416]

217.   The Respondent denies these actions, stating, amongst other things, that no threats were ever issued, that the takeover was a legal handover and that Mr. Zhao was arrested in accordance with due process after the filing of a complaint by a fellow Chinese citizen.[417]

---

[413] Statement of Defence, ¶¶ 27, 62, 64, 67, 68 and 133.

[414] Statement of Defence, ¶ 94.

[415] Statement of Claim, ¶¶ 240-241.

[416] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011.** See also Email from Jason Han to Elizabeth Uwaifo, 25 September 2016, **C-012;** Witness Statement of Jason Han, 30 April 2019, ¶¶ 106, 108, 111, 114 and 128; First Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 21 and 37; Request for Protection from Zhang Bin to State Security Service (Nigeria), 2 August 2016, **C-197;** Report by Lisa on CAI seizing assets, 16 October 2016, **C-184;** Report from Steve Allen, 30 March 2017, **C-183;** Letter from Zhongfu International Investment (NIG) FZE to NEPZA, 22 August 2017, **C-198.**

[417] Statement of Defence, ¶¶ 83, 95, 100, 101, 102, 106 and 107.

The Respondent's factual denials are unpersuasive in light of the evidence presented.[418] In particular, Mr. Adeoluwa's denial that he did not issue a threat against Dr. Han is contradicted -- practically verbatim -- by the evidence on record.[419]

218.   The conduct of the Respondent is not dissimilar to the circumstances in *Desert Line v Yemen*, where the tribunal in that case found a breach of FET in circumstances where the respondent (Yemen) made a series of physical threats, coercing the claimant to enter into an unwanted settlement agreement.[420]   Such threats included: (a) the arrest of its managers; (b) a phone call urging the chairman of the company to leave the country; and (c) a failure to provide the claimant with protection and security in the face of harassment and threats from third parties.[421]

### 4.   The Respondent's actions were arbitrary, unfair and unjust

219.   As shown above, the measures taken by the Respondent fall squarely within the notion of arbitrariness under international law, which has been accepted to occur when *"prejudice, preference or bias is substituted for the rule of law."*[422]  In its Statement of Defence, the Respondent has not pointed to any rational basis to evict Zhongfu Nigeria from the Zone and eviscerate its rights under the JVA 2013 and the Fucheng Industrial Park Agreement. Indeed, the Respondent's principal rationale for purporting to terminate the JVA 2013 was a mischaracterisation of Note 1601, which contained none of the allegations which were subsequently used as justification in the Notice of Termination.[423]  The arbitrariness of the Respondent's actions is further confirmed by the inconsistent statements of representatives of the Respondent:

(a)   the Secretary to the Ogun State Government, Mr. Adeoluwa, wrote to Dr. Han following the termination, in which Mr. Adeoluwa wrote *"Be sure, sir, that this is nothing personal against you, or your company"*;[424] and

(b)   Mr. Adeoluwa and Zhongfu Nigeria's lawyer, Ms. Uwaifo, stating that the *"Ogun State Government [...] has no issues with [Zhongfu Nigeria]"* and that the *"complaint

[418] See also, for example, Second Witness Statement of Wenxiao (Areak) Zhao, 21 January 2020, ¶¶ 4-9.

[419] Witness Statement of Taiwo Adeoluwa, 14 October 2019, ¶ 70; Text message from Taiwo Adeoluwa to Jianxin (Jason) Han, 16 July 2016, **C-196**.

[420] *Desert Line Projects LLC v The Republic of Yemen*, ICSID Case No. ARB/05/17, Award, 6 February 2008, ¶¶ 185,193, **CLA-066**.

[421] *Desert Line Projects LLC v The Republic of Yemen*, ICSID Case No. ARB/05/17, Award, 6 February 2008, ¶ 185, **CLA-066**.

[422] *Joseph C Lemire v Ukraine II*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010, ¶¶ 262-263, **CLA-060**.

[423] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 27 May 2016, **C-158**.

[424] Text message from Taiwo Adeoluwa to Jianxin (Jason) Han, 16 July 2016, **C-196**.

*against* [Zhongfu Nigeria...] *came from the Government of the People's Republic of China.*"[425]

### 5.   The Respondent failed to respect the Claimant's legitimate expectations

220.   It is striking from the Respondent's position, as articulated in its Statement of Defence, that it failed to respect the Claimant's legitimate expectations in relation to its investment, in breach of the FET standard.  For example, the Respondent provided Zhongfu Nigeria and the Claimant with multiple assurances with respect to its investment and rights within the Zone from which it subsequently resiled and now asserts a contrary position.

221.   In addition to the rights acquired under the Fucheng Industrial Park Agreement and the JVA 2013, on which the Claimant relied to invest and had a legitimate expectation would be respected, the Respondent provided specific assurances to the Claimant with respect to its shareholding rights in the OGFTZ Company, which it now denies.  These included the following:

(a)   The Ogun State Government represented by way of its letter dated 15 March 2012, titled "*Termination of* [CAI]'*s Participation in Ogun Guangdong Free Trade Zone*",[426] that CAI's shareholding rights in the OGFTZ Company, granted pursuant to the JVA 2007, and had been terminated in accordance with Clause 18.1 thereof.[427]

(b)   The Ogun State Government represented in the recitals and operative terms of the JVA 2013 that CAI's shareholding rights in the OGFTZ Company had been terminated and Zhongfu Nigeria was to acquire shareholding rights in the OGFTZ Company.[428]  In particular, the JVA 2013 states:

(i)   "[CAI] *was participating in the* [OGFTZ Company] *but its participation in the* [OGFTZ Company] *has been terminated by the* [Ogun State Government] *vide a letter dated 15th March, 2012 from the office of the Secretary to* [the Ogun State Government]";[429]

(ii)   The "[p]*arties* [to the JVA 2013] *have agreed to take over the shareholding structure of the* [OGFTZ Company] *which shall be responsible to take over*

---

[425] Email from Taiwo Adeoiuwa to Elizabeth Uwaifo, Jason Han, Gbolahan Elias and others, 18 August 2016, **C-175**.

[426] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Guandong Xinguang International Group and China Africa Investment Ltd., 15 March 2012, **C-006** (emphasis added).

[427] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Guangdong Xinguang International Group and China Africa Investment Ltd., 15 March 2012, **C-006**.

[428] Clause 1.9 of the JVA 2013 refers to the recitals as being the "*Whereas~* [sic.] *Clauses*." Pursuant to Clause 1.9 of the JVA 2013, the "*parties to* [the JVA] *confirm the context contained in the foregoing* "*Whereas~* [sic.] *Clauses herein is true and accurate...*" (JVA 2013, Clause 1.9, **C-008**).

[429] JVA 2013, p. 3, **C-008**.

74

*and carry out all the obligations of the [OGFTZ Company] which includes, development, operation, management and administration of the [Zone] and to do such acts, matters and things as may be consistent with, necessary for or incidental to the attainment of any of the foregoing and matters hereinafter stated*";[430]

(iii) "*Further to the incorporation of the [OGFTZ Company], the shareholding structure is hereby adjusted to reflect the new parties for the purpose of taking over the development, management and operation of the [Zone]*";[431] and

(iv) The OGFTZ Company, with authorised share capital of NGN 2 billion and issued share capital of NGN 1 billion, "*is hereby readjusted*" with Zhongfu Nigeria being allocated 60% of the shareholding.[432]

(c)  The Secretary to the Ogun State Government, Mr. Adeoluwa, confirmed "[*i*]*t is pertinent to note that the appointment of* [CAI] *has been terminated since 15th March 2012*" and "*consequently,* [Zhongfu Nigeria] *is enjoined to be pro-active in the Management/Administration of* [the Zone] *by promptly warding off activities of trespassers callable of causing confusion in the Zone.*"[433]

(d)  On the same day, M.A. Banire & Associates, the solicitor of the OGFTZ Company, confirmed:

> "*Ogun State Government has long terminated the interest of* [CAI] *in the Ogun Guangdong Free Trade Zone. This was done through a letter dated March 15, 2012. Kindly find attached the letter dated 15th March, 2012 written by the Secretary to the State Government of Ogun State terminating the said interest.*"[434]

222.  Similar types of conduct as that engaged in by the Respondent have been repeatedly recognised by investment tribunals as violating the FET standard. For example, in *NextEra v Spain*, the Tribunal found that the statements made in writing to the investor from Spanish officials "*constitute the best evidence of Spanish assurances that could be the basis for legitimate expectations.*"[435] In acting contrary to these assurances, Spain breached the

---

[430] JVA 2013, pp. 3-4, **C-008**.

[431] JVA 2013, Clause 2.1, **C-008**.

[432] JVA 2013, Clause 2.2, **C-008**.

[433] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG), 28 April 2014, **C-096**.

[434] Letter from M.A. Banire & Associates to Zhongfu International Investment (NIG) FZE, 28 April 2014, **C-095**.

[435] *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Principles of Quantum, 12 March 2019, ¶ 590, **CLA-182**.

investor's legitimate expectations and the FET standard.[436]  Similarly, in *CEF Energia v Italy*, the tribunal held that the letters from an emanation of the respondent to the investor were assurances to the investor that it would receive certain incentives, in a constant currency, for a twenty year period, pursuant to private law contracts.[437]  By acting contrary to those assurances, the respondent had breached the FET standard under the relevant treaty.[438]

223.    Likewise, in *Crystallex v Venezuela*, the tribunal found that a letter from the respondent's Ministry of Environment created a legitimate expectation that the permit for the exploitation of gold would be issued.[439]  Thus, by denying the permit, the respondent frustrated the investor's legitimate expectations.[440]  The tribunal in *Pezold v Zimbabwe* also recognised that acting contrary to assurances made by the Zimbabwean Government that the investor's property would be respected, including assurances from the Zimbabwean Minister of Agriculture and President Mugabe, and a *note verbale* from the Government, constituted a breach of the respondent's FET obligations.[441]

224.    Accordingly, the Claimant had a legitimate expectation that the Respondent would adhere to its representations and assurances and the Respondent's position to act contrary to those assurances is a clear violation of the FET standard under the Treaty.

### 6.    The Respondent has breached the principle of good faith under international law by contradicting its earlier assurances

225.    Finally, it is undisputed that the principle of good faith is a fundamental principle of international law and an integral element of the FET standard.  It is universally accepted that *"one of the basic principles governing the creation and performance of legal obligations, whatever their source, is the principle of good faith."*[442]  Under general public international law, the principle of good faith is recognised to be particularly *"relevant to the*

---

[436] *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Principles of Quantum, 12 March 2019, ¶¶ 593-601, **CLA-182**.

[437] *CEF Energia BV v Italian Republic*, SCC Case No. 2015/158, Award, 16 January 2019, ¶¶ 211, 17, 234, **CLA-183**.

[438] *CEF Energia BV v Italian Republic*, SCC Case No. 2015/158, Award, 16 January 2019, ¶¶ 235-246, **CLA-183**.

[439] *Crystallex International Corporation v Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, 4 April 2016, ¶ 564, **CLA-090**.

[440] *Crystallex International Corporation v Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, 4 April 2016, ¶ 575, **CLA-090**.

[441] *Bernhard von Pezold and others v Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Award, 28 July 2015, ¶¶ 547-551, **CLA-080**.

[442] *Nuclear Tests (Australia v France)*, Judgment, ICJ Reports 1974, 20 December 1974, ¶ 46, **CLA-184**; *Border and Transborder Armed Actions (Nicaragua v Honduras)*, Jurisdiction and Admissibility, Judgment, ICJ Reports 1988, 20 December 1988, ¶ 94, **CLA-185**.

*manner in which a State is required to perform its treaty obligations.*"[443]   As reinforced under the Vienna Convention on the Law of Treaties, "[e]*very treaty in force is binding upon the parties to it and must be performed by them in good faith.*"[444]   Accordingly, in application of the principle of good faith, a State is under an obligation to "*apply [a treaty] in a reasonable way and in such a manner that its purpose can be realized.*"[445]

226.   The principle of good faith has equally been endorsed under investment treaty law. Investment treaty tribunals have acknowledged that "[g]*ood faith is a supreme principle, which governs legal relations in all of their aspects and content...*"[446] and that "*the safeguarding of good faith is one of the fundamental principles of international law and the law of investments.*"[447]

227.   In the context of investment treaty protection, the arbitral tribunal in *Sempra v Argentina* emphasised that the:

> "*requirement of good faith [...] permeates the whole approach to the protection granted under treaties and contracts. Even if the standard were restricted to a question of reasonableness and proportionality not entailing objective liability [...] there are nevertheless expectations arising from promises that must be respected when relied upon by the beneficiary.*"[448]

228.   Similarly, the arbitral tribunal in *Tecmed v Mexico* stated: "*the good faith principle established by international law, requires the Contracting Parties to provide to international investments treatment that does not affect the basic expectations that were taken into account by the foreign investor to make the investment.*"[449]

229.   In light of this, the principle of good faith imposes an obligation on the Respondent to respect any representations, promises or commitments it has made, upon which the Claimant has effectively relied.  Any actions by the Respondent to the contrary, would be deemed in violation of the principle of good faith.  Indeed, in *Mobil v Argentina*, the arbitral

---

[443] *Mobil Investments v Canada (III)*, ICSID Case No. ARB/15/6, Decision on Jurisdiction and Admissibility, 13 July 2018, ¶ 168, **CLA-186**.

[444] VCLT, Art. 26, **CLA-018**.

[445] *Gabčíkovo-Nagymaros Project (Hungary/Slovakia)*, Judgment, 25 September 1997, ICJ Reports 1997, ¶ 142, **CLA-118**.

[446] *Inceysa Vallisoletana S.L. v Republic of El Salvador*, ICSID Case No. ARB/03/26, Award, 2 August 2006, ¶ 230, **CLA-187**.

[447] *Malicorp Limited v the Arab Republic of Egypt*, ICSID Case No. ARB/08/18, Award, 7 February 2011, ¶ 116, **CLA-188**.

[448] *Sempra Energy International v Argentine Republic*, ICSID Case No. ARB/02/16, Award, 28 September 2007, ¶ 299, **CLA-189**.

[449] *Tecnicas Medioambientales Tecmed, S.A. v The United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, ¶ 154, **CLA-063**.

JA-150

tribunal expressly found that Argentina was prevented from denying the Claimant's rights which had been recognised by Argentinian officials.[450] The tribunal held in this regard that:

> "the principle of good faith and the doctrine of venire contra factum proprium prevent Argentina from denying the validity of the Claimants' acquisition or ownership of the above interests and others constituting its investment. Argentina has consistently and repeatedly, for about a decade recognised and acted on the basis of the validity of the Claimants' title. By its own actions and those of its provincial authorities, for which it clearly bears responsibility under international law, it has shown that it regards the Claimants as the rightful holders of title."[451]

230.   Moreover, in *Chevron v Ecuador*, the arbitral tribunal explained that the:

> "duty of good faith precludes clearly inconsistent statements, deliberately made for one party's material advantage or to the other's material prejudice, that adversely affect the legitimacy of the arbitral process. In other words, no party to this arbitration can 'have it both ways' or 'blow hot and cold', to affirm a thing at one time and to deny that same thing at another time according to the mere exigencies of the moment."[452]

231.   As referred to above, the Ogun State Government expressly represented to Zhongfu Nigeria that CAI's shareholding rights in the OGFTZ Company had been terminated and, when entering into the JVA 2013, Zhongfu Nigeria was to acquire its own shareholding rights in the OGFTZ Company.[453] Following the claims of NSG to the Zone in April 2014, Zhongfu Nigeria was subsequently assured of its status in respect of the OGFTZ Company by the Ogun State Government,[454] with such assurances being also confirmed by the lawyer for the OGFTZ Company and the third counter-party to the JVA 2013, Zenith.[455]

---

[450] *Mobil Exploration and Development Inc. Suc. Argentina and Mobil Argentina S.A. v Argentine Republic*, ICSID Case No. ARB/04/16, Decision on Jurisdiction and Liability, 10 April 2013, ¶ 221, **CLA-175**.

[451] *Mobil Exploration and Development Inc. Suc. Argentina and Mobil Argentina S.A. v Argentine Republic*, ICSID Case No. ARB/04/16, Decision on Jurisdiction and Liability, 10 April 2013, ¶ 200, **CLA-175**. See also *Middle East Cement Shipping and Handling Co. S.A. v Arab Republic of Egypt*, ICSID Case No. ARB/99/6, Award, 12 April 2002, ¶ 135, **CLA-150**.

[452] *Chevron Corporation and Texaco Petroleum Company v The Republic of Ecuador (II)*, PCA Case No. 2009-23, Second Award on Track II, 30 August 2018, ¶ 7.106, **CLA-190**.

[453] See, for example, Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Guangdong Xinguang International Group and China Africa Investment Ltd., 15 March 2012, **C-006**; JVA 2013, pp. 3-4, Clauses 1.9 and 2.1-2.2 **C-008**.

[454] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG), 28 April 2014, **C-096**.

[455] Letter from M.A. Banire & Associates to Zhongfu International Investment (NIG) FZE, 28 April 2014, **C-095**; Letter from Zenith Global Merchant Ltd. to Office of the Secretary to the State Government, Ogun State, 23 April 2014, **C-094**.

232. On the basis of these representations, Zhongfu Nigeria continued to invest significant amounts of its own capital into the development of the Zone. Further, the Respondent recognised Zhongfu Nigeria's shareholding rights by not only assuring it of such rights but also knowingly permitting Zhongfu Nigeria to continue investing in the development of the Zone for a period of nearly 2.5 years from the date of signing of the JVA 2013. The Respondent's conduct now to seek to row back on and deny the veracity of its own previous representations concerning the termination of CAI's and acquisition of Zhongfu Nigeria's shareholding rights in the OGFTZ Company offends against the principle of good faith. As in the case of *Chevron v Ecuador*, by virtue of such principle, the Respondent is precluded from "*affirm*[ing] *a thing at one time and* [...] *deny*[ing] *that same thing at another time according to the mere exigencies of the moment*."[456]

233. Accordingly, the Respondent must comply with its commitments in good faith. This principle would be breached if the Respondent were to not respect the provisions of the JVA 2013 which provide Zhongfu Nigeria with shareholding rights in the OGFTZ Company. The Respondent should, therefore, be precluded from seeking to go back on its representations, contrary to the principle of good faith, and deny that the shareholding rights of CAI in the OGFTZ Company were terminated and Zhongfu Nigeria acquired its own shareholding rights in respect of the same company.

7. **The doctrine of estoppel under international law prevents the Respondent from now asserting that Zhongfu Nigeria does not have shareholding rights in the OGFTZ Company**

234. In its Statement of Defence, the Respondent denies that Zhongfu Nigeria had shareholding rights in the OGFTZ Company.[457] However, as set out above, the Respondent, through its State organs, explicitly represented and assured Zhongfu Nigeria that it had shareholding rights in the OGFTZ Company and that it had previously terminated the shareholding of CAI in the OGFTZ Company. The Respondent's purported *volte-face* is precluded by the doctrine of estoppel in international law.

235. The doctrine of estoppel is a general principle of international law based on the principles of good faith and consistency.[458] As Judge Spender held in the *Temple of Preah Vihear* case:

---

[456] *Chevron Corporation and Texaco Petroleum Company v The Republic of Ecuador (II)*, PCA Case No. 2009-23, Second Award on Track II, 30 August 2018, ¶ 7.106, **CLA-190**.

[457] Statement of Defence, ¶¶ 55 and 72.

[458] The principle is also known as *non licet venire contra factum proprium* or *allegans contraria non audiendus est*. See, for example, *Duke Energy International Peru Investments No. 1 Ltd. v Republic of Peru*, ICSID Case No. ARB/03/28, Award, 18 August 2008, ¶

79

> *"the principle [of estoppel] operates to prevent a State contesting before the Court a situation contrary to a clear and unequivocal representation previously made by it to another State, either expressly or impliedly, on which representation the other State was, in the circumstances, entitled to rely and in fact did rely, and as a result that other State has been prejudiced or the State making it has secured some benefit or advantage for itself."*[459]

236. The doctrine precludes a party from asserting or acting contrary to a previous (express or implied) statement of fact.[460] Thus, estoppel works as a safeguard against the injustice of that party going back on its word or deed.[461] The application of this doctrine in investment treaty arbitration has been repeatedly confirmed by multiple arbitral tribunals.[462] There are three requirements for estoppel to apply under international law.[463] The State must have made:

   (a) an unambiguous statement of fact;

   (b) which is voluntary, unconditional and authorised; and

   (c) which is relied on in good faith to the detriment of the other party or to the advantage of the State making the statement.[464]

237. The three elements of this test are evidently satisfied in the present case.

238. First, the Ogun State Government made unequivocal statements of fact representing that Zhongfu Nigeria had a 60% shareholding right in the OGFTZ Company in accordance with

---

[231] **CLA-191**; *Legal Status of Eastern Greenland (Denmark v Norway)*, Judgment, 5 April 1933, PCIJ Series A/B No. 53, pp. 66-69, **CLA-192**; *Oded Besserglik v Republic of Mozambique*, ICSID Case No. ARB(AF)/14/2, Award, 28 October 2019, ¶ 423, **CLA-193**.

[459] *Case concerning the Temple of Preah Vihear (Cambodia v Thailand)*, Judgment on the Merits, 15 June 1962, ICJ Reports 1962, Dissenting Opinion of Sir Percy Spender, pp. 143-144, **CLA-194**. See also, for example, *North Sea Continental Shelf (Federal Republic of Germany/Denmark; Federal Republic of Germany/Netherlands)*, Judgment, 20 February 1969, ICJ Reports 1969, ¶ 30, **CLA-195**; *Case concerning the Barcelona Traction, Light and Power Co Ltd (Belgium v Spain)*, Judgment on Preliminary Objections, 24 July 1964, ICJ Reports 1964, pp. 24-25, **CLA-196**.

[460] *Chevron Corporation and Texaco Petroleum Company v The Republic of Ecuador (II)*, PCA Case No. 2009-23, Second Partial Award on Track II, 30 August 2018, ¶ 7.89, **CLA-190**.

[461] *Canfor Corporation v United States of America; Terminal Forest Products Ltd. v United States of America*, Order of the Consolidation Tribunal, 7 September 2005, ¶ 168, **CLA-197**; *Pan American Energy LLC and BP Argentina Exploration Company v Argentine Republic*, ICSID Case No. ARB/03/13, Decision on Preliminary Objections, 27 July 2006, ¶¶ 159-160, **CLA-152**.

[462] See, for example, *Amco Asia Corporation and others v Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on Jurisdiction, 25 September 1983, ¶ 47, **CLA-198**; *CME Czech Republic B.V. v Czech Republic*, Final Award, 14 March 2003, ¶ 488, **CLA- 079**; *Chevron Corporation and Texaco Petroleum Company v The Republic of Ecuador (II)*, PCA Case No. 2009-23, Second Partial Award on Track II, 30 August 2018, ¶ 7.106, **CLA-190**.

[463] See *Pope & Talbot Inc. v Government of Canada*, UNCITRAL, Interim Award, 26 June 2000, ¶ 111, **CLA-199**.

[464] *Duke Energy International Peru Investments No. 1 Ltd. v Republic of Peru*, ICSID Case No. ARB/03/28, Award, 18 August 2008, ¶¶ 231, 245-246, **CLA-191**.

80

the terms of the JVA 2013.[465] This representation was unambiguous from recitals and operative terms of the JVA 2013, which confirm:

(a)  "[CAI] *was participating* in the [OGFTZ Company] but *its participation* in the [OGFTZ Company] *has been terminated* by the [Ogun State Government] *vide a letter dated 15th March, 2012 from the office of the Secretary to* [the Ogun State Government]";[466]

(b)  The "[p]arties [to the JVA 2013] *have agreed to take over the shareholding structure of the* [OGFTZ Company] which shall be responsible to take over and carry out all the obligations of the [OGFTZ Company] which includes, development, operation, management and administration of the [Zone] and to do such acts, matters and things as may be consistent with, necessary for or incidental to the attainment of any of the foregoing and matters hereinafter stated";[467]

(c)  "*Further to the incorporation of the* [OGFTZ Company], *the shareholding structure is hereby adjusted to reflect the new parties* for the purpose of taking over the development, management and operation of the [Zone]";[468] and

(d)  the OGFTZ Company, with authorised share capital of NGN 2 billion and issued share capital of NGN 1 billion, "*is hereby readjusted*" with Zhongfu Nigeria being allocated 60% of the shareholding.[469]

239.  In addition to the representations made in the JVA 2013, Dr. Han explains that the actions of the Ogun State Government, as understood by the Claimant's representative, further confirmed Zhongfu Nigeria's shareholding rights in the OGFTZ Company. Dr. Han states:

> "*Jeffrey told me that he had successfully completed negotiations on behalf of Zhongfu Nigeria with the Ogun State Government for a majority shareholding in the OGFTZ Company* [...]
>
> *I was particularly pleased that Zhongfu Nigeria had been given a majority shareholding in the OGFTZ Company as it meant that Zhongfu Nigeria had more security in respect of the investment into the Zone and would receive additional revenue streams.*"[470]

---

[465] See *African Continental Seaways Ltd. v Nigerian Dredging Roads and General Works Ltd.* [1977] NSCC 323, **CLA-200**.

[466] JVA 2013, p. 3, **C-008** (emphasis added).

[467] JVA 2013, pp. 3-4, **C-008** (emphasis added).

[468] JVA 2013, Clause 2.1, **C-008** (emphasis added).

[469] JVA 2013, Clause 2.2, **C-008** (emphasis added).

[470] Second Witness Statement of Jason Han, 23 January 2020, ¶¶ 37-38. See also Second Witness Statement of John Xue, 22 January 2020, ¶ 11.

81

240. Moreover, repeated assurances given to Zhongfu Nigeria on behalf of the Respondent are pertinent. For example:

(a) In an April 2014 letter from the coordinator of the Zone to the Ogun State Government, Mr. Onas referred to CAI as the "*old manager/stakeholder, whose appointment as manager and caretaker of the [Z]one had been terminated*";[471] and

(b) In a May 2016 letter from Mr. Adeoluwa to Zhongfu Nigeria, Mr. Adeoluwa referred to the "*management & participation rights of Messrs [Zhongfu Nigeria] in the Ogun Guangdong Free Trade Zone*."[472]

241. Second, the statements of fact were made in a voluntary and unconditional manner by the Respondent's representatives. As explained in *Duke Energy v Peru*, the State "*assumes the risk for the acts of its organs or officials which, by their nature, may reasonably induce reliance in third parties.*"[473] Thus, the decisive element for estoppel "*is the reasonable appearance that the representation binds the State.*"[474]

242. Third, Zhongfu Nigeria and the Claimant relied on these statements in good faith to their detriment. On the basis of the representations and assurances, the Claimant continued to invest its time, expertise and significant capital in the development of the Zone. For example, part of Zhongfu Nigeria's initial capital investment was made by way of loans to the OGFTZ Company. Those loans, totally NGN 827,532,307, were subsequently converted to an equity contribution into the OGFTZ Company.[475]

243. In the words of the tribunal in *Duke Energy v Peru*, the Respondent's contention that Zhongfu Nigeria was solely the manager of the Zone and not a shareholder "*flies in the face of all of the evidence.*"[476] Accordingly, the doctrine of estoppel acts as a bar to the Respondent's contention that Zhongfu Nigeria was merely the manager of the Zone and did not have shareholding rights in the OGFTZ Company.[477]

---

[471] Letter from Zenith Global Merchant Ltd. to Office of the Secretary to the State Government, Ogun State, 23 April 2014, **C-094**.

[472] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 27 May 2016, **C-158** (emphasis added).

[473] *Duke Energy International Peru Investments No. 1 Ltd. v Republic of Peru*, ICSID Case No. ARB/03/28, Award, 18 August 2008, ¶ 246, **CLA-191**.

[474] *Duke Energy International Peru Investments No. 1 Ltd. v Republic of Peru*, ICSID Case No. ARB/03/28, Award, 18 August 2008, ¶¶ 247, 434, **CLA-191**.

[475] Minutes of Meeting of Directors of Zhongfu International Investment (NIG) FZE, 31 December 2015, **C-210**.

[476] *Duke Energy International Peru Investments No. 1 Ltd. v Republic of Peru*, ICSID Case No. ARB/03/28, Award, 18 August 2008, ¶ 439, **CLA-191**.

[477] *ADC Affiliate Limited and ADC & ADMC Management Limited v The Republic of Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, ¶ 475, **CLA-076**. See also *Karkey Karadeniz Elektrik Uretim A.S. v Islamic Republic of Pakistan*, ICSID Case No. ARB/13/1, Award, 22 August 2017, ¶ 628, **CLA-139**.

82

**B    The Respondent failed to afford continuous protection to the Claimant's investment**

244.    Article 2(2) of the Treaty provides that:

> "[i]nvestments of the investors of either Contracting Party shall enjoy the continuous protection in the territory of the other Contracting Party."[478]

245.    The Respondent does not dispute that it has an obligation to afford the Claimant's investment continuous protection, but asserts a blanket denial that it breached the Treaty.[479] As shown above, the actions taken by the Respondent, as well as its inaction in protecting the Claimant's investment, breached its obligations to protect the Claimant's investment since the Respondent failed to provide physical as well as legal security to the Claimant's investment.[480]

246.    In *Biwater Gauff v Tanzania*, the tribunal found that the actions by State organs and representatives in removing the management from the offices of the investor and the seizure of the claimant's subsidiary's premises amounted to a violation of the respondent's obligation to ensure full protection and security.[481] Similarly in the present case, the actions by Nigerian State organs and representatives in forcing Zhongfu Nigeria from the Zone and from the country violates the Respondent's obligation to provide continuous protection. The Respondent's actions, and inaction, in failing to protect the Claimant's investment included, amongst other things:

(a)    the Ogun State Government threatening and intimidating the Zhongfu Nigeria Management Team leading to them leaving Nigeria in fear of their safety;[482]

(b)    NEPZA and the Nigerian police participating in the taking over of the Zone on 22 July 2016 and assisting NSG in forcibly removing Zhongfu Nigeria;[483]

---

[478] China-Nigeria BIT, Art. 2(2), **CLA-001**.

[479] Statement of Defence, ¶ 134.

[480] Statement of Claim, ¶¶ 255-256, 258-260.

[481] *Biwater Gauff (Tanzania) Limited v United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, ¶¶ 730-731, **CLA-061**.

[482] Text message from Taiwo Adeoluwa to Jianxin (Jason) Han, 16 July 2016, **C-196**; First Witness Statement of Jason Han, 30 April 2019, ¶¶ 95-131; Second Witness Statement of Jason Han, 23 January 2020, ¶ 54; Second Witness Statement of Wenxiao (Areak) Zhao, 21 January 2020, ¶ 9; Second Witness Statement of John Xue, 22 January 2020, ¶ 24.

[483] Letter from NEPZA to All Free Zone Enterprises (OGFTZ), 21 July 2016, **C-163**; Letter from Ogun-Guangdong Free Trade Zone Co-ordinator, Zenith Global Merchant Ltd. to Zhongfu International Investment (NIG) FZE, 21 July 2016, **C-164**; Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**; Report from Steve Allen, 30 March 2017, **C-183**.

83

JA-156

(c)   the Nigerian police arresting, detaining and mistreating Mr. Zhao;[484]

(d)   the Respondent allowing NSG to harass and intimidate Zhongfu Nigeria's employees;[485]

(e)   the Respondent failing to protect the Claimant's legal rights under the Fucheng Industrial Park Agreement by depriving Zhongfu Nigeria of the ability to operate in the Zone, despite the Respondent now claiming that Zhongfu Nigeria is a valid tenant in the Zone;[486] and

(f)   the Inspector-General of Police failing properly to investigate and disclose the outcome of any investigation into the mistreatment of Mr. Zhao.[487]

**C   The Respondent took unreasonable measures**

247.   Article 2(3) of the Treaty prohibits the Respondent from taking:

> "*any unreasonable or discriminatory measures against the management, maintenance, use, enjoyment and disposal of the investments by the investors of the other Contracting Party.*"[488]

248.   The Respondent has not disputed the Claimant's articulation of this treaty standard. Accordingly, as shown above, the Respondent has violated this treaty standard as its conduct in respect of the Claimant's investment was unreasonable in multiple respects, including through the following actions.

**1.   The Respondent evicted Zhongfu Nigeria from the Zone and eviscerated its rights under the JVA 2013 and Fucheng Industrial Park Agreement without any proper basis**

249.   Beyond the purported termination of the JVA 2013 by the Respondent the day after receiving a request for a meeting from Zhongfu Nigeria, the Respondent's actions, through NEPZA and the Nigerian police, to force Zhongfu Nigeria out of the Zone were manifestly unreasonable.

---

[484] First Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 10-36. See also Second Witness Statement of Wenxiao (Areak) Zhao, 21 January 2020, ¶ 5.

[485] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**; Report from Steve Allen, 30 March 2017, **C-183**.

[486] Statement of Defence, ¶ 83.

[487] Second Witness Statement of Wenxiao (Areak) Zhao, 21 January 2020, ¶ 8.

[488] China-Nigeria BIT, Art. 2(3), **CLA-001** (emphasis added).

84

250.   First, the Respondent's claimed rationale for purporting to terminate the JVA 2013 is that it was required to give effect to the request of the Chinese Consulate in Note 1601. However, the Respondent – without any reasonable basis – mischaracterises the content of Note 1601 to justify the termination. As explained above, Note 1601 was a letter sent from the Chinese Consulate in Lagos to Ogun State on 11 March 2016 stating that it received a notification by the State-owned Assets Supervision and Administration Commission of Guangdong Province "*about the replacement of shareholdings owner of [CAI] from [GXI] to [NSG].*"  Contrary to the Respondent's position, Note 1601 does not make a single reference to fraud, corruption or misconduct of Zhongfu Nigeria, either explicitly nor by implication.[489]   Further, the Respondent now asserts a series of inconsistent *post-facto* arguments for why the JVA 2013 was allegedly not entered into, not enforced, not binding or was allegedly breached by Zhongfu Nigeria.[490]

251.   Second, this conduct is even more egregious considering that the Ogun State Government gave explicit assurances in 2014 to Zhongfu Nigeria that CAI's shareholding in the OGFTZ Company had been terminated and that NSG had no interest in the OGFTZ Company.[491] It was consequently unreasonable for the Respondent to reverse its position, deny the Claimant's shareholding rights in the OGFTZ Company and take action to remove Zhongfu Nigeria from the Zone.

252.   Third, the Respondent's conduct eviscerated the Claimant's rights under the Fucheng Industrial Park Agreement by preventing Zhongfu Nigeria from accessing the Zone.  This was despite the repeated pleas from Zhongfu Nigeria's legal counsel that Zhongfu Nigeria retained valid and subsisting rights.

253.   In its termination letter dated 27 May 2016, the Respondent directed Zhongfu Nigeria to "*vacate the Zone within 30 days.*"[492]  Zhongfu Nigeria and its lawyers repeatedly wrote to ask for NEPZA's assistance in preserving Zhongfu Nigeria's rights under the Fucheng Industrial Park Agreement.[493]   The Respondent behaved unreasonably by ignoring Zhongfu Nigeria's pleas.

---

[489] Statement of Defence, ¶¶ 89 and 92; Witness Statement of Taiwo Adeoluwa, 14 October 2019, ¶ 66.

[490] Statement of Defence, ¶¶ 85-89, 99; Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 27 May 2016, C-158.

[491] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG), 28 April 2014, C-096.

[492] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 27 May 2016, C-158. This letter contrasts sharply with Mr. Adeoluwa's assertion that OSGS did not evict Zhongfu Nigeria from the Zone. Witness Statement of Taiwo Adeoluwa, 14 October 2019, ¶ 37.

[493] Letter from G. Elias & Co. to Managing Director of NEPZA, 21 September 2016, C-180; Letter from G. Elias & Co. to NEPZA, 21 September 2016, C-181; Letter from G. Elias & Co. to Managing Director of NEPZA, 21 September 2016, C-181. See also Letter from

85

## 2. The Respondent harassed, intimidated and detained the employees of Zhongfu Nigeria

254. Moreover, the Respondent harassed and intimidated Zhongfu Nigeria's staff and the Nigerian police arrested and detained Mr. Zhao on alleged charges of criminal breach of trust. In its signature blanket denial, the Respondent argues that no threats took place and that the police arrested Mr. Zhao *"pursuant to its responsibilities under Nigerian law to investigate crime and prosecute offenders in order to protect lives and properties of every one living in the Country."*[494]

255. Moreover, the Respondent alleges that the police acted in compliance with Nigerian law. This is not true. The following circumstances surrounding Mr. Zhao's detention constitute flagrant breaches of Nigerian law:

(a) Mr. Zhao was not promptly informed of the charges against him in a language that he understood.[495]

(b) Mr. Zhao was not charged nor brought to court within the first 24 hours of his arrest.[496]

(c) Mr. Zhao was intimidated into answering questions without the presence of his lawyer.[497]

(d) Mr. Zhao's right not to be treated in an inhumane and degrading manner was violated on multiple occasions.[498]  Among other treatment he was subjected to, he was beaten, not given regular food and water, denied proper shelter and clothing.[499]

---

G. Elias & Co. to NEPZA, 8 May 2017, **C-202**; Letter from G. Elias & Co to NEPZA, 12 June 2017, **C-222**; Letter from Zhongfu International Investment (NIG) FZE to NEPZA, 22 August 2017, **C-198**.

[494] Statement of Defence, ¶ 108.

[495] Constitution of the Federal Republic of Nigeria 1999, Section 35(3), **C-195**: *"Any person who is arrested or detained shall be informed in writing within twenty-four hours (and in a language that he understands) of the facts and grounds for his arrest or detention."*

[496] Constitution of the Federal Republic of Nigeria 1999, Section 35(4) and 35(5)(a), **C-195**: *"Any person who is arrested or detained in accordance with subsection (1) (c) of this section shall be brought before a court of law within a reasonable time"; "in subsection (4) of this section, the expression 'a reasonable time' means - (a) in the case of an arrest or detention in any place where there is a court of competent jurisdiction within a radius of forty kilometres, a period of one day."*; African Charter on Human and Peoples' Rights (Ratification and Enforcement) Act 1983, Art. 7.1(d), **CLA-201**.

[497] Administration of Criminal Justice Act 2015, Section 6(2), **CLA-202**: *"The police officer or the person making the arrest or the police officer in charge of a police station shall inform the suspect of his rights to: [...] consult a legal practitioner of his choice before making, endorsing or writing any statement or answering any question put to him after arrest"*; African Charter on Human and Peoples' Rights (Ratification and Enforcement) Act 1983, Art. 7.1(c), **CLA-201**.

[498] Constitution of the Federal Republic of Nigeria 1999, Section 34(1)(a), **C-195**: *"Every individual is entitled to respect for the dignity of his person, and accordingly – (a) no person shall be subject to torture or to inhuman or degrading treatment'"*; African Charter on Human and Peoples' Rights (Ratification and Enforcement) Act 1983, Art. 5, **CLA-201**. See also A.G. Kebbi State v Jokolo (2013) LPELR-22349(CA), **CLA-203**.

[499] First Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 17-37. See also Second Witness Statement of Wenxiao (Areak) Zhao, 21 January 2020, ¶ 15.

86

(e)  Mr. Zhao's treatment at the hands of the Nigerian police amounted to torture under Nigerian law.[500]  As set out in the *A.G. Kebbi State v Jokolo* case, torture under Nigerian law has been defined as "*the infliction of intense pain to the body or mind to punish, to extract a confession or information, or to obtain sadistic pleasure.*"[501]  As Mr. Zhao explains, he was the victim of physical abuse, he was forced to witness brutal violence, he was made to believe he would be forced to physically attack another prisoner and he was forced to watch horrific videos.[502]  Such conduct is contrary to the Respondent's obligations under its own law and under international law, including the Respondent's obligations under the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, to which the Respondent is a contracting party.[503]

### 3.  The Respondent unreasonably prevented Zhongfu Nigeria exercising its contractual rights under the JVA 2013 in international arbitration

256.  It was also unreasonable for the High Court to issue the anti-suit injunction preventing the parties from continuing with the Singapore Arbitration Proceedings.  As held by the tribunal in *Vivendi v Argentina* concerning the enactment of two laws designed to prevent the claimant from pursuing lawsuits:

> "[t]*hese measures were, and can only be seen as a vindictive exercise of sovereign power aimed at punishing CAA and its shareholders for seeking to terminate the Concession Agreement and for exercising their rights to arbitrate under the BIT.*"[504]

257.  Considering the arbitration clause in the JVA 2013, it is undeniable that the Respondent's courts went out of their way to stop Zhongfu Nigeria from exercising its rights to a fair and independent arbitral tribunal.  This judgment undoubtedly amounts to an unreasonable measure under the Treaty.

---

[500] African Charter on Human and Peoples' Rights (Ratification and Enforcement) Act 1983, Art. 5, **CLA-201**.

[501] *A.G. Kebbi State v Jokolo* (2013) LPELR-22349(CA), p. 25, **CLA-203**.

[502] First Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶ 34; Second Witness Statement of Wenxiao (Areak) Zhao, 21 January 2020, ¶ 5.

[503] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 10 December 1984, UNTS, Vol. 1465, p. 85, **CLA-204**.

[504] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, ¶ 7.4.45, **CLA-108**.

**D**   **The Respondent expropriated the Claimant's investment without compensation**

258.   Article 4 of the Treaty provides that:

> "Neither Contracting Party shall expropriate, nationalize or take similar measures (hereinafter referred to as "expropriation") against the investments of investors of the other Contracting Party in its territory, unless the following conditions are met:
>
> (a) for the public interests;
>
> (b) under domestic legal procedure;
>
> (c) without discrimination;
>
> (d) against fair compensation.
>
> The compensation mentioned in Paragraph 1 (d) of this Article shall be equivalent to the value of the expropriated investments immediately before the expropriation is proclaimed, be convertible and freely transferable. The compensation shall be paid without unreasonable delay and include interest at a normal commercial rate."[505]

259.   The Respondent has, again, not disputed the Claimant's articulation of this treaty standard. It has, however, denied that it "act[ed] *either directly or indirectly in a way or manner to expropriate either directly or indirectly the investments of the Claimant in OGFTZ.*"[506] As shown above, the Respondent's measures resulted in the deprivation or taking of the Claimant's rights and assets in Nigeria. The failure of the Respondent to satisfy any one of the conditions in Article 4 of the Treaty renders the taking unlawful.[507] As the Claimant has not received any compensation for the expropriation of its investment – a point which has not been denied by the Respondent – it was an unlawful expropriation under Article 4 of the Treaty.[508] Furthermore, the Respondent has also not claimed that the expropriation was done for a public purpose nor under any domestic legal procedure.

260.   As shown above, multiple actions of the Respondent, and its State organs, constitute an expropriation of the Claimant's investment, these include:

---

[505] China-Nigeria BIT, Art. 4, **CLA-001.**

[506] Statement of Defence, ¶ 134.

[507] *Bernardus Henricus Funnekotter and Others v Republic of Zimbabwe*, ICSID Case No. ARB/05/6, Award, 22 April 2009, ¶ 98, **CLA-114.**

[508] *Bernhard von Pezold and Others v Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Award, 28 July 2015, ¶¶ 497-498, **CLA-080;** *Marion Unglaube and Reinhard Unglaube v Republic of Costa Rica*, ICSID Case No. ARB/08/1 and ARB/09/20, Award, 16 May 2012, ¶ 305, **CLA-205.**

(a) *The deprivation by the Respondent of the Claimant's rights and economic benefit under the Fucheng Industrial Park Agreement.* As demonstrated, the Respondent's position that Zhongfu Nigeria is still recognised as a tenant in the Zone and any rights conferred on it by the Fucheng Industrial Park Agreement are still subsisting,[509] is fanciful and is contradicted by the evidence on the record. Through the use of the police and NEPZA, Zhongfu Nigeria was intimidated, harassed and forcefully removed from the Zone. It was "*directed to* [...] *vacate the Zone within 30 days*", which rendered impossible the continuation of its investment and blocked its further involvement in the Zone in all capacities.[510] The direct threats from the Secretary to the Ogun State Government to Dr. Han led to the Management Team to leave the Zone, and the arrest, detention and inhumane treatment levelled against Mr. Zhao led the Management Team to flee Nigeria. These actions resulted in Zhongfu Nigeria's business no longer being able to function in Nigeria and rendered the investment worthless. The evidence that leading and experienced international businessmen fled Nigeria, leaving their substantial investment, highlights that an expropriation took place.

(b) *The evisceration of Zhongfu Nigeria's rights under the JVA 2013, including its shareholding rights in the OGFTZ Company.* As shown above, the Respondent's argument that the JVA 2013 only concerned management rights to the Zone and did not concern shareholding rights is contradicted by the text of the JVA 2013 and multiple representations and assurances made by the Ogun State Government, including those made in the JVA 2013 itself. Accordingly, the Respondent's assertion that the Claimant does not currently have shareholding rights, leads to only one conclusion, which is that they were eviscerated by the Respondent.

(c) *The seizure of Zhongfu Nigeria's physical assets.* Aside from the assets and infrastructure which was built in the Zone,[511] some of Zhongfu Nigeria's physical assets taken included: vehicles, construction materials (which included, for example,

---

[509] Statement of Defence, ¶ 95.

[510] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 27 May 2016, **C-158**. This letter contrasts sharply with Mr. Adeoluwa's assertion that the Ogun State Government did not evict Zhongfu Nigeria from the Zone. Witness Statement of Taiwo Adeoluwa, 14 October 2019, ¶ 37.

[511] Warehouse Construction Project Report, 22 December 2013, **C-109**; Proforma Invoices from Eastern Harbour International Ltd. to Zhongfu International Investment (NIG) FZE, 6 January 2016, 10 January 2016, 30 March 2016, **C-110**; Sale Invoices from Lafarge Cement WAPCO Nigeria PLC to Zhongfu International Investment (NIG) FZE, 23-24 April 2015, **C-112**; Invoices from CNC Engineering Co., Ltd. to Zhongfu International Investment (NIG) FZE, 3 February - 3 June 2015, **C-113**; Invoices from Sinotrust International Investment Ltd. to Zhongfu International Investment (NIG) FZE, 14 February - 29 July 2015, **C-114**; and Invoice from Unicontinental International to Zhongfu International Investment (NIG) FZE, 24 March 2015, **C-115**; Cash Credit Invoices and Receipts from Bertola Machine Tool Ltd. to Ogun-Guangdong Free Trade Zone, 20 January and 26 January 2015, **C-116**.

89

JA-162

cement mixers, payloaders, a crane, road rollers, bulldozers and tipper trucks), offices and equipment.[512]

## VIII. THE CLAIMANT IS ENTITLED TO COMPENSATION FOR ITS LOSSES

261. As a result of the Respondent's breaches of the Treaty, the Claimant is entitled to compensation for the losses it suffered in relation to its investment in Nigeria. As set out in the Statement of Claim and underlined in Section IV above, the measures taken by the Respondent have destroyed the Claimant's investment, or alternatively have at least substantially deprived the Claimant of the value of its investment.

262. The Respondent has sought – implausibly – to challenge the role of Zhongfu Nigeria in developing the Zone.[513] However, the Respondent has not disputed, nor provided any evidence to refute the value of the losses suffered by the Claimant. With its Statement of Claim, the Claimant filed the FTI Report of Mr. Noel Matthews, Senior Managing Director at FTI Consulting ("**FTI**" or "**Mr. Matthews**") dated 1 May 2019 (the "**FTI Report**"). The Respondent does not engage with Mr. Matthews' findings contained in the FTI Report nor does it provide evidence to dispute the methodology he has used to calculate the quantum of damages due to the Claimant as compensation for the losses it has suffered in relation to its investments in Nigeria.[514] Similarly, the Respondent does not provide an alternative methodology or calculation of compensation due to the Claimant.

263. Reaffirming the Claimant's position set out in its Statement of Claim, in accordance with international law, the Claimant seeks full reparation for its losses caused by the Respondent's actions, which deprived the Claimant of the value of its investment.[515] The Claimant is entitled to compensation for loss of profits, loss of future profits and loss of assets caused by the Respondent's breaches of the Treaty.[516]

264. For the reasons set out in the Statement of Claim, the appropriate method to calculate reparation for the Claimant's losses, which has been applied by Mr. Matthews in the FTI Report, is the DCF method.[517] This method has been used to calculate the fair market

---

[512] First Witness Statement of Jason Han, 30 April 2019, ¶¶ 66, 72; Commercial Invoice from Ghassan Aboud Cars Dubai, UAE, to Zhongfu International Investment (NIG) FZE, 3 January 2015, **C-111**; Invoice and Delivery Note from Fouani Nigeria Ltd. to Zhongfu International Investment (NIG) FZE, 27 January and 30 January 2015, **C-117**; and Quotations from CFAO Equipment to Zhongfu International Investment (NIG) FZE, 26 January 2015, **C-118**; Construction Materials and Equipment for Hospital Projects Commission Purchasing Contract, 8 October 2015, **C-119**; Construction Materials and Equipment for Hotels and Accommodation Office Areas Commission Purchasing Contract, 8 October 2015, **C-120**; Report from Steve Allen, 30 March 2017, **C-183**.

[513] Statement of Defence, ¶ 57.

[514] Statement of Defence, ¶ 39.

[515] Statement of Claim, ¶¶ 298-300.

[516] Statement of Claim, ¶¶ 301-307.

[517] Statement of Claim, ¶¶ 308-316.

value of the Claimant's expropriated investment in Nigeria as at 22 July 2016.[518] The DCF method projects the future cash flows that would have been generated by the Claimant's investment in the Zone, and discounts those cash flows to 22 July 2016.[519] On the basis of the DCF method, the value of the Claimant's losses is assessed at US$1,078 million.[520]

265.  As an alternative and a cross-check, Mr. Matthews has also calculated the amount of compensation due to the Claimant on the basis of a comparable approach by considering comparable assets at the time of the Claimant's investment in the Zone; in particular, two transactions in the Nkok free trade zone in Gabon.[521] By reference to a comparable Nkok SEZ transaction in 2014, the implied land valuation was calculated at US$26.6 per square metre.[522] Using this figure, the comparable approach valued the Claimant's losses at US$1,446 million.[523]

266.  The Claimant and its representatives have also suffered shocking treatment at the hands of organs of the Respondent, including physical abuse, assaults, and threats to personal safety. The Claimant is entitled to moral damages for these actions and mistreatment and has so claimed.[524] Moral damages are claimed in the amount of US$1 million, or such other amount to be determined by the Tribunal.[525]

267.  In order to receive full reparation under customary international law, the Claimant re-iterates its request for pre-award and post-award interest, at the commercially reasonable rate which the Claimant would have been able to borrow at the Valuation Date, calculated in the FTI Report to be one-month US$ LIBOR plus 2%.[526]

## IX.   RELIEF SOUGHT BY THE CLAIMANT

268.  The Claimant maintains its request for relief and respectfully seeks, without prejudice to its reserved right to supplement and / or amend its claims and / or the quantum of its claims and / or the request for relief provided herein, an Award:

---

[518] Statement of Claim, ¶ 322; FTI Report, p. ii.

[519] Statement of Claim, ¶¶ 333-360; FTI Report, ¶ 7.61 and Appendix 7-3.

[520] Statement of Claim, ¶¶ 361; FTI Report, ¶ 7.65.

[521] Statement of Claim, ¶¶ 362-365; FTI Report, ¶ 8.12.

[522] Statement of Claim, ¶¶ 366; FTI Report, ¶ 8.18.

[523] Statement of Claim, ¶¶ 367; FTI Report, ¶ 8.21.

[524] Statement of Claim, ¶¶ 323-331.

[525] Statement of Claim, ¶¶ 14-15 and 328-330.

[526] Statement of Claim, ¶¶ 369-372; FTI Report, ¶ 2.18.

(a)     Declaring that the Respondent has breached Article 3(1) of the Treaty by failing to accord the Claimant's investment fair and equitable treatment;

(b)     Declaring that the Respondent has breached Article 2(2) of the Treaty by failing to accord the Claimant's investment continuous protection;

(c)     Declaring that the Respondent has breached Article 2(3) of the Treaty by taking unreasonable measures against the management, maintenance, use, enjoyment and disposal of the Claimant's investment;

(d)     Declaring that the Respondent has breached Article 4(1) of the Treaty by expropriating the Claimant's investment in Nigeria, alternatively by measures having effect equivalent to expropriation of the Claimant's investment in Nigeria;

(e)     Ordering the Respondent to pay the Claimant compensation for its total losses of US$1,078 million or, in the alternative, US$1,446 million;

(f)     Ordering the Respondent to pay the Claimant moral damages in the amount of US$1 million or such other amount to be determined by the Tribunal;

(g)     Ordering the Respondent to pay pre-award and post-award interest at a rate of LIBOR plus 2% compounded monthly or such other rate fixed by the Tribunal;

(h)     Ordering the Respondent to indemnify the Claimant for all costs and expenses of the arbitral proceedings; and

(i)     Ordering such further and / or other relief as the Tribunal deems just and appropriate.

Respectfully submitted,

Withers LLP

Christopher Harris QC, 3 Verulam Buildings

Radix Legal & Consulting Limited

G. Elias & Co.

31 January 2020

92

JA-165

# EXHIBIT B

IN THE MATTER OF AN ARBITRATION PURSUANT TO THE AGREEMENT BETWEEN THE GOVERNMENT OF THE PEOPLE'S REPUBLIC OF CHINA AND THE GOVERNMENT OF THE FEDERAL REPUBLIC OF NIGERIA FOR THE RECIPROCAL PROMOTION AND PROTECTION OF INVESTMENTS

- BETWEEN -

ZHONGSHAN FUCHENG INDUSTRIAL INVESTMENT CO. LTD.

(THE "CLAIMANT")

- AND –

THE FEDERAL REPUBLIC OF NIGERIA

(THE "RESPONDENT")

STATEMENT OF CLAIM

1 MAY 2019



I.     INTRODUCTION ................................................................................ 1

II.    EXECUTIVE SUMMARY ................................................................... 1

III.    FACTS RELEVANT TO THE DISPUTE ........................................... 7

    A    Zhongshan's Parent Company had a Long History of Operating Successful
        Businesses in Free Trade Zones in China ................................................ 7

    B    The Nigerian Government and the Ogun State Government Established the
        Ogun-Guangdong Free Trade Zone to Encourage Foreign Direct Investment to
        Nigeria ................................................................................................ 10

    C    The Fucheng Industrial Park was Established as a Model Area in the Zone..... 13

        1.    Zhuhai Zhongfu, and later the Claimant, Acquired Extensive Rights under
            the Fucheng Industrial Park Agreement to Develop the Zone ............... 13

        2.    The Claimant Made Significant Investments to Develop the Zone......... 17

    D    The Claimant, through Zhongfu Nigeria, Took Over the Management of the
        Zone, First as Interim Manager and Later as Permanent Manager under a JVA
        with the Ogun State Government ............................................................ 18

        1.    The Claimant, through Zhongfu Nigeria, took over the Full Management
            of the Zone as Interim Manager ........................................................ 18

        2.    Zhongfu Nigeria Entered into the JVA with the Ogun State Government
            to Take Over the Full Management of the Zone Permanently and
            Become the Majority Shareholder in OGFTZ Company ....................... 24

        3.    Zhongfu Nigeria's Successful Management of the Zone was Widely
            Recognised and Praised by the Nigerian Government and
            Internationally ................................................................................ 31

    E    The Respondent Took Over the Claimant's Investment Without Compensation
        and Forced Zhongfu Nigeria out of Nigeria .......................................... 37

    F    The Respondent's Judiciary Thwarted the Commercial Arbitration Rights of the
        Claimant's Nigerian subsidiary, Zhongfu Nigeria, under the JVA .................... 50

IV.    THE TRIBUNAL HAS JURISDICTION OVER THIS DISPUTE .................................. 57

    A    Nigeria is Bound by the Treaty and Consented to Arbitration ........................... 57

    B    The Claimant is a Protected Investor under the Treaty ..................................... 58

i

JA-168

C     The Claimant holds Qualifying Investment under the Treaty............................ 58

     1.    Direct investment by the Claimant............................................................. 59

     2.    The Claimant's Shareholding in Zhongfu Nigeria .................................. 61

     3.    The Claimant's Investment should be Considered as a Whole.............. 62

**V.    PRINCIPLES OF TREATY INTERPRETATION AND THE APPLICABLE LAW......... 63**

     A    The Principles of Treaty Interpretation............................................................. 63

     B    The Applicable Law ......................................................................................... 64

**VI.   NIGERIA IS RESPONSIBLE FOR ACTIONS ATTRIBUTABLE TO IT UNDER THE TREATY AND INTERNATIONAL LAW ...................................................................... 66**

     A    The Framework of Attribution Under the ARSIWA............................................ 66

     1.    ARSIWA Article 4 - State Organs (*de jure* and *de facto*) ...................... 67

     2.    ARSIWA Article 5 - Parastatal Entities .................................................. 69

     B    Attribution of Acts to Nigeria ............................................................................ 71

     1.    The Actions of the Ogun State Government are Attributable to Nigeria. 71

     2.    The Actions of NEPZA are Attributable to Nigeria ................................ 72

     3.    The Actions of the Nigerian police force are Attributable to Nigeria....... 73

     4.    The actions of Nigeria's courts are attributable to Nigeria .................... 74

**VII.  NIGERIA'S ACTIONS ARE IN BREACH OF THE TREATY AND INTERNATIONAL LAW.................................................................................................................... 75**

     A    Nigeria did not Treat the Claimant's Investment Fairly and Equitably ............... 75

     1.    The Content of the Fair and Equitable Treatment Standard .................. 75

     2.    Nigeria has Denied the Claimant's Right to Due Process in Violation of the FET Standard ................................................................................. 78

     3.    Nigeria has Failed to Act in a Transparent Manner .............................. 80

     4.    Nigeria Failed to Treat the Claimant in a Manner that is Free from Coercion and Harassment ................................................................... 82

     5.    Nigeria Acted in a Manner that was Arbitrary, Unfair, Unjust and/or Idiosyncratic........................................................................................ 84

6. Nigeria Failed to Respect the Claimant's Legitimate Expectations ........ 86

B Nigeria Failed to Afford Continuous Protection to the Claimant's Investment.... 88

C Nigeria Took Unreasonable Measures ............................................................ 92

D Nigeria Wrongfully Expropriated the Claimant's Investment Without Compensation .................................................................................................... 94

1. Nigeria's actions constitute a "taking" that is unlawful under the China-Nigeria BIT and international law ........................................................ 95

2. Nigeria's taking of the Claimant's investment violates Article 4 of the China-Nigeria BIT because the taking was not accompanied by the payment of fair compensation ............................................................... 97

3. Nigeria's taking of the Claimant's investment violates Article 4 of the BIT because the taking was not for a public purpose................................... 98

4. Nigeria's taking of the Claimant's investment violates Article 4 of the China-Nigeria BIT because the taking was not done under a domestic legal procedure, nor in accordance with the standards of treatment provided under the China-Nigeria BIT................................................. 100

VIII. THE CLAIMANT IS ENTITLED TO COMPENSATION FOR ITS LOSSES ............... 101

A The Claimant is Entitled to Full Compensation for its Investment which was Unlawfully Taken by the Respondent ............................................................. 102

1. Full Compensation is the Appropriate Standard.................................. 103

2. Compensation must be Equal to Fair Market Value ............................ 105

3. The Valuation Date ............................................................................. 107

4. The Claimant is Entitled to be Awarded Moral Damages ................... 108

B Quantum of Compensation ............................................................................. 111

1. The DCF Approach............................................................................. 111

2. The Comparable Transaction Approach............................................. 118

3. Conclusion.......................................................................................... 119

C The Claimant is Entitled to Interest................................................................ 120

IX. RELIEF SOUGHT BY THE CLAIMANT .................................................................... 121

JA-170

## I.   INTRODUCTION

1.   This Statement of Claim is submitted on behalf of Zhongshan Fucheng Industrial Investment Co. Ltd. (the "**Claimant**" or "**Zhongshan**"), a company incorporated under the laws of the People's Republic of China ("**China**"), pursuant to the Tribunal's Procedural Order No. 1 dated 19 February 2019.  It sets out the factual and substantive legal grounds entitling the Claimant to compensation from the Federal Republic of Nigeria ("**Nigeria**" or the "**Respondent**") for breaches of the Agreement between the Government of China and the Government of Nigeria for the Reciprocal Promotion and Protection of Investments (the "**Treaty**" or "**China-Nigeria BIT**")[1] and international law.

## II.   EXECUTIVE SUMMARY

2.   This dispute relates to a shocking series of actions by which multiple emanations of the Nigerian State came together to forcibly evict the Claimant from Nigeria and seized its valuable investment.  It relates to wrongful acts by Nigeria which are difficult to understand and, at the same time, tragic for the opportunity to which they laid waste.  After years of investment and hard work, the Claimant (and Ogun State) had started to see the rewards of the Claimant's efforts.  The Free Trade Zone was growing at a remarkable rate, revenues were rising and the future looked bright – even the Economist Intelligence Unit recognised the Claimant's work.  Suddenly, without warning, Nigeria's attitude changed completely.  Nigeria decided, for reasons which remain unclear, to erase the Claimant from the project – terminating its management of the Free Trade Zone, expropriating its shareholding rights in the Zone management company and forcibly removing and chasing its employees out of the country.  It rode roughshod over the Claimant's acquired rights and legitimate expectations and treated the Claimant's investment and personnel in a way which breached multiple provisions of the Treaty and caused the Claimant enormous financial harm.  Whilst nothing can truly put right what occurred in 2016, only a substantial award of financial compensation can begin to comply with Nigeria's duty to make full reparation for its wrongful acts at international law.

3.   In a little more detail, this dispute arises out of a multi-faceted investment by the Claimant, Zhongshan - a Chinese company which was established by one of the largest and most successful bottling businesses in China - in Ogun State in Nigeria to develop and manage a 10,000 hectare (100 km$^2$) free trade zone, known as the Ogun-Guangdong Free Trade Zone (the "**Zone**"). Zhongshan brought together senior business executives who had decades of experience of working in and developing Special Economic Zones ("**SEZs**") in

---

[1] Agreement between the Government of the People's Republic of China and the Government of the Federal Republic of Nigeria for the Reciprocal Promotion and Protection of Investments, done in Beijing on 27 August 2001 (hereinafter "**China-Nigeria BIT**"), **CLA-001**. The China-Nigeria BIT came into effect on 18 February 2010, see Ministry of Commerce of the People's Republic of China, "The China Nigeria Investment Protection Agreement came into effect on February 18, 2010 Bilateral Investment Treaty", 2 March 2010, **CLA-002**; and Ministry of Commerce of the People's Republic of China, "Bilateral Investment Treaty", 31 March 2016, available at: http://english.mofcom.gov.cn/article/bilateralchanges/201603/20160301287079.shtml (last accessed on 30 April 2019), **CLA-003**.

JA-171

China that had historic parallels to the Zone.  The Zone is adjacent to Lagos city and in close proximity to Lagos airport and Apapa port.  The strategic location of the Zone in Nigeria - Africa's most populous country, which also has the highest Gross Domestic Product ("**GDP**") in the African Continent - is further enhanced by Nigeria being in the Economic Community of West African States ("**ECOWAS**") region.[2]

4.      The investment in Nigeria began in June 2010 under the framework of an agreement between the Claimant's shareholder Zhuhai Zhongfu Industrial Group Co., Ltd ("**Zhuhai Zhongfu**") and the Ogun-Guangdong Free Trade Zone Company (the "**OGFTZ Company**") (the "**Fucheng Industrial Park Agreement**").[3]  The Fucheng Industrial Park Agreement provided the Claimant, which took over Zhuhai Zhongfu's rights and obligations under that agreement, with the right to develop the Zone, starting with a model area in the heart of the Zone known as Fucheng Industrial Park and with priority rights to develop the remainder of the Zone.

5.      The Fucheng Industrial Park Agreement granted the Claimant land use rights in the Zone for 97 years and gave the Claimant the right to land transfer fees as well as to administration fees from tenants in line with those tenants' turnover in the Zone.  On the basis of its rights under the Fucheng Industrial Park Agreement, the Claimant made significant investments in Nigeria and registered a subsidiary company, Zhongfu International Investment (NIG) FZE ("**Zhongfu Nigeria**") in Nigeria.[4]

6.      In March 2012, the Ogun State Government terminated the joint venture that it had previously entered into in June 2007 with Guangdong Xinguang International China-Africa Investment Ltd. ("**CAI**") to manage the Zone - citing among other issues CAI's bankruptcy and its failure to develop the Zone.[5]  On the same day, Zhongfu Nigeria was requested by the Ogun State Government to take over the management the Zone on an interim basis with expectations of Zhongfu Nigeria "*attracting sufficient businesses to the Zone to boost economic activities*" and "*rejuvenating generally the Free Trade Zone to ensure the attainment of its lofty objectives.*"[6]  Having already invested significant sums into the Zone under the Fucheng Industrial Park Agreement and faced with the possibility of the Zone

---

[2] Member countries making up ECOWAS are Benin, Burkina Faso, Cape Verde, Cote d'Ivoire, The Gambia, Ghana, Guinea, Guinea Bissau, Liberia, Mali, Niger, Nigeria, Senegal, Sierra Leone and Togo. See Economic Community of West African States, "Member States", available at http://www.ecowas.int/member-states/ (last accessed on 16 April 2019), **C-001**.

[3] Framework Agreement on Establishment of Fucheng Industrial Park in Ogun-Guangdong Free Trade Zone, 29 June 2010 (hereinafter "**Fucheng Industrial Park Agreement**"), **C-002**.

[4] Zhongfu International Investment (NIG) FZE, "Regulations", 10 October 2010, **C-003**; Zhongfu International Investment (NIG) FZE, "The Enterprise Overseas Investment Certificate", Registration No. 201005944, 13 October 2010, **C-004**; Zhongfu International Investment (NIG) FZE, "Overseas Enterprise Investment Certificate" No. 4400201100286, 6 September 2011, **C-005**.

[5] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Guandong Xinguang International Group and China Africa Investment Ltd., 15 March 2012, **C-006**.

[6] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 15 March 2012, **C-007**.

2

otherwise being shut down or grinding to an effective halt, the Claimant and Zhongfu Nigeria agreed to accept this interim management role in the Zone to protect their investments in Nigeria.

7.    In reliance on both the Fucheng Industrial Park Agreement and Zhongfu Nigeria's separate appointment as Interim Manager of the Zone, the Claimant made further investments to develop the Zone.  This included the development of significant infrastructure in the Zone including roads, the establishment of a power plant and electrical cables, water supply, sewage and improved telecommunications. Zhongshan also attracted large numbers of international investors, particularly from China, to establish factories and businesses in the Zone.

8.    After 18 months of Zhongfu Nigeria's successful management of the Zone as Interim Manager (as judged by the Ogun State Government against its benchmarks), the Ogun State Government decided to make the interim management long-term.  Accordingly, the Ogun State Government entered into a joint venture agreement with Zhongfu Nigeria which gave Zhongfu Nigeria additional rights to the development, management and operation of the Zone for over 90 years and the majority shareholding interest in OGFTZ Company (the "**JVA**").[7]

9.    Pursuant to the JVA and in the context of further encouragement and assurances from the Ogun State Government, the Claimant continued to make investments in the Zone and attracted major businesses as tenants.  This included highly successful companies such as Hong Kong listed China Glass Holding Ltd. ("**China Glass**") as well as a major consortium from Xi'an in China which agreed to invest US$1 billion to establish and develop a Hi-Tech Industrial Pharmaceutical Park covering a 1,000 hectare (10 km$^2$) area in the Zone (i.e., 1/10[th] of the Zone's total land) (the "**Pharmaceutical Park**").

10.   The Claimant also progressed plans to raise US$250 million to expand and enhance the infrastructure in the Zone, working with experts on free trade zones and development finance, First Hectares Capital ("**First Hectares**") and its principals Professor Issa Baluch and Mr. Jon Vandenheuvel.  Overwhelmingly positive feedback was received from numerous international and private institutions who were interested in the possibility of providing finance for the infrastructure and supporting the further development of the Zone. This included expressions of interest from the Dubai International Financial Center, the Abu Dhabi Global Market, the World Bank, the African Development Bank and, in the context of a potential listing of Zhongfu Nigeria's business on the Nigerian Stock Exchange, United Capital, part of the United Bank of Africa Group ("**UBA**").

---

[7] Joint Venture Agreement between: (1) Ogun State Government; (2) Zhongfu International Investment (NIG) FZE; and (3) Zenith Global Merchant Limited for the Development, Management and Operation of the Ogun-Guangdong Free Trade Zone, 28 September 2013 (hereinafter "**JVA**"), **C-008**.

11.  The Claimant's investments, development and management of the Zone became an international success story for foreign direct investment and sustainable development in Africa.  Senior members of Zhongfu Nigeria's management team were invited to present about the Zone at international conferences such as at Harvard University and the Massachusetts Institute of Technology ("**MIT**").   Postgraduate students from Johns Hopkins University School of Advanced International Studies ("**Johns Hopkins University**") and from Harvard University were sent to study the Zone in person through university placements.  The Economist Intelligence Unit produced a video on the Zone and its success in April 2016, featuring interviews with the Chief Operating Officer ("**COO**") of Zhongfu Nigeria (Mr. Zheng (John) Xue), Nigerian State representatives, World Bank economists and international development academics.[8] In terms of economic success, Zhongfu Nigeria was also going from strength to strength, posting profits of over US$3 million for the year ending 31 December 2015, more than double the profits that it earned in the previous year.[9]

12.  In 2014, a Chinese company New South Group ("**NSG**") alleged that it had acquired CAI's terminated rights in the Zone and that this gave NSG the right to manage the Zone. These allegations were categorically rejected by the Ogun State Government in 2014 and Zhongfu Nigeria received express assurances at that time from the Ogun State Government about Zhongfu Nigeria's standing and rights in the Zone, on which the Claimant and Zhongfu Nigeria relied in continuing to invest in and develop the Zone. However, two years later, the Ogun State Government radically shifted its position.  In May 2016, the Ogun State Government purported to terminate the JVA, acting without administrative due process and on grounds that made no sense and were entirely without evidential support.  Thereafter, Nigeria - through actions of the Ogun State Government, the Nigeria Export Processing Zones Authority ("**NEPZA**") and the Nigerian police - took over the entirety of the Claimant's rights and assets in the Zone and forcibly evicted Zhongfu Nigeria from the Zone, thereby destroying the entire value of the Claimant's investment in Nigeria.

13.  Notably, these actions of the Nigerian authorities were carried out despite the fact that the Claimant and Zhongfu Nigeria had multiple rights in the Zone, including under the Fucheng Industrial Park Agreement and as a tenant in the Zone, in addition to rights under the JVA as the manager of the Zone and majority shareholder in OGFTZ Company.   Yet the

---

[8] Economist Intelligence Unit Video, "Growth Crossings: Ogun Guangdong Free Trade Zone in Nigeria", 21 April 2016, available at http://growthcrossings.economist.com/video/zones-of-influence/ (last accessed on 11 April 2019) (hereinafter "**Economist Intelligence Unit Video**"), **C-009;** Transcript of the Economist Intelligence Video, 21 April 2016, **C-010.**

[9] See the expert report of Mr. Noel Matthews, 1 May 2019 (hereinafter "**FTI Report**"), ¶ 5.25.

4

JA-174

Nigerian authorities ignored this important point when it was repeatedly made to them, including through Zhongfu Nigeria's lawyers in Nigeria.

14.     The draconian actions of the Nigerian authorities included the Secretary to the Ogun State Government directly threatening Zhongfu Nigeria's Chief Executive Officer ("**CEO**") Dr. Jianxin (Jason) Han to "*leave peacefully when there is* [an] *opportunity to do so, and avoid forceful removal, complications and possible prosecution.*"[10]   As if this treatment were not appalling enough, the Nigerian authorities followed through on their threats of physical harm to the Claimant's management team in Nigeria.   The police arrested the Chief Financial Officer ("**CFO**") of Zhongfu Nigeria, Mr. Wenxiao (Areak) Zhao, detained him without basis or explanation in terrible conditions and physically beat him on two occasions before releasing him - without any charge - after a week in two jails.

15.     Recalling the treatment he received in police custody, Mr. Zhao states:

> "*After a while, the police car stopped somewhere that looked like a police station.  The police officers asked me to stay outside and then another group of police officers arrived.  One police officer in uniform came over to me and slapped me twice on the face with his hand.  Then the police officers who brought me there took me to a room where they asked me to sign a piece of paper.  They did not say or explain what this paper was or what it said.  I refused to sign the piece of paper.*
>
> *The police officers then took my flip flops and placed me in a courtyard with a number of cells surrounding it.  It was dark and cold and I was standing at the gate to one of the cells.  Then another prisoner came out of that cell and asked why I was taken. I did not speak.  There were also some other people who had been brought to the courtyard and the prisoner told us to stand side-by-side and asked whether we had money and why we were there.  If someone had no money, he would slap them.  Then the prisoner took me aside and asked me to speak.  He said that if I did not speak, he would beat me with a club.   Then another prisoner joined that first prisoner in intimidating me.  Later the second prisoner took me aside and told me not to be afraid.  However, the first prisoner came back and threatened me with a club and asked me to speak, which I did not do.*
>
> *[…]*
>
> *On what I think was the third day in the Abuja police station, a lot of people were brought into the office.  The police officers moved me to another office.  In the new office, two handcuffed men were being forced to hit each other.  They were each told that if you hit the other man, you would be released.  The two persons were hitting each other, and I could see the blood.  After this, the police officer showed me a video of a prisoner eating a rat.  The police officer then approached me asking what happened.  I did not respond*

---

[10] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**; Email from Jason Han to Elizabeth Uwaifo, 25 September 2016, **C-012**.

> *and he hit me twice, first on the neck and the second time on the head with a fist.  It was painful and I felt numb.*"[11]

16.    Fearing for their safety, Zhongfu Nigeria's management team were forced to leave Nigeria. Zhongfu Nigeria tried to take preventive legal steps in the Nigerian courts to preserve their rights but the Ogun State Government, NEPZA and the police orchestrated the complete evisceration of the Claimant's investment in Nigeria.

17.    The Solicitor-General of Nigeria warned the Ogun State Government against "*forcibly eject*[ing]" Zhongfu Nigeria from the Zone and "*resort to self help*", stating that "*it has become necessary to remind you that the planned or purported ejection of Zhongfu from the Zone will amount to contempt of court as the matter is subjudice*".[12]  This warning was ignored by the Ogun State Government, NEPZA and the Nigerian police who rendered any continued presence of Zhongfu Nigeria personnel in the Zone impossible - including through outright hostility and the taking of physical assets belonging to Zhongfu Nigeria.

18.    The Claimant thus had the entirety of its investment in Nigeria taken from it through the actions of the Respondent, for which the Claimant received no compensation.  The Respondent even stymied Zhongfu Nigeria's commercial arbitration rights under the JVA through the issuance of an anti-suit injunction in the High Court in Ogun State that was misconceived on any analysis and further aggravated the Respondent's taking of the Claimant's investment.

19.    The shocking treatment meted out to the Claimant and Zhongfu Nigeria by the Nigerian State organs, including the Ogun State Government, NEPZA and the Nigerian police, breached Nigeria's international obligations to the Claimant under the Treaty.  In particular, the measures taken by the Ogun State Government, NEPZA and the police contravened Nigeria's obligation to provide fair and equitable treatment under the Treaty as well as not to take unreasonable measures and to accord the Claimant's investment continuous protection.

20.    Furthermore, the Respondent is responsible for expropriating the Claimant's investment in Nigeria. Since this expropriation was carried out without the payment of compensation, due process and/or a public purpose, it was moreover an unlawful expropriation.

21.    In accordance with well-settled principles of international law, the Claimant seeks full reparation for the losses resulting from the Respondent's violations of the Treaty and international law, in the form of monetary compensation such as to wipe out the consequences of the Respondent's wrongful acts.

---

[11] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 23-24 and 34.

[12] Letter from Solicitor-General of the Federation and Permanent Secretary to Secretary to the State Government, Ogun State Secretariat, 17 October 2016, **C-013**.

22.   As a result of the Respondent's actions, the Claimant has lost the entire value of its investment in Nigeria and is entitled to full compensation for its losses.  The Claimant's valuation experts FTI have applied two approaches to value the Claimant's investment at the time it was taken in July 2016.  The primary basis is adopting a discounted cash flow ("**DCF**") methodology which calculates the Claimant's losses at US$1.078 billion before interest.  The secondary comparable transaction basis, by reference to a transaction in a free trade zone in Gabon, calculates losses at US$1.446 billion before interest.

23.   This Statement of Claim is accompanied by the Witness Statements of: (i) Dr. Jianxin (Jason) Han, Managing Director of the Claimant; (ii) Mr. Zheng (John) Xue, former COO of Zhongfu Nigeria; (iii) Mr. Wenxiao (Areak) Zhao, former CFO of Zhongfu Nigeria; (iv) Professor Issa Baluch, Chairman of First Hectares and (v) Mr. Jon Vanenheuvel, CEO of First Hectares.  It is also accompanied by an expert report prepared by Mr. Noel Matthews, quantum and valuation expert of the firm FTI.

24.   This Statement of Claim is structured as follows. Section III describes the relevant facts of the dispute, including Zhongshan's investment in Nigeria. Section IV establishes the basis for the Tribunal's jurisdiction over this dispute. Section V sets out the law applicable to this dispute.  Section VI addresses Nigeria's responsibility for actions attributable to it under the Treaty.  Section VII provides an analysis of Nigeria's obligations under the Treaty and how Nigeria's actions are in breach of those obligations.  Section VIII explains the value of damages suffered by Zhongshan and the compensation owing to it.  Section IX sets out Zhongshan's request for relief.

25.   Also submitted with this Statement of Claim are the Claimant's factual exhibits numbered C-001 to C-194, and legal authorities numbered CLA-001 to CLA-142.

### III.   FACTS RELEVANT TO THE DISPUTE

#### A   Zhongshan's Parent Company had a Long History of Operating Successful Businesses in Free Trade Zones in China

26.   From humble beginnings, Mr. Lefu Huang set up a small company in Zhuhai, Guangdong province, China and started to make clothing lining from polyester / polyethylene terephthalate ("**PET**").[13] In the mid-1980s, Mr. Lefu Huang saw an opportunity to expand the business into manufacturing PET bottles as there were few, if any, bottle manufactures

---

[13] PET is a thermoplastic polymer resin, which is a common raw ingredient used in the plastic bottling and packaging industries. See Witness Statement of Jason Han, 30 April 2019, footnote 1.

in China at the time.[14]  This company, which became Zhuhai Zhongfu, partnered with Coca-Cola in the mid-1980s to manufacture bottles for its beverages in China.[15]

27.    The economic environment in which Zhuhai Zhongfu was established and emerged was that of SEZs.  The creation of Chinese SEZs was part of Deng Xiaoping's economic liberalisation plan announced in 1979, through which the Chinese Government initially created four prototype SEZs on the coast of South China.  These were in Zhuhai, Shenzhen, Shantou in Guangdong province and Xiamen (Amoy) in Fujian province.[16] SEZs provided businesses within the SEZs with, among other advantages, special tax rates, exemptions from import duties, the ability to employ foreign management and simplified entry and exit procedures for foreign personnel.[17]   Zhuhai Zhongfu was established in the Zhuhai SEZ (hence the reason for the first part of its name).[18]  The Zhuhai SEZ was created in 1980 and was located next to Macau and Hong Kong which allowed access to established ports and a large urban consumer base.

28.    As Coca-Cola expanded across China in the 1990s, establishing manufacturing plants, Zhuhai Zhongfu, through its subsidiary Zhuhai Zhongfu Enterprise Co., Ltd. ("**Zhongfu Enterprise**"), set up bottling factories to service Coca-Cola's and other beverage companies' demand for bottles.[19]  Over time, Zhongfu Enterprise grew to be the largest producer of PET beverage bottles in China, gaining approximately 60 percent of China's market for PET bottles by the year 2000.[20]  Zhongfu Enterprise was listed on the Shenzhen

---

[14] Witness Statement of Jason Han, 30 April 2019, ¶ 8.

[15] Witness Statement of Jason Han, 30 April 2019, ¶ 9.

[16] V Sit, "The Special Economic Zones of China: A New Type of Export Processing Zone?", *The Developing Economies*, XXIII-1, March 1985, p. 76, **C-014**.

[17] V Sit, "The Special Economic Zones of China: A New Type of Export Processing Zone?", *The Developing Economies*, XXIII-1, March 1985, pp. 72-73, **C-014**.

[18] By 2015, the Chinese Development Bank estimated that SEZs contributed 22% of China's GDP, 45% of total national foreign direct investment, and 60% of exports. SEZs are estimated to have created over 30 million jobs, increased the income of participating farmers by 30%, and accelerated industrialisation, agricultural modernisation and urbanisation. China Development Bank, "China's Special Economic Zones: Experience Gained", 2015, **C-015**.

[19] See Peking University, Tsinghua University and University of South Carolina, "Economic Impact of the Coca-Cola System on China", August 2000, pp. 58- 60, available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.202.2447&rep=rep1&type =pdf (last accessed on 18 April 2019), **C-016**; Manufacturing News, "PET packaging bottle producer buys 100th Sidel blow molding machine", 5 November 2007, available at https://web.archive.org/web/20080503194647/http://www.jobwerx.com/news/sidel-biz-949481-871.html (last accessed on 11 April 2019), **C-017**; Witness Statement of Jason Han, 30 April 2019, ¶ 13-14; Witness Statement of John Xue, 29 April 2019, ¶ 5.

[20] See Peking University, Tsinghua University and University of South Carolina, "Economic Impact of the Coca-Cola System on China", August 2000, p. 59, available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.202.2447&rep=rep1&type=pdf (last accessed on 18 April 2019), **C-016**.

Stock Exchange in 1996[21] and now employs over 4,000 people, with more than 60 subsidiaries and factories in over 30 cities in China.[22]

29.   The growth of Zhongfu Enterprise's business took place almost exclusively within the SEZs, free trade zones and industrial parks which were being established across China starting from the 1980s and 1990s.[23]  As a result, Zhongfu Enterprise and its management team gained considerable experience working in and developing businesses in SEZs and industrial parks.  The industrial parks are zones offering similar incentives to businesses as those granted in SEZs, but are established at a local rather than federal Government level.[24]  As SEZs and industrial parks were established across China, Zhongfu Enterprise expanded its business within these zones and industrial parks.  At the same time, Zhongfu Enterprise started to lease greater areas of land within SEZs and industrial parks in order to develop the land and sub-lease that land to other enterprises.[25]  In effect, Zhongfu Enterprise would develop and manage its own 'zone' within the SEZ or industrial park with a variety of tenants across different sectors of industry.[26]

30.   Dr. Jason Han, currently the Managing Director of the Claimant, worked for Zhongfu Enterprise for over 20 years during the expansion of the business.  He joined Zhongfu Enterprise in 1991 and eventually becoming the Regional Manager for around 75% of Zhongfu Enterprise's operations across China.  Dr. Han was often involved in the management and development of the SEZs and industrial parks in which Zhongfu Enterprise would build its factories.  This included managing the construction of roads and infrastructure to support Zhongfu Enterprise's and other tenants' manufacturing facilities.[27]

31.   In 2007, the global private equity firm, CVC Capital Partners, acquired a 29% stake in Zhongfu Enterprise for approximately US$225 million.[28]  Following this acquisition and

---

[21] Bloomberg Company Information, "Zhuhai Zhongfu Enterprise Co., Ltd.", 2   April   2019, available at https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=5684450 (last accessed on 2 April 2019) **C-018**; CVC Press Release, "CVC Announces Investment in China's Largest Beverage Packaging Company", 22 October 2007, available at   https://www.cvc.com/media/press-releases/2007/10-22-2007-123721395 (last accessed on 11 April 2019), **C-019**; Witness Statement of Jason Han, 30 April 2019, ¶ 16.

[22] See Zhuhai Zhongfu, "About Zhongfu", available at http://www.zhongfu.com.cn/ (last accessed on 2 April 2019), **C-020**; S Tucker, "CVC wins approval for stake in China bottling", *Financial Times*, 22 October 2007, **C-021**.

[23] China Development Bank, "China's Special Economic Zones: Experience Gained", 2015, **C-015**; Witness Statement of Jason Han, 30 April 2019, ¶¶ 14 and 18-19.

[24] Witness Statement of Jason Han, 30 April 2019, ¶ 13.

[25] Witness Statement of Jason Han, 30 April 2019, ¶ 19.

[26] Witness Statement of Jason Han, 30 April 2019, ¶ 19.

[27] Witness Statement of Jason Han, 30 April 2019, ¶ 19.

[28] See Z Ran, "Zhuhai Zhongfu to sell stake to PE firm at higher prices", *China Daily*, 16 April 2007, available at http://www.chinadaily.com.cn/business/2007-04/16/content_851647.htm (last accessed on 18 April 2019), **C-022**; S Tucker, "CVC wins approval for stake in China bottling", *Financial Times*, 22 October 2007, **C-021**; CVC Press Release, "CVC Announces Investment in China's Largest Beverage Packaging Company", 22 October 2007, available at https://www.cvc.com/media/press-releases/2007/10-22-2007-123721395 (last accessed on 18 April 2019), **C-019**.

injection of capital, Zhuhai Zhongfu began looking to develop opportunities outside of China.[29]   This led to Zhuhai Zhongfu establishing Zhongshan (the Claimant) as its subsidiary to make a significant investment in Nigeria.[30]

**B    The Nigerian Government and the Ogun State Government Established the Ogun-Guangdong Free Trade Zone to Encourage Foreign Direct Investment to Nigeria**

32.    As part of its efforts to attract foreign trade and investment, starting in the early 1990s the Nigerian Government adopted policies to establish a number of export processing and free trade zones ("**Free Zones**") throughout the country.   The Free Zones were subject to special legislative and administrative regimes in order to incentivise foreign investors and exporters by providing exemptions from certain taxes and business regulations.[31]   To regulate and administer the Free Zones, the Nigerian Government enacted the Nigeria Export Processing Zones Act 1992 (the "**NEPZA Act**").[32]   The NEPZA Act established NEPZA which is the Nigerian Government agency authorised to administer Free Zones.

33.    NEPZA was established for the purposes of carrying out various public functions and responsibilities, including: (i) making recommendations to the President of Nigeria for the designation of "*such areas as* [the President] *thinks fit to be an export processing zone*";[33] (ii) "*the administration of the* [NEPZA] *and management of all the Export Processing Zones*";[34] (iii) "*the establishment of customs, police, immigration and similar posts in the Zones*";[35] (iv) "*the establishment and supervision of Zonal Administrator for the purpose of managing the Zones and the grant of all requisite permits and licences to approved enterprises;*"[36] and (v) to "*prescribe regulations governing the Zone.*"[37]

---

[29] Witness Statement of Jason Han, 30 April 2019, ¶ 27.

[30] See Zhongshan Fucheng Industrial Investment Co., Ltd., "Business License", 7 November 2016, **C-023**; Zhongshan Fucheng Industrial Investment Co., Ltd., "Approved Change of Registration Notice", 16 September 2011, **C-024**.

[31] See Nigeria Export Processing Zones Act 1992, Act No. 63, 19 November 1992, (hereinafter "**NEPZA Act**"), Arts. 8, 11, 12, which provide, *inter alia,* that approved enterprises operating within Free Zones shall be (i) "*exempted from all Federal, State and Government taxes, levies and rates*", (ii) entitled to receive payment for goods and services supplied to customers within the customs territory in foreign currency; and (iii) import" "*free of customs duty, any capital goods, consumer goods, raw materials, components or articles intended to be used for the purposes of and in connection with an approved activity, including any article for the construction, alteration, reconstruction, extension or repair of premises in a Zone or for equipping such premises.*"  It also provides that customs excise will only be payable on dutiable goods when, subject to the prior approval of NEPZA, such goods are transferred from the Free Zone to the Nigerian customs territory, **C-025**.

[32] NEPZA Act, **C-025**.

[33] NEPZA Act, Art. 1(1), **C-025**.

[34] NEPZA Act, Art. 4(a), **C-025**.

[35] NEPZA Act, Art. 4(c), **C-025**.

[36] NEPZA Act, Art. 4(h), **C-025**.

[37] NEPZA Act, Art. 10(4), **C-025**.

34.     In 2004, in accordance with Article 10(4) of the NEPZA Act, NEPZA issued the Investment
        Procedures, Regulations and Operational Guidelines for Free Zones in Nigeria, 2004 (the
        "**NEPZA Regulations**").[38]   The NEPZA Regulations govern, *inter alia*, the designation of
        Free Zones, the management procedures for Free Zones and the investment, customs
        and immigration procedures applicable in Free Zones.[39]   The NEPZA Regulations provide
        that approved enterprises within Free Zones shall be entitled to the following incentives
        and concessions:

(a)     Legislative provisions pertaining to taxes, levies, duties and foreign exchange
        regulations shall not apply within the Free Zones;

(b)     Repatriation of foreign capital investment in the Free Zones at any time with capital
        appreciation of the investment;

(c)     Remittance of profits and dividends earned by foreign investors in the Free Zones;

(d)     No import or export licences shall be required;

(e)     Up to 100% of production may be sold in the customs territory against a valid permit,
        and on payment of appropriate duties;

(f)     Rent free land at construction stage, thereafter rent shall be as determined by the
        Authority or Zone Management;

(g)     Up to 100% foreign ownership of business in the Free Zones permitted;

(h)     Foreign managers and qualified personnel may be employed by companies
        operating in the Free Zones; and

(i)     The import duty on goods manufactured, processed or assembled in the Free Zones
        and exported into the Nigerian customs territory, shall be the rate applicable to the
        raw materials (in the state in which they are originally brought into the Free Zones).[40]

35.     In 2007, pursuant to the NEPZA Act and the NEPZA Regulations, the Ogun State
        Government in Nigeria established the Zone as a Free Zone.[41] The Zone is a 10,000
        hectare (100 km$^2$) area of land in the Igbesa region of Ogun State in South-West Nigeria,

---

[38] NEPZA Act, Art. 10(4), **C-025**.

[39] Investment Procedures, Regulations and Operational Guidelines for Free Zones in Nigeria, 2004 (hereinafter "**NEPZA Regulations**"), **C-026**.

[40] NEPZA Regulations, Part 2, Art. 3, **C-026**.

[41] Witness Statement of Jason Han, 30 April 2019, ¶ 29.

11

bordering the outer suburbs of Lagos.[42] To put this into context, Paris has an area of 105 km[2].[43]

36.    The Zone is located approximately 30 kilometres from the Lagos International Airport and a similar distance from Nigeria's main shipping port in Apapa, Lagos.  The location of the Zone can be seen from the map below:



*Figure 1: Map of Zone location. Source: Google and Wikimedia Commons.*

37.    The Zone is ideally situated only a short distance from the capital of Africa's most populous country, with the fastest growing population of the ten largest countries in the world.[44] By around 2050, Nigeria is projected to become the third largest country in the world, surpassing the USA and behind only India and China.[45] In 2014, Nigeria became Africa's largest economy with GDP of US$509.9 billion, expected to grow at an average annual rate of 6.6% until 2050.[46] Nigeria's economy has historically been dependent on petroleum and petroleum products. [47] However, notwithstanding the decline in oil prices from mid-2014 onwards, Nigeria's non-oil sector has continued to grow.[48] Among other sectors, the

---

[42] Witness Statement of Jason Han, 30 April 2019, ¶ 29.

[43] See Encyclopaedia Britannica, "Paris", undated, available at https://www.britannica.com/print/article/443621 (last accessed on 29 April 2019), **C-027**.

[44] United Nations, "World Population Prospects", 2015 Revision, 29 July 2015, p. 4, **C-028**.

[45] United Nations, "World Population Prospects", 2015 Revision, 29 July 2015, p. 4, **C-028**.

[46] African Development Bank Group, "Nigeria becomes largest economy in Africa with $509.9 billion GDP", 8 April 2014, available at https://www.afdb.org/en/news-and-events/nigeria-becomes-largest-economy-in-africa-with-509-9-billion-gdp-12981/ (last accessed on 25 April 2019), **C-029**; PwC, "The World in 2050, Will the shift in global economic power continue?", February 2015, p. 18, **C-030**; PwC, "Nigeria: Looking beyond Oil", March 2016, p. 6, **C-031**.

[47] PwC, "Nigeria: Looking beyond Oil", March 2016, p. 7, **C-031**.

[48] PwC, "Nigeria: Looking beyond Oil", March 2016, p. 8, **C-031**.

retail sector is growing rapidly, with consumer spending accounting for around 70% of GDP and Nigeria's young population (with 67% of its population below the age of 30) and growing middle class (representing around 30% of the population) driving an increase in the consumption of consumer goods.[49]

**C      The Fucheng Industrial Park was Established as a Model Area in the Zone**

**1.      Zhuhai Zhongfu, and later the Claimant, Acquired Extensive Rights under the Fucheng Industrial Park Agreement to Develop the Zone**

38.    Following the establishment of the Zone, Mr. Lefu Huang, the Chairman of Zhuhai Zhongfu and his son, Mr. Jeffrey Huang, were approached by a former supplier of cardboard boxes to Zhuhai Zhongfu, Mr. Hong. Mr. Hong was one of the first tenants in the Zone, having set up a packaging company called Hewang Packaging & Printing FZE ("**Hewang**") in 2009 with money borrowed from Mr. Jeffrey Huang.  Mr. Hong encouraged Zhuhai Zhongfu to invest in the Zone.[50]  Messrs. Huang were looking for the right opportunity to utilise their extensive knowledge, experience and capital to make an investment in a suitable country outside of China (as Zhuhai Zhongfu had a non-compete agreement with CVC for a period of five years in China).[51]  As Dr. Han explains, Messrs. Huang travelled to Nigeria to inspect the Zone.  On their return to China, they told Dr. Han that they saw huge potential to establish a bottling business in the Zone.[52]  As Dr. Han recalls from his conversations with Messrs. Huang concerning the Zone:

> *"They told me that there were only a small number of tenants in operation in the Zone at that time and very little infrastructure in place. They said that the Zone was located close to Lagos and that the roads in and around it and the relative lack of infrastructure reminded them of Zhuhai 30 years ago before the development of the SEZ changed the area. I recall them also telling me that labour costs in Nigeria were far lower than in China. Jeffrey said that, given Zhuhai Zhongfu's knowledge of the industry and its experience operating in SEZs, the establishment of a facility to sell PET bottles to such a large consumer base as Nigeria and across Africa offered a huge opportunity."*[53]

39.    In early 2010, the Zone was being managed and developed by OGFTZ Company. At that time, OGFTZ Company was a joint venture between: (i) CAI, which was a Chinese State-owned company developing and managing the Zone; (ii) CCNC Group Limited ("**CCNC**");

---

[49] PwC, "Nigeria: Looking beyond Oil", March 2016, pp. 23 and 25, **C-031**.

[50] Witness Statement of Jason Han, 30 April 2019, ¶ 28.

[51] Witness Statement of Jason Han, 30 April 2019, ¶ 27-28.

[52] Witness Statement of Jason Han, 30 April 2019, ¶ 30.

[53] Witness Statement of Jason Han, 30 April 2019, ¶ 30.

and (iii) the Ogun State Government.  Having decided to invest in the Zone, Zhuhai Zhongfu entered into discussions with representatives of CAI responsible for managing the Zone.[54] The General Manager of CAI, Mr. Felix Zhong, explained to Messrs. Huang that CAI no longer had sufficient funds to continue investing in the development of the Zone.[55] Consequently, Mr. Zhong proposed that, given Zhuhai Zhongfu's experience in successfully developing and managing SEZs in China, Zhuhai Zhongfu invest its own capital to develop the Zone with CAI.[56]  The proposal was for Zhuhai Zhongfu to provide capital, arrange for the construction of infrastructure and attract tenants to the Zone and for CAI to manage the coordination of administrative issues with Chinese and Nigerian government agencies.[57]

40.  Arising out of these discussions, on 29 June 2010, Zhuhai Zhongfu entered into the Fucheng Industrial Park Agreement with OGFTZ Company.[58] Under the Fucheng Industrial Park Agreement, Zhuhai Zhongfu acquired significant rights to develop the Zone.  The Zone is defined in the Fucheng Industrial Park Agreement as "*an area of 100km$^2$ free trade zone constructed and managed by* [OGFTZ Company], *which is located in the southwest of Ogun State, Nigeria.*"[59]

41.  The purpose of the Fucheng Industrial Park Agreement was to develop the Zone and, in particular, to attract Chinese and other international enterprises and investors, initially in a 224 hectares (2.24 km$^2$) model area in the Zone (the "**Fucheng Industrial Park**").[60]  The Fucheng Industrial Park Agreement also provided that Zhuhai Zhongfu would have "*the priority to invest in and develop other areas in* [the Zone] *under the same conditions*" as in the Fucheng Industrial Park Agreement.[61]  Below is a plan showing the initial model area in the Zone allocated to the Fucheng Industrial Park.

---

[54] Witness Statement of Jason Han, 30 April 2019, ¶ 31.

[55] Witness Statement of Jason Han, 30 April 2019, ¶ 31.

[56] Witness Statement of Jason Han, 30 April 2019, ¶ 32.

[57] Witness Statement of Jason Han, 30 April 2019, ¶ 32.

[58] Fucheng Industrial Park Agreement, **C-002**.

[59] Fucheng Industrial Park Agreement, Art. 1.1, **C-002**.

[60] Fucheng Industrial Park Agreement, Art. 1.1 (describing the Fucheng Industrial Park as the "*First Phase Initiation Area in* [the Zone]"), **C-002**; Witness Statement of Jason Han, 30 April 2019, ¶ 32.

[61]Fucheng Industrial Park Agreement, Art. 4.1.7, **C-002**.



*Figure 2: Plan of the model area of the Fucheng Industrial Park. Source: Fucheng Industrial Park Agreement.*[62]

42.     Under the terms of the Fucheng Industrial Park Agreement, Zhuhai Zhongfu was granted land use rights over the Fucheng Industrial Park for 97 years.[63]  Zhuhai Zhongfu had "*full right*" over the "*occupancy, use, proceeds and disposal*" of the land in the Fucheng Industrial Park.[64]  These rights enabled Zhuhai Zhongfu to transfer or lease its land use rights in the Fucheng Industrial Park to tenants who would invest in and establish businesses in the Zone.  In return for these land use rights, Zhuhai Zhongfu was to pay a "*Concession Fee*" of RMB 10 million to OGFTZ Company[65] (which could be offset by other expenses paid by Zhuhai Zhongfu)[66] and an additional "*Concession Fee*" if Zhuhai Zhongfu transferred its land use right in the Zone to a third party.[67] Zhuhai Zhongfu was entitled to retain all income from a "*Transfer Fee*" after the payment of the additional "*Concession Fee*" to OGFTZ Company.[68]

43.     In addition to the land use rights, Zhuhai Zhongfu was granted other rights under the Fucheng Industrial Park Agreement, which included:

---

[62] Enclosure 2 to Fucheng Industrial Park Agreement, 29 June 2010, **C-032**.

[63] Fucheng Industrial Park Agreement, Art. 2.6, **C-002**.

[64] Fucheng Industrial Park Agreement, Art. 2.6, **C-002**.

[65] Fucheng Industrial Park Agreement, Art. 3.1.1, **C-002**.

[66] Fucheng Industrial Park Agreement, Art. 3.2, **C-002**.

[67] Fucheng Industrial Park Agreement, Art. 3.1.2, **C-002**.

[68] Fucheng Industrial Park Agreement, Art. 3.1.2, **C-002**.

15

(a)     An entitlement to charge a "*Comprehensive Administration Fee*" to each enterprise operating in the Zone, equivalent to 3.75% of the enterprise's annual turnover.[69] Zhuhai Zhongfu was to pay 0.75% out of the 3.75% fee to the Nigerian Government, apply approximately 10% of the remaining 3% to management expenses incurred in the Fucheng Industrial Park and share the remaining approximately 2.7% equally between it and OGFTZ Company (the "**Administration Fee**").[70]

(b)     The exclusive right to undertake infrastructure construction in the Fucheng Industrial Park and the priority right to undertake infrastructure construction in all other parts of the Zone.[71]

(c)     Administrative rights over enterprises already established in the Fucheng Industrial Park pursuant to contracts or agreements reached by Zhuhai Zhongfu and those enterprises.[72]

(d)     The right (i) to have transferred to it by OGFTZ Company all contracts executed by OGFTZ Company and enterprises already operating in the Fucheng Industrial Park; and (ii) to the proceeds arising under those contracts in accordance with the Fucheng Industrial Park Agreement.[73]

44.     On 30 June 2010, Zhuhai Zhongfu and OGFTZ Company entered into a Supplementary Agreement to the Fucheng Industrial Park Agreement updating and clarifying particular terms in relation to the "*Concession Fee*" and "*Transfer Fee*" payable, as well as other terms including in relation to overdue payments.[74]

45.     On 10 October 2010, Zhuhai Zhongfu, OGFTZ Company and the Claimant agreed that Zhuhai Zhongfu's rights and obligations under the Fucheng Industrial Park Agreement were transferred to Zhuhai Zhongfu's subsidiary, the Claimant, which was established on 13 September 2010 for the investment in the Zone.[75]

46.     The Fucheng Industrial Park Agreement also provided that the "*actual operation and management organ of Fucheng Industrial Park shall be* [Zhuhai Zhongfu's] *wholly-owned subsidiary or a company under* [Zhuhai Zhongfu's] *control established in Nigeria with a*

---

[69] Fucheng Industrial Park Agreement, Arts. 3.3 and 4.1.1, **C-002**.

[70] Fucheng Industrial Park Agreement, Art. 4.1.1, **C-002**.

[71] Fucheng Industrial Park Agreement, Art. 4.1.3, **C-002**.

[72] Fucheng Industrial Park Agreement, Art. 4.1.6, **C-002**.

[73] Fucheng Industrial Park Agreement, Art. 6.1, **C-002**.

[74] Supplementary Agreement to Framework Agreement on Establishment of Fucheng Industrial Park in Ogun-Guangdong Free Trade Zone, 30 June 2010, Arts. 2, 3 and 4 (hereinafter "**Supplementary Agreement to the Fucheng Industrial Park Agreement**"), **C-033**.

[75] Supplementary Agreement (II) on Fucheng Industrial Park in Ogun-Guangdong Free Trade Zone, 10 October 2010 (hereinafter "**Supplementary Agreement (II) on Fucheng Industrial Park**"), **C-034**; Witness Statement of Jason Han, 30 April 2019, ¶ 36.

*registered office in Fucheng Industrial Park*."[76]  In accordance with this provision, on 10 October 2010, the Claimant registered Zhongfu Nigeria as a wholly-owned overseas subsidiary with the Chinese authorities.[77]  On 24 January 2011, Zhongfu Nigeria was registered by NEPZA in Nigeria as a Free Zone Enterprise within the Zone.[78]

47.   In consideration for the land use right under the Fucheng Industrial Park Agreement, as amended by the Supplementary Agreement to the Fucheng Industrial Park Agreement,[79] the Claimant paid the initial land use rights concession fee of RMB 10 million to OGFTZ Company in two instalments.[80]  These payments were recorded in a supplementary agreement to the Fucheng Industrial Park Agreement dated 13 April 2013 between the Claimant and OGFTZ Company (the "**Fucheng Industrial Park Fee Agreement**").[81] Under the Fucheng Industrial Park Fee Agreement, OGFTZ Company acknowledged and agreed that Zhuhai Zhongfu and the Claimant "*invested RMB 12,755,574.00 in kind and in cash in* [OGFTZ Company] *via* [Zhongfu Nigeria]."[82]

### 2.   The Claimant Made Significant Investments to Develop the Zone

48.   In reliance on the Fucheng Industrial Park Agreement, from mid-2010, the Claimant started to develop the Zone with OGFTZ Company and made significant investments in the Zone.[83]  Under the Fucheng Industrial Park Agreement, the responsibilities between the parties were clearly delineated.  OGFTZ Company was to play the "*leading role in the Administrative Affairs of Fucheng Industrial Park*" which referred to "*corresponding and coordination affairs with Chinese government and Nigerian government as well as their respective all level departments and the affairs related to industrial and commerce, custom, safety and security, firefighting and construction layout, environment protection, sanitation, visa management, public roads and facilities.*"[84]  The Claimant, primarily through its Nigerian subsidiary, Zhongfu Nigeria, was to "*play the leading role in the investment, construction, investment promotion and operation*" which involved the Claimant injecting

---

[76] Fucheng Industrial Park Agreement, Art. 2.2, **C-002**.

[77] Zhongfu International Investment (NIG) FZE, "Regulations", 10 October 2010, **C-003**; Zhongfu International Investment (NIG) FZE, "The Enterprise Overseas Investment Certificate", Registration No. 201005944, 13 October 2010, **C-004**; Zhongfu International Investment (NIG) FZE, "Overseas Enterprise Investment Certificate" No. 4400201100286, 6 September 2011, **C-005**.

[78] Zhongfu International Investment (NIG) FZE, "NEPZA Certificate of Registration", 24 January 2011, **C-035**.

[79] See Fucheng Industrial Park Agreement, Art. 3.1, **C-002**; and Supplementary Agreement to the Fucheng Industrial Park Agreement, Art. 2, **C-033**.

[80] See Receipt of Ogun-Guangdong Free Trade Zone for payment from Zhongshan Fucheng Industrial Investment Co., Ltd., 25 July 2011, **C-036**; and Supplementary Agreement of the Framework Agreement on Establishment of Fucheng Industrial Park in the Ogun-Guangdong Free Trade Zone, 13 April 2013, (hereinafter "**Fucheng Industrial Park Fee Agreement**"), **C-037**.

[81] Fucheng Industrial Park Fee Agreement, **C-037**.

[82] Fucheng Industrial Park Fee Agreement, **C-037**.

[83] Witness Statement of Jason Han, 30 April 2019, ¶ 41.

[84] Fucheng Industrial Park Agreement, Arts. 2.3 and 1.1, **C-002**.

the majority of capital in the project and being responsible for the commercial development of the Zone.[85]

49.    In late 2010, OGFTZ Company was facing pressure from the Nigerian Government to show that progress had been made in the Zone.[86]  The then recently elected president of Nigeria, Goodluck Jonathan, had arranged a visit to inspect the Zone.  OGFTZ Company did not have the funds to complete the planned works before President Jonathan's visit.  The Claimant and Zhuhai Zhongfu invested funds to cover the cost of works on a fence for part of the Zone and the construction of various buildings and a road through the Zone, as well as other expenses such as security uniforms and car hire.[87] President Jonathan's visit in November 2010 was a major event and validation of the Government of Nigeria's support for the Zone at the highest levels.  It was reported in the press at the time[88] and a picture of the visit is still on the Chinese Embassy in Nigeria's website today.[89]

50.    In early 2011, the Claimant started to implement procedures for the management and operation of the Zone. The procedures included engaging contractors to assist with the operation of the Zone, the collection of the land transfer fees from the tenants and the construction of planned infrastructure works.[90]

D    **The Claimant, through Zhongfu Nigeria, Took Over the Management of the Zone, First as Interim Manager and Later as Permanent Manager under a JVA with the Ogun State Government**

1.    **The Claimant, through Zhongfu Nigeria, took over the Full Management of the Zone as Interim Manager**

51.    In the latter part of 2011, it became public that one of CAI's shareholders, Guangdong Xinguang International Group Co., Ltd ("**GXI**"), was under investigation by the Chinese authorities.[91] GXI and its Board Chairman and General Manager, Mr. Wu Rijing, were accused of misconduct, including misappropriating public funds.  This led to Mr. Wu Rijing being arrested and brought before a Chinese court in October 2011.[92]

---

[85] Fucheng Industrial Park Agreement, Art. 2.3, **C-002**.

[86] Witness Statement of Jason Han, 30 April 2019, ¶ 42.

[87] Witness Statement of Jason Han, 30 April 2019, ¶ 42.

[88] Brand icon Image, "Ogun Dazzles Mr. President with Projects", 12 November 2010, available at https://www.brandiconimage.com/2010/11/ogun-dazzles-mr-president-with-projects.html (last accessed on 27 April 2019), **C-038**.

[89] Historic Pictures of China-Nigeria Relations, 13 November 2010, available at http://ng.china-embassy.org/eng/zngx/cne/t792194.htm (last accessed on 11 April 2019), **C-039**.

[90] Witness Statement of Jason Han, 30 April 2019, ¶ 43.

[91] Oriental Morning News, "A state-owned colossus in Guangdong fell down", 10 November 2011, **C-040**.

[92] Oriental Morning News, "A state-owned colossus in Guangdong fell down", 10 November 2011, **C-040**.

52.    On 28 November 2011, Mr. Taiwo Adeoluwa, the Secretary to the Ogun State Government, wrote to CAI and GXI in relation to concerns about the management of the Zone.[93] In his letter, Mr. Adeoluwa stated that: (i) CAI "*is facilitator only and neither owns any factory/business nor has any proprietary interests*" within the Zone; (ii) GXI did not have "*approval of the Provincial Government of Guangdong, China to invest or manage investments abroad*" and so its activities were illegal; (iii) GXI was "*now officially bankrupt*" and the government was "*worried about the legal capacity of an undischarged bankrupt to enter into a valid contract or to assume obligations*"; and (iv) GXI and its top officials were alleged to be involved in criminal activity and under investigation for fraud.[94]

53.    In early 2012, Mr. Jeffrey Huang had been informed that as a result of issues that had arisen concerning CAI in China and its management of the Zone, the Ogun State Government was considering closing the Zone, but that the Ogun State Government was also impressed with Zhongfu Nigeria's performance developing the Zone.[95] In order to preserve its investment in the Zone, the Claimant agreed with the Ogun State Government to take over the management of the Zone on an interim basis.[96] At the time, the Claimant had little choice but to take over the management of the Zone.[97] It had already invested a considerable amount of its money in the Zone. If the Claimant did not take over management at the time, it was likely that the Zone would fail and it would lose its entire investment.[98]

54.    On 15 March 2012, the Ogun State Government sent a letter to CAI terminating the joint venture agreement between the Ogun State Government, CAI and CCNC, and CAI's participation in OGFTZ Company on various grounds, including: CAI's loss of "*capacity to continue to hold shares in* [OGFTZ Company] *having been declared an undischarged*

---

[93] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to China Africa Investment Co., Ltd. and Guandong Xinguang International Group, 28 November 2011, **C-041**.

[94] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to China Africa Investment Co., Ltd. and Guandong Xinguang International Group, 28 November 2011, **C-041**.

[95] Witness Statement of Jason Han, 30 April 2019, ¶ 44.

[96] Witness Statement of Jason Han, 30 April 2019, ¶ 44.

[97] At that time, a number of tenants had been attracted to the Zone. See, e.g., Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLC-09001, 11 April 2009, **C-042**; Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-09001, 11 April 2009, **C-043**; Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-09001, 16 July 2009, **C-044**; Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-09010, 16 July 2009, **C-045**; Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-09007, 22 November 2009, **C-046**; Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLC-09007, 1 January 2010, **C-047**; Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-10001, 18 April 2010, **C-048**; Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLC-10002, 1 July 2010, **C-049**; Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-11002, 17 January 2011, **C-050**; Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-11003, 17 January 2011, **C-051**; Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-11006, 14 May 2011, **C-052**; Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-11008, 18 June 2011, **C-053**; Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-11008, 18 June 2011, **C-054**; Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-11014, 16 December 2011, **C-055**; Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-11014, 16 December 2011, **C-056**; Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-11015, 31 December 2011, **C-057**; and Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-11015, 31 December 2011, **C-058**.

[98] Witness Statement of Jason Han, 30 April 2019, ¶ 44.

19

*bankrupt*"; the illegality of CAI's activities due to it not having "*approval of the Provincial Government of Guangdong, China* [...] *to invest or manage investments or continue to do so abroad*"; and alleged fraudulent practices on the part of CAI.[99]

55.     Also on 15 March 2012, the Ogun State Government sent a letter to Zhongfu Nigeria appointing Zhongfu Nigeria as the "*interim Manager/Administrator*" of the Zone. The letter stated that the "*appointment, which takes effect immediately, shall be for an initial period of three (3) months, subject to a renewal thereof upon satisfactory performance.*"[100] The Ogun State Government also stated that it had the following specific expectations from Zhongfu Nigeria regarding the interim appointment:

    (a)     "*attracting sufficient businesses to the Zone to boost economic activities*"; and

    (b)     "*rejuvenating generally the Free Trade Zone to ensure the attainment of its lofty objectives.*"[101]

56.     On 10 April 2012, NEPZA sent a letter to CAI confirming the termination of CAI as the manager and operator of the Zone by the Ogun State Government.  NEPZA directed CAI to handover immediately all assets and documentation which belonged to OGFTZ Company to Zhongfu Nigeria, as the newly appointed manager of the Zone.[102]   On the following day, 11 April 2012, NEPZA sent a letter to Zhongfu Nigeria confirming its appointment as the manager and operator of the Zone.[103]

57.     Following the appointment of Zhongfu Nigeria by the Ogun State Government and confirmation by NEPZA, Zhongfu Nigeria became the manager of the Zone on an interim basis.  In line with its rights under the Fucheng Industrial Park Agreement, Zhongfu Nigeria continued to have responsibility for attracting investment, undertaking construction and operating the Zone.[104]

58.     When Zhongfu Nigeria took over as manager of the Zone, some basic infrastructure had been built - mostly by Zhuhai Zhongfu and the Claimant, such as, a road and a power generation unit.[105]  In order to accelerate the development of the Zone, the Claimant began

---

[99] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Guandong Xinguang International Group and China Africa Investment Ltd., 15 March 2012, **C-006**.

[100] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 15 March 2012, **C-007**.

[101] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 15 March 2012, **C-007**.

[102] Letter from NEPZA to China Africa Investment Ltd., 10 April 2012, **C-059**.

[103] Letter from NEPZA to Zhongfu Industrial Zone Management Co., 11 April 2012, **C-060**.

[104] Fucheng Industrial Park Agreement, Art. 2.3, **C-002**.

[105] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶ 3.

to hire experienced business professionals from China who had previously worked for or with Zhuhai Zhongfu or Zhongfu Enterprise.  The first to arrive in the Zone was Mr. Zhao.  Mr. Zhao had worked for Zhuhai Enterprise since 2006 as the HR Director for South West and North West China, having studied business administration and accounting and having worked in the audit department of the Governmental Organisation for Xianyang County, as well as a private beverage company.[106]

59.    Mr. Zhao was hired as the CFO of Zhongfu Nigeria and assistant to the Chairman.[107] He arrived in the Zone in around April 2012.  His main responsibilities were to manage the finances of Zhongfu Nigeria, administer the collection of fees from tenants and the payment of taxes and charges to government agencies, such as NEPZA and customs, and deal with accounting and human resource matters.[108]

60.    Later in 2012, Dr. Han and Mr. John Xue were hired by the Claimant to be the CEO and COO of Zhongfu Nigeria, respectively.  Their arrival completed the core management team of the Claimant in the Zone.  Dr. Han and Mr. Xue arrived in the Zone in October 2012.[109] Dr. Han had extensive operations and management experience developing businesses in free trade zones and in the fast-moving consumer goods industry.  He had worked for Zhongfu Enterprise for over 20 years on many strategic partnership with various major multinational companies, including Coca-Cola and Pepsi.[110]  He was previously Zhongfu Enterprise's Regional Manager and was responsible for the development and management of Zhongfu Enterprise's business in eastern, western and central regions of China, representing 75% of its total operations.[111]

61.    Mr. Xue was an experienced international business executive who had come out of retirement to help develop the Zone.  He gained a masters degree in international management from the American Graduate School of International Management, which is now the Thunderbird School of Global Management in the USA.  He spent many years working for Coca-Cola, Pepsi and Jack Daniels in China as a senior executive in various business, sales and marketing roles.[112]  In their roles for Zhongfu Nigeria, Dr. Han and Mr.

---

[106] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 1-2.

[107] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶ 2; see also Letter of Appointment of Mr. Zhao Wen Xiao as Chief Financial Officer and Board Secretary of Zhongfu International Investment (NIG) FZE, 1 April 2012, **C-061**.

[108] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶ 4.

[109] Witness Statement of Jason Han, 30 April 2019, ¶ 48; Witness Statement of John Xue, 29 April 2019, ¶ 11.

[110] Witness Statement of Jason Han, 30 April 2019, ¶¶ 10-25.

[111] Witness Statement of Jason Han, 30 April 2019, ¶ 24.

[112] Witness Statement of John Xue, 29 April 2019, ¶¶ 1-7.

Xue were jointly tasked with the day-to-day management of the Zone, its development and its promotion to attract investment into the Zone.[113]

62.   Following the arrival of Dr. Han, Mr. Xue, and Mr. Zhao (the "**Management Team**"), Zhongfu Nigeria set about professionalising the management of the Zone. This included:

(a)   Surveying the boundary of the area of the Zone;[114]

(b)   Implementing systems to collect and monitor the payment of customs duties, taxes and fees;[115]

(c)   Improving security in the Zone;[116]

(d)   Meeting with the Ogun State Government in January 2013 to discuss plans to develop the Zone, which included modelling the Zone on Shenzhen, China to develop it into a large city with industrial, commercial and residential areas;[117] and

(e)   The Claimant entered into an agreement for Zhongfu Nigeria to implement and perform the obligations of the Claimant under the Fucheng Industrial Park Agreement.[118]

63.   As Dr. Han states in his witness statement:

"*Given the success Zhongfu Enterprise had had in the development and management of industrial parks, we considered that we could adopt a similar approach to that which I had previously been involved with in China. Our plans for the Zone's development involved a number of phases:*

*a)   It was necessary to ensure the security of the Zone and implement appropriate policies and working procedures to facilitate the tenants' operations.*

*b)   We would concentrate initially on attracting tenants manufacturing fast-moving consumer goods, building materials and household products. John and I had contacts in the fast-moving consumer goods sector as a result of our previous careers in the sector. We identified these sectors as we wanted to encourage tenants involved in low cost but labour-intensive industries that would create jobs in the Zone and the*

---

[113] Witness Statement of Jason Han, 30 April 2019, ¶ 49; Witness Statement of John Xue, 29 April 2019, ¶ 13.

[114] Witness Statement of Jason Han, 30 April 2019, ¶ 50; Witness Statement of John Xue, 29 April 2019, ¶ 12.

[115] Witness Statement of Jason Han, 30 April 2019, ¶ 52.

[116] Witness Statement of Jason Han, 30 April 2019, ¶ 53(a).

[117] Witness Statement of Jason Han, 30 April 2019, ¶ 55; Witness Statement of John Xue, 29 April 2019, ¶ 15.

[118] Agreement between Zhongshan Fucheng Industry Investment Co., Ltd. and Zhongfu International Investment (NIG) FZE, 15 January 2013, Art. 1, **C-062**.

> *local community. We would then seek to attract tenants involved in the electrical goods, pharmaceuticals and hi-tech products sectors.*
>
> c) *As the Zone was still in its early stages, tenants would be charged a lower land transfer fee. As more tenants entered the Zone and its infrastructure became more developed, we would be able to charge higher land transfer fees due to the increase in land values.*
>
> d) *The Zone would, over time, be redeveloped with the intention of turning it into a sustainable urban development, with industrial, commercial and residential areas.*"[119]

64.   In respect of the meeting with the Ogun State Government on 16 January 2013, Mr. Xue recalls:

> "*During this meeting, we explained that, using the Shenzhen SEZ as an example, we intended to develop the Zone so that it would transform Igbesa, where the Zone was situated, from a small town of 30,000 into a large city encompassing industrial, commercial and residential areas. We received a positive response from the Ogun State Governor who encouraged us to proceed with this plan. While I thought, at the time, that modeling the Zone on Shenzhen was ambitious given the rapid development of Shenzhen over the last 30 years, I could see very clear parallels. Igbesa felt very much like Shenzhen 30 to 40 years ago. For example, Shenzhen was just across the harbour from Hong Kong, which was a developed economic centre with a large consumer population, busy international airport and shipping port. Igbesa had some of the same fundamentals as Shenzhen, being close to Lagos international airport and Apapa shipping port. It was also just over the Ogun River from the city of Lagos - it was not hard to see the potential of this large and developing consumer market.*"[120]

65.   In addition to improving the administration and operation of the Zone, the Management Team implemented plans to increase investment in the Zone and generate greater revenue. Zhongfu Nigeria promoted the Zone in China in order to attract new tenants. These efforts quickly proved successful and the activity and development in the Zone increased significantly.[121]

66.   Zhongfu Nigeria had three sources of income. These were: (i) land lease transfer fees, which were upfront fees from tenants to lease out an area of the Zone;[122] (ii) land rental

---

[119] Witness Statement of Jason Han, 30 April 2019, ¶ 53.

[120] Witness Statement of John Xue, 29 April 2019, ¶ 15.

[121] Witness Statement of John Xue, 29 April 2019, ¶ 23-24.

[122] See e.g., Goodwill Ceramic FZE ("**Goodwill Ceramic**") entered into four land lease agreements for the purposes of constructing ceramic production facilities. The first agreement was in the name of Wang Kang Investment Co. Limited dated 16 December 2011 for a period of 94 years for an area of 120,000 m² of land and for an upfront transfer fee. The rental area under this agreement was later increased to 140,404.24 m², see Excel table, "Statistical table of Goodwill Ceramic", undated, **C-063**; Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-11014, 16 December 2011, **C-055**; Agreement Regarding the Long-Term Lease Contract of the Ogun-Guangdong Free Trade Zone Supplemental Agreement, 19 November 2014, **C-064**. Other agreements were

fees, which were fees from tenants who rented out warehouse space in what was called the "incubator" area of the Zone, either on a monthly or an annual basis; and (iii) a portion of the Administration Fee.[123] As Mr. Zhao explains, long-term tenants in the Zone typically entered into a land lease, for which they would pay an upfront transfer fee, and a separate investment agreement, the latter of which entitled Zhonghu Nigeria and OGFTZ Company to receive the Administration Fee.[124]

67.     While Zhongfu Nigeria was interim manager, the investments it brought into the Zone included, amongst others: (i) Far East Steel and Consumable Industry FZE (steel piping);[125] (ii) Green Power Utility (Ogun-Guangdong Free Trade Zone) FZE (power plant operator);[126] (iii) Unitech Industry FZE (vehicles) via Shandong Yanmei Kaida Environmental Protection Machinery Co., Ltd.;[127] (iv) Vindax Industries FZE (furniture) via Mr. Wang Jingdong;[128] and (v) Discovery International FZE (furniture) via Mr. Cai Ming.[129] The total area of land leased to new tenants during the period that Zhongfu Nigeria was the interim manager of the Zone encompassed over 59,000m$^2$. These land leases generated over US\$6.8 million in land transfer fees over the lease terms. The new tenants were to invest a total of US\$15 million with expected total turnover to reach over US\$13.9 million per year once their manufacturing facilities were operational.

### 2.     Zhongfu Nigeria Entered into the JVA with the Ogun State Government to Take Over the Full Management of the Zone Permanently and Become the Majority Shareholder in OGFTZ Company

68.     Following Zhongfu Nigeria's successful performance as interim manager / administrator of the Zone - having satisfied the Ogun State Government's specific expectations of "*attracting sufficient businesses to the Zone to boost economic activities*" and "*rejuvenating*

---

entered into in the name of Goodwill Ceramic, see Land Lease Agreement No. LLLL-15001, 2 January 2015, **C-065**; and Land Lease Agreement No. LLLC-15006, 5 September 2015, **C-066**.

[123] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶ 6.

[124] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 7 and 11.

[125] Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-12001, 21 March 2012, **C-067**; Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-12001, 21 March 2012, **C-068**; Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-13002, 16 May 2013, **C-069**.

[126] Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-2012-002, 12 April 2012, **C-070**; Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-2012-002, 12 April 2012, **C-071**.

[127] Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-12003, 14 July 2012, **C-072**; Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-12003, 14 July 2012, **C-073**.

[128] Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-12003, 21 July 2012, **C-074**; Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-12003, 21 July 2012, **C-075**.

[129] Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-13008, 17 August 2013, **C-076**; Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-13008, 17 August 2013, **C-077**.

*generally the Free Trade Zone to ensure the attainment of its lofty objectives*"[130] - on 28 September 2013, the Ogun State Government, Zhongfu Nigeria, and Zenith Global Merchant Limited ("**Zenith**") entered into the JVA for the development, management, and operation of the Zone.[131]  The Managing Director and CEO of Zenith was Mr. Abbey Onas, who also became the chief coordinator of the Zone for the Ogun State Government.

69.     The JVA provided that the Ogun State Government would partner with Zhongfu Nigeria to develop the Zone into a "*multi-purposes industrial area for industries of* [sic.] *including but not limited to, residential houses, recreation, ceramic processing, furniture processing, hardware, household appliances, construction material processing.*"[132]  The JVA acknowledged that CAI's participation in the Zone had been terminated a year and half earlier on 15 March 2012.[133] It explained that Zhongfu Nigeria "*ha*[d] *been appointed as the new manager of the* [*Zone*]" and "*has invested in the infrastructure of the* [*Zone*]*, and has proved its expertise to partner in the development, operation, management and administration of a free trade Zone.*"[134]

70.     The JVA provided that the concession period for the exclusive management of the 10,000 hectares (100 km$^2$) of the Zone was 99 years from the date on which the Zone land was transferred to OGFTZ Company and a Certificate of Occupancy over the first phase land was issued to OGFTZ Company.[135]  This was in line with the rights for 97 years which the Claimant had under the Fucheng Industrial Park Agreement to the "*occupancy, use, proceeds and disposal*" of the land in the Zone.[136]

71.     The JVA recorded that the shareholding of OGFTZ Company was "*adjusted to reflect the new parties*" with Zhongfu Nigeria grated a 60% stake in OGFTZ Company.[137]

72.     The Ogun State Government also represented and warranted to Zhongfu Nigeria and Zenith that:

---

[130] See Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) Ltd., 15 March 2012, **C-007**.

[131] JVA, **C-008**.

[132] JVA, p. 3, **C-008**.

[133] JVA, p. 3, **C-008**.

[134] JVA, p. 3, **C-008**.

[135] JVA, p. 4, **C-008**.

[136] Fucheng Industrial Park Agreement, Art. 2.6, **C-002**.

[137] JVA, clauses 2.1 - 2.2, **C-008**.

(a) the Ogun State Government was the "*legal and beneficial owner of the* [10,000 hectare] *Zone Land*";[138]

(b) the Ogun State Government had "*the right to transfer the Zone Land to OGFTZ* [Company] *free from any encumbrance under provisions of this Agreement*";[139]

(c) "*the Zone Land* [was] *unencumbered and free from any adverse claim*";[140]

(d) the Ogun State Government had "*the authority to enter into and perform* [the JVA]" and the provisions were "*legal and valid against* [the Ogun State Government] *and constitute*[d] *its obligations binding and enforceable against it*";[141]

(e) the Ogun State Government would "*strictly observe the provision of the bilateral agreements/treaties entered into by and between the Government of the People's Republic of China and the Government of Federal Republic of Nigeria*" and "*provide adequate protection to the investment of the Consortium* [Zhongfu Nigeria and Zenith]" in OGFTZ Company and the Zone;[142] and

(f) the Ogun State Government would not, within the term of the JVA, in its own capacity or on behalf of the Federal Government of Nigeria, "*appropriate or nationalize for public purpose the Zone Land and/or any construction or structure thereon*".[143]  In the event of an expropriation for public purposes by the Federal Government or another Government agency, Zhongfu Nigeria was to be compensated for the value of the property expropriated plus the expected profits until the expiration of the 99-year term of the JVA.[144]

73. Other terms of the JVA included the following:

(a) The Ogun State Government was to deliver "*unencumbered possession of the Zone Land in phases*" to OGFTZ Company and to "*adopt special policies or administrative measures to ensure*" that OGFTZ Company, Zhongfu Nigeria, and the Zone were "*not affected by any abnormal interference*";[145] and

---

[138] JVA, clause 15.1, **C-008**.

[139] JVA, clause 15.1, **C-008**.

[140] JVA, clause 15.1, **C-008**.

[141] JVA, clause 15.1, **C-008**.

[142] JVA, clause 15.1, **C-008**.

[143] JVA, clause 15.6, **C-008**.

[144] JVA, clause 15.6, **C-008**.

[145] JVA, clause 6.1, **C-008**.

(b)  The Ogun State agreed to indemnify OGFTZ Company against "*all costs, claims, demands, losses, damages and expenses*" resulting from the adverse effect on the economic benefits to OGFTZ Company, Zhongfu Nigeria and Zenith of "*any new laws, rules or regulations of any relevant authority within* [the Ogun State Government] *or the amendment or interpretation of any existing laws, rules or regulations of such relevant authority*" after the date of the JVA.[146]

74.  On entering the JVA, the Claimant became entitled to a further income stream, in addition to the three revenue sources it had under the Fucheng Industrial Park Agreement.[147]  As the 60% shareholder of OGFTZ Company under the JVA, Zhongfu Nigeria became entitled to 60% of OGFTZ Company's portion of the Administration Fee as well as OGFTZ Company's proportion of the income from the land transfer fees, both as reflected in the Fucheng Industrial Park Agreement.[148]

75.  In reliance on the specific commitments embodied in the JVA, together with the subsisting rights under the Fucheng Industrial Park Agreement, the Claimant continued to invest in Zhongfu Nigeria and the Zone in order to develop the Zone.[149] At the start of 2014, the Management Team focused on promoting the Zone to potential tenants in China and attracting investment.[150]  The economic potential of the Zone - taking into account its presence in Nigeria and in the ECOWAS region, as well as its particular proximity to Lagos and the fact that it was professionally managed by a private company - was quickly recognised by foreign investors.  As a result, the number of tenants entering into land lease agreements and investment agreements to establish businesses in the Zone quickly increased during the course of 2014. At the same time, established tenants in the Zone started to see their investments generate significant income.  This resulted in an increase in revenue for customs duties and taxes received by the Nigerian Government.[151]  Zhongfu Nigeria recorded a 2014 year-end profit of NGN 227,075,000 (US$1,232,510).[152]

76.  The promotional efforts of the Management Team in China contributed to a number of new tenants moving to the Zone in 2014 to manufacture various fast-moving consumer goods,

---

[146] JVA, clause 15.2, **C-008**.

[147] See ¶ 66.

[148] See Fucheng Industrial Park Agreement, Arts. 3.1 and 4.1, **C-002**.

[149] In respect of tenants entering the Zone after Zhongfu Nigeria had been appointed after the JVA and prior to 2014, see e.g. Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-13009, 22 October 2013, **C-078**; Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-13009, 22 October 2013, **C-079**.

[150] Witness Statement of John Xue, 29 April 2019, ¶ 23; see also Ogun-Guangdong Free Trade Zone Brochure, undated, **C-080**.

[151] See Ships & Ports, "Customs generates N161m at Ogun FTZ in 2014", 9 February 2015, available at http://shipsandports.com.ng/2015/02/09/customs-generates-n161m-at-ogun-ftz-in-2014/ (last accessed on 11 April 2019), **C-081**.

[152] Zhongfu International Investment (NIG) FZE Auditors' Report and Financial Statements for the Year Ended December 31, 2015, 23 September 2016, **C-082**.

household products and industrial equipment, including: Pearlcoin (Ogun) FZE (hair attachments) via Dongguan Golden Speed Hair Product Co., Ltd;[153] Hua Tai Industry FZE (mosquito nets) via Mr. Fu Xiaoer;[154] CFC Towers FZE (power grid towers) via Qingdao Qiangli Steel Structure Co., Ltd;[155] One Percent Industry FZE (cleaning mops and products) via Ningbo Yinzhou Ocean Meeting Imp & Exp Co. Ltd;[156] First Battery Industry FZE (car batteries) via Shanghai Upworld Industrial Co. Ltd;[157] and Zhuotang Industry FZE (roofing material) via Taizhou Jijui Trading Co., Ltd.[158]

77.   On 23 April 2014, Mr. Onas wrote to the Ogun State Government to provide an update on progress made in the Zone and an issue that had arisen.  Around that time, an entity called NSG had been holding itself out to tenants as having an interest in OGFTZ Company derived from CAI and purporting to act as the manager and administrator of the Zone, despite CAI's rights having been terminated in March 2012.[159]  In Mr. Onas' letter, he said, *inter alia*, that:

(a)   "*I am very pleased to inform you that there has been an immeasurable amount of progress recorded so far under the supervision and management of the new investors,* [Zhongfu Nigeria].  *As we speak, there are currently about thirty-six (36) Chinese enterprises in the zone and more investors are still interested in coming in the nearest future while the existing ones are looking to expand their businesses.*"

(b)   "*I can also confirm that the revenue currently generated from the zone has sky-rocketed by over 50% increase compared to what it used to be in the past when irregularities such as smuggling and tax evasion were quite prominent. The* [NEPZA] *and Nigeria Customs agencies are also on ground at the zone to confirm these claims.*"

(c)   "*Apparently, the more we have an influx of investors, the higher the revenue of the Federal Government and stakeholders, particularly the Ogun State government in*

---

[153] Lease Agreement of Land and Standard Factory Building No. LLLC-14001, 17 June 2014, **C-083**; Investment and Service Agreement No. IA-14001, 17 June 2014, **C-084**.

[154] Land Lease Agreement No. LLLC-14002, 21 June 2014, **C-085**; Investment and Service Agreement No. IA-14002, 21 June 2014, **C-086**.

[155] Land Lease Agreement No. LLLC-14003, 10 July 2014, **C-087**; Investment and Service Agreement No. IA-14003, 10 July 2014, **C-088**.

[156] Lease Agreement of Land and Standard Factory Building No. LLLC-14005, 10 October 2014, **C-089**; Investment and Service Agreement No. IA-14005, 10 October 2014, **C-090**.

[157] Lease Agreement of Land and Standard Factory Building No. LLLC-14006, 16 October 2014, **C-091**; Investment and Service Agreement No. IA-14006, 16 October 2014, **C-092**.

[158] Lease Agreement of Warehouse and Standard Factory Building No. LLLC-14009, 20 December 2014, **C-093**.

[159] Witness Statement of Jason Han, 30 April 2019, ¶ 60; Witness Statement of John Xue, 29 April 2019, ¶ 18.

terms of creation of employment opportunities for its people and generation of income and revenue which will undoubtedly boost its profit margin."

(d)   "However, there is a vital issue that needs to be looked into… concerning [CAI] and its claims to retake possession of the [Zone]. The report reaching me is that [CAI]… has been creating an air of confusion and chaos among the current investors in the [Zone]."

(e)   "[CAI had] misled the current investors in the [Zone] informing them that they have sold their rights to new [sic.] Chinese Company 'New South Group'…"

(f)   "On the part of the co-ordinator company, I have had to call several meetings with the existing investors, disapproving all the misconceptions of the new company and dissuading them from getting involved in any way with the new company; and that [Zhongfu Nigeria] is the only genuine and approved investor in charge of the management of the [Zone].[160]

78.   Mr. Onas requested that Ogun State Government, inter alia: (i) "[i]ntervene in the issue… to clear the confusion off [sic.] the air between the investors"; (ii) "[w]rite [to] all the current investors at the [Zone], correcting them on these misleading claims and disapproving the contradicting claims of the "New South Group" who are posing as new owners"; and (iii) "[f]ormally acknowledge [Zhongfu Nigeria] as the only Chinese investor authorised with approval to be in charge of the management of the affairs of the [Zone]."[161]

79.   On 29 April 2014, Zhongfu Nigeria received two letters, both dated 28 April 2014, confirming that CAI's participation in OGFTZ Company had been terminated in March 2012 and Zhongfu Nigeria was the sole manager of the Zone.   The first letter, entitled "Termination of [CAI]'s Participation in [the Zone]," was from the lawyers for OGFTZ Company, M.A. Banire & Associates, and requested Zhongfu Nigeria to disregard any communications from CAI as "they have no authority or approval of the [Ogun State Government] to act or do anything in respect of the said Free Trade Zone."   The letter referred to CAI's interest in OGFTZ Company having been "long terminated… through a letter dated March 15, 2012 written by the Secretary to the State Government of Ogun State…"[162]

80.   The second letter to Zhongfu Nigeria on 28 April 2014 was from the Ogun State Government directly. In that letter, the Ogun State Government referred to the situation,

---

[160] Letter from Zenith Global Merchant Ltd. to Office of the Secretary to the State Government, Ogun State, 23 April 2014, **C-094**.

[161] Letter from Zenith Global Merchant Ltd. to Office of the Secretary to the State Government, Ogun State, 23 April 2014, **C-094**.

[162] Letter from M.A. Banire & Associates to Zhongfu International Investment (NIG) FZE, 28 April 2014, **C-095**.

where CAI "*continued to parade itself as the authentic Manager/Administrator of the Zone.*"[163]  The Ogun State Government wrote that:

> "*It is pertinent to note that the appointment of* [CAI] *has been terminated since 15th March, 2012.*
>
> *It must be stressed that Ogun Guangdong State did not at any time sell any portion of the* [Zone] *to* [CAI].  *Further, the State Government has no dealing whosoever* [sic.] *with 'The New South Group', either.  Consequently,* [Zhongfu Nigeria] *is enjoined* [sic.] *to be pro-active in the Management/Administration of* [the Zone] *by promptly warding off activities of trespassers capable of causing confusion in the Zone.*"[164]

81.   On 29 April 2014, Mr. Onas, as co-ordinator of the Zone, also wrote to Zhongfu Nigeria about the "*on-going propagandas and rumours that is* [sic.] *being spread across the* [Zone] *in relation to the claims of* [CAI] *to take possession of the management of the* [Zone]."[165] Mr. Onas referred to a letter from the Ogun State Government to CAI dated 15 March 2012 by which its participation in OGFTZ Company was terminated, and advised that it is in Zhongfu Nigeria's "*best interests to disregard any information indicating that* [CAI] *is intending to re-take possession of the* [Zone] *management or had sold its rights in any form to a new company called 'New South Group'.*"[166] Mr. Onas implored "*all investors and stakeholders to please take note of this development which took effect since year 2012 and to avoid any form of contact with the previous managers or their associates as whoever attempts to do so is at their own risk.*"[167]  Mr. Onas concluded the letter by stating:

> "*And finally, we should ensure that we all work as a team for the best interest of our country, our team as well as our investment and I can assure you that the Ogun State government is willing to continually give its maximum support so far as we comply with the rules, regulations and contract binding on the parties.*"[168]

82.   On 9 May 2014, the NEPZA representative in the Zone was forwarded the letters from the Ogun State Government, M.A. Banire & Associates and Zenith.[169] In reliance on its rights under the JVA and the Fucheng Industrial Park Agreement and reassured by the express reiteration and confirmation by the Ogun State Government that Zhongfu Nigeria was the

---

[163] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG), 28 April 2014, **C-096**.

[164] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG), 28 April 2014, **C-096**.

[165] Letter from Zenith Global Merchant Ltd. to Zhongfu International Investment (NIG) FZE, 29 April 2014, p. 1, **C-097**.

[166] Letter from Zenith Global Merchant Ltd. to Zhongfu International Investment (NIG) FZE, 29 April 2014, p. 1, **C-097**.

[167] Letter from Zenith Global Merchant Ltd. to Zhongfu International Investment (NIG) FZE, 29 April 2014, p. 1, **C-097**.

[168] Letter from Zenith Global Merchant Ltd to Zhongfu International Investment (NIG) FZE, 29 April 2014, p. 2, **C-097**.

[169] Letter from Zhongfu International Investment (NIG) FZE to NEPZA Representative, 9 May 2014, **C-098**.

manager / administrator of the Zone and that Zhongfu Nigeria's rights would be preserved, the Claimant and Zhongfu Nigeria continued to develop the Zone and secure the investment of other enterprises into the Zone.[170]

### 3. Zhongfu Nigeria's Successful Management of the Zone was Widely Recognised and Praised by the Nigerian Government and Internationally

83.    Zhongfu Nigeria made a success of the Zone by attracting new tenants and developing the Zone effectively. The Zone was so successful that it garnered international recognition as a model for foreign direct investment in Africa.[171]

84.    Throughout 2014, 2015 and early 2016, Zhongfu Nigeria continued to invest in and develop the Zone and attract new tenants.[172] This involved, amongst other matters, constructing more roads and drainage,[173] arranging for power lines to be built, building around $21,000m^2$ of warehouses for "incubator" space and purchasing five new cars to use in connection to the Zone.[174]  During this period, Zhongfu Nigeria also arranged for key service providers to provide amenities to tenants in the Zone.  This included arranging for the opening of a bank by "First Bank", a supermarket, a larger electrical supplier to increase capacity in the Zone, an increase in gas supply from "Shell" and the installation of a mobile phone tower in the Zone.[175]  The Zone was becoming a thriving industrial and commercial precinct.

---

[170] Witness Statement of John Xue, 29 April 2019, ¶ 22.

[171] Witness Statement of John Xue, 29 April 2019, ¶¶ 29-33.

[172] See e.g., footnotes 153 to 158 above and Land Lease Agreement No. LLLC-15004, 13 August 2015, **C-099**; Investment and Service Agreement No. IA-15004, 13 August 2015, **C-100**; Lease Agreement of Land and Standard Factory Building No. LLLC-15006, 3 October 2013, **C-101**; Investment and Service Agreement No. IA-15006, 3 October 2013, **C-102**; Land Lease Agreement No. LLLC-15007, 21 October 2015, **C-103**; Land Lease Agreement No. LLLC-16002, 26 January 2016, **C-104**; Investment and Service Agreement No. IA-16002, 26 January 2016, **C-105**; Land Lease Agreement No. LLLC-16002, 10 March 2016, **C-106**.

[173] See Photo of road, drainage and power lines in Zone, undated, **C-107**.

[174] See Photos of Incubator Warehouses, undated, **C-108**; Warehouse Construction Project Report, 22 December 2013, **C-109**; Proforma Invoices from Eastern Harbour International Ltd. to Zhongfu International Investment (NIG) FZE, 6 January 2016, 10 January 2016, 30 March 2016, **C-110**; Commercial Invoice from Ghassan Aboud Cars Dubai, UAE, to Zhongfu International Investment (NIG) FZE, 3 January 2015, **C-111**; Sale Invoices from Lafarge Cement WAPCO Nigeria PLC to Zhongfu International Investment (NIG) FZE, 23-24 April 2015, **C-112**; Invoices from CNC Engineering Co., Ltd. to Zhongfu International Investment (NIG) FZE, 3 February - 3 June 2015, **C-113**; Invoices from Sinotrust International Investment Ltd. to Zhongfu International Investment (NIG) FZE, 14 February - 29 July 2015, **C-114**; and Invoice from Unicontinental International to Zhongfu International Investment (NIG) FZE, 24 March 2015, **C-115**; Cash Credit Invoices and Receipts from Bertola Machine Tool Ltd. to Ogun-Guangdong Free Trade Zone, 20 January and 26 January 2015, **C-116**; Invoice and Delivery Note from Fouani Nigeria Ltd. to Zhongfu International Investment (NIG) FZE, 27 January and 30 January 2015, **C-117**; and Quotations from CFAO Equipment to Zhongfu International Investment (NIG) FZE, 26 January 2015, **C-118**; Construction Materials and Equipment for Hospital Projects Commission Purchasing Contract, 8 October 2015, **C-119**; Construction Materials and Equipment for Hotels and Accommodation Office Areas Commission Purchasing Contract, 8 October 2015, **C-120**.

[175] Witness Statement of Jason Han, 30 April 2019, ¶¶ 69 and 71.

JA-201



*Figure 3: Photo of the Zone, April 2016. Source: Economist Intelligence Unit*

85.     As a result of Zhongfu Nigeria's work in developing the Zone, it managed to double the tax revenues generated by the Zone from 2013 to 2014 to NGN 161 million.[176]  Following a tour of the Zone in early February 2015, the Assistant Comptroller of the Nigerian Customs Service was reported saying he was "*impressed with the level of activities in the* [Zone]" and that Zhongfu Nigeria "*should 'be given a pat on the back' for a job well done.*"[177]

86.     By February 2015, there were over 4,000 workers engaged by 15 companies that were operational in the Zone, with a further 25 located there that were in the process of construction.[178] For the year ending 31 December 2015, Zhongfu Nigeria more than doubled its profits from the year before to NGN 620,940,000 (US$3,123,328).[179]  This was an increase of 128% from profits earned by Zhongfu Nigeria in the year ending 31 October 2014.[180]  OGFTZ's revenue for the year ending 31 December 2015 was also substantial, bringing in NGN 607,824,000 (US$3,057,354).[181] By the end of July 2016, the total tenants

---

[176]   Ships & Ports, "Customs generates N161m at Ogun FTZ in 2014", 9 February 2015, available at http://shipsandports.com.ng/2015/02/09/customs-generates-n161m-at-ogun-ftz-in-2014/ (last accessed on 11 April 2019), **C-081**.

[177]   Ships & Ports, "Customs generates N161m at Ogun FTZ in 2014", 9 February 2015, available at http://shipsandports.com.ng/2015/02/09/customs-generates-n161m-at-ogun-ftz-in-2014/ (last accessed on 11 April 2019), **C-081**.

[178]   Ships & Ports, "Customs generates N161m at Ogun FTZ in 2014", 9 February 2015, available at http://shipsandports.com.ng/2015/02/09/customs-generates-n161m-at-ogun-ftz-in-2014/ (last accessed on 11 April 2019), **C-081**.

[179]   Zhongfu International Investment (NIG) FZE Auditors' Report and Financial Statements for the Year Ended December 31, 2015, 23 September 2016, **C-082**.

[180]   See FTI Report, ¶ [5.25.

[181]   Ogun-Guangdong Free Trade Zone Company Auditors' Report on Special Purpose for the Year Ended December 31, 2015, 23 September 2016, **C-121**.

in the Zone had risen to 37, with 4,500 Nigerian workers and 220 Chinese workers employed within the Zone.[182]

87.     Zhongfu Nigeria also attracted high-profile businesses to make very significant investments in the Zone, including China Glass[183] and Xi'an Ogun Construction and Development Ltd. Company ("**Xi'an Company**").  On 30 April 2015 China Glass, through its subsidiary CNG (Nigeria) Investment Ltd., signed a land lease agreement with OGFTZ Company to lease 272,000 m$^2$ to build a float glass and solar control coated glass production line, together with an Investment and Service Agreement with Zhongfu Nigeria.[184]  China Glass, is one of the largest float glass manufacturers in China and is listed on the Hong Kong stock exchange.[185]  Its decision to invest in the Zone represented a vote of confidence in the management and trajectory of the Zone and would play an important role in encouraging further Chinese investment.[186]  The investment by China Glass was planned to be US$78,000,000 and its expected turnover per year was US$100,000,000.[187] This investment alone was expected to generate approximately US$1,350,000 per year in income for Zhongfu Nigeria under the Fucheng Industrial Park Agreement and another US$810,000 per year for Zhongfu Nigeria though its 60% shareholding in OGFTZ Company under the JVA.

88.     Zhongfu Nigeria also procured a major agreement with the Xi'an Industrial Delegation to invest US$1 billion over 10 years to establish the Pharmaceutical Park.  On 20 January 2016, a memorandum of understanding was signed between OGFTZ Company and the Xi'an Industrial Delegation (the "**MOU**").[188] Under the terms of the MOU, in addition to the investment in the Zone, the Xi'an Company was "*willing to build roads and bridges over Ogun River to connect* [the Zone] *and Ogun State with Lagos State*" and "*build a harbor*

---

[182] Excel table, "Operational tenants in Zone in 2016", undated, **C-122**.

[183] See China Glass Holding Ltd., "About Us", available at http://www.chinaglassholdings.com/en/about.aspx (last accessed on 18 April 2019), **C-123**.

[184] Land Lease Agreement No. LLLC-15002, 30 April 2015, **C-124**; Feasibility Report of CNG Glass (Nigeria) FZE, 23 July 2015, **C-125**; Investment and Service Agreement No. IA-15002, 30 April 2015, **C-126**. See e.g., under the Land Lease Agreement No. LLLC-15002, 30 April 2015, **C-124**.China Glass Holding Ltd. was to pay an upfront land transfer fee of US$3,264,000. By September 2015, China Glass Holding Ltd. transferred US$1,161,265 to Zhongfu International Investment (NIG) FZE, see Payment Receipt from Zhongfu International Investment (NIG) FZE to China Glass Holding Ltd., 8 May 2015, (in the amount of US$161,290), **C-127**; and Payment Receipt from Zhongfu International Investment (NIG) FZE to CNG Glass, 8 September 2015, (in the amount of US$999,975), **C-128**.

[185] See China Glass Holding Ltd., "About Us", 18 April 2019, available at http://www.chinaglassholdings.com/en/about.aspx (last accessed on 18 April 2019), **C-123**.

[186] Witness Statement of Jason Han, 30 April 2019, ¶ 86; Witness Statement of John Xue, 29 April 2019, ¶ 27.

[187] CNG (Nigeria) Investment Limited, "Application for Registration as an Enterprise in Ogun-Guangdong Free Trade Zone", 23 July 2015, **C-129**; Feasibility Report of CNG Glass (Nigeria) FZE, 23 July 2015, **C-125**.

[188] Memorandum of Understanding between Xi'an Industrial Delegation and Ogun-Guangdong Free Trade Zone on Establishment of Hi-Tech Park in the Zone, 20 January 2016 (hereinafter "**MOU**"; **C-130**; List of Delegation Personnel from Shaanxi to Visiting Nigeria in January 2016, January 2016, **C-131**; Framework Agreement on Establishment of Xi'an Industrial Park in Nigeria Ogun-Guangdong Free Trade Zone, 20 April 2016 (hereinafter "**Xi'an Industrial Park Agreement**"), **C-132**.

*port in Ogun State to develop the goods and materials transfer.*"[189]  As an indication of the importance of this deal for the economic development of Nigeria, the President of Nigeria, Muhammadu Buhari, attended a ceremony in Beijing, at the China-Nigeria Forum on Production Capacity and Investment Cooperation on 12 April 2016 (the "**China-Nigeria Forum**"), at which there was the signing of a strategic cooperation agreement to construct the Pharmaceutical Park.[190]  To expedite the implementation of the project, the following week, on 20 April 2016, a Framework Agreement on Establishment of Xi'an Industrial Park in Nigeria Ogun-Guangdong Free Trade Zone was entered into between the Xi'an Company and OGFTZ Company.[191]

89.    As Mr. Xue explains:

> "*Attracting the investment from the Xi'an Delegation, as well as from China Glass, gave us confidence that the Zone was going to be very successful. With these investments, we had the sense that we had reached a tipping point for the exponential growth and success of the Zone.*"[192]

90.    The Claimant and Zhongfu Nigeria thus developed the Zone effectively and profitably to widespread acclaim.  The strong growth attracted positive international recognition.  Mr. Xue was invited to international conferences to speak about the success of the Zone.[193] In January 2016, students from Johns Hopkins University visited the Zone to study its success as a model for foreign direct investment in Africa.[194] In April 2016, the Economist Intelligence Unit produced a video on the Zone and its success, citing Mr. Xue, Nigerian State representatives, World Bank economists and international development academics.[195]  A link the video is below:

---

[189] MOU, p. 5, **C-130**; P Adepoju, "China is building $1 billion pharmaceutical park in Southwestern Nigeria", *Innovation Village*, 14 March 2016, available at https://innovation-village.com/china-building-1-billion-pharmaceutical-facilities-southwestern-nigeria/ (last accessed on 28 April 2019), **C-133**.

[190] Photo of signing of Memorandum of Understanding between Xi'an Industrial Delegation and Ogun-Guangdong Free Trade Zone on Establishment of Hi-Tech Park in the Zone at the China-Nigeria Forum on Production Capacity and Investment Cooperation, 12 April 2014, the individuals in the photograph are: standing from left to right: (i) an officer from Nigerian Investment Promotion Commission, (ii) Dr. Sina Agboluaje, former Chief Executive Officer of NEPZA, (iii) Mr. Hongbing Ran, Deputy Chief of Xian City Development and Reform Commission, (iv) Mr. John Xue, (v) Mr. Shaoyan Fan, Director of Urban Planning Institute, (vi) Mr. Abbey Onas, (vii) Mr. Geng Xu, Chairman of Shaanxi Bang Sheng Pharmaceutical Co., Ltd., (viii) Mr. N.C. Chan, Chairman of Silk Road Investment Center, Sitting from left to right: (ix) Mr. Jason Han, and (x) Mr. Jianxin Li, Vice President of Shaanxi Pharmaceutical Group, **C-134**; ChinaGoAbroad, "China-Nigeria Forum on Production Capacity and Investment Cooperation Convenes", 12 April 2016, available at http://www.chinagoabroad.com/en/member_update/china-nigeria-forum-on-production-capacity-and-investment-cooperation-convenes (last accessed on 23 April 2019), **C-135**; A Adeogun, "Buhari's China visit yields multi-billion dollar investment for Nigeria", *New Mail Nigeria*, 15 April 2016, available at https://newmail-ng.com/buharis-china-visit-yields-multi-billion-dollar-investment-for-nigeria/ (last accessed on 23 April 2019), **C-136**; Xi'an Industrial Park Agreement, pp. 1-2, **C-132**.

[191] Xi'an Industrial Park Agreement, **C-132**.

[192] Witness Statement of John Xue, 29 April 2019, ¶ 27.

[193] Witness Statement of John Xue, 29 April 2019, ¶ 31.

[194] Witness Statement of John Xue, 29 April 2019, ¶ 30.

[195] Economist Intelligence Unit Video, available at http://growthcrossings.economist.com/video/zones-of-influence/ (last accessed on 11 April 2019), **C-009**; Transcript of the Economist Intelligence Video, 21 April 2016, **C-010**.



91.     In parallel to attracting significant tenants to the Zone, the Claimant was also working on plans to accelerate the infrastructure development of the Zone by raising external capital. As part of these efforts, the Claimant started working with Prof. Issa Baluch and Mr. Jon Vandenheuvel of First Hectares.  Mr. Xue was introduced to Prof. Baluch when he was invited to present at the Harvard African Development Conference, held at Harvard University on 3-4 April 2015.  At this conference Mr. Xue was a speaker on a panel chaired by Prof. Baluch.  Prof. Baluch is one of the world's leading experts on free trade zones,[196] having played an integral and longstanding role in assisting the Dubai Government to develop the Jebel Ali Free Trade Zone in Dubai.[197]  The Jebel Ali Free Trade Zone is now one of the most prominent and successful Free Trade Zones in the world.[198]  Prof. Baluch went on to found the largest (by turnover) "sea-air" freight logistics provider in the Middle East, "Swift", which operated in a number of free trade zones in the UAE.[199]  At its peak, Swift had a network of offices and agents in 19 countries in Africa, six in the Middle East, 13 in Asia, 18 in Europe and two in North America.[200]  In Nigeria alone, Swift had approximately five offices and 250 distribution centres servicing the country.[201]

---

[196] Witness Statement of Jon Vandenheuvel, 29 April 2019, ¶ 7. Prof. Baluch is also a consultant advising the Ports, Customs and Free Zone Corporation (a Government of Dubai cooperation) having originally been involved in creating the sea-air combined transport business that operates in the United Arab Emirates. See Letter from DP World re: Issa Baluch, 4 April 2018, **C-137**.

[197] Witness Statement of Issa Baluch, 29 April 2019, ¶¶ 9 and 12; see also Letter from Government of Dubai re: Issa Baluch, 25 October 1989, **C-138**; Letter from Government of Dubai, Department of Civil Aviation re United Nations Procurement & Logistics Base in Dubai, 20 May 2001, **C-139**; Letter from Government of Dubai, Department of Civil Aviation re: Issa Baluch, 9 July 2002, **C-140**; and Letter from Dubai Port, Customs and Fee Zone Corporation re: Issa Baluch, 31 January 2005, **C-141**.

[198] See Jebel Ali Free Zone, "About us", available at http://jafza.ae/about-us/ (last accessed on 16 April 2019), **C-142**; see also ZAWYA, "Jafza generates over $83bln in trade in 2017", 15 May 2018, available at https://www.zawya.com/mena/en/press-releases/story/Jafza_generates_over_83bln_in_trade_in_2017-ZAWYA20180515083723/ (last accessed on 16 April 2019), **C-143**.

[199] Witness Statement of Issa Baluch, 29 April 2019, ¶ 3; see also Air Cargo News, "IATA's top cargo agents in the Middle East and Africa", 10 November 2005, **C-144**.

[200] Witness Statement of Issa Baluch, 29 April 2019, ¶ 3; See also Swift Freight International Brochure, 22 October 1999, **C-145**.

[201] Witness Statement of Issa Baluch, 29 April 2019, ¶ 3. The Swift business relied on the use of "multi-modal transport" which is where there is a carriage of goods by at least two different modes of transport on the basis of a multimodal transport contract from a place in one country to a place in a different country, See United Nations Conference on a Convention on International Multimodal Transport,

35

92.     As Prof. Baluch explains in his witness statement, when he heard about the rights Zhongfu Nigeria had to develop the 10,000 hectare Zone which was about 30km from both the Lagos International Airport and the Apapa Port / Lagos Port Complex, he immediately saw the enormous potential of the Zone.  As Prof. Baluch notes, "[t]*he proximity of the Zone to air and sea ports meant that the Zone could expand the distribution model for the whole* [ECOWAS] *region.*"[202] In respect of the future prospect of the Zone, Prof. Baluch states that:

> "*After spending more time with John and working with Zhongfu Nigeria, I became even more convinced on the very significant value and potential of the Zone and project. Based on what John told me about characteristics of the 10,000 hectare (100 km$^2$) Zone and the right to develop it for over 90-years, I considered that the project was worth in the billions of US Dollars. Based on my experience and network, I thought the value add offerings that Zhongfu Nigeria could develop in the Zone, together with professional management by a private company, were excellent. This set the project far apart from all the other free zones I was aware of in Africa.*"[203]

93.     Prof. Baluch's enthusiasm for the project and the tremendous potential he saw in the Zone led him to become a consultant to OGFTZ Company, together with his business partner, Mr. Jon Vandenheuvel.  Through First Hectares, Prof. Baluch and Mr. Vandenheuvel were formally engaged on 1 April 2016 to "*provide services to advance investment design, promotion and mobilization for the* [Zone]."[204]

94.     The success of the Zone spurred further development plans and a program to raise external finance to accelerate the growth of the Zone.  The Management Team, advised by First Hectares, began to develop strategic plans to turn the Zone into a significant industrial, commercial and residential city.[205]   As part of these plans, preparations were started to list Zhongfu Nigeria, or another entity created for that purpose, on the Nigerian Stock Exchange (the "**NSE**").  Positive discussions were held with a number of banks, leading to the drafting of a mandate letter with United Capital, part of the UBA.[206]  Following

---

Vol I 1981, UN Doc No. TD/MT/CONF/17, **C-146**. In 2008 Prof. Baluch sold the Swift Group to Barloworld Limited, a South African Logistics company which is listed on the Johannesburg Stock Exchange (JSE: BAW), see SENS Archive, "BAW/BAWP - Barloworld Limited - Barloworld Logistics announces significant international acquisitions in US$70 transaction", 13 March 2008, available at http://www.profile.co.za/sens.asp?id=117190 (last accessed on 16 April 2019), **C-147**; and Issa Baluch, "Swift Freight Confirms Acquisition by Barloworld", 26 March 2008, available at http://issabaluch.com/swift-freight-confirms-acquisition-by-barloworld/ (last accessed on 16 April 2019), **C-148**.

[202] Witness Statement of Issa Baluch, 29 April 2019, ¶ 20.

[203] Witness Statement of Issa Baluch, 29 April 2019, ¶ 23.

[204] Letter from First Hectares Capital to the Ogun-Guangdong Free Trade Zone, 30 March 2016, **C-149**.

[205] See Memorandum on Development Plan from  First Hectares Capital to Ogun-Guangdong Free Trade Zone, 13 July 2016, **C-150**; Presentation of the Southwest Nigeria Research & Infrastructure Corporation, undated, **C-151.**

[206] See Email from Elizabeth Uwaifo to Oluwatoyin Sanni and John Xue, 17 July 2016, **C-152**; Draft Letter from Zhongfu International Investment (NIG) FZE to United Capital PLC, 17 July 2016, **C-153**.

Zhongfu Nigeria's forcible removal from the Zone (as to which, see further below), these discussions had to be suspended and eventually abandoned.[207]

95.    Separately, Dr. Han and Mr. Xue, together with First Hectares, began meeting with international development banks and financial institutions to seek to raise capital to finance the rapid expansion of the Zone.[208]   This involved meeting with representatives from Chinese Development Bank and the World Bank in Beijing as well as meetings with various banks in the USA and research institutions, such as Johns Hopkins University (where representatives from World Bank and Brookings Institution were also present), Harvard University and MIT.[209] The progress made with these institutions also had to be abandoned following Zhongfu Nigeria's forcible expulsion from the Zone.[210]

### E    The Respondent Took Over the Claimant's Investment Without Compensation and Forced Zhongfu Nigeria out of Nigeria

96.    Despite the Claimant's and Zhongfu Nigeria's rights under the Fucheng Industrial Park Agreement, JVA and the locally and internationally recognised success of Zhongfu Nigeria's management of the Zone, in the Spring of 2016 the Ogun State Government adopted draconian measures to evict Zhongfu Nigeria from the Zone, took over the Claimant's investment and forced the Management Team of Zhongfu Nigeria to flee Nigeria in fear of their personal safety.

97.    On 12 April 2016, the Ogun State Government wrote a letter to Zhongfu Nigeria, entitled "*Replacement of shareholdings owner of China Africa Investment Limited and management rights of Ogun- Guangdong Free Trade Zone*",[211] stating that:

> "*the Government of the People's Republic of China, through the Economic and Commercial Section of the Consulate of the People's Republic of China in Lagos has notified that the State owned Assets Supervision and Administration Commission of Guangdong Province, China has directed that Ogun State Government be notified of the transfer of Shareholding interests of China Africa Investment in the OGFTZ to the New South Group. As a result of this development, the Consulate is requesting that the Management Rights over the Zone be given to the new share owners.*"[212]

---

[207] Witness Statement of John Xue, 29 April 2019, ¶¶ 37 and 45.

[208] Witness Statement of Jason Han, 30 April 2019, ¶ 75; Witness Statement of John Xue, 29 April 2019, ¶ 37.

[209] Witness Statement of John Xue, 29 April 2019, ¶ 40.

[210] Witness Statement of John Xue, 29 April 2019, ¶ 45; Witness Statement of Jon Vandenheuvel, 29 April 2019, ¶ 22; Letter from First Hectares to Radix Legal & Consulting, 25 October 2016, **C-154**.

[211] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Managing Director of Ogun-Guangdong Free Trade Zone, 12 April 2016, **C-155**.

[212] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Managing Director of Ogun-Guangdong Free Trade Zone, 12 April 2016, **C-155**.

98.     In its letter, the Ogun State Government also bizarrely demanded "*proof that your company,* [Zhongfu Nigeria] *is legitimately entitled to the shares and management rights over the Zone,*"[213] and claimed that it had been "*persuaded by the argument of the Consulate that the problem Ogun State had with China Africa was as regards management rights and practices, not, shareholding.*"[214]   The Ogun State Government further wrote that:

> "*if the claims of New South Group be* [sic.] *substantiated, the implication will be that the MOU and agreement between the Ogun State Government and Zhongfu was premised upon misrepresentation and concealment of facts, and, therefore cannot be allowed to stand.*"[215]

99.     The Ogun State Government did not explain to what it was referring when it alleged that there might have been a "*misrepresentation and concealment of facts*".   Nevertheless, it demanded a response to the letter of the Chinese Consulate (which it did not provide to Zhongfu Nigeria) saying that "[o]*therwise, we shall have no choice but to accede to the request of the Consulate and replace the management of the OGFTZ.*"[216]

100.    The letter of the Ogun State Government dated 12 April 2016 was an apparent reaction to a letter sent on 11 March 2016, by the Chinese Consulate in Lagos to the Ogun State Government ("**Note 1601**"), which was not received by the Claimant until 27 May 2016.   In Note 1601, the Chinese Consulate wrote:

> "*We have been officially notified by State-owned Assets Supervision and Administration Commission of Guangdong Province, China about the replacement of shareholdings owner of China Africa Investment Limited from Guangdong Xinguang International Group to Guangdong New South Group. The shift of shareholdings will legally lead to the replacement of the management rights of the OGFTZ, which is now in the hand* [sic.] *of Zhuhai Zhongfu Group, to Guangdong New South Group.*"[217]

101.    It is telling that Note 1601 contained no allegations of wrongdoing or impropriety against the Claimant or Zhongfu Nigeria, notwithstanding this characterisation of Note 1601 by the Ogun State Government.   Nor did Note 1601 mention misrepresentation or concealment of facts. It also did not mention the JVA, which granted Zhongfu Nigeria full management rights over the Zone, or make reference to the Fucheng Industrial Park Agreement, which

---

[213] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Managing Director of Ogun-Guangdong Free Trade Zone, 12 April 2016, **C-155**.

[214] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Managing Director of Ogun-Guangdong Free Trade Zone, 12 April 2016, **C-155**.

[215] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Managing Director of Ogun-Guangdong Free Trade Zone, 12 April 2016, **C-155**.

[216] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Managing Director of Ogun-Guangdong Free Trade Zone, 12 April 2016, **C-0155**.

[217] Note 1601 from the Economic and Commercial Section of the Consulate General of the People's Republic of China in Lagos to the Ogun State Government, 11 March 2016, **C-156**.

granted the Claimant separate and independent rights in the Zone, including land use rights and the right to a share of Administration Fees.

102. At the time Zhongfu Nigeria received the Ogun State Government's letter of 12 April 2016, Dr. Han and Mr. Xue were travelling in the USA following their attendance at the China-Nigeria Forum.[218]  Dr. Han and Mr. Xue were informed about the Ogun State Government's letter by Zhongfu Nigeria staff shortly after its receipt.[219]  As Dr. Han and Mr. Xue explain in their witness statements, they initially did not give too much weight to the Ogun State Government's letter and NSG's efforts to again try to take over the Zone.[220]  Zhongfu Nigeria had received categorical assurances from the Ogun State Government in 2014 that Zhongfu Nigeria was the rightful manager / administrator of the Zone and was advised to "*disregard any communication by any person purporting to claim through* [CAI] *as they have no authority or approval of the Ogun State Government to act or do anything in respect of the* [Zone]."[221]

103. Dr. Han and Mr. Xue were travelling in the USA to meet with a number of potential investors in the Zone and research institutions to identify opportunities to develop the Zone.[222]  Before Dr. Han and Mr. Xue returned to Nigeria, on 26 May 2016, Zhongfu Nigeria replied to the Ogun State Government's letter requesting a meeting with the Secretary to the Ogun State Government in order to clarify Zhongfu Nigeria's "*legitimate right*" in relation to the Zone.[223]

104. Instead of responding to this meeting invitation to discuss Zhongfu Nigeria's rights, the following day, on 27 May 2016, the Ogun State Government dramatically sent a purported notice of termination of the JVA (the "**Notice of Termination**") enclosing also Note 1601.[224]  In this Notice of Termination, the Ogun State Government made a number of unproven and erroneous allegations based on evident mischaracterisations of Note 1601.  In particular, the Ogun State Government claimed that Zhongfu Nigeria was "*alleged to have fraudulently converted State assets of the Guangdong Province*" and "*misled Ogun State*

---

[218] Witness Statement of Jason Han, 30 April 2019, ¶ 97; Witness Statement of John Xue, 29 April 2019, ¶ 40.

[219] Witness Statement of John Xue, 29 April 2019, ¶ 38.

[220] Witness Statement of Jason Han, 30 April 2019, ¶ 97; Witness Statement of John Xue, 29 April 2019, ¶ 39.

[221] Witness Statement of Jason Han, 30 April 2019, ¶ 97; Witness Statement of John Xue, 29 April 2019, ¶ 39; Letter from M.A. Banire & Associates to Zhongfu International Investment (NIG) FZE, 28 April 2014, **C-095**, see also Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG), 28 April 2014, **C-096**.

[222] Witness Statement of Jason Han, 30 April 2019, ¶ 95; Witness Statement of John Xue, 29 April 2019, ¶ 40.

[223] Letter from Zhongfu International Investment (NIG) FZE to Secretary to the State Government of Ogun State, 26 May 2016, **C-157**.

[224] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 27 May 2016, **C-158**; Note 1601 from the Economic and Commercial Section of the Consulate General of the People's Republic of China in Lagos to the Ogun State Government, 11 March 2016, **C-156**.

thereby."[225] "*Coming directly from the Government of the People's Republic of China vide Diplomatic Note 1601, and, in the absence of new facts*" the Ogun State Government said it was "*obliged to accept the facts as presented by the Chinese government and act accordingly.*"[226]  These extraordinary allegations were not explained, nor supported with any evidence.

105.   The Ogun State Government referred to the "*weighty and criminal nature of the allegations*" against Zhongfu Nigeria in the "*said request*" from the Chinese Consulate.  Yet, Note 1601 contained no allegations of that or any type against Zhongfu Nigeria.  Indeed, Note 1601 made no comment at all on the actions of Zhongfu Nigeria, the Claimant or Zhuhai Zhongfu.[227]   Notwithstanding these blatant mischaracterisations, the Ogun State Government purported to terminate the JVA on 27 May 2016 under clauses 15.7 and 18.1.[228]

106.   This purported termination made no sense and was wrongful on a number of grounds, including, but not limited to, the following:

(a)   The Ogun State Government's allegations and purported basis for terminating the JVA were neither substantiated nor evidenced;

(b)   Note 1601 made no comment on Zhongfu Nigeria's actions and did not contain any reference to "*criminal allegations*" or "*fraudulent conversion*" as alleged by Ogun State;

(c)   Zhongfu Nigeria's interest in OGFTZ Company under the JVA was unconnected to CAI's previous interest or shareholding, which had been terminated on 15 March 2012 by the Ogun State Government Indeed, in the JVA itself, Ogun State Government specifically referenced that the termination of CAI's joint venture agreement had taken place on 15 March 2012.[229] This was over one and a half years before the execution of the JVA on 28 September 2013 and more than 4 years before the Notice of Termination; and

(d)   The Ogun State Government's Notice of Termination failed even to comply with clause 18.1 of the JVA to which it referred and which provided for a period of 60 days

---

[225] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 27 May 2016, **C-158**.

[226] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 27 May 2016, **C-158**.

[227] Note 1601 from the Economic and Commercial Section of the Consulate General of the People's Republic of China in Lagos to the Ogun State Government, 11 March 2016, **C-156**.

[228] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 27 May 2016, **C-158**.

[229] JVA, p. 3, **C-008**.

to remedy any alleged material breach.   The Ogun State Government's letter threatening to "*accede to the request of the Consulate and replace the management of the OGFTZ*" had been sent on 18 April 2016, yet the Ogun State Government purported to terminate the JVA on 27 May 2016, far less than 60 days later and remarkably only one day after Zhongfu Nigeria had requested a meeting to "*clarify* [its] *legitimate right.*"[230]  It was clear that the Ogun State Government had no interest in hearing Zhongfu Nigeria clarify its legitimate rights, or to accord it due process. The Ogun State Government had evidently predetermined its course of action against Zhongfu Nigeria.

107.   Moreover, and importantly, the Ogun State Government rode roughshod over Zhongfu Nigeria's rights in the Zone pursuant to the Fucheng Industrial Park Agreement.  These rights were distinct from and pre-dated the JVA by almost three years.

108.   As Mr. Xue states in his witness statement:

"*Jason and I were shocked by the response of the Secretary to the Ogun State Government and by the false allegations contained in the letter that Zhongfu Nigeria had "*fraudulently converted State assets of the Guangdong Province*" and "*misled Ogun State.*" Note 1601 made no reference to any fraud or misrepresentation as alleged in the letter from the Secretary to the Ogun State Government. I was not sure how we should take this purported termination because it was so clearly based on false accusations and a misreading of Note 1601. I thought that there must be a misunderstanding and which could still be resolved. We had helped make the Zone so successful and had been given repeated assurances; I could not believe we would be evicted from the Zone.* "[231]

109.   Following the Ogun State Government's misrepresentations and its extraordinary purported termination of the JVA, Nigeria mounted a campaign to threaten, harass, intimidate and evict Zhongfu Nigeria from the Zone (including the area of the Fucheng Industrial Park) utilising multiple State organs, including the police, NEPZA and officials from the Ogun State Government.

110.   On 14 June 2016, the lawyer for OGFTZ Company, Dr. Banire, wrote to the Ogun State Government stating that Zhongfu Nigeria maintained legitimate rights to the Zone and urging restraint by the Ogun State Government.[232]  In Dr. Banire's letter, he stated:

---

[230] Letter from Zhongfu International Investment (NIG) FZE to Secretary to the State Government of Ogun State, 26 May 2016, **C-157**.

[231] Witness Statement of John Xue, 29 April 2019, ¶ 42.

[232] Letter from M.A. Banire to the Secretary to the Ogun State Government, 14 June 2016, **C-159**; See also Email from Jason Han to Muiz Banire, Abbey Onas, John Xue and others, 9 June 2016, **C-160**.

(a)     The issue on which the termination was based first arose in 2014 and a response was communicated at that time to the Ogun State Government which had "*laid to rest that issue.*"

(b)     The "*participation and management rights of* [CAI] *in respect of the* [Zone] *was effectively terminated via* [the Ogun State Government's] *letter of 15th March, 2012, with serial number C.491/124.*"

(c)     Zhongfu Nigeria was "*subsequently appointed the management company of the* [Zone] *and consequently, a Joint Venture Agreement was signed with* [the Ogun State Government] *and* [Zenith] *for the development, management and operation of the* [Zone]".[233]

111.    Rumours of the Ogun State Government's purported termination of the JVA started to spread and on 16 June 2016, OGFTZ Company received a letter from Xi'an Company enquiring about the potential change in the management of the Zone.[234]  In its letter Xi'an Company stated:

> "*We are very deeply impressed by the excellent service and highly effective working spirit of the* [OGFTZ Company].  *And we decided accordingly to set up the Xi'an industrial park.  We now have been* [sic.] *completed the company setting up and capital raising and we are moving forward to the preparation of foreign investment submitting and review.  Recently we heard that there is a possibility that the right of administration of the* [OGFTZ Company] *would be changed and we are very concerned about that.*"[235]

112.    On 16 July 2016, the Secretary to the Ogun State Government issued a direct threat to Dr. Han of Zhongfu Nigeria, warning him that he should "*leave peacefully when there is* [an] *opportunity to do so, and avoid forceful removal, complications and possible prosecution.*"[236]

113.    Recalling his reaction to the message from the Secretary to the Ogun State Government, Dr. Han states:

---

[233]Letter from M. A. Banire & Associates to Secretary to the Ogun State Government, 14 June 2016, **C-159**.

[234] Letter from Xi'an Ogun Construction and Development Ltd. Liability Co., to Ogun-Guangdong FTZ Management Company, 16 June 2016, **C-161**.

[235] Letter from Xi'an Ogun Construction and Development Ltd Liability Co., to Ogun-Guangdong FTZ Management Company, 16 June 2016, **C-161**.

[236] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**; Email from Jason Han to Elizabeth Uwaifo, 25 September 2016, **C-012**.

> "*I was very scared by this outright threat to me and concerned about the need to protect not only Zhongfu Nigeria's rights under the JVA, but also Zhongshan's rights under the Fucheng Industrial Park Agreement.*"[237]

114.    On 18 July 2016, Dr. Han, on behalf of Zhongfu Nigeria, visited the Economic and Commercial Section of the Lagos Consulate General of the People's Republic of China in relation to the issues in the Zone.[238]   He explained the background to the matter, the tremendous progress Zhongfu Nigeria had made in the Zone and sought assistance to rectify the situation. As Dr. Han explains in his witness statement:

> "[Mr. Xu of the Chinese Consulate in Lagos] *stated that they had a received a letter from the State-owned Assets Supervision and Administration Commission of Guangdong Province, but that they were not aware that Zhongshan had rights in relation to the Zone.  He suggested that Zhongshan should approach the Ogun State Government to sort out the issue.*"[239]

115.    On 19 July 2016, Dr. Han was informed by a NEPZA representative in the Zone, Mr. Wilfred Odega, that the Ogun State Government would use security personnel to get Zhongfu Nigeria out of the Zone if he did not leave peacefully.[240]   Dr. Han told the NEPZA representative that if Zhongfu Nigeria "*had many assets in the Zone and that if the Ogun State Government wanted to take them they would have to pay for them.*"[241] The NEPZA representative responded that "*it was too late and that they would give Zhongfu Nigeria nothing. He told me that I should just leave.*"[242]

116.    Around this time, Dr. Han received a telephone call from Mr. Onas telling him that if he did not hand over peacefully, the Secretary to the Ogun State Government would send immigration to seize Dr. Han's passport and the Department of State Services would put him in jail while Zhongfu Nigeria would be forcibly removed from the Zone.[243]   Mr. Onas also told Dr. Han about a handover meeting that was to take place in the coming days.[244] As Dr. Han states in his witness statement:

> "*The repeated threats that I was receiving including about my physical safety and the possibility of being forcibly removed from the Zone made me deeply concerned about what would happen if I stayed in the Zone any*

---

[237] Witness Statement of Jason Han, 30 April 2019, ¶ 106.

[238] See Letter from Zhongfu International Investment (NIG) FZE to the Consulate General of the People's Republic of China, 20 July 2016, **C-162**.

[239] Witness Statement of Jason Han, 30 April 2019, ¶ 107.

[240] Witness Statement of Jason Han, 30 April 2019, ¶ 108.

[241] Witness Statement of Jason Han, 30 April 2019, ¶ 108.

[242] Witness Statement of Jason Han, 30 April 2019, ¶ 108.

[243] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**; Witness Statement of Jason Han, 30 April 2019, ¶ 109.

[244] Witness Statement of Jason Han, 30 April 2019, ¶ 109; Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶ 16.

*longer. John was, at that time, overseas at a conference in the Seychelles. I explained to Areak what had happened and how I was concerned for our safety. I also spoke to Ms. Uwaifo by phone; she told us that we had to get out of the Zone immediately.*

*Areak and I left the Zone in separate vehicles on 20 July 2016 to go to the Oriental Hotel in Lagos, an international hotel that Zhongfu Nigeria employees would use when they were staying in Lagos. In order to seek to carry on Zhongfu Nigeria's business activities, we set up a makeshift office in Areak's hotel room. We would keep in contact with Zhongfu Nigeria employees, who would update us on what had been happening in the Zone.*"[245]

117.   On 21 July 2016, NEPZA and the Ogun State Government, in conjunction with Zenith and its Chairman, Mr. Onas, as chief coordinator for OGFTZ Company, convened a meeting in the Zone to announce that Zhongfu Nigeria's appointment had been terminated and that new management had been appointed.[246]   The same day, the Ogun State Government directed that a handover ceremony would take place for the Zone management the next day, on 22 July 2016.[247]

118.   On 22 July 2016, the handover ceremony was held in the Zone.[248]   Mr. Onas arrived at the Zone with policemen.   He ordered staff of Zhongfu Nigeria to give him access to Zhongfu Nigeria's offices and refused to allow certain staff to leave the premises in a vehicle belonging to Zhongfu Nigeria.[249]   People in the Zone felt "*terrorised and fearful.*"[250]

119.   On 22 July 2016, a NEPZA representative in the Zone, Mr. Odega, wrote to Zone Security stating:

*"Please recall yesterday* [sic.] *meeting of Ogun State Representative with all enterprises,* [Zhongfu Nigeria]*, all government agencies and NEPZA where the representative of the Governor of Ogun State Mr. Abbey Onas brought to our notice the termination of* [Zhongfu Nigeria] *as the managers of the zone and appointment of Guangdong New South as new managers.*"[251]

---

[245] Witness Statement of Jason Han, 30 April 2019, ¶¶ 110-111.

[246] Letter from NEPZA to All Free Zone Enterprises (OGFTZ), 21 July 2016, **C-163**; Letter from Ogun-Guangdong Free Trade Zone Co-Ordinator, Zenith Global Merchant Ltd. to Zhongfu International Investment (NIG) FZE, 21 July 2016, **C-164**. On 18 July 2016, a letter from Ogun-Guangdong Free Trade Zone had also been sent regarding this meeting. See Letter from Ogun-Guangdong Free Trade Zone Co-ordinator, Zenith Global Merchant Ltd. to Zhongfu International Investment (NIG) FZE, 18 July 2016, **C-165**.

[247] Letter from NEPZA to All Free Zone Enterprises (OGFTZ), 21 July 2016, **C-163**; Letter from Ogun-Guangdong Free Trade Zone Co-ordinator, Zenith Global Merchant Ltd. to Zhongfu International Investment (NIG) FZE, 21 July 2016, **C-164**.

[248] Witness Statement of Jason Han, 30 April 2019, ¶ 114; Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶ 16.

[249] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**.

[250] Witness Statement of Jason Han, 30 April 2019, ¶ 114; Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**.

[251] Letter from NEPZA to O/C, Zone Security, Ogun-Guangdong FTZ, 22 July 2016, **C-166**.

JA-214

120. Following the threats to Zhongfu Nigeria's Management Team and employees, Zhongfu Nigeria's lawyer in Nigeria, Prof. Gbolahan Elias SAN, wrote to NEPZA requesting it to "*restore the status quo, prevent the bullying, oppressive and menacing tactics*" of the Ogun State Government and Mr. Onas.[252]   NEPZA had a statutory duty to supervise and coordinate the various public and private sector organisations operating within the Zone and to resolve disputes.[253]   However, instead of seeking to maintain the status quo while the situation was resolved, NEPZA wrote to the Nigeria Immigration Service asking it to collect official immigration papers (known as CERPAC) from Zhongfu Nigeria's staff.[254]

121. In the midst of this maelstrom of attacks on Zhongfu Nigeria, approaches were made on behalf of the Management Team to the Governor of Ogun State, Ibikunle Amosun,[255] and the Chinese Consul General, Mr. Cao Xiaoliang,[256] to seek to resolve the situation and restore Zhongfu Nigeria's legitimate rights.

122. However, instead of the hoped for improvement, the situation for Zhongfu Nigeria, its Management Team and its staff deteriorated even further.   On 4 August 2016, unbeknownst to Zhongfu Nigeria, the Nigerian authorities issued warrants (referring to allegations of "*criminal breach of trust*" in relation to a civil claim by a former contractor of Zhongfu Nigeria, Mr. Junxiong Wang) for the arrest of both Dr. Han and Mr. Zhao.[257]

123. At around midnight on 17 August 2016, Mr. Zhao was arrested by armed policemen from the Nigerian police.[258]   As Mr. Zhao explains, he was forcibly taken in his underwear to a police station with a gun pointed at him in Lagos.[259]   He was held outside in the cold and rain and had his flip flops taken from him.[260]   He was not told why he had been arrested, nor offered food or water for many hours.[261]   Mr. Zhao was later flown to Abuja by an armed

---

[252] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**.

[253] NEPZA Act, Art. 4(d), **C-025**.

[254] Letter from NEPZA to the Nigeria Immigration Service, 27 July 2016, **C-167**.

[255] Letter from Radix Legal & Consulting to Office of the Governor of Ogun State, 25 July 2016, **C-168**.

[256] Letter from Zhongfu International Investment (NIG) FZE to Lagos Consulate General of the People's Republic of China, 25 July 2016, **C-169**. Zhongfu Nigeria sought the Consul General's "*immediate intervention in preventing the continued infliction of intimidation, terror and oppression…and the ongoing expropriation of our* [Zhongfu Nigeria] *investment*". On 3 August 2016, Mr. Han and Mr. Xue also met with Mr. Hongzhao Zang, the attaché to the Economic & Commercial Counsellor's Office of the Chinese Embassy in Abuja. See Letter from Zhongfu International Investment (NIG) FZE to Economic & Commercial Counsellor's Office, Embassy of the People's Republic of China in the Federal Republic of Nigeria, 4 August 2016, **C-170**; Witness Statement of Jason Han, 30 April 2019, ¶ 117.

[257] Federal Capital Territory Judicial Form 4, "Warrant of Arrest of Mr. Jason Han", 4 August 2016, **C-171**; Federal Capital Territory Judicial Form 4, "Warrant of Arrest of Mr. Zhao Wenxiao", 4 August 2016, **C-172**.

[258] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 17-21; Witness Statement of Jason Han, 30 April 2019, ¶ 119; Witness Statement of John Xue, 29 April 2019, ¶¶ 52.

[259] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶ 21.

[260] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 23-24.

[261] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 23 and 26.

JA-215

police officer and detained for approximately a week - still without knowing the reason for his arrest.[262]

124. While in police custody, Mr. Zhao physically was beaten twice by uniformed members of the Nigerian police force.[263]  Mr. Zhao was subsequently released in Abuja on bail without any charge by the Nigerian police.[264]  This shocking treatment by the Nigerian police of a member of Zhongfu Nigeria's Management Team was calculated to intimidate and scare Zhongfu Nigeria and the Management Team from remaining in Nigeria.

125. Recalling the treatment he received in police custody, Mr. Zhao states:

> "*After a while, the police car stopped somewhere that looked like a police station. The police officers asked me to stay outside and then another group of police officers arrived. One police officer in uniform came over to me and slapped me twice on the face with his hand. Then the police officers who brought me there took me to a room where they asked me to sign a piece of paper. They did not say or explain what this paper was or what it said. I refused to sign the piece of paper.*
>
> *The police officers then took my flip flops and placed me in a courtyard with a number of cells surrounding it. It was dark and cold and I was standing at the gate to one of the cells. Then another prisoner came out of that cell and asked why I was taken. I did not speak. There were also some other people who had been brought to the courtyard and the prisoner told us to stand side-by-side and asked whether we had money and why we were there. If someone had no money, he would slap them. Then the prisoner took me aside and asked me to speak. He said that if I did not speak, he would beat me with a club. Then another prisoner joined that first prisoner in intimidating me. Later the second prisoner took me aside and told me not to be afraid. However, the first prisoner came back and threatened me with a club and asked me to speak, which I did not do.*
>
> [...]
>
> *On what I think was the third day in the Abuja police station, a lot of people were brought into the office. The police officers moved me to another office. In the new office, two handcuffed men were being forced to hit each other. They were each told that if you hit the other man, you would be released. The two persons were hitting each other, and I could see the blood. After this, the police officer showed me a video of a prisoner eating a rat. The police officer then approached me asking what happened. I did not respond and he hit me twice, first on the neck and the second time on the head with a fist. It was painful and I felt numb.*"[265]

---

[262] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 29, 30 and 36.

[263] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 23 and 34.

[264] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶ 36.

[265] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 23-24 and 34.

126.    Following his eventual release, Mr. Zhao explains that:

>   "*I was extremely traumatised and exhausted after my experiences. It took me several months to recover in a basic sense, but the scars of my mistreatment will remain with me for much longer.*
>
>   […]
>
>   *To this day, when I remember events of August 2016, I feel very distressed and traumatised.*"[266]

127.    Mr. Zhao's detention attracted media attention and was covered by the Nigerian news outlet Newsbreak.[267]

128.    The lawyer for the Ogun State Government, Mr. Taiwo Adewlowa, wrote to Elizabeth Uwaifo on 18 August 2016 commenting on the press coverage of Mr. Zhao's arrest.  Mr. Adewlowa commented that the "*Ogun State Government, if I must repeat, has no issues with your client,* [Zhongfu Nigeria]."[268]

129.    The Claimant's Nigerian Counsel, Prof. Elias, raised the abuse of police power to the Inspector-General of Police and noted that:

>   "*… men of the Nigerian Police Force have constantly connived and colluded with* [the Ogun State Government] *to perpetuate its sinister acts against Zhongfu* [Nigeria].  *The* [Ogun State Government]*and its allies have used the Police to forcefully eject certain Zhongfu* [Nigeria] *personnel from the Zone without a court order. The Police are being employed to harass and intimidate employees of Zhongfu* [Nigeria]."[269]

130.    Zhongfu Nigeria also appealed to the President of Nigeria, Muhammadu Buhari, in a letter dated 2 September 2016 imploring him to intervene in the dispute and asking him to "*show the world that Nigeria respects law and order by procuring the reversal of the forceful occupation of our property, the forceful removal of our management rights and the withdrawal of the warrants for arrest issued in abuse of legal process.*"[270]   Despite this

---

[266] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 37 and 42.

[267] Newsbreak, "Panic as Police Abduct Chinese Man", 18 August 2016, available at https://www.newsbreak.ng/2016/08/panic-police-abduct-chinese-man-igs-order/ (last accessed on 26 April 219), **C-173**. See also Email from Elizabeth Uwaifo to Femi Edun, Jon Vandenheuval, Issa Baluch, Jason Han and others, 18 August 2016, **C-174**.

[268] Email from Taiwo Adeoluwa to Elizabeth Uwaifo, Jason Han, Gbolahan Elias and others, 18 August 2016, **C-175**.

[269] Letter from G. Elias & Co to Inspector-General of Police, 21 September 2016, **C-176**.

[270] Letter from Zhongfu International Investment (NIG) FZE to the President of the Federal Republic of Nigeria, 2 September 2016, **C-177**. See also D Kayode-Adedeji, "Save us from Ogun government, Chinese firm writes Buhari", *Premium Times,* 6 September 2016, available at https://www.premiumtimesng.com/business/business-news/209899-save-us-ogun-government-chinese-firm-writes-buhari.html (last accessed on 26 April 2019), **C-178**; D Kayode-Adedeji, "Chinese firm drags Ogun govt to President Buhari over alleged breach of Free Trade Zone contract", *Premium Times,* 7 September 2019, available at https://www.premiumtimesng.com/regional/210029-chinese-firm-drags-ogun-govt-to-president-buhari-over-alleged-breach-of-free-trade-zone-contract.html (last accessed on 26 April 2019), **C-179**.

JA-217

letter being subsequently published in the Nigerian national press, no response was received.[271]

131.   On 21 September 2016, the Claimant's Nigerian Counsel again wrote to NEPZA reiterating that Zhongfu Nigeria "*is a valid subsisting registered enterprise and a lawful tenant in the Zone.  Even if Zhongfu* [Nigeria]*'s management rights and participation in the* [OGFTZ] *Company are in dispute, Zhongfu* [Nigeria]*'s tenancy and registration as an enterprise in the Zone are not.  As such, Zhongfu* [Nigeria] *cannot be evicted from the Zone.*"[272]  Indeed, Zhongfu Nigeria's separate right as a tenant in the Zone was implicitly recognised by the purported new managers of the Zone because they issued Zhongfu Nigeria with an invoice to collect management fees on 7 October 2016.[273]

132.   Mr. Xue and Dr. Han explain in their witness statements that following the arrest and detention of Mr. Zhao, they feared for their personal safety and security in Nigeria and made arrangements to leave the country.  They left Nigeria separately in early September 2016 and mid-October 2016, respectively.

133.   As Mr. Xue states in his witness statement:

"*While we were in hiding* [following Mr. Zhao's arrest]*, Jason and I did not know what to do. We knew that it was not safe for us to stay in Nigeria and that we should leave, but we also did not want to abandon our sizeable investment in the Zone, Zhongfu Nigeria's employees and the tenants we had brought to the Zone.*

[…]

*I left Nigeria in early September 2016. I had planned to return, but then we received reports that the situation in the Zone and Nigeria more generally was too dangerous for us. I was very disappointed as the Zone was filled with our accomplishments and dreams. I made further visits to other African countries in 2017, such as Benin Republic and Kenya, but I could not go back to Nigeria.*"[274]

134.   As Dr. Han states in his witness statement:

"*On 11 October 2016, I left the residence to go to Lagos airport to take a flight to Ghana. I was concerned that I would be stopped passing through immigration and detained by the police. I was relieved when I arrived in Ghana, but hugely disappointed about having to leave Nigeria and the*

---

[271] Witness Statement of Jason Han, 30 April 2019, ¶ 129.

[272] Letter from G. Elias & Co. to Managing Director of NEPZA, 21 September 2016, **C-180**. See also Letter from G. Elias & Co. to NEPZA, 21 September 2016, **C-181.**

[273] Invoice for Collection of Quarterly Management Fee from China Africa Investment FZC to Zhongfu International Investment (NIG) FZE, 7 October 2016, **C-182**.

[274] Witness Statement of John Xue, 29 April 2019, ¶ 55 and 56.

*mistreatment which I and Zhongshan received. I had very high hopes for the development of the Zone and we were making significant progress to our goal of creating a sustainable development in Africa which I think would have had a tremendous impact in the region.*"[275]

135. Ogun State and NEPZA continued to use the police to intimidate Zhongfu Nigeria's personnel and to take over its assets.[276]  Indeed, on 14 October 2016, policemen assisted NSG employees to forcibly seize tools and machinery Zhongfu Nigeria had stored in the Zone.[277]

136. In the context of lawsuits that were brought in the Nigerian Courts to prevent Zhongfu Nigeria's forcible ejection from Nigeria (as to which, see further below), the Solicitor-General of Nigeria warned NEPZA and the Ogun State Government on 17 October 2016, that it should:

> *"refrain from taking any further steps in this matter, particularly in relation to the alleged "resort to self help to forcibly evict Zhongfu* [Nigeria] *and its personnel from the zone" being planned and/or contemplated by the State Government, NEPZA or any of its representatives or agent*[s]. *Parties should maintain status quo ante. In this connection, and in line with extant laws, Zhongfu* [Nigeria] *be* [sic.] *allowed to exercise its mandate pending the determination of these matters, or any court order made pursuant thereto."* [278]

137. This unequivocal direction of the Solicitor-General of Nigeria to the Ogun State Government and NEPZA to desist from forcibly evicting Zhongfu Nigeria from the Zone and to maintain the *status quo ante* pending court processes was ignored.  The Ogun State Government and NEPZA, with the assistance of the Nigerian police, continued to evict Zhongfu Nigeria.  A meeting was held on 5 December 2016 at the Area Command Office of the Nigerian Police, Ota, between Zhongfu Nigeria, NSG, relevant federal agencies, the Divisional Police Officer Ota (the "**DPO**") and the Area Commander to determine the meaning of "*status quo ante*".[279]  At the meeting, Mr. Odega and the DPO disagreed with Zhongfu Nigeria's lawyer's interpretation that the *status quo* was the state of affairs that existed before the occurrence of the dispute.[280]  According to Mr. Odega and the DPO, the position to be "*maintained*" was the new status of NSG as managers of the Zone.  This

---

[275] Witness Statement of Jason Han, 30 April 2019, ¶ 131.

[276] Report from Steven Allen, 30 March 2017, **C-183**.

[277] Report by Lisa on CAI seizing assets, 16 October 2016, **C-184**.

[278] Letter from Solicitor-General of the Federation and Permanent Secretary to the Secretary to the State Government, Ogun State Secretariat, 17 October 2016, **C-013**; Letter from Solicitor-General of the Federation and Permanent Secretary to NEPZA, 17 October 2016, **C-185**.

[279] G. Elias & Co., Report of the Meeting with the Divisional Police Officer, Ota Division on 5 December, 6 December 2016, **C-186**; See also G. Elias & Co., Report of the Meeting with the Divisional Police Officer, Ota Division, 1 December 2016, **C-187**.

[280] G. Elias & Co., Report of the Meeting with the Divisional Police Officer, Ota Division on 5 December, 6 December 2016, **C-186**.

JA-219

was also the position of the Area Commander.[281]  This enforced the take-over of Zhongfu Nigeria's assets and ended any hope that its investments in Nigeria would be recovered through due process in Nigeria.

138.  The Claimant and Zhongfu Nigeria have now been denied access to the Zone and its physical assets in the Zone, including warehouses, apartments, other buildings, construction vehicles, IT equipment, and other equipment for three years.  The Claimant and Zhongfu Nigeria have been prevented from operating or receiving income as manager / administrator of the Zone, or even from the Fucheng Industrial Park.  Zhongfu Nigeria's investment in Nigeria has been eviscerated and the value of the Claimant's investment in Nigeria has been destroyed.

**F    The Respondent's Judiciary Thwarted the Commercial Arbitration Rights of the Claimant's Nigerian subsidiary, Zhongfu Nigeria, under the JVA**

139.  Following the takeover of the Zone by NSG with the assistance of NEPZA and the Nigerian police and at the direction of the Ogun State Government,[282] the Claimant's subsidiary, Zhongfu Nigeria, initiated protective proceedings before the Nigerian courts.  The focus of these proceedings was injunctive and declaratory relief to prevent Zhongfu Nigeria's unlawful eviction from the Zone and to preserve the *status quo ante.*  In particular:

(a)    On 11 August 2016, Zhongfu Nigeria filed a claim in the Federal High Court of Abuja against NEPZA as first defendant (the Attorney General of Ogun State and Zenith were added as second and third defendants respectively) seeking to prevent the unlawful eviction and forceful removal of Zhongfu Nigeria from the Zone (the "**NEPZA Proceedings**").[283]   In particular, Zhongfu Nigeria sought declaratory relief to: (i) remain and conduct its lawful business in the Zone; (ii) declare that NEPZA acted unlawfully or wrongfully by colluding with Ogun State to threaten, harass, intimidate, forcibly evict and/or remove Zhongfu Nigeria and its personnel from the Zone; and (iii) direct NEPZA and its representatives to recognise Zhongfu Nigeria as the manager and operator of the Zone.  Zhongfu Nigeria also sought injunctive relief to: (i) restrain NEPZA and its representatives from giving effect to any communications from Ogun State and Zenith (or their representatives) purportedly removing Zhongfu Nigeria as the manager and operator of the Zone; (ii) restrain NEPZA and its representatives from recognising Zenith or anyone else as the manager and operator

---

[281] G. Elias & Co., Report of the Meeting with the Divisional Police Officer, Ota Division on 5 December, 6 December 2016, **C-186**.

[282] See e.g., Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 27 May 2016, **C-158**; Letter from Ogun-Guangdong Free Trade Zone Co-Ordinator, Zenith Global Merchant Ltd. to Zhongfu International Investment (NIG) FZE, 21 July 2016, **C-164**; Letter from NEPZA to O/C, Zone Security, Ogun-Guangdong FTZ, 22 July 2016, **C-166**.

[283] See Writ of Summons together with the Statement of Claim, Federal High Court of Nigeria, Suit No. FHC/ABJ/CS/601/2016, as issued on 18 August 2016, **C-188**.

JA-220

of the Zone; and (iii) restrain NEPZA and its representatives from intimidating, harassing, or removing Zhongfu Nigeria from the Zone.[284]

(b)     On 9 September 2016, Zhongfu Nigeria initiated proceedings in the High Court of Ogun State in Ota (the "**High Court of Ogun State**") seeking, *inter alia*, declaratory relief that it was entitled to possession of the 224 hectares of land granted to Zhongfu Nigeria under the Fucheng Industrial Park Agreement as well as damages for losses (the "**Fucheng Park Land Proceedings**"). This claim was brought against OGFTZ Company as the first defendant and counter-party to the Fucheng Industrial Park Agreement, with Ogun State and the Attorney General of Ogun State being named as second and third defendants respectively.[285]

140.    Following the arrest and appalling treatment of the CFO of Zhongfu Nigeria, Mr. Zhao, at the hands of and under the custody of the Nigerian police, Mr. Zhao filed a claim against the Nigerian Police Force, the Inspector-General of Police and the Commissioner of Police for the Federal Capital Territory in Abuja, as well as against a former contractor of Zhongfu Nigeria. [286] This claim by Mr. Zhao sought, *inter alia*, declaratory and injunctive reliefs concerning violations of Mr. Zhao's fundamental right to liberty and to prevent further harassment, intimidation, arrest or detention in addition to damages for "*the unlawful and illegal arrest and detention and the inhuman and degrading treatment*" (the "**Zhao Rights Proceedings**").[287]

141.    Notwithstanding Zhongfu Nigeria's attempts to preserve the *status quo ante*, the Ogun State Government and NEPZA continued to act as though Zhongfu Nigeria had no rights in the Zone - whether as tenant, manager, operator or majority owner of OGFTZ Company. Accordingly, the Nigerian lawyers representing Zhongfu Nigeria, G. Elias & Co., wrote to NEPZA on 21 September 2016 explaining that "[e]*ven if Zhongfu* [Nigeria] *were no longer the manager of the Zone, which is denied, you cannot evict it from the Zone. This is because Zhongfu* [Nigeria]*, apart from also being an enterprise in the Zone, is also a lawful tenant of over 224 hectares of the Zone land meant for the development of the Fucheng Industrial Park within the Zone. By law one can be evicted forcibly only pursuant to a court order*".[288]

---

[284] See Writ of Summons together with the Statement of Claim, Federal High Court of Nigeria, Suit No. FHC/ABJ/CS/601/2016, as issued on 18 August 2016, **C-0188**.

[285] See Statement of Claim, High Court of Ogun State, Suit No. HCT/417/2016, 9 September 2016, **C-189**.

[286] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶ 38.

[287] See Originating Notice of Motion, Federal Court of Nigeria, Suit No. FHC/ABJ/CS/703/2016, 9 September 2016, **C-190**. Zhongfu Nigeria also filed a claim against Mr. Wang Junxiong on 9 September 2016 seeking declaratory relief and damages for breach of contract related to his previous role as an independent contractor in assisting with the management of the Zone. See Statement of Claim, High Court of Ogun State, Suit No. HCT/416/2016, 9 September 2016, **C-191**.

[288] Letter from G. Elias & Co. to NEPZA, 21 September 2016, **C-181**.

142. On the same date, G. Elias & Co., wrote to the Managing Director of NEPZA explaining that:

> "We are alarmed that despite the fact that the issues revolving around the purported termination of the management and participation rights of Zhongfu [Nigeria] in the Zone Company are currently subject of litigation in at least 3 suits, the Ogun Statement Government ("OGSG"), its allies and the NEPZA Administrator at the Zone have continued to restrain Zhongfu [Nigeria] access to the Zone.
>
> We have it on good authority that the NEPZA Administrator at the Zone had written to the DPO and other security agencies in the Zone to finally evict the remainder of Zhongfu [Nigeria]'s property and staff from the Zone on Friday September 23, 2016.
>
> We need to reiterate once again that Zhongfu [Nigeria] is a valid subsisting registered enterprise and a lawful tenant in the Zone.  Even if Zhongfu [Nigeria]'s management rights and participation in the Zone Company are in dispute, Zhongfu's tenancy and registration as an enterprise in the Zone are not.  As such, Zhongfu [Nigeria] cannot be evicted from the Zone."[289]

143. Also on 21 September 2016, G. Elias & Co wrote to the Inspector-General of Police to explain that:

> "… sometime in April 2016, the Ogun State Government ("OGSG") began taking steps towards forcibly and illegally stripping Zhongfu [Nigeria] of its rights in the Zone… Regrettably, men of the Nigerian Police Force have constantly connived and colluded with the OGSG to perpetuate its sinister acts against Zhongfu [Nigeria], even whilst the matter is in court.  The OGSG and its allies have used the Police to forcefully eject certain Zhongfu [Nigeria] personnel from the Zone without a court order.  The Police are being employed to harass and intimidate employees of Zhongfu [Nigeria]."[290]

144. No response to G. Elias & Co's letters was received from NEPZA or the Nigerian police.

145. On 17 October 2016, the Solicitor-General of Nigeria wrote to the Secretary to the Ogun State Government explaining that:

> "… it has become necessary to remind you that the planned or purported ejection of Zhongfu [Nigeria] from the Zone will amount to contempt of court as the matter is subjudice… Given the circumstances of the above matter which is contentious in nature, you are hereby advised to refrain from taking any further steps in this matter, particularly in relation to the alleged 'resort to self help to forcibly evict Zhongfu [Nigeria] and its personnel from the zone' being planned and/or contemplated by the State Government, NEPZA or any of its representatives or agent.  Parties should maintain status quo

---

[289] Letter from G. Elias & Co., to Managing Director of NEPZA, 21 September 2016, **C-180**.

[290] Letter from G. Elias & Co., to Inspector-General of Police, 21 September 2016, **C-176**.

JA-222

*ante. In this connection, and in line with extant laws, Zhongfu* [Nigeria] *be allowed to exercise its mandate pending the determination of these matters, or any court order made pursuant thereto. It is trite that once a court of law is seized of a matter no party has a right to take the laws into his own hands by resorting to self help."*[291]

146. As explained above, the letter from the Solicitor-General to maintain the *status quo ante* was ignored by NEPZA and the Nigerian police and Zhongfu Nigeria was forcibly evicted from the Zone. Indeed, when Zhongfu Nigeria repeatedly approached NEPZA and the police to seek to maintain the *staus quo ante* in accordance with the Solicitor-General's clear instruction, Zhongfu Nigeria's requests were dismissed and the *ex post* position - with NSG installed as managers of the Zone - was instead recognised and enforced by NEPZA and the Nigerian police.[292]

147. On 1 December 2016, Zhongfu Nigeria initiated a commercial arbitration administered by the Singapore International Arbitration Center ("**SIAC**") under the UNCITRAL Arbitration Rules (the "**Singapore Arbitration Proceedings**") against the Ogun State Government and Zenith concerning breaches of the JVA Agreement.[293]

148. The arbitration clause under the JVA reads as follows:

> *"27. DISPUTE AND ARBITRATION RESOLUTION*
>
> *27.1 Where any dispute, question or difference arises between the parties to this agreement in respect of the construction of or concerning anything contained in this Agreement or as to the right, duties or liabilities under it whether during or after the determination of this Agreement, then upon notice to that effect being given to the other party an attempt shall be made by the parties to resolve such issues amicably.*
>
> *27.2 In the event of any dispute, question or difference between the parties to this Agreement arising out of the construction of or concerning anything contained in this Agreement or as to the rights, duties or liabilities under it whether during or after the determination of this Agreement, if it cannot be settled under Clause 27.1, shall upon notice to that effect being given to the other party be referred to arbitration. The parties agree to select Singapore International Arbitration Center (SIAC) to conduct the arbitration. Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or invalidity thereof, **shall be settled by arbitration in Singapore** under the UNCITRAL Arbitration Rules in accordance with the SIAC Procedures for the Administration of International Arbitration in force at the date of this Agreement. The language to be used in the course*

---

[291] Letter from Solicitor-General of the Federation and Permanent Secretary to Secretary to the State Government, Ogun State Secretariat, 17 October 2016, **C-013**.

[292] G. Elias & Co., Report of the Meeting with the Divisional Police Officer, Ota Division on 5 December, 6 December 2016, **C-186**; See also G. Elias & Co., Report of the Meeting with the Divisional Police Officer, Ota Division, 1 December 2016, **C-187**.

[293] Judgment of the High Court of Justice of the Ogun State of Nigeria, Suit No. AB/04/17, 29 March 2017, p. 3, **C-192**.

*of the arbitration shall be English.  And the arbitral award shall be final and binding on the parties.*

*27.3 The parties hereby agree that this Agreement shall be construed in accordance with the Laws of the Federal Republic of Nigeria and agree to refer to Arbitration any dispute, differences, claim or demand arising out of this Agreement in accordance with Clause 27.2 above."*[294]

149.   On 5 January 2017, Zenith made an application to the High Court of Ogun State for an anti-arbitration injunction alleging that Zhongfu Nigeria had waived its respective arbitration right under the JVA by instituting and taking steps in the NEPZA Proceedings.[295]

150.   On 29 March 2017, just over a month after Zenith made the above applications, the High Court of Ogun State in Abeokuta (the "**Ogun Court**") issued a "*forever injunction*" permanently restraining Zhongfu Nigeria "*from seeking and or continuing with any step, action, and or participate directly or otherwise from seeking and or continuing with any step, action and or participate directly or indirectly*" in the Singapore Arbitration Proceedings.[296]

151.   In its judgment, the Ogun Court came to extraordinary conclusions, including that:

(a)   The express reference to "*arbitration in Singapore*" in clause 27.2 of the JVA did not mean that Singapore was the seat of the Singapore Arbitration Proceedings.  Rather, the Ogun Court assumed jurisdiction by finding that:

(i) "*Nigeria has a closer and more intimate connection to the arbitration than Singapore, and is therefore the seat of the arbitration, while Singapore is no more than the venue of the arbitration*";[297] and

(ii) "*the intention of the parties was merely to choose Singapore as the venue and not the seat of the arbitration.*"[298]

(b)   In justifying this conclusion, the Ogun Court made the remarkable assumption that parties to a contract would <u>never</u> choose a neutral forum (unrelated to the enforcement jurisdiction) as the seat of their arbitration.  Rather, they would <u>always</u> choose as the seat of an arbitration the forum where the parties and/or their assets were based.  In particular, the Ogun Court held that:

*"To subject the arbitration to the lex arbitri (external) of Singapore would be absurd in my view, because the courts of Singapore would*

---

[294] JVA, 28 September 2013, **C-008**, emphasis added.

[295] Judgment of the High Court of Justice of the Ogun State of Nigeria, Suit No. AB/04/17, 29 March 2017, pp. 1-2, **C-192**.

[296] Judgment of the High Court of Justice of the Ogun State of Nigeria, Suit No. AB/04/17, 29 March 2017, **C-192**.

[297] Judgment of the High Court of Justice of the Ogun State of Nigeria, Suit No. AB/04/17, 29 March 2017, p. 33, **C-192**.

[298] Judgment of the High Court of Justice of the Ogun State of Nigeria, Suit No. AB/04/17, 29 March 2017, p. 33, **C-192**.

then be called upon to supervise an award which they cannot enforce in Singapore, since the parties and their assets are in Nigeria. **_It could never have been the intention of the parties to enter into an arbitration agreement that would produce an award that they cannot effectively enforce_**."[299]

(c)     Leaving aside that the Ogun Court gave no reason for its conclusion that Singapore could not be a suitable jurisdiction to enforce an arbitral award against Ogun State, the Court's conclusion runs diametrically contrary to the orthodox and internationally accepted position that it is possible and indeed common practice for parties to an arbitration agreement to choose as the seat of their arbitration a neutral third jurisdiction.   Indeed, that is a particular advantage of international arbitration as compared with local court litigation and is clearly reflected in the JVA by the choice of Singapore as the seat of a contractual dispute under the JVA.[300]

(d)     The Ogun Court held that Zhongfu Nigeria had waived its right to arbitration by commencing proceedings in the Federal High Court in Abuja for declaratory relief in the NEPZA Proceedings.   The Ogun Court admitted that, having considered the NEPZA Proceedings, "*nowhere in them is the JVA or the issue of arbitration specifically mentioned.*"[301]   Yet the Ogun Court went on nonetheless to conclude that it did not see how the NEPZA Proceedings could be determined without any reference to the JVA and that this meant that Zhongfu Nigeria had somehow waived its arbitration right under the JVA and was culpable of "*oppression and abuse of process*" by trying to uphold its arbitration right.[302]

(e)     As mentioned above, in the NEPZA Proceedings, Zhongfu Nigeria sought declaratory and injunctive relief to preclude its eviction by NEPZA in particular from the Zone.   Zhongfu Nigeria did not in the NEPZA Proceedings pursue a damages claim against Ogun State for breach of the JVA, as Zhongfu Nigeria did by contrast in the Singapore Arbitration Proceedings.   Furthermore, NEPZA was not even a party to the JVA pursuant to which the Singapore Arbitration Proceedings were commenced.   The cause of action in the respective proceedings was clearly different. In the NEPZA Proceedings, Zhongfu Nigeria sought recognition by NEPZA, as a regulatory organ of the State, of Zhongfu Nigeria as the lawful manager and operator of the Zone to prevent NEPZA and others from evicting Zhongfu Nigeria from the

---

[299] Judgment of the High Court of Justice of the Ogun State of Nigeria, Suit No. AB/04/17, 29 March 2017, p. 33, **C-192**, emphasis added.

[300] See David St. John Sutton, Judith Gill QC, Matthew Gearing QC, Russell on Arbitration (Sweet & Maxwell 24th edn 2015), ¶ 1-026, **CLA-004**. Nigel Blackaby and others, Redfern & Hunter: Law and Practice of International Commercial Arbitration (Oxford University Press 6th edn 2015), ¶ 1.21, **CLA-005**, Gary B. Born, International Commercial Arbitration (Kluwer Law International, Second Edition 2014) ¶ 14.02[A][7], **CLA-006**.

[301] Judgment of the High Court of Justice of the Ogun State of Nigeria, Suit No. AB/04/17, 29 March 2017, p. 38, **C-192**.

[302] Judgment of the High Court of Justice of the Ogun State of Nigeria, Suit No. AB/04/17, 29 March 2017, p. 41, **C-192**.

Zone.  In the Singapore Arbitration Proceedings, Zhongfu Nigeria sought monetary compensation for contractual breaches committed by Ogun State and Zenith as counterparties to the JVA.

152.    The conclusions of the Ogun Court and its gross interference with the Singapore Arbitration Proceedings clearly contravene the New York Convention on the Recognition and Enforcement of Arbitral Awards of 1958 (the "**New York Convention**"), to which both Nigeria and China are State Parties.[303]  In particular, Article 2 of the New York Convention provides, in relevant part:

> *"1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not concerning a subject matter capable of settlement by arbitration.*
>
> *  …*
>
> *3. The Court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed."*[304]

153.    The Ogun Court did not find the arbitration agreement "*null and void, inoperative or incapable of being performed*".  Rather, the Ogun Court thwarted Zhongfu Nigeria's commercial arbitration right under the JVA through conclusions that run directly contrary to Nigeria's obligations in Article 2 of the New York Convention. Zhongfu Nigeria challenged the Ogun Court Judgment in the Nigerian Court of Appeal.[305]

154.    As regards the respective Nigerian litigation proceedings, Zhongfu Nigeria has taken steps to discontinue them, having lost any confidence given developments in the Nigerian Courts and the actions of Nigeria more generally of obtaining justice in Nigeria.

---

[303] The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 10 June 1958, a certified true copy taken from the United Nations, Treaty Series, Vol. 330, p. 3, available at: https://treaties.un.org/doc/Treaties/1959/06/19590607%2009-35%20PM/Ch_XXII_01p.pdf (last accessed on 30 April 2019) (hereinafter the "**New York Convention**"), **CLA-007.** See the New York Arbitration Convention, "Contracting States", available at: http://www.newyorkconvention.org/countries (last accessed on 30 April 2019), **CLA-008.**

[304] See the New York Convention, Article 2, **CLA-007**.

[305] Notice of Appeal, Nigerian Court of Appeal, Suit No. AB/04/2017, 23 June 2017, **C-193**.

56

JA-226

## IV.    THE TRIBUNAL HAS JURISDICTION OVER THIS DISPUTE

### A    Nigeria is Bound by the Treaty and Consented to Arbitration

155.    China and Nigeria signed the Treaty on 27 August 2001 and the Treaty entered into force on 18 February 2010.[306]  Article 11 of the Treaty provides as follows:

> *"Article 11 APPLICATION*
>
> *This Agreement shall apply to investments, which are made prior to or after its entry into force by investors of either Contracting Party in accordance with the laws and regulations of the other Contracting Party in the territory of the latter."[307]*

156.    As shown above, the Claimant acquired rights and made an investment in Nigeria starting with the Fucheng Industrial Park Agreement in June 2010 and with further rights acquired pursuant to the JVA in September 2013.  Therefore, the Treaty was in force at all relevant times to this dispute.

157.    Nigeria expressly consented to resolve investment disputes with Chinese investors through international arbitration by way of Article 9 of the Treaty.

158.    Article 9 of the Treaty provides, in relevant part:

> *"1. Any dispute between an investor of the other contracting Party and the other Contracting Party in connection with an investment in the territory of the other Contracting Party shall, as far as possible, be settled amicably through negotiations between the parties to the dispute.*
>
> *2. If the dispute cannot the settled through negotiations within six months, then either Party to the dispute shall be entitled to submit the dispute to the competent court to the Contracting Party accepting the investment.*
>
> *3. If a dispute cannot be settled within six months after resort to negotiations as specified in Paragraph 1 of this Article it may be submitted at the request of either Party to an ad hoc arbitral tribunal.  The provisions of this Paragraph shall not apply if the investor concerned has resorted to the procedure specified in Paragraph 2 of this Article."[308]*

159.    The Claimant consented to arbitrate this dispute in its Request for Arbitration.  As shown below, the Claimant is a protected investor and holds a qualifying investment under the Treaty.  The Claimant provided Nigeria with a notice of this dispute on 31 September 2017, in accordance with Article 9 of the Treaty.  The notice contained a request to meet at Nigeria's earliest convenience to discuss the terms of an amicable settlement under the

---

[306] See Ministry of Commerce of the People's Republic of China, "Bilateral Investment Treaty", 31 March 2016, available at: http://english.mofcom.gov.cn/article/bilateralchanges/201603/20160301287079.shtml (last accessed on 30 April 2019), **CLA-002**.

[307] China-Nigeria BIT, Art. 11, **CLA-001**.

[308] China-Nigeria BIT, Art. 9, **CLA-001**.

Treaty.  Following Nigeria's failure to communicate a response to the Claimant's invitation to enter settlement negotiations, the Claimant filed the Request for Arbitration on 30 August 2018.  Accordingly, the Parties have been unable to settle this dispute amicably within six months and this arbitration has been validly commenced in accordance with the provisions of Article 9(3) of the Treaty.

**B   The Claimant is a Protected Investor under the Treaty**

160.   Article 1(2) of the Treaty provides that:

> *"2. The term 'investor' include nationals and companies of both Contracting Parties:*
>
> *(a) 'nationals' means, with regards to the other Contracting Party, natural persons having the nationality of that Contracting Party;*
>
> *(b) 'companies' means, with regards to either Contracting Party, corporations, firms and associations incorporated or constituted under the law in force in the territory of the Contracting Party."[309]*

161.   The Claimant is a company that was incorporated on 13 September 2010 under the laws of China.[310]  The Claimant therefore qualifies as a protected "*investor*" under the Treaty. Zhuhai Zhongfu, the company from which the Claimant acquired the rights and obligations pursuant to the Fucheng Industrial Park Agreement (and which was formerly a majority shareholder in the Claimant), is also a company incorporated under the laws of China.[311]

**C   The Claimant holds Qualifying Investment under the Treaty**

162.   Article 1(1) of the Treaty provides that:

> *"Article 1 DEFINITIONS*
>
> *For the purpose of this Agreement,*
>
> *1. The term "investment" means every kind of asset invested by investors of one Contracting Party in accordance with the laws and regulations of the other Contracting Party in the territory of the latter, and in particularly, though not exclusively, includes:*
>
> *(a) movable and immovable property as well as any property rights, such as mortgages, liens and pledges;*
>
> *(b) shares, debentures, stock and any other kind of participation in companies;*

---

[309] China-Nigeria BIT, Art. 1(2), **CLA-001**.

[310] Zhongshan Fucheng Industrial Investment Co., Ltd., "Business License", 7 November 2016, **C-023**, (referring to the date of establishment of 13 September 2010).

[311] Zhuhai Zhongfu Industrial Group Co., Ltd., "Business License", 2 March 2017, **C-194**, (referring to the date of establishment of 9 July 1986).

*(c) claims to money or to any other performance having an economic value associated with an investment;*

*(d) intellectual property rights, in particular copyrights, patents, trade-marks, tradenames, technical process, know-how and good-will; and*

*(e) business concessions conferred by law or under contract permitted by law, including concessions to search for, cultivate, extract or exploit natural resources."[312]*

163.   It has been accepted by investment treaty arbitration tribunals construing similarly-worded provisions to Article 1 of the Treaty that the use of the phrase "*every kind of asset*" is very broad "*so as to cover the widest possible economic activities and to encourage economic cooperation between the two countries, as expressly stated in the BIT's Preamble*"[313]

164.   The activities of the Claimant directly and through its 100 percent owned subsidiary, Zhongfu Nigeria, evidence an investment in Nigeria which is protected under the Treaty. The Claimant's investment which qualify for protection under Article 1 of the Treaty include, but are not limited to:

(a)   the Claimant's direct investment in Nigeria by way of the contractual rights and obligations acquired pursuant to the Fucheng Industrial Park Agreement, which corresponds to "*claims to money or to any other performance having an economic value associated with an investment*" and a "*business concession* […] *under contract permitted by law*";[314] and

(b)   the Claimant's direct shareholding in Zhongfu Nigeria, which clearly falls within the definition of "*shares*" in a Nigerian asset.[315]  Zhongfu Nigeria itself owned and/or was entitled to "*movable and immovable property as well as* […] *property rights*," and "*claims to money or to any other performance having an economic value associated with an investment*" in Nigeria, such as the rights and obligations Zhongfu Nigeria obtained under the JVA, including shareholding rights in OGFTZ Company.[316]

### 1.   Direct investment by the Claimant

165.   Previous tribunals have repeatedly found that rights under long-term contracts constitute an investment.  For example, in *Flemingo v Poland*, the tribunal accepted that lease agreements to conduct business in a duty free shop in an airport were investments in

---

[312] China-Nigeria BIT, Art. 1(1), **CLA-001.**

[313] *Mytilineos Holdings SA v The State Union of Serbia & Montenegro and Republic of Serbia*, UNCITRAL, Partial Award on Jurisdiction, 8 September 2006, ¶ 108, **CLA-009.**

[314] China-Nigeria BIT, Art. 1.1(c), 1.1(e), **CLA-001.**

[315] China-Nigeria BIT, Art. 1.1(b), **CLA-001.**

[316] China-Nigeria BIT, Arts. 1.1(a), 1.1(c), **CLA-001.**

relation to a BIT with a similarly-worded definition of investment as in the Treaty.   The tribunal in that case said:

> *"The Tribunal finds - contrary to Respondent's submissions - that the Lease Agreements and the related permits for conducting business in the DFZ of Chopin Airport have to be considered 'investments' under the Treaty."* [317]

166.   The tribunal in *Flemingo v Poland* also went on to find that the investments made by the claimant were considered as "*business concessions*".   The tribunal said:

> "I*n this regard the Tribunal is of the view that a business concession does not necessarily need to be a concession for public works or for activities in areas that are key to the State's security, nor does it need to be granted by the State itself - as Respondent incorrectly alleges.  The fact that the Lease Agreements must be obtained through a tender to be considered to be a 'concession' under Polish law does not exclude them from being considered 'investments' falling within the scope of the Treaty.  The Lease Agreements and permits may therefore also fall within the scope of the Treaty as 'business concessions', as understood in Article 1(1)(e) of the Treaty.*"[318]

167.   Similarly, the tribunal in *Inmaris v Ukraine* found that a "*Bareboat Charter Contract can give rise to "claims to performance" within the meaning of Article 1(1) of the BIT's definition of "investment."*"[319]

168.   Under the Fucheng Industrial Park Agreement, the Claimant acquired the "*full right*" over the "*occupancy, use, proceeds and disposal*" of the land in the 224 hectare (2.24 km²) Fucheng Industrial Park.[320]   These rights have been held by the Claimant at all relevant times.   Under the terms of the Fucheng Industrial Park Agreement, the Claimant had the right to "*incorporate or designate a certain company to perform this Agreement, which shall not be deemed as transfer of Agreement.*"[321]   The Claimant incorporated its Nigerian subsidiary Zhongfu Nigeria to perform various obligations under the Fucheng Industrial Park Agreement, but the Claimant retained the rights and claims to performance having an economic value derived from the Fucheng Industrial Park Agreement. These included rights to occupy and develop the Zone, as well as to income from the land lease transfer fees and the Administration Fees.

---

[317] *Flemingo DutyFree Shop Private Limited v Republic of Poland*, UNCITRAL, Award, 12 August 2016, ¶ 299, **CLA-010**.

[318] *Flemingo DutyFree Shop Private Limited v Republic of Poland*, UNCITRAL, Award, 12 August 2016, ¶ 302, **CLA-010**.

[319] *Inmaris Perestroika Sailing Maritime Services GmbH and others v Ukraine,* ICSID Case No. ARB/08/8, Decision on Jurisdiction, 8 March 2010, ¶ 84, **CLA-011**; *Azurix Corp. v Argentine Republic,* ICSID Case No. ARB/01/12, 8 December 2003, ¶ 65, **CLA-012**.

[320] Fucheng Industrial Park Agreement, Art. 2.6, **C-002**. On 10 October 2010, Zhuhai Zhongfu, Ogun State and the Claimant agreed that Zhuhai Zhongfu's rights and obligations under the Fucheng Industrial Park Agreement were transferred to Zhuhai Zhongfu's subsidiary, the Claimant. See Supplementary Agreement (II) on Fucheng Industrial Park, **C-034**.

[321] Fucheng Industrial Park Agreement, Art. 8.1, see also Art. 2.2, **C-002**.

JA-230

169.   In connection with the Claimant's rights under the Fucheng Industrial Park Agreement, the Claimant held multiple assets as part of its qualifying investment under the Treaty.  In sum, these include:

(a)   In relation to a business concession under contract permitted by law, the rights derived from the Fucheng Industrial Park Agreement are a business concession under the Treaty, as well as entailing claims to money or to any other performance having an economic value associated with an investment.[322]

(b)   In relation to movable and immovable property, the following all qualify as investments:  the purchase of vehicles and equipment (including cement mixers, payloaders, a crane, road rollers, bulldozers and tipper trucks) for the Zone, the construction of roads, drainage and warehouses and the payment of RMB 12,755,574.00 in kind and in cash.[323]

### 2.   The Claimant's Shareholding in Zhongfu Nigeria

170.   In addition to the direct investment made by the Claimant in Nigeria in connection with the Fucheng Industrial Park Agreement, the Claimant holds 100 percent of the shares in Zhongfu Nigeria.  Zhongfu Nigeria was registered by NEPZA as a Nigerian company and Free Zone Enterprise on or around 24 January 2011,[324] having been registered by the Claimant as its wholly-owned overseas subsidiary with the Chinese authorities on or around 10 October 2010.[325]  At all relevant times Zhongfu Nigeria remained 100 percent owned by the Claimant.[326]  As such, the Claimant's shares in Zhongfu Nigeria meet the definition of an investment under Article 1 of the Treaty.

171.   It has been consistently accepted by investment treaty arbitration tribunals that a shareholding in a locally-incorporated entity is sufficient to have a qualifying investment.  For example, the tribunal in *Flemingo v Poland* stated:

> "*In fact under investment treaties, investments can just as well consist of a shareholding in a local company, as of the investments made by a local company, controlled by successive intermediate companies.  The investor 'steps into the shoes' of the local company and claims for damages suffered*

---

[322] See *Flemingo DutyFree Shop Private Limited v Republic of Poland*, UNCITRAL, Award, 12 August 2016, ¶ 302, **CLA-010**.

[323] Witness Statement of Jason Han, 30 April 2019, ¶ 66; see also Section III.E.

[324] Zhongfu International Investment (NIG) FZE, "NEPZA Certificate of Registration", 24 January 2011, **C-035**.

[325] Zhongfu International Investment (NIG) FZE, "Regulations", 10 October 2010, **C-003**; Zhongfu International Investment (NIG) FZE "The Enterprise Overseas Investment Certificate", Registration No. 201005944, 13 October 2010, **C-004**. Zhongfu International Investment (NIG) FZE, "Overseas Enterprise Investment Certificate", Registration No. 4400201100286, 6 September 2011, **C-005**.

[326] See Zhongfu International Investment (NIG) FZE, "Regulations", 10 October 2010, **C-003**; Zhongfu International Investment (NIG) FZE, "Overseas Enterprise Investment Certificate", No. 4400201100286, 6 September 2011, **C-005**.

JA-231

by the local company as if it had been inflicted, on a pro rata basis, on itself…."[327]

172.   Likewise, in *Siemens v Argentina*, the tribunal held:

"As regards ICSID case law dealing with the issue of the right of shareholders to bring a claim before an arbitral tribunal, the decisions of arbitral tribunals have been consistent in deciding in favor of such right of shareholders."[328]

173.   Zhongfu Nigeria itself owned and/or was entitled to "*movable and immovable property as well as* […] *property rights*," and "*claims to money or to any other performance having an economic value associated with an investment*" in Nigeria, including under the JVA and regarding Zhongfu Nigeria's 60% shareholding rights in OGFTZ Company.[329]   Zhongfu Nigeria and OGFTZ Company also had rights to income under multiple lease agreements and investment agreements with tenants.[330]

### 3.   The Claimant's Investment should be Considered as a Whole

174.   The overarching investment made by the Claimant in Nigeria should be considered in light of the totality of investment activities undertaken by the Claimant, which is greater than the list of assets that comprises its parts.   On this, the tribunal in *Inmaris v Ukraine* stated:

"It is not necessary to parse each component part of the overall transaction and examine whether each, standing alone, would satisfy the definitional requirements of the BIT and the ICSID Convention.   For purposes of this Tribunal's jurisdiction, it is sufficient that the transaction as a whole meets those requirements."[331]

---

[327] *Flemingo DutyFree Shop Private Limited v Republic of Poland*, UNCITRAL, Award, 12 August 2016, ¶ 305, **CLA-010**.

[328] *Siemens A.G. v Argentine Republic*, ICSID Case No. ARB/02/8, Decision on Jurisdiction, 3 August 2004, ¶ 137, **CLA-013**.

[329] JVA, clauses 2.1 - 2.2, **C-008**.

[330] See, e.g., Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-11014, 16 December 2011, **C-056**; Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-11014, 16 December 2011, **C-056**; Land Lease Agreement No. LLLC-15001, 2 January 2015, **C-065**; Long-term Land Lease Contract of Ogun-Guangdong Free Trade Zone No. LLLC-13008, 17 August 2013, **C-076**; Investment Agreement of Ogun-Guangdong Free Trade Zone Enterprise No. IA-13008, 17 August 2013, **C-077**; Land Lease Agreement No. LLLC-16002, 10 March 2016, **C-106**; Land Lease Agreement No. LLLC-15002, 30 April 2015; **C-124**; Investment and Service Agreement No. LLC-15002, 30 April 2015, **C-0126**; Land Lease Agreement No. LLLC-16002, 26 January 2016, **C-104**; Investment and Service Agreement No. IA-16002, 26 January 2016, **C-105**.

[331] *Inmaris Perestroika Sailing Maritime Services GmbH and others v Ukraine*, ICSID Case No. ARB/08/8, Decision on Jurisdiction, 8 March 2010, ¶ 92, **CLA-011**. See also *Tenaris S.A. and Talta - Trading E Marketing Sociedade Unipessoal LDA v Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/26, Award, 29 January 2016, ¶ 284, **CLA-014**; *Mytilineos Holdings SA v The State Union of Serbia & Montenegro and Republic of Serbia*, UNCITRAL, Partial Award on Jurisdiction, 8 September 2006, ¶ 120, **CLA-009**; *ATA Construction, Industrial and Trading Company v The Hashemite Kingdom of Jordan*, ICSID Case No. ARB/08/2, Award, 18 May 2010, ¶ 115, **CLA-015**; *Saipem S.p.A. v The People's Republic of Bangladesh*, ICSID Case No. ARB/05/07, Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007, ¶ 110, **CLA-016**; *Holiday Inns SA v Morocco*, ICSID Case No. ARB/72/1, Decision on Jurisdiction, 12 May 1974, reported in P Lalive, "The First 'World Bank' Arbitration (*Holiday Inns v. Morocco*) – Some Legal Problems," 1980 *British Yearbook of International Law*, p. 159, **CLA-017**.

175.   The rights held and funds expended by the Claimant developing the Zone meet the definition of an investment under the Treaty.  Accordingly, and for the reasons shown above, the Tribunal has jurisdiction over the dispute.

## V.   PRINCIPLES OF TREATY INTERPRETATION AND THE APPLICABLE LAW

### A   The Principles of Treaty Interpretation

176.   As a treaty, the China-Nigeria BIT falls to be interpreted in accordance with the usual rules of treaty interpretation set out in Article 31–33 of the Vienna Convention on the Law of Treaties ("**VCLT**"),[332] which reflect customary international law.[333]

177.   The VCLT Article 31(1) - the basic rule of interpretation - provides that:

> *"A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose."*[334]

178.   Article 31(1) contains four criteria that are to be taken into account in the process of treaty interpretation: (a) good faith, (b) ordinary meaning, (c) context and (d) object and purpose.[335]  The focus of the exercise is on the text of the treaty as the perfection of the parties' intent.  As the International Court of Justice has noted, "[i]*nterpretation must be based above all upon the text of the treaty*".[336]  However, this canon should not be mistaken as prioritizing ordinary meaning above the other elements of VCLT Article 31: rather, "*the ordinary meaning, the context and the object and purpose should by and large come from the text of that treaty*".[337]

179.   As a general rule, treaties should be not interpreted so as to prioritise the interests of the State over the investor.  Rather, the Tribunal is required to interpret a treaty in such a way as to prioritise the needs of neither party, unless such an interpretation is clearly called for.[338]  Put another way, tribunals have considered that, with respect to questions of interpretation, "*a balanced interpretation is needed, taking into account both the State's*

---

[332] Vienna Convention on the Law of Treaties, 22 May 1969, 1155 UNTS 331 (hereinafter "**VCLT**"), **CLA-018**. The VCLT entered into force on 27 January 1980. See Chapter XXIII, Law of Treaties, available at: https://treaties.un.org/doc/Publication/MTDSG/Volume%20II/Chapter%20XXIII/XXIII-1.en.pdf (last accessed on 28 April 2019), **CLA-019**. Both China and Nigeria are parties to the VCLT: See United Nations Treaty Collection, "Status of Treaties: 1. Vienna Convention on the Law of Treaties", available at https://treaties.un.org/pages/ViewDetailsIII.aspx?src=TREATY&mtdsg_no=XXIII-1&chapter=23 (last accessed on 08 April 219), **CLA-019**.

[333] See e.g. *BIVAC BV v Republic of Paraguay*, ICSID Case No. ARB/07/9, Decision on Jurisdiction, 29 May 2009, **CLA-020**.

[334] VCLT, Article 31(1), **CLA-018**.

[335] R. Weeramantry, *Treaty Interpretation in Investment Arbitration* (Oxford University Press 2012), ¶ 3.11, **CLA-021**.

[336] *Territorial Dispute (Libya v Chad)* [1994] ICJ Rep 6, ¶ 41, **CLA-022**.

[337] R. Weeramantry, *Treaty Interpretation in Investment Arbitration* (Oxford University Press 2012), ¶ 3.13, **CLA-021**.

[338] See e.g. *Noble Ventures Inc v Romania*, ICSID Case No. ARB/01/11, Award, 12 October 2005, ¶ 52, **CLA-023**.

*sovereignty and its responsibility to create an adapted and evolutionary framework for the development of economic activities, and the necessity to protect foreign investment*".[339] That interpretation, moreover, must take "*into account the totality of the Treaty's purposes*".[340]

180. On this basis, the best source for determining the object and purpose of a treaty is its preamble.[341]  With specific reference to the preamble of the Treaty in this case, this means that the provisions of the Treaty must be interpreted in light of the fact that the Treaty parties:

(a) recognise "*that the reciprocal encouragement, promotion and protection of* […] *investments will be conducive to stimulating business initiative of* […] *investors and will increase prosperity in both States*"; and

(b) are determined to "*create favourable conditions for greater investment by investors of one Contracting Party in the territory of the other Contracting Party*".[342]

### B   The Applicable Law

181. The Claimant's claims are based on the Treaty provisions and international law. Article 9(7) of the Treaty provides that:

> "The tribunal shall adjudicate in accordance with the law of the Contracting Party to the dispute accepting the investment including its rules on the conflict of laws, the provisions of this Agreement as well as the generally recognized principles of international law accepting by both Contracting Parties."[343]

182. As noted, the Treaty, including Article 9(7), must be interpreted in accordance with the VCLT.  Article 27 of the VCLT provides that "[a] *party may not invoke the provisions of its internal law as justification for its failure to perform a treaty.*"[344]  Thus, Nigeria cannot use its own internal law to avoid its international responsibility under the provisions of the Treaty, a treaty which is governed by international law.

---

[339] *El Paso Energy International Company v Argentine Republic*, ICSID Case No. ARB/03/15, Decision on Jurisdiction, 27 April 2006, ¶ 99, **CLA-024**.

[340] *Plama Consortium Limited v Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 24 August 2008, ¶ 167, **CLA-025**.

[341] See *Guinea-Bissau v Senegal*, Arbitral Award of 31 July 1989, [1991] ICJ Rep 53, ¶ 142 , **CLA-026** (Judge Weeramantry, diss.: "An obvious internal source of reference is the preamble to the treaty.  The preamble is the principle and natural source from which indications can be gathered of a treaty's objects and purposes even though the preamble does not contain substantive provisions.")

[342] China-Nigeria BIT, Preamble, **CLA-001**.

[343] China-Nigeria BIT, Art. 9(7), **CLA-001**.

[344] VCLT, Art. 27, **CLA-018**.

183.   Similarly, Article 3 of the International Law Commission's Articles on Responsibility of States for Internationally Wrongful Acts (the "**ARSIWA**") provides that:

> "[t]he characterization of an act of a State as internationally wrongful is governed by international law.  Such characterization is not affected by the characterization of the same act as lawful by internal law."[345]

184.   Accordingly, whether Nigerian law allows or prohibits the actions of Nigeria, as a matter of Nigerian law, does not determine whether those actions are lawful or unlawful under the Treaty and as a matter of international law.  International law prevails for the purposes of these proceedings.  This principle has been repeatedly applied to investment treaty arbitrations.[346]

185.   In *Total S.A. v Argentine Republic*, the tribunal, while assessing a very similar BIT applicable law provision to that in Article 9(7) of the Treaty, found that:

> "since Total complains of breaches of the BIT, the Tribunal must apply principally the BIT, as interpreted under international law, to resolve any matter raised.  This means that the Tribunal must assess Argentina's responsibility under the BIT by applying the treaty itself and the relevant rules of customary international law."[347]

186.   In *El Paso Energy v Argentina*, the tribunal stated: "*whether a modification or cancellation of such rights, even if legally valid under* [the domestic] *law, constitutes a violation of a protection guaranteed by the BIT is a matter to be decided solely on the basis of the BIT itself and the other applicable rules of international law.*"[348]

187.   Likewise, in *Daimler v Argentina*, the tribunal, faced with a similar applicable law provision in the Germany-Argentina BIT as in the Treaty, declared that "*the proper law to be applied is the German-Argentine BIT itself, in concert with the ICSID Convention, as interpreted in the light of the general principles of international law.*"[349]

188.   This standard has also been applied by a number of other tribunals when assessing BITs with similarly worded provisions to that in Article 9(7).[350]  As explained above, it is an

---

[345] Responsibility of States for Internationally Wrongful Acts, GA Res 56/83, UN Doc A/RES/56/83, 12 December 2001, (hereinafter "**ARSIWA**"), Art. 3, **CLA-027**.

[346] See for, example, *Saipem S.p.A. v People's Republic of Bangladesh*, ICSID Case No. ARB/05/07, Award, 30 June 2009, ¶ 165, **CLA-028**; *Total S.A. v Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Liability, 27 December 2010, ¶ 40, **CLA-029**; *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v Argentine Republic*, ICSID Case No. ARB/09/01, Award, 21 July 2017, ¶¶ 477, 479, **CLA-030**; *Daimler Financial Services AG v Argentine Republic*, ICSID Case No. ARB/05/1, Award, 22 August 2012, ¶ 46, **CLA-31**; *Swisslion DOO Skopje v The Former Yugoslav Republic of Macedonia*, ICSID Case No. ARB/09/16, Award, 6 July 2012, ¶¶ 261, 262, **CLA-32**.

[347] *Total S.A. v Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Liability, 27 December 2010, ¶ 40, **CLA-029**.

[348] *El Paso Energy International Company v Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011, ¶ 135, **CLA-033**.

[349] *Daimler Financial Services AG v Argentine Republic*, ICSID Case No. ARB/05/1, Award, 22 August 2012, ¶ 50, **CLA-031**.

[350] See *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v Argentine Republic*, ICSID Case No. ARB/09/01, Award, 21 July 2017, ¶ 475, **CLA-030**: "*The Treaty is lex specialis between Respondent and Spain, as it governs*

JA-235

established rule that a State cannot justify non-compliance with its international obligations under an investment treaty by asserting the provisions of its domestic law.[351]  Thus, in the present case, Nigeria is precluded from raising its internal laws to avoid the application of, and its liability under, the Treaty and international law.

## VI. NIGERIA IS RESPONSIBLE FOR ACTIONS ATTRIBUTABLE TO IT UNDER THE TREATY AND INTERNATIONAL LAW

189. Customary international law on questions of State responsibility is largely codified in the ARSIWA, as adopted by the International Law Commission (**"ILC"**) (with commentaries) in 2001.[352]  ARSIWA Article 2 provides in terms that:

> *"There is an internationally wrongful act of a State when conduct consisting of an action or omission:*
>
> *(a)     is attributable to the State under international law; and*
>
> *(b)     constitutes a breach of an international law obligation."*[353]

190. In relation to the present dispute, Nigeria is responsible for the conduct of its State actors which have deprived the Claimant of its investment, including, the Ogun State Government, NEPZA, the Nigerian police, and the Nigerian judiciary.  The wrongful conduct of these State organs triggers Nigeria's international responsibility within the meaning of ARSIWA Article 2 because:

(a)     their actions are attributable to Nigeria (**Section A**); and

(b)     their conduct amounts to a breach of Nigeria's obligations under the Treaty (**Section B**).

## A     The Framework of Attribution Under the ARSIWA

191. ARSIWA Articles 4, 5 and 8 provide the basic framework for attribution in customary international law.  In these proceedings, ARSIWA Articles 4 and 5 - dealing, respectively,

---

*investments made by nationals of one State in the territory of the other. The Treaty forms the legal basis for Claimants' claims against Respondent in this arbitration"*; *Petrobart Limited v Kyrgyz Republic*, SCC Case No. 126/2003, Final Award, 29 March 2005, ¶ VII.1.B, pp. 22-23, **CLA-034**, where the court deemed that the case was "*in its entirety a claim under international law and more specifically a Treaty claim"*; *Daimler Financial Services AG v Argentine Republic*, ICSID Case No. ARB/05/1, Award, 22 August 2012, ¶ 88, **CLA-031**; *RosInvestCo UK Ltd. v The Russian Federation*, SCC Case No. V079/2005, Final Award, 12 September 2010, ¶ 249, **CLA-035**.

[351] *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, ¶ 94, **CLA-036**; *Petrobart Limited v Kyrgyz Republic*, SCC Case No. 126/2003, Final Award, 29 March 2005, ¶ VII.1.B, p. 23, **CLA-034**; *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v Argentine Republic*, ICSID Case No. ARB/09/01, Award, 21 July 2017, ¶ 477, **CLA-030**; *Merck Sharp & Dohme (I.A.) LLC v Republic of Ecuador*, PCA Case No. 2012-10, Second Decision on Interim Measures, 6 September 2016, ¶ 33, **CLA-037**.

[352] J Crawford, *Brownlie's Principles of Public International Law* (8th edn: OUP 2012) 539–540, **CLA-038**. International Law Commission, "Draft articles on Responsibility of States for Internationally Wrongful Acts, with commentaries", 2001, Vol II Part Two Yearbook of the International Law Commission (hereinafter "**ARSIWA Commentary**"), **CLA-039**.

[353] ARSIWA, Art.2, **CLA-027**.

JA-236

with State organs and parastatal entities - provide the relevant bases for attribution of the numerous specific wrongful acts to Nigeria.

### 1.   ARSIWA Article 4 - State Organs (*de jure* and *de facto*)

192.   ARSIWA Article 4 provides as follows:

> *"1.   The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.*
>
> *2.   An organ includes any person or entity which has that status in accordance with the internal law of the State.*"[354]

193.   Article 4 of the ARSIWA covers all organs of a State - being "*the individual or collective entities which make up the organization of the State and act on its behalf*"[355] - irrespective of their function or status within the internal hierarchy of the State.  The ILC itself confirmed this in its commentary to Article 4:

> "*Thus the reference to a State organ in article 4 is intended in the most general sense.  It is not limited to the organs of the central government, to officials at a high level or to persons with responsibility for the external relations of the State.  It extends to organs of government of whatever kind or classification, exercising whatever functions, at whatever level in the hierarchy, including those at provincial or even local level.  No distinction is made for this purpose between legislative, executive or judicial organs.*"[356]

194.   The content of Article 4 was confirmed as customary international law in the International Court of Justice's ("**ICJ**") advisory opinion on *Difference Relating to Immunity from Legal Process of a Special Rapporteur of the Commission on Human Rights*.  There, the Court said that:

> "[a]*ccording to a well-established rule of international law, the conduct of any organ of a State must be regarded as an act of that State. This rule* [...] *is of customary character.*"[357]

195.   ARSIWA Article 4 has also been applied in the investor–State context.  For example, the provision was cited and relied on in *Ampal v Egypt*, with the tribunal there stating that the

---

[354] ARSIWA, Art. 4, **CLA-027**.

[355] ARSIWA Commentary, Art. 4, ¶ 1, **CLA-039**.

[356] ARSIWA Commentary, Art. 4, ¶ 5, **CLA-039**.

[357] *Difference Relating to Immunity from Legal Process of a Special Rapporteur of the Commission on Human Rights,* Advisory Opinion, 29 April 1999, ICJ Reports 1999, ¶ 62, **CLA-040**. The Court cited the rule now embodied in Article 4 of the ARSIWA, which was then at Article 6. See also, *Case Concerning Armed Activities on the Territory of the Congo (DRC v Uganda*), Judgment, 19 December 2005, ICJ Reports 2005, ¶ 213, **CLA-041**.

JA-237

ARSIWA "*form part of the applicable customary law*".[358]  It was also cited and relied upon - along with the paragraph of the ARSIWA Commentary set out above - in *Mytilineos v Serbia*[359] and *Gavrilović v Croatia*.[360]

196.     Where an entity is found to be an organ of the State, all of its acts, irrespective of their character, will be attributed to the State so long as they are done in the entity's capacity as an organ of the same.[361]

197.     State organs will often be recognised as such by the State's internal legal order - referred to as an organ *de jure*.  Thus, in *Eureko v Poland*, the State Treasury was recognized as an organ of the Polish State.[362]  However, the fact a particular entity has a legal personality separate from that of the State as a matter of municipal law does not necessarily mean that it cannot be considered an organ for the purposes of Article 4.  As the ARSIWA Commentary notes:

> "*it is not sufficient to refer to internal law for the capacity of State organs.  In some systems the status and functions of various entities are determined not only by law but also by practice, and reference exclusively to internal law would be misleading*".  Put another way, "*a State cannot avoid responsibility for the conduct of a body which does in truth act as one of its organs merely by denying it that status under its own law*".[363]

198.     Thus, in the *Bosnian Genocide* case, the ICJ recognized the existence of another category of organ - an organ *de facto* - in the following terms:

> "[P]*ersons, groups of persons or entities may, for the purposes of international responsibility, be equated with state organs even if that status does not follow from internal law, provided that in fact the persons, groups or entities act in 'complete dependence' on the State, of which they are ultimately merely the instrument.  In such a case, it is appropriate to look beyond legal status alone, in order to grasp the reality of the relationship between the person taking action, and the State to which he is so closely attached as to appear to be nothing more than its agent: any other solution would allow States to escape their international responsibility by choosing*

---

[358] *Ampal-American Israel Corporation & Ors v Arab Republic of Egypt*, ICSID Case No. ARB/12/11, Decision on Liability and Heads of Loss, 21 February 2017, ¶ 135, **CLA-042**.

[359] *Mytilineos Holdings SA v State Union of Serbia & Montenegro and Republic of Serbia*, UNCITRAL, Partial Award on Jurisdiction, 8 September 2006, ¶¶ 175–176, **CLA-009**

[360] *Gavrilović & Gavrilović D.O.O. v Republic of Croatia*, ICSID Case No. ARB/12/39, Award, 26 July 2018, ¶ 798, **CLA-043**

[361] ARSIWA Commentary, Art. 4, ¶ 6, **CLA-039**.  See further *Alpha Projektholding GmbH v Ukraine*, ICSID Case No. ARB/07/16, Award, 8 November 2010, ¶ 402, **CLA-044**.

[362] *Eureko B.V. v Republic of Poland*, UNCITRAL, Partial Award, 19 August 2005, ¶¶ 127–134, **CLA-045**

[363] ARSIWA Commentary, Art 4, ¶ 11, **CLA-039**.

*to act through organs or entities whose supposed independence would be purely fictitious.*"[364]

199. As Petrochilos observes, the question of whether a separate legal person can be considered a *de facto* organ of the State is answered by reference to that organ's relative independence as matter of fact: "*if an entity has no institutional separateness, it should be considered a state organ*".  He adds:

> "*Relevant indications will include, notably, the matter in which the relevant body has been established and the manner in which it has been constituted; whether its functions are fully controlled by law (as opposed to being subject to freedom of contract); whether it has prerogatives of power that individuals cannot lawfully exercise; or whether it is funded exclusively by the state.*"[365]

200. Thus, in *Flemingo v Poland*, a tribunal concluded that the Polish Airports State Enterprise (**"PPL"**), a State-owned entity managing Warsaw's Chopin Airport, was a *de facto* organ of the Polish state on the basis that, *inter alia*: (a) PPL was owned by the State Treasury; (b) certain of PPL's commercial activities required State Treasury approval; (c) management of an airport was not an activity usually carried out by a private business; (d) PPL performed strategic functions for the existence of the state; (e) PPL's statutory framework allowed the Ministry of Transport control over the PPL's management, including auditing, finances, staff salary and property; and (f) PPL was protected from bankruptcy.[366]

201. Similarly, in *Deutsche Bank v Sri Lanka*, an ICSID tribunal considered that the Ceylon Petroleum Corporation (**"CPC"**) was a *de facto* organ of the Sri Lankan State on the basis (*inter alia*) that: (a) CPC was a State-owned entity; (b) it was established by statute for the purpose of conducting government policy; (c) there was significant evidence as to governmental control over CPC's personnel, finances and decision-making; and (d) CPC was required to comply with direct instructions from Sri Lanka's Ministry of Petroleum.[367]

### 2.   ARSIWA Article 5 - Parastatal Entities

202. ARSIWA Article 5 provides:

> "*The conduct of a person or entity which is not an organ of the State under article 4 but which is empowered by the law of that State to exercise elements of the governmental authority shall be considered an act of the*

---

[364] *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia & Herzegovina v Serbia & Montenegro)*, Judgment, 26 February 2007, ICJ Reports p 43, ¶ 392, **CLA-046**.

[365] G Petrochilos, 'Attribution: State Organs and Entities Exercising Elements of Governmental Authority', in K Yannaca-Small (ed), *Arbitration Under International Investment Agreements: A Guide to the Key Issues* (2nd edn: OUP 2018) 332, ¶ 14.25, **CLA-047**.

[366] *Flemingo DutyFree Shop Private Limited v Republic of Poland*, UNCITRAL, Award, 12 August 2016, ¶¶ 427–430, **CLA-010**.

[367] *Deutsche Bank AG v Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/2, Award, 31 October 2012, ¶ 405, **CLA-048**.  See also *Ampal v Egypt*, Decision on Liability, ¶¶ 138–140, **CLA-042**.

*State under international law, provided the person or entity is acting in that capacity in the particular instance.*"[368]

203.   This provision is intended to deal with a situation in which a State - via statute or some other mechanism - bestows the power to exercise State powers on an entity that is not its organ for the purposes of ARSIWA Article 4: this is referred to as a "parastatal" entity.[369] As with Article 4, Article 5 has been deemed reflective of custom.[370]

204.   By its terms, Article 5 imposes two conditions for an entity's act to be attributed to the State:

   (a)   the entity must be empowered by the State to exercise governmental authority; and

   (b)   the act complained of must have been undertaken by the entity in the exercise of that authority.[371]

205.   Neither the ARSIWA nor the ARSIWA Commentary purports to define 'governmental authority' for the purposes of Article 5.   Rather, the ILC determined that customary international law was reflected in an open-ended test based on the particular characteristics of each State:

   "*Beyond a certain limit, what is regarded as 'governmental' depends on the particular society, its history and traditions.  Of particular importance will not just be the content of the powers, but the way they are conferred on the entity, the purposes for which they are to be exercised and the extent to which the entity is accountable to the government for their exercise.  These are essentially questions on the application of a general standard to varied circumstances.*"[372]

206.   What is 'governmental' with respect to a particular State may be answered by reference to those functions or powers that the State reserves to itself.[373]   This may include a wide variety of functions, including "core" State powers such as police powers, immigration and

---

[368] ARSIWA, Art. 5, **CLA-027**.

[369] ARSIWA Commentary, Art. 5, ¶ 1, **CLA-039**.

[370] See e.g. *Ampal v Egypt*, Decision on Liability, ¶ 135, **CLA-042**; *Gavrilović and Gavrilović D.O.O. v Republic of Croatia*, Award, ¶¶ 810–811, **CLA-043**; *Flemingo v Poland*, Award, ¶¶ 420–423, **CLA-010**.

[371] Petrochilos, 'Attribution', ¶ 14.35, **CLA-047**.

[372] ARSIWA Commentary, Art. 5, ¶ 6, **CLA-039**.

[373] Petrochilos, 'Attribution', ¶ 14.37, **CLA-047**.

JA-240

quarantine control[374] or the management or privatization of State-owned assets,[375] as well as 'non-core' powers such as airport services[376] or industrial planning.[377]

207.    Whether a governmental power is being exercised in a particular situation encompasses not only when the relevant power is exercised directly, but also where the act in question is closely connected to that power so as to amount to an execution of the governmental mandate.[378]  Thus, in *Mesa Power v Canada*, contracts for the supply of power into the electricity system were considered to be attributable to Canada[379] on the basis of an authority conferred on a State corporation to manage the supply of electricity.[380]  And in *Flemingo v Poland*, PPL's actions with respect to particular commercial leases in Chopin Airport were considered attributable to the state as the relevant leases were terminated in order to fulfil PPL's statutory mission concerning the construction, extension and maintenance of airport terminals.

### B    Attribution of Acts to Nigeria

208.    In light of these established customary international law rules, the unlawful actions of: (1) the Ogun State Government; (2) NEPZA; (3) the Nigerian police; and (4) the Nigerian courts, are attributable to Nigeria.

### 1.    The Actions of the Ogun State Government are Attributable to Nigeria

209.    It is uncontroversial that actions of the federal subdivisions or provinces of a State are attributable to that State for the purposes of ARSIWA Article 4.[381] As was said by the tribunal in *Vivendi v Argentina*:

"*Under international law, and for purposes of jurisdiction of this Tribunal, it is well established that actions of a political subdivision of federal state, such as the Province of Tucumán in the federal state of the Argentine Republic, are attributable to the central government. It is equally clear that the internal constitutional structure of a country cannot alter these obligations.*"[382]

---

[374] ARSIWA Commentary, Art. 5, ¶ 2, **CLA-039**.

[375] *Helnan International Hotels AS v Arab Republic of Egypt*, ICSID Case No. ARB/05/19, Decision on Jurisdiction, 17 October 2006, ¶ 93, **CLA-049**.

[376] *Flemingo v Poland*, Award, ¶¶ 427–430, **CLA-010**.

[377] *Fedders Corporation v Loristan Refrigeration Industries & Ors* (1986-IV) 13 Iran–US CTR 97, 98, **CLA-050**.

[378] Petrochilos, 'Attribution', ¶ 14.57, **CLA-047**.

[379] *Flemingo v Poland*, Award, ¶¶ 440–447, **CLA-010**.

[380] *Mesa Power Group LLC v Government of Canada*, PCA Case No. 2012-17, Award, 24 March 2016, ¶¶ 367–377, **CLA-051**.

[381] ARSIWA Commentary, Art. 4, ¶ 9, **CLA-039**.

[382] *Compañía de Aguas del Aconquija SA and Vivendi Universal SA v Argentine Republic*, ICSID Case No. ARB/97/3, Award, 21 November 2000**, ¶ 49, **CLA-052**.

210.  Ogun State is one of the 36 states of the Federal Republic of Nigeria.[383] Therefore, all the unlawful actions taken by the Ogun State Government towards the Claimant, including the Notice of Termination and eviction from the Zone, are attributable to Nigeria under the Treaty.

### 2.   The Actions of NEPZA are Attributable to Nigeria

211.  NEPZA is an administrative agency which forms part of the executive branch of Nigeria and is therefore a *de jure* organ for the purposes of ARSIWA Article 4. NEPZA was created by Nigerian Statute - namely the NEPZA Act - to execute functions of the executive branch of government, such as the establishment of customs, police and immigration in such zones.[384] In the alternative, NEPZA clearly meets the criteria - like PPL in *Flemingo v Poland* and CPC in *Deutsche Bank v Sri Lanka* - of a *de facto* organ for the purposes of ARSIWA Article 4. Multiple facts lead to this conclusion, as revealed by the terms of NEPZA's constituent legislation, the NEPZA Act and associated regulations:[385]

(a)   NEPZA is an entity created by statute and wholly owned by the Nigerian State.[386]

(b)   NEPZA was created for an overwhelmingly governmental purpose, namely the supervision and management of Nigeria's Free Zones[387] - including the Zone - as established by the President of Nigeria.[388]

(c)   To that end, NEPZA was granted a wide range of governmental powers including:[389] recommending the creation of Free Zones; approving Free Zone development plans and budgets; establishing customs, police and immigration posts in the Free Zones; supervision and coordination of public and private sector organizations within each Free Zone; resolution of labour disputes, granting of licenses and registrations to operate within each Free Zone; and making regulations for the proper implementation of the NEPZA Act.

(d)   A majority of NEPZA's board is made up of representatives from various government departments (the Ministries of Commerce, Culture and Tourism, Industry and Science and Technology, the Comptroller-General of Customs, the Nigerian Ports Authority and the Central Bank of Nigeria) and appointees of the responsible Minister.[390]

---

[383] Constitution of the Federal Republic of Nigeria of 1999, Art. 3(1) and First Schedule to the Constitution, **C-195**.

[384] NEPZA Act, s. 4, **C-025**.

[385] NEPZA Act, **C-025**; NEPZA Regulations, **C-026**.

[386] NEPZA Act, s. 2, **C-025**.

[387] NEPZA Act, s. 4(a), **C-025**.

[388] NEPZA Act, s. 1(1), **C-025**.

[389] NEPZA Act, ss. 1(1), 4, 10, 27, **C-025**.

[390] The only non-government-appointed members of the NEPZA board were three representatives from industry bodies: NEPZA Act, s. 3(1), **C-025**.

(e)   The chairman of NEPZA's board[391] and NEPZA's managing director[392] are both appointed by the President.

(f)   The President has the power to fire any NEPZA board member at will.[393]

(g)   NEPZA is required to produce annual estimates and accounts to the relevant Minister and must have the latter audited by a government-approved auditor.[394]

(h)   NEPZA participates in drafting legislation and guidelines concerning trade and tax policy,[395] as well as in relation to immigration and employment matters.[396]

212.   In the further alternative, NEPZA is undeniably at a minimum a parastatal entity within the context of ARSIWA Article 5.  It has been granted a multitude of governmental powers (set out at paragraph 211(c) above) and the acts complained of were clearly undertaken in the course of them being exercised.  This includes - but is not limited to - the following:

(a)   NEPZA exercised governmental authority by calling a meeting on 22 July 2016 at which it oversaw the takeover of Zhongfu Nigeria's rights and investment in the Zone;[397]

(b)   NEPZA exercised governmental authority by requiring in a directive to the Nigeria Immigration Service dated 27 July 2016 that any Zhongfu Nigeria employee that left or travelled from the Zone would be required to submit their original CERPAC to the Nigeria immigrations service (and could only leave with a copy of the original CERPAC) thereby compromising their freedom of movement from the Zone and in Nigeria;[398] and

(c)   NEPZA exercised governmental authority by enforcing NSG's takeover of the Claimant's and Zhongfu Nigeria's rights and investment in the Zone.[399]

### 3.   The Actions of the Nigerian police force are Attributable to Nigeria

213.   The police, security and intelligence services are - self-evidently - organs of the State.  Thus, in *Al Tamimi v Oman*, the arbitral tribunal confirmed that:

---

[391] NEPZA Act, s. 3(1), **C-025**.

[392] NEPZA Act, s. 5(1), **C-025**.

[393] NEPZA Act, s. 3(3), **C-025**.

[394] NEPZA Act, s. 23(1), **C-025**.

[395] NEPZA Regulations, Part 6, Art. 1, **C-026,** ("[t]*he Authority shall in consultation with the Federal Inland Revenue Service publish agreed guidelines as to the tax implication of transaction between Free Zones and Free Zone Enterprises with entities within the customs territory.*").

[396] NEPZA Regulations, Part 6, Art. 2, **C-026,** ("[t]*he Authority shall work in consultation with the Nigerian Immigration Service to publish agreed guidelines, procedures and regulations.*")

[397] Letter from NEPZA to All Free Zone Enterprises (OGFTZ), 21 July 2016, **C-163**.

[398] Letter from NEPZA to the Nigeria Immigration Service, 27 July 2016**, C-167**.

[399] G. Elias & Co., Report of the Meeting with the Divisional Police Officer, Ota Division on 5 December, 6 December 2016, **C-186**; Report from Steven Allen, 30 March 2017, **C-183**.

*"There is no question that State organs such as government ministries and the State police force operate as arms of the State, and indeed [...] such entities are characterised by their exercise of 'regulatory, administrative or governmental' authority."*[400]

214.   Therefore, the actions of the Nigerian police in assisting with, and/or permitting, the seizure of the Claimant's and Zhongfu Nigeria's assets and land rights in the Zone are attributable to Nigeria. Likewise, the wrongful arrest and detention of Mr. Zhao and his mistreatment while in custody by the Nigerian police are also attributable to Nigeria.

### 4.   The actions of Nigeria's courts are attributable to Nigeria

215.   It is beyond doubt that, as a matter of customary international law, judicial bodies are considered State organs,[401] as expressly recognised in the text of ARSIWA Article 4.  This principle has accepted without question by multiple investment treaty tribunals. Thus, in *Saipem v Bangladesh*, the tribunal stated that "*the courts are 'part of the State' and, thus, their actions are attributable to Bangladesh*".[402] Similarly, in *Azinian v Mexico* it was said that "[a]*lthough independent of the Government, the judiciary is not independent of the State: the judgment given by a judicial authority emanates from an organ of the State in just the same way as a law promulgated by the legislature or a decision taken by the executive.*"[403]  And in *ATA v Jordan*, the tribunal attributed the conduct of the host State's judiciary to the State when it found that the extinguishment of the claimant's right to arbitration under an arbitration agreement by the Jordanian Court of Cassation was a breach of the Turkey-Jordan BIT.[404]

216.   Therefore, the wrongful conduct of the Nigerian courts in issuing the anti-arbitration injunction,[405] denying the Claimant its right to a fair hearing in the appropriate forum, is attributable to Nigeria.

---

[400] *Adel A Hamadi Al Tamimi v Sultanate of Oman*, ICSID Case No. ARB/11/33, Award, 27 October 2015, ¶ 344, **CLA-053**. See also *Ivan Peter Busta and James Peter Busta v Czech Republic*, SCC Case No. V 2015/014, Final Award, 10 March 2017, **CLA-054**, ¶ 400.

[401] ARSIWA Commentary, Art. 4, ¶ 6, **CLA-039**.

[402] *Saipem SpA v The People's Republic of Bangladesh*, ICSID Case No. ARB/05/07, Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007, ¶ 143, **CLA-028**. See also *Dan Cake (Portugal) SA v Hungary*, ICSID Case No. ARB/12/9, Decision on Jurisdiction and Liability, 24 August 2015, ¶ 143, **CLA-055** ("*there is no dispute as to the fact that the act of a State court is attributable, under international law, to the State itself.*").

[403] *Azinian, Davitian, & Baca v Mexico*, ICSID Case ARB(AF)/97/2, Award, 1 November 1999, ¶ 98, **CLA-056**.

[404] *ATA Construction, Industrial and Trading Company v The Hashemite Kingdom of Jordan*, ICSID Case No. ARB/08/2, Award, 18 May 2010, ¶¶ 116-125, 127-129, 132, 133(3), **CLA-015**.

[405] Judgment of the High Court of Justice of the Ogun State of Nigeria, Suit No. AB/04/17, 29 March 2017, **C-192**.

JA-244

## VII.   NIGERIA'S ACTIONS ARE IN BREACH OF THE TREATY AND INTERNATIONAL LAW

217.   As a result of the actions described above, Nigeria has breached a number of its international obligations under the Treaty with respect to its treatment of the Claimant's investment in Nigeria.  Nigeria's breaches of the Treaty include the following:

(a)   Nigeria violated its obligation of fair and equitable treatment (**Section A**);

(b)   Nigeria failed to afford continuous / full protection and security (**Section B**)

(c)   Nigeria took unreasonable measures (**Section C**); and

(d)   Nigeria wrongfully expropriated the Claimant's investments without compensation, or alternatively took measures the effect of which was equivalent to expropriating the Claimant's investment (**Section D**).

### A   Nigeria did not Treat the Claimant's Investment Fairly and Equitably

#### 1.   The Content of the Fair and Equitable Treatment Standard

218.   Article 3(1) of the Treaty provides that:

> "[I]*nvestments of investors of each Contracting party shall all the time be accorded fair and equitable treatment in the territory of the other Contracting Party.*"[406]

219.   When interpreting the meaning and effect of a provision of the Treaty, the Tribunal must do so in accordance with the general rule of treaty interpretation, as set out in Article 31(1) of the VCLT.  This article provides that a treaty must be interpreted "*in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*"[407]

220.   As explained above, Article 31(2) of the VCLT elaborates that the *"context for the purpose of the interpretation of a treaty"* includes its "*preamble and annexes.*"[408]  The preamble of a treaty is "*a principal and natural source from which indications can be gathered of a treaty's objects and purposes even though the preamble does not contain substantive provisions*".[409]  As such, the Preamble to the Treaty acknowledges that Nigeria has agreed to the obligations in the Treaty:

---

[406] China-Nigeria BIT, Art. 3(1), **CLA-001**.

[407] VCLT, Art. 31(1), **CLA-018**.

[408] VCLT, Art. 31(2), **CLA-018**.

[409] *Arbitral Award of 31 July 1989 (Guinea-Bissau v Senegal)*, Judgment, Dissenting Opinion of Judge Weeramantry, 12 November 1991, ICJ Reports 1991, p. 142, **CLA-026**, citing *Rights of Nationals of the United States of America in Morocco (France v United States of America)*, Judgment, 27 August 1952, ICJ Reports 1952, p. 196, **CLA-057** and *Asylum (Colombia v Peru)*, Judgment, 20 November 1950, ICJ Reports 1950, p. 282, **CLA-058**.

(a)  "*Recognizing that the reciprocal encouragement, promotion, and protection of such investments will be conducive to stimulating business initiative of the investors and will increase prosperity in both States;*" and

(b)  "*Determined to create favourable conditions for greater investment* [in its territory]."[410]

221.  It is in this light that the fair and equitable treatment ("**FET**") standard - and indeed all of the obligations - in the Treaty must be interpreted.  It follows that the obligation to "*all the time* [accord] *fair and equitable treatment*" is placed in the context of an obligation to "*promote*" and "*protect*" investments and "*create favourable conditions*" for investments. Similar terms to these have been interpreted to imply a requirement on a host State to adopt proactive conduct "*rather than prescriptions for a passive behavior of the State or avoidance of prejudicial conduct to the investors".[411]*

222.  There is a substantial body of investment treaty jurisprudence which has interpreted the meaning of the "*fair and equitable treatment*" standard.[412]  While these interpretations are helpful to guide the Tribunal in the application of Article 3(1) of the Treaty, the ordinary meaning of this provision must prevail.  Therefore, the overarching question for this Tribunal is whether, in light of the object and purpose of the Treaty to create "*favourable conditions for greater investment*", did Nigeria treat the Claimant's investment, including its rights, its property and its employees, "*fairly and equitably*".  As will be shown, Nigeria fell far short of according such treatment.

223.  Previous investment treaty tribunals have accepted that the FET standard is "*an autonomous treaty standard, whose precise meaning must be established on a case-by-case basis.  It requires an action or omission by the State which violates a certain threshold of propriety, causing harm to the investor, and with a causal link between action or omission and harm.*"[413]  This threshold must be determined by the Tribunal on the basis of the wording in Article 3(1) of the Treaty.  There is a significant body of jurisprudence on

---

[410] China-Nigeria BIT, Preamble, **CLA-001**.

[411] See *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, ¶ 113, **CLA-059**; *Siemens A.G. v Argentine Republic*, ICSID Case No. ARB/02/8, Award, 6 February 2007, ¶ 290, **CLA-121**.

[412] *Joseph C Lemire v Ukraine* II, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010, ¶ 284, **CLA-060**; *Biwater Gauff (Tanzania) Limited v United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, ¶ 602, **CLA-061**; *Rumeli Telekom AS and Telsim Mobil Telekomikasyon Hizmetleri AS v Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, ¶ 609, **CLA-062**.

[413] *Joseph C Lemire v Ukraine* II, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010, ¶ 284, **CLA-060**. See also *Rumeli Telekom AS and Telsim Mobil Telekomikasyon Hizmetleri AS v Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, ¶ 610, **CLA-062**.

the factors which a Tribunal can have regard to when determining whether this threshold has been breached, which include, amongst others:[414]

(a)     whether the host State has denied the investor due process;[415]

(b)     whether the host State failed to act in a transparent manner towards the investor;[416]

(c)     whether the host State has permitted harassment or coercion of the investor;[417]

(d)     whether the host State has acted in a manner that is arbitrary, unfair, unjust or idiosyncratic;[418] and

(e)     whether the host State failed to respect the investor's legitimate expectations.[419]

224.    The case law is clear that not all these factors must be present for a violation of the FET standard to be found.  Indeed, there will be a violation of the FET standard under the Treaty if any one of these factors is present.[420]  In this case, as the Claimant has shown, Nigeria's conduct falls within each one of the factors identified in the previous paragraph.

---

[414] See e.g., *Tecnicas Medioambientales Tecmed SA v United Mexican States,* ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, ¶ 154, **CLA-063** ("*The foreign investor expects the host State to act in a consistent manner, free from ambiguity and totally transparently in its relations with the foreign investor, so that it may know beforehand any and all rules and regulations that will govern its investments, as well as the goals of the relevant policies and administrative practices or directives, to be able to plan its investment and comply with such regulations. Any and all State actions conforming to such criteria should relate not only to the guidelines, directives or requirements issued, or the resolutions approved thereunder, but also to the goals underlying such regulations. The foreign investor also expects the host State to act consistently, i.e. without arbitrarily revoking any pre-existing decisions or permits issued by the State that were relied upon by the investor to assume its commitments as well as to plan and launch its commercial and business activities. The investor also expects the State to use the legal instruments that govern the actions of the investor or the investment in conformity with the function usually assigned to such instruments, and not to deprive the investor of its investment without the required compensation.*").

[415] *Rumeli Telekom AS and Telsim Mobil Telekomikasyon Hizmetleri AS v Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, ¶ 609, **CLA-062**; *Waste Management Inc v United Mexican States ("Number 2")*, ICSID Case No. ARB(AF)/00/3, Final Award, 30 April 2004, ¶ 98, **CLA-064**; *Joseph C Lemire v Ukraine* II, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010, ¶ 284, **CLA-060**.

[416] *Emilio Agustin Maffezini v the Kingdom of Spain*, ICSID Case No. ARB/97/7, Award of 13 November 2000, ¶ 83, **CLA-065**; *Rumeli Telekom AS and Telsim Mobil Telekomikasyon Hizmetleri AS v Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, ¶ 609, **CLA-062**; *Joseph C Lemire v Ukraine II*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010, ¶ 284, **CLA-060**; *Biwater Gauff (Tanzania) Limited v United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, ¶ 602, **CLA-061**.

[417] *Desert Line Projects LLC v The Republic of Yemen*, ICSID Case No. ARB/05/17, Award, 6 February 2008, **CLA-066**, ¶¶ 188-290; *Joseph C Lemire v Ukraine* II, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010, ¶ 284, **CLA-060**.

[418] *Rusoro Mining Ltd. v Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/12/5, Award, 22 August 2016, ¶ 524, **CLA-067**. See also *Casinos Austria International GmbH and Casinos Austria Aktiengesellschaft v Argentine Republic*, ICSID Case No. ARB/14/32, Decision on Jurisdiction, 29 June 2018, ¶ 242, **CLA-068**; *Anglo American PLC v Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/14/1, Award, 18 January 2019, ¶ 443, **CLA-069**; *Joseph C Lemire v Ukraine* II, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010, ¶ 284, **CLA-060**.

[419] *Occidental v Republic of Ecuador*, LCIA Case No. UN3467, Award, 1 July 2004, ¶ 183, **CLA-070***; Rumeli Telekom AS and Telsim Mobil Telekomikasyon Hizmetleri AS v Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, ¶ 609, **CLA-062**; *Anglo American PLC v Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/14/1, Award, 18 January 2019, ¶ 443, **CLA-069**; *Joseph C Lemire v Ukraine* II, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010, ¶ 284, **CLA-060**; *Técnicas Medioambientales Tecmed, S.A. v The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003, ¶ 163, **CLA-063**.

[420] See e.g., *Rumeli Telekom AS and Telsim Mobil Telekomikasyon Hizmetleri AS v Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, ¶ 617, **CLA-062**.

### 2. Nigeria has Denied the Claimant's Right to Due Process in Violation of the FET Standard

225. Investment treaty tribunals have consistently interpreted provisions containing the FET standard to include an obligation of the host State to comply with due process.[421]   In particular, arbitral tribunals have accepted that a failure to ensure due process can concern both judicial proceedings, as well as due process in the administrative acts of the State.[422]   For example, in *Waste Management v Mexico II*, the arbitral tribunal held that the FET standard is breached where the action of the host State involves a "*lack of due process leading to an outcome which offends judicial propriety—as might be the case with a manifest failure of natural justice in judicial proceedings or a complete lack of transparency and candour in an administrative process.*"[423]   When considering whether there was a breach of the FET standard, the arbitral tribunal in *Kardassopoulos and Fuchs v Georgia* stressed the need to give an investor a reasonable chance, within a reasonable timeframe, to claim its legitimate rights and have its claims heard.[424]

226. A number of investment treaty tribunals have also held that the cancellation of a permission or license granted to a foreign investor without meeting due process and procedural requirements can be a breach of the FET standard.  These cases have included the refusal to grant a construction permit without giving the investor the opportunity of a hearing[425] and the revocation of a construction license by the relevant governmental authority, without allowing the claimant to respond to the infringements alleged, or opportunity to cure them.[426]

227. Multiple actions taken by Nigeria, have denied the Claimant's right to due process, thereby violating the FET standard in the Treaty.  These include, but are not limited to, the following, which considered, either individually or collectively, entail a breach of the FET standard.

---

[421] *Rumeli Telekom AS and Telsim Mobil Telekomikasyon Hizmetleri A.S. v Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, ¶ 609, **CLA-062**. ("[T]*he fair and equitable treatment standard encompasses" the principle that "the State must respect procedural propriety and due process.*"); *Olin Holdings Ltd v State of Libya*, ICC Case No. 20355/MCP, Award, 25 May 2018, ¶¶ 346-347, **CLA-071**; *Anglo American PLC v Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/14/1, Award, 18 January 2019, ¶¶ 461-462, **CLA-069**; *International Thunderbird Gaming Corporation v United Mexican States*, UNCITRAL, Award, 26 January 2006, ¶ 289, **CLA-072**.

[422] SW Schill, "Fair and Equitable Treatment, the Rule of Law, and Comparative Public Law" in WS Schill (ed*), International Investment Law and Comparative Public Law* (Oxford University Press 2010), p. 166, **CLA-073**.

[423] *Waste Management Inc v United Mexican States ("Number 2")*, ICSID Case No. ARB(AF)/00/3, Final Award, 30 April 2004, ¶ 98, **CLA-064**; *The Loewen Group, Inc. and Raymond L. Loewen v United States of America*, ICSID Case No. ARB(AF)/98/3, Final Award, 26 June 2003, ¶ 131, **CLA-074**.

[424] *Ioannis Kardassopoulos and Ron Fuchs v Republic of Georgia*, ICSID Case Nos. ARB/05/18 and ARB/07/15, Award, 3 March 2010, ¶ 396, **CLA-075**. See also *ADC Affiliate Limited and ADC & ADMC Management Limited v Republic of Hungary*, ICSID Case No. ARB/03/16, Award of the Tribunal, 2 October 2006, ¶ 435, **CLA-076**; *PSEG Global, Inc., The North American Coal Corporation, and Konya Ingin Electrik Üretim ve Ticaret Limited Sirketi v Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, ¶ 246, **CLA-077**.

[425] *Metalclad Corporation v The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000, ¶¶ 91, 101, **CLA-078**.

[426] *Tecnicas Medioambientales Tecmed SA v United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, ¶¶ 161-162, 174, **CLA-063**.

JA-248

228. First, the Ogun State Government ran roughshod over Zhongfu Nigeria's rights under both the Fucheng Industrial Park Agreement and the JVA by initially threatening Zhongfu Nigeria to "*leave peacefully when there is* [an] *opportunity to do so, and avoid forceful removal, complications and possible prosecution*"[427] and then employing the Nigerian police and NEPZA to intimidate and evict Zhongfu Nigeria from the Zone.  Eventually, through these, and other actions - such as NEPZA seeking to collect immigration papers (known as CERPACs) from Zhongfu Nigeria's staff[428] and the Nigerian police arresting and physically beating Mr. Zhao - Nigeria forced Zhongfu Nigeria's Management Team to leave the country.  The Ogun State Government and NEPZA ignored repeated pleas from Zhongfu Nigeria's legal counsel that Zhongfu Nigeria was a *"valid subsisting registered enterprise and a lawful tenant in the Zone … As such, Zhongfu cannot be evicted from the Zone.*"[429]

229. Second, the Ogun State Government purported to terminate the JVA without providing Zhongfu Nigeria with an opportunity to respond and have its legitimate rights considered in accordance with due process.  Indeed, when Zhongfu Nigeria wrote on 26 May 2016 requesting a meeting to clarify its legitimate rights in OGFTZ Company and the Zone, the Ogun State Government responded the very next day - without providing Zhongfu Nigeria with an opportunity to explain its position - by dramatically purporting to terminate the JVA.[430]  Moreover, following the purported termination, the Ogun State Government proceeded to engage the Nigerian police and NEPZA to enforce the purported termination of the JVA and physically take over the Claimant's investment in the Zone.

230. Third, the Ogun State Government and NEPZA ignored the unequivocal and direct instructions from the Solicitor-General of Nigeria to preserve the *status quo ante* in the Zone pending court processes which were commenced to validate the Claimant's rights.[431]  The Solicitor-General of Nigeria warned NEPZA and the Ogun State Government on 17 October 2016, that they should:

> "*refrain from taking any further steps in this matter, particularly in relation to the alleged 'resort to self help to forcibly evict Zhongfu and its personnel from the zone' being planned and/or contemplated by the State*

---

[427] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**; Email from Email from Jason Han to Elizabeth Uwaifo, 25 September 2016, **C-012**.

[428] Letter from NEPZA to the Nigeria Immigration Service, 27 July 2016**, C-167**.

[429] Letter from G. Elias & Co. to Managing Director of NEPZA, 21 September 2016, **C-180**; See also Letter from G. Elias & Co. to NEPZA, 21 September 2016, **C-181**.

[430] Letter from Zhongfu International Investment (NIG) FZE to Secretary to the State Government of Ogun State, 26 May 2016, **C-157**; Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 27 May 2016, **C-158**.

[431] Letter from Solicitor-General of the Federation and Permanent Secretary to Secretary to the State Government, Ogun State Secretariat, 17 October 2016, **C-013**; Letter from Solicitor-General of the Federation and Permanent Secretary to NEPZA, 17 October 2016, **C-185**.

JA-249

*Government, NEPZA or any of its representatives or agent[s]. Parties should maintain status quo ante. In this connection, and in line with extant laws, Zhongfu be allowed to exercise its mandate pending the determination of these matters, or any court order made pursuant thereto."* [432]

231. Far from refraining from taking further steps and allowing Zhongfu Nigeria to exercise its mandate pending the determination of these matters, the Ogun State Government continued to rely on the Nigerian police and NEPZA to enforce the takeover. The disregard of the instructions of Nigeria's own Solicitor-General evidences a manifest failure to preserve the Claimant's and Zhongfu Nigeria's due process rights.

232. Fourth, when Zhongfu Nigeria commenced the Singapore Arbitration Proceedings to have its contractual rights determined pursuant to the arbitration agreement in the JVA, the Ogun Court issued a "*forever injunction*" permanently restraining Zhongfu Nigeria "*from seeking and or continuing with any step, action, and or participate directly or otherwise from seeking and or continuing with any step, action and or participate directly or indirectly*" in the Singapore Arbitration Proceedings.[433] This decision was patently arbitrary and unjust as it failed to accord with the most basic principles of the New York Convention to which Nigeria is a Party. Nigeria's use of its own judiciary to thwart the Claimant's exercise of its legitimate right to have its contractual claims under the JVA resolved by a fair and impartial tribunal is a further clear violation of due process and the Treaty.

### 3. Nigeria has Failed to Act in a Transparent Manner

233. Investment treaty tribunals have consistently held that a State must act consistently and "*transparently in its relations with foreign investors*".[434] A failure on the part of State organs to act in a transparent manner would amount to a breach of the FET standard. Transparency means that the legal framework for the successful initiation, completion and operation of the investor's operations is readily known to the investor, and that any decisions affecting the investor can be traced to that legal framework.[435] In *LG&E v Argentina*, the arbitral tribunal found that:

> "having considered […] the sources of international law, understands that the fair and equitable standard consists of the host State's consistent and transparent behaviour, free of ambiguity that involves the obligation to grant

---

[432] Letter from Solicitor-General of the Federation and Permanent Secretary to Secretary to the State Government, Ogun State Secretariat, 17 October 2016, **C-013**; Letter from Solicitor-General of the Federation and Permanent Secretary to NEPZA, 17 October 2016, **C-185**.

[433] Judgment of the High Court of Justice of the Ogun State of Nigeria, Suit No. AB/04/17, 29 March 2017, **C-192**.

[434] *Tecnicas Medioambientales Tecmed SA v United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, ¶ 154, **CLA-063**. See also *Emilio Agustín Maffezini v Kingdom of Spain*, ICSID Case No. ARB/97/7, Award (Merits), 13 November 2000, ¶ 83, **CLA-065**; *CME Czech Republic B.V. v Czech Republic*, UNCITRAL, Final Award, 14 March 2003, ¶ 611, **CLA-079**; *Bernhard von Pezold and others v Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Award, 28 July 2015, ¶ 546, **CLA-080**.

[435] R Dolzer and C Schreuer, *Principles of International Investment Law* (Oxford University Press 2nd edn 2012), p. 149, **CLA-081**; *Metalclad Corporation v United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000, ¶ 76, **CLA-078**.

JA-250

> *and maintain a stable and predictable legal framework necessary to fulfil the justified expectations of the foreign investor.*[436]

234.   Similarly, the arbitral tribunal in *Rumeli v Kazakhstan* accepted that a State must "*act in a transparent manner*"[437] and that the failure to provide the claimant with "*a real possibility to present their position*" was a breach of the obligation to act transparently under the FET standard.[438]   Likewise, in *Teinver v Argentina* the tribunal held that the investor could expect that the host State "*would comply with its laws and regulations and act transparently.*"[439]   Put differently, the obligation of transparency requires that the host State, when taking a decision affecting a foreign investor in the exercise of its public administration, has an obligation to engage in "*open and frank communication*"[440] and must give reasons "*clearly and consistently and not deceptively*".[441]

235.   As the arbitral tribunal in *Al-Bahloul v Tajikistan* explained:

> *"The notion of transparency as an element of fair and equitable treatment has been expounded upon in a number of investment treaty arbitration decisions. Interpreting transparency in the context of the NAFTA treaty, the tribunal in Metalclad v. Mexico considered it 'to include the idea that all relevant legal requirements for the purpose of initiating, completing and successfully operating investments made, or intended to be made, under the Agreement should be capable of being readily known to all affected investors of another Party. There should be no room for doubt or uncertainty on such matters.'"*[442]

236.   As shown, the actions of Nigeria, through its State organs, demonstrate a failure to act transparently in relation to Zhongfu Nigeria's eviction from the Zone, as well as the arrest and detention of Mr. Zhao and the evisceration of the Claimant's investment.

237.   In particular, Nigeria's lack of transparency includes the Ogun State Government's failure to engage with Zhongfu Nigeria's repeated requests to have its rights under the Fucheng Industrial Park Agreement preserved.   For example, following the threats to Zhongfu Nigeria's Management Team and employees, Prof. Elias wrote to NEPZA requesting it to "*restore the status quo, prevent the bullying, oppressive and menacing tactics*" of the Ogun

---

[436] *LG&E Energy Corp v Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, ¶ 131, **CLA-036**.

[437] *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, ¶ 609, **CLA-062**.

[438] *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, ¶ 617, **CLA-062**.

[439] *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v Argentine Republic*, ICSID Case No. ARB/09/01, Award, 21 July 2017, ¶ 679, **CLA-030**.

[440] *Nordzucker v Poland*, UNCITRAL, Second Partial Award, Merits, 28 January 2009, ¶¶ 83-84, **CLA-082**.

[441] C McLachlan, L Shore, M Weineger, *International Investment* Arbitration (Oxford University Press 2nd edition 2017), ¶ 7.205(b), **CLA-083**.

[442] *Mohammad Ammar Al-Bahloul v The Republic of Tajikistan*, SCC Case No. V (064/2008), Partial Award on Jurisdiction and Liability, 2 September 2009, ¶ 183, **CLA-084**.

State Government and Mr. Onas.[443]  However, instead of seeking to maintain the *status quo* and engaging with Prof. Elias' communication, NEPZA wrote to the Nigeria Immigration Service and the Nigerian police asking them to collect CERPACs from Zhongfu Nigeria's staff.[444]  On 21 September 2016, Prof. Elias again wrote to NEPZA and put it on notice that Zhongfu Nigeria was "*a valid subsisting registered enterprise and a lawful tenant in the Zone.*"[445]  Once again, no response was received and the Ogun State Government continued to use the police and NEPZA to intimidate Zhongfu Nigeria's personnel and to take over its assets without communicating the basis for these actions.[446]

238.   Similarly, the Nigerian police failed to act in a transparent manner when arresting and detaining Mr. Zhao.  Mr. Zhao did not receive an explanation for the reason of his arrest in a language he could understand.  As Mr. Zhao explains, while he was detained he was taken to a room by police officers "*where they asked* [him] *to sign a piece of paper. They did not say or explain what this paper was or what it said.*"[447]

239.   The Ogun State Government's allegations and purported basis for terminating the JVA also lacked transparency, being neither substantiated nor evidenced.  The Ogun State Government's purported termination failed to comply with clause 18.1 of the JVA to which it referred and which provided for a period of 60 days to remedy any alleged material breach.  Instead of accepting Zhongfu Nigeria's request for a meeting, the very next day the Ogun State Government purported to terminate the JVA - completely ignoring the 60-day remedy period in the JVA and demonstrating that the Ogun State Government had no interest in hearing Zhongfu Nigeria's position nor acting in a transparent manner.

### 4.    Nigeria Failed to Treat the Claimant in a Manner that is Free from Coercion and Harassment

240.   The FET standard is breached where a State engages in conduct which involves coercion and harassment of investors, regardless of whether this conduct is undertaken by civil or criminal authorities.[448]  It has been recognised that where a measure taken by a host State involves pressure in the form of coercion, there is a breach of the FET standard.[449]  In

---

[443] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**.

[444] Letter from NEPZA to the Nigeria Immigration Service, 27 July 2016**, C-167**.

[445] Letter from G. Elias & Co. to Managing Director of NEPZA, 21 September 2016, **C-180**. See also Letter from G. Elias & Co. to NEPZA, 21 September 2016, **C-181**.

[446] Report from Steven Allen, 30 March 2017, **C-183**.

[447] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶ 23.

[448] *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v The Argentine Republic,* ICSID Case No. ARB/09/1, Award, 21 July 2017, ¶ 679, **CLA-030**; *Bernhard von Pezold and others v Republic of Zimbabwe,* ICSID Case No. ARB/10/15, Award, 28 July 2015, ¶ 546, **CLA-080**.

[449] *Tecnicas Medioambientales Tecmed SA v United Mexican States,* ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, ¶ 163, **CLA-063**.

JA-252

particular, coercive conduct in breach of the FET standard has been found were there were threats and arrests of an investor's personnel which resulted in a settlement imposed upon the investor under duress.[450]   It has also been found where the terms of a licence were changed, requiring the investor to relocate its investment, since "[u]*nder such circumstances, such pressure involves forms of coercion that may be considered inconsistent with the fair and equitable treatment to be given to international investment…*"[451]

241.    In the present case, the Nigerian authorities engaged in a series of extraordinary actions over a number of months to coerce and harass the Claimant and Zhongfu Nigeria to leave the Zone, and indeed the country.   These actions included, amongst other conduct, the following:

(a)   The Secretary to the Ogun State Government directly threatening Zhongfu Nigeria's CEO, Dr. Han: "*My advise* [sic.] *to you as a friend; leave peacefully when there is opportunity to do so, and avoid forceful removal, complications and possible prosecution.*"[452]   Around the same time, a NEPZA representative in the Zone repeated a similar threat to Dr. Han.[453]   The threats from the Nigerian authorities were of such a threatening nature that they forced Dr. Han and Mr. Zhao to flee the Zone.[454]   As Dr. Han recalls, "*I was very scared by this outright threat to me and concerned about the need to protect not only Zhongfu Nigeria's rights under the JVA, but also Zhongshan's rights under the Fucheng Industrial Park Agreement.*"[455]

(b)   The Nigerian police assisted the Zone coordinator, Mr. Onas, to conduct a "*handover ceremony*" in the Zone under the directives of the Ogun State Government.[456]   This resulted in people in the Zone feeling "*terrorized and fearful*" as Zhongfu Nigeria employees were coerced to give Mr. Onas and the Nigerian police access to Zhongfu Nigeria's offices and were prevented from leaving the Zone in a vehicle belonging to Zhongfu Nigeria.[457]

---

[450] *Desert Line Projects LLC v The Republic of Yemen*, ICSID Case No. ARB/05/17, Award, 6 February 2008, ¶¶ 151-159, **CLA-067**.

[451] *Técnicas Medioambientales Tecmed, S.A. v The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003, ¶ 163, **CLA-063**.

[452] Email from Jason Han to Elizabeth Uwaifo, 25 September 2016, **C-012**.

[453] See Witness Statement of Jason Han, 30 April 2019, ¶ 108.

[454] See Witness Statement of Jason Han, 30 April 2019, ¶ 111.

[455] See Witness Statement of Jason Han, 30 April 2019, ¶ 106.

[456] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**.

[457] See Witness Statement of Jason Han, 30 April 2019, ¶ 114; Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**.

(c)   The coercing and harassing nature of the Nigerian authorities was apparent from the need by Zhongfu Nigeria to engage Nigerian lawyers to write to NEPZA requesting it to "*restore the status quo, prevent the bullying, oppressive and menacing tactics*" of the Ogun State Government and the Nigerian police as well as Mr. Onas.[458]

(d)   A further example of Nigeria's actions calculated to intimidate, coerce and harass Zhongfu Nigeria was the arrest and detention of Mr. Zhao.  As Mr. Zhao recalls, he was taken from his hotel room by armed Nigerian police at around midnight wearing only a vest, shorts and flip flops.[459]  He was held at gun point, repeatedly beaten and held without charge for almost a week.  As Mr. Zhao explains: "*I was extremely traumatised and exhausted after my experiences. It took me several months to recover in a basic sense, but the scars of my mistreatment will remain with me for much longer.*"[460]  Mr. Zhao's arrest had an immediate and profound effect on the Zhongfu Nigeria Management Team.  Aside from the traumatic effects suffered by Mr. Zhao, his arrest shocked Dr. Han and Mr. Xue and was the catalyst for Dr. Han "*decid*[ing] *that it was time for* [him] *to leave Nigeria.*"[461]

### 5.   Nigeria Acted in a Manner that was Arbitrary, Unfair, Unjust and/or Idiosyncratic

242.   It is accepted that the FET standard requires that a State refrain from taking arbitrary measures.[462]  The tribunal in *Lemire v Ukraine II* observed that "*the underlying notion of arbitrariness is that prejudice, preference or bias is substituted for the rule of law*".[463]  The tribunal in *Lauder v Czech Republic* used the Black's Law Dictionary to define "arbitrary" as meaning "*depending on individual discretion; (...) founded on prejudice or preference rather than on reason or fact*".[464]

243.   When considering if a measure is arbitrary, arbitral tribunals will consider whether the host State "*acted not for cause but for purely arbitrary reasons.*"[465]  The arbitral tribunal in

---

[458] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**.

[459] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶ 21.

[460] Witness Statement of Wenxiao (Areak) Zhao, 30 April 2019, ¶ 37.

[461] See Witness Statement of Jason Han, 30 April 2019, ¶ 128.

[462] *Ronald S. Lauder v The Czech Republic*, UNCITRAL, Final Award, 3 September 2001, ¶ 221, **CLA-085;** *Biwater Gauff (Tanzania) Ltd. v United Republic of Tanzania*, ICSID Case No ARB/05/22, Award, 24 July 2008, ¶ 709, **CLA-061**; *EDF (Services) Limited v Romania*, ICSID Case No ARB/05/13, Award, 8 October 2009, ¶ 303, **CLA-086**.

[463] *Joseph C Lemire v Ukraine II*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010, ¶ 262-263, **CLA-060**.

[464] *Ronald S. Lauder v The Czech Republic*, UNCITRAL, Final Award, 3 September 2001, ¶ 221, **CLA-085**. See also *Saluka Investments BV (The Netherlands) v Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, ¶¶ 460-461, **CLA-087**.

[465] *Eureko BV v Republic of Poland*, Ad Hoc, Partial Award and Dissenting Opinion, 19 August 2005, ¶ 233, **CLA-045**.

JA-254

*EDF v Romania*, agreeing with the expert opinion of Professor Christoph Schreuer, described "arbitrary" as a:

> "a. measure that inflicts damage on the investor without serving any apparent legitimate purpose;
>
> b. measure that is not based on legal standards but on discretion, prejudice or personal preference;
>
> c. measure taken for reasons that are different from those put forward by the decision maker;
>
> d. measure taken in wilful disregard of due process and proper procedure".[466]

244. For example, in *Biwater Gauff v Tanzania*, the arbitral tribunal considered that Tanzania's State organs' seizure of the investor's assets and company in Tanzania, the deportation of the local company's senior management and the installation of a different company to manage the water services granted to *Biwater Gauff* amounted to arbitrary measures breaching the fair and equitable standard of treatment.[467]

245. As shown above, the measures taken by Nigeria fall squarely within the accepted notion of arbitrariness under international law. There was no rational basis for Nigeria to evict Zhongfu Nigeria from the Zone, eviscerate the Claimant's rights under the JVA and Fucheng Industrial Park Agreement and destroy the Claimant's investment. Nor was it reasonable to do so.

246. The Ogun State Government's actions to force Zhongfu Nigeria out of the Zone, with the assistance of NEPZA and the Nigerian police, ignoring Zhongfu Nigeria's rights under the Fucheng Industrial Park Agreement, for example, inflicted damage without serving any legitimate purpose. The Claimant's investment in the Zone had turned the Zone into an internationally recognised success story for foreign direct investment in Africa. Under the Claimant's management, the tax revenues generated in the Zone for Nigeria more than doubled from 2013 to 2014 to NGN 161 million.[468] The Assistant Comptroller of the Nigerian Customs Service acknowledged that Zhongfu Nigeria "*should 'be given a pat on the back' for a job well done.*"[469] The Zone was used as case study by preeminent universities of a successful development project in Africa. The Economist Intelligence Unit

---

[466] *EDF (Services) Limited v Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009, ¶ 303, **CLA-086**. Also affirmed in *Joseph C Lemire v Ukraine II*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010, ¶ 262-263, **CLA-060**.

[467] *Biwater Gauff (Tanzania) Ltd. v United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, ¶ 709, **CLA-061**.

[468] Ships & Ports Article, "Customs generates N161m at Ogun FTZ in 2014", 9 February, 2015, **C-081**.

[469] Ships & Ports Article, "Customs generates N161m at Ogun FTZ in 2014", 9 February, 2015, **C-081**.

produced a video lauding the achievements of the Zone.[470]   There was no rational justification for destroying the Claimant's investment in the Zone which it had, and continued to, develop so successfully.

247.   Nigeria's action were also, as explained above, arbitrary and idiosyncratic, as evidenced by the fact that the Ogun State Government, NEPZA and the Nigerian police ignored the clear directives of the Solicitor-General of Nigeria.

### 6.   Nigeria Failed to Respect the Claimant's Legitimate Expectations

248.   Investment treaty arbitral tribunals have repeatedly found that the FET standard also encompasses the legitimate expectations of investors regarding the key terms of their investment and the stability of the host State's legal and business framework.[471] As noted by investment treaty tribunals "*the doctrine of legitimate expectations is 'firmly rooted in arbitral practice' as part of the FET standard*".[472]   In line with this position, the arbitral tribunal in *Arif v Moldova* elaborated that where an investor's "*expectations have an objective basis, and are not fanciful or the result of misplaced optimism, then they are described as 'legitimate expectations'.*"[473]   The tribunal went on to explain that:

> "*an investor's legitimate expectations might be breached not only by a substantive change in policy, but also by the treatment of the investor during the process of the change of policy. It has been said that an investor's legitimate expectations should be treated with transparency, free from ambiguity, consistently, and within a framework of a proper exercise of powers. Consistency by the State in its relations with the investor is an important element of the fair and equitable treatment standard, whether viewed independently or within the context of legitimate expectations.*"[474]

---

[470]   Witness Statement of John Xue, 29 April 2019, ¶ 33; Economist Intelligence Unit Video, available at http://growthcrossings.economist.com/video/zones-of-influence/ (last accessed on 11 April 2019), **C-009;** Transcript of the Economist Intelligence Video, 21 April 2016, **C-010.**

[471]   *Olin Holdings Ltd v Libya,* ICC Case No. 20355/MCP, Award, 25 May 2018, ¶ 269, **CLA-071**; *International Thunderbird Gaming Corporation v United Mexican States*, UNCITRAL, Award, 26 January 2006, ¶ 147, **CLA-072**; *Total S.A. v Argentina,* ICSID Case No. ARB/04/01, Decision on Liability, 27 December 2010, ¶ 118, **CLA-029**; *Gavrilović and Gavrilović D.O.O. v Republic of Croatia,* ICSID Case No. ARB/12/39, Award, 25 July 2018, ¶¶ 954-955, **CLA-043**; *Tecnicas Medioambientales Tecmed S.A. v United Mexican States,* ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, ¶ 154, **CLA-063**; *El Paso Energy International Company v The Argentine Republic,* ICSID Case No. ARB/03/15, Award, 31 October 2011, ¶348, **CLA-033**; *EDF (Services) Limited v Romania,* ICSID Case No. ARB/05/13, Award, 8 October 2009, ¶ 216, **CLA-086**; *Gold Reserve Inc v Bolivarian Republic of Venezuela,* ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014, ¶ 571, **CLA-088**; *Franck Charles Arif v Republic of Moldova,* ICSID Case No. ARB/11/23, Award, 8 April 2013, ¶ 543, **CLA-089.**

[472]   *Crystallex International Corporation v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB(AF)/11/2, Award, 4 April 2016, ¶ 546, **CLA-090** citing *Yuri Bogdanov and Yulia Bogdanov v Republic of Moldova,* SCC Case No. V091/2012, Final Award, 16 April 2013, ¶ 183, **CLA-091**. See also *Ioan Micula, Viorel Micula & others v Romania,* ICSID Case No. ARB/05/20, Award, 11 December 2013, ¶ 667, **CLA-092**; L Reed, S Consedine, "Chapter 20: Fair and Equitable Treatment: Legitimate Expectations and Transparency', in Meg Kinnear , Geraldine R. Fischer , et al. (eds), Building International Investment Law: The First 50 Years of ICSID, (Kluwer Law International; Kluwer Law International 2015) pp. 283 - 29, **CLA-093.**

[473]   *Franck Charles Arif v Republic of Moldova,* ICSID Case No. ARB/11/23, Award, 8 April 2013, ¶ 532, **CLA-089.**

[474]   *Franck Charles Arif v Republic of Moldova,* ICSID Case No. ARB/11/23, Award, 8 April 2013, ¶ 538, **CLA-089.**

249.    This is reflected in the seminal decision of the arbitral tribunal in *Tecmed v Mexico,* as follows:

> *"[t]he Arbitral Tribunal considers that this provision of the Agreement [fair and equitable treatment], in light of the good faith principle established by international law, requires the Contracting Parties to provide to international investments treatment that does not affect the basic expectations that were taken into account by the foreign investor to make the investment. The foreign investor expects the host State to act in a consistent manner, free from ambiguity and totally transparently in its relations with the foreign investor, so that it may know beforehand any and all rules and regulations that will govern its investments, as well as the goals of the relevant policies and administrative practices or directives, to be able to plan its investment and comply with such regulations."*[475]

250.    In addition to the rights acquired by the Claimant under the Fucheng Industrial Park Agreement and by Zhongfu Nigeria under the JVA, the Claimant relied on specific assurances from the Ogun State Government in relation to its investment.  In particular, in April 2014, following rumours circulating in the Zone about attempts of NSG to take over the Zone - claiming NSG had acquired rights from the past manager CAI and that this entitled it to rights in the Zone - Zhongfu Nigeria received explicit assurances from the Ogun State Government that Zhongfu Nigeria was the legitimate manager of the Zone:

> *"It must be stressed that OGSG did not at any time sell any portion of the [Zone] to [CAI].  Further, the State Government has no dealing whosoever [sic.] with 'The New South Group', either.  Consequently, [Zhongfu Nigeria] is enjoined [sic.] to be pro-active in the Management/Administration of [the Zone] by promptly warding off activities of trespassers capable of causing confusion in the Zone."*[476]

251.    Mr. Onas, as co-ordinator of the Zone, also wrote to Zhongfu Nigeria stating:

> *"And finally, we should ensure that we all work as a team for the best interest of our country, our team as well as our investment and I can assure you that the Ogun State government is willing to continually give its maximum support so far as we comply with the rules, regulations and contract binding on the parties."*[477]

---

[475] *Tecnicas Medioambientales Tecmed SA v United Mexican States,* ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, ¶ 154, **CLA-063**.  See also *Saluka Investments B.V. v Czech Republic,* UNCITRAL, Partial Award, 17 March 2006, ¶¶ 301-302, **CLA-087**, (*"The standard of 'fair and equitable' is therefore closely tied to the notion of legitimate expectations, which is the dominant element of that standard."*); *Electrabel v Hungary,* ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ¶ 7.75, **CLA-094**, (*"It is widely accepted that the most important function of the fair and equitable treatment standard is the protection of the investor's reasonable and legitimate expectations"*); *Gold Reserve Inc. v Bolivarian Republic of Venezuela,* ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014, ¶ 570, **CLA-088**; *MTD Equity Sdn Bhd and MTD Chile SA v Republic of Chile,* ICSID Case No. ARB/01/7, Award, 25 May 2004, ¶ 114, **CLA-059**; *El Paso Energy International Company v Argentine Republic,* ICSID Case No. ARB/03/15, Award, 31 October 2011, ¶ 348, **CLA-033**.

[476] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG), 28 April 2014, **C-096**.

[477] Letter from Zenith Global Merchant Ltd to Zhongfu International Investment (NIG) FZE, 29 April 2014, **C-097**.

JA-257

252.    These assurances were consistent with the Preamble to the JVA which specifically acknowledged that CAI's management rights had been terminated by the Ogun State Government on 15 March 2012.[478]  The Claimant, therefore, had a legitimate expectation that the Ogun State Government and Nigeria would adhere to those assurances and respect the Claimant's legitimate expectations.

253.    Moreover, it should not require stating that the Claimant had a legitimate expectation that it would not be threatened with forcible removal from the Zone and have its employees "*terrorised*", wrongfully detained and beaten.

**B      Nigeria Failed to Afford Continuous Protection to the Claimant's Investment**

254.    Article 2(2) of the Treaty provides that:

> "[i]*nvestments of the investors of either Contracting Party shall enjoy the continuous protection in the territory of the other Contracting Party.*"[479]

255.    BITs use various formulations of "*continuous protection*", which can be articulated as the "*full protection and security*", "*constant protection and security*", or "*full legal protection and security*".  It is generally accepted that such variations in the wording used in BITs do not refer to a material difference in the level of protection that is afforded to an investor's investment.[480]  Similarly worded provisions to that of Article 2(2) in the Treaty in other BITs have been held by investment treaty tribunals to refer to the same standard of protection as the "*full and protection and security*" standard.[481]

256.    In *Frontier Petroleum Services Ltd v. Czech Republic* the tribunal held that:

> "[m]*ost bilateral or multilateral treaties dealing with the protection of investments contain clauses with the same or similar wording as the full protection and security clause in Article III(1) of the BIT. Some omit the adjective "full", others put "security" before "protection" and some refer to "most constant protection and security", but these variations do not appear to carry any substantive significance.*"[482]

---

[478] JVA, Preamble, **C-008**.

[479] China-Nigeria BIT, Art. 2(2), **CLA-001**.

[480] See *Frontier Petroleum Services Ltd v Czech Republic,* UNCITRAL, Award, 12 November 2010, ¶ 260, **CLA-095**; *Ampal-American Israel Corp., EGI-Fund (08-10) Investors LLC, Egi-Series Investments LLC, and BSS-EMG Investors LLC v Arab Republic of Egypt,* ICSID Case No. ARB/12/11, Decision on Liability and Heads of Loss, 21 February 2017, ¶ 240, **CLA-042**.

[481] See *Ampal-American Israel Corp., EGI-Fund (08-10) Investors LLC, Egi-Series Investments LLC, and BSS-EMG Investors LLC v Arab Republic of Egypt,* ICSID Case No. ARB/12/11, Decision on Liability and Heads of Loss, 21 February 2017, ¶ 240, **CLA-042**.

[482] *Frontier Petroleum Services Ltd v Czech Republic,* UNCITRAL, Award, 12 November 2010, ¶ 260, **CLA-095**.

257.   Nigeria is therefore bound by the obligation to provide full protection and security to the Claimant's investment.

258.   It has been accepted by arbitral tribunals that the standard imposes the duty on States to act with due diligence to take steps to protect and secure investments from damage and must be assessed according to the circumstances of the case.[483]  The arbitral tribunal in *Asian Agricultural Products v. Republic of Sri Lanka* quoted with approval Professor Freeman's definition of due diligence as follows:

> *"The 'due diligence' is nothing more nor less than the reasonable measures of prevention which a well-administered government could be expected to exercise under similar circumstances."* [484]

259.   The due diligence obligation extends to State actions and inactions.[485]  The investment treaty tribunal in *Ampal v. Egypt* held that "*the operation of the standard does not depend upon whether the acts that give rise to the damage to the Claimants' investment are committed by agents of State (which are thus directly attributable to the State) or by third parties. Rather the focus is on the acts or omissions of the State in addressing the unrest that gives rise to the damage.*"[486]

260.   In *Asian Agricultural Products v. Sri Lanka*, the investment treaty tribunal, in finding that Sri Lanka had breached the full protection and security standard, noted that Sri Lanka had an obligation of due diligence that required "*undertaking all possible measures that could be reasonably expected to prevent the eventual occurrence of killings and property destructions.*"[487]   In that case, the Sri Lankan security forces destroyed the claimant's investment, a shrimp farm, in the course of a counter-insurgency operation.[488]  The tribunal further noted that the requirement of due diligence does not require negligence on the part of the host State: "*the violation of international law entailing the State's responsibility has*

---

[483] See *South American Silver Limited v Plurinational State of Bolivia, PCA Case No. 2013-15*, Award, 30 August 2018, ¶ 687, **CLA-096**, *Ampal-American Israel Corp., EGI-Fund (08-10) Investors LLC, Egi-Series Investments LLC, and BSS-EMG Investors LLC v Arab Republic of Egypt, ICSID Case No. ARB/12/11*, Decision on Liability and Heads of Loss, 21 February 2017, ¶ 241, **CLA-042**.

[484] See *Asian Agricultural Products LTD (AAPL) v Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Final Award, 27 June 1990, ¶ 77, **CLA-097**.

[485] See *CME Czech Republic B.V. v Czech Republic*, UNCITRAL, Partial Award, 13 September 2001, ¶ 613, **CLA-098**, *Wena Hotels Limited v The Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, ¶¶ 84-89, **CLA-099**, *Waguih Elie George Siag & Clorinda Vecchi v Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009, ¶¶ 447-448, **CLA-100**.

[486] See *Ampal-American Israel Corp., EGI-Fund (08-10) Investors LLC, Egi-Series Investments LLC, and BSS-EMG Investors LLC v Arab Republic of Egypt*, ICSID Case No. ARB/12/11, Decision on Liability and Heads of Loss, 21 February 2017, ¶ 245, **CLA-042**.

[487] *Asian Agricultural Products LTD (AAPL) v Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Final Award, 27 June 1990, ¶ 85(B), **CLA-097**.

[488] *Asian Agricultural Products LTD (AAPL) v Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Final Award, 27 June 1990, ¶ 77, **CLA-097**.

*to be considered constituted by 'the mere lack or want of diligence,' without any need to establish malice or negligence.*"[489]

261.    The due diligence obligation applies to situations where the State breaches its treaty obligations by failing to protect an investment from the infliction of physical damage.[490]  In the case of *Tatneft v Ukraine*, the investment treaty tribunal considered the events of the case surrounding the seizure of the Kremenchug refinery and the change in the company's management that followed and held that "*the forceful entry into the premises of the refinery and the retention of certain officials in their offices, just like the carrying of weapons, are all pointing in the direction of a breach of full protection and security in the realm of police protection and physical security*".[491]

262.    In cases where investors' employees were harassed, investment treaty tribunals have found that the host States breached the obligation to provide full protection and security. For example, in *Biwater Gauff v Tanzania* the tribunal found that even if no force was used in removing the management from the offices or in the seizure of claimant's premises, these acts were "*unnecessary and abusive and amounted to a violation by the Republic of its obligation to ensure full protection and security*".[492]

263.    Moreover, the tribunals in *AMG v Zaire, Siag v Egypt* and *Wena Hotels v Egypt* held that the host State cannot rely on domestic laws to detract from its obligation to provide full protection and security, having an obligation of vigilance, in the sense that it must take all measures necessary to ensure the full protection and security of the investments.[493]

264.    Not only did Nigeria fail to take measures necessary to ensure the protection of the Claimant's investment as required under the Treaty, Nigeria actively took measures to eviscerate that investment.  These measures included:

(a)    Nigerian State organs issuing repeated threats to the physical security to the Claimant's management and its staff.  For example, on 16 July 2016, Zhongfu Nigeria's CEO Dr. Han received a direct threat via a text from the Secretary to the

---

[489] *Asian Agricultural Products LTD (AAPL) v Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Final Award, 27 June 1990, ¶¶ 3, 86, **CLA-097**.

[490] See *Wena Hotels Limited v Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, ¶¶ 84-85, **CLA-099**.

[491] See *OAO Tatneft v Ukraine*, UNCITRAL, Award on the Merits, 29 July 2014, ¶ 428, **CLA-101**.

[492] *Biwater Gauff (Tanzania) Limited v United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, ¶¶ 729-731, **CLA-061**.

[493] *American Manufacturing & Trading, Inc. v Republic of Zaire*, ICSID Case No. ARB/93/1, Award, 21 February 1997, ¶ 6.08, **CLA-102**; *Waguih Elie George Siag & Clorinda Vecchi v Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009, ¶ 485, **CLA-100**. *Wena Hotels Limited v. The Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, ¶ 84, **CLA-099**.

Ogun State Government to "*leave peacefully when there is* [an] *opportunity to do so, and avoid forceful removal, complications and possible prosecution.*"[494]

(b) On 17 August 2016, the police arrested Zhongfu Nigeria's CFO Mr. Zhao without proper explanation, harassed and detained him in appalling conditions, deprived him of food and water, threatened him with violence and physically beat him.[495]

(c) Nigerian State authorities, including NEPZA and the Nigerian police, took over the Zone in July 2016 and assisted the NSG to forcibly remove Zhongfu Nigeria. The police and the NSG moreover harassed and intimidated Zhongfu Nigeria's employees. An account from Zhongfu Nigeria's employee Mr. Zhang Bin (Steven), noted "*so many unbelievable and illegal things happened to* [him] *and our* [staff]".[496] Steven and his colleague Lisa "*were not allowed to enter the Zone, after talking with police*", "*were not allowed to get off of the car and… ten local securities* [were sent] *to stand around the car and harassed* [them]". Their colleague Desmond "*was stopped by* [the] *securities from coming close to* [Steven's and Lisa's] *car.*" They "*were treated like prisoners and all the Nigerian Government officers sat in their office without helping or even asking…what happened*". When Steven tried to visit the Zone in February 2017, the NSG "*refused to allow* [him] *in* [the Zone] *and detained* [him] *at the gate for more than 2 hours*" and then they "*cut off the power and water in* [his] *room to force* [him to] *leave*". They did not "*allow* [them] *to use* [their] *company vehicles,* […] *to go buy vegetables and food. All* [their] *construction materials and tools were occupied by* [NSG]". Since August 2016 NEPZA, in cooperation with the NSG, "*always refused to accept and process the documents submitted* [to NEPZA]", "*occupied all* [Zhongfu Nigeria's] *offices and equipment and blocked the corridor with sofa and chairs to* [the] *financial office.* [They] *were not even allowed to enter the offices to pick up [their] personal stuff*", all the office locks were changed, NEPZA used Zhongfu Nigeria's "*dormitories and kitchen without any pe*rmission" "*cracked the lock and entered*". Zhongfu Nigeria's "*employees were all treated like prisoners in [Nigeria], without…any basic human rights" and received life threats "so many times*".[497]

265. In recent years, investment treaty jurisprudence has moved on to recognise that the obligation of due diliegence extends to a framework that grants administrative and legal

---

[494] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**; Email from Jason Han to Elizabeth Uwaifo, 25 September 2016, **C-012**.

[495] See Witness Statement of Mr. Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 10-36.

[496] Report from Mr. Steven Allen, 30 March 2017, **C-183**.

[497] Report from Mr. Steven Allen, 30 March 2017, **C-183**.

security and not just to steps taken to forestall the infliction of physical damage on the investor and their investment.

266.  In *Plama v. Bulgaria*, the investment treaty tribunal held that "*the standard includes, in this manner, an obligation actively to create a framework that grants security.*"[498] In *Jürgen Wirtgen and others v. Czech Republic*, the tribunal pointed out that "*the full protection and security standard requires a state to provide a framework that protects an investment from adverse interference*".[499]

267.  In *National Grid v Argentina*, the arbitral tribunal in interpreting the Argentina-UK BIT, noted that "*the phrase 'protection and constant security' as related to the subject matter of the Treaty does not carry with it the implication that this protection is inherently limited to protection and security of physical assets.*"[500]

268.  The investment treaty tribunal in *Azurix v. Argentina* stated that "*it is not only a matter of physical security; the stability afforded by a secure investment environment is as important from an investor's point of view.*"[501]

269.  As the events described above show, Nigeria failed to protect the Claimant's contractual rights under the Fucheng Industrial Park Agreement by eviscerating those rights through, amongst other actions, depriving Zhongfu Nigeria of the ability to operate effectively in the Zone.

## C   Nigeria Took Unreasonable Measures

270.  Article 2(3) of the China-Nigeria BIT prohibits Nigeria from taking "*any unreasonable or discriminatory measures against the management, maintenance, use, enjoyment and disposal of the investments by the investors of the other Contracting Party.*"[502]  The use of the disjunctive term "or" between "unreasonable" and "discriminatory" means that Nigeria will be in breach of its obligations under Article 2(3) of the China-Nigeria BIT through either "unreasonable" or "discriminatory" measures against the Claimant's investment.

271.  The tribunal in *National Grid v Argentina* observed, in relation to an almost identical standard as that in Article 2(3) of the China-Nigeria BIT,[503] that the "*plain meaning of the*

---

[498] *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 180, **CLA-025**.

[499] See *Jürgen Wirtgen and others v. Czech Republic*, PCA Case No. 2014-03, Final Award, 11 October 2017, ¶ 451, **CLA-103**.

[500] See *National Grid PLC v Argentina Republic*, UNCITRAL, Award, 3 November 2008, ¶ 189, **CLA-104**.

[501] See *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006, ¶ 408, **CLA-105**.

[502] China-Nigeria BIT, Art. 2(3) (emphasis added), **CLA-001**.

[503] Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Argentine Republic for the Promotion and Protection of Investments, 19 February 1993, **CLA-106**, Art. 2(2) ("*Neither Contracting Party shall in any way impair by <u>unreasonable or discriminatory</u> measures the management, maintenance, use, enjoyment or disposal of investments in its territory of investors of the other Contracting Party.*"(emphasis added)).

*terms 'unreasonable' and 'arbitrary' is substantially the same in the sense of something done capriciously, without reason.'*[504]

272. In interpreting Article 2(3) of the China-Nigeria BIT, the Tribunal must consider whether Nigeria's conduct is unreasonable from the objective perspective of what both States Parties to the China-Nigeria BIT would have anticipated in advance of the unreasonable conduct. The tribunal accepted an articulation of the unreasonable measures standard in *CME v Czech Republic* as follows:

> *"As with the fair and equitable standard, the determination of reasonableness is in its essence a matter for the arbitrator's judgment. That judgment must be exercised within the context of asking what the parties to bilateral investment treaties should jointly anticipate, in advance of a challenged action, to be appropriate behaviour in light of the goals of the Treaty."*[505]

273. CME, the claimant in this case, entered into a service agreement with the host State which the latter terminated, disrupting the legal and commercial status of the investor's company in the Czech Republic. The tribunal found that the Czech Republic's actions were unreasonable:

> *"[o]n the face of it, the Media Council's actions and inactions in 1996 and 1999 were unreasonable as the clear intention of the 1996 actions was to deprive the foreign investor of the exclusive use of the Licence under the [Agreement] and the clear intention of the 1999 actions and inactions was to collude with the foreign investor's Czech business partner to deprive the foreign investor of its investment. …"*[506]

274. Similarly, in *Siag v Egypt,* the tribunal found that the measures adopted by the Egyptian Minister of Tourism to cancel the contract to develop land and transfer ownership of the land to the government was unreasonable "*in the ordinary meaning of that term*".[507] Such unreasonableness was found to be evidenced in the State seizing control of the investor's investment based on a resolution at time when the claimant's application to enjoin the resolution was pending.[508]

275. As has been demonstrated, the measures adopted by Nigeria in relation to the Claimant's investment were unreasonable in multiple respects. Without repeating each and every action of Nigeria which was unreasonable, it is readily apparent that Nigeria violated its

---

[504] *National Grid plc v The Argentine Republic*, UNCITRAL, Award, 3 November 2008, ¶ 197, **CLA-104**.

[505] *CME Czech Republic BV v Czech Republic*, UNCITRAL, Partial Award, 13 September 2001, ¶158, **CLA-98**.

[506] *CME Czech Republic BV v Czech Republic*, UNCITRAL, Partial Award, 13 September 2001, ¶ 612, **CLA-98**.

[507] *Waquih Elie George Siag & Clorinda Vecchi v Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009, ¶ 459, **CLA-100**.

[508] *Waquih Elie George Siag & Clorinda Vecchi v Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009, ¶ 459, **CLA-100**.

JA-263

obligation not to take unreasonable measures under Article 2(3) of the BIT including as follows:

(a)     Nigeria, through the Ogun State Government, gave explicit assurances in 2014 to Zhongfu Nigeria that it had the rights to manage and develop the Zone.[509]  These assurances were over and above the explicit rights contained in the Fucheng Industrial Park Agreement and the JVA.  The Claimant was induced to proceed with its investment under these assurances of Nigeria and it was unreasonable for Nigeria to reverse its position contrary to the assurances it had given and use the police and NEPZA to remove Zhongfu Nigeria from the Zone;

(b)     the Ogun State Government, NEPZA and the Nigerian police harassed and intimidated Zhongfu Nigeria's Management Team and employees; and

(c)     the Ogun High Court issued an anti-suit injunction preventing Zhongfu Nigeria from proceeding to have its contractual rights under the JVA heard through arbitration pursuant to the JVA.

**D     Nigeria Wrongfully Expropriated the Claimant's Investment Without Compensation**

276.    Article 4 of the China-Nigeria BIT provides that:

*"Neither Contracting Party shall expropriate, nationalize or take similar measures (hereinafter referred to as "expropriation") against the investments of investors of the other Contracting Party in its territory, unless the following conditions are met:*

*(a) for the public interests;*

*(b) under domestic legal procedure;*

*(c) without discrimination;*

*(d) against fair compensation.*

*The compensation mentioned in Paragraph 1 (d) of this Article shall be equivalent to the value of the expropriated investments immediately before the expropriation is proclaimed, be convertible and freely transferable. The compensation shall be paid without unreasonable delay and include interest at a normal commercial rate."[510]*

277.    Nigeria's actions, including the forcible eviction of Zhongfu Nigeria from the Zone and the wrongful taking of its property, together with the wrongful taking of the Claimant's rights pursuant to the Fucheng Industrial Park Agreement and the JVA constitute an

---

[509] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG), 28 April 2014, **C-096**.

[510] China-Nigeria BIT, Art. 4, **CLA-001**.

expropriation of the Claimant's investment in Nigeria, or at least a substantial deprivation in the value of the Claimant's investment, contrary to Nigeria's obligation in Article 4 of the BIT and under international law.

278.   The failure by Nigeria to satisfy any one of the conditions in Article 4 of the China-Nigeria BIT renders unlawful Nigeria's taking of the Claimant's investment.  The Claimant has not received any compensation for the expropriation of its investment.  It was therefore an unlawful expropriation in violation of Article 4 of the BIT.  In addition, the expropriation was not done for a public purpose, nor under a domestic legal procedure.  As such, it is also unlawful under these grounds.

### 1.   Nigeria's actions constitute a "taking" that is unlawful under the China-Nigeria BIT and international law

279.   Expropriation is the deprivation, or "taking", of private property by actions of the State without the owner's consent.[511]  As the tribunal in *Metaclad* held, a "taking" may be direct or indirect:

> *"[e]xpropriation […] includes not only, open, deliberate and acknowledged takings of property, such as outright seizure or formal or obligatory transfer of title in favour of the host State, but also covert or incidental interference with the use of property which has the effect of depriving the owner, in whole or in significant part, of the use or reasonably-to-be-expected economic benefit of property even if not necessarily to the obvious benefit of the host State."[512]*

280.   Direct expropriation relates to the overt seizure of a foreign investor's property, or the title to such property, by the host State, including cases where "*no explicit attempt is made* [by the State] *to affect the legal title to the property, and even though the respondent State may specifically disclaim any such intention.*"[513]  Indirect expropriation occurs whenever a State takes steps "*that effectively neutralize the benefit of the property for the foreign owner*".[514]  For example, this type of expropriation occurs when a host State undertook actions which *"radically deprived* [the claimant] *of the economical use and enjoyment of its investments, as if the rights related thereto —such as the income or benefits related to the* [investment] *or to its exploitation— had ceased to exist. In other words, if due to the actions*

---

[511] Nigel Blackaby and others, *Redfern & Hunter: Law and Practice of International Commercial Arbitration* (Oxford University Press 6th edn 2015), ¶ 8.81, **CLA-005**.

[512] *Metalclad Corporation v The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000, ¶ 103, **CLA-078**.

[513] GC Christie, *What Constitutes a Taking of Property Under International Law?*, 38 British Yearbook of International Law 307, (1962), p. 309, **CLA-107**.

[514] *CME Czech Republic B.V. v Czech Republic*, UNCITRAL, Partial Award, 13 September 2001, ¶ 604, **CLA-098**.

*of the* [r]*espondent, the assets involved have lost their value or economic use for their holder and the extent of the loss."*[515]

281. Pursuant to the China-Nigeria BIT, expropriation extends to the taking of "investment" as defined in Article 1(1) of the BIT, including "*claims to money or to any other performance having an economic value associated with an investment*"[516] and "*business concessions conferred by law or under contract permitted by law.*"[517]

282. Investment treaty jurisprudence supports a wide concept of "property" that includes, for purposes of expropriation and equivalent measures, real property as well as rights acquired by contract or law. For example, the tribunal in *Azurix v Argentina* observed that it "*is widely accepted by the case law and the doctrine"* that "*contract rights may be expropriated.*"[518] Similarly, the *Vivendi II* tribunal stated that: "[t]*here can be no doubt that contractual rights are capable of being expropriated.*"[519]

283. As demonstrated above, Nigeria's actions constitute an expropriation of the Claimant's investment under the China-Nigeria BIT and international law.  These actions include, but are not limited to:

   (a)   Nigeria depriving the Claimant of its land use rights and economic benefit under the Fucheng Industrial Park Agreement;

   (b)   Nigeria wrongfully evicting and forcibly removing Zhongfu Nigeria from the Zone and from its position as manager / administrator of the Zone through the actions of the Ogun State Government and using the Nigerian police and NEPZA to enforce this decision;

   (c)   Nigeria eviscerating Zhongfu Nigeria's rights under the JVA by taking over the Zone through the actions of the Nigerian police and NEPZA to enforce the Ogun State Government's purported termination of the JVA;

---

[515] *Tecnicas Medioambientales Tecmed SA v United Mexican States,* ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, ¶ 115, **CLA-063**.

[516] China-Nigeria BIT, Art. 1(1)(c), **CLA-001**.

[517] China-Nigeria BIT, Art. 1(1)(e), **CLA-001**.

[518] *Azurix Corp. v The Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006, ¶ 314, **CLA-105**.

[519] *Compañía de Aguas del Aconquija SA and Vivendi Universal SA v Argentine Republic*, ICSID Case No ARB/97/3, Second Presentation of the Case, Award, 20 August 2007, ¶ 7.5.4, **CLA-108**. This is a long-standing principle that can be traced back to earlier international authorities such as: *Rudloff Case*, US-Venezuela Mixed Claims Commission, Interlocutory Decision, RIAA Vol IX, 1903 - 1905, p. 250, **CLA-109**; *Norwegian Shipowners' Claims*, PCA Case No 1921-01, Award, 13 October 1922, p. 11, **CLA-110**; and *Certain German Interests in Polish Upper Silesia*, Judgment, 25 May 1926, PCIJ (Series No 7), p. 44, **CLA-111**. *See also Phillips Petroleum Co. Iran v. Iran*, Iran-U.S. Claims Tribunal, Award No. 425-9-2, 29 June 1989, ¶ 76 (the Tribunal held that expropriation gives rise to liability for compensation "*whether the expropriation is formal or de facto and whether the property is tangible, such as real estate or a factory, or intangible, such as the contractual rights involved in the present Case.*"), **CLA-112**.

(d)   Nigeria seizing Zhongfu Nigeria's physical assets, including cars, warehouses and construction equipment (comprising, for example, cement mixers, payloaders, a crane, road rollers, bulldozers and tipper trucks);[520] and

(e)   Nigeria - through NEPZA and the Nigerian police - harassing, intimidating and detaining Zhongfu Nigeria's staff, such that its business could no longer function in Nigeria and rendering the value of the business worthless.

284.   The expropriatory conduct was unlawful as Nigeria failed to comply with the requirements in Article 4 of the BIT and international law, which prohibit Nigeria from expropriating investments of Chinese investors unless the measures concerned were for the public interest, under a domestic legal procedure, without discrimination and accompanied by the payment of fair compensation.[521]  Through the actions of Nigerian State organs, including the Ogun State Government, NEPZA and the Nigerian police, Nigeria's conduct entailed an unlawful expropriation as it failed to provide the Claimant with any compensation for the taking of the Claimant's property - let alone "fair" compensation as required under Article 4 of the BIT.  In addition, Nigeria's expropriation of the Claimant's investment was unlawful as it was not done "*under domestic legal procedure*" nor "*for the public interests.*"[522]

## 2.   Nigeria's taking of the Claimant's investment violates Article 4 of the China-Nigeria BIT because the taking was not accompanied by the payment of fair compensation

285.   Article 4 of the China-Nigeria BIT requires that for an expropriation to be lawful it must, among other things, provide "*fair compensation*" for the investment and such compensation must be "*equivalent to the value of the expropriated investments immediately before the expropriation is proclaimed, be convertible and freely transferable* [and] *shall be paid without unreasonable delay and include interest at a normal commercial rate.*"[523]

286.   Previous investment treaty tribunals have found, in relation to provisions similar to Article 4 of the China-Nigeria BIT, that a claimant need only show that just compensation was not provided to prove an unlawful expropriation. In *Funnekotter v Zimbabwe,*[524] Zimbabwe expropriated the claimants' investments in commercial farms under a government land acquisition programme, as well as by means of physical invasions.[525] Zimbabwe accepted

---

[520] See Witness Statement of Jason Han, 30 April 2019, ¶ 66, 72.

[521] See Jennings R., Watts. A., *Oppenheim's International Law* (Oxford University Press 9th ed), pp. 920-921, **CLA-113**.

[522] See China-Nigeria BIT, Art. 4, **CLA-001**.

[523] China-Nigeria BIT, Art. 1(1)(e), **CLA-001**.

[524] *Bernardus Henricus Funnekotter and others v Republic of Zimbabwe*, ICSID Case No ARB/05/6, Award, 22 April 2009, **CLA-114**.

[525] *Bernardus Henricus Funnekotter and others v Republic of Zimbabwe*, ICSID Case No ARB/05/6, Award, 22 April 2009, ¶¶ 21-26, **CLA-114**.

that its actions were tantamount to expropriation,[526] but claimed that they were in keeping with Article 6 of the Netherlands-Zimbabwe BIT, and only a state of emergency in the country had prevented them from providing the claimants with compensation.[527] The tribunal, rejecting Zimbabwe's argument, found that the condition of providing just compensation in the BIT had not been met. As a result, the tribunal did not need to consider any of the other conditions in the expropriation provision in order to find that an unlawful expropriation had occurred.[528]

287.    In the present case, Nigeria's failure to pay any compensation to the Claimant is sufficient to find that Nigeria's taking of the Claimant's investment was an unlawful expropriation.

> **3.    Nigeria's taking of the Claimant's investment violates Article 4 of the BIT because the taking was not for a public purpose**

288.    Nigeria's expropriation of the Claimant's investment also did not serve any public purpose. The requirement that a lawful expropriation must be made for a public purpose is a rule of international law.[529] For example, in *ADC v Hungary*, the tribunal noted that:

> *"… a treaty requirement for 'public interest' requires some genuine interest of the public. If mere reference to 'public interest' can magically put such interest into existence and therefore satisfy this requirement, then this requirement would be rendered meaningless since the Tribunal can imagine no situation where this requirement would not have been met."*[530]

289.    In *BP Exploration Co v Libya*, the *ad hoc* arbitrator held that the taking of a foreign oil concession was an act of political retaliation and, as such, did not qualify as a public purpose. In that case, the reason for the expropriation was Libya's belief that the United Kingdom had encouraged Iran to occupy certain Arab islands.[531] The tribunal concluded that the taking of the company's property, rights and interests "*violate*[d] *public international law as it was made for <u>purely extraneous political reasons</u> and was arbitrary and discriminatory in character*".[532]

---

[526] *Bernardus Henricus Funnekotter and others v Republic of Zimbabwe*, ICSID Case No ARB/05/6, Award, 22 April 2009, ¶ 97, **CLA-114**.

[527] *Bernardus Henricus Funnekotter and others v Republic of Zimbabwe*, ICSID Case No ARB/05/6, Award, 22 April 2009, ¶¶ 102, 106, **CLA-114**.

[528] *Bernardus Henricus Funnekotter and others v Republic of Zimbabwe*, ICSID Case No ARB/05/6, Award, 22 April 2009, ¶¶ 106-107, **CLA-114**.

[529] UNCTAD, *Expropriation: A Sequel, UNCTAD Series on Issues in International Investment Agreements II* (United Nations 2012), pp. 28-29, available at http://unctad.org/en/Docs/unctaddiaeia2011d7_en.pdf (last accessed on 11 February 2018), **CLA-115** (noting that the taking of property must be motivated by the pursuance of a legitimate welfare objective, as opposed to a purely private gain or an illicit end).

[530] *ADC Affiliate Limited and ADC & ADMC Management Limited v The Republic of Hungary*, ICSID Case No ARB/03/16, Award, 2 October 2006, ¶ 432, **CLA-076**.

[531] *BP Exploration Company (Libya) Limited v Government of the Libyan Arab Republic*, 53 ILR 297, Award, 10 October 1973 and 1 August 1974, p. 315, **CLA-116**.

[532] *BP Exploration Company (Libya) Limited v Government of the Libyan Arab Republic*, 53 ILR 297, Award, 10 October 1973 and 1 August 1974, p. 329, **CLA-116**.

290.   In *Siag v Egypt*, the Egyptian Government expropriated the claimant's investment, citing the claimant's inability to fulfil its commitments stipulated in the applicable contract on time, but without reference to a public purpose.[533] The tribunal noted:

> "that because an investment was eventually put to public use, the expropriation of that investment [cannot] necessarily be said to have been 'for' a public purpose….. The Tribunal finds on the evidence that in the present circumstances, [c]laimants' land was not expropriated 'for a public purpose.'"[534]

291.   It has also been recognised by investment treaty tribunals that State measures taken must be proportionate to the public interest. In *Tecmed v Mexico*, the arbitral tribunal noted that:

> "[t]he Arbitral Tribunal will consider, in order to determine if they are to be characterized as expropriatory, whether such actions or measures <u>are proportional to the public interest</u> presumably protected thereby and to the protection legally granted to investments, <u>taking into account that the significance of such impact has a key role upon deciding the proportionality</u>. Although the analysis starts at the due deference owing to the State when defining the issues that affect its public policy or the interests of society as a whole, as well as the actions that will be implemented to protect such values, such situation does not prevent the Arbitral Tribunal, without thereby questioning such due deference, from examining the actions of the State… <u>to determine whether such measures are reasonable with respect to their goals, the deprivation of economic rights and the legitimate expectations of who suffered such deprivation. There must be a reasonable relationship of proportionality between the charge or weight imposed to the foreign investor and the aim sought to be realized by any expropriatory measure.</u> To value such charge or weight, it is very important to measure the size of the ownership deprivation caused by the actions of the state and whether such deprivation was compensated or not."[535]

292.   Nigeria's evisceration of the Fucheng Industrial Park Agreement by expelling Zhongfu Nigeria from the Zone was not even purportedly justified by Nigeria with reference to an alleged public purpose.  The same lack of any public purpose applies to the harassment and expulsion by Nigeria of Zhongfu Nigeria's personnel from the Zone and from Nigeria, as well as to the taking of the physical assets of Zhongfu Nigeria.

293.   While Nigeria's termination of the JVA was done with reference to Note 1601, it cannot be said to be have been for a proper public purpose, nor indeed was it proportionate to the public interest.

---

[533] *Waguih Elie George Siag and Clorinda Vecchi v The Arab Republic of Egypt*, ICSID Case No ARB/05/15, Award, 1 June 2009, ¶ 431, **CLA-100**.

[534] *Waguih Elie George Siag and Clorinda Vecchi v The Arab Republic of Egypt*, ICSID Case No ARB/05/15, Award, 1 June 2009, ¶ 432, **CLA-100**.

[535] *Técnicas Medioambientales Tecmed, S.A. v The United Mexican States*, ICSID Case No ARB (AF)/00/2, Award, 29 May 2003, ¶ 122, **CLA-063**; Affirmed in *Marfin Investment Group Holdings S.A. and others v Republic of Cyprus*, ICSID Case No ARB/13/27, Award, 26 July 2018, ¶ 982, **CLA-117**.

4.   **Nigeria's taking of the Claimant's investment violates Article 4 of the China-Nigeria BIT because the taking was not done under a domestic legal procedure, nor in accordance with the standards of treatment provided under the China-Nigeria BIT**

294.   Article 4 of the China-Nigeria BIT requires that for an expropriation to be lawful it must be done "*under domestic legal procedure*".   This is corresponds to the international law principle - which is reflected in many BITs - that expropriation must be done in accordance with "*due process*".[536]   This principle has been repeatedly recognised by investment treaty tribunals.   For example, the tribunal in *ADC v Hungary* commented on the content of the due process requirement when finding that Hungary breached this obligation:

> *"'due process of law', in the expropriation context, demands an actual and substantive legal procedure for a foreign investor to raise its claims against the depriving actions already taken or about to be taken against it. Some basic legal mechanisms, such as reasonable advance notice, a fair hearing and an unbiased and impartial adjudicator to assess the actions in dispute, are expected to be readily available and accessible to the investor to make such legal procedure meaningful. In general, the legal procedure must be of a nature to grant an affected investor a reasonable chance within a reasonable time to claim its legitimate rights and have its claims heard. If no legal procedure of such nature exists at all, the argument that 'the actions are taken under due process of law' rings hollow."[537]*

295.   Nigeria's expropriation of the Claimant's investment did not follow a legal procedure and a number of Nigeria's actions violated the requirement of due process.   This included, among other conduct:

(a)   A failure to acknowledge Zhongfu Nigeria's rights under the Fucheng Industrial Park Agreement, let alone to deal with them in accordance with due process rather than eviscerating them altogether through Zhongfu Nigeria's harassment and expulsion from the Zone and Nigeria;

(b)   A failure to provide Zhongfu Nigeria with an opportunity to respond to the Ogun State Government's arbitrary actions to terminate the JVA and replace Zhongfu Nigeria's management rights in the Zone and shareholding in OGFTZ Company. The Ogun State Government sent Zhongfu Nigeria a letter dated 12 April 2016 (entitled "*Replacement of shareholdings owner of China Africa Investment Limited and Management right of* [the Zone]").   When Zhongfu Nigeria requested a meeting to

---

[536] *ADC Affiliate Limited and ADC & ADMC Management Limited v The Republic of Hungary*, ICSID Case No ARB/03/16, Award, 2 October 2006, ¶ 435, **CLA-076**.

[537] *ADC Affiliate Limited and ADC & ADMC Management Limited v Republic of Hungary*, ICSID Case No ARB/03/16, Award, 2 October 2006, ¶ 435, **CLA-076**. See also *Ioannis Kardassopoulos v Georgia*, ICSID Case No ARB/05/18, Award, 3 March 2010, ¶¶ 395-408, **CLA-075**; *Olin Holdings Limited v State of Libya*, ICC Case No20355/MCP, Final Award, 25 May 2018, ¶ 172, **CLA-071**.

clarify its legitimate right in OGFTZ Company and the Zone on 26 May 2016, the Ogun State Government responded the very next day - thereby bypassing any discussion with Zhongfu Nigeria - by summarily purporting to terminate the JVA;[538]

(c)   Engaging the Nigerian police to forcibly remove - without legal process - Zhongfu Nigeria from the Zone and taking Zhongfu Nigeria's assets;

(d)   A failure to abide by direct instructions from the Solicitor-General of Nigeria to preserve the *status quo ante* in the Zone and not to remove Zhongfu Nigeria from the Zone; and

(e)   Intimidating and harassing the Management Team and Zhongfu Nigeria employees to leave the Zone and eventually the country.

## VIII.   THE CLAIMANT IS ENTITLED TO COMPENSATION FOR ITS LOSSES

296.   As a result of Nigeria's breaches of the Treaty, the Claimant is entitled to compensation for the losses it has suffered in relation to its investment in Nigeria.  The measures taken by Nigeria have destroyed the Claimant's investment, or alternatively have at least substantially deprived the Claimant of the value of its investment.  The Claimant has suffered losses in the form of loss of profits, loss of future profits and loss of assets for which the Claimant is entitled to full compensation.  Additionally, the Claimant is entitled to moral damages for the egregious treatment which it suffered at the hands of Nigeria and its State organs.  This Section VIII explains the applicable compensation standards (**Section A**), analyses the quantum of compensation owed to the Claimant (**Section B**) and shows that pre-award and post-award interest is applicable (**Section C**).

297.   In relation to the valuation of the Claimant's to damages for Nigeria's breaches of the Treaty, the Claimant submits the expert report of Mr. Noel Matthews, Senior Managing Director at FTI Consulting ("**FTI**" or "**Mr. Matthews**"), dated 1 May 2019 (the "**FTI Report**"). Mr. Matthews concludes that the value of the Claimant's losses is US$1,078 million using a DCF method or, alternatively, US$1,446 million using a comparable transaction method, to which is added interest calculated at one-month US$ London Inter-bank Offered Rate ("**LIBOR**") plus 2%.  Accordingly, Nigeria is obliged to make reparation to the Claimant in these amounts plus compensation for moral damages.

---

[538] Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Managing Director of Ogun-Guangdong Free Trade Zone, 12 April 2016, **C-155**; Letter from Zhongfu International Investment (NIG) FZE to Secretary to the State Government of Ogun State, 26 May 2016, **C-157**; Letter from Office of the Secretary to the State Government, Office of the Governor of Ogun State to Zhongfu International Investment (NIG) FZE, 27 May 2016, **C-158**; Note 1601 from the Economic and Commercial Section of the Consulate General of the People's Republic of China in Lagos to the Ogun State Government, 11 March 2016, **C-156**.

A       **The Claimant is Entitled to Full Compensation for its Investment which was Unlawfully Taken by the Respondent**

298.    In accordance with settled principles of international law, the Claimant seeks full reparation for its losses caused by Nigeria's violations of the Treaty and international law.[539]  The duty to make reparation is a fundamental norm which has been affirmed and applied by the ICJ,[540] arbitral tribunals,[541] the European Court of Human Rights[542] and the International Tribunal for the Law of the Sea.[543]  As articulated by the PCIJ in the *Chorzów Factory* case:

> *"It is a principle of international law that the breach of an engagement involves an obligation to make reparation in an adequate form. Reparation therefore is the indispensable complement of a failure to apply a convention and there is no necessity for this to be stated in the convention itself."*[544]

299.    Under customary international law, as codified in the ARSIWA, reparation *"shall take the form of restitution, compensation and satisfaction, either singly or in combination"*[545] and *"as far as possible, wipe out all the consequences of the illegal act and re-establish the situation the situation which would, in all probability, have existed if that act had not been committed."*[546]

300.    In the present circumstances, the only practical form of reparation which would wipe out all the consequences of Nigeria's illegal act is for monetary compensation to be paid to the Claimant.  In light of the circumstances of the removal of Zhongfu Nigeria from the Zone and the harassment and intimidation of its staff, which resulted in them fleeing Nigeria, restitution would not be an appropriate nor practical remedy.

---

[539] ARSIWA, Art. 31(1), **CLA-027**.

[540] See for instance *Case Concerning the Gabčíkovo-Nagymaros Project (Hungary v Slovakia)*, Judgment, 25 September 1997, ICJ Reports 1997, ¶¶ 149-150, **CLA-118**; *Case Concerning the Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)*, Judgment,14 February 2002, ICJ Reports 2002, ¶ 76, **CLA-119**.

[541] See for instance *S.D. Myers, Inc. v Canada*, UNICTRAL, Award, 13 November 2000, ¶ 311 ("*The principle of international law stated in the Chorzów Factory (Indemnity) case is still recognized as authoritative on the matter of general principle* [*payment of a sum corresponding to the value which a restitution in kind would bear.*]"), **CLA-120**; *MTD Equity Sdn Bhd and MTD Chile SA v Chile*, ICSID Case No ARB/01/7, Award, 25 May 2004, ¶ 238, **CLA-59**; *Siemens A.G. v The Argentine Republic*, ICSID Case No ARB/02/8, Award, 6 February 2007, ¶¶ 350-351, **CLA-121**; *ADC Affiliate Limited and ADC & ADMC Management Limited v Republic of Hungary*, ICSID Case No ARB/03/16, Award, 2 October 2006, ¶ 494, **CLA-076**.

[542] See for instance *Papamichalopoulos et al. v Greece (Article 50)*, ECHR, Application No 14556/89, Judgment, October 31, 1995, ¶ 36, **CLA-122**.

[543] *The M/V "Saiga" (No. 2) Case (Saint Vincent and the Grenadines v. Guinea)*, ITLOS, Judgment, 1 July 1999, International Legal Materials, vol. 38, p. 1357, ¶ 170f, **CLA-123**.

[544] *Case Concerning the Factory at Chorzów*, Judgment No 8 on Jurisdiction, PCIJ (Series A No 9), 26 July 1927, p. 21, **CLA-124**.

[545] ARSIWA, Art. 34, **CLA-027**.

[546] *Case Concerning the Factory at Chorzów*, Judgment No 13 on Merits, PCIJ (Series A No 17), 13 September 1928, p. 47, **CLA-125**. See also *Petrobart Limited v The Kyrgyz Republic*, SCC Case No 126/2003, Final Award, 29 March 2005, pp. 77-78, **CLA-034**.

### 1.   Full Compensation is the Appropriate Standard

301.   The obligation of full compensation is reflected in Article 36 of the ARSIWA, which states:

"*1. The State responsible for an internationally wrongful act is under an obligation to compensate for the damage caused thereby, insofar as such damage is not made good by restitution.*

*2. The compensation shall cover any financially assessable damage including loss of profits insofar as it is established.*"[547]

302.   Therefore, as the tribunal held in *Petrobart v Kyrgyz Republic*, to wipe out all the consequences of the illegal act, the award of damages should place the Claimant in the financial position it would have been in had the breaches not occurred.[548]   Accordingly, the Claimant is entitled to full compensation for all of the losses it suffered as a result of Nigeria's unlawful conduct, including the profits which the Claimant would have earned under the Fucheng Industrial Park Agreement for the remainder of the 97-year lease and the value of the Claimant's investment in Zhongfu Nigeria, which include the rights under the JVA for the remainder of the 99-year lease term.

303.   The standard of compensation, given the facts and circumstances of this case, is substantially the same regardless of the breach of the treaty provision relied upon as Nigeria has destroyed the Claimant's investment, or at least substantially deprived the Claimant of the value of its investment.   As the *Vivendi v Argentina* tribunal observed, it is generally accepted that, "*regardless of the type of investment, and regardless of the nature of the illegitimate measure, the level of damages awarded in international investment arbitration is supposed to be sufficient to compensate the affected party fully and to eliminate the consequences of the state's action.*"[549]

304.   As regards expropriation in particular, under international law, a distinction has been drawn between lawful and unlawful expropriation which has recognised that a different standard of compensation potentially applies to each.[550]   Article 4(2) of the Treaty specifies that in the case of an expropriation which has been done in accordance with Article 4(1) of the Treaty (i.e., lawfully, in that it was done for a legitimate public purpose, under due process of law, without discrimination and with payment of compensation), then compensation shall be:

---

[547] ARSIWA, Art. 36, **CLA-027**.

[548] *Petrobart Ltd. v Kyrgyz Republic*, SCC Arbitration No. 126/2003, Award, 29 March 2005, ¶¶ 77 - 78, **CLA-034**.

[549] *Compañía de Aguas del Aconquija SA and Vivendi Universal SA v Argentine Republic*, ICSID Case No ARB/97/3, Second Presentation of the Case, Award, 20 August 2007, ¶ 8.2.7, **CLA-052**.

[550] See *Compañiá de Aguas del Aconquija S.A. and Vivendi Universal S.A. v Argentine Republic*, ICSID Case No ARB/97/3, Award, 20 August 2007, ¶ 8.3.20, **CLA-052**.

JA-273

> *"equivalent to the value of the expropriated investments immediately before the expropriation is proclaimed, be convertible and freely transferable. The compensation shall be paid without unreasonable delay and include interest at a normal commercial rate."*

305.  However, the Treaty does not address the standard of compensation payable in the case of an unlawful expropriation or for breaches of the other treaty protections such as those in Articles 2(2), 2(3) and 3(1) of the Treaty.  In the absence of an express standard of compensation in the Treaty for those treaty breaches, the applicable standard of compensation is that under customary international law.[551]  This position was recognised by the tribunal in *ADC v Hungary*, finding:

> *"[I]n the present case the BIT does not stipulate any rules relating to damages payable in the case of an unlawful expropriation.  The BIT only stipulates the standard of compensation that is payable in the case of a lawful expropriation, and these cannot be used to determine the issue of damages payable in the case of an unlawful expropriation since this would be to conflate compensation for a lawful expropriation with damages for an unlawful expropriation […] Since the BIT does not contain any lex specialis rules that govern the issue of the standard for assessing damages in the case of an unlawful expropriation, the Tribunal is required to apply the default standard contained in customary international law in the present case."[552]*

306.  As noted above, the standard of compensation under customary international law is full reparation, as articulated by the PCIJ in the *Chorzów Factory* case which has been repeatedly cited, approved, and followed in subsequent decisions of investment arbitration tribunals.  For example, in *Kardassopoulos and Fuchs v. Georgia*, the Tribunal stated:

> *"the customary international law standard of compensation requires that reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability have existed if that act had not been committed…this standard is intended to eliminate the consequences of the wrongful act for which the State is responsible."[553]*

307.  The Tribunal in *ADC v. Hungary* also noted that the statement of customary international law from the *Chorzów Factory* case had "*subsequently been affirmed and applied in a number of international arbitrations relating to the expropriation of foreign owned*

---

[551] See *Case Concerning the Factory at Chorzów*, Judgment No 8 on Jurisdiction, PCIJ (Series A No 9), 26 July 1927, p. 21, **CLA-124**.

[552] *ADC Affiliate Limited and ADC & ADMC Management Limited v Republic of Hungary*, ICSID Case No ARB/03/16 , Award, 2 October 2006, ¶¶ 481, 483, **CLA-076**.

[553] *Ioannis Kardassopoulos and Ron Fuchs v Republic of Georgia*, ICSID Case Nos. ARB/05/18 and ARB/07/15, Award, 3 March 2010, ¶ 594, **CLA-075**.

property."[554]  Further, the tribunal in that case noted that the PCIJ had also "*repeatedly… reconfirmed the validity, indeed the primacy, of Chorzów Factory as the standard of compensation for acts by States unlawful under international law.*"[555]

### 2.    Compensation must be Equal to Fair Market Value

308.    To calculate the appropriate amount of compensation due to the Claimant, the generally accepted methodology is to determine the fair market value (the "**FMV**") of the Claimant's investment but for Nigeria's wrongful conduct.[556]   This method is reflected in the commentary to the ILC's Articles on State Responsibility, where it states that: "[c]*ompensation reflecting the capital value of property taken or destroyed as the result of an internationally wrongful act is generally assessed on the basis of the 'fair market value' of the property lost.*"[557]

309.    The tribunal in *Crystallex v Venezuela*, held that a proper assessment of the FMV of an investment ensures that the injured party is restored to the situation it would have been in but-for the internationally wrongful acts:

> *"*[I]*t is well-accepted that reparation should reflect the 'fair market value' of the investment.  Appraising the investment in accordance with the fair market value methodology indeed ensures that the consequences of the breach are wiped out and that the situation which would, in all probability, have existed if the wrongful acts had not been committed is re-established."*[558]

310.    Investment treaty arbitral tribunals have regularly applied the FMV standard in cases involving both breaches of expropriation[559] and the fair and equitable treatment standard.[560]   It has been held by investment treaty tribunals that the FMV standard

---

[554] *ADC Affiliate Limited and ADC & ADMC Management Limited v Republic of Hungary*, ICSID Case No. ARB/03/16 , Award, 2 October 2006, ¶ 486, **CLA-076**.

[555] *ADC Affiliate Limited and ADC & ADMC Management Limited v Republic of Hungary*, ICSID Case No ARB/03/16 , Award, 2 October 2006, ¶ 493, **CLA-076**.

[556] The approach is adopted in any event in Article 4(2) of the Treaty, which refers to the "*value of the expropriated investments*".

[557] ARSIWA Commentary, Art. 36, ¶ 22, **CLA-039.**

[558] *Crystallex International Corporation v Bolivarian Republic of Venezuela,* ICSID Case No ARB(AF)/11/2, Award, 4 April 2016, ¶ 850, **CLA-090**.

[559] See, e.g., *Metalclad Corporation v The United Mexican States*, ICSID Case No ARB(AF)/97/1, Award, 30 August 2000, ¶ 118, **CLA-078**; *CME Czech Republic B.V. v Czech Republic*, UNCITRAL, Final Award, 14 March 2003, ¶¶ 496-499, **CLA-079**; *Bernardus Henricus Funnekotter and others v Republic of Zimbabwe*, ICSID Case No ARB/05/6, Award, 22 April 2009, ¶ 124, **CLA-114**.

[560] See, e.g., *CMS Gas Transmission Company v The Argentine Republic*, ICSID Case No ARB/01/8, Award, 12 May 2005, ¶ 410, **CLA-126**; *Enron Corporation and Ponderosa Assets, L.P. v Argentine Republic*, ICSID Case No ARB/01/3, Award, 22 May 2007, ¶¶ 359-363, **CLA-127**; *Azurix Corp. v The Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006, ¶ 424, **CLA-104**; *El Paso Energy International Company v Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011, ¶ 702-704, **CLA-033**.

"*equates with 'just compensation' that represents the 'genuine value' of the property affected*"[561] and has been particularised as:

> "*the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms length in an open and unrestricted market when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.*"[562].

311.   Where the investment which is the subject of the illegal measure(s) is a "going concern", the assessment of the FMV of the investment must take future profitability into consideration in order to provide full compensation.[563]   Indeed in *Chorzów Factory*, the PCIJ noted that "future prospects," "probable profit" and future "financial results" were factors material to the valuation.[564]   Similarly, in the case of *Phillips Petroleum v Iran*, the Iran-US Claims Tribunal explained that:

> "[A]*nalysis of a revenue-producing asset… must involve a careful and realistic appraisal of the revenue-producing potential of the asset over the duration of its term, which requires appraisal of the level of production that reasonably may be expected, the costs of operation, including taxes and other liabilities, and the revenue such production would be expected to yield, which, in turn, requires a determination of the price estimates for sales of the future production that a reasonable buyer would use in deciding upon the price it would be willing to pay to acquire the asset.*"[565]

312.   At the time of Nigeria's unlawful expropriation of the Claimant's investment and other violations of the Treaty, Zhongfu Nigeria was a going concern.   Indeed, in its last full year of operation, Zhongfu Nigeria generated a substantial profit of over US$3 million.   In such circumstances, the FMV of the Claimant's investment must take into account the value of the future cash flows that its investment would have generated in the absence of Nigeria's unlawful conduct.

313.   The most appropriate way to determine the FMV of going concerns is the DCF method.   This method reflects the present worth of the cash flows that the business is expected to generate in the future.   The DCF method involves calculating future cash flows and discounting these at an appropriate rate to estimate the present value of a business on a

---

[561] *CME Czech Republic B.V. v Czech Republic*, UNCITRAL, Final Award, 14 March 2003, ¶ 493, **CLA-079**.

[562] *CMS Gas Transmission Company v The Argentine Republic*, ICSID Case No ARB/01/8, Award, 12 May 2005, ¶ 402, **CLA-126**.

[563] *Walter Bau AG v The Kingdom of Thailand*, UNCITRAL, Award, 1 July 2009, ¶¶ 14.12, 14.12, 14.22, **CLA-128**; *Sistem Mühendislik In aat Sanayi ve Ticaret A. v Kyrgyz Republic*, ICSID Case No. ARB(AF)/06/1, Award, 9 September 2009, ¶ 161, **CLA-129**.

[564] *Case Concerning the Factory at Chorzów (Claim for Indemnity)*, Judgment on Merits, 13 September 1928, (PCIJ Series A No. 17), pp. 51-52, **CLA-125**.

[565] *Phillips Petroleum Co. Iran v Iran*, Iran-US Claims Tribunal, Award No 425-9-2, 29 June 1989, ¶ 111, **CLA-112**.

given date.  It is considered to be the most appropriate approach as it considers the future benefits and risks associated with the ownership of the evaluated asset.[566]

314.   International arbitral tribunals have recognised the utility and applicability of the DCF method for measuring compensation.  The *Enron v. Argentina* tribunal noted that it had been "*constantly used by tribunals in establishing the fair market value of assets to determine compensation of breaches of international law.*"[567]  Similarly, the *Walter Bau v. Thailand* tribunal applied a DCF analysis and said that it is the "*only method which can accurately track value through time*" and "[i]*f value and damages must be computed on the basis of what was legitimately expected at any given time, then the DCF method is the most reasonable one to apply.*"[568]

315.   Accordingly, the DCF method is the appropriate method to assess the FMV of the Claimant's expropriated investment in Nigeria.  It is the primary methodology that has been adopted in the FTI Report.

316.   In the alternative, and as a cross-check, the FTI Report has also calculated the FMV of the Claimant's investment on the basis of a comparable approach.  This methodology considers comparable assets to those which were affected by the Nigerian State's unlawful measures to calculate the FMV, in particular with reference to transactions in the Nkok free trade zone in Gabon.

### 3.   The Valuation Date

317.   Under the full reparation principle, the injured claimant is entitled to full compensation such that the consequences of the State's internationally wrongful conduct is entirely wiped out.  This standard of full reparation must be the basis for determining the appropriate date of valuation.

318.   Determination of the appropriate valuation date therefore requires the tribunal "*precisely to ensure full reparation and to avoid any diminution of value attributable to the State's conduct leading up to the expropriation.*"[569]  Therefore, the valuation date must reflect the

---

[566] World Bank Group, "Guidelines on the Treatment of Foreign Direct Investment" (1992) Vol 7(2) ICSID Review–*Foreign Investment Law Journal* 297, S. IV, ¶ 6, **CLA-130**, (defining DCF as "*the cash receipts realistically expected from the enterprise in each future year of its economic life as reasonably projected minus that year's expected cash expenditure, after discounting this net cash flow for each year by a factor which reflects the time value of money, expected inflation, and the risk associated with such cash flow under realistic circumstances.*"); Borzu Sabahi, *Compensation and Restitution in Investor-State Arbitration: Principles and Practice* (Oxford University Press 2011), p. 118, **CLA-131**.

[567] *Enron Corporation Ponderosa Assets, LP v Argentine Republic*, ICSID Case No ARB/0l/3, Award, 22 May 2007, ¶ 385, **CLA-127**.

[568] *Werner Schneider acting in his capacity as insolvency administrator of Walter Bau Ag (In Liquidation) v Kingdom of Thailand*, UNCITRAL, Award, 1 July 2009, ¶ 14.12; 14.22, **CLA-128**.

[569] *Ioannis Kardassopoulos v Georgia*, ICSID Case No ARB/05/18, Award, 3 March 2010, ¶ 517, **CLA-075**.

situation that would have existed but for the State's wrongful conduct.  As set out by the tribunal in *Santa Elena v Costa Rica*:

> "*The expropriated property is to be evaluated as of the date on which the governmental 'interference' has deprived the owner of his rights or has made those rights practically useless.  This is a matter of fact for the Tribunal to assess in the light of the circumstances of the case.*"[570]

319.    In light of this, the most appropriate date on which the value the Claimant's investment should be calculated is 22 July 2016, which was the date of the handover ceremony of the Zone, as this is the date on which the Claimant was practically deprived its rights.

320.    Furthermore, this valuation date accords with the Treaty.  Article 4(2) of the Treaty provides that compensation (albeit for a lawful expropriation) shall be "*equivalent to the value of the expropriated investments immediately before the expropriation is proclaimed*".[571]

321.    This date of 22 July 2016 is also appropriate because although some damage had likely already been done to the Claimant's investment by that time, such as by the purported Notice of Termination of the Ogun State Government in May 2016, the position for the Claimant was irretrievable after 22 July 2016 when the Nigerian State, using the instrumentalities of the Nigerian police and NEPZA, physically took over the Claimant's investment in the Zone.

322.    Accordingly, the FTI Report has based its assessment of the Claimant's losses on a valuation date of 22 July 2016 ("**Valuation Date**").

### 4.    The Claimant is Entitled to be Awarded Moral Damages

323.    As part of its obligation of full reparation, Nigeria is also liable to pay the Claimant moral damages for the considerable harm done to its employees and agents.  It is well known in customary international law, as described in the *Lusitania* case:

> "*That one injured is, under the rules of international law, entitled to be compensated for an injury inflicted resulting in mental suffering, injury to his feelings, humiliation, shame, degradation, loss of social position or injury to his credit or reputation, there can be no doubt, and such compensation should be commensurate to his injury.  Such damages are very real, and the mere fact they are difficult to measure or estimate by money standards makes them none the less real and affords no reason why the injured person should not be compensated therefor as compensatory damages, but not as a penalty.*"[572]

---

[570] *Compañia del Desarrollo de Santa Elena S.A. v Republic of Costa Rica*, ICSID Case No ARB/96/1, Award, 17 February 2000, ¶ 78, **CLA-132**.

[571] China-Nigeria BIT, Art. 4(2).

[572] *Lusitania (US v Germany)* (1923) VII RIAA 32, ¶ 40, **CLA-133**.

324.  In ARSIWA Article 31(2), when describing the principle of full reparation, the ILC stated that an injury in respect of which reparation is owed "*includes any damage, whether material or moral, caused by the internationally wrongful act of a State*".   In the Commentary to that provision, the ILC defined moral damage as including "*such items as individual pain and suffering, loss of loved ones or personal affront associated with an intrusion on one's home or private life.*"[573]

325.  Investment treaty tribunals have long accepted the availability of an award of damage to reflect moral injury.  In *Desert Line v Yemen*, the tribunal granted moral damages for the actions of Jordanian authorities, including:

> "[T]*he physical duress exerted on the executives of the Claimant, was malicious and is therefore constitutive of a fault-based liability. Therefore, the Respondent shall be liable to reparation for the injury suffered by the Claimant, whether it be bodily, moral or material in nature. The Arbitral Tribunal agrees with the Claimant that its prejudice was substantial since it affected the physical health of the Claimant's executives and the Claimant's credit and reputation".*[574]

326.  The tribunal in that case found that the claimant should be granted moral damages, including for loss of reputation, and awarded moral damages of US$1,000,000.[575]

327.  Similarly, in *Funnekotter v Zimbabwe*, the tribunal considered that "*the Claimants must obtain reparation for the disturbances resulting from the taking over of their farms and for the necessity for them to start a new life often in another country*", and evaluated the damages suffered in this respect for each Claimant at EUR 20,000.[576]  Other investment treaty tribunals have similarly made States liable to pay moral damages, such as: CFA 5,000,000 to the investor for damaging its activities;[577] US$30,000,000 to an investor "*as a result of the damage to its worldwide professional reputation after the Defendants' abusive cancellation of the important project that they previously approved its establishment and investment, by the Plaintiff, for a period of 83 years, and for the execution of which the Plaintiff had negotiated and entered into contracts with international companies*";[578] and US$1,000,000 as moral damages to investors for threats to their safety.[579]

---

[573] ARSIWA Commentary, Art. 31, ¶ 5, **CLA-039**.

[574] *Desert Line Projects LLC v The Republic of Yemen*, ICSID Case No. ARB/05/17, Award, 6 February 2008, ¶ 290, **CLA-066**.

[575] *Desert Line Projects LLC v The Republic of Yemen*, ICSID Case No. ARB/05/17, Award, 6 February 2008, ¶¶ 290-291, **CLA-066**.

[576] *Bernardus Henricus Funnekotter and others v Republic of Zimbabwe*, ICSID Case No ARB/05/6, Award, 22 April 2009, ¶ 138, **CLA-114**.

[577] *S.A.R.L. Benvenuti & Bonfant v People's Republic of the Congo*, ICSID Case No ARB/77/2, Award, 8 August 1980, ¶ 4.96, **CLA-134**.

[578] *Mohamed Abdulmohsen Al-Kharafi & Sons Co. v State of Libya and others*, Final Arbitral Award, 22 March 2013, p. 369, **CLA-135**.

[579] *Bernhard von Pezold and others v Republic of Zimbabwe*, ICSID Case No ARB/10/15, Award, 28 July 2015, ¶¶ 921, 923, **CLA-080**.

328.  Moral damages are clearly warranted in the present case.  The Ogun State Government issued direct threats to Zhongfu Nigeria's CEO, Dr. Han, to "*leave peacefully when there is* [an] *opportunity to do so, and avoid forceful removal, complications and prosecution*".[580] These threats alone would warrant moral damages - but precisely what "*complications*" the Nigerian authorities had in mind was to become all too clear in the shocking treatment meted out to Zhongfu Nigeria's CFO, Mr. Zhao.

329.  As set out in his witness statement, on the night of 17 August 2016, Mr. Zhao was taken forcibly from his hotel room in Lagos by the Nigerian police.[581]  He was threatened and physically abused before being detained in appalling conditions for two days and not offered food and water.[582]  On 19 August 2016, he was taken by an armed officer to Ajuba where he received similar treatment, in an apparent bid to persuade him to reveal the whereabouts of Dr. Han.[583]  He was finally released on 23 August 2016 in Abuja - but was unable to leave Nigeria for a further month as the police unlawfully retained his passport in a bid to exercise further leverage and discover Dr. Han's whereabouts.[584]  As he explains in his evidence, Mr. Zhao remains distressed and traumatised by his experiences to this day.

330.  Recalling the treatment he received in police custody, Mr Zhao states:

> "*After a while, the police car stopped somewhere that looked like a police station.  The police officers asked me to stay outside and then another group of police officers arrived.  One police officer in uniform came over to me and slapped me twice on the face with his hand.  Then the police officers who brought me there took me to a room where they asked me to sign a piece of paper.  They did not say or explain what this paper was or what it said.  I refused to sign the piece of paper.*
>
> *The police officers then took my flip flops and placed me in a courtyard with a number of cells surrounding it.  It was dark and cold and I was standing at the gate to one of the cells.  Then another prisoner came out of that cell and asked why I was taken.  I did not speak.  There were also some other people who had been brought to the courtyard and the prisoner told us to stand side-by-side and asked whether we had money and why we were there.  If someone had no money, he would slap them.  Then the prisoner took me aside and asked me to speak.  He said that if I did not speak, he would beat me with a club.  Then another prisoner joined that first prisoner in intimidating me.  Later the second prisoner took me aside and told me not*

---

[580] Letter from G. Elias & Co. to NEPZA with Note of harassment, threats and intimidation of Jason Han attached, 25 July 2016, **C-011**; Email from Jason Han to Elizabeth Uwaifo, 25 September 2016, **C-012**.

[581] Witness Statement of Mr Wenxiao (Areak) Zhao, 30 April 2019, ¶ 21.

[582] Witness Statement of Mr Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 22–27.

[583] Witness Statement of Mr Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 28–36

[584] Witness Statement of Mr Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 39–41.

*to be afraid.  However, the first prisoner came back and threatened me with a club and asked me to speak, which I did not do.*

*[…]*

*On what I think was the third day in the Abuja police station, a lot of people were brought into the office.  The police officers moved me to another office.  In the new office, two handcuffed men were being forced to hit each other.  They were each told that if you hit the other man, you would be released.  The two persons were hitting each other, and I could see the blood.  After this, the police officer showed me a video of a prisoner eating a rat.  The police officer then approached me asking what happened.  I did not respond and he hit me twice, first on the neck and the second time on the head with a fist.  It was painful and I felt numb."*[585]

331. Plainly, if there were any case in which moral damages in the *Lusitania* sense - that is, "*injury to* [a person's] *feelings, humiliation, shame, degradation, loss of social position or injury to his credit or reputation*" - were required, it is this one.

**B       Quantum of Compensation**

332. In order to assess the full compensation due to the Claimant in relation to its investment in Nigeria, Mr. Matthews has calculated the FMV of the Claimant's investment as of 22 July 2016, using a DCF analysis as the primary approach and a further valuation method based on comparable transactions in free trade zones as an alternative approach and cross check.   In so doing, Mr. Matthews has assessed losses by comparing two financial positions:

(a)   the financial position that the Claimant would have been in with respect to its investment in Nigeria, but for the wrongful actions of Nigeria (the "**But For Position**").  This can be measured by assessing the market value of the Claimant's investment in the Zone at the Valuation Date, absent the Respondent's alleged wrongful actions; and

(b)   the financial position that the Claimant is actually in with respect to its investment in the Zone (the "**Actual Position**").  This is equal to the actual market value of the Claimant's investment in the Zone at the Valuation Date.  Since the Respondent's breaches of the Treaty and take over of the Claimant's investment resulted in the Claimant losing all of its investment in the Zone, this value is nil.

**1.      The DCF Approach**

333. To assess the full compensation due to the Claimant in relation to its investment in the Zone using the DCF approach, Mr. Matthews calculates the FMV of that investment as at

---

[585] Witness Statement of Mr Wenxiao (Areak) Zhao, 30 April 2019, ¶¶ 39–41.

the Valuation Date.  This approach requires a projection of (i) the future revenues that would have been generated from the Zone; and (ii) the costs associated with the development of the Zone and generating those future revenues, as they would have been but for the wrongful actions of the Respondent.

334.   Mr. Matthews' assessment of the Claimant's damages in relation to the expropriation of its investment in the Zone using the DCF approach involves the following:

(a)   considering the historical performance of the Fucheng Industrial Park up to the Valuation Date;

(b)   using the documentary evidence available in respect of the Fucheng Industrial Park's historical performance to inform the projections for the overall financial performance of the Zone subsequent to the Valuation Date;

(c)   determining the future revenue that would have been generated from the Zone but for Nigeria's wrongful actions from land transfer fees based on the expected rate of development of the Zone and the expected increase in land value during that time;

(d)   determining the future revenue that would have been generated from the Zone but for Nigeria's wrongful actions from the Administration Fee based on the actual and forecast turnover of existing tenants and the expected rate of development of the Zone;

(e)   calculating the future cash flows due to the Claimant pursuant to the Fucheng Industrial Park Agreement and JVA but for Nigeria's wrongful actions by subtracting from the above-referenced future revenues the expected land and infrastructure development costs, and other running costs associated with the Zone;

(f)   determining the net present value of these cash flows by discounting them using the appropriate discount rate; and

(g)   determining the FMV of the Claimant's investment by subtracting from the net present value any financial debt incurred by Zhongfu Nigeria and OGFTZ Company.

335.   In undertaking the above exercise, Mr. Matthews has adopted certain assumptions.  This includes: (i) the time it would take for the Zone to be developed and filled with tenants; (ii) the future land transfer fee revenue from tenants; (iii) the future administrative fee revenue from tenants; and (iv) the costs of developing and running the Zone, including the infrastructure development and land development costs.[586]

---

[586] FTI Report, ¶ 7.6.

(i)   *Timeframe for full development of the Zone*

336. Mr. Matthews values the Claimant's investment on the basis that, in the But For Position, the concession period for the Zone would have ended on 31 December 2016, in accordance with the terms of the JVA.[587]

337. Mr. Matthews' valuation takes the Fucheng Industrial Park as a "blueprint" for the rest of the Zone and anticipates that it would have been fully developed to its target utilisation, with 60% being leased to tenants and 40% reserved for roads, public utilities and greenery, within 12 months of the Valuation Date.[588]

338. In view of the Claimant's "*priority right to invest in and develop other areas in* [the Zone]" under the same conditions as the Fucheng Industrial Park Agreement,[589] the development of the Zone by the Claimant is anticipated to have followed that of the Fucheng Industrial Park.[590]   The remaining area of the Zone, excluding the land to be developed for the Pharmaceutical Park, is anticipated to have reached its target utilisation over a period of 20 years from the Valuation Date.[591]

339. The land leased to the Xi'an Company for the Pharmaceutical Park would have been developed to its target utilisation of 80%, with 20% reserved for infrastructure and non-profit public utilities, over a period of 10 years from 2017 onwards.[592]

(ii)   *Land transfer fee revenues (excluding the Pharmaceutical Park)*

340. The land transfer fee revenue generated from sub-leases by tenants for land within the Zone was received by the Claimant (i) directly under the Fucheng Industrial Park Agreement; and (ii) by virtue of Zhongfu Nigeria's 60% shareholding in OGFTZ Company under the JVA.  The land transfer fee is a one-off upfront fee covering the term of the sub-lease and chargeable by reference to the size of the land leased and the duration of the lease.[593]

341. Initially, tenants were offered longer term leases for periods such as 90 years.  From 2015, shorter and more flexible lease terms of 10 to 50 years were offered, with 20 year leases

---

[587] FTI Report, ¶ 7.13.

[588] FTI Report, ¶¶ 7.5 and 7.17(1).

[589] Fucheng Industrial Park Agreement, Art. 4.1.7, **C-002**.

[590] FTI Report, ¶ 7.5.

[591] FTI Report, ¶ 7.17(2).

[592] FTI Report, ¶ 7.19.

[593] FTI Report, ¶¶ 7.20-7.21.

being the most popular.[594]  In 2015 and 2016, the lease agreements show the median and mean land transfer fees as being equivalent to US$12 per square metre and US$13.6 per square metre for the duration of a 20 year lease term.[595]

342.   Mr. Matthews has valued the revenue arising from the land transfer fees on the basis that, from the Valuation Date up to the date of expiry of the Zone concession period, tenants were continuing the trend of entering into 20 year lease terms for a land transfer fee equivalent to US$12 per square metre adjusted for inflation.[596]   The land transfer fee revenues are calculated on the basis that, upon expiry, the lease agreements would be continuously renewed by the existing tenant or an alternate lease agreement entered into with a new tenant.

343.   In addition to the one-off upfront land transfer fees, further revenue was generated through the rental income paid by tenants leasing the workshops in the "*incubator*" warehouse in the Zone.[597]  The "*incubator*" tenants would pay a yearly rental fee at a significantly higher rate per square metre to that paid by tenants entering into the longer term land lease agreements.[598]   Despite the higher rates paid, as the "incubator" yearly rental income represented less than 4% of Zhongfu Nigeria's revenues, it has not been included in the land transfer fee revenue calculation.[599]

344.   The valuation of the land transfer fee at US$12 per square metre for the entirety of the period from the Valuation Date to the date of expiry of the Zone concession period is considered to be conservative given that it does not take into account (i)  the increase to the land value (other than for inflation) as the development of the Zone continues and the concomitant increase in land transfer fees that would be charged to tenants upon the future renewal or execution of land lease agreements;[600] or (ii) the higher rates of annual rental income that was generated from the tenants leasing space in the "incubator" warehouses.[601]

---

[594] FTI Report, ¶ 7.22.

[595] FTI Report, ¶ 7.24.

[596] FTI Report, ¶ 7.28(2).

[597] FTI Report, ¶ 7.29.

[598] FTI Report, ¶ 7.30.

[599] FTI Report, ¶ 7.31.

[600] FTI Report, ¶ 7.28(2).

[601] FTI Report, ¶ 7.31.

*(iii)* <u>Revenue from land transfer fees in the Pharmaceutical Park</u>

345. Zhongfu Nigeria, as majority shareholder of OGFTZ Company, was entitled to a proportion of the land transfer fees charged to tenants of the Pharmaceutical Park and the land transfer revenue from the lease of land reserved for infrastructure and non-profit public utilities areas, pursuant to the Xi'an Industrial Park Agreement.[602]

346. The benchmark land lease fee for non-infrastructure and public utilities areas under the Xi'an Industrial Park Agreement was set at RMB 75 per square metre, equivalent to US$11.23 per square metre as at the Valuation Date.[603] The portion of land lease fee revenue due to OGFTZ Company was to be calculated at (i) 20% where the land lease fee was below the benchmark land lease fee; (ii) 30% where the land lease fee was at the benchmark land lease; (iii) 40% of the land lease fees charged between RMB 75 and RMB 150 per square metre; and (iv) where the land lease fees was higher than RMB 150 per square metre, 50% of the land lease fee above RMB 75 per square metre.[604]

347. Land reserved for the infrastructure and public utilities areas would be leased at a rate equal to 20% of the benchmark land lease fee.[605]

348. Mr. Matthews has calculated the revenue arising from the land lease fees under the Pharmaceutical Park Framework Agreement on the basis that the sub-leases for the Pharmaceutical Park would be for a 20 year term at the benchmark rate of US $ 11.23 per square metre from the Valuation Date and would have been renewed continuously throughout the remainder of the concession period at the same land transfer fee adjusted for inflation.[606]

349. In respect of the land lease fees generated from the infrastructure and public utilities areas, Mr. Matthews had calculated the revenue arising on the basis that: (i) 0.5 square kilometres of that land would be transferred at 20% of the benchmark rate of US$11.23 per square metre at the beginning of 2017; and (ii) the remaining land would be transferred as the Pharmaceutical Park develop at the same rates adjusted for inflation.[607]

*(iv)* <u>Revenue from administrative fees</u>

350. The Claimant was entitled to a proportion of the revenue arising from the Administration Fees paid by tenants within the Zone (i) directly under the Fucheng Industrial Park

---

[602] Xi'an Industrial Park Agreement, **C-132**

[603] FTI Report, ¶ 7.33.

[604] Xi'an Industrial Park Agreement, clauses 3.4-3.6, **C-132**.

[605] FTI Report, ¶ 7.34.

[606] FTI Report, ¶ 7.35(1).

[607] FTI Report, ¶ 7.35(1).

JA-285

Agreement; and (ii) by virtue of Zhongfu Nigeria's 60% shareholding in OGFTZ Company, under the JVA.[608]  The Zone tenants would generally be granted a grace period of six to twelve months from the date of commencement of operations before the administration fees would be collected.[609]

351.   Zhongfu Nigeria, as majority shareholder of OGFTZ Company, was also entitled to a proportion of the revenue arising from administration fees paid by tenants within the Pharmaceutical Park.[610]

352.   Based on Mr. Matthews' analysis of the forecast revenues set out in the investment agreements entered into by Zone tenants ranging from US$127 to US$4,000 per square metre, the revenue forecast from administration fees up to the date of expiry of the concession period is calculated to be US$400 per square metre adjusted for inflation each year for the tenants operating in the Zone.[611]  Allowing for an average grace period of 9 months from the date of commencement of operations, the administration fees would be collected from the tenants 18 months from the start of the lease period.[612]

353.   The forecast revenue from administration fees is considered to be conservative as the actual revenues of tenants for which Mr. Matthews has available data are greater than the forecasts provided in the investment agreements.

*(v)   Land development costs*

354.   Land development costs incurred for the construction of roads and connections of utilities to the new tenants' facilities were funded by the upfront land transfer fees paid over by the tenants.  Based on Mr. Matthews' analysis, the land development costs are calculated at a ratio of one third of the land transfer fee revenues per square metre.[613]

355.   While the land development costs would reduce over time as the roads and utilities connections in the Zone would  already be in place prior to the renewal of leases by existing tenants or agreement of new leases, the necessary land development costs are calculated

---

[608] FTI Report, ¶ 7.36.

[609] FTI Report, ¶ 7.38.

[610] FTI Report, ¶ 7.37.

[611] FTI Report, ¶¶ 7.41(1) and (2).

[612] FTI Report, ¶¶ 7.41(3) and (4).

[613] FTI Report, ¶ 7.44(1).

at the same ratio for each of the subsequent 20 year lease terms.[614] The forecast land development costs are accordingly considered by Mr. Matthews to be conservative.[615]

*(vi)   Infrastructure development costs*

356.   The Claimant engaged in discussions to raise around US$250 million to fund infrastructure development across the Zone.  The capital was to be raised in the form of a municipal bond with the World Bank or a blended debt and equity approach through a listing of Zhongfu Nigeria on the Nigerian Stock Exchange.[616]

357.   The future infrastructure development costs have been calculated on the basis that the US$250 million funding would have been raised by the end of 2017 and subsequently invested into the Zone's development.[617]

358.   The development of the Zone's infrastructure would have led to an increase in the land value and, therefore, the land transfer fees.  In addition, it was intended that the infrastructure developed using the fund would generate additional income.  Credit has not been given in the calculations of the above forecast revenues for the increase to the land transfer fees or the potential additional income.  The exclusion of those revenue streams is considered, therefore, by Mr. Matthews to be mean that, all else being equal, his valuation is likely to be understated.[618]

*(vii)   Other running costs associated with the Zone*

359.   Costs incurred in 2014 and 2015 for the general running of the Zone included expenses for personnel, wages and salaries, medical insurance, rental expenses, travel expenses, utilities, hospitality and advisory services.[619]  These costs increased by 2.1% adjusted for inflation from 2014 to 2015.[620]  For the purposes of Mr. Matthews' calculations, the general running costs of the Zone are considered to continue to increase at the same rate up to the expiry of the concession period.[621]

---

[614] FTI Report, ¶ 7.44(2).

[615] FTI Report, ¶ 7.44(2).

[616] FTI Report, ¶ 7.45.

[617] FTI Report, ¶ 7.50.

[618] FTI Report, ¶ 7.51.

[619] FTI Report, ¶ 7.52-7.56.

[620] FTI Report, ¶ 7.57.

[621] FTI Report, ¶ 7.59.

JA-287

*(viii)*   <u>The discount rate</u>

360.   In accordance with accepted principles of corporate finance, Mr. Matthews has undertaken a DCF analysis by discounting projected cash flows to the Valuation Date using an estimate of the cost of equity of the Claimant's investment in the Zone.[622]   The cost of equity of the Claimant's investment in the Zone, using the capital asset pricing model, has been estimated at 14.3%.[623]

*(ix)*   <u>DCF valuation of the Claimant's investment in the Zone</u>

361.   On the basis of the above approach and methodology, Mr. Matthews assess the value of the Claimant's investment in the Zone, arising under the Fucheng Industrial Park Agreement and the JVA, as at the Valuation Date to be US$1,078 million.[624]

## 2.   The Comparable Transaction Approach

362.   As a secondary valuation approach and a cross-check for the DCF approach, Mr. Matthews has also considered the value of the Claimant's investment in the Zone by reference to comparable transactions involving shares of other entities holding rights to develop other free trade zones.[625]   A comparable transaction identified by Mr. Matthews relates to Olam International Limited's ("**Olam**") investment in the Nkok SEZ in the Republic of Gabon[626]

363.   The Nkok SEZ is a free trade zone currently encompassing 600 hectares (with a development capacity for over 1,100 hectares) close to Libreville, the capital of Gabon, with 141 investors from 18 countries.[627]   It is owned and operated by Gabon Special Economic Zone, a joint venture company originally established in August 2010 by Olam (60%) and the Republic of Gabon (40%).[628]

364.   From the available data on the financial performance of the Nkok SEZ, there are some differences with its revenue model as compared with that of the Zone. As dealt with in detail above, the Zone generates a number of different revenue streams, including the

---

[622] FTI Report, ¶ 7.60.

[623] FTI Report, ¶ 7.61.

[624] FTI Report, ¶ 7.65.

[625] FTI Report, ¶ 8.1.

[626] FTI Report, ¶¶ 8.2-8.3.

[627] FTI Report, ¶¶ 3.27 and 8.5.

[628] FTI Report, ¶ 8.4(1).

upfront one-off land transfer and ongoing administration fees. Revenue deriving from the Nkok SEZ appears to be solely, or to a significant extent, from one-off land transfer fees.[629]

365.   Mr. Matthews identified two transactions which afforded sufficient information to determine the implied value of the transaction on a per square metre basis.[630]  These were: (i) the sale of 20% of Olam's shareholding in Gabon SEZ to the Republic of Gabon for approximately US$60 million in June 2014;[631] and (ii) the investment by African Finance Corporation of US$140 million in the Gabon SEZ in exchange for a 21% shareholding in April 2016.[632]  On the basis of these two transactions, Mr. Matthews calculated an implied land value of the 2014 and 2016 transaction as US$26.6 and US$59.2 per square metre respectively.[633]

366.   Mr. Matthews, in principle, considers that the above valuation multiples should be adjusted to take into account the differences between the Zone and the Nkok SEZ, including (i) the state of development of the Nkok SEZ at the time of the transactions; (ii) the prospects for future growth; (iii) the benefits offered for investors; (iv) economic prospects of the countries in which they are situated; and (v) the size of the Zone and the Nkok SEZ and the pace of development.[634]  On the basis of that analysis, Mr. Matthews considered the lower June 2014 valuation of US$26.6 per square metre to be a more appropriate multiple.[635]

367.   Mr. Matthews calculated the Claimant's investment in the Zone by reference to the comparison transaction methodology to be US$1,446 million.[636]

### 3.   Conclusion

368.   Using Mr. Matthews' DCF primary methodology, the FMV of the Claimant's expropriated investment in the Zone as at the Valuation Date is assessed to be US$1,078 million.  In the alternative, the FMV of the Claimant's investment in the Zone using the comparable transaction approach is quantified by Mr. Matthews as being US$1,446 million as at the Valuation Date.

---

[629] FTI Report, ¶¶ 8.9-8.11.

[630] FTI Report, ¶ 8.12.

[631] FTI Report, ¶¶ 8.4(3) and 8.12.

[632] FTI Report, ¶¶ 8.4(5) and 8.12.

[633] FTI Report, ¶ 8.13.

[634] FTI Report, ¶ 8.16.

[635] FTI Report, ¶ 8.18.

[636] FTI Report, ¶ 8.21.

## C    The Claimant is Entitled to Interest

369.    In order to receive full reparation under customary international law, the Claimant requests of pre-award and post-award interest at the rate of US$ one month LIBOR plus 2% to be compounded monthly.

370.    The role of interest is to compensate a claimant for the delay between the date of the harm suffered and the award of damages.  It is an integral component of full compensation under customary international law.[637]  A State's duty to make reparation arises immediately after its unlawful actions cause harm, and to the extent that payment is delayed, the claimant loses the opportunity to invest the compensation.[638]    As the International Law Commission's Articles on State Responsibility make clear, "[i]*nterest runs from the date when the principal sum should have been paid until the date the obligation to pay is fulfilled.*"[639]   Accordingly, to place the Claimant in the economic position it would have occupied had Nigeria not breached its obligation under the Treaty and taken the Claimant's investment in the Zone, the Claimant requests both pre-award and post-award interest until the date Nigeria pays compensation.

371.    There is no bar on a Tribunal to award compound interest.[640]   Rather, tribunals have frequently recognised that compound interest is the most accepted and appropriate method to give effect to the rule of full reparation[641] Compound interest ensures that (i) the claimant receives "*the full present value of the compensation that it should have received at the time of taking*"; and (ii) the respondent State is prevented from "*unjustly… enrich*[ing]

---

[637] *Compañía de Aguas del Aconquija SA and Vivendi Universal SA v Argentine Republic*, ICSID Case No ARB/97/3, Award, 20 August 2007, ¶ 9.2.1, **CLA-108**; *Maffezini v Kingdom of Spain*, ICSID Case No ARB/97/7, Award, 13 November 2000, ¶ 96, **CLA-065**; *Compañía del Desarrollo de Santa Elena SA v Republic of Costa Rica*, ICSID Case No ARB/96/1, Final Award, 17 February 2000, CLA-25, ¶¶ 96-97, **CLA-132**.

[638] *Metalclad Corporation v United Mexican States*, ICSID Case No ARB(AF)/97/1, Award, 30 August 2000, ¶ 128, **CLA-078**; *Compañía de Aguas del Aconquija SA and Vivendi Universal SA v Argentine Republic*, ICSID Case No ARB/97/3, Award, 20 August 2007, ¶ 9.2.3, **CLA-108**; *Foresight Luxembourg Solar 1 S. Á.R1., et al. v Kingdom of Spain*, SCC Case No. 2015/150, Award, 14 November 2018, ¶¶ 544-545, **CLA-136**.

[639] ARSIWA, Art. 38(2), **CLA-027**.

[640] *Compañia del Desarrollo de Santa Elena S.A. v Republic of Costa Rica*, ICSID Case No. ARB/96/1, Award, 17 February 2000, ¶¶ 96-107, **CLA-132**; *Metalclad Corporation v The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000, ¶ 131, **CLA-078**; *Wena Hotels Ltd. v Arab Republic of Egypt*, ICSID Case No ARB/98/4, Award, 8 December 2000, ¶¶ 128-129, **CLA-099**; *MTD Equity Sdn. Bhd. and MTD Chile S.A. v Republic of Chile*, ICSID Case No ARB/01/7, Award, 25 May 2004, ¶¶ 250-251, **CLA-059**; *Siemens A.G. v The Argentine Republic*, ICSID Case No ARB/02/8, Award, 6 February 2007, ¶¶ 399-401, **CLA-121**; and *Compañia de Aguas del Aconquija S.A. and Vivendi Universal S.A. v Argentine Republic*, ICSID Case No ARB/97/3, Award, 20 August 2007, ¶ 9.1.1, **CLA-108**.

[641] See, for example, *Compañia del Desarrollo de Santa Elena S.A. v Republic of Costa Rica*, ICSID Case No ARB/96/1, Award, 17 February 2000, ¶ 104, **CLA-132**; *Wena Hotels Ltd. v Arab Republic of Egypt*, ICSID Case No ARB/98/4, Award, 8 December 2000, ¶¶ 128-129, **CLA-099**; *Azurix Corp. v Argentine Republic*, ICSID Case No ARB/01/12, Award, 14 July 2006, ¶ 440, **CLA-105**; *ADC Affiliate Limited and ADC & ADMC Management Limited v Republic of Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, ¶ 522, **CLA-076**; *Siemens A.G. v The Argentine Republic*, ICSID Case No ARB/02/8, Award, 6 February 2007, ¶¶ 399-401, **CLA-121**; *Enron Corporation and Ponderosa Assets, L.P. v Argentine Republic*, ICSID Case No ARB/01/3, Award, 22 May 2007, ¶ 452, **CLA-127**; *BG Group Plc. v The Republic of Argentina*, UNCITRAL, Final Award, 24 December 2007, ¶¶ 456-457, **CLA-137**; *Bernardus Henricus Funnekotter and others v Republic of Zimbabwe*, ICSID Case No ARB/05/6, Award, 22 April 2009, ¶¶ 145-146, **CLA-114**; *Total S.A. v Argentine Republic*, ICSID Case No ARB/04/1, Award, 27 November 2013, ¶¶ 260-261, **CLA-138**; *Karkey Karadeniz Elektrik Uretim A.S. v Islamic Republic of Pakistan*, ICSID Case No ARB/13/1, Award, 22 August 2017, ¶¶ 999-1000, **CLA-139**; *Greentech Energy Systems A/S, NovEnergia II Energy & Environment (SCA) SICAR and NovEnergia II Italian Portfolio SA v Italian Republic*, SCC Case No V (2015/095), Final Award, 23 December 2018, ¶ 577, **CLA-140**; *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v The Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018, ¶¶ 846-847, **CLA-141**.

*itself by reason of the fact that the payment of compensation has long been delayed."*[642] It also "*reflects economic reality in modern times*" where "[t]*he time value of money in free market economies is measured in compound interest.*"[643]   On this basis, pre-award and post-award interest should be subject to reasonable compounding.   The appropriate interval of the compounding until payment is monthly.[644]

372.   The Claimant considers that an appropriate interest rate is US$ one month LIBOR plus 2% per annum on the basis that it represents a commercially reasonable and commonly-used interest rate at which the Claimant would have been able to borrow at the Valuation Date. Modern jurisprudence shows that the use of LIBOR as an appropriate benchmark interest rate has been applied by Tribunals in investment treaty cases.[645]

## IX.   RELIEF SOUGHT BY THE CLAIMANT

373.   The Claimant respectfully seeks, without prejudice to its reserved right to supplement and/or amend its claims and/or the quantum of its claims and/or the request for relief provided herein, an Award:

(1)   Declaring that the Respondent has breached Article 3(1) of the Treaty by failing to accord the Claimant's investment fair and equitable treatment;

(2)   Declaring that the Respondent has breached Article 2(2) of the Treaty by failing to accord the Claimant's investment continuous protection;

(3)   Declaring that the Respondent has breached Article 2(3) of the Treaty by taking unreasonable measures against the management, maintenance, use, enjoyment and disposal of the Claimant's investment;

(4)   Declaring that the Respondent has breached Article 4(1) of the Treaty by expropriating the Claimant's investment in Nigeria, alternatively by measures having effect equivalent to expropriation of the Claimant's investment in Nigeria;

(5)   Ordering the Respondent to pay the Claimant compensation for its total losses of US$1,078 million or, in the alternative, US$1,446 million;

---

[642] *Compañia del Desarrollo de Santa Elena S.A. v Republic of Costa Rica*, ICSID Case No. ARB/96/1, Award, 17 February 2000, ¶ 101, **CLA-132.**

[643] *Continental Casualty Company v Argentine Republic*, ICSID Case No. ARB/03/9, Award, 5 September 2008, ¶ 309, **CLA-142.**

[644] See, e.g., *Foresight Luxembourg Solar 1 S. Á.R1., et al. v Kingdom of Spain*, SCC Case No. 2015/150, Award, 14 November 2018, ¶ 545, **CLA-136**; *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v The Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018, ¶¶ 846-847, **CLA-141.**

[645] See, e.g., *MTD Equity Sdn Bhd and MTD Chile SA v Chile*, ICSID Case No ARB/01/7, Award, 25 May 2004, ¶ 250, **CLA-059**; *Enron Corporation and Ponderosa Assets, L.P. v Argentine Republic*, ICSID Case No ARB/01/3, Award, 22 May 2007, ¶ 452, **CLA-127**; *Greentech Energy Systems A/S, NovEnergia II Energy & Environment (SCA) SICAR and NovEnergia II Italian Portfolio SA v Italian Republic*, SCC Case No V (2015/095), Final Award, 23 December 2018, ¶ 577, **CLA-140.**

(6)    Ordering the Respondent to pay the Claimant moral damages in the amount of US$1 million or such other amount to be determined by the Tribunal;

(7)    Ordering the Respondent to pay pre-award and post-award interest at a rate of LIBOR plus 2% compounded monthly or such other rate fixed by the Tribunal;

(8)    Ordering the Respondent to indemnify the Claimant for all costs and expenses of the arbitral proceedings; and

(9)    Ordering such further and/or other relief as the Tribunal deems just and appropriate.


Respectfully submitted,


Withers LLP

Radix Legal & Consulting Limited

Christopher Harris QC, 3 Verulam Buildings

1 May 2019

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ZHONGSHAN FUCHENG INDUSTRIAL INVESTMENT CO., LTD., <br><br> Petitioner, <br><br> v. <br><br> FEDERAL REPUBLIC OF NIGERIA, <br><br> Respondent. | Civil Action No. 22-170 (BAH) |

### [*PROPOSED*] ORDER GRANTING MOTION TO DISMISS PETITION TO RECOGNIZE AND ENFORCE FOREIGN ARBITRAL AWARD

Upon consideration of the Respondent Federal Republic of Nigeria's Motion to Dismiss Petitioner Zhongshan Fucheng Industrial Investment Co., Ltd.'s Petition to Recognize and Enforce Foreign Arbitral Award, Dkt. No. 1, for lack of jurisdiction under the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, Petitioner's Opposition thereto, Respondent's Reply, and the arguments of the Parties made at the oral hearing held on _____, 2022, it is hereby

ORDERED that the Motion is GRANTED, and it is further

ORDERED that the case is dismissed.  The Clerk of Court is directed to close the case.

Dated: _____, 2022.

<br>

_____
HON. BERYL A. HOWELL
UNITED STATES DISTRICT JUDGE

cc: All counsel of record via ECF

JA-293

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

ZHONGSHAN FUCHENG INDUSTRIAL
INVESTMENT CO., LTD.,

        Petitioner,

        v.

FEDERAL REPUBLIC OF NIGERIA,

        Respondent.

---

Civil Action No. 22-170 (BAH)

Oral Argument Requested

**REPLY BRIEF IN SUPPORT OF FEDERAL REPUBLIC OF NIGERIA'S
MOTION TO DISMISS FOR LACK OF JURISDICTION
<u>UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT, 28 U.S.C. § 1605</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ................................................................................................................... 6

    I.     The New York Convention Does Not Apply Because This Treaty-Based
          Dispute Is Not Commercial. ................................................................... 6

          A.     Petitioner Conceded That Its Relationship With Nigeria Was
               Noncommercial........................................................................... 6

          B.     Petitioner and Nigeria's Relationship Arising From The
               Application Of The Nigeria-China Treaty Is Quintessentially
               Sovereign, Not Commercial........................................................ 9

          C.     Prior Precedent Does Not Address The Applicability Of The New
               York Convention To Bilateral Investment Treaty Disputes. ................... 11

    II.    As The New York Convention Does Not Apply, Nigeria Is Immune From
          Suit. ................................................................................................... 14

CONCLUSION ................................................................................................................ 15

## TABLE OF AUTHORITIES

**Cases**

*Africard Co. v. Republic of Niger*, 210 F. Supp. 3d 119 (D.D.C. 2016)........................................ 4

*BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233 (D.D.C. 2015)................................ 10

*Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144 (2d Cir. 2021) ............................ 11

\* *Belize Soc. Dev., Ltd. v. Gov't of Belize*, 794 F.3d 99 (D.C. Cir. 2015)................................ 1, 12

*Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312 (2017) . 6

*Campagnie Sahélienne d'Enterprise v. Republic of Guinea*, No. 20-1536, 2021 U.S. Dist. LEXIS

    10442 (D.D.C. June 14, 2021) ........................................................................... 4

*Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200 (D.C. Cir. 2015) ...................................... 12

*Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57 (D.D.C. 2013) .......................... 12, 14

*Citizens Bank v. Alafabo, Inc.*, 539 U.S. 52 (2003) ....................................................................... 2

*Customs & Tax Consultancy LLC v. Dem. Rep. Congo*, No. 18-1408, 2019 U.S. Dist. LEXIS

    162136 (D.D.C. Sept. 16, 2019) ............................................................................. 4

\* *Diag Human v. Czech Rep. Ministry of Health*, 824 F.3d 131 (D.C. Cir. 2016)........................ 1

*Gebre LLC v. Kyrgyz Republic*, No. 20-1795, 2022 U.S. Dist. LEXIS 106179 (D.D.C. Jun. 14,

    2022) ....................................................................................................................... 2, 10

\* *Process & Indus. Devs. v. Fed. Republic of Nigeria*, 962 F.3d 586 (D.C. Cir. 2020)................ 6

*Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384 (2d Cir. 2011)......................................... 11

\* *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)......................................................................... 14

*Schneider v. Kingdom of Thail.*, 688 F.3d 68 (2d Cir. 2012)....................................................... 12

*Schneider v. Kingdom of Thail.*, No. 10 Civ. 2729, 2011 U.S. Dist. LEXIS 158832 (S.D.N.Y.

    Mar. 14, 2011)......................................................................................................... 12

\* *Tatneft v. Ukraine*, 21 F.4th 829 (D.C. Cir. 2021)................................................................... 12

JA-296

*Tatneft v. Ukraine*, 301 F. Supp. 3d 175 (D.D.C. 2018) .............................................................. 12

*Turan Petro Inc. v. Ministry of Oil & Gas of Kaz.*, No. 21-7023, 2022 U.S. App. LEXIS 7980

    (D.C. Cir. Mar. 25, 2022)........................................................................................................... 5

\* *United States v. Morrison*, 529 U.S. 598 (2000) ................................................................ 2, 11

**Statutes**

Foreign Sovereign Immunities Act, 28 U.S.C. § 1605 ....................................................... 5, 6, 15

**Other Authorities**

Alexis Blane, *Sovereign Immunity as a Bar to the Execution of International Arbitral Awards*, 41

    N.Y.U. J. Int'l L. & Pol. 453 (2009) ........................................................................................ 9

*Deutsche Bank AG v Democratic Socialist Republic of Sri Lanka* ICSID Case No ARB/09/2,

    Award (31 October 2012) .......................................................................................................... 8

\* Draft Articles on Responsibility of States for Internationally Wrongful Acts, With

    Commentaries, U.N. Doc. A/56/10 (2001) .............................................................................. 7

**Treatises**

\* Restatement (Third) of Foreign Relations Law (1987)........................................................ 5, 13

Restatement of International Commercial Arbitration and Investor-State Arbitration (2019). 5, 13

         \* Authorities upon which Nigeria chiefly relies are marked with asterisks.

JA-297

**PRELIMINARY STATEMENT**

The Award at issue is unlike other arbitration awards routinely enforced in this Circuit.  It arose neither from a commercial agreement between Petitioner and Nigeria, nor from a contractual or other business relationship between them.[1]  No such agreement or relationship ever existed here.  Instead, the Award arose from the Nigeria-China Treaty; specifically, because of Nigeria's sovereign conduct—mainly an alleged expropriation—deemed to have violated the protections Nigeria afforded under the Treaty to Chinese nationals, like Petitioner.

Petitioner does not explain how or why the Nigeria-China Treaty, or Nigeria's conduct deemed to have violated the Treaty and that gave rise to the Award, establish a "legal relationship . . . which is considered as commercial," *Diag Human v. Czech Rep. Ministry of Health*, 824 F.3d 131, 136 (D.C. Cir. 2016), as is required for the New York Convention to apply to the Award.  Petitioner similarly fails to engage with Circuit precedent defining "commercial" in this context to mean "matters or relationships … that arise out of or in connection with commerce." *Belize Soc. Dev., Ltd. v. Gov't of Belize*, 794 F.3d 99, 105 (D.C. Cir. 2015).  The Nigeria-China Treaty does not govern how Nigeria and China conduct commerce, nor does it set forth what commercial activity is permitted in either country.  Rather, as Nigeria explained and Petitioner acknowledged in its Opposition, the Nigeria-China Treaty is "comprehensively focused on regulating state conduct in the protection of investments."  Opp'n at 14 (quoting Mot. at 9).[2]  It

---

[1] All capitalized terms not otherwise defined below have the same meaning as in Nigeria's Memorandum of Points and Authorities in Support of its Motion to Dismiss for Lack of Jurisdiction (the "Motion," Dkt. No. 24-1).

[2] Petitioner's reliance on *Gebre LLC v. Kyrgyz Republic* for the proposition that "the regulation of such state conduct" meets the "arise out of or in connection with commerce" requirement under *Diag Human* is misplaced.  Opp'n at 14.  *Gebre* does not say that.  *Gebre* found that the dispute in that case was commercial because it "arose out of a series of license agreements between the parties [Gebre and Kyrgyzstan] to transfer shares of company stock and mine rare earth elements in

seeks to prevent Nigeria and China from expropriating and otherwise abusing their police powers regarding investments made by each other's nationals.  That is decidedly <u>not</u> conduct "affecting commerce," as reasoned by the Supreme Court in the context of the Commerce Clause of the U.S. Constitution.  *United States v. Morrison*, 529 U.S. 598, 618-19 (2000) (distinguishing between "police power" and the Commerce Clause); *see also id.* at 584 (Thomas, J., concurring) ("we always have rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power").  As Nigeria explained in its Motion—without retort from Petitioner—this Circuit adopted that reasoning in deciding what conduct is "commercial" under the Federal Arbitration Act, which codifies the New York Convention.  *See* Mot. at 18 (quoting *Belize Soc. Dev.*, 794 F.3d at 104) (the Act reaches contracts "evidencing a transaction involving commerce"—"the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress's Commerce Clause Power") (quoting *Citizens Bank v. Alafabo, Inc.*, 539 U.S. 52, 56 (2003)).

Consistent with this, the Nigeria-China Treaty chiefly protects investments from a series of sovereign conduct.  It does not govern the terms of an investment, including when or how it should be made or operated, or what returns can be realized.  For all of that, Petitioner relied on a series of agreements, including a 2010 Framework Agreement and 2013 Joint Venture Agreement ("JVA") that its subsidiary Zhongfu executed with OGFTZ and Ogun State, respectively.  *See* Pet. ¶¶ 16-17.  As Petitioner concedes, it brought the arbitration to protect its rights under those agreements.  *See id.* ¶ 18 ("in breach of its obligations under the BIT, Nigeria … deprived Petitioner and Zhongfu of their rights under the 2010 Framework Agreement and/or the 2013

---

Kyrgyzstan." *Gebre LLC v. Kyrgyz Republic*, No. 20-1795, 2022 U.S. Dist. LEXIS 106179, at *9, (D.D.C. June 14, 2022).

JVA").[3]   For this reason, Petitioner's reliance on Article 1 of the Nigeria-China Treaty is misplaced.  That article merely defines an "investment" broadly to mean "every kind of asset" and lists five "not exclusive" categories of assets.  *See* Nigeria-China Treaty (Dkt. No. 2-2), art. 1.  That definition does <u>not</u> "show[] a commercial relationship between the investor and the host State in which the investment is made," as Petitioner incorrectly asserts.  Opp'n at 6.  It only explains that "every kind of asset" owned by a Chinese national within Nigeria will be protected against the sovereign conduct the Nigeria-China Treaty proscribes.  Again, the Treaty is not concerned with the terms and conditions of an investment, including its making, holding, or disposition.

The "commercial relationship" regarding Petitioner's investment was formed with OGFTZ and Ogun State, <u>not</u> Nigeria, under the 2010 Framework Agreement and 2013 JVA.  Petitioner was never in privity with Nigeria.  *See* Award (Dkt. No. 2-1), ¶¶ 33-41, 72.  Petitioner tactically chose to walk away from that commercial relationship and, having caused its subsidiary Zhongfu to file claims domestically before Nigerian courts and internationally before a Singapore International Arbitration Centre ("SIAC") commercial arbitration tribunal under those agreements, abandoned those claims to pursue its investment-treaty arbitration against Nigeria.  *Id.* ¶¶ 42-43, 45, 53, 58.  In the arbitration, Petitioner emphatically cast its investment-treaty claims as non-commercial, arguing to the investment-treaty tribunal: "This dispute relates to a shocking series of actions by which multiple emanations of the Nigerian State came together to forcibly evict the

---

[3] Precisely because of this, the Award finds that Petitioner's damages amount to the loss of Zhongfu's rights under the agreements.  *See* Award (Dkt. No. 2-1), ¶ 78 ("What would be treated as lost is Zhongfu's rights, and it is they that were valued by Mr. Matthews … it seems to us that the natural inference is that the depreciation in the value of Zhongfu as a result of the loss of its interests would have been equivalent to the value of the rights which were lost."); *see also* Opp'n at 5 ("The Tribunal [rendered the Award] based on a detailed analysis of the harm that Respondent's breaches of the Investment Treaty caused to Petitioner's investment and awarded Petitioner compensation for the loss of its rights … under the 2010 Framework Agreement and the 2013 JVA").

JA-300

Claimant from Nigeria and seized its valuable investment." Zhongshan Statement of Claim (Dkt. No. 24-4), ¶ 1. Further distinguishing its international law claims against Nigeria (at issue) from the commercial claims Zhongfu abandoned, Petitioner argued to the investment-treaty tribunal: "there is a difference between litigation concerning matters of local law, as in the proceedings before the Nigerian courts, and investment treaty disputes concerning breaches of treaty obligations and international law." Zhongshan Statement of Reply (Dkt. No. 24-3), ¶ 153. Agreeing with Petitioner, the arbitration tribunal found Petitioner brought non-commercial, investment-treaty claims governed by public international law. *See* Mot. at 11 (citing Award (Dkt. No. 2-2), ¶¶ 72-73)).

Because the only relationship between the parties is the protection from proscribed sovereign conduct afforded to Chinese nationals by Nigeria under the Nigeria-China Treaty, the Award is fundamentally distinct from circumstances in which courts have found that a direct relationship between a foreign state and an investor was commercial for purposes of the New York Convention. *See* Mot. at 13-14.[4] The fact that the relationship between Nigeria and Petitioner is noncommercial is also consistent with the Restatement (Third) of Foreign Relations Law and the Restatement of International Commercial Arbitration and Investor-State Arbitration, both of which note that certain investor-State relationships are noncommercial for purposes of the New York Convention. *See* Restatement (Third) of Foreign Relations Law § 487 (1987) cmt. f (explaining that investor-State arbitrations that are based on an international agreement are not subject to the

---

[4] *See also Diag Human*, 824 F.3d at 136; *Belize Soc. Dev. Ltd.*, 794 F.3d at 100; *Campagnie Sahélienne d'Enterprise v. Republic of Guinea*, No. 20-1536, 2021 U.S. Dist. LEXIS 10442, at *4 (D.D.C. June 14, 2021); *Customs & Tax Consultancy LLC v. Dem. Rep. Congo*, No. 18-1408, 2019 U.S. Dist. LEXIS 162136, at *10 (D.D.C. Sept. 16, 2019); *Africard Co. v. Republic of Niger*, 210 F. Supp. 3d 119, 124 (D.D.C. 2016).

New York Convention, noting: "arbitration of a controversy of a public international law character … such as a … dispute about … performance under an international agreement … is <u>not</u> subject to the New York Convention"); Restatement of International Commercial Arbitration and Investor-State Arbitration (2019) § 1-1 cmt. E, Reporters Note e (explaining the definition of commercial for purposes of the New York Convention would "ordinarily" but not necessarily "include awards arising from an investment dispute").[5]

Ultimately, Petitioner cannot have it both ways.  Having truly abandoned commercial claims to pursue international law claims against Nigeria for expropriation and other alleged abuses of police powers, Petitioner purposefully put the Award outside the scope of the New York Convention.  Because the New York Convention does not apply, the "arbitration exception" to Nigeria's jurisdictional immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(6), is not met.  That being Petitioner's sole ground for seeking to establish subject matter jurisdiction against Nigeria, all other jurisdictional arguments have been waived and the case must accordingly be dismissed.  *See Turan Petro Inc. v. Ministry of Oil & Gas of Kaz.*, No. 21-7023, 2022 U.S. App. LEXIS 7980, at *6 (D.C. Cir. Mar. 25, 2022) (holding plaintiffs "forfeited reliance on the [FSIA] waiver exception by failing to raise it" in their opening brief).

As a sovereign state, Nigeria is entitled to a threshold determination of its immunity defense precisely because of the comity considerations that undergird the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*[6]  *See Process & Indus. Devs. v. Fed. Republic of Nigeria*,

---

[5] While the Restatement (Third) of Foreign Relations Law acknowledges that certain investor-State disputes arising out of a "contract between a government and a private person" may constitute as commercial for purposes of the New York Convention, there is no such contract at issue here, as Nigeria and Petitioner were never in privity.  Restatement (Third) of Foreign Relations Law § 487 cmt. f (1987).

[6] For this reason, Nigeria has not waived any of its New York Convention, Article V defenses to enforcement of the petition should this Court determine that the New York Convention applies.

962 F.3d 586, 576 (D.C. Cir. 2020) (explaining the "'basic objective of the FSIA is to respect the independence and dignity' of foreign sovereigns .… [Courts] must resolve colorable assertions of immunity before the . . . . merits . . . .") (quoting *Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1319 (2017)).  As such, the Petition should be dismissed for lack of jurisdiction under the FSIA prior to an assessment of Nigeria's merits defenses.

## ARGUMENT

I.  <u>The New York Convention Does Not Apply Because This Treaty-Based Dispute Is Not Commercial.</u>

A.  Petitioner Conceded That Its Relationship With Nigeria Was Noncommercial.

The alleged expropriation and abuse of Nigeria's police powers discussed in the Award had consequences in the commercial sphere, with Petitioner's subsidiary Zhongfu bringing claims in Nigeria and before a SIAC international arbitration tribunal under the operative agreements (the "Commercial Claims"), and in the public international law plane, with Petitioner bringing claims under the Nigeria-China Treaty (the "Treaty Claims").  Petitioner tactically chose to proceed exclusively with the Treaty Claims and caused its subsidiary to abandon the Commercial Claims brought outside of the investment-treaty arbitration.  The Award explicitly distinguishes between these two types of claims, finding that the Commercial Claims were based "on alleged breaches of [Zhongfu's] contractual and possessory rights" whereas in the Treaty Claims "Zhongshan's case … [was] based <u>squarely</u> on the Treaty."  *See* Award (Dkt. No. 2-1), ¶ 86 (emphasis added); *see also id.* ¶ 74 (distinguishing Petitioner's Treaty Claims from the Commercial Claims).

---

*See Process & Indus. Devs. v. Fed. Republic of Nigeria*, 962 F.3d 576, 584 (D.C. Cir. 2020) (holding "the district court erred in requiring Nigeria to defend the merits before resolving its colorable immunity assertion.").  Nigeria reserves the right to raise these defenses at the appropriate juncture.

Contradicting its earlier position and the Award's findings, Petitioner now seeks to mischaracterize the Award as commercial in nature.  It is not.

Attempting to minimize the Award's distinction between the Commercial Claims and the Treaty Claims, Petitioner argues that the "discussion of applicable law does not speak to whether there was a commercial relationship between Petitioner and Respondent."  Opp'n at 5 n.3. Petitioner misses the point.  "[I]nternational law determined whether Respondent's actions were lawful or unlawful," as Petitioner argues, *see id.*, precisely because the conduct at issue was sovereign and an "internationally wrongful act" under public international law, *see* Award ¶ 72. Had Nigeria's conduct been commercial in nature, as Petitioner implies here, it would have fallen outside of the Nigeria-China Treaty—which concerns only sovereign conduct—and the arbitration tribunal's jurisdiction.[7]

In the arbitration, Petitioner did not plead breach of contract or similar commercial claims. *See* Zhongshan Statement of Claim (Dkt. No. 24-4), ¶¶ 218-75.  It argued Nigeria's exercise of "core State powers such as police powers" and other sovereign conduct, which allegedly resulted in the expropriation of Petitioner's assets in Nigeria.  *Id.* ¶ 206.  *See also id.* ¶ 1 (alleging a "shocking series of actions by which multiple emanations of the Nigerian State came together to forcibly evict the Claimant from Nigeria and seized its valuable investment"); ¶ 12 (alleging

---

[7] The Draft Articles on Responsibility of States for Internationally Wrongful Acts ("ARSIWA"), cited in the Award at ¶ 72 and relied upon by Petitioner in the arbitration, *see* Dkt. No. 24-4 ¶¶ 204, 208, reflect this distinction.  The Commentary to Article 5 of the ARSIWA explains: "If it is to be regarded as an act of the State for purposes of international responsibility, the conduct of an entity must accordingly concern governmental activity and not other private or commercial activity in which the entity may engage."  Draft Articles on Responsibility of States for Internationally Wrongful Acts, With Commentaries, art. 5 cmt. 5, U.N. Doc. A/56/10 (2001), https://legal.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf.  *See* Zhongshan Statement of Claim (Dkt. No. 24-4), ¶¶ 204, 208 (arguing that the complained of conduct was an internationally wrongful act attributable to Nigeria under Article V of the ARSIWA because it was "undertaken by the entit[ies] in the exercise of [governmental] authority").

termination of its rights "without administrative due process" and "draconian actions of the Nigerian authorities," including threats and arrests); ¶ 18 (alleging a "taking of the Claimant's investment").

Agreeing with Petitioner, the Award accepts that the conduct was sovereign and thus attributable to Nigeria, *see* Mot. at 11-12 (summarizing points), and distinguishes that conduct from Petitioner's separate Commercial Claims, citing a line of cases that makes that precise distinction when determining whether actions of an entity affiliated with a state can be attributed to the state under public international law. *See* Award (Dkt. No. 2-1), ¶¶ 72-73 (citing *Deutsche Bank AG v Democratic Socialist Republic of Sri Lanka* ICSID Case No ARB/09/2, Award, ¶ 559 (31 October 2012) (finding dispute arose under BIT because it "does not derive from the fact that CPC failed to comply with its payment obligations to Deutsche Bank under the Hedging Agreement, but from the fact that Respondent intervened as a sovereign by virtue of its State power")). Consistent with this, the Award differentiates "a 'mere' breach of contract by a local authority [that] could not of itself be attributed to the state" from an "action complained of [that] would otherwise amount to a breach of the treaty in issue, then it would be attributed to the state." *Id.* ¶ 74.

Ultimately, the Award finds the complained of conduct sovereign in nature and constituting an "actual and threatened illegitimate use of the state's power … ." *Id.* ¶ 126. As noted, that finding is dispositive of Petitioner's argument because it confirms that the Award did not arise from a commercial relationship between Petitioner and Nigeria, but from an alleged "illegitimate use of the state's power" contrary to public international law.

B. Petitioner and Nigeria's Relationship Arising From The Application Of The Nigeria-China Treaty Is Quintessentially Sovereign, Not Commercial.

The fact that Petitioner made an investment in Nigeria that was protected from adverse sovereign conduct under the Nigeria-China Treaty does not create a "plainly commercial" relationship between Petitioner and Nigeria, as Petitioner argues. Opp'n at 12. As noted, the Nigeria-China Treaty does not govern any of the terms of Petitioner's investment or what it could do with that investment. It is an instrument through which Nigeria and China undertake to promote mutual "respect" for "sovereignty and laws," to "intensify the cooperation of both States on the basis of equality and mutual benefits," and to "create favourable conditions for greater investment" in both sovereign states. Nigeria-China Treaty (Dkt. 2-2), 1. As such, the Nigeria-China Treaty is "quintessentially [] sovereign."[8]

The sovereign nature of the Nigeria-China BIT is further confirmed by the conduct it reaches. As Petitioner concedes, it is an international treaty "comprehensively focused on regulating state conduct in the protection of investments." Opp'n at 14 (quoting Mot. at 9); *see also* Nigeria-China Treaty (Dkt. No. 2-2), arts. 2-4. At base, bilateral investment treaties, such as the Nigeria-China Treaty, "are designed to protect investors against 'political risk,' generally understood as government policies that so alter the investment environment that an investment no longer retains its value." Alexis Blane, *Sovereign Immunity as a Bar to the Execution of International Arbitral Awards*, 41 N.Y.U. J. Int'l L. & Pol. 453, 477 (2009).

Petitioner asks this Court to disregard the sovereign nature of the China-Nigeria Treaty because the "subject matter" of Petitioner's investment was commercial. Opp'n at 9-10. This

---

[8] Alexis Blane, *Sovereign Immunity as a Bar to the Execution of International Arbitral Awards*, 41 N.Y.U. J. Int'l L. & Pol. 453, 487 (2009) (explaining "the act of treaty formation is itself quintessentially a sovereign act" that "bind[s] the signatory states under international law" and that "[b]ilateral investment treaties are no different").

again ignores the fundamental fact that the Nigeria-China Treaty does not regulate or provide the terms governing Petitioner's investment and that no independent legal relationship existed between Nigeria and Petitioner regarding those investments.  Rather, the "subject matter" of the arbitration was the fact that certain sovereign conduct, allegedly constituting an "internationally wrongful act," breached the sovereign protections Nigeria undertook to provide to Chinese nationals under the Nigeria-China Treaty.  Award (Dkt. No. 2-1), ¶ 72 (citing ARSIWA); *see also id.* (defining an "internationally wrongful act" as a "breach of an international law obligation"); Zhongshan Statement of Claim (Dkt. No. 24-4), ¶ 284 ("The expropriatory conduct was unlawful as Nigeria failed to comply with the requirements in Article 4 of the BIT and international law, which prohibit Nigeria from expropriating investments of Chinese investors unless the measures concerned were for the public interest under a domestic legal procedure, without discrimination and accompanied by the payment of fair compensation.").  Petitioner's reliance on cases in which courts in this Circuit have found the commercial requirement met where there is an independent direct relationship between a sovereign and an investor is accordingly misplaced.  *See, e.g.*, *BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 243 (D.D.C. 2015) (finding independent settlement agreement to resolve share purchase between sovereign and petitioner satisfied commercial requirement); *Gebre LLC,* 2022 U.S. Dist. LEXIS 106179, at *9 (finding "series of license agreements between the parties" satisfied commercial requirement).

Here, the nature of Petitioner's investment, as defined through a series of agreements to which Nigeria was <u>not</u> a party, cannot alter the nature of the Nigeria-China Treaty or the sovereign nature of the conduct it seeks to regulate.  Nor can those third-party agreements dictate whether the extrinsic legal relationship between Nigeria and Petitioner is commercial for purposes of the New York Convention.  As the Second Circuit recently explained, a "bilateral investment

agreement is an agreement between two sovereign states that in effect constitutes a unilateral standing offer to submit to arbitration with investors of the other sovereign when certain conditions are met." *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 155 (2d Cir. 2021) (citing *Republic of Ecuador v. Chevron Corp.,* 638 F.3d 384, 392 (2d Cir. 2011)).  The conditions in question here—that the conduct of organs of the Nigerian state were attributed to Nigeria so as to constitute internationally wrongful acts in violation of the Nigeria-China Treaty—rendered the legal relationship between Nigeria and Petitioner fundamentally noncommercial.

By focusing on the conditions and attributes of its investment, Petitioner studiously avoids discussion of the actual sovereign conduct that led to Nigeria's liability under the Nigeria-China BIT.  *See supra*.  Petitioner invokes the Commerce Clause as a source of the limitations on the term "commerce" for purposes of the New York Convention.  Opp'n at 8.  As noted, however, the Opposition fails to engage with U.S. courts' consistent refusal to allow the exercise of police powers, like those exercised by Nigeria, under the Commerce Clause.  *See* Mot. at 13 (citing *Morrison*, 529 U.S. at 618-19 (Thomas, J., concurring) ("[W]e have always rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power")).  Because the exercise of police powers is inconsistent with the Commerce Clause, axiomatically, no commercial relationship can form when a state exercises those police powers. Yet, that is precisely what Petitioner argues here.

C.  Prior Precedent Does Not Address The Applicability Of The New York Convention To Bilateral Investment Treaty Disputes.

Petitioner concedes there is a dearth of cases addressing whether "an investment treaty award like Petitioner's … arise[s] out of a non-commercial relationship and therefore falls outside the New York Convention."  Opp'n at 14.  In the absence of binding precedent, Petitioner seeks to rely on easily distinguishable, inapposite cases.  As a preliminary matter, many of Petitioner's

- 11 -

JA-308

cited cases arose out of a direct legal relationship the petitioner had with a foreign sovereign, and are thus inapposite for the reasons discussed, *supra*.  *See, e.g.*, *Diag Human*, 824 F.3d at 135 (discussing Framework Agreement); *Belize Soc. Dev., Ltd. v. Gov't of Belize*, 794 F.3d 99, 100 (D.C. Cir. 2015) (discussing Accommodation Agreement).

Petitioner only identifies three cases in which courts have applied the New York Convention to confirm an award obtained pursuant to a bilateral investment treaty.  *See* Opp'n at 13-14 (citing *Tatneft v. Ukraine*, 21 F.4th 829 (D.C. Cir. 2021); *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200 (D.C. Cir. 2015); *Schneider v. Kingdom of Thail.*, 688 F.3d 68 (2d Cir. 2012)).  Unlike here, in each of these three cases, there was no dispute that the New York Convention applied, and the courts accordingly did not address whether the legal relationship between the parties related to commerce.  *See Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 187 (D.D.C. 2018) (describing Ukraine's jurisdictional objections which did not extend to whether or not the dispute was commercial); *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 62 (D.D.C. 2013) (finding New York Convention applied to award without addressing commercial requirement); *Schneider v. Kingdom of Thail.*, No. 10 Civ. 2729, 2011 U.S. Dist. LEXIS 158832, at *10-11 (S.D.N.Y. Mar. 14, 2011) (listing Thailand's objections under the New York Convention, which did not extend to its applicability).[9]

---

[9] Furthermore, in each of these three instances the arbitration agreement explicitly invoked the UNCITRAL procedural arbitration rules which were issued by the same body that drafted the New York Convention and the drafters therefore could arguably have been said to have contemplated the applicability of the New York Convention.  *See Tatneft*, 21 F.4th at 833 ("The Russia—Ukraine Bilateral Investment Treaty incorporates the United Nations Commission on International Trade Law's (UNCITRAL) arbitration rules."); *Chevron Corp.*, 795 F.3d at 207 ("Under [the UNCITRAL arbitration] rules, which the BIT incorporates by reference . . ."); *Schneider*, 688 F.3d at 70 ("The Terms of Reference empowered the tribunal to 'consider . . . objections to jurisdiction' and provided that the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules were to be the applicable procedural rules.").

Nor can the Restatement on International Commercial Arbitration be read as foreclosing Nigeria's argument that this bilateral investment treaty arbitration was noncommercial. *See* Opp'n at 1, 6, 7, 14 (citing Restatement (Third) of U.S. Law of Int'l Com. & Inv. State Arb., § 1.1, cmt. e (2019)). That Restatement is clear that its definition of "commercial" is intentionally broad to bring multiple forms of arbitration within the "ambit of the … Restatement". Restatement of U.S. Law of Int'l Com. & Inv. State Arb., § 1.1, cmt. e, Reporter's Note e. Because of this, the Restatement cautions that this definition of commercial "is not intended to provide a unified definition governing every context in which the commercial character of a transaction or relationship leads to application of the principles stated." *Id.; see also id.* (suggesting the definition of commercial for purposes of the New York Convention would "ordinarily" but not necessarily "include awards arising from an investment dispute"). The Award here is precisely one of those awards that escapes the definition of commercial under this Restatement.

In its opening brief, Nigeria explained that the Restatement (Third) of Foreign Relations Law removes arbitrations based on international treaties such as the Nigeria-China Treaty from the reach of the New York Convention. *See* Mot. at 2, 8, 11 (explaining how the Restatement distinguishes between international agreements and other forms of commercial arrangements to which a sovereign might be a party). Petitioner reduces its discussion of the Restatement of Foreign Relations Law to a footnote, in which it claims this distinction "is contradicted by the Restatement … itself." Opp'n at 12 n.9 (citing Restatement (Third) of Foreign Relations Law § 487 cmt. f). When read as a whole, section 487 of the Restatement clearly distinguishes between certain direct contractual arrangements between sovereigns and investors, which are subject to the New York Convention, and international treaties, which are not. *See* Restatement (Third) of Foreign Relations Law § 487 cmt. f. Thus, the Restatement explains that "the fact that an

- 13 -

agreement to arbitrate is in [a] <u>contract</u> between a government and a private person may confirm its commercial character." *Id.* (emphasis added).  No contract existed between Petitioner and Nigeria, as noted, *supra*.  The Restatement next clarifies that "arbitration of a controversy of a public international law character such as … performance under an international agreement … is not subject to the New York Convention." *Id*.  That is precisely the case here, where Petitioner's controversy arose under the Nigeria-China Treaty.

As the underlying legal relationship between Nigeria and Petitioner is fundamentally noncommercial and a holding to the contrary is not even counseled by prior Circuit precedent, the Court should hold that the Award does not fall under the New York Convention.

II.   <u>As The New York Convention Does Not Apply, Nigeria Is Immune From Suit.</u>

Petitioner does not dispute that the Petition must be dismissed if the prerequisites for the New York Convention are not met because the arbitration exception to the FSIA requires the Award be "governed by a treaty or other international agreement."  Opp'n at 15 (quoting *Chevron Corp.*, 949 F. Supp. 2d at 62).  As Petitioner does not assert any other exception to immunity under the FSIA and the New York Convention does not apply to the underlying Award, which evinces a noncommercial legal relationship between Nigeria and Petitioner, the case should be dismissed on the basis of the FSIA.  *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) ("[A] foreign state is presumptively immune from the jurisdiction of the United States courts; unless a specified [FSIA] exception applies.").

- 14 -

JA-311

**CONCLUSION**

For the foregoing reasons, the Petition to Recognize and Enforce Arbitral Award against

Nigeria must be dismissed for lack of jurisdiction under the Foreign Sovereign Immunities Act,

28 U.S.C. § 1602 *et seq.*

Date: July 12, 2022

Respectfully submitted,

SQUIRE PATTON BOGGS (US) LLP

*/s/ Raúl  B. Mañón*

Raúl  B. Mañón (*Pro Hac Vice*)
Maria Gomez (*Pro Hac Vice*)
200 South Biscayne Boulevard, Suite 3400
Miami, FL 33131
T: (305) 577-7000
F: (305) 577-7001
Email: raúl.manon@squirepb.com
        maria.gomez@squirepb.com

-and-

Alexandra E. Chopin (D.C. Bar No. 490736)
2550 M Street, N.W.
Washington, DC 20037
T: (202) 457-5623
F: (202) 457-6315
Email: alexandra.chopin@squirepb.com

*Counsel for Respondent Federal Republic of Nigeria*

- 15 -

JA-312

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ZHONGSHAN FUCHENG INDUSTRIAL INVESTMENT CO., LTD., | |
| Petitioner, | Civil Action No. 22-170 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| FEDERAL REPULIC OF NIGERIA, | |
| Respondent. | |

## ORDER

Upon consideration of the respondent's Motion to Dismiss, ECF No. 24, the related legal memoranda in support and in opposition, the attachments thereto, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby—

**ORDERED** that the respondent's Motion to Dismiss is **DENIED**; it is further

**ORDERED** that the parties shall submit jointly, by February 18, 2023, a schedule to govern further proceeds in this matter.

**SO ORDERED.**

Date: January 26, 2023

*This is a final and appealable Order.*

_____
BERYL A. HOWELL
Chief Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

ZHONGSHAN FUCHENG INDUSTRIAL
INVESTMENT CO., LTD.,

           Petitioner,

           v.

FEDERAL REPULIC OF NIGERIA,

           Respondent.

Civil Action No. 22-170 (BAH)

Chief Judge Beryl A. Howell

---

## MEMORANDUM OPINION

Petitioner Zhongshan Fucheng Industrial Investment Co., Ltd. ("Zhongshan") instituted this suit against Respondent, the Federal Republic of Nigeria ("Nigeria"), to enforce an arbitration award that—nearly two years after issuance—Nigeria has failed to pay. Nigeria now moves to dismiss the petition for lack of subject matter jurisdiction and personal jurisdiction, pursuant to Federal Rules of Civil Procedure 12(b)(1)–(2), on the grounds of sovereign immunity not exempted under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq. See* Resp't's Mot. Dismiss for Lack of Jurisdiction Under the FSIA ("Resp't's Mot."), ECF No. 24. Petitioner counters that the requirements of the FSIA's arbitration exception are met, and jurisdiction may therefore be exercised. *See* Pet'r's Mem. Opp'n Resp't's Mot. Dismiss ("Pet'r's Opp'n"), ECF No. 26. For the reasons explained below, petitioner has the better of the arguments under the binding precedent of the D.C. Circuit, requiring denial of Nigeria's motion to dismiss.

## I.    BACKGROUND

### A.    Nigeria's Seizure of Zhongshan's Assets

The present dispute emerges from a Chinese business investment in Nigeria—once successful enough to have garnered coverage by the Economist Intelligence Unit as an example of "China's economic model in Africa"—that ended in the expropriation of the company's assets, the flight of its executives from Nigeria after one executive was arrested at gunpoint and physically beaten by the police, and, ultimately, a $55-million-plus arbitration award against Nigeria.[1]   The locus of the saga is a free-trade zone, called the Ogun Guangdong Free Trade Zone, in Nigeria's southwestern region in Ogun State, not far from Lagos.

As set forth in the arbitral tribunal's findings of facts in its Final Award, ECF No. 2-1, starting in 2007, Ogun State contracted with various Chinese companies, including petitioner, to develop the subject free-trade zone.  Specifically, Ogun State entered an agreement with Guangdong Xinguang International China-Africa Investment Ltd. ("CAI") and CCNC Group, Ltd., pursuant to which the three entities would jointly own the Ogun Guangdong Free Trade Zone Company ("OGFTZ") for a period of 99 years, and CAI would lead the development of the Zone, encompassing nearly 8 square miles of land.  *See* Decl. of Hussein Haeri Supp. Pet. Recognize & Enforce Foreign Arbitral Award ("Haeri Decl. Supp. Pet."), Ex. A, Final Arbitration Award dated March 26, 2021 ("Final Award") ¶¶ 4–5, ECF No. 2-1.  After three years of limited progress, on June 29, 2010, OGFTZ entered an agreement with petitioner's parent company, Zhuhai Zhongfu Industrial Group Co. Ltd. ("Zhuhai"), giving Zhuhai control of developing and operating a fraction of the Zone's area into Fucheng Industrial Park.  *Id.* ¶¶ 6–8.

---

[1]    The Economist Intelligence Unit's profile of the Ogun Guangdong Free Trade Zone was referenced by the arbitral tribunal in its final award decision.  *See* Decl. of Hussein Haeri Supp. Pet. Recognize & Enforce Foreign Arbitral Award ("Haeri Decl. Supp. Pet."), Ex. A, Final Arbitration Award dated March 26, 2021 ("Final Award") ¶ 127, ECF No. 2-1; Economist Intelligence Unit, Zones of Influence (last accessed January 21, 2023), https://growthcrossings.economist.com/video/zones-of-influence/.

That year, Zhuhai effectively transferred its rights to petitioner, which operated in Nigeria through its wholly-owned Nigerian subsidiary Zhongfu International Investment (NIG) FZE ("Zhongfu"). *Id.* ¶¶ 3, 9.[2]

From 2010 until the breakdown of the relationship in 2016, Zhongfu invested substantial assets into developing Fucheng Industrial Park. For example, to attract industrial lessees to the Park, Zhongfu built roads, upgraded communications, sewage, and power systems, and opened community services including a hospital, hotel, supermarket, and bank. *Id.* ¶¶ 21–22. By early 2014, the Park had attracted approximately sixteen businesses. *Id.* ¶ 23. During this period, CAI's management of the overall Zone had apparently broken down, resulting in Ogun State's termination of the company's participation in the OGFTZ in 2012 and appointment of Zhongfu to take its place as part owner of the OGFTZ in 2013. *Id.* ¶¶ 13–20.

Zhongfu's woes began in April 2016, when the Secretary of Ogun State indicated in a letter to OGFTZ—apparently on the advice of the Chinese Consulate in Lagos—that CAI had been acquired by Guangdong New South Group ("NSG"), and that this transfer may have somehow entitled NSG, rather than Zhongfu, to ownership of the Zone. *Id.* ¶¶ 33–34. Ogun State had received a *note verbale*, a diplomatic note, from the Economic and Commercial Section of the Chinese consulate in Lagos, dated March 11, 2016, which stated that the acquisition of CAI "will legally lead to the replacement of the management rights of the OGFTZ which is now in the hands of [Zhongfu] to Guangdong New South Group." *Id.* ¶ 33.[3] In May

---

[2]     The tribunal noted in its Final Award that, although Zhongfu had apparently assumed Zhuhai's interests in the Zone by 2010—as reflected in an October 10, 2010-dated deed entitling Zhuhai to delegate its rights and obligations to third parties—the assignment of interests between Zhuhai and Zhongfu was formalized in a January 15, 2013 document. Final Award ¶ 16, ECF No. 2-1.

[3]     This detail of the Chinese government's involvement in—if not outright instigation of—Ogun State's ejection of Zhongfu from the Zone did not detain the arbitral tribunal for long, and Nigeria apparently did not call, or even "suggest[]," that any agents of the Chinese government could be identified to provide evidence of the underlying reasons for replacement of petitioner with NSG as manager of the Zone. Final Award ¶¶ 93–94. The tribunal's admitted lack of clarity on this element of the underlying facts is unsettling in light of the whisper in the

2016, according to petitioner, Ogun State purported to terminate its 2013 agreement that

appointed Zhongfu as part owner of the Zone, and reneged on the 2010 agreement that had given

Zhongfu and Zhongshan management rights of the Fucheng Industrial Park.  Pet'r's Pet. to

Recognize & Enforce Foreign Arbitral Award ("Pet.") ¶¶ 18–19, ECF No. 1.  In July 2016, Ogun

State's Secretary texted Zhongshan's managing director Jianxin Han, urging him to "leave

peacefully when there is opportunity to do so," and the following month, warrants were issued

for the arrest of Han and Wenxiao Zhao, who had served as the Chief Financial Officer of the

OGFTZ.  Final Award ¶¶ 37, 39.  Zhao was arrested at gunpoint, physically beaten, and detained

for ten days by police before he and Han could flee the country—unceremoniously closing the

book on Zhongshan's management of the OGFTZ and Fucheng Industrial Park.  *Id.* ¶¶ 39–40.

### B.   Subsequent Arbitration Proceedings

Petitioner commenced an arbitration proceeding against Nigeria on August 30, 2018

pursuant to a bilateral treaty between Nigeria and China.  Pet. ¶ 22–23.[4]  The bilateral investment

treaty, called the Agreement Between the Government of the People's Republic of China and the

---

Final Award's pages that Zhongfu's administration of the Zone might have fallen short of expectations.  *See, e.g., id.*
¶ 29 (noting a May 18, 2015-dated letter from the Secretary of Ogun State complaining about Zhongfu's
performance); *id.* ¶¶ 115–120 (noting that the parent companies of CAI and Zhongfu signed an "entrustment of
equity management agreement" in March 2012, in which CAI's share of the Zone would be "entrusted" to
Zhongfu—a detail that the arbitral tribunal apparently found perplexing and about which it "had an initial degree of
concern about the accuracy" of Zhongfu's witness's testimony, but that it ultimately found irrelevant).  The factual
findings by the arbitral tribunal, however, are not reviewable by this Court, nor are they presently challenged by
Nigeria.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 110 (D.D.C. 2017)
(describing courts' deferential standard in reviewing foreign arbitral awards as "allowing vacatur of an award not if
'the panel committed an error—or even a serious error' but 'only when [an] arbitrator strays from interpretation and
application of the agreement and effectively dispense[s] his own brand of industrial justice'" (quoting *Stolt-Nielsen
S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671–72 (2010))).

[4]         Petitioner, via Zhongfu, initially sought relief through the Nigerian courts, initiating one lawsuit in the
Federal High Court in Abuja, Nigeria, against Nigeria's Export Processing Zones Authority ("NEPZA"), the
Attorney-General of Ogun State, and another company that was a partner of the OGFTZ, *see* Final Award ¶ 42, and
another lawsuit in Ogun State High Court against OGFTZ, Ogun State, and the Attorney-General of Ogun State, *id.*
The lawsuits sought reinstatement of Zhongfu's management and possession of the Zone based on the 2010 and
2013 contracts, *id.* ¶ 43, but both proceedings "were discontinued" in March and April 2018, *id.* ¶ 44.  Zhongfu also
began arbitration proceedings in the Singapore International Arbitration Center against, *inter alia*, Ogun State, but
that proceeding was enjoined by the Ogun State High Court.  *Id.* ¶ 45.

Government of the Federal Republic of Nigeria for the Reciprocal Promotion and Protection of

Investments ("China-Nigeria BIT"), represents an agreement between the countries to promote

bilateral investment by guaranteeing that the other country's investors would be treated equally

and protected from the nationalization of their investments.  *See generally* Haeri Decl. Supp.

Pet., Ex. B, China-Nigeria BIT, ECF No. 2-2.  Article 9 of the China-Nigeria BIT provides that,

when any dispute arises between one of the countries and an investor from the other country—

*e.g.*, a dispute between Nigeria and a Chinese investor—that cannot be resolved by the parties,

either party may request that an ad hoc arbitral tribunal settle the dispute with a binding decision.

*See id.* at Art. 9.

Petitioner brought five claims against Nigeria for breaches of the China-Nigeria BIT in

the arbitral action.  First, petitioner claimed that Nigeria violated its obligation of fair and

equitable treatment of Chinese investors under Art. 3(1).  Pet. ¶ 23.  Second, petitioner claimed

that Nigeria unreasonably discriminated against it, violating Art. 2(3), and third, that Nigeria

failed to provide the "continuous protection" afforded by Art. 2(2).  *Id.*  Fourth, petitioner

claimed that Nigeria violated its contract with petitioner, violating Art. 10(2).  *Id.*  Finally,

petitioner claimed that Nigeria wrongfully expropriated Zhongshan's investments without

compensation, in violation of Art. 4.  *Id.*

The London, United Kingdom-located arbitral tribunal rendered its Final Award on

March 26, 2021, finding that Nigeria had violated Zhongshan's rights under the China-Nigeria

BIT.  Specifically, the tribunal determined that Nigeria took actions that were "plainly designed

to deprive, and indeed succeeded in depriving, Zhongfu of its rights" under the 2010 and 2013

agreements.  Final Award ¶¶ 125–26.  In addition, the tribunal found that Ogun State, Nigeria's

Export Processing Zones Authority ("NEPZA"), and the police—all state actors—took

JA-318

discriminatory and coercive steps against Zhongfu that resulted in Nigeria taking possession of Zhongfu's investment in the country.  *Id.* ¶¶ 125–32.  Nigeria was ordered to pay Zhongshan approximately $55.6 million in compensation for the expropriation, $75,000 in "moral damages," $9.4 million in interest calculated between the July 22, 2016-dated expropriation and rendering of the award, approximately $3 million in legal fees and costs related to the arbitration, approximately $430,000 in other costs, and post-Award interest on the preceding sums—a total figure approaching $70 million, and growing.  Pet. ¶ 33.[5]

Nigeria has already tried and failed to shirk this arbitration award in the United Kingdom. Approximately one month after the Award's rendering, Nigeria filed an arbitration claim form in the English High Court, collaterally challenging the Award under the English Arbitration Act on the basis that the tribunal lacked jurisdiction.  Although Nigeria later discontinued this challenge, petitioner was still not paid the sums awarded by the tribunal.  *Id.* ¶¶ 35–41.  On December 8, 2021, petitioner commenced enforcement proceedings in the United Kingdom, and the English court issued an order that recognized the Award.  *Id.* ¶ 42.

### C.    Instant Litigation

On January 25, 2022, Zhongshan initiated the instant lawsuit, pursuant to the Federal Arbitration Act (the "FAA"), which provides for confirmation of arbitral awards falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517 (the "New York Convention"), *see* 9 U.S.C. § 201–207.  *See* Pet. ¶ 1.  The FAA provides that the New York Convention is enforceable in the courts of the United States, to which courts a party may apply for an order confirming an arbitral award issued under the

---

[5]    The Award enumerated certain of the damages—namely, the compensation, moral damages, and pre-Award interest on both—in U.S. dollars, and the legal fees and costs related to the arbitration in British pounds.  As a result, the Court's calculation of the total figure, which converted all sums into U.S. dollars, is a mere estimate.

Convention. *Id.* §§ 201, 207.  In response, Nigeria filed the pending motion to dismiss for lack of subject-matter and personal jurisdiction under the FSIA, contending that no exception to the FSIA applies because the award does not fall under the New York Convention, Resp't's Mot., ECF No. 24, which motion petitioner opposes, Pet'r's Opp'n, ECF No. 26.  With briefing now complete, *see* Resp't's Reply, ECF No. 27, Nigeria's motion to dismiss is now ripe for review.

## II.    LEGAL STANDARD

"Federal courts are courts of limited jurisdiction," *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)), and "have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto," *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 980 (D.C. Cir. 2017) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)).  To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), plaintiff thus "bears the burden of invoking the court's subject matter jurisdiction." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  "Where a plaintiff has asserted jurisdiction under the FSIA and the defendant foreign state has asserted 'the jurisdictional defense of immunity,' the defendant state 'bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity.'" *Belize Social Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 102 (D.C. Cir. 2015) (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).  Further, in deciding a motion to dismiss on the basis of the FSIA, courts' subject-matter and personal jurisdictional inquiries often collapse into the same question: "If none of the exceptions to sovereign immunity set forth in the Act applies, the District Court lacks both statutory subject matter jurisdiction and personal jurisdiction." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983).

JA-320

*See also Schubarth v. Federal Republic of Germany*, 891 F.3d 392, 397 n.1 (D.C. Cir. 2018)

("Under the FSIA, personal jurisdiction exists where (1) subject matter jurisdiction has been

satisfied, and (2) proper service has been effected." (citing 28 U.S.C. § 1330(b))).  Nigeria does

not contend that service was improper, so the jurisdictional challenges merge.

When a jurisdictional skirmish "present[s] a dispute over the factual basis of the court's

subject matter jurisdiction . . . the court must go beyond the pleadings and resolve" any dispute

necessary to the disposition of the motion to dismiss.  *Feldman v. F.D.I.C.*, 879 F.3d 347, 351

(D.C. Cir. 2018) (quoting *Phoenix Consulting*, 216 F.3d at 40).  In such situations, the "court

may properly consider allegations in the complaint and evidentiary material in the record,"

affording plaintiff "the benefit of all reasonable inferences."  *Id.; see also Am. Freedom Law Ctr.

v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) ("In considering a motion to dismiss for lack of

subject matter jurisdiction . . . we 'may consider materials outside the pleadings in deciding

whether to grant a motion to dismiss for lack of jurisdiction.'" (quoting *Jerome Stevens Pharm.,

Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005))).  Absent "evidentiary offering[s],"

*Feldman*, 879 F.3d at 351, however, courts must seek jurisdictional assurance by accepting as

true all material "factual allegations in the complaint and contru[ing] the complaint liberally,"

and again "granting plaintiff the benefit of all inferences that can be derived from the facts

alleged."  *Am. Nat'l Ins. Co. v. F.D.I.C.,* 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal

quotation marks omitted).

## III.   DISCUSSION

For this Court to have subject matter jurisdiction over a petition to enforce a foreign

arbitral award against a foreign sovereign, two inter-related requirements must be satisfied: (1)

"there must be a basis upon which a court in the United States may enforce a foreign arbitral

award," and (2) the foreign state "must not enjoy sovereign immunity from such an

enforcement." *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999).

Both requirements are addressed in turn.

### A.      Jurisdiction under the Federal Arbitration Act

The New York Convention is an international treaty ratified by the United States that

provides for signatory states' recognition of arbitral awards "made in the territory of a State other

than the State where the recognition and enforcement of such awards are sought." *Process &*

*Indus. Dev. Ltd. v. Fed. Republic of Nigeria ("P&ID")*, 27 F.4th 771, 774 (D.C. Cir. 2022)

(quoting New York Convention, art. I(1)).  The FAA codified the New York Convention into

law, providing that "[a]n action . . . falling under the Convention shall be deemed to arise under

the laws and treaties of the United States," and granted district courts original jurisdiction over

such actions.  9 U.S.C. § 203.

For an arbitral award to "fall[] under the Convention," two requirements—both optional

elements of the New York Convention that the United States adopted at ratification—must be

satisfied.  *See* Restatement (Third) of the Foreign Relations Law of the United States § 487 cmts.

b, f (Am. L. Inst. 1987).  First, the arbitral award must be "rendered within the jurisdiction of a

signatory country," pursuant to the reciprocity reservation of the Convention.  *Creighton*, 181

F.3d at 123.  The United Kingdom, where the at-issue arbitration award was rendered, is a

member of the New York Convention.  *See* New York Arbitration Convention, Contracting

States, http://www.newyorkconvention.org/countries (last visited Jan. 22, 2023).  Second,

pursuant to the Convention's commercial reservation, which the United States adopted as a part

of a minority of the Convention's signatories, the award must "aris[e] out of a legal relationship,

whether contractual or not, which is considered as commercial."  9 U.S.C. § 202; *Belize Social*

*Dev. Ltd.*, 794 F.3d at 103.  This commercial reservation is the basis for Nigeria's instant motion.

Nigeria argues that petitioner is "precluded from relying on the New York Convention to

recognize and enforce the Award in this Court," because the China-Nigeria BIT giving rise to

petitioner's arbitral award "does not establish a 'legal relationship . . . which is considered as

commercial.'"  Resp't's Mot. at 8, 13 (quoting *Diag Human, S.E. v. Czech Republic Ministry of*

*Health*, 824 F.3d 131, 136 (D.C. Cir. 2016)).  The FAA does not define the term "commercial,"

but the D.C. Circuit has interpreted the term expansively.  "In the context of international

arbitration, 'commercial' refers to 'matters or relationships, whether contractual or not, that arise

out of or in connection with commerce.'"  *Belize Social Dev. Ltd.*, 794 F.3d at 103–104 (quoting

Restatement (Third) of U.S. Law of Int'l Comm. Arbitration § 1–1 (2012)); *see also id*. at 104

(noting the relationship between the "term's broad compass" and "the more familiar term

'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of

Congress' Commerce Clause power" (quoting *Citizens Bank v. Alafabco, Inc*., 539 U.S. 52, 56

(2003))).

Nigeria's attempts to cast the Final Award as arising from a non-commercial relationship

lack support in D.C. Circuit precedent.  According to Nigeria, the China-Nigeria BIT is

"quintessentially sovereign" and cannot form the basis for a commercial relationship between a

private investor and either country.  *See* Resp't's Mot. at 13–15; Resp't's Reply at 13–15.  Next,

Nigeria contends that Zhongshan conceded the non-commercial character of its relationship with

Nigeria by litigating initially against Ogun State, as reflected in the arbitral record.  *See* Resp't's

Mot. at 15–18; Resp't's Reply at 10–12; *see also supra* n.4.  Finally, Nigeria challenges the Final

Award as being "unlike other arbitration awards routinely enforced in this Circuit" because this

JA-323

Award did not arise from a business relationship between Nigeria and Zhongshan, but solely

from the China-Nigeria BIT.  Resp't's Reply at 5.

Each argument is considered in turn and none is persuasive.

### 1.    *The Award's Basis in the China-Nigeria BIT Does Not Render the Parties' Legal Relationship* Per Se *Non-Commercial*

Nigeria asserts the bold argument that, as a matter of law, the China-Nigeria BIT cannot

form the basis of an arbitral award that falls within the coverage of the New York Convention's

commercial reservation.  Resp't's Mot. at 13–15.  Nigeria urges a distinction between "certain

direct contractual arrangements between sovereigns and investors, which are subject to the New

York Convention, and international treaties, which are not."  Resp't's Reply at 17.  The parties

do not dispute that the China-Nigeria BIT is a treaty and, under Nigeria's reasoning, falls in the

latter category.  *See* Resp't's Mot. at 14 (observing that "the Nigeria-China Treaty is

comprehensively focused on regulating state conduct in the protection of investments" and is not

"a commercial agreement between Petitioner and Nigeria").  Nigeria claims to derive this

hardline distinction from the Restatement (Third) of Foreign Relations Law.  Resp't's Reply at

17–18; Resp't's Mot. at 14 ("'international agreements,' like the Nigeria-China Treaty, that

involve 'two or more states' and are 'governed by international law' are 'not subject to the New

York Convention' because they are not commercial" (quoting, barely, Restatement (Third) of

Foreign Relations Law §§ 301, 487 cmt. f)).

Nigeria, however, has cherry-picked the quoted text out of context.  The relevant portion

of § 487 comment f from the Restatement reads in full as follows:

> Ordinarily, arbitration of a controversy of a public international law character, such as a
>
> boundary dispute or a dispute about interpretation of or performance under an
>
> international agreement (see § 301), is not subject to the New York Convention, and an

award resulting from such an arbitration is not subject to enforcement through civil

courts. *See* § 904 and Comment e thereto.

Restatement (Third) of Foreign Relations Law § 487 cmt. f.  Nigeria reasons that, as an

"international agreement" under Restatement (Third) of Foreign Relations Law § 301, the China-

Nigeria BIT is "'not subject to the New York Convention' because [it is] not commercial."

Resp.'s Mot. at 14 (quoting Restatement (Third) of Foreign Relations Law § 487).  Yet, this

comment does not broadly exclude *all* international agreements from the Convention's scope, as

Nigeria apparently reads the text.  Rather, the comment only excludes controversies "of a public

international law character," citing § 904 of the Restatement ("interstate arbitration"), which

concerns *only arbitrations between states*.  Of course, this arbitration took place between Nigeria

and Zhongshan, a private actor—not two states.

　　　　Moreover, the remainder of the comment makes clear the extremely narrow scope of the

commercial reservation's exclusion, which as noted does not cover *all* arbitrations arising under

international agreements.  Indeed, earlier in the same comment, the Restatement expressly

advises that "[d]isputes arising out of investment agreements are not excluded by" the

commercial reservation.  Restatement (Third) of Foreign Relations Law § 487 cmt. f.  The

Restatement goes on to explain that this reservation merely "excludes arbitration agreements and

awards *arising out of matrimonial or custody disputes, disputes concerning succession to

property, and labor disputes*, and for the United States also other disputes excluded from the

United States Arbitration Act under 9 U.S.C. § 1."  *Id.* (emphasis added).  *See also Island

Territory of Curacao v. Solitron Devices, Inc.,* 356 F. Supp. 1, 13 (S.D.N.Y. 1973) ("Research

has developed nothing to show what the purpose of the 'commercial' limitation was.  We may

logically speculate that it was to exclude matrimonial and other domestic relations awards, political awards, and the like.").[6]

Nigeria's novel argument contradicts U.S. courts' regular confirmation of arbitral awards rendered under similar treaties.  According to the logic of Nigeria's argument, any arbitral award rendered pursuant to a sovereign state's violation of a treaty created under public international law would be "*per se* noncommercial," Resp't's Mot. at 17, and fall outside of the New York Convention.  *See also* Resp't's Mot. at 15 (arguing that BITs, "as international agreement[s] governed by and applying public international law, fall[] outside the ambit of the New York Convention as a matter of U.S. foreign relations law").  The D.C. Circuit has confirmed many arbitral awards in which sovereign nations have been found to breach treaty—rather than contract—obligations.  *See, e.g., Tatneft v. Ukraine,* 21 F.4th 829 (D.C. Cir. 2021) (confirming arbitral award rendered pursuant to Ukraine-Russia BIT); *Chevron Corp. v. Ecuador*, 795 F.3d 200, 203–204 (D.C. Cir. 2015) (confirming arbitral award rendered pursuant to BIT between United States and Ecuador); *LLC Komstroy v. Republic of Moldova*, 2019 WL 3997385, *1–2 (D.D.C. Aug. 23, 2019) (confirming arbitral award pursuant to multilateral Energy Charter Treaty); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 105–108 (D.D.C. 2017) (confirming arbitral award resulting from Venezuelan expropriation of investments pursuant to BIT between Canada and Venezuela); *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 118–120 (D.D.C. 2015) (confirming arbitral award rendered pursuant to BIT between Canada and Venezuela).  This Court declines to swim

---

[6]     Nor does Nigeria's citation to the Restatement on International Commercial Arbitration support its argument, since this Restatement likewise embraces a broad definition of arbitral agreements, disputes, and awards that are "commercial" in nature.  *See* Restatement (Third) of the U.S. Law of Int'l Comm. and Inv'r-State Arbitration § 1.1, cmt. e (Am. Law Inst., Proposed Final Draft 2019) ("[A] dispute or award may be commercial even though one of the parties to it is a sovereign State and even though the dispute arises out of public regulatory acts.").

upstream against the common practice of confirming arbitral awards rendered pursuant to

violations of treaties based on respondent's cherry-picked and partial quotation from a

Restatement.

Nigeria attempts to explain away courts' application of the New York Convention in

other cases involving treaties similar to the China-Nigeria BIT by arguing that many of those

treaties explicitly reference the New York Convention, and that the parties in other cases agreed

that the Convention applied to their dispute.  *See* Resp't's Mot. at 15.  Neither of these

scattershot attempts to distinguish those cases is persuasive.  First, Nigeria does not explain why

a treaty's mere reference to the New York Convention rescues an arbitral award from the treaty's

"public international law character" that Nigeria claims would exclude such a treaty-based

arbitral award from confirmation.  Referencing the New York Convention, after all, does not

transform a treaty into a contract between a state and private actor.  This argument is particularly

perplexing given that, in one of the cases upon which Nigeria relies as support for this point, the

treaty at issue merely refers to the New York Convention to discuss the Convention's

requirement that parties agree in writing to arbitration, rather than the Convention's commercial

reservation.  *See* Resp't's Mot. at 15 (citing *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp.

2d 57, 70 (D.D.C. 2013)); *Chevron Corp. v. Republic of Ecuador*, Case No. 12-cv-1247 (JEB),

Decl. of Edward G. Kehoe, Ex. 1, U.S.-Ecuador BIT at art. VI(4)(b), ECF No. 4-1.[7]  Second,

respondent cites to *Crystallex Int'l Corp.*, 244 F. Supp. 3d at 109, seeming to argue that the New

York Convention applied in this case because the respondent did not object to the court's

jurisdiction.  Resp't's Mot. at 15.  This argument ignores that, in *Crystallex,* as here, the

---

[7]       Further, as petitioner notes, not all arbitral awards that have been confirmed in the D.C. Circuit arise from
treaties that expressly reference the New York Convention.  *See* Pet'r's Opp'n at 17 (noting that the Russia-Ukraine
BIT at issue in *Tatneft*, 21 F.4th 829, "does not mention that the New York Convention applies to enforcements of
awards arising under it").

applicability of the New York Convention folded into the question of the court's subject-matter

jurisdiction and, thus, whether Venezuela consented to jurisdiction is irrelevant since "[i]t is

axiomatic that subject matter jurisdiction may not be waived" and "a federal court must raise the

issue because it is 'forbidden—as a court of limited jurisdiction—from acting beyond [its]

authority.'"  *Diag Human S.E. v. Czech Republic, Ministry of Health*, 64 F. Supp. 3d 22, 27

(D.D.C. 2014) (quoting *NetworkIP, LLC v. F.C.C.,* 548 F.3d 116, 120 (D.C. Cir. 2008)), *rev'd on

other grounds*, 824 F.3d 131 (D.C. Cir. 2016).  Nigeria makes no convincing argument to

explain away the crush of cases that undercut its theory.

## 2. *The Arbitration Record Does Not Prove That the Dispute was Non-Commercial*

Nigeria next turns to the record of the underlying arbitration to argue that the dispute was

non-commercial, asserting a new distinction between what it calls "Treaty Claims" and

"Commercial Claims."  In support of this argument, Nigeria recounts that petitioner had initially

brought claims in the Nigerian courts and the Singapore International Arbitration Center

(SIAC)—the latter pursuant to a clause in the 2013 agreement—alleging breach of contract

claims under its series of agreements with Ogun State.  *See* Resp't's Reply at 10; *see also* Final

Award ¶¶ 43–45.  Nigeria describes petitioner's discontinuance of both proceedings as a

"tactical[]" decision to "proceed exclusively with the Treaty Claims" and "abandon the

Commercial Claims."  Resp't's Reply at 10.  As a result, as Nigeria's argument goes, the Final

Award was based on Nigeria's *sovereign,* rather than *commercial*, conduct—or, by way of

analogy to the limits of the Commerce Clause, the country's use of its police power, rather than

commerce power.  *See* Resp't's Mot. at 15–18; Resp't's Reply at 11–12.

The flaw in this argument stems from predication on a false dichotomy between

sovereign and commercial conduct in the context of the New York Convention.  A similar

argument was considered and rejected by the D.C. Circuit in *Belize Social Dev. Ltd. v. Government of Belize,* 794 F.3d 99, 104–105 (D.C. Cir. 2015).  There, Belize argued that, in granting a private telecommunications company tax and duty exemptions pursuant to an agreement, "it exercised 'powers peculiar to sovereigns' as opposed to 'powers that can also be exercised by private citizens,' and thus its actions were not commercial."  *Id.* at 105 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)).  This argument attempted to define the commercial reservation by reference to the FSIA's "commercial activity" exception, 28 U.S.C. § 1605(a)(2), under which a foreign state is only held to "engage[] in commercial activities when it acts in the manner of a private player within the market."  *Belize Social Dev. Ltd.,* 794 F.3d at 104.  The D.C. Circuit rejected this narrow view of the commercial reservation, holding that "[u]nlike with the FSIA, Congress was not codifying the restrictive theory of foreign sovereign immunity when it ratified and implemented the New York Convention."  *Id.* at 105.  Instead, because the Convention's "purpose was to 'encourage the recognition and enforcement of commercial arbitration agreements in international contracts' . . . 'commercial' in the context of international arbitration refers to matters which have a connection to commerce."  *Id.* (quoting *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 933 (D.C. Cir. 2007)).  Accordingly, as Zhongshan correctly posits, "there can be no debate that the multimillion-dollar investment that Petitioner made in Nigeria to develop, manage and operate a free trade zone near Lagos was connected with commerce."  Pet'r's Opp'n at 5–6.  *See Belize Social Dev. Ltd.,* 794 F.3d at 104 (holding that "taxes Belize levies against a company . . . have a connection with commerce . . . as do the duties Belize charges").

### 3.    *No Underlying Contract Between Nigeria and Zhongshan is Required*

Finally, Nigeria urges that the "Award at issue is unlike other arbitration awards routinely enforced in this Circuit" because "it arose neither from a commercial agreement between

Petitioner and Nigeria, nor from a contractual or other business relationship between them."

Resp't's Reply at 5.  To be sure, nearly every case enforcing an arbitration award against a

foreign sovereign in this Circuit has involved an underlying contract or business agreement

between the petitioner and foreign sovereign.  *See, e.g., P&ID,* 27 F.4th at 772 (describing

underlying twenty-year natural gas supply and processing agreement between Irish engineering

company and Nigeria); *Diag Human*, 824 F.3d at 135 (describing underlying "Framework

Agreement"  between arbitration parties Czech Republic and foreign blood plasma company by

which company supported modernization of Czech Republic's blood plasma supply and services

in exchange for share of the total volume of plasma produced); *Belize Social Dev. Ltd.*, 794 F.3d

at 100–01 (involving underlying agreement between Belize and petitioner's predecessor-in-

interest, a telecommunications company, pursuant to which company would purchase property

from Belize); *Gebre LLC v. Kyrgyz Republic*, 2022 WL 2132481, *2 (D.D.C. June 14, 2022)

(foreign company signed series of license agreements with Kyrgyz authorities to mine rare earth

elements).  In contrast, Nigeria is correct—and petitioner does not dispute, *see* Pet'r's Opp'n at

15 n.8—that the underlying agreements leading to Zhongshan's investments in the Zone and

Industrial Park "[were] formed with OGFTZ and Ogun State, <u>not</u> Nigeria."  Resp't's Reply at 7

(emphasis in original).

   This distinction drawn by Nigeria between the parties involved in the facts underlying the

arbitral award at issue (*i.e.*, involving a business arrangement between a private party and part of

a sovereign country) versus previous awards confirmed in this Circuit (*i.e.*, involving business

arrangements between a private party and a sovereign country), falls short of showing that the

instant parties' legal relationship is therefore not commercial.  As the FAA provides, a legal

relationship need not arise from contract to be commercial, *see* 9 U.S.C. § 202, with the crucial

JA-330

factor being that "the subject matter [of the arbitration] is commercial."  *Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 184 (D.D.C. 2016) (quoting *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 241 F.3d 135, 146 (2d Cir. 2001)).  Here, the subject matter of the underlying arbitration related to commerce: Zhongshan's status as a foreign investor in Nigeria, pouring millions of dollars into developing the free trade zone, "has an obvious connection to commerce."  *Diag Human*, 824 F.3d at 136 (describing "the provision of healthcare technology and medical services" as having "an obvious connection to commerce" based on health care's role in the "global economy").

Notably, Nigeria focuses principally on urging adoption of its characterization of the parties' relationship as non-commercial.  *See, e.g.,* Resp't's Mot. at 15 ("The record of the arbitration confirms the *non-commercial nature of the parties' legal relationship* that is the foundation for the Award.") (emphasis added); Resp't's Reply at 14–15 (arguing that petitioner's agreements with Ogun State cannot "dictate whether the extrinsic legal relationship between Nigeria and Petitioner is commercial for purposes of the New York Convention" and urging that "[t]he conditions in question here . . . rendered the legal relationship between Nigeria and Petitioner fundamentally noncommercial").  Only passingly, in reply, does Nigeria allude to the absence of a direct contractual or business relationship between Zhongshan and Nigeria as precluding the existence a "legal relationship" between the parties—a condition precedent to the requirement that the arbitral award "aris[e] out of a legal relationship, whether contractual or not, which is considered as commercial."  9 U.S.C. § 202; *see* Resp't's Reply at 14 (noting that "no independent legal relationship existed between Nigeria and Petitioner regarding [the latter's] investments" in service of its argument that Nigeria's conduct was "sovereign" rather than commercial).

Regardless, the parties plainly shared a "defined legal relationship, whether contractual or not," *Diag Human*, 824 F.3d at 135, based on the China-Nigeria BIT.  In *Diag Human*, the D.C. Circuit held that, even if failing to qualify as a contract, a "Framework Agreement" between a blood plasma company and the Czech Republic created a legal relationship, because the Agreement "explicitly contemplated which parties it would obligate, the extent of the obligations, the remuneration exchanged for meeting the obligations, and the legal framework to govern the arrangement."  *Diag Human*, 824 F.3d at 135.  The China-Nigeria BIT, too, creates a legal framework "entitling [Chinese investors] to the standards of treatment guaranteed by" Nigeria.  Pet'r's Opp'n at 7.  Further, the treaty constitutes "an already-binding arbitration contract" between Nigeria and China, with investors from both countries, including petitioner, acting as the equivalent of third-party beneficiaries, *BG Group, PLC v. Republic of Argentina*, 572 U.S. 25, 41 (2014), or at the very least, the treaty operates as Nigeria's "standing offer to all potential [Chinese] investors to arbitrate investment disputes," *Chevron*, 795 F.3d at 206. Nigeria cannot and does not explicitly dispute that the BIT thus creates a legal relationship—even if not a contractual one—between the parties.

### B.   Nigeria Is Not Immune Under the FSIA.

Having established that this matter falls under the New York Convention, and thereby the FAA, the next question is whether Nigeria is immune from suit under the FSIA.  The FSIA is "a comprehensive statute containing a 'set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities.'" *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004) (quoting *Verlinden*, 461 U.S. at 488). The FSIA "provides, with specified exceptions, that a 'foreign state shall be immune from the jurisdiction of the courts of the United States . . . ." *Bolivarian Republic of Venezuela v.*

JA-332

*Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 173 (2017) (quoting 28 U.S.C. § 1604).

Accordingly, "subject matter jurisdiction in any [FSIA] action depends on the existence of one of

the specified exceptions to foreign sovereign immunity." *Verlinden,* 461 U.S. at 493.

At issue here is the arbitration exception, 28 U.S.C. § 1605(a)(6), which permits U.S.

courts to confirm an arbitration award rendered outside of the United States in certain instances.[8]

The exception provides, in pertinent part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or
>
> of the States in any case . . . in which the action is brought . . . to confirm an award made
>
> pursuant to . . . an agreement to arbitrate, if . . . the agreement or award is or may be
>
> governed by a treaty or other international agreement in force . . . calling for the
>
> recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a)(6). For the Court's jurisdiction to attach pursuant to the arbitration

exception, "the existence of an arbitration agreement, an arbitration award and a treaty governing

the award are all jurisdictional facts that must be established." *LLC SPC Stileks v. Republic of*

*Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021) (citing *Chevron*, 795 F.3d at 204). As to these

three requirements, petitioner bears "a burden of production" to support a claim that the

---

[8]        Congress amended the FSIA in 1988 to include the arbitration exception, ensuring that foreign agreements
to arbitrate and arbitral awards governed by certain treaties would be enforceable in U.S. courts, even against
sovereigns. *See Process & Indus. Dev. Ltd. v. Fed. Republic of Nigeria*, 506 F. Supp. 3d 1, 10 (D.D.C. 2020), *aff'd
on other grounds,* 27 F.4th 771 (D.C. Cir. 2022). This exception facilitated the participation of U.S. courts in
upholding the international arbitration system that has flourished since the post-World War II era, designed to
facilitate cross-border investments and business dealings. The conventional wisdom undergirding the international
arbitration system is that promising foreign investors an efficient and fair alternative dispute-resolution mechanism
outside of potentially biased local courts would encourage foreign direct investment, insulated from the uncertainties
created by the host country's domestic politics and law. *See generally* Jeswald W. Salacuse & Nicholas P. Sullivan,
*Do BITS Really Work? An Evaluation of Bilateral Investment Treaties and Their Grand Bargain*, 46 Harv. Int'l L. J.
67, 68–79 (2005) (arguing that arbitration provisions in BITs are a "mechanism that gives important, practical
significance to BITs, a mechanism that truly enables these bilateral treaties to afford protection to foreign
investment," and that BITs have promoted foreign direct investment in developing countries and the United States);
Leonard V. Quigley, *Accession by the United States to the United Nations Convention on the Recognition and
Enforcement of Foreign Arbitral Awards*, 70 Yale L. J. 1049 (June 1961) (detailing the reasons for the United
States' ratification of the New York Convention).

arbitration exception applies; "the burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence." *Chevron*, 795 F.3d at 204.

Petitioner has met its burden of production as to all three requirements under the arbitration exception.  First, as to the existence of the arbitration agreement, petitioner has alleged, without dissent from Nigeria, that both parties consented to the arbitration—Nigeria via Art. 9 of the China-Nigeria BIT, which provided that either party may submit a dispute to an *ad hoc* tribunal, and Zhongshan via filing a Request for Arbitration.  Pet. ¶¶ 24–25.  *See Stati*, 199 F. Supp. 3d at 188 ("All that is required is that the petitioner make a 'prima facie showing that there was an arbitration agreement by producing the [treaty] and the notice of arbitration.'" (quoting *Chevron*, 795 F.3d at 205)).  Petitioner has also met its burden as to the second and third requirements by producing the Final Award and referring to the New York Convention. *See* Final Award, ECF No. 2-1; *see also Creighton*, 181 F.3d at 123–24 (describing the "New York Convention [as] 'exactly the sort of treaty Congress intended to include in the arbitration exception'" (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1018 (2d Cir. 1993))).  Nigeria, meanwhile, has failed to discharge its burden of persuasion to establish that this arbitral award falls outside the scope of the New York Convention, for the reasons stated *supra,* in Part III.A.  Resultantly, the Court finds that the arbitration exception to the FSIA applies, stripping Nigeria of sovereign immunity and establishing the Court's subject-matter and personal jurisdiction over the case.

## IV.    CONCLUSION

For the foregoing reasons, the Federal Republic of Nigeria's Motion to Dismiss is

**DENIED**.  An order consistent with the Memorandum Opinion will be entered

contemporaneously.

Date: January 26, 2023

_____
BERYL A. HOWELL
Chief Judge

JA-335